Patrick J. Nash, Jr. (*pro hac vice* pending)
Jeffrey D. Pawlitz (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Joshua A. Sussberg (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Attorneys for the Debtors and
Debtors in Possession*

Dion W. Hayes (VSB No. 34304)
John H. Maddock III (VSB No. 41011)
Sarah B. Boehm (VSB No. 45201)
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
Telephone:    (804) 775-1000
Facsimile:    (804) 775-1061

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AMF BOWLING WORLDWIDE, INC., *et al.*,[1] | ) | Case No. 12-36495 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF STEPHEN D. SATTERWHITE, CHIEF FINANCIAL OFFICER AND CHIEF OPERATING OFFICER OF AMF BOWLING WORLDWIDE, INC., IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, I, Stephen D. Satterwhite, hereby submit this declaration

under penalty of perjury:

---

[1]   The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  AMF Bowling Worldwide, Inc. (3272); 300, Inc. (3632); American Recreation Centers, Inc. (1151); AMF BCH LLC (9642); AMF Beverage Company of Oregon, Inc. (4960); AMF Bowling Centers Holdings Inc. (1697); AMF Bowling Centers, Inc. (1662); AMF Bowling Mexico Holding, Inc. (7931); AMF Holdings, Inc. (5037); AMF WBCH LLC (9643); AMF Worldwide Bowling Centers Holdings Inc. (1641); Boliches AMF, Inc. (9631); Bush River Corporation (7033); King Louie Lenexa, Inc. (0814); Kingpin Holdings, LLC (5411); and Kingpin Intermediate Corp. (5447).  The location of the Debtors' service address is: 7313 Bell Creek Road, Mechanicsville, Virginia 23111.

1.      I am the Chief Financial Officer and Chief Operating Officer of AMF Bowling

Worldwide, Inc. ("WINC"), a corporation headquartered in Richmond, Virginia, and AMF

Bowling Centers, Inc., also headquartered in Richmond, Virginia.  AMF Bowling Centers, Inc. is

the main operating company for each of the above-captioned debtors and debtors in possession

(collectively, "AMF" or the "Debtors").  In this capacity, I am intimately familiar with AMF's

businesses, day-to-day operations, and financial affairs.

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and filed

the motions described herein requesting certain relief (collectively, the "First Day Pleadings").

AMF is operating its business and managing its properties as a debtor in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this

declaration, AMF requested procedural consolidation and joint administration of the chapter 11

cases.

3.      I have reviewed and am familiar with the contents of each of the First Day

Pleadings, and I believe that the approval of the relief requested therein is necessary to minimize

disruption to AMF's business operations so as to permit an effective transition into chapter 11,

preserve and maximize the value of AMF's estates, and, ultimately, achieve a successful

restructuring.  I also believe that, absent immediate access to cash collateral and postpetition

financing, as well as authority to make certain essential payments and otherwise continue

conducting ordinary course business operations, as sought and described in greater detail in the

First Day Pleadings, AMF would suffer immediate and irreparable harm.

4.      Except as otherwise indicated herein, the facts set forth in this declaration are

based upon my personal knowledge of AMF's business operations, my review of relevant

documents, information provided to me or verified by AMF's executives, employees, or professional advisors, and my personal opinion based upon my experience and knowledge of information concerning AMF's operations and financial condition.  Unless otherwise indicated, the financial information contained in this declaration is presented on a consolidated basis and is unaudited and subject to change.  I am authorized to submit this declaration on behalf of the Debtors, and if called upon to testify I could and would testify competently to the facts set forth herein.

## Preliminary Statement

5.      AMF is the largest operator of bowling centers in the world.  With clusters of centers located in key metropolitan markets and unparalleled geographic diversity outside metropolitan areas, AMF currently operates 262 bowling centers across the United States and, through its non-Debtor facilities, 8 bowling centers in Mexico.  AMF operates more than three times the number of bowling centers of its closest competitor, and it employs approximately 7,000 people.

6.      Through the largest portfolio of bowling centers in the industry—both in number and size—AMF realizes economies of scale, such as purchasing power for food and beverage inventory and national sales and marketing opportunities.  Although the global recession has had a dramatic (and lasting) impact on AMF's operations, AMF is well positioned to succeed as the economy stabilizes.  In fact, AMF has seen a steadying over the last several quarters in its revenue and adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA").

7.      Unfortunately for AMF, the lasting effects of the recession and economic downturn have proven too difficult to overcome.  As consumers spent less on bowling, AMF's revenues have declined.  Yet AMF's costs to run its bowling centers remained fairly static, no matter how many customers visited its centers. Given AMF's high fixed-cost business model,

even a small decrease in revenues can have a lasting, and devastating, impact on earnings.  For example, between 2008 and 2011, a 3.9% drop in AMF's revenue resulted in a nearly 33% decline in EBITDA.

8.      Over the last 50 years, the bowling industry has seen a gradual but marked shift in the average bowling customer.   In the 1960s and 70s, bowlers valued the basic bowling experience; they kept track of bowling scores on a piece of paper and were satisfied with no-frills dining options and amenities.   Back then, the typical bowler was a blue collar factory worker who belonged to one or more bowling leagues.   Today's typical bowler comes from a broader swath of the middle-class, and is unlikely to bowl in a league.   Non-league bowlers bowl less often.   And when they do bowl, they expect nicer amenities – automatic scoring, a variety of food and beverage options, and more attractive facilities.

9.      The ongoing shift away from league play towards more recreational "open" play continues to reshape the bowling industry.   In fact, according to the United States Bowling Congress, in 1998 the nation's three largest league bowling organizations had over 4.1 million members.  Just a decade later, membership had declined by 36% to 2.6 million.

10.      Such changes in bowler preferences would normally have led AMF to make sustained, multi-year capital expenditures aimed at rehabilitating and upgrading the bowling experience to keep pace with consumer expectations.   And indeed, through 2008, AMF had constructed 9 upscale "300 Centers" to capture the higher margins associated with higher-income bowlers.

11.      However, the Great Recession of 2008 eroded AMF's EBITDA and, when combined with its leveraged capital structure, made it difficult for AMF to fund the capital expenditures necessary to maintain and enhance its 262 bowling centers.

12.     Over the last four years, AMF has undertaken a number of management-led initiatives.  Through these initiatives management has sought to right-size AMF's cost structure and increase revenues.  The initiatives were also intended to enhance liquidity through reduced corporate spending, energy efficiency projects, salary freezes, cuts to existing benefit programs, reductions in workforce, and implementation of strategic marketing initiatives.  Despite management's efforts, AMF's debt burden has simply become unmanageable. This has left AMF unable to make the capital investments in its bowling centers necessary to increase its EBITDA. In addition, upcoming maturities of AMF's debt obligations demanded that management consider strategic alternatives.

13.     To that end, AMF hired Moelis & Company LLC ("Moelis") to assist AMF in marketing and selling substantially all of AMF's assets.  In December 2011, Moelis contacted 168 parties to gauge their interest in a potential purchase.  Approximately 50 of those parties entered into confidentiality agreements and received confidential information. Two potential purchasers conducted significant due diligence, including on-site visits and meetings with management.  In the end, neither potential buyer was willing to proceed because of certain significant concerns and issues that, at the time, AMF was unable to resolve.  More specifically, the two potential purchasers that conducted significant diligence were concerned with AMF's operational flexibility given certain restrictions imposed under AMF's lease agreements with affiliates of iStar Financial, Inc. ("iStar") with respect to 186 of AMF's bowling centers.  Despite efforts made by AMF to address these concerns through negotiations and discussions with iStar during the marketing process, the parties were unable at that time to reach a consensual resolution to alleviate these operational restraints.

14.     Following the failed sale process, and in the face of upcoming debt maturities and real-time liquidity concerns, AMF embarked on a path to organize its major creditor constituencies to negotiate, and ultimately implement, global restructuring.  As a necessary first step, AMF had to negotiate an extension to its revolving credit facility (originally due to mature on June 8, 2012).  After obtaining that extension, AMF engaged in constructive and ongoing negotiations with each of its major stakeholders and their respective advisors. Informal groups of AMF's first and second lien lenders, as well as their agents, have retained legal and financial advisors to conduct due diligence and participate in restructuring negotiations.[2]  In addition, AMF, with input from its first lien lenders and in consultation with its second lien lenders, has engaged in discussions and negotiations with iStar regarding certain modifications and amendments to the iStar Agreements.

15.     From the start of these negotiations, which have continued for more than five months, AMF has consistently articulated to its major stakeholders the "goal posts" for any restructuring.  *First*, the restructuring would result in the reduction of significant indebtedness and the preservation of cash that has otherwise been dedicated to debt service over the last several years.  *Second*, amendments would be made to the iStar Agreements to provide AMF with necessary operational flexibility.  *Third*, and most importantly, the restructuring would maximize creditor recoveries in a consensual fashion, with both the first and second lien lenders having a full and fair opportunity to participate in AMF's restructuring.[3]

---

[2]    As of the date hereof, AMF has paid more than $3 million in professional fees to the first and second lien advisors.

[3]    Certain second lien lenders have indicated a desire to sponsor a restructuring through the conversion of all second lien secured claims into equity.  AMF's management team and professional advisors have spent a significant amount of time educating the second lien lenders and their advisors and providing all requested due diligence over the last 5 months.  While AMF has been provided with an initial indication of certain directional

(Continued…)

16.     As can be expected in this environment, each stakeholder's wants and desires are asymmetric and it has been a difficult balancing act to ensure that AMF's objectives were achieved.  But AMF believes it has been successful.

17.     Prior to commencing the chapter 11 cases, AMF and a majority (in principal amount) of its first lien secured lenders negotiated a restructuring term sheet (the "Restructuring Term Sheet") that laid the foundation for a restructuring support agreement (the "RSA") between the parties that is designed to maximize recoveries for all parties in interest and shorten the Debtors' stay in chapter 11 (the "Restructuring").   In addition, and contingent upon the consummation of the Restructuring, AMF and iStar (with significant lender input and involvement) have reached an agreement on an amendment to the iStar Agreements (the "Amended iStar Agreements") that avoids litigation and will afford AMF certain flexibility from an operational perspective.[4]  In connection with the negotiations between AMF and iStar, iStar also agreed to sign a joinder to the Restructuring Term Sheet (the "iStar Joinder").   The Restructuring itself is uncomplicated:

- the first lien lenders that have executed the RSA have committed to "backstop" AMF's Restructuring through a refinancing and conversion of the existing first lien claims into 100% of the equity in the reorganized Debtors absent the agreement of a third party, following a robust marketing process through Court-approved bidding procedures, to satisfy the first lien claims in full in cash and otherwise serve as a sponsor of the Debtors' chapter 11 plan. In addition, in the event that the marketing process does not yield a winning bidder, the ad hoc group of first lien lenders has committed, as part of the

---

terms that would accompany any formal second lien lender restructuring proposal, AMF looks forward to potentially receiving a committed-to restructuring proposal from the second lien lenders (consistent with the parameters and objectives articulated herein) or their participation in the sale process described below.

[4]   AMF will file a motion shortly hereafter seeking approval of the Amended iStar Agreements, which would take effect, and are contingent upon, the consummation of the Restructuring.  Because of the competitively sensitive nature of certain terms of the Amended iStar Agreements, AMF will seek authority to file under seal the motion and the Amended iStar Agreements.

RSA, to finance a $150 million exit term loan (the "Backstop Party Term Loan") upon emergence, subject to not being utilized in favor of possible third-party financing on terms no less favorable (in which case, the ad hoc first lien lender group will receive proceeds thereof as the second component of their recovery);[5]

- to provide a marker on valuation and ensure that all creditor recoveries are maximized, AMF intends to immediately commence a marketing process for the sale of substantially all of its assets through Court approved bidding procedures and an auction;

- whether consummated through the first lien debt for equity conversion or a sale to a third party, the Restructuring will (a) be effectuated pursuant to a chapter 11 plan, (b) result in the Debtors emerging from chapter 11 with no more than $150 million of funded term loan indebtedness, and (c) include modifications and amendments to the iStar Agreements that will provide AMF with operational flexibility;

- the Restructuring will be effectuated within 160 days; and

- the Debtors may terminate the RSA and consider any alternative transaction during the chapter 11 cases as the Debtors may reasonably determine in accordance with their fiduciary duties.

18.    To familiarize the Court with AMF, its businesses, and the initial relief sought by AMF to stabilize operations and facilitate the Restructuring, this declaration is organized as follows.   Section I describes AMF's current operations and its corporate history.   Section II summarizes AMF's prepetition organizational and capital structure.   Section III details the circumstances surrounding the commencement of the chapter 11 cases.   Section IV discusses the key provisions in the RSA and the key milestones associated with the Debtors' Restructuring. Finally, Section V summarizes the relief requested in, and the facts supporting, each of the First Day Pleadings.

---

[5]    The ad hoc first lien lender group's obligation to fund the Backstop Party Term Loan is conditioned under the RSA upon Court approval of the Backstop Party Term Loan commitment letter within the first thirty days of the chapter 11 cases.

# I.

## Background

**A.    AMF's Operations.**

19.    AMF offers its customers a multi-faceted experience through a combination of bowling, food and beverage offerings, and amusement games.   AMF employs approximately 7,000 employees throughout its 262 bowling centers in the United States and eight bowling centers in Mexico.   Nine of AMF's bowling centers offer an "upscale" bowling experience (the "300 Centers"), complementing the traditional experience with high-end bars and lounges designed with a modern decor.   The 300 Centers are among the highest performing assets in AMF's center portfolio and draw significant business through group events.   In addition, AMF owns and operates pro shops in five of its bowling centers. The shops sell bowling merchandise such as balls, shoes, shirts, and various other bowling accessories.   The pro shops in the remaining AMF centers are leased to various third-party operators.

20.    AMF has a high fixed-cost business model.   In fact, approximately 74% of AMF's expenses are fixed: the largest expense categories being rent, utilities, supplies, payroll, and insurance.

21.    AMF owns 27 of its bowling centers (approximately 9%), and operates the remaining bowling centers (approximately 91%) pursuant to agreements with third parties.   One hundred and eighty-six of AMF's bowling centers are leased by AMF under the iStar Agreements (as discussed below in more detail).   The remaining 78 bowling centers are leased under separate lease agreements with a number of distinct counterparties.   The map below highlights the locations of all of AMF's bowling centers:



*262 bowling centers in the U.S.*



*8 bowling centers in Mexico (3 cities)*

22.     For the twelve months ended September 30, 2012, AMF reported approximately $387.0 million in total revenues.  Of this amount, bowling fees generated approximately $239.3 million, food and beverage sales approximately $132.7 million, and ancillary services/fees approximately $15.0 million.  AMF reported aggregate adjusted EBITDA of $52.7 million over this same period.

**B.      AMF's Historical Background.**

23.     AMF operates over three times more bowling centers than its nearest competitor. Each year, more than twenty million customers bowl with AMF.

24.     Before 2005, AMF consisted of two business segments. The first operated bowling centers both in the United States and internationally (the "<u>Bowling Centers Division</u>"). The second manufactured and sold bowling equipment, such as automatic pinspotters, automatic scoring equipment, bowling pins, lanes, ball returns, lane machines, and bowling center supplies (collectively, the "<u>Bowling Products Division</u>").  As set forth in further detail, the Bowling Products Division was contributed into a joint venture by and among AMF Holdings, Inc. and Qubica Lux, S.à.r.l. ("<u>QubicaAMF Worldwide, S.à.r.l.</u>" or the "<u>Joint Venture</u>") in 2005.  AMF continues to hold a 50% investment in the Joint Venture, which operates separately from AMF's operations.

10

25.    In 1998, AMF's revenue and cash flow from operations declined.  One reason was that customer demand for bowling equipment had fallen.  In addition, AMF had overextended itself by acquiring 260 additional bowling centers that it struggled to manage.  As a result, in July 2001, AMF commenced a chapter 11 case in this Court to effectuate a comprehensive balance-sheet restructuring.  AMF's secured lenders received a substantial majority of the reorganized equity in satisfaction of their claims.

26.    Following AMF's emergence from chapter 11 in March 2002, it began to explore a potential marketing and sale process.  AMF approached a number of strategic purchasers, including Code Hennessy & Simmons LLC ("CHS").  CHS recognized the potential strategic value that could be generated through a revised AMF business model.  More specifically, CHS believed that AMF's focus on non-core, foreign operations was having an adverse impact on its core US bowling center operations.

27.    CHS entered into discussions with AMF starting in 2003, and on February 27, 2004, CHS acquired majority ownership (the "CHS Acquisition").  To finance the CHS Acquisition, CHS invested $135 million in equity, together with financing that included:  (a) a $175 million senior secured credit facility; (b) the issuance of $150 million in senior subordinated notes; and (c) a $254 million transaction with iStar (as explained below).

28.    Shortly after the CHS Acquisition, AMF implemented a "simplify and transform" strategy.  AMF simplified by shedding non-core, foreign assets and focusing on its domestic bowling center operations.  It transformed by overhauling its operational management system to improve center oversight, and by implementing "best practices" of multi-unit retail operators across all of its bowling centers.  It also hired a new CEO and made a number of changes to the management team at the center and district-level.

29.    The strategy was a success.  AMF improved its profitability and repositioned itself to capture the growth in open play bowling.  In fact, from March 2005 through May 2008, AMF experienced positive same-store sales growth in 36 out of 39 months.  During that time the total number of games played at its bowling centers increased; average revenue per game also increased by over 15%.  Food and beverage revenue per game also improved significantly.

30.    In June 2007, AMF entered into the current prepetition debt facilities.  AMF used the proceeds of those facilities (and certain existing cash on hand) to refinance or satisfy existing debt, to cover transaction expenses, and to pay a $142.5 million dividend to the existing equity holders of Kingpin Holdings, LLC ("Holdings").

31.    After the refinancing, AMF continued its strong performance.  For the year ended June 30, 2008, AMF generated total revenue of approximately $466 million and adjusted EBITDA of approximately $70 million.

## II.

## Corporate and Capital Structure

**A.    AMF's Prepetition Corporate Structure.**

32.    WINC is the direct subsidiary of Kingpin Intermediate Corp. ("Kingpin"), which in turn is the direct subsidiary of Holdings.  Holdings is the indirect parent of each of the remaining Debtors.  A chart of AMF's corporate structure is as follows:



## B.    AMF's Prepetition Capital Structure.[6]

33.    As of the Petition Date, AMF has outstanding funded indebtedness totaling approximately $296.0 million, which includes:  (a) approximately $215.5 million outstanding (in principal amount) under AMF's first lien secured credit facility; and (b) approximately $80.0 million (in principal amount) outstanding under AMF's second lien secured credit facility.

---

[6]    The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

i.      **First Lien Credit Facility.**

34.     WINC, as borrower (the "Borrower"), Credit Suisse AG, Cayman Islands Branch, as administrative agent (the "First Lien Agent"), and certain lenders (the "First Lien Lenders") are parties to the First Lien Credit Agreement, dated as of June 12, 2007 (as amended, supplemented, modified, or amended and restated from time to time, the "First Lien Credit Agreement").  Each of the other Debtor entities (with the exception of Holdings) guarantees the obligations under the First Lien Credit Agreement (collectively, the "Guarantors," and together with the Borrower, the "Obligors").  The First Lien Credit Agreement provides for $285 million in total availability comprised of:  (a) a revolving credit facility (with up to $19.5 million in maximum availability) (the "First Lien Revolver"); and (b) a $245 million "Term B" Loan (with approximately $215.5 million in principal amount outstanding as of the Petition Date) (both tranches referred to together as, the "First Lien Credit Facility").  AMF has no availability under the First Lien Revolver due to the issuance of approximately $19.5 million in letters of credit.

35.     The First Lien Credit Facility obligations are secured by:  (a) first priority liens on substantially all of the Obligors' receivables, inventory, general intangibles, intellectual property, documents and supporting obligations, equipment, investment property, deposit accounts, as-extracted collateral, collateral accounts, books and records, and proceeds thereof (collectively, the "Liened Assets"), as set forth in the security agreement dated June 12, 2007, by and among the Obligors and the First Lien Agent; and (b) first priority pledges on all of the Obligors' stock (exclusive of AMF's interest in the Joint Venture), instruments, LLC interests, partnership interests, investment property, financial assets, general intangibles, and all proceeds thereof (collectively, the "Pledged Assets"), as set forth in the pledge agreement dated June 12, 2007, by and among the Obligors and the First Lien Agent.

### ii.    Second Lien Credit Facility.

36.    WINC, as borrower, Gleacher Products Corp.,[7] as administrative agent (the "Second Lien Agent"), and certain lenders (the "Second Lien Lenders," and together with the First Lien Lenders, the "Prepetition Lenders") are parties to the Second Lien Credit Agreement, dated as of June 12, 2007 (as amended, supplemented, modified, or amended and restated from time to time, the "Second Lien Credit Agreement).  Each of the Guarantors also guarantees obligations under the Second Lien Credit Agreement.  The Second Lien Credit Agreement provides AMF with an $80 million term loan (with approximately $80 million outstanding as of the Petition Date) (the "Second Lien Credit Facility," and collectively with the First Lien Credit Facility, the "Prepetition Credit Facilities").

37.    The Second Lien Credit Facility obligations are secured by:  (a) second priority liens on substantially all of the Obligors' Liened Assets, as set forth in the security agreement dated June 12, 2007, by and among the Obligors and the Second Lien Agent; and (b) second priority pledges on all of the Obligors' Pledged Assets, as set forth in the pledge agreement dated June 12, 2007, by and among the Obligors and the Second Lien Agent.

### iii.    Intercreditor Agreement.

38.    On June 12, 2007, the First Lien Agent, in its capacity as the collateral agent for the First Lien Credit Facility, and the Second Lien Agent, in its capacity as the collateral agent for the Second Lien Credit Facility, entered into an agreement that, among other things, assigns relative priorities of the Prepetition Lenders with respect to claims arising under the Prepetition

---

[7]    Gleacher Products Corp. is the successor Second Lien Agent pursuant to that certain Successor Agent Agreement, dated as of October 29, 2012, by and between Gleacher Products Corp. and Credit Suisse AG, Cayman Islands Branch.  Prior to November 2012, the First Lien Agent, Credit Suisse AG, Cayman Islands Branch, was also the Second Lien Agent.

Credit Facilities (the "Intercreditor Agreement").  The Intercreditor Agreement, which explains the relative priorities of first and second lien claims, imposes certain limitations on actions that can be taken following the occurrence of an event of default under the Prepetition Credit Facilities.

### iv.      iStar Agreements.

39.      AMF Bowling Centers, Inc. ("Centers"), is party to (i) that certain agreement, dated as of February 27, 2004 (as amended from time to time, the "iStar I Agreement"), by and between Centers and iStar Bowling Centers I LP, an affiliate of iStar, and (ii) that certain agreement, dated as of February 27, 2004 (as amended from time to time, the "iStar II Agreement," and together with the iStar I Agreement, the "iStar Agreements") by and between Centers and iStar Bowling Centers II LP, an affiliate of iStar.

40.      As part of the CHS Acquisition, the iStar Agreements were structured as sale-leaseback transactions, pursuant to which AMF sold 186 bowling center properties to iStar, and iStar in turn leased those properties back to AMF under two separate leases (each holding 93 bowling centers).  AMF's obligations under the leases are secured by its interest in the properties themselves.  The iStar sale lease-back produced $254 million in proceeds which were used to help finance the CHS Acquisition.

### v.      QAMF Joint Venture.

41.      In 2005, as part of AMF's "simplify and transform" strategy, WINC contributed the stock of QubicaAMF Worldwide, LLC ("QAMF LLC") to QubicaAMF Worldwide, S.à.r.l. (the "Joint Venture") in exchange for a 50% equity interest in the Joint Venture.  Since 1986, QAMF LLC and its predecessor entities had conducted the "AMF" bowling products business.  Also in 2005, Qubica Lux, S.à.r.l. ("QLUX"), a Luxembourg holding company, became the holder of the other 50% equity interest in the Joint Venture by contributing the stock of Italian-

based Qubica, S.p.A. (now QubicaAMF S.p.A.) ("QAMF SPA") in exchange for such equity.

QAMF SPA makes automatic scoring equipment for bowling centers.

42.     In March 2012, the equityholders of the Joint Venture entered into a non-binding

offer with Bowltech International Holding B.V. ("Bowltech") for the possible acquisition of the

Joint Venture.  The Bowltech transaction could result in value to AMF and its stakeholders.

### III.

### Events Leading to the Chapter 11 Cases

**A.     The Global Recession Adversely Affects AMF's Performance.**

43.     AMF's decline in performance is linked to the global recession beginning in

2008.  Unemployment, reduced customer demand, substantial declines in real estate values, and

a significant decrease in leisure and entertainment spending meant that people were bowling less

often.  This had a direct and significant impact on AMF's bottom line.

44.     As stated above, AMF operates under a high fixed-cost business model; that is, its

costs are relatively consistent no matter how many customers visit its bowling centers.  While

this high operating leverage benefits AMF in times of growth (*e.g.*, $1 of incremental revenue

per game results in approximately $50 million of additional EBITDA), modest decreases in

revenue result in disproportionate declines in EBITDA.  In fact, AMF's 3.9% revenue decline

from 2008 to 2011 corresponded to a nearly 33% decrease to its EBITDA during the same

period.  The negative impact to AMF's EBITDA had a direct impact on its ability to invest in

long-term capital projects and maintenance. For instance, AMF is budgeting $20 million less in

projected capital expenditures for the current fiscal year than it did for fiscal year 2008.

**B.**      **AMF Implements, and Continues to Explore, Numerous Restructuring Initiatives Aimed at Maximizing Portfolio Performance and Minimizing Costs.**

45.      As a result of the global recession, AMF implemented several cost-cutting initiatives followed by a number of strategic revenue boosting campaigns to better position itself and take advantage of future anticipated market growth.  For example, AMF implemented multiple reductions in its workforce, cut corporate spending, froze employee raises, discontinued employer contributions to AMF's 401K plan, and reduced general and administrative costs. These initiatives have already generated total cost savings of approximately $10 million since 2008.  AMF also recently completed a center-by-center evaluation to identify bowling center operations negatively impacting AMF's overall performance.  As a result of that process, AMF identified 29 underperforming bowling centers in the months leading up to chapter 11 cases. AMF believes that it can create substantial value for its estates by exiting those leases.

46.      In response to the recession, AMF stopped developing its 300 Center locations through the conversion of traditional bowling centers into upscale non-traditional centers.  It also instituted selective price adjustments and improved food and beverage offerings, as well as new promotional items targeted at group events, birthday parties, and league retention, all of which AMF believes will contribute to same-store-sales growth across its bowling center portfolio when the U.S. economy recovers.  Moreover, AMF's management is ready to begin exploring potential strategic acquisitions, such as upscale bowling chains, family entertainment center conversions, additional center openings in Mexico, and expanding amusement areas in its bowing center portfolio.  Lastly, AMF instituted cutting-edge marketing campaigns, including web, e-mail, and mobile-based marketing programs to boost revenue.

18

C.    **AMF Explores Strategic Alternatives.**

47.    The restructuring initiatives had a discernibly positive impact on AMF's operations; however, the initiatives could not right-size AMF's balance sheet, which remained overleveraged relative to its post-recession financial projections.  This required AMF to shift its focus to potential strategic alternatives.

48.    AMF engaged Moelis to conduct a formal marketing process and potential sale of its assets. Moelis formally kicked off the marketing process in December 2011.  In total, 168 potential purchasers (including financial and strategic buyers) were contacted. Approximately 50 of those parties received a confidential information memorandum (CIM) and six parties submitted non-binding, initial indications of interest, with proposals ranging from $225 million to $350 million.  Two bidders progressed further into the diligence and sale process, but ultimately determined not to move forward.

49.    Following the failed sale process, AMF and its advisors began to analyze other strategic alternatives, including a standalone restructuring.  To that end, AMF engaged in discussions with its major creditor constituencies to explore the terms of a global restructuring. Informal groups of first and second lien lenders formed, and AMF worked to ensure that they had access to information and management and advisors.  In addition, AMF and certain of the first lien lenders once again approached iStar to negotiate a potential amendment ahead of a potential chapter 11 filing.

50.    As negotiations progressed into September 2012, AMF began to experience severe liquidity constraints.  It was unable to make interest payments to the first and second lien lenders, or rent payments to iStar.  To secure additional time to negotiate the terms of a potential

pre-arranged restructuring, AMF entered into a series of forbearance agreements with the first

lien lenders and iStar.[8]

51.     Negotiations between the parties during the forbearance period have been very

productive.  Indeed, as set forth in more detail below, AMF has reached an agreement with a

majority of the first lien lenders.  In short, the first lien lenders have committed to AMF's

Restructuring, subject to a marketing process.  AMF has also reached an agreement with iStar on

the material terms of the Amended iStar Agreements.   These agreements, for which the

documentation is substantially finalized, will greatly improve AMF's operations and capital

structure, among other benefits.  In turn, AMF will be in a better position to effectively market

its assets during the chapter 11 cases, which will ensure that value is maximized for the benefit

of all stakeholders.[9]

## IV.

## The RSA and Restructuring Transactions[10]

52.     AMF and the ad hoc group of first lien lenders entered into the RSA, and iStar

executed the iStar Joinder, just prior to commencing the chapter 11 cases.  As noted above, under

the RSA, the Debtors will proceed on a simultaneous "dual track" basis.  The first track provides

for AMF to continue to test the marketplace in an effort to maximize stakeholder recoveries.

The second track provides for a "backstop" agreement from a majority of first lien lenders.

---

[8]     Pursuant to the Intercreditor Agreement, the second lien lenders were effectively in a standstill on account of the first lien lender forbearance agreements negotiated by the Debtors.

[9]     The ad hoc second lien lender group recently provided a high-level restructuring term sheet to the Debtors; however, the term sheet was merely directional in nature and not committed.

[10]    The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the RSA.  In the event of any inconsistency between this summary and the RSA, the RSA will control in all respects.

Under the backstop agreement, first lien debt would be converted to equity and the lenders would commit to provide necessary exit financing, all through a chapter 11 plan (the "First Lien Proposal").

53.    The First Lien Proposal provides, among other things, that:

- holders of first lien claims will receive either:  (a) in the event that the marketing process does not yield a winning bidder (the "Plan Transaction"), their pro rata share of (i) 100% of the reorganized equity in the Debtors (subject to dilution from a MEIP and second lien warrants) and (ii) proceeds from a $150 million exit term loan (either pursuant to the Backstop Party Term Loan, the terms of which are set forth in Exhibit 1 to the Restructuring Term Sheet,[11] or pursuant to third-party financing on terms at least as favorable thereto), or (b) upon the sale of AMF to a third party (a "Sale Transaction"), payment in full in cash;

- holders of second lien claims will receive either:  (a) in a Plan Transaction, their pro rata share of 10% warrants; or (b) in a Sale Transaction, recoveries on account of their claims in accordance with the Bankruptcy Code and relative priorities thereunder;

- holders of general unsecured claims will receive either: (a) in a Plan Transaction, their pro rata share of a funded recovery amount of [_]; or (b) in a Sale Transaction, recoveries on account of their claims in accordance with the Bankruptcy Code and relative priorities thereunder; and

- any Sale Transaction must not provide for more than $150 million under an exit term loan and no more than $40 million under an exit revolving loan; provided, however, that the First Lien Proposal specifically provides that the Debtors may consider any alternative transaction during the chapter 11 cases in the exercise of their fiduciary duties (and such alternative transaction would not be bound by the requirements of the RSA, including the maximum debt levels).

54.    The RSA also incorporates certain terms and conditions related to the Amended iStar Agreements and their effectiveness.    Importantly, the Debtors wanted to secure an agreement with respect to the Amended iStar Agreements and ensure that such amendment was

---

[11]    As previously noted, the RSA requires that the Debtors obtain approval of the Backstop Party Exit Term Loan commitment letter within the first thirty days of the chapter 11 cases.

effectively "portable" to any restructuring alternative compliant with the RSA.  Thus, the RSA contemplates that the Debtors will seek emergency relief (on or before November 21, 2012) to assume, or assume and assign, the Amended iStar Agreements effective only upon consummation of a plan of reorganization that satisfies the terms and conditions of the RSA.  In connection with this agreement, which will enable the Debtors to market their business with the operational flexibility inherent in the Amended iStar Agreement, the Debtors will seek authority to immediately pay past due prepetition rent owed to iStar (those rent payments were the source of a series of recent forbearance agreements).

55.    The RSA should be an effective tool to ensure that the chapter 11 cases are conducted in a smooth and efficient manner, and that AMF will be able to emerge from chapter 11 in accordance with the process outlined in the RSA.  In short, the RSA, together with the relief sought in the First Day Pleadings (as discussed below), should minimize the adverse effects of the commencement of the chapter 11 cases on AMF's assets and its ongoing business operations.

## V.

## **Evidentiary Support for the First Day Motions**

56.    The Debtors have filed a number of First Day Pleadings seeking targeted relief intended to allow the Debtors to minimize the adverse effects of the commencement of the chapter 11 cases on their ongoing business operations.  The First Day Pleadings seek authority to, among other things, access cash collateral, maintain employee morale and retention during this critical juncture, and ensure the continuation of AMF's cash management systems and other business operations without interruption.  Court approval of the relief requested in the First Day Pleadings is essential to providing the Debtors with an opportunity to successfully meet their creditor obligations in a manner that benefits all of the Debtors' constituents.

57.     I have reviewed each of the First Day Pleadings.  The facts stated therein, the description of the relief requested, and the facts supporting each pleading are attached hereto as **Exhibit A** and are true and correct to the best of my information and belief.  I believe that the relief sought in each of the First Day Pleadings is necessary: it will allow the Debtors' to maintain baseline operations following the commencement of the chapter 11 cases; it will enable the Debtors to operate in chapter 11 with minimal disruption to their business operations; and it will minimize any loss of value to the Debtors' business.  I believe that if the Court grants the relief requested in the First Day Pleadings, the prospect of achieving these objectives—to the maximum benefit of the Debtors estates, creditors, and other parties in interest—will be substantially enhanced.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated:  November 12, 2012

By:       */s/ Stephen D. Satterwhite*        
                   Stephen D. Satterwhite
                   Chief Financial Officer and
                   Chief Operating Officer
                   AMF Bowling Worldwide, Inc.

## **Exhibit A**

**Evidentiary Support**

## EVIDENTIARY SUPPORT[1]

A.     **Debtors' Motion for Entry of an Order Setting an Expedited Hearing on "First Day Motions" and Related Relief (the "Expedited Hearing Motion").**

1.     The Debtors request that the Court set an expedited First Day Hearing for November 13, 2012, at 3:00 p.m. (prevailing Eastern Time), or as soon thereafter as counsel may be heard, to consider the First Day Motions described below.  In addition, the Debtors request that the Court deem the Debtors' Notice of First Day Hearing to be adequate and appropriate notice under the circumstances.

2.     I believe that the relief requested in the Expedited Hearing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Prompt entry of the relief requested in the First Day Motions is critical to maintaining the Debtors' ongoing operations and preserving the value of their estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited Hearing Motion should be approved.

B.     **Debtors' Motion for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases (the "Joint Administration Motion").**

3.     The Debtors request entry of an order directing joint administration of the chapter 11 cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the case of AMF Bowling Worldwide, Inc. The Debtors also request that an entry be made on the docket of each of the Debtors' chapter 11 cases, other than AMF Bowling Worldwide, Inc., to reflect the joint administration of the chapter 11 cases.

---

[1]     Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the applicable First Day Pleading.

4.    Given the integrated nature of the Debtors' operations, I believe that joint administration will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will arise in the chapter 11 cases will jointly affect WINC and each of its affiliates that also have filed chapter 11 cases.  Joint administration will also reduce fees and costs by avoiding duplicative filings and objections, and will allow the U.S. Trustee and all parties in interest to easily monitor thee chapter 11 cases.

5.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**C.    Debtors' Motion for Authority to (I) Prepare a List of Creditors In Lieu of Submitting a Formatted Mailing Matrix and (II) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors (the "Creditor Matrix Motion")**

6.    The Debtors seek entry of an order authorizing the Debtors to (a) prepare a list of creditors in lieu of submitting a formatted mailing matrix and (b) file a consolidated list of the Debtors' 30 largest unsecured creditors.

7.    There are thousands of creditors and parties in interest in the Debtors' bankruptcy cases.  The Debtors maintain lists of the names and addresses of all those entities on various computer software programs.  The programs allow the Debtors, and/or a third-party service provider on the Debtors' behalf, to print mailing labels for each entity.  I believe that compiling the information in the format required by the Local Bankruptcy Rules would create an unnecessary administrative burden for the Debtors' estates.  I also believe that it would increase

the risk of transcription errors, particularly in light of the large number of creditors and parties in interest.

8.      In addition, the exercise of compiling separate top 20 creditor lists for each individual Debtor would consume an excessive amount of the Debtors' time and resources. Moreover, because the Debtors will request that the U.S. Trustee appoint a single official committee of unsecured creditors, a consolidated list of the largest creditors is a more appropriate list of the Debtors' most significant unsecured creditors.  For these reasons, I believe that relief to file a single consolidated list of the 30 largest unsecured creditors in the chapter 11 cases is appropriate.

9.      I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be approved.

**D.    Debtors' Motion for Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "<u>Case Management Motion</u>")**

10.     The Debtors request the authority to establish certain Case Management Procedures, which include the following:  (a) directing that matters requiring notice under the Bankruptcy Rules will be served only to individuals and entities identified on a shortened mailing list, and those creditors who, in accordance with the Local Bankruptcy Rules, file with the Court a request that they receive such notice pursuant to the Bankruptcy Rules; (b) allowing electronic service of all documents (except complaints and summonses) for the 2002 List; and (c) directing that all matters be heard at periodic omnibus hearings to be scheduled in advance by the Court.  In addition, the Debtors request that the Bankruptcy Code, the Bankruptcy Rules, and

the Local Bankruptcy Rules apply to the Debtors' chapter 11 cases to the extent that they do not conflict with the Case Management Procedures.

11.     In support of the Case Management Motion, it is important to note that the Debtors have thousands of potential creditors who, along with other parties in interest in the chapter 11 cases, may file requests for service of filings.  The Debtors also expect that numerous motions and applications will be filed in the chapter 11 cases in pursuit of various forms of relief. I believe that the notice, case management, and administrative procedures set forth in the Case Management Procedures will allow for all parties in interest to be better able to plan for and schedule attendance at hearings, which, in turn, will reduce the need for emergency hearings and requests for expedited relief, and will foster consensual resolution of important matters. Moreover, by directing that certain notices be mailed only to recipients named on a shortened mailing list and those creditors who file a request with the Court to receive such notices, I believe that all parties in interest will be assured of receiving appropriate notice of matters affecting their interests and ample opportunity to prepare for and respond to such matters.

12.     In addition, the Debtors' proposed notice, claims, and balloting agent, Kurtzman Carson Consultants, LLC, intends to establish the Case Website, where, among other things, electronic copies of all pleadings filed in the Debtors' chapter 11 cases, including the Case Management Procedures, shall be posted within three business days of filing and may be viewed free of charge.

13.     I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  I further believe that the relief requested will substantially reduce administrative burdens and result in substantial cost savings to the Debtors' estates, without adversely affecting any party in interest.

Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion

should be approved.

**E.    Debtors' Motion for Entry of an Order Authorizing the Debtors to Continue (I) Using Their Existing Cash Management System, Bank Accounts, and Business Forms and (II) Performing Ordinary Course Intercompany Transactions (the "<u>Cash Management Motion</u>")**

14.    The Debtors request the authority, but not the direction, to:  (a) continue to use,

with the same account numbers, all of the Bank Accounts in their Cash Management System;

(b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession;

(c) open new debtor-in-possession accounts, if needed; (d) use, in their present form, all

correspondence and business forms (including letterhead, purchase orders, and invoices) and

other documents related to the Bank Accounts existing immediately before the Petition Date,

without reference to the Debtors' status as a "debtors in possession"; and (e) grant administrative

priority status for intercompany claims and continue performing Intercompany Transactions in

the ordinary course of business.

15.    In addition, the Debtors request that the Court authorize and direct the Banks to:

(a) continue to maintain, service, and administer the Bank Accounts and (b) debit the Bank

Accounts in the ordinary course of business on account of (i) checks drawn on the Bank

Accounts that are presented for payment at the Banks or exchanged for cashier's checks before

the Petition Date, (ii) checks or other items deposited in the Bank Accounts before the Petition

Date that have been dishonored or returned unpaid for any reason (including associated fees and

costs), to the same extent the Debtors were responsible for such items before the Petition Date,

and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on

account of the maintenance of the Debtors' Cash Management System, if any.

16.     In the ordinary course of business, the Debtors use an integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations, and maintain current and accurate accounting records of all daily cash transactions.  I believe that if the Debtors were required to comply with the U.S. Trustee Chapter 11 Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would disrupt the Debtors' business at this critical time.  I further believe that maintaining the existing Cash Management System, including their Bank Accounts, will not harm parties in interest because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

17.     In addition, in the ordinary course of business, the Debtors maintain a complex system of Intercompany Transactions for, among other reasons, facilitating intercompany sales, centralizing accounting and purchasing departments, and moving cash between entities.  If the Intercompany Transactions are discontinued, I believe that a number of services provided by and to the Debtors would be disrupted, which would impact the Debtors' ability to continue operating in the ordinary course.

18.     I believe that the relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  Authorizing the Debtors to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of the chapter 11 cases.

19.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**F.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition (I) Wages, Salaries, and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits (the "<u>Wages and Benefits Motion</u>")**

20.    The Debtors request the authority, in their sole discretion, to pay prepetition claims, honor obligations, and to continue programs, in the ordinary course of business and consistent with past practices, relating to employee obligations.  In addition, the Debtors seek a waiver of the automatic stay as it applies to workers' compensation claims.

21.    As of the Petition Date, the Debtors employ approximately 7,000 employees. Although the Debtors have paid their wage, salary, and other obligations in accordance with their ordinary compensation schedule before the Petition Date, as of the date hereof, certain prepetition employees obligations may nevertheless be due and owing.

22.    The majority of the Debtors' Employees rely exclusively on their compensation, benefits, and expense reimbursement payments to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support and productivity are critical.  In the absence of such payments, I believe that the Debtors' Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors, thereby hindering the

32

Debtors' ability to meet their customer obligations and likely diminishing creditors' confidence in the Debtors. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace them would be a massive and costly distraction at a time when the Debtors should be focusing on stabilizing their operations.

23.     In addition, the Debtors are seeking authorization to permit the Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum. I believe that this is necessary because preventing Employees from proceeding with their workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees, and lead to the departure of certain Employees who are critical at this juncture.

24.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be approved.

**G.      Debtors' Motion for Entry of an Order Authorizing the Debtors to Maintain and Administer Customer Programs and Practices and Honor Related Prepetition Obligations (the "<u>Customer Programs Motion</u>")**

25.     The Debtors request the authority to maintain and administer customer programs and honor prepetition obligations to customers related thereto in the ordinary course of business and in a manner consistent with past practice.

26.     To maintain the loyalty and goodwill of their customers, in the ordinary course of business the Debtors implemented various Customer Programs to encourage new purchases, enhance customer satisfaction, sustain goodwill, and ensure the Debtors' competitiveness. The Debtors' ability to honor their Customer Program Obligations in the ordinary course of business

is necessary to retain their customer base and reputation for quality. I believe that the relief requested in the Customer Programs Motion will pay dividends with respect to the long-term reorganization of the Debtors' business—both because it will increase profits and because it will engender goodwill, which is especially critical following the filing of the chapter 11 cases.

27.    I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**H.    Debtors' Motion for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees (the "Taxes and Fees Motion")**

28.    The Debtors request the authority to pay any Taxes and Fees that, in the ordinary course of business, accrued or arose before the Petition Date. In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various Authorities. The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during the chapter 11 cases.

29.    Specifically, it is my understanding that the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' business operations because the Authorities could suspend the Debtors' operations, file liens, or seek to lift the automatic stay. In addition, certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which undoubtedly would distract those key personnel from their duties related to the Debtors' restructuring.

30.    I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable

the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

**I.    Debtors' Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion")**

31.    The Debtors request the entry of an order:    (a) determining that the Utility

Providers have been provided with adequate assurance of payment; (b) approving the Debtors'

proposed offer of adequate assurance and procedures governing the Utility Providers' requests

for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering,

refusing, or discontinuing services on account of prepetition amounts outstanding and on account

of any perceived inadequacy of the Debtors' proposed adequate assurance; and (d) determining

that the Debtors are not required to provide any additional adequate assurance beyond what is

proposed by the Utilities Motion.

32.    In the ordinary course of business, the Debtors incur expenses for water, sewer,

electric, natural gas, telephone, and waste removal utility services provided by approximately

386 utility providers.    Uninterrupted utility services are essential to the Debtors' ongoing

operations and, therefore, to the success of their reorganization.    Indeed, any interruption of

utility services, even for a brief period of time, would negatively affect the Debtors' operations,

customer relationships, revenues and profits, seriously jeopardizing the Debtors' reorganization

efforts and, ultimately, value and creditor recoveries.    It is critical that utility services continue

uninterrupted during the chapter 11 cases.

33.    I believe and am advised that the proposed procedures are necessary in the

chapter 11 cases because if such procedures are not approved, the Debtors could be forced to

address numerous requests by the Utility Providers in a disorganized manner during the critical

first weeks of the chapter 11 cases.  Moreover, a Utility Provider could blindside the Debtors by

unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately protected, and as a result, discontinue service or make an exorbitant demand for payment to continue service.  Discontinuation of utility service could essentially shut down operations, and any significant disruption of operations could put the chapter 11 cases in jeopardy.

34.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**J.      Debtors' Motion for Entry of an Order Authorizing and Approving (I) Rejection of Certain Unexpired Leases and (II) Abandonment of Certain Personal Property, Each Effective *Nunc Pro Tunc* to the Petition Date (the "<u>Lease Rejection Motion</u>")**

35.     The Debtors seek entry of an order authorizing and approving (a) the rejection of unexpired Leases with regards to certain nonresidential real property (the "<u>Premises</u>"), and (b) the abandonment of certain Personal Property that may be located at the Premises, each effective *nunc pro tunc* to the Petition Date.

36.     In considering their options with respect to the Leases before the Petition Date, the Debtors and their advisors evaluated the possibility of certain assignments or subleases of the leased Premises.  The Debtors determined that the transactional costs and postpetition occupancy costs associated with marketing the Leases, in addition to the costs of moving and storing the Personal Property, far exceed any marginal benefit that would be derived from potential assignments or subleases.  Accordingly, by rejecting the Leases and abandoning the Personal Property, the Debtors believe that they will be able to save approximately $4.8 million over the remaining duration of the Leases.   Moreover, the Debtors also will avoid certain other

contractual obligations under the Leases, including certain property taxes, utilities, insurance, and other related charges associated with the Leases.

37.     I believe that the relief requested in the Lease Rejection Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Lease Rejection Motion should be approved.

**K.     Debtors' Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Schedules and SOFAs Motion")**

38.     The Debtors seek entry of an order (a) extending the time within which they are required to file their Schedules and SOFAs to January 10, 2013 (*i.e.*, an additional 45 days) without prejudice to the Debtors' ability to request additional extensions, and (b) authorizing the U.S. Trustee to schedule the Section 341 Meeting after the 40-day deadline imposed pursuant to the Bankruptcy Rules.

39.     Notwithstanding the Debtors' thousands of potential creditors, the conduct and operation of the Debtors' business operations require the Debtors to maintain voluminous records and manage a complex accounting system.  Absent an extension of time, the Debtors' attention would be diverted from business operations at a critical time.  Thus, due to the substantial size, scope and complexity of the chapter 11 cases and the volume of material that must be compiled and reviewed by the Debtors' staff in order to complete the Schedules and Statements during the initial days of the chapter 11 cases, I do not believe that we will be able to complete the Schedules and Statements in the time required under the Bankruptcy Rules and Local Bankruptcy Rules.  But I believe that the Debtors recognize the importance of the

Schedules and Statements in the chapter 11 cases and that they intend to complete the Schedules and Statements as quickly as possible under the circumstances.

40.    I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be approved.

**L.    Debtors' Motion for Entry of an Order Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness With Respect to, Certain Equity Securities and for Related Relief (the "<u>NOL Preservation Motion</u>")**

41.    The Debtors request the authority to establish notification and hearing procedures that must be satisfied before certain transfers of, or declarations of worthlessness for federal or state tax purposes with respect to, equity securities in Kingpin Holdings, LLC, or of any beneficial interest therein, including options to acquire such stock, are deemed effective.

42.    I believe that the Procedures for Trading in Equity Securities are necessary to protect and preserve the Debtors' valuable tax attributes, including NOLs and other tax and business credits.  I believe that the Tax Attributes represent a potential future tax savings of approximately $188 million.  If no restrictions on trading are imposed by the Court, I believe that such trading could severely limit—or even eliminate—the Debtors' ability to use their Tax Attributes, which could lead to significant negative consequences for the Debtors, their estates, and the overall reorganization process.

43.    I believe that the relief requested in the NOL Preservation Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on

behalf of the Debtors, I respectfully submit that the NOL Preservation Motion should be approved.

**M.      Debtors' Motion for Entry of an Order Authorizing the Retention and Employment of Kurtzman Carson Consultants LLC as Notice, Claims, and Balloting Agent *Nunc Pro Tunc* to the Petition Date (the "<u>KCC Retention Motion</u>")**

44.      The Debtors request entry of an order authorizing the Debtors' employment and retention of Kurtzman Carson Consultants LLC ("<u>KCC</u>") as notice, claims, and balloting agent in connection with the Debtors' chapter 11 cases, *nunc pro tunc* to the Petition Date.

45.      I believe that the relief requested in the KCC Retention Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the KCC Retention Motion should be approved.

**N.      Debtors' Motion for Entry of an Order Authorizing the Debtors to Pay 503(b)(9) Claims and Materialman's Liens Claims (the "<u>503(b)(9) and Materialman's Lien Motion</u>")**

46.      The Debtors seek entry of an order authorizing the Debtors to pay and discharge, on a case-by-case basis and in their sole discretion, up to $2 million in claims held by the 503(b)(9) Claimants and the Materialman's Lien Claimants.

47.      I believe that in the twenty-days leading up to the Petition Date the Debtors were sold, and received, goods in the ordinary course of business.  I believe and have been advised that the vendors that sold those goods to the Debtors may have claims against the Debtors' estates that are entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code.  I also believe that the Debtors routinely contract with third party service providers to maintain and repair their bowling center facilities, and that several of those third parties performed work for the Debtors' prepetition.  I believe and have been advised that such providers could potentially assert state law statutory liens against the estates, including

mechanic's liens and materialman's liens.  I further believe that, as of the Petition Date, the outstanding prepetition invoices of the 503(b)(9) Claimants total approximately $1.6 million, while those of the Materialman's Lien Claimants total approximately $400,000.

48.     I believe that the relief requested in the 503(b)(9) and Materialman's Lien Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest. I further believe that the relief sought in the 503(b)(9) and Materialman's Lien Motion will not prejudice unsecured creditors, considering that the Debtors will only pay those claims that it believes, in its business judgment, are secured by valid liens or capable of being secured by perfecting liens in the Debtors' property.  For these reasons, on behalf of the Debtors, I respectfully submit that the 503(b)(9) and Materialman's Lien Motion should be approved.

**O.     Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business (the "OCP Motion").**

49.     The Debtors request authority to retain and compensate professionals used in the ordinary course of their businesses.  The Debtors retain various attorneys in the ordinary course of their businesses (each, an "OCP" and, collectively, the "OCPs").  The OCPs provide legal services to the Debtors in a variety of matters unrelated to the chapter 11 cases, including providing legal services related to specialized areas of the law.

50.     Due to the number of OCPs that are regularly retained by the Debtors, I believe it would be unwieldy and burdensome to both the Debtors and the Court to request each such OCP to apply separately for approval of its employment and compensation.  While I believe that some OCPs may wish to continue to represent the Debtors on an ongoing basis, others may be unwilling to do so if the Debtors cannot pay them on a regular basis.  Without the background knowledge, expertise, and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in

educating replacement professionals about the Debtors' business and financial operations. Moreover, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business.

51.    I believe that the continued retention and compensation of the OCPs is in the best interests of the Debtors' estates, creditors, and other parties in interest, and that the Ordinary Course Professionals Motion should be granted. Thus, to prevent immediate and irreparable harm to the Debtors' business, I respectfully submit that the relief requested in the OCP Motion should be granted.

**P.    Debtors' Motion for Entry of an Order Establishing Interim Compensation Procedures (the "Compensation Procedures Motion").**

52.    The Debtors request authority to establish procedures for the interim compensation and reimbursement of expenses for Professionals and Committee Members. I believe that establishing orderly procedures for addressing issues related to payment of Professionals and Committee Members will streamline the administration of the chapter 11 cases and otherwise promote efficiency for the Court, the U.S. Trustee, and all parties in interest. I also believe that the Compensation Procedures Motion will permit the Debtors to manage payments efficiently to the Professionals and Committee Members and will allow all parties to monitor appropriately the cost of administration of the chapter 11 cases. Accordingly, I believe the approval of the Compensation Procedures Motion is in the best interests of the Debtors' estates, creditors, and other parties in interest and respectfully submit that the relief requested in the Compensation Procedures Motion should be granted.

**Q.     Debtors' Motion for Entry of an Order Authorizing Debtors to (I) Enter into the Amended iStar Agreements and (II) Assume or Assume and Assign the Amended iStar Agreements (the "<u>iStar Motion</u>")**

53.     The Debtors seek entry of an order authorizing their entry into the Amended iStar Agreements, pay the Prepetition Obligations owing to iStar within seven days of the Petition Date, and assume or assume and assign, as applicable, the Amended iStar Agreements, effective as of the Plan Effective Date.

54.     I believe that the relief requested by the iStar Motion will be critical to the overall success of the Debtors' chapter 11 cases.  The iStar Agreements have a negative impact on the Debtors' operations.  Securing the Amended iStar Agreements will help ensure a smooth, value-maximizing process during the chapter 11 cases.  More specifically, the Amended iStar Agreements will deliver substantial value to the Debtors by improving the Debtors' operational flexibility and ensuring that the Debtors utilize their capital resources most efficiently.  The Amended iStar Agreements also represent a key component of the Debtors' marketing process in the chapter 11 cases.  Potential purchasers will now have the benefit of reviewing substantially finalized Amended iStar Agreements (and the value produced on account thereof) in connection with the bidding process.  Most significantly, by reaching a consensus, the Debtors and iStar have avoided potential litigation.  Such litigation would have been costly, time-consuming, and ultimately would have created severe uncertainly in the chapter 11 cases—all of which would have hurt the value of the Debtors' estates and lowered recoveries to parties in interest.

55.     A material component of iStar's decision to enter into the Amended iStar Agreements was a commitment made by the Debtors to seek satisfaction of the Prepetition Obligations within the first seven days of the chapter 11 cases.  The Debtors were willing to commit to that obligation because I believe that the arrangement negotiated with iStar will generate value for the benefit of the estates.

## Exhibit B

**RSA**

**EXECUTION VERSION**

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (together with all exhibits and attachments hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), dated as of November 12, 2012, is entered into by and among Kingpin Holdings, Inc., a Delaware corporation ("Holdings"), Kingpin Intermediate Corp., a Delaware corporation ("Kingpin"), AMF Bowling Worldwide, Inc. ("WINC") and certain of its undersigned subsidiaries (collectively the "Company" or the "Debtors"),[1] and certain holders of the First Lien Loans (as defined below) parties hereto from time to time (together with their respective successors and permitted assigns, the "Consenting Lenders"). The Company, each Consenting Lender and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "Parties" and individually as a "Party". Capitalized terms used herein and not defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet (as defined below).

# PRELIMINARY STATEMENTS

**WHEREAS**, as of the date hereof, the Consenting Lenders hold, in the aggregate, in excess of 50.0% of the aggregate outstanding principal amount of the loans, including letters of credit (the "First Lien Loans") under that certain First Lien Credit Agreement, dated as of June 12, 2007 (as amended by Amendment No. 1 to First Lien Credit Agreement, dated as of May 8, 2009, and Amendment No. 2 to First Lien Credit Agreement, dated as of May 3, 2012 the "Credit Agreement") among Kingpin, WINC, the lenders party thereto (the "Lenders") and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent for the Lenders;

**WHEREAS**, the Company and the Consenting Lenders have agreed to implement a restructuring of the Company in accordance with and subject to the terms and conditions set forth herein and in the restructuring term sheet attached hereto as Exhibit A (including any schedules and exhibits attached thereto, and as may be modified in accordance with Section 10 hereof, the "Restructuring Term Sheet");

**WHEREAS**, the restructuring transactions contemplated by the Restructuring Term Sheet will be implemented through either a Sale Transaction or a Plan Transaction (as each is defined herein and together, the "Restructuring Transaction"), in both cases pursuant to a joint plan of reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), which plan of reorganization shall be (i) consistent in all material respects with the terms of this Agreement and the Restructuring Term Sheet and, (ii) in form and substance acceptable to the Requisite Consenting Lenders (or the Winning Bidder, as applicable) (the "Joint Plan");

---

[1]   The AMF entities that will be filing a voluntary petition for relief in connection with the Chapter 11 Cases are: AMF Bowling Worldwide, Inc.; 300, Inc.; American Recreation Centers, Inc.; AMF BCH LLC; AMF Beverage Company of Oregon, Inc.; AMF Bowling Centers Holdings Inc.; AMF Bowling Centers, Inc.; AMF Bowling Mexico Holding, Inc.; AMF Holdings, Inc.; AMF WBCH LLC; AMF Worldwide Bowling Centers Holdings Inc.; Boliches AMF, Inc.; Bush River Corporation; King Louie Lenexa, Inc.; Kingpin Holdings, LLC; and Kingpin Intermediate Corp.

**WHEREAS**, the Company has agreed to commence voluntary, pre-arranged reorganization cases (to be jointly administered) under chapter 11 of the Bankruptcy Code for the Debtors (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") to effect the Restructuring Transaction;

**WHEREAS**, the Restructuring Term Sheet is the product of arm's-length, good faith negotiations between the Company and the Consenting Lenders and their respective professionals; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      **Restructuring Term Sheet.**

The Restructuring Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. The Restructuring Term Sheet sets forth the material terms and conditions of the Restructuring Transaction; however, the Restructuring Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistency between the Restructuring Term Sheet and this Agreement, this Agreement shall control.

2.      **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)      "Auction" means the auction contemplated under the Bidding Procedures in connection with the Sale Transaction to determine a Winning Bidder to sponsor the Joint Plan.

(b)      "Bidding Procedures" means the Debtors' bidding procedures, which procedures shall be materially consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Consenting Lenders.

(c)      "Bidding Procedures Motion" means the motion to be filed by the Debtors in the Chapter 11 Cases seeking entry of the Bidding Procedures Order, which motion shall be materially consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Consenting Lenders.

(d)      "Bidding Procedures Order" means an order of the Bankruptcy Court approving the Bidding Procedures, which order shall be materially consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Consenting Lenders (and pursuant to which the Consenting Lender shall automatically be deemed "qualified bidders" and entitled to participate at the Auction).

2

(e)      "<u>Confirmation Order</u>" means a Final Order of the Bankruptcy Court confirming the Joint Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be materially consistent with this Agreement and otherwise in form and substance acceptable to the Requisite Consenting Lenders or the Winning Bidder, as applicable.

(f)      "<u>Consideration</u>" means cash and, to the extent exercised by holders of the First Lien Loans or, so long as the First Lien Loan are paid in full in cash, the holders of the Second Lien Loans, "credit bidding" to the extent provided under section 363(k) of the Bankruptcy Code, to be received in connection with a bid at the Auction by the Debtors, but does not include any consideration on account of the value of any assumed liabilities.

(g)      "<u>Disclosure Statement</u>" means the disclosure statement for the Joint Plan, as amended, supplemented or otherwise modified from time to time, that describes the Joint Plan and is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, rule 3018 of the Federal Rules of Bankruptcy Procedure and other applicable law, and which shall be materially consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Consenting Lenders.

(h)      "<u>Disclosure Statement Motion</u>" means the motion to be filed by the Debtors in the Chapter 11 Cases seeking entry of the Disclosure Statement Order, which motion shall be materially consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Consenting Lenders.

(i)      "<u>Disclosure Statement Order</u>" means an order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation, which order shall be materially consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Consenting Lenders.

(j)      "<u>Effective Date</u>" means the effective date of the Joint Plan.

(k)      "<u>Exit Commitment Motion</u>" means the motion to be filed by the Debtors in the Chapter 11 Cases seeking approval of the Exit Commitment Letter (as defined in the Restructuring Term Sheet) and the fees and expenses provided for therein, including, without limitation, any commitment fee, which motion shall be in form and substance reasonably acceptable to the Requisite Consenting Lenders.

(l)      "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or

3

rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided*, that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

(m)    "First Day Motions" means any motions or applications, other than ministerial first day motions, filed by the Company on the Filing Date (as defined herein), which motions shall be materially consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Consenting Lenders.

(n)    "First Lien Loan Claims" means any and all claims arising under the Credit Agreement or First Lien Loans.

(o)    "Kirkland" means Kirkland & Ellis LLP, counsel to the Company.

(p)    "Marketing Process" means the process of marketing the assets of the Debtors in order to determine the highest bona fide offer (*i.e.*, the highest amount of Consideration) for the purchase of the Debtors' assets in connection with the Sale Transaction. The Marketing Process shall be conducted by Moelis, subject to the terms and conditions set forth in this Agreement and the Bidding Procedures.

(q)    "Material Adverse Effect" means any event, change, effect, occurrence, development, circumstance or change of fact occurring after the date hereof that has had, or would reasonably be expected to have, a material adverse effect on the business, results of operations (financial or otherwise), assets or liabilities of the Company taken as a whole; *provided, however*, that "Material Adverse Effect" shall not include any event, effect, occurrence, development, circumstance or change of fact arising out of, resulting from or attributable to (a) conditions or effects that generally affect persons or entities engaged in the industries and markets in which the Company operate, (b) general economic conditions in the United States or globally, including in those countries within which the Company operates, (c) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (d) financial, banking, securities, credit, or commodities markets, the economy in general, prevailing interest rates or general capital market conditions in the United States or those countries within which the Company operate, (e) a change in U.S. GAAP or regulatory accounting principles or interpretations thereof after the date hereof, or a change in applicable law or interpretations thereof by any governmental entity after the date hereof, (f) announcement of the Restructuring Transaction, the filing and pendency of the Chapter 11 Cases, the pendency of the  Restructuring Transaction, or compliance by any Party with the covenants and agreements herein or in the Joint Plan, the Plan Process Documents, or the Restructuring Term Sheet, or (g) the acts or omissions of the Consenting

4

Lenders (except in each of clauses (a), (b), and (c) above, if the Company is disproportionately affected thereby relative to the other participants in the industries in which the Company operate).

(r)     "Miller Buckfire" means Miller Buckfire & Co., financial advisor to the Consenting Lenders.

(s)     "Moelis" means Moelis & Company, financial advisor to the Company.

(t)     "Non-First Lien Loan Claims" means any claim against or interests in the Company other than First Lien Loan Claims, including claims arising under the Second Lien Loan.

(u)     "Plan Process Documents" means all agreements, instruments, pleadings, orders or other related documents utilized to implement the Plan Transaction and to obtain confirmation of the Joint Plan, including, but not limited to, the Joint Plan, the Disclosure Statement, the Disclosure Statement Motion, the Disclosure Statement Order, the ballots, the motion to approve the form of ballots and solicitation procedures, the order of the Bankruptcy Court approving the form of ballots and solicitation procedures and the Confirmation Order, each of which shall contain terms and conditions materially consistent with this Agreement and shall otherwise be in form and substance reasonably acceptable to the Requisite Consenting Lenders (except the  Joint Plan and the Confirmation Order, unless there is a Winning Bidder, each of which shall be in form and substance acceptable to the Requisite Consenting Lenders).

(v)     "Plan Transaction" means confirmation and consummation of the Joint Plan pursuant to the Plan Process Documents in the event that there is no Winning Bidder.

(w)     "Purchase Agreement" means the asset purchase agreement to be entered into as part of the Sale Transaction by and among the Debtors, as sellers, and the Winning Bidder (if any), as purchaser and sponsor of the Joint Plan, which agreement shall be materially consistent with the form purchase agreement attached as an exhibit to the Bidding Procedures and which shall comply with this Agreement and shall provide for cash consideration sufficient to pay the First Lien Loans in full.

(x)     "Requisite Consenting Lenders" means, as of any date of determination, Consenting Lenders holding a majority of the outstanding principal amount of the First Lien Loans held by the Consenting Lenders in the aggregate as of such date.

(y)     "Restructuring Documents" means the Plan Process Documents and the Sale Process Documents.

(z)     "Restructuring Support Effective Date" means the date upon which this Agreement becomes effective and binding on the Parties in accordance with the provisions of Section 11 hereof.

5

(aa)    "<u>Restructuring Support Period</u>" means the period commencing on the Restructuring Support Effective Date and ending on the date on which this Agreement is terminated in accordance with Section 5 hereof.

(bb)    "<u>Sale Process Documents</u>" means all agreements, instruments, pleadings, orders or other related documents utilized to consummate the Sale Transaction, including, but not limited to, the Bidding Procedures, Bidding Procedures Motion, Bidding Procedures Order, and Purchase Agreement, each of which shall contain terms and conditions that are materially consistent with this Agreement and shall otherwise be in form and substance reasonably acceptable to the Requisite Consenting Lenders.

(cc)    "<u>Sale Transaction</u>" means confirmation and consummation of the Joint Plan pursuant to the Sale Process Documents in the event a Winning Bidder is selected.

(dd)    "<u>Second Lien Loans</u>" means the loans outstanding pursuant to that certain Second Lien Credit Agreement, dated as of June 12, 2007 (as amended, supplemented, modified, or amended and restated from time to time).

(ee)    "<u>Solicitation</u>" means the solicitation of votes in connection with the Joint Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

(ff)    "<u>Stroock</u>" means Stroock & Stroock & Lavan LLP, counsel to the Consenting Lenders.

(gg)    "<u>Winning Bidder</u>" means the bidder selected in accordance with the Bidding Procedures at the Auction (to the extent one occurs) that will sponsor the Joint Plan in accordance with the terms of this Agreement and the Restructuring Term Sheet.

## 3.    **Agreements of the Consenting Lenders.**

(a)    <u>Support of Restructuring Transaction</u>.  Subject to the satisfaction of the conditions contained in Section 3(b) hereof, each Consenting Lender agrees that, for the duration of the Restructuring Support Period, such Consenting Lender shall:

(i)    support, and take all reasonable actions necessary or reasonably requested by the Company to facilitate the implementation or consummation of, the Restructuring Transaction (including, but not limited to, the approval of the Bidding Procedures, the Disclosure Statement, the Solicitation, the consummation of the Restructuring Transaction pursuant to the Joint Plan) or the approval by the Bankruptcy Court of the Restructuring Documents, it being understood that none of the Consenting Lenders shall be required to incur any costs, expenses or liabilities in connection therewith;

(ii)    not (A) directly or indirectly seek, solicit, vote its First Lien Loan Claims or any Non-First Lien Loan Claims for, support or encourage the termination or modification of the exclusive period for the filing of any plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company other than the Restructuring

Transaction, or (B) take any other action, including but not limited to initiating any legal proceedings or enforcing rights as a holder of the First Lien Loans or Non-First Lien Loan Claims, that is inconsistent with this Agreement or the Restructuring Documents, or could prevent, interfere with, delay or impede the implementation or consummation of the Restructuring Transaction (including, but not limited to, the Bankruptcy Court's approval of the Restructuring Documents, the Solicitation and confirmation of the Joint Plan);

(iii)    (A) subject to the receipt by the Consenting Lenders of the Disclosure Statement, timely vote, or cause to be voted, its First Lien Loan Claims and any Non-First Lien Loan Claims (as applicable) to accept the Joint Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Joint Plan on a timely basis following commencement of the Solicitation, and (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); *provided, however*, that, subject to all remedies available to the Debtors at law, equity or otherwise, including those remedies set forth in section 13 of this Agreement, such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any of the Consenting Lenders at any time following the expiration of the Restructuring Support Period;

(iv)    timely vote or cause to be voted its First Lien Loan Claims and any Non-First Lien Loan Claims, as applicable, against and not consent to, or otherwise directly or indirectly support, solicit, assist, encourage or participate in the formulation, pursuit or support of, any restructuring or reorganization of the Company (or any plan or proposal in respect of the same) other than the Restructuring Transaction;

(v)    support the releases provided for in the Restructuring Term Sheet and customary exculpation, injunction, and discharge provisions to be provided in the Joint Plan;

(vi)    not directly or indirectly arrange, fund, participate in or consent to any exit facility or other financing, rights offering or issuance of debt or equity securities in connection with any reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company (through a plan of reorganization or otherwise) other than in connection with the Restructuring Transaction; and

(vii)    not directly or indirectly support, encourage, participate in or consent to any reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company other than the Restructuring Transaction.

(b)    Certain Conditions.   The obligations of each Consenting Lender set forth in Section 3(a) hereof are subject to the following conditions:

(i)    this Agreement shall have become effective in accordance with the provisions of Section 11 hereof; and

(ii)    this Agreement shall not have terminated in accordance with the terms of Section 5 hereof.

(c)    <u>Rights of Consenting Lenders Unaffected</u>.    Nothing contained herein shall (i) limit (A) the ability of a Consenting Lender to consult with other Consenting Lenders or the Company or (B) the rights of a Consenting Lender under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with the Consenting Lender's obligations hereunder or under the terms of the Restructuring Term Sheet and is not intended or reasonably likely to hinder, delay or prevent confirmation or the consummation of the Restructuring Transaction; (ii) limit the ability of a Consenting Lender to sell or enter into any transactions in connection with the First Lien Loans or any Non-First Lien Loans, subject to the terms hereof; or (iii) limit the rights of any Consenting Lender under the Credit Agreement or constitute a waiver or amendment of any provision of the Credit Agreement, subject to the terms of Section 3(a) hereof.

(d)    <u>Transfers</u>.    Each Consenting Lender agrees that, for the duration of the Restructuring Support Period, such Consenting Lender shall not sell, transfer, loan, issue, pledge (except for blanket security interests of lenders to any of the Consenting Lenders), hypothecate, assign or otherwise dispose of (including by participation), directly or indirectly, in whole or in part, any of the First Lien Loans, the First Lien Loan Claims, the Second Lien Loans or any Non-First Lien Loan Claims or any option thereon or any right or interest therein (including granting any proxies, depositing any First Lien Loans, First Lien Loan Claims, Second Lien Loans or Non-First Lien Loan Claims into a voting trust or entering into a voting agreement with respect to any such First Lien Loans, First Lien Loan Claims, Second Lien Loans, or Non-First Lien Loan Claims (collectively, "<u>Transfer</u>"), unless the transferee thereof either (i) is a Consenting Lender or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Lender and to be bound by all of the terms of this Agreement (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing the joinder attached hereto as <u>Exhibit B</u> (the "<u>Joinder Agreement</u>"), and delivering an executed copy thereof, within two (2) business days of closing of such Transfer, to Stroock and Kirkland, in which event (x) the transferee (including the Consenting Lender transferee, if applicable) shall be deemed to be a Consenting Lender hereunder to the extent of such transferred rights and obligations and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.    Each Consenting Lender agrees that any Transfer of any First Lien Loans or First Lien Loan Claims or any Non-First Lien Loan Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Lender shall have the right to enforce the voiding of such transfer.    Notwithstanding anything contained herein to the contrary, during the Restructuring Support Period, a Consenting Lender may offer, sell or otherwise transfer any or all of its holdings of First Lien Loans, First Lien Loan Claims, Second Lien Loans or Non-First Lien Loan Claims to any entity that, as of the date of transfer, controls, is controlled by or is under common control with such Consenting Lender; *provided, however*, that such entity shall automatically be subject to the terms of this Agreement and deemed a Party hereto and shall execute a Joinder Agreement hereto.

8

(e)      Additional Claims.  To the extent any Consenting Lender (a) acquires additional First Lien Loans or (b) holds or acquires any other loans or claims against the company, including for the avoidance of doubt, Second Lien Loans and Non-First Lien Loan Claims, each such Consenting Lender agrees that such obligations shall be subject to this Agreement and that, for the duration of the Restructuring Support Period, it shall vote (or cause to be voted) any such additional obligation in a manner consistent with Section 3(a) hereof.

## 4.      Agreements of the Company.

(a)      Affirmative Covenants.  The Company agrees that, so long as this Agreement has not been terminated in accordance with its terms, unless (x) otherwise expressly permitted or required by this Agreement or the Restructuring Term Sheet, or (y) otherwise consented to in writing by the Requisite Consenting Lenders the Company shall, and shall cause each of its direct and indirect subsidiaries to, directly or indirectly, do the following:

(i)      (A) commence the Chapter 11 Cases no later than November 12, 2012 (the date of commencement of the Chapter 11 Cases, the "Filing Date") and file the First Day Motions; (B) file a motion with the Bankruptcy Court on the Filing Date seeking approval for debtor-in-possession financing in an amount and subject to terms and conditions that are materially consistent with this Agreement and the Restructuring Term Sheet (the "DIP Facility"), (C) obtain approval of the DIP Facility on an interim basis by entry of an order of the Bankruptcy Court as soon as reasonably practicable and in no event later than the date that is three (3) days after the Filing Date, and (D) obtain approval on a final basis of the DIP Facility by entry of an order of the Bankruptcy Court (which order shall be in form and substance reasonably acceptable to the Requisite Consenting Lenders), as soon as reasonably practicable and in no event later than the date that is 45 days after the Filing Date;

(ii)      file with the Bankruptcy Court the Bidding Procedures Motion no more than 5 calendar days after the Petition Date;

(iii)      (a) file with the Bankruptcy Court the Exit Commitment Motion no more than 5 calendar days after the Petition Date, and (b) obtain entry of an order from the Bankruptcy Court (which order shall be in form and substance reasonably acceptable to the Requisite Consenting Lenders) approving the Exit Commitment Motion no later than 30 days after the Filing Date;

(iv)      obtain entry by the Bankruptcy Court of the Bidding Procedures Order no later than 45 days after the Filing Date;

(v)      ensure that potential bids for the Debtors' assets that are qualified under the Bidding Procedures are due no later than 90 days after entry of the Bidding Procedures Order;

(vi)      in the event that the Auction is to be conducted pursuant to the terms of the Restructuring Term Sheet, conduct and consummate the Auction no later than 120 days following the Filing Date;

9

(vii)   file with the Bankruptcy Court the Disclosure Statement Motion no later than 90 days after the Filing Date;

(viii)   no later than one (1) calendar day following the Filing Date, seek approval from the Bankruptcy Court of amended agreements with iStar Bowling Centers I LP and iStar Bowling Centers II LP in form and substance reasonably acceptable to the Requisite Consenting Lenders;

(ix)   obtain entry by the Bankruptcy Court of the Disclosure Statement Order no later than 120 days after the Filing Date;

(x)   commence the Solicitation no later than five (5) business days after entry of the Disclosure Statement Order;

(xi)   obtain entry by the Bankruptcy Court of the Confirmation Order no later than 160 days after the Filing Date;

(xii)   complete the preparation, as soon as reasonably practicable after the date hereof, of all First Day Motions and Restructuring Documents, including, without limitation, the Bidding Procedures, the Joint Plan and the Disclosure Statement;

(xiii)   (A) support and take all reasonable actions necessary or reasonably requested by the Consenting Lenders to facilitate the Restructuring Transaction, including the solicitation, confirmation and consummation of the Joint Plan, (B) not take any action that is inconsistent with, or that would delay or impede the Restructuring Transaction, including solicitation, confirmation or consummation of the Joint Plan, and (iii) support the releases provided for in the Restructuring Term Sheet and customary exculpation, injunction and discharge provisions to be provided in the Joint Plan;

(xiv)   provide draft copies of all material motions, applications, orders, agreements and other documents the Company intends to file with the Bankruptcy Court to Stroock within two (2) days prior to the date the Company intends to file any such motion, application, order, agreement or other document (except where not reasonably practicable) and consult in advance in good faith with Stroock regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(xv)   unless otherwise required by the Bankruptcy Court, cause the amount of First Lien Loan Claims identified on the signature pages attached to this Agreement to be redacted to the extent this Agreement is filed on the docket maintained in the Chapter 11 Cases;

(xvi)   maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized;

(xvii)   timely file a formal written objection to any motion filed with the Bankruptcy Court by any party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

10

(xviii)   timely file a formal written objection to any motion filed with the Bankruptcy Court by any party seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(xix)   timely file a formal written response in opposition to any motion or objection filed with the Bankruptcy Court by any party objecting to the motion to approve the DIP Facility;

(xx)   provide Stroock, Miller Buckfire and such other professionals as may be retained by the Consenting Lenders (collectively, the "Advisors") (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records and facilities, (B) reasonable access to the respective management and advisors (including Moelis) of the Company for the purposes of evaluating the Restructuring Transaction (to the fullest extent possible under applicable law), (C) timely and reasonable responses to all reasonable diligence requests, and (D) information with respect to all material executory contracts and unexpired leases of the Company for the purposes of concluding, in consultation with the Company and its advisors, which executory contracts and unexpired leases the Company intends to assume, assume and assign or reject in the Chapter 11 Cases;

(xxi)   on the date that is at least one (1) day prior to the Filing Date, pay in cash to each of Stroock and Miller Buckfire all reasonable amounts then due and outstanding as provided in an invoice supplied to the Company containing a summary of hours and services provided;

(xxii)   to the extent not otherwise paid in connection with the Chapter 11 Cases (including pursuant to the DIP Order), indefeasibly pay in full in cash, to the extent not previously paid, all out-of-pocket, reasonable and documented fees and expenses of the Consenting Lenders;

(xxiii)   promptly notify the Consenting Lenders in writing of any governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened), in any such case which could reasonably be anticipated to have a Material Adverse Effect;

(xxiv)   comply in all respects with the covenants contained in the DIP Facility; and

(xxv)   take all actions contemplated by the Restructuring Term Sheet.

(b)   Negative Covenants.   The Company agrees that, so long as this Agreement has not been terminated in accordance with its terms unless, (x) otherwise expressly permitted or required by this Agreement or the Restructuring Term Sheet, or (y) otherwise consented to in writing by the Requisite Consenting Lenders (which consent may be provided by Stroock), the Company shall not, and shall cause each of its direct and indirect subsidiaries not to, directly or indirectly, do or permit to occur any of the following:

11

(i)        directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation of, any restructuring, liquidation, or reorganization of the Company (or any plan or proposal in respect of the same) other than the Restructuring Transaction;

(ii)       suspend or revoke the Marketing Process or the Sale Transaction or publicly announce its intention not to pursue the Sale Transaction (except as otherwise provided in the Restructuring Term Sheet);

(iii)      modify the Joint Plan, in whole or in part, in a manner that is not consistent in any material respect with this Agreement or the Restructuring Term Sheet;

(iv)      withdraw or revoke the Joint Plan or publicly announce its intention not to pursue the Joint Plan;

(v)       take any such action in connection with the Restructuring Transaction, including, but not limited to, selection of the stalking horse bidder or auction decision, that is not consistent in any material respect with this Agreement or the Restructuring Term Sheet;

(vi)      file any motion, pleading or other Restructuring Document with the Bankruptcy Court (including any modifications or amendments thereof) that, in whole or in part, is not consistent in any material respect with this Agreement, the Restructuring Term Sheet or the Joint Plan and is not otherwise reasonably satisfactory in all respects to the Requisite Consenting Lenders;

(vii)     move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of a material executory contract or unexpired lease other than in accordance with this Agreement, the Restructuring Term Sheet, or the Joint Plan;

(viii)    allow any claims, other than payment of the Pre-Petition Rent, in the Chapter 11 Cases alleged to have administrative or priority status in excess of $350,000 per claim individually, and $2 million in the aggregate, unless (i) the Requisite Consenting Lenders shall consent to the allowance of such claims, or (ii) such claims are allowed by order of the Bankruptcy Court;

(ix)      commence an avoidance action or other legal proceeding that challenges the validity, enforceability or priority of the First Lien Loan Claims, or otherwise affects the rights of the Consenting Lenders (solely in their capacity as holders of the First Lien Loans);

(x)       issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(xi)      amend or propose to amend its respective certificate or articles of incorporation, bylaws or comparable organizational documents;

12

(xii)    split, combine or reclassify any outstanding shares of its capital stock or other equity interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its equity interests;

(xiii)    redeem, purchase or acquire or offer to acquire any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(xiv)    acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or (B) assets of the Company, other than in the ordinary course of business consistent with past practices;

(xv)    incur any capital expenditures in excess of the amounts permitted under the DIP Facility in the ordinary course of business and in amounts consistent with historical business practices;

(xvi)    incur or suffer to exist any indebtedness, except indebtedness existing and outstanding immediately prior to the date hereof, trade payables and liabilities arising and incurred in the ordinary course of business, and indebtedness arising under the DIP Facility;

(xvii)    incur any liens or security interests, except as permitted under the DIP Facility;

(xviii)   enter into any collective bargaining agreements or materially modify any existing collective bargaining agreements;

(xix)    enter into any commitment or agreement with respect to debtor-in-possession financing or the use of cash collateral other than the DIP Facility unless such commitment or agreement satisfied the DIP Facility obligations in full in cash and such commitment or agreement complies in all respects with this Agreement and the Restructuring Term Sheet ;

(xx)    hire any executive or employee whose total compensation is greater than $350,000 or increase the compensation for any executive or employee whose total compensation is greater than $350,000; and

(xxi)    allow or settle claims or any pending litigation not otherwise insured under the Debtors' insurance policies and paid for by the Debtors' applicable insurance carrier for more than $200,000 per claim individually, or $1,000,000 in the aggregate.

(c)    <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

5.      **Termination of Agreement.**

(a)      Consenting Lenders' Termination Events.  The Requisite Consenting Lenders may terminate this Agreement as to all Parties, upon five (5) business days written notice (the "Termination Notice") delivered in accordance with Section 20 hereof, at any time after the occurrence of, and during the continuation of, any of the following events (each, a "Consenting Lenders' Termination Event"), unless waived in writing by the Requisite Consenting Lenders in their sole discretion:

(i)      the breach in any material respect by the Debtors of any of their covenants, obligations, representations or warranties under Sections 4(a), 4(b) or 8 of this Agreement; *provided*, *however*, the Company shall have five (5) business days from the receipt of a Termination Notice to cure such breach;

(ii)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of a material portion of the Restructuring Transaction; *provided*, *however*, that the Debtors shall have five (5) business days from receipt of a Termination Notice to cure any breach in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement;

(iii)      the occurrence of a Material Adverse Effect;

(iv)      the Chapter 11 Cases shall not have been filed on or before November 12, 2012;

(v)      the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(vi)      the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $500,000; provided that any modification of the automatic stay (A) provided by an order approving the DIP Facility that relates to the DIP Facility or authorizing the Debtors' use of cash collateral in connection with the DIP Facility or (B) to the extent reasonably necessary to permit the Debtors' employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum (and the filing of such claims) shall not constitute a Consenting Lenders' Termination Event;

(vii)      the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of a material executory contract or unexpired lease other than in accordance with the Restructuring Term Sheet or the Joint Plan or as otherwise approved in writing by the Requisite Consenting Lenders (which approval shall not be unreasonably withheld);

(viii)      the commencement of an avoidance action or other legal proceeding by the Company to challenge the validity, enforceability or priority of the First Lien Loan Claims,

14

or otherwise affect the rights and remedies of any of the Consenting Lenders (solely in their capacity as holders of the First Lien Loans);

(ix)     the Joint Plan is amended or otherwise modified so as to be materially inconsistent with this Agreement or the Restructuring Term Sheet;

(x)     the Bankruptcy Court enters an order denying the Exit Commitment Motion or otherwise fails to approve any fees contained in the Exit Commitment Letter (as defined in the Restructuring Term Sheet), including any commitment fee;

(xi)     the termination of, or occurrence of an event of default (as defined in the applicable agreement) under the DIP Facility or any commitment or agreement to provide exit financing to the Debtors to the extent permitted hereunder, which shall not have been cured within any applicable grace periods or waived pursuant to the terms of the commitment or agreement governing such facility;

(xii)     the termination of, or occurrence of an event of default (as defined in the applicable order or agreement) under, any order or agreement permitting the use of cash collateral to the extent permitted hereunder which shall not have been cured within any applicable grace periods or waived pursuant to the terms of such order or agreement;

(xiii)     the Bankruptcy Court having entered an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases; and

(xiv)     the failure to satisfy any of the conditions to effectiveness set forth in the Joint Plan by the deadlines set forth in such Joint Plan unless otherwise waived by the Requisite Consenting Lenders.

(b)     <u>Company Termination Events</u>.  The Company may terminate this Agreement as to all Parties upon delivery of a Termination Notice in accordance with Section 20 hereof, upon the occurrence of any of the following events:

(i)     the breach in any material respect by one or more of Consenting Lenders that hold a principal amount of the First Lien Loans such that the non-breaching Consenting Lenders fail to hold in excess of 33 ⅓% of the outstanding principal amount of the First Lien Loans of any of covenants, obligations, representations or warranties of the Consenting Lenders set forth in this Agreement; *provided*, *however*, the Consenting Lenders shall have five (5) business days from the receipt of a Termination Notice to cure such breach;

(ii)     the issuance by any required governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of a material portion of the Restructuring Transaction; *provided*, *however*, that the Consenting Lenders shall have five (5) business days from receipt of a Termination Notice to cure any breach in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement; or

15

(iii)   the board of directors of the Company after consultation with outside counsel reasonably determines in good faith that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law.

(c)   <u>Mutual Termination</u>.   This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Company and the Requisite Consenting Lenders.

(d)   <u>Effect of Termination</u>.   Upon the termination of this Agreement in accordance with this Section 5, and except as provided in Section 14 herein, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as otherwise expressly provided in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring Transaction or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the First Lien Loans, the Credit Agreement and any ancillary documents or agreements thereto; *provided, however*, that in no event shall any such termination relieve a Party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.   At any time prior to the expiration of the voting deadline, upon any such termination of this Agreement, a Consenting Lender may, upon written notice to the Debtors and the other Parties (and if prior to any deadline to vote on a Joint Plan, without seeking permission of the Bankruptcy Court), revoke its vote or any consents given by such Consenting Lender prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void ab initio and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement.   If this Agreement has been terminated in accordance with its terms at a time when permission of the Bankruptcy Court shall be required for a Consenting Lender to change or withdraw (or cause to change or withdraw) its vote to accept the Joint Plan, the Company shall not oppose any attempt by such Consenting Lender to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Debtors at law, equity, or otherwise, including those remedies set forth in Section 13.   The Consenting Lenders shall have no liability to the Debtors or to each other in respect of any termination of this Agreement in accordance with the terms of this Section 5 that was not challenged by the Debtors or was found by a court of competent jurisdiction to be validly exercised.

## 6.   <u>Good Faith Cooperation; Further Assurances; Acknowledgement.</u>

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (a) all matters relating to their rights hereunder in respect of the Company or otherwise in connection with their relationship with the Company, (b) all matters concerning the implementation of the Restructuring Transaction, and (c) the pursuit and support of the Restructuring Transaction (including confirmation of the Joint Plan).   Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement, including making and filing any required governmental or regulatory filings

16

and voting any claims against or securities of the Debtors in favor of the Joint Plan (provided that none of the Consenting Lenders shall be required to incur any material expenses, liabilities or other obligations in connection therewith), and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.  This Agreement is not, and shall not be deemed, a solicitation for consents to the Joint Plan or a solicitation to tender or exchange of any of the First Lien Loans.  The acceptance of the Joint Plan by the Consenting Lenders will not be solicited until the Consenting Lenders have received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

**7.    Plan Process Documents and Sale Process Documents.**

Each Party hereby covenants and agrees (i) to negotiate in good faith the Plan Process Documents and the Sale Process Documents and (ii) to execute (to the extent such Party is a party thereto) and otherwise support the Plan Process Documents and Sale Process Documents, as applicable.  For the avoidance of doubt, each Party agrees to (a) act in good faith and use commercially reasonable efforts to support and complete successfully the implementation of the Restructuring Term Sheet and the Joint Plan in accordance with the terms of this Agreement, (b) do all things reasonably necessary and appropriate in furtherance of consummating the Restructuring Transaction in accordance with, and within the time frames contemplated by, the Restructuring Term Sheet and this Agreement and (c) act in good faith and use commercially reasonable efforts to consummate the Restructuring Transaction as contemplated by the Restructuring Term Sheet and this Agreement.  The Company shall provide Stroock with drafts of all Restructuring Documents prior to their being executed and/or filed with the Bankruptcy Court, shall afford Stroock and the Consenting Lenders a reasonable opportunity to review and comment on all such documents.

**8.    Representations and Warranties.**

(a)    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Lender becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated under this Agreement and the Restructuring Term Sheet and perform its obligations contemplated under this Agreement and the Restructuring Term Sheet, and the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement and the Restructuring Term Sheet have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse

17

of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, other than breaches that arise from the filing of the Chapter 11 Cases;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission and in connection with the Chapter 11 Cases, the Joint Plan and the Disclosure Statement; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Lender severally (and not jointly), represents and warrants to the Debtors that, as of the date hereof (or as of the date such Consenting Lender becomes a party hereto), such Consenting Lender (i) is the beneficial owner of the aggregate principal amount of First Lien Loans set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Lender that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owners of such First Lien Loans, (A) sole investment or voting discretion with respect to such First Lien Loans, (B) full power and authority to vote on and consent to matters concerning such First Lien Loans or to exchange, assign and transfer such First Lien Loans or (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)    Each Consenting Lender severally (and not jointly), represents and warrants to the Debtors that, such Consenting Lender has made no prior assignment, sale, participation, grant, conveyance or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any First Lien Loans that are inconsistent with the representations and warranties of such Consenting Lender herein or would render such Consenting Lender otherwise unable to comply with this Agreement and perform its obligations hereunder.

## 9.    Disclosure; Publicity.

(a)    Not later than one (1) business day after the Filing Date, subject to the provisions set forth in Section 9(b) hereof, the Company shall disclose the existence of this Agreement and the terms hereof and of the Restructuring Term Sheet (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the date the Chapter 11 Cases are commenced) with such redactions as may be reasonably requested by Stroock on behalf of the Consenting Lenders to maintain the confidentiality of the items identified in Section 9(b) hereof, except as otherwise required by law.  In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any such Consenting Lender may publicly disclose the foregoing, including, without limitation, this Agreement and all of its

18

exhibits and schedules (subject to the redactions called for by this Section 9), and the Company hereby waives any claims against the Consenting Lenders arising as a result of such disclosure by a Consenting Lender in compliance with this Agreement.

(b)    The Company shall submit drafts to the Advisors of any documents that disclose of the existence or terms of this Agreement or the Restructuring Term Sheet, or any amendment to the terms of this Agreement at least three (3) business days prior to making any such disclosure, which such documents shall be subject to prior approval of the Requisite Consenting Lenders.    Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Lender, no Party or its advisors shall (i) use the name of any Consenting Lender in any public manner (except in connection with retention of professionals under section 327 of title 11 of the United States Code) or (ii) disclose to any person (including, for the avoidance of doubt, any other Consenting Lender), other than advisors to the Company, the principal amount or percentage of any First Lien Loans or any other securities of the Company held by any Consenting Lender, in each case, without such Consenting Lender's prior written consent; *provided, however*, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of First Lien Loans held by all the Consenting Lenders collectively.    Notwithstanding the provisions in this Section 9, (i) any Party hereto may disclose the identities of the Parties hereto in any action to enforce this Agreement or in an action for damages as a result of any breaches hereof and (ii) any Party hereto may disclose, to the extent consented to in writing by the affected Consenting Lender, such Consenting Lender's identity and individual holdings.

## 10.    **Amendments and Waivers.**

This Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented except in a writing signed by the Company and the Requisite Consenting Lenders; *provided, however*, that any modification of, or amendment or supplement to, this Section 10 or the definition of Requisite Consenting Lenders shall require the written consent of all of the Parties.    A Consenting Lenders' Termination Event may not be waived except in a writing signed by the Requisite Consenting Lenders.

## 11.    **Effectiveness.**

This Agreement shall become effective and binding when counterpart signature pages to this Agreement have been executed and delivered by (i) the Debtors, (ii) Consenting Lenders holding at least 50.1% in aggregate principal amount of the First Lien Loan Claim; *provided, however*, that signature pages executed by the Consenting Lenders shall be delivered to (x) other Consenting Lenders in a redacted form that removes each Consenting Lenders' holdings of First Lien Loan Claims, and (y) the Debtors and Stroock in an unredacted form.    Upon the Restructuring Support Effective Date, the Restructuring Term Sheet shall be deemed effective for the purposes of this Agreement and thereafter the terms and conditions therein may only be amended, modified, waived or otherwise supplemented as set forth in Section 10 above.

19

12.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS LOCATED IN THE STATE OF NEW YORK OR IN THE BANKRUPTCY COURT (FOR SO LONG AS THE DEBTORS ARE SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT) AND THE PARTIES HERETO IRREVOCABLY CONSENT TO THE JURISDICTION OF SUCH COURTS AND WAIVE ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES AND SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION OVER THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

13.    **Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys fees and costs) as a remedy of any such breach, in addition to any other remedy to which such non-breaching Party may be entitled, at law or in equity, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

14.    **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, the agreements and obligations of the Parties in this Section 14 and Sections 5(d), 9, 10, 12, 13, 16, 17, 18, 21, 22, 23, and 26 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

15. **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

16. **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives; *provided, however*, that nothing contained in this Section 16 shall be deemed to permit sales, assignments or other Transfers of the First Lien Loans or First Lien Loan Claims or Non-First Lien Loan Claims other than in accordance with Section 3(d) of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the Restructuring Transaction contemplated hereby are not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the Restructuring Transaction contemplated hereby are consummated as originally contemplated to the greatest extent possible.

17. **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof, other than any No Recourse Party with respect to Section 26 herein.

18. **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (including the Restructuring Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Lender shall continue in full force and effect.

19. **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this Section 19.

20.    **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

(1)    If to the Company, to:

AMF Bowling Worldwide, Inc.
7313 Bell Creek Road
Mechanicsville, VA 231111
Attention:  Dan McCormack

With a copy to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Fax: (312) 862-2200
Attention:    Patrick J. Nash
                      and
                      Jeffrey D. Pawlitz

And

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:  Joshua A. Sussberg

(2)    If to a Consenting Lender or a transferee thereof, to the addresses or facsimile numbers set forth below following the Consenting Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Fax: (212) 806-6006
Attention:   Kristopher M. Hansen, Esq.
                      and
                      Sayan  Bhattacharyya, Esq.

22

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

### 21.    **Reservation of Rights; No Admission.**

Except as expressly provided in this Agreement and in any amendment among the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries. Except as expressly provided in this Agreement and in any amendment among the Parties, if the transactions contemplated by the Restructuring Transaction are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. This Agreement and the Restructuring Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 22.    **Prevailing Party.**

If any Party brings an action or proceeding against any other Party based upon a breach by such Party of its obligations hereunder, the prevailing Party shall be entitled to all reasonable expenses incurred, including reasonable attorneys', accountants' and financial advisors fees in connection with such action or proceeding.

### 23.    **Relationship Among Parties.**

It is understood and agreed that no Consenting Lender has any duty of trust or confidence in any kind or form with any other Consenting Lender as a result of this Agreement, and, except as expressly provided in this Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any Consenting Lender may trade in the First Lien Loans or other debt or equity securities of the Company without the consent of the Company or any other Consenting Lender, subject to applicable securities laws and the terms of this Agreement; provided, however, that no Consenting Lender shall have any responsibility for any such trading to any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Consenting Lenders shall in any way affect or negate this understanding and agreement.

24. **Fiduciary Duties.**

Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Debtors or any directors or officers of the Debtors (in such person's capacity as a director or officer of the Debtors) to take any action, or to refrain from taking any action, to the extent required, in the opinion of counsel, to comply with its or their fiduciary obligations under applicable law.  Nothing herein will limit or affect, or give rise to any liability, to the extent required for the discharge of the fiduciary obligations described in this Section 24.

25. **Representation by Counsel.**

Each Party acknowledges that it has been represented by, or provided a reasonable period of time to obtain access to and advice by, counsel with this Agreement and the Restructuring Transaction contemplated herein.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

26. **No Recourse.**

Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, the Parties covenant, agree and acknowledge that no recourse under this Agreement shall be had against any former, current or future directors, officers, agents, affiliates, general or limited partners, members, managers, employees, stockholders or equity holders of any Party or any former, current or future directors, officers, agents, affiliates, employees, general or limited partners, members, managers, employees, stockholders or equity holders of any of the foregoing, as such (any such person or entity, a "No Recourse Party"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no liability whatsoever shall attach to, be imposed on or otherwise be incurred by any No Recourse Party for any obligation of any Party under this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

27. **Independent Analysis.**

Each of the Consenting Lender hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

*[Signature Pages Follow]*

24

**[Restructuring Support Agreement Signature Pages]**

AMF Bowling Worldwide, Inc.
Kingpin Intermediate Corp.
American Recreation Centers Inc.
AMF BCH LLC
AMF Bowling Centers Holdings Inc.
AMF Bowling Mexico Holding, Inc.
AMF Holdings, Inc.
AMF WBCH LLC
AMF Worldwide Bowling Centers
Holdings Inc.
King Louie Lenexa, Inc.
AMF Beverage Company Of Oregon, Inc.
Bush River Corporation
AMF Bowling Centers, Inc.
Boliches AMF, Inc.

By: _____
    Name:
    Title:


300, Inc.

By: _____
    Name:
    Title:


**[CONSENTING LENDER]**

By: _____

Name: _____

Title: _____

Principal Amount of First Lien Loans:  $_____

Notice Address:

_____

_____

Fax: _____
Attention: _____

[Restructuring Support Agreement Signature Pages]

**CONSENTING LENDER**

█████████████████████

By:    █████████████████ 

Name:  ████████████

Title: ███████████████

Principal Amount of First Lien Loans:  $█████████████

Notice Address:

█████████████████████████████████

Fax:   ████████████

Attention:  ██████████████

**[Restructuring Support Agreement Signature Pages]**

**CONSENTING LENDER**

By:

Name:

Title:

Principal Amount of First Lien Loans:  $

Notice Address:

Fax:

Attention:

**[Restructuring Support Agreement Signature Pages]**

**CONSENTING LENDER**

████████████████████████████

By:     ████████████████████

Name:   ████████████████████

Title:  ████████████████████

Principal Amount of First Lien Loans:  $██████████████

<u>Notice Address:</u>

████████████████████████████████████

Fax:    ████████████████████
Attention:  ████████████████████

**[Restructuring Support Agreement Signature Pages]**

**CONSENTING LENDER**

██████████████████████████

By: _____████████████████████████

Name: _____████████████████████████

Title: _____

Principal Amount of First Lien Loans: $ ██████████

Notice Address:
_____████████████
████████████████████████████████
████████████████████████████████

Fax: ____████████████_____

Attention: ____████████████____

**[Restructuring Support Agreement Signature Pages]**

**CONSENTING LENDER**



By: _____

Name: _____

Title: _____

Principal Amount of First Lien Loans: 

Notice Address:

_____

_____

Fax: _____

Attention: _____

**[Restructuring Support Agreement Signature Pages]**

**CONSENTING LENDER**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

By: _____▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮____

Name: _▮▮▮▮▮▮▮▮▮▮▮▮▮_____

Title: _▮▮▮▮▮▮▮▮_____

Principal Amount of First Lien Loans:  $_▮▮▮▮▮▮▮▮▮▮▮▮▮_

<u>Notice Address</u>:

_▮▮▮▮▮▮▮▮▮▮▮▮▮▮_____
_▮▮▮▮▮▮▮▮▮▮▮▮▮▮_____
_____
Fax: _▮▮▮▮▮▮▮▮_____
Attention: _▮▮▮▮▮▮▮▮▮▮▮▮▮▮

EXHIBIT A
RESTRUCTURING TERM SHEET

EXECUTION VERSION

**AMF BOWLING WORLDWIDE, INC., et al.,**
**RESTRUCTURING TERM SHEET**

THIS TERM SHEET (THE "TERM SHEET"), WHICH IS EXHIBIT A TO THE RESTRUCTURING SUPPORT AGREEMENT DATED NOVEMBER 12, 2012 (AS AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "RSA"),[1] DESCRIBES THE MATERIAL TERMS OF A PROPOSED RESTRUCTURING TRANSACTION FOR KINGPIN HOLDINGS, LLC ("HOLDINGS"), KINGPIN INTERMEDIATE CORP. ("KINGPIN"), AMF BOWLING WORLDWIDE, INC. (THE "COMPANY") AND CERTAIN OF THEIR SUBSIDIARIES (COLLECTIVELY, THE "DEBTORS"), THE TERMS OF WHICH WILL BE EFFECTUATED PURSUANT TO A JOINT PLAN OF REORGANIZATION (THE "JOINT PLAN"), WHICH JOINT PLAN WILL BE CONSISTENT IN ALL MATERIAL RESPECTS WITH THIS TERM SHEET AND WHICH WILL BE CONFIRMED IN THE DEBTORS' VOLUNTARY, PRE-ARRANGED REORGANIZATION CASES (TO BE JOINTLY ADMINISTERED) UNDER CHAPTER 11 (THE "CHAPTER 11 CASES") OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE") IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA (THE "BANKRUPTCY COURT").

THE TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE DEBTORS, NOR IS IT A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THE TERM SHEET IS PROVIDED IN ACCORDANCE WITH THE EXISTING CONFIDENTIALITY ARRANGEMENTS AND MAY NOT BE DISTRIBUTED WITHOUT THE EXPRESS WRITTEN CONSENT OF THE DEBTORS.  THE TERM SHEET REPRESENTS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS.  ACCORDINGLY, THE TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

**THE TERM SHEET DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE DEFINITIVE DOCUMENTATION GOVERNING THE RESTRUCTURING TRANSACTION(S), WHICH REMAIN SUBJECT TO DISCUSSION AND**

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings set forth later herein or in the RSA.

**NEGOTIATION AND THE AGREEMENTS AND CONSENTS REFLECTED IN THE RSA.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE RSA AND THE TERM SHEET, THE RSA SHALL CONTROL.**

| OVERVIEW | |
|---|---|
| **Restructuring Transactions Summary** | Prior to commencement of the Chapter 11 Cases, the Debtors and Consenting Lenders holding in excess of 50.0% in principal amount outstanding under the First Lien Facility shall have executed an RSA, pursuant to which the Debtors will agree to pursue and implement the Joint Plan pursuant to the terms of the RSA and this Term Sheet.<br><br>Pursuant to the RSA, the Debtors shall simultaneously (i) commence a process of marketing (a) substantially all of the assets of the Debtors or (b) new stock of the Reorganized Debtors to determine the highest *bona fide* offer (*i.e.*, the highest amount of Consideration (as defined in the RSA)) with respect to the purchase of the Debtors' assets or stock in connection with a sale process (the "<u>Marketing Process</u>") that will result in, among other things, payment in full in cash of all outstanding obligations under the DIP Facility, the First Lien Facility, and sponsorship of the Joint Plan (on terms consistent with those set forth herein, including funding of the Administration Fund) (the "<u>Sale Transaction</u>") and (ii) file a Joint Plan which will, among other things, provide that:<br><br>1.    Each First Lien Lender will receive, in satisfaction of all outstanding obligations under the First Lien Facility:<br><br>    a)    if no Sale Transaction is consummated:<br><br>        i)    its pro rata share of the proceeds of no less than $135 million of the Exit Term Loan, and<br><br>        ii)    its pro rata share of 100% of the New Equity (subject to dilution for the MEIP and the Second Lien Warrants) (the "<u>Equity Distribution</u>") (both (a)(i) and (a)(ii), the "<u>Plan Transaction</u>", and together with the Sale Transaction, the "<u>Restructuring Transaction</u>"); <u>OR</u><br><br>    b)    if a Sale Transaction is consummated, payment in full in cash.<br><br>2.    Within 1 calendar day of the Filing Date, the Debtors shall file a motion seeking approval to enter into the Amended iStar Agreements upon consummation of the Joint Plan (as part of the Restructuring Transaction) in accordance with the terms and conditions agreed to by the Debtors and iStar Bowling Centers I LP ("<u>iStar I</u>") and iStar Bowling Centers II LP ("<u>iStar II</u>," and together with iStar I, "<u>iStar</u>") and memorialized in the Amended iStar Agreements, which Amended iStar Agreements and related |

2

|  | motion (the "iStar Motion") shall be filed under seal with the Bankruptcy Court. |
|  | 3.   To facilitate the Restructuring Transaction, the Debtors will enter into the DIP Facility, which will (i) immediately replace all existing Letters of Credit with new letters of credit (the "Replacement Letters of Credit") pursuant to an emergency interim order as of the commencement of the Chapter 11 Cases but in no event later than November 14, 2012 and (ii) include a draw to cash collateralize the Replacement Letters of Credit. |
|  | 4.   As part of the Plan Transaction, the Replacement Letters of Credit (to the extent not terminated previously by their terms) will be replaced by letters of credit issued pursuant to the Exit Revolver. |
|  | 5.   Any bid made in connection with the Sale Transaction must, pursuant to the Bidding Procedures, at a minimum include a commitment to indefeasibly pay all of the allowed DIP Facility Claims and First Lien Loan Claims in full in cash on the Effective Date and sponsor the Joint Plan (including payment of the Administration Fund) and provide evidence that the Bidder (as defined in the Bidding Procedures) or the entity designated by the Bidder to be the assignee of the Amended iStar Agreements (if other than the Bidder) satisfies all requirements of a transferee permitted under Section 25(b) of the Amended iStar Agreements. |
|  | The Joint Plan will not contemplate the substantive consolidation of the Debtors' estates.  Instead, the Joint Plan, although to be proposed jointly, will constitute a separate plan for each of the 16 Debtors in the Chapter 11 Cases.  Holders of allowed claims or interests against each of the Debtors will receive the same recovery provided to other holders of allowed claims or interests in the applicable class and will be entitled to their share of assets available for distribution to such class. |
| **Restructured Indebtedness** | The Joint Plan will restructure prepetition obligations of the Debtors that include:<br><br>(1) approximately $216.0 million in unpaid principal, plus interest and fees arising under or in connection with that certain First Lien Credit Agreement, including payment on account of any accrued but unpaid interest (including post-petition interest at the default contract rate) (the "First Lien Loan Claims"), dated as of June 12, 2007, among Intermediate and the Company, as borrowers, Credit Suisse AG, Cayman Islands Branch, as administrative agent (together with any successors or assigns, the "First Lien Agent"), and the lenders from time to time party thereto (the "First Lien Lenders") (as amended, restated, supplemented or otherwise modified from time to time) (the "First Lien Facility");<br><br>(2) approximately $19.4 million in issued and outstanding letters of credit under the First Lien Facility, plus any and all fees accrued under or arising from such letters of credit, to the extent not previously terminated by their terms or replaced |

3

|  | by Replacement Letters of Credit and cash collateralized pursuant to the DIP Facility (the "<u>Letters of Credit</u>"); and<br><br>(3) approximately $80.0 million in unpaid principal, plus interest and fees arising under or in connection with that certain Second Lien Credit Agreement (the "<u>Second Lien Loan Claims</u>"), dated as of June 12, 2007, among Intermediate and the Company, as borrowers, Gleacher Products Corp., as administrative agent (together with any successors or assigns, the "<u>Second Lien Agent</u>"), and the lenders from time to time party thereto (the "<u>Second Lien Lenders</u>") (as amended, restated, supplemented or otherwise modified from time to time) (the "<u>Second Lien Facility</u>"). |
|---|---|
| **Assumption of iStar Agreements, As Amended** | Within 1 calendar day of the Filing Date, the Debtors shall file a motion seeking entry of an order by November 21, 2012 (the "<u>iStar Order</u>"), in form and substance reasonably acceptable to iStar, (i) authorizing and directing the Debtors to assume, in accordance with the amended and modified terms agreed to by the Debtors and iStar, pursuant to section 365(a) of the Bankruptcy Code, that certain (A) Lease I Agreement, dated as of February 27, 2004, by and between iStar I, as lessor, and the Company, as lessee (the "<u>iStar I Agreement</u>"), and (B) Lease II Agreement, dated as of February 27, 2004, by and between iStar II, as lessor, and the Company, as lessee (the "<u>iStar II Agreement</u>," and together with the iStar I Agreement, the "<u>Existing iStar Agreements</u>") (as amended and otherwise modified pursuant to the Restructuring Transaction, the "<u>Amended iStar Agreements</u>"), the form of which shall be attached to the iStar Motion and shall be reasonably acceptable to the Requisite Consenting Lenders; *provided, however*, the assumption of the Amended iStar Agreements shall be conditioned upon, and subject in all respects to, the consummation and occurrence of the Effective Date of the Joint Plan and the conditions set forth in the succeeding paragraph; *provided, further*, that iStar agrees, and expressly consents to (x) the Plan Transaction (provided that the terms and conditions of the Exit Term Loan and (to the extent applicable) the Exit Revolver are materially no worse than those reflected on **Exhibit 1** hereto and that the aggregate principal amount of the Exit Term Loan and the Exit Revolver shall not exceed $200 million, with any material modification being subject to iStar's consent and the Reorganized Debtors implement a business plan materially consistent with the Debtors' Business Plan Review, dated September 2012 and their management presentation to iStar on September 17, 2012 and subject to a mutually acceptable formulation, as among the Debtors, iStar and the Exit Backstop Parties, with respect to the standard for review regarding the Exit Term Loan financial covenants), and (y) subject to the succeeding paragraph, a Sale Transaction, including the assignment of the Amended iStar Agreements, if the assignee in the Sale Transaction designated by the Winning Bidder satisfies all requirements of a transferee permitted under Section 25(b) of the Amended iStar Agreements, as determined with the consent of iStar, which consent shall not be unreasonably withheld; and (ii) authorizing and directing the Debtors to make immediate payment of all Fixed Rent, Additional Rent (as such terms are defined in the Existing iStar Agreements) and other charges due and owing to iStar under the Existing iStar Agreements for the months of September, October, and November 2012 (in its entirety and not prorated) upon entry of the iStar Order (and notwithstanding the delayed |

4

| | |
|---|---|
| | effectiveness of the assumption of the Amended iStar Agreements) (the "<u>Pre-Petition Rent</u>").<br><br>The iStar Order shall provide that the assumption, or the assumption and assignment, and effectiveness of the Amended iStar Agreements will be subject to (i) the Debtors' prior payment of the Pre-Petition Rent and, upon the date of such assumption, or assumption and assignment, the cure of any then outstanding defaults under the Existing iStar Agreements (other than failure to comply with Section 20(c) of the iStar Agreements); (ii) iStar's prior approval of (A) the form of all real property conveyance documents and exhibits contemplated by the Amended iStar Agreements (including, without limitation, amended and restated guaranties), (B) the status of title to all real property being conveyed under the Amended iStar Agreements and satisfactory completion of due diligence with respect to such properties (including, for example only, environmental reviews, surveys, updated title reports and title insurance policies), and (C) with respect to a Sale Transaction, the Winning Bidder's equity sponsorship, business plan, and proposed debt financing, provided that debt financing on terms substantially similar to the Exit Financing applicable to a Plan Transaction will be deemed acceptable to iStar; (iii) iStar and the Debtors' agreement on the definitions of "EBITDA" and terms ancillary thereto and the addition of State of Kansas specific provisions; and (iv) the Debtors' payment of all of iStar's reasonable and documented fees and expenses (based on summary invoices, which shall exclude narrative descriptions and shall not constitute or result in a waiver of any right or privilege) related to the Amended iStar Agreements and the Chapter 11 Cases.<br><br>The iStar Order shall further provide that (x) the Debtors' payment of all Pre-Petition Rent and other charges to iStar pursuant to the iStar Order shall be fully earned and unavoidable upon entry of the iStar Order regardless of whether the Amended iStar Agreements are ultimately assumed or become effective; (y) no terms of the Amended iStar Agreements shall be modified following submission of the Amended iStar Agreements to the Bankruptcy Court pursuant to the iStar Motion without the consent of iStar, which may be withheld in its sole and absolute discretion; and (z) the Bankruptcy Court shall retain jurisdiction (1) to resolve any disputes with respect to terms of the Amended iStar Agreements that are to be agreed upon in connection with the Restructuring Transaction and (2) in the event the Restructuring Transaction is not consummated, in which case all rights are reserved (except as otherwise provided in (x) above). |
| **Terms Related to the Sale Transaction** | Within 5 calendar days of the date upon which the Debtors commence the Chapter 11 Cases (the "<u>Filing Date</u>"), the Debtors shall file a motion seeking approval of the procedures (the "<u>Bidding Procedures</u>," as described on **Exhibit 3**) to implement the Marketing Process.  Any offer made through the Marketing Process for a Sale Transaction must, at a minimum, include a commitment to indefeasibly pay all of the allowed DIP Facility Claims and First Lien Loan Claims in full in cash on the Effective Date and sponsor the Joint Plan (including payment of the Administration Fund).<br><br>If a Sale Transaction is consummated, the Joint Plan will provide that: |

5

| | |
|---|---|
| | 1. each First Lien Lender will receive, in satisfaction of all outstanding obligations under the First Lien Facility, payment in full in cash;<br><br>2. the proceeds of the Sale Transaction will be used, among other things, to pay claims arising under the DIP Facility (the "DIP Facility Claims") in full in cash, to pay allowed administrative and priority claims, to make other distributions as set forth in the Joint Plan, to fund the Administration Fund, and to fund general expenses incurred in the ordinary course of business;<br><br>3. an entity (reasonably acceptable to the Requisite Consenting Lenders) shall be designated by the Debtors as the plan administrator (the "Plan Administrator") pursuant to the Joint Plan (as set forth in the Joint Plan or the Plan Supplement) to effectuate the administration and closing of the Debtors' Chapter 11 Cases following the Effective Date, as set forth in the Joint Plan; and<br><br>4. an amount determined by the Debtors and the Requisite Consenting Lenders that is sufficient to pay all administrative and priority claims through the Effective Date of the Joint Plan (the "Administration Fund"), shall be held in trust by the Plan Administrator and used solely to administer the Debtors' estates. |
| **Terms Related to the Plan Transaction** | In the event that a Sale Transaction does not occur, the Debtors will consummate the Plan Transaction as provided herein.  To effectuate the Plan Transaction, on the Effective Date, the Reorganized Debtors shall enter into the Exit Revolver and the Exit Term Loan.<br><br>If a Plan Transaction is effectuated, the Joint Plan will provide that:<br><br>1. Each First Lien Lender will receive, in satisfaction of all outstanding obligations under the First Lien Facility:<br><br>    a) its pro rata share of no less than $135 million of the proceeds of the Exit Term Loan; and<br><br>    b) the Equity Distribution;<br><br>2. the Replacement Letters of Credit (to the extent not terminated previously by their terms) will be replaced by letters of credit issued pursuant to the Exit Revolver, and will be cash collateralized by the proceeds of the Exit Revolver; and<br><br>3. the remaining proceeds of the Exit Term Loan and/or cash on hand will be used, among other things, to pay the DIP Facility Claims in full in cash, to pay allowed administrative and priority claims, to make other distributions as set forth in the Joint Plan, to fund the Administration Fund, and to fund general expenses incurred in the ordinary course of |

6

| | |
|---|---|
| | business. |
| **DIP Financing** | Pursuant to the Restructuring Transaction, the Debtors shall seek approval of a senior secured debtor-in-possession postpetition financing agreement (the "DIP Agreement," and together with related loan, security, collateral, and other documents, the "DIP Facility") in the aggregate amount of approximately $50.0 million, to be entered into by each of the Debtors other than Kingpin, one or more existing First Lien Lenders (collectively, the "DIP Lenders"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent (together with any successors or assigns, the "DIP Agent"). A copy of the proposed DIP Agreement shall be attached as an exhibit to the RSA.<br><br>Proceeds of the DIP Facility will be used to immediately replace all existing Letters of Credit in favor of iStar pursuant to an emergency interim order as of the commencement of the Chapter 11 Cases, but in no event later than November 14, 2012, with new letters of credit identical in all respects (except that the expiration of the replacement letters of credit shall be one year from the date of their issuance) and for such other purposes set forth in the DIP Agreement. The Replacement Letters of Credit issued to iStar shall be on identical terms as the Letters of Credit securing the Existing iStar Agreements except that the expiration date of such Replacement Letters of Credit shall be one year from the date of their issuance by the DIP Lenders. |
| **Exit Financing** | In the event that the Plan Transaction is consummated through the Joint Plan, then on the date that the Joint Plan is consummated (the "Effective Date"), the reorganized Debtors (including Reorganized Holdings, the "Reorganized Debtors") shall enter into a new revolving credit facility in an amount up to $40 million (the "Exit Revolver") and either (i) a senior secured, first lien facility in an amount up to $154.5 million (the "Backstop Party Term Loan"), the material terms of which shall be substantially as set forth in **Exhibit 1** hereto, that is backstopped by certain of the Requisite Consenting Lenders (the "Exit Backstop Parties"), on terms to be set forth in the Exit Commitment Letter, by and between the Exit Backstop Parties and the Debtors (the "Exit Commitment Letter"), a form of which is annexed hereto as **Exhibit 2**, and as otherwise provided herein, or (ii) a third-party financing, on more favorable terms than those set forth in **Exhibit 1** and, in any event, on terms and in substance acceptable to the Debtors and reasonably acceptable to the Requisite Consenting Lenders, in an amount up to $150 million (the "Third Party Term Loan"). As used herein, "Exit Term Loan" shall refer to either the Backstop Party Term Loan or the Third Party Term Loan, as applicable, and the Exit Revolver, together with the Exit Term Loan, shall be referred to as the "Exit Facility".<br><br>Exit financing entered into as part of the Plan Transaction shall be used to, among other things, (i) satisfy obligations under the Joint Plan, including a portion of the First Lien Loan Claims and the DIP Facility Claims in full in cash, (ii) replace the Replacement Letters of Credit issued under the DIP Facility with new letters of credit issued pursuant to the Exit Revolver, and (iii) to fund general expenses incurred in the ordinary course of business. |

| Cancellation of Instruments, Certificates, and Other Documents/ Issuance of New Equity | On the Effective Date, except to the extent otherwise provided above, all instruments, certificates, and other documents evidencing debt or equity interests in the Debtors shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged.<br><br>Additionally, on the Effective Date, Holdings' existing equity will be cancelled and reorganized Holdings ("Reorganized Holdings") will issue new equity (the "New Equity") pursuant to the Joint Plan. |
| --- | --- |

**CLASSIFICATION AND TREATMENT OF CLAIMS**

**Treatment of Unclassified Claims**

| DIP Facility Claims | **Treatment.**  On the Effective Date, each holder of an allowed DIP Facility Claim shall be repaid in full in cash. |
| --- | --- |
| Administrative Claims | **Treatment.**  Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) of the Bankruptcy Code to the extent such claim has not already been paid during the Chapter 11 Cases (each, an "Administrative Claim"), shall receive payment in full, in cash, of the unpaid portion of its allowed Administrative Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such Administrative Claim and the Debtors.  Administrative Claims shall include reasonable fees and out-of-pocket expenses incurred by the Backstop Parties, including fees and expenses of the Backstop Parties' advisors, incurred in connection with the Backstop Commitment. |
| Priority Tax Claims | **Treatment.**  Each holder of an allowed claim described in section 507(a)(8) of the Bankruptcy Code, to the extent such claim has not already been paid during the Chapter 11 Cases (collectively, the "Priority Tax Claims"), shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. |

**Treatment of Classified Claims and Interests**

| Other Priority Claims | **Treatment.**  Each holder of an allowed claim described in section 507(a) of the Bankruptcy Code other than a Priority Tax Claim, to the extent such claim has not already been paid during the Chapter 11 Cases (collectively, the "Other Priority Claims"), shall receive payment in full, in cash, of the unpaid portion of its Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of an Other Priority Claim and the Debtors.<br><br>**Voting.**  Unimpaired.  Each holder of an Other Priority Claim will be conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Other Priority Claim will not be entitled to vote to accept or reject the Joint Plan. |
| --- | --- |

8

| | |
|---|---|
| **Other Secured Claims** | **Treatment.**  Each holder of an allowed prepetition secured claim other than a First Lien Loan Claim or Second Lien Loan Claim (each, an "<u>Other Secured Claim</u>") shall receive either (i) payment in full in cash of the unpaid portion of its Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.<br><br>**Voting.**   Unimpaired.   Each holder of an Other Secured Claim will be conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Other Secured Claim will not be entitled to vote to accept or reject the Joint Plan. |
| **First Lien Loan Claims** | **Allowance.**  The First Lien Loan Claims shall be allowed in an aggregate amount equal to approximately $216.0 million, plus interest and fees due and owing under the First Lien Facility as of the Effective Date pursuant to the terms of the First Lien Facility or related documents, including payment on account of any accrued but unpaid interest (including post-petition interest at the default contract rate) and/or accrued but unpaid fees arising from the Letters of Credit.<br><br>**Treatment.**  On the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a holder of a First Lien Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed First Lien Loan Claim, each holder of a First Lien Loan Claim shall receive either:<br><br>(i)  if no Sale Transaction is consummated, (a) its pro rata share of no less than $135 million of the proceeds of the Exit Term Loan, and (b) the Equity Distribution; or<br><br>(ii)  if a Sale Transaction is consummated, payment in full in cash.<br><br>**Voting.**  Impaired.  Each holder of a First Lien Loan Claim will be entitled to vote to accept or reject the Joint Plan. |
| **Second Lien Loan Claims** | **Allowance.**   The Second Lien Loan Claims shall be allowed in an aggregate amount equal to approximately $80.0 million, plus accrued but unpaid interest as of the date upon which the Debtors commence the Chapter 11 Cases.<br><br>**Treatment.**  On the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a holder of a Second Lien Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed Second Lien Loan Claim, each holder of a Second Lien Loan Claim shall receive either:<br><br>(i)  if no Sale Transaction is consummated, warrants to acquire up to 10% of the New Equity that is issued and outstanding on the Effective Date, subject to dilution by any MEIP awards and the subsequent issuance of equity or equity linked securities, at a price that is equal to 115% of the Claim Hurdle (the "<u>Second Lien Warrants</u>").  For purposes of calculating |

9

| | |
|---|---|
| | the Second Lien Warrants purchase price, the "Claim Hurdle" is equal to the principal amount of the DIP Facility Claims and the First Lien Loan Claims, plus any allowed administrative and priority claims.  The Second Lien Warrants shall only be exerciseable in the event that all or substantially all of the New Equity is sold for cash within three years from the Effective Date. The Second Lien Warrants will otherwise be on terms and in form and substance reasonably acceptable to the Requisite Consenting Lenders (which terms will be further described in a term sheet to filed as a supplement to the Joint Plan); or<br><br>(ii)  if a Sale Transaction is consummated, such holder's pro rata share of such cash or non-cash consideration available, if any, until satisfied in full to holders of Second Lien Loan Claims, after all DIP Facility Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and First Lien Loan Claims have been paid and satisfied in full pursuant to the Joint Plan and the Administration Fund has been funded.<br><br>**Voting.**  Impaired.  Each holder of a Second Lien Loan Claim will be entitled to vote to accept or reject the Joint Plan. |
| **General Unsecured Claims** | **Treatment.**  On the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a holder of an allowed, general unsecured claim (each, a "***General Unsecured Claim***") agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed General Unsecured Claim, each holder of a General Unsecured Claim shall receive, subject to applicable law, either:<br><br>(i)  if no Sale Transaction is consummated and to the extent permitted under applicable law, such holder's pro rata share $300,000 amount of cash; or<br><br>(ii)  if a Sale Transaction is consummated, such holder's pro rata share of such cash or non cash consideration available, if any, after satisfaction in full of the Second Lien Loan Claims.<br><br>**Voting.**  Impaired.  Each holder of a General Unsecured Claim will be entitled to vote to accept or reject the Joint Plan. |
| **[Convenience Class]**[2] | **[Treatment.**  Convenience class TBD, which shall receive a pro rata distribution of cash equal to $[__] in exchange for such holder's claim (each, a "<u>Convenience Class Claim</u>").<br><br>**Voting.**  Impaired.  Each holder of a Convenience Class Claim will be entitled to vote to accept or reject the Joint Plan.] |
| **Section 510(b)** | **Treatment.**  On the Effective Date, allowed claims arising under section 510(b) |

---

[2]     To be included upon the consent of the Debtors and the Requisite Consenting Lenders.

| | |
|---|---|
| **Claims** | of the Bankruptcy Code (each, a "510(b) Claim"), if any, shall be cancelled without any distribution, and such holders of 510(b) Claims will receive no recovery.  Notwithstanding the prior sentence, if the Sale Transaction is consummated and the holders of General Unsecured Claims are paid in full, then holders of 510(b) Claims will receive such holder's pro rata share of cash or non-cash consideration available, if any, after satisfaction in full of the General Unsecured Claims. <br><br> **Voting.**  Impaired.  Each holder of a 510(b) Claim will be conclusively deemed to have rejected the Joint Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of a 510(b) Claim will not be entitled to vote to accept or reject the Joint Plan. |
| **Intercompany Claims** | **Treatment.**   Claims held by one Debtor against another Debtor (each, an "Intercompany Claim") may be reinstated as of the Effective Date or, at the Debtors' or Reorganized Debtors' option, be cancelled, and no distribution shall be made on account of such claims. <br><br> **Voting.**  Unimpaired.  Each holder of an Intercompany Claim will be conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Intercompany Claim will not be entitled to vote to accept or reject the Joint Plan. |
| **Intercompany Interests** | **Treatment.**  Interests in a Debtor held by another Debtor (each, an "Intercompany Interest") may be reinstated as of the Effective Date or, at the Debtors' or Reorganized Debtors' option, be cancelled, and no distribution shall be made on account of such interests. <br><br> **Voting.**   Unimpaired.   Each holder of an Intercompany Interest will be conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Intercompany Interest will not be entitled to vote to accept or reject the Joint Plan. |
| **Existing Equity Interests** | **Treatment.**  On the Effective Date, and subject to any potential recovery through a Sale Transaction, existing equity interests in Kingpin (each, an "Existing Equity Interest") shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Existing Equity Interests on account of such Existing Equity Interests.   Notwithstanding the prior sentence, if the Sale Transaction is consummated and the holders of 510(b) Claims are paid in full, then holders of Existing Equity Interests will receive such holder's pro rata share of cash or non-cash consideration available, if any, after satisfaction in full of the 510(b) Claims. <br><br> **Voting.**   Impaired.   Each holder of an Existing Equity Interest will be conclusively deemed to have rejected the Joint Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of an Existing Equity Interest will not be entitled to vote to accept or reject the Joint Plan. |

11

| GENERAL PROVISIONS/ CORPORATE GOVERNANCE/ CHARTER PROVISIONS/RELEASES | |
|---|---|
| **Management Equity Incentive Plan** | On the Effective Date, the Reorganized Debtors shall implement a management equity incentive plan (the "MEIP").  On the Effective Date, an amount, no less than 7.5% and no more than 10%, of the fully diluted New Equity shall be reserved for equity grants to continuing officers and employees of the Reorganized Debtors, on terms to be negotiated and included in the supplement to the Joint Plan (the "Plan Supplement"), and such MEIP shall be in form and substance acceptable to the Requisite Consenting Lenders (if no Sale Transaction is consummated). |
| **Initial Board of Directors and Officers of Reorganized Kingpin** | To be set forth in the Plan Supplement. |
| **Assumption of Contracts** | All executory contracts to which the Debtors are a party shall be assumed under the Joint Plan on the Effective Date unless specifically rejected, as agreed between the Debtors and the Requisite Consenting Lenders (if no Sale Transaction is consummated) during the pendency of the Chapter 11 Cases. |
| **Charter; Bylaws** | The charter, bylaws and/or other organizational documents of the Debtors shall be amended and restated for the Reorganized Debtors in a manner consistent with section 1123(a)(6) of the Bankruptcy Code, and shall otherwise be in form and substance satisfactory to the Requisite Consenting Lenders (if no Sale Transaction is consummated). |
| **Debtor Releases** | "Released Party" means each of the following in their capacity as such:  (a) the First Lien Agent; (b) the Second Lien Agent; (c) the DIP Agent; (d) the DIP Lenders; (e) holders of First Lien Loan Claims; (f) holders of Second Lien Loan Claims; (g) iStar; (h) holders of Convenience Class Claims; (*i*) the official committee of unsecured creditors; (j) all other holders of claims and interests (related to such claims and interests against the Debtors, including Holders of Existing Equity), subject to any reservations on claims and/or causes of action as set forth in the Joint Plan or the Plan Supplement; (k) the Winning Bidder (if a Sale Transaction is consummated through a Joint Plan); (*l*) the agent under the Exit Revolver; (m) the agent under the Exit Term Loan; (n) the lenders party to the Exit Facility; and (o) with respect to the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (n) such person's current and former shareholders, affiliates, partners, subsidiaries, members, officers, directors, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective predecessors, successors, and assigns (in each case in their capacity as such).

**Releases by the Debtors.**  Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Joint Plan, for good and valuable consideration, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and |

12

their estates from any and all claims, obligations, rights, suits, damages, causes of action (including avoidance actions), remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors and/or Reorganized Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or equity interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transaction, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated under the Joint Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and equity interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Joint Plan and related disclosure statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

**Releases by Holders of Claims and Equity Interests.**  As of the Effective Date, to the fullest extent permitted by applicable law, each Released Party and each holder of a claim against or an equity interest in the Debtors shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, each Debtor's and/or Reorganized Debtor's current and former affiliates, partners, subsidiaries, officers, directors, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns (in each case in their capacity as such), and the Released Parties from any and all claims, equity interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of a debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, existing or hereafter arising, in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transaction, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Joint Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and equity interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Joint Plan, the related disclosure statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

| | |
|---|---|
| **Exculpation** | Customary exculpation provisions, including all Released Parties. |

13

| | |
|---|---|
| **Injunction** | Customary injunction provisions, including all Released Parties. |
| **Discharge** | Customary discharge provisions. |
| **Indemnification of Prepetition Officers and Directors** | All indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, board resolutions, indemnification agreements, or employment contracts) for the current directors, officers, and employees of the Debtors shall survive and remain in place following the Effective Date of the Restructuring Transaction. |
| **Tax Issues** | The Restructuring Transaction shall be structured to preserve favorable tax attributes to the extent practicable and shall be otherwise acceptable to the Requisite Consenting Lenders (if no Sale Transaction is consummated) or the Winning Bidder (if a Sale Transaction is consummated). |
| **Conditions Precedent** | The conditions precedent to the confirmation of the Joint Plan and the Effective Date shall be set forth in the Joint Plan and shall be acceptable to the Requisite Consenting Lenders (if no Sale Transaction is consummated) or the Winning Bidder (if a Sale Transaction is consummated). |
| **Fiduciary Duties** | At any time prior to the Effective Date, the Debtors shall be entitled to take any action, or to refrain from taking any action, including a decision to pursue any alternative restructuring, that the Debtors determine is consistent with their fiduciary obligations. |

14

## **Exhibit 1 to the Restructuring Term Sheet**

**Material Terms of the Backstop Party Term Loan**

**AMF BOWLING WORLDWIDE, INC.**

**SENIOR SECURED
EXIT TERM LOAN FACILITY**

**Summary of Terms and Conditions**

This Summary of Terms and Conditions ("Exit Term Sheet") outlines certain terms of the Exit Term Loan Facility (as defined below) referred to in that certain Commitment Letter, dated as of November 12, 2012 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Commitment Letter"), from the Agent and the Initial Exit Lenders (each as defined below) to the Borrower (as defined below).  This Term Sheet is part of, and subject to, the Commitment Letter. Capitalized terms used in this Term Sheet but not defined herein shall have the meanings given to them in the Commitment Letter.

| | |
|---|---|
| **Borrower:** | AMF Bowling Worldwide, Inc., as a reorganized debtor (the "Borrower") upon emergence from a case (together with the cases of its affiliated debtors and debtors-in-possession, the "Case") filed under Chapter 11 of Title 11 of the United States Code ("Chapter 11") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"). |
| **Guarantors:** | Kingpin Holdings, LLC, Kingpin Intermediate Corp. ("Kingpin") and each of the Borrower's existing and future direct and indirect domestic subsidiaries, as reorganized debtors upon emergence from the Case, on a joint and several basis (collectively, the "Guarantors"; together with the Borrower, each individually a "Loan Party", and collectively, the "Loan Parties"). |
| **Agent:** | Credit Suisse AG, Cayman Islands Branch (in such capacity, together with its successors and assigns, the "Agent"). |
| **Exit Lenders:** | The Initial Exit Lenders (as defined below) and any other entity approved by the Initial Exit Lenders, (together with their successors and permitted assignees, each an "Exit Lender", and collectively, the "Exit Lenders"). |
| **Initial Exit Lenders:** | Midtown Acquisitions, L.P., Credit Suisse Loan Funding LLC, Goldman Sachs Palmetto State Credit Fund, L.P. and Liberty Harbor Master Fund I, L.P. (each, an "Initial Exit Lender" and collectively, the "Initial Exit Lenders") |
| **Type and Amount of the Exit Term Loan Facility:** | A senior, secured term loan facility in an aggregate principal amount not to exceed $154.5 million (the "Exit Term Loan Facility"; the Exit Lenders' commitment under the Exit Term Loan Facility, the "Exit Commitment"; and the loans under the Exit Term Loan Facility, the "Exit Loans").  The Exit Loans will be made available in a single drawing on the Closing Date (as defined below).  The Exit Term Loan Facility will be offered to the Exit Lenders with 300 basis points of original issue discount on the amount thereof. |
| **Closing Date:** | On or before May 12, 2013, or if approved by the Exit Lenders, such later |

date, if any, on which the Loan Parties emerge from bankruptcy protection under Chapter 11 (the "Closing Date").

**Maturity:**  All Exit Obligations (as defined below) will be due and payable in full in cash on the earlier of (i) the fourth (4th) anniversary of the Closing Date and (ii) the acceleration of the Exit Loans upon the occurrence of an event referred to below under "Termination" (any such date, the "Exit Termination Date"). Principal of, and accrued interest on, the Exit Loans and all other amounts owing to the Agent and/or the Exit Lenders under the Exit Term Loan Facility shall be payable on the Exit Termination Date.

**Use of Proceeds**  The proceeds of the Exit Term Loan Facility (net of original issue discount and fees under the Fee Letter) will be used to repay indebtedness under that certain First Lien Credit Agreement, dated as of June 12, 2007 (as amended by Amendment No. 1 to First Lien Credit agreement, dated as of May 8, 2009, and Amendment No. 2 to First Lien Credit Agreement, dated as of May 3, 2012 and as further amended, waived, supplemented or restated from time to time, the "First Lien Credit Agreement") among Kingpin, the Borrower, the lenders party thereto and the Agent, in an aggregate amount not less than $135,000,000, and the remaining proceeds of the Exit Term Loan Facility may be used to (w) repay indebtedness under and replace the commitments under the Loan Parties' senior secured, priming and super-priority, debtor-in-possession delayed draw term loan credit facility, (x) fund other costs of exiting Chapter 11, (y) pay fees and expenses (including any fees and original issue discount with respect to the Exit Term Loan Facility) incurred in connection with the Exit Term Loan Facility and (z) provide working capital and for other general corporate purposes after emergence from Chapter 11.

**Documentation:**  The Exit Term Loan Facility will be evidenced by a credit agreement (the "Exit Credit Agreement"), security documents, guarantees and other legal documentation (collectively, together with the Exit Credit Agreement, the "Exit Loan Agreements") required by the Agent and the Exit Lenders, which Exit Loan Agreements shall be consistent with this Term Sheet and otherwise in form and substance satisfactory to the Agent and the Exit Lenders.

**Interest:**  The Loans will bear interest based on LIBOR ("LIBOR Loans") or Base Rate ("Base Rate Loans"), at the Borrower's option:

(a) LIBOR Loans: LIBOR Loans will bear interest at the Applicable Interest Margin (as defined below) *plus* the current LIBOR Rate (as defined below) as determined by the Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate, to be the rate at which United States Dollar deposits are offered to major banks in the London interbank market three (3) business days prior to the commencement of the requested interest period, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one, two or three months (the "LIBOR Rate"), payable at the end of the relevant interest period, but in any event at least quarterly; provided, however, that in no event shall the LIBOR Rate at

2

any time be less than 1.50%.

Interest on LIBOR Loans shall be calculated on the basis of the actual number of days elapsed in a 360 day year.

(b) Base Rate Loans: Interest on Base Rate Loans will accrue at the Base Rate plus the Applicable Interest Margin referred to below. Interest on the Base Rate Loans will be calculated on the basis of the actual number of days elapsed in a 365-day year (or a 366-day year in a leap year) and payable quarterly in arrears.

"Base Rate" means the highest of (i) the federal funds effective rate plus 1/2 of 1.00%, (ii) the rate of interest publicly announced by the Agent as its prime rate in effect at its principal office in New York City, and (iii) LIBOR for an interest period of one month beginning on such day plus 1.00%; provided, that the Base Rate shall not be less than 2.50% per annum.

Base Rate Loans may be borrowed with same day notice in minimum amounts to be agreed.

"Applicable Interest Margin" means a rate per annum equal to 9.50% with respect to the LIBOR Loans and 8.50% with respect to the Base Rate Loans.

**Default Interest:** Upon the occurrence of and during the continuance of a default or an Event of Default under the Exit Loan Agreements, the Exit Loans will bear interest at an additional 2.00% *per annum*.

**Fees:** The Loan Parties shall pay the fees payable to the Initial Exit Lenders and the Agent as and when set forth in that certain Fee Letter, dated as of November 12, 2012 (the "Fee Letter"), by and between the Borrower and the Agent.

**Optional Prepayments:** The Loan Parties may voluntarily prepay the Exit Loans in minimum increments to be agreed, without any prepayment premium or penalty.

**Mandatory Prepayments:** The Exit Credit Agreement will contain customary mandatory prepayment events for financings of this type and others agreed to by the Exit Lenders and the Borrower ("Mandatory Prepayments"), including, without limitation, prepayments (a) from proceeds of (i) asset sales, including without limitation any asset sales by any of the Loan Parties' foreign or U.S. subsidiaries and/or of the Loan Parties' or the Loan Parties' subsidiaries' interest in QubicaAMF Worldwide, S.à.r.l., (ii) insurance and condemnation proceeds, subject to reinvestment rights to be agreed upon by the Loan Parties and the Requisite Exit Lenders, (iii) equity issuances, (iv) debt issuances and (v) extraordinary receipts, in each case, received by any of the Loan Parties and subject to exceptions to be agreed, and (b) annually for each fiscal year of the Borrower ending after the Closing Date, of 50% of excess cash flow (to be defined) of the Loan Parties.  Mandatory Prepayments will result in a permanent reduction of the Exit Term Loan Facility.

| | |
|---|---|
| **Amortization:** | The Exit Term Loan Facility will be repayable in consecutive quarterly installments of $386,250 payable each calendar quarter, and a bullet payment of the remaining outstanding balance payable on the Exit Termination Date. |

**Priority and Security under Exit Term Loan Facility:**

All obligations of the Borrower and the Guarantors to the Agent and the Exit Lenders under the Exit Term Loan Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses or any other amounts due thereunder (collectively, the "Exit Obligations"), shall be secured by perfected first-priority liens on and security interests in substantially all assets (whether tangible, intangible, real, personal or mixed) of the Borrower and the Guarantors (subject to customary exceptions, to be agreed), whether now owned or hereafter acquired and wherever located, before or after the Closing Date, including, without limitation, all accounts, inventory, equipment, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the proceeds of all claims or causes of action and all products, offspring, profits and proceeds thereof (collectively, the "Exit Collateral").

All or a portion of the Exit Collateral may be subject to an equal-priority lien of the Revolving Lenders (as defined below) subject to the consent of the Requisite Exit Lenders and the terms of the Intercreditor Agreement (as defined below).

**Conditions Precedent to the Closing and Funding of the Exit Term Loan Facility:**

The Exit Credit Agreement will contain customary conditions for financings of this type and other conditions deemed by the Exit Lenders in their discretion to be appropriate to the Exit Term Loan Facility, and in any event including, without limitation, the following:

- All documentation relating to the Exit Term Loan Facility shall be in form and substance satisfactory to the Agent and the Exit Lenders and their counsel.

- All fees, costs, disbursements and expenses of (i) the Agent (including fees, costs, disbursements and expenses of its outside counsel, King & Spalding LLP, and its local counsel) and (ii) the Exit Lenders (including fees, costs, disbursements and expenses of (a) their outside counsel, Stroock & Stroock & Lavan LLP ("Stroock") and their local counsel and (b) Miller Buckfire & Co., LLC ("Miller Buckfire"), as financial advisor to the Exit Lenders (pursuant to that certain letter of engagement dated as of July 3, 2012 between Stroock, Miller Buckfire, Kingpin and the Borrower (as amended, the "Miller Buckfire Engagement Letter"))) shall have been paid in full in cash to the extent invoiced to the Borrower no later than one business day prior to the Closing Date.

- There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the judgment of the Agent at the direction of the Requisite Exit Lenders, prohibits, restricts or imposes a

4

materially adverse condition on the Borrower or the Guarantors, the Exit Term Loan Facility or the exercise by the Agent at the direction of the Exit Lenders of its rights as a secured party with respect to the Exit Collateral.

- The Agent and the Exit Lenders shall have received satisfactory and customary opinions of independent counsel to the Loan Parties, addressing such matters as the Agent or the Exit Lenders shall reasonably request, including, without limitation, the enforceability of all Exit Loan Agreements, compliance with all laws and regulations (including, without limitation, Regulations T, U and X of the Board of Governors of the Federal Reserve System), the creation and perfection of all liens and security interests purported to be granted and no conflicts with material agreements.

- There shall have occurred no event which has resulted in or could reasonably be expected to result in a material adverse change in (i) the business, assets, operations, performance, properties, financial condition, or contingent liabilities of the Loan Parties and their subsidiaries, taken as a whole, since the date of the last annual audited financial statement, (ii) the legality, validity or enforceability of any Exit Loan Agreement, (iii) the ability of the Borrower or the Guarantors to perform their respective obligations under the Exit Loan Agreements, (iv) the value of the Exit Collateral, (v) the perfection or priority of the liens granted pursuant to the Exit Loan Agreements, or (vi) the ability of the Agent and the Exit Lenders to enforce the Exit Loan Agreements (any of the foregoing being a "<u>Material Adverse Change</u>").

- There shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Change or, except as disclosed, if adversely determined, could reasonably be expected to result in a Material Adverse Change or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the Exit Term Loan Facility, the Exit Collateral or the transactions contemplated thereby.

- All governmental and third party consents and approvals necessary in connection with the Exit Term Loan Facility shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Agent and the Requisite Exit Lenders) and shall remain in effect; and no law or regulation shall be applicable, in the judgment of the Agent and the Requisite Exit Lenders, that restrains, prevents or imposes materially adverse conditions upon the Exit Term Loan Facility or the transactions contemplated thereby.

- The Agent, for the benefit of the Exit Lenders, shall have a valid and perfected lien on and security interest in the Exit Collateral on the basis and with the priority set forth herein.

- The Agent and the Requisite Exit Lenders shall be satisfied with the amount, types and terms and conditions of all insurance and bonding maintained by the Loan Parties and their subsidiaries. The Borrower shall have obtained and delivered to the Agent endorsements naming the Agent, on behalf of the Exit Lenders, as an additional insured or loss payee, as applicable, under all insurance policies to be maintained with respect to the properties of the Loan Parties and their subsidiaries forming part of the Exit Lenders' collateral, which endorsements shall, among other things, provide for 30 days' prior notice of cancellation of such policies to be delivered to the Agent.

- Immediately prior to the Closing Date and immediately following the Closing Date, there shall exist no default under the Exit Loan Agreements.

- The representations and warranties of the Borrower and each Guarantor therein shall be true and correct on the Closing Date, immediately prior to, and after giving effect to, the funding of the Exit Term Loan Facility.

- The funding of the Exit Term Loan Facility shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

- The Agent and the Requisite Exit Lenders shall be satisfied, in form and substance, with the Amended iStar Agreements (as defined in RSA (as defined below)).

- The Borrower shall have entered into a revolving credit facility in an aggregate principal amount not to exceed $40 million (the "Revolving Facility") with one or more lenders (the "Revolving Lenders") and an agent on behalf of the Revolving Lenders (the "Revolving Agent"), which Revolving Facility and all documents related thereto shall be satisfactory to the Requisite Exit Lenders in all respects. Such Revolving Facility shall be in an aggregate principal amount not less than $25 million.

- The Exit Lenders and the Agent shall have entered into an intercreditor agreement with the Revolving Lenders and the Revolving Agent in form and substance satisfactory to the Exit Lenders in their discretion (the "Intercreditor Agreement").

- The effective date of the Joint Plan under and as defined in, and on the terms and conditions set forth in, that certain Restructuring Support Agreement among the Borrower, the Initial Exit Lenders and the other parties thereto, dated as of November 12, 2012 (together with all schedules, annexes and exhibits thereto, the "RSA"), shall have occurred and such Joint Plan shall have become effective.

- The Loan Parties shall have entered into cash management arrangements reasonably acceptable to the Agent and the Requisite Exit

6

Lenders (the "<u>Control Agreements</u>").

**Representations and Warranties:**

The Exit Credit Agreement will contain customary representations and warranties for financings of this type and others deemed by the Exit Lenders in their discretion to be appropriate to the Exit Term Loan Facility (which will be applicable to each Loan Party and its subsidiaries), including, without limitation, representations and warranties regarding valid existence, requisite power, due authorization, no conflict with agreements, orders or applicable law, governmental consent, enforceability of Exit Loan Agreements, accuracy of financial statements, projections, budgets and all other information provided, compliance with law, absence of Material Adverse Change, no default under the Exit Loan Agreements, absence of material litigation and contingent obligations, taxes, subsidiaries, ERISA, pension and benefit plans (U.S. and foreign), absence of liens on assets (other than permitted liens to be agreed), ownership of properties and necessary rights to intellectual property, insurance, no burdensome restrictions, inapplicability of Investment Company Act, continued accuracy of representations. Representations and warranties related to any foreign pension plans, including any obligations related to the UK pension obligations, will be included in the Exit Credit Agreement.

**Affirmative, Negative and Financial Covenants:**

The Exit Credit Agreement will contain customary affirmative, negative and financial covenants as are customary for financings of this type and others determined by the Exit Lenders in their discretion to be appropriate (which will be applicable to each Loan Party and its subsidiaries) including, without limitation, the following.

- Comply in all material respects with laws (including without limitation, ERISA and environmental laws), pay taxes, maintain all necessary licenses and permits and trade names, trademarks, patents, preserve corporate existence, maintain appropriate and adequate insurance coverage and permit inspection of properties, books and records. Covenants will be included in the Exit Credit Agreement pertaining to compliance with any applicable foreign pension laws.

- Conduct all transactions with affiliates on terms no less favorable to the Loan Parties than those obtainable in arm's length transactions, including, without limitation, restrictions on management fees to affiliates.

- The cash management system shall be maintained as in effect on the Closing Date. During the term of the Exit Term Loan Facility, all cash of the Loan Parties shall be deposited directly into accounts covered by Control Agreements (except for payroll, employee benefits and escrow and trust accounts (including cash collected by any Loan Party as league bowling fees, properly escrowed and used to fund prize winnings) and accounts not exceeding $150,000 in the aggregate at any time).

- Maximum Capital Expenditures (to be defined), Minimum EBITDA (to be defined) and other financial covenants.

7

- Not incur or assume any additional debt or contingent obligations, give any guaranties, create any liens, charges or encumbrances or incur additional lease obligations, in each case, beyond agreed upon limits; not merge or consolidate with any other person, change the nature of business or corporate structure or create or acquire new subsidiaries, in each case, beyond agreed upon limits; not materially adversely amend its charter or by-laws; not sell, lease or otherwise dispose of assets (including, without limitation, in connection with a sale leaseback transaction) outside the ordinary course of business and beyond agreed upon limits; not give a negative pledge on any assets in favor of any person other than the Agent for the benefit of the Exit Lenders; and not permit to exist any consensual encumbrance on the ability of any subsidiary to pay dividends or other distributions to the Borrower; in each case, subject to customary exceptions or baskets as may be agreed.

- Not prepay, redeem, purchase, defease, exchange or repurchase any debt or amend or modify any of the terms of any such debt or other similar agreements entered into by any Loan Party or its subsidiaries, except with respect to the Revolving Facility, to the extent permitted by the Intercreditor Agreement.

- Not make any loans, advances, capital contributions or acquisitions, form any joint ventures or partnerships or make any other investments in subsidiaries or any other person, subject to certain exceptions to be agreed.

- Not make or commit to make any payments in respect of warrants, options, repurchase of stock, dividends or any other distributions, subject to certain exceptions as may be agreed.

- Not permit any change in ownership or control of any Loan Party or any subsidiary, subject to certain exceptions as may be agreed, or any change in accounting treatment or reporting practices, except as required by GAAP and as permitted by the Exit Credit Agreement.

- The Loan Parties will use their respective reasonable best efforts to cooperate with and support the Agent and the Exit Lenders in connection with the financing contemplated by the Exit Term Loan Facility.

**Financial Reporting Requirements:** The Borrower shall provide to the Agent for the benefit of the Exit Lenders (hereinafter the "Financial Reporting Requirements"): (i) monthly consolidated financial statements of the Loan Parties and their subsidiaries, (consistent in form and substance with prior monthly reporting required to be provided to the Administrative Agent for delivery to the Lenders, pursuant to and as such terms are defined in the First Lien Credit Agreement) within thirty (30) days of month end, certified by the Loan Parties' chief financial officer; (ii) quarterly consolidated financial statements of the Loan Parties and their subsidiaries within forty-five (45)

8

days of fiscal quarter end, certified by the Borrower's chief financial officer; (iii) annual audited consolidated financial statements of the Loan Parties and their subsidiaries within one-hundred ten (110) days of fiscal year end, certified with respect to such consolidated statements by independent certified public accountants acceptable to the Exit Lenders which shall not be qualified in any material respect as to scope; and (iv) annual business and financial plans provided at least thirty (30) days prior to the fiscal year-end. The Borrower will promptly provide notice to the Agent, for prompt distribution to the Exit Lenders, of any Material Adverse Change.  All deliveries required pursuant to this section shall be subject to a confidentiality provision to be negotiated in the Exit Credit Agreement.

**Other Reporting Requirements:**

The Exit Credit Agreement will contain other customary reporting requirements for similar financings and others determined by the Exit Lenders in their discretion to be appropriate to the Exit Term Loan Facility, including, without limitation, with respect to litigation, contingent liabilities, ERISA or environmental events (collectively with the financial reporting information described above, the "Information").

**Public Information:**

Notwithstanding any of the foregoing, any Exit Lender, via Intralinks, may elect not to receive any of the Information.

**Events of Default:**

The Exit Credit Agreement will contain events of default customarily found in loan agreements for similar financings and other events of default deemed by the Exit Lenders appropriate to the Exit Term Loan Facility which will be applicable to the Loan Parties and their subsidiaries (each an "Event of Default"), including, without limitation:

- failure to make payments when due (subject to customary grace periods, to be agreed);

- noncompliance with covenants (subject to customary cure periods as may be agreed with respect to certain covenants);

- breaches of representations and warranties in any material respect;

- failure to satisfy or stay execution of judgments in excess of specified amounts;

- the existence of certain materially adverse employee benefit or environmental liabilities, except for such liabilities as are in existence as of the Closing Date and are set forth on a schedule to the Exit Credit Agreement, and customary ERISA and similar foreign plan events (including with respect to the UK pension plan);

- impairment of Exit Loan Agreements;

- the occurrence of an event which has resulted in or could reasonably be expected to result in a material adverse change in (i) the business, assets, operations, performance, properties or condition (financial or otherwise), contingent liabilities, prospects or material agreements of the Loan Parties and their subsidiaries, taken as a whole, since the date of the last audited annual financial statements delivered to the Exit Lenders, (ii) the legality, validity or enforceability of any Exit Loan

Agreement, (iii) the ability of the Borrower or the Guarantors to perform their respective obligations under the Exit Loan Agreements, (iv) the perfection or priority of the liens granted pursuant to the Exit Loan Agreements, or (v) the ability of the Agent and the Exit Lenders to enforce the Exit Loan Agreements;

- change in control (to be defined);

- cross-default to other material debt and certain material agreements, including to the Revolving Facility;

- any uninsured judgments are entered with respect to any liabilities against any of the Loan Parties or any of their respective properties in a combined aggregate amount in excess of an amount to be agreed, unless stayed; and

- any insolvency or bankruptcy event with respect to any Loan Party.

**Termination:**  Upon the occurrence and during the continuance of an Event of Default, the Agent may, and at the direction of the Requisite Exit Lenders shall, terminate the Exit Term Loan Facility, declare the obligations in respect thereof to be immediately due and payable and exercise all rights and remedies under the Exit Loan Agreements.

**Remedies:**  The Agent and the Exit Lenders shall have customary rights and remedies, subject to the Intercreditor Agreement.

**Indemnification:**  The Loan Parties shall jointly and severally indemnify and hold harmless the Agent, each Exit Lender and each of their affiliates and each of the respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the Exit Term Loan Facility, the Exit Loan Agreements or the transactions contemplated thereby, or any use made or proposed to be made with the proceeds of the Exit Term Loan Facility, whether or not such investigation, litigation or proceeding is brought by any Loan Party or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the Exit Loan Agreements are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's bad faith, gross negligence or willful misconduct.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Loan Party or any of its subsidiaries or any shareholders or creditors of the foregoing for or in

10

connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's bad faith, gross negligence or willful misconduct.  In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

**Expenses**:

The Borrower and each Guarantor shall jointly and severally pay promptly upon demand all (i) reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the Agent (including fees, costs, disbursements and expenses of its outside counsel, King & Spalding LLP, and its local counsel) and the Exit Lenders (including fees, costs, disbursements and expenses of their outside counsel, Stroock, and their local counsel), in connection with the negotiations, preparation, execution and delivery of the Exit Loan Agreements and the funding of all Exit Loans under the Exit Term Loan Facility, including, without limitation, all transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the Agent, the Exit Lenders and their respective counsel and professional advisors in connection with the Exit Term Loan Facility, the Exit Loan Agreements or the transaction contemplated thereby, the administration of the Exit Term Loan Facility and any amendment or waiver of any provision of the Exit Loan Agreements, and (ii) documented costs and expenses of each of the Agent, the Exit Lenders and their respective counsel and professional advisors, in connection with the enforcement of any rights and remedies under the Exit Loan Agreements.

**Assignments and Participations:**

Prior to the occurrence of an Event of Default, assignments (other than assignments to another Exit Lender or an affiliate of any Exit Lender or an Approved Fund (to be defined)) shall be subject to the consent of the Borrower, which consent shall not be unreasonably withheld, delayed or conditioned.  Following the occurrence of an Event of Default, no consent of the Borrower shall be required for any assignment.  Each Exit Lender shall have the right to sell participations in its Exit Loans, subject to customary voting limitations.

**Removal of Exit Lenders:**

The Requisite Exit Lenders and the Borrower shall have the right to cause any Exit Lender (under certain situations to be specified in the Exit Credit Agreement) to assign its Exit Loans or any other obligations to one or more existing Exit Lenders.

**Requisite Exit Lenders:**

Exit Lenders holding more than 50% of the Exit Commitments (the "Requisite Exit Lenders") except as to matters requiring unanimity under the Exit Credit Agreement (*e.g.*, the reduction of interest rates, the extension of interest payment dates, the reduction of fees, the extension of the maturity of the Borrower's obligations, any change in the priority of the Borrower's and Guarantors' obligations under the Exit Term Loan Facility and the release of all or substantially all of the Exit Collateral).

**Miscellaneous:**

The Exit Credit Agreement will include standard yield protection provisions

11

|  | (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes). |
|---|---|
| **Governing Law:** | The State of New York. |
| **Counsel to the Agent:** | King & Spalding LLP |
| **Counsel to the Exit Lenders:** | Stroock & Stroock & Lavan LLP |

## Exhibit 2 to the Restructuring Term Sheet

**Form of Exit Commitment Letter**

CREDIT SUISSE AG
Eleven Madison Avenue
New York, NY 10010

**November 12, 2012**

AMF Bowling Worldwide, Inc.
7313 Bell Creek Road
Mechanicsville, Virginia 23111

Attention:  Steven Satterwhite
            Chief Financial Officer

AMF Bowling Worldwide, Inc.
$150,000,000 Exit Term Loan Facility
Commitment Letter

Ladies and Gentlemen:

AMF Bowling Worldwide, Inc. (the "***Company***") has advised Credit Suisse AG, Cayman Islands Branch (the "***Agent***"), Credit Suisse Loan Funding LLC ("***CS***"), Liberty Harbor Master Fund I, L.P. and Goldman Sachs Palmetto State Credit Fund, L.P. ("***LH***") and Midtown Acquisitions, L.P. ("***DK***", and together with CS  and LH, each an "***Initial Exit Lender***" and collectively, the "***Initial Exit Lenders***") that the Company intends to file for bankruptcy protection under Chapter 11 ("***Chapter 11***") of Title 11 of the United States Bankruptcy Code (the "***Bankruptcy Code***"), and that the Company intends to emerge from Chapter 11 implementing and consummating a Chapter 11 plan of reorganization (the "***Plan of Reorganization***").   The Company has further advised the Initial Exit Lenders and the Agent that the Company desires to obtain an exit financing facility upon emergence from Chapter 11 in an aggregate principal amount of $154,500,000 (the "***Exit Facility***") on the terms set forth in the Summary of Principal Terms and Conditions attached hereto as <u>Annex I</u> (the "***Term Sheet***"), the proceeds of which Exit Facility will be used to repay indebtedness under the First Lien Credit Agreement (as defined in the Term Sheet) in an aggregate amount not less than $135,000,000, and the remaining proceeds of the Exit Facility may be used to (x) repay indebtedness under and replace the commitments under the senior secured, priming and super-priority, debtor-in-possession delayed draw term loan credit facility (the "***DIP Facility***"), (y) fund other costs of exiting Chapter 11 and (z) provide working capital and for other general corporate purposes after emergence from Chapter 11.  Capitalized terms used in this letter but not defined herein shall have the meanings given to them in the Term Sheet.

A.    <u>Commitment</u>

Upon the terms and conditions set forth in this letter and the Term Sheet (collectively, including all annexes or attachments hereto or thereto, this "***Commitment Letter***"), (i) CS is pleased to advise the Company of its several and not joint commitment to provide, directly or through an affiliate, 20% of the principal amount of the Exit Facility, (ii) LH is pleased to advise the Company of its several and not joint commitment to provide, directly or through an affiliate, 53% of the principal amount of the Exit Facility, and (iii) DK is pleased to advise the Company of its several and not joint commitment to provide, directly or through an affiliate, 27% of the principal amount of the Exit Facility.

AMF Bowling Worldwide, Inc.
November 12, 2012
Page 2

B.    **Information Requirements**

The Company hereby represents and covenants (and it shall be a condition to the Agent's and the Initial Exit Lenders' several and not joint commitments hereunder and agreements to perform the services described herein) that (i) all information other than projections (the "***Projections***") and general industry and market data (the "***Information***") that has been or will be made available to the Agent and the Initial Exit Lenders (collectively, the "***Commitment Parties***" and each, a "***Commitment Party***") by or on behalf of the Company or any of its representatives is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available to the Commitment Parties by or on behalf of the Company or any of its representatives have been or will be prepared in good faith based upon accounting principles consistent with the historical audited financial statements of the Company and upon assumptions that are reasonable at the time made and at the time the related Projections are made available to the Commitment Parties.  The Company agrees that if at any time prior to the Closing Date, any of the representations in the preceding sentence would be incorrect in any material respects if the Information and Projections were being furnished, and such representations were being made, at such time, then the Company will promptly supplement the Information and Projections so that such representations will be correct in all material respects under those circumstances.  In arranging the Exit Facility, the Commitment Parties will be entitled to use and rely on the Information and Projections without responsibility for independent verification thereof.  The Company hereby acknowledges that information and documents relating to the Exit Facility may be transmitted through SyndTrak, Intralinks, the Internet, e-mail or similar electronic transmission systems, and that none of the Commitment Parties shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

C.    **Conditions**

The several and not joint undertakings and obligations of the Commitment Parties under this Commitment Letter are subject to: (i) the negotiation, execution and delivery of definitive documentation with respect to the Exit Facility satisfactory to the Commitment Parties, including a credit agreement incorporating substantially the terms and conditions outlined in this Commitment Letter and the Term Sheet and otherwise satisfactory in form and substance to the Commitment Parties and their counsel (the "***Credit Agreement***"); (ii) the accuracy of all representations that the Company makes to any Commitment Party (including those in Section D below) and all information that the Company furnishes to a Commitment Party, and the absence of any information disclosed after the date hereof that is inconsistent in a material and adverse manner with any information provided to any Commitment Party; (iii) the Agent or any Initial Exit Lender not having discovered or otherwise having become aware of any information not previously disclosed to it that it reasonably believes to be inconsistent in a material and adverse manner with its understanding, based on the information provided to it prior to the date hereof, of the business, assets, liabilities, operations, condition (financial or otherwise), operating results, Projections or prospects of the Company and its subsidiaries taken as a whole; (iv) such Commitment Party's reasonable satisfaction with, and the approval by the Bankruptcy Court (as defined in the Term Sheet) of, (x) all aspects of this Commitment Letter, the Fee Letter (as defined below), the Exit Facility and the transactions contemplated thereby, and (y) all actions to be taken, all undertakings to be made and obligations to be incurred by the Loan Parties in connection with the Exit Facility (all such approvals to be evidenced by the entry of one or more orders of the Bankruptcy Court reasonably satisfactory in form and substance to such Commitment Party, which orders shall, among other things, approve the payment by the Borrower of all fees and expenses that are provided for in the Term Sheet); (v) the payment in full

AMF Bowling Worldwide, Inc.
November 12, 2012
Page 3

of all fees, expenses and other amounts payable hereunder and under the Fee Letter; (vi) the compliance by the Company with the provisions of this Commitment Letter and the Fee Letter; (vii) a closing of the Exit Facility on or prior to May 12, 2013; and (viii) the satisfaction of the other conditions set forth in the Term Sheet.  The Commitment Parties may elect that their obligations under this Commitment Letter terminate and be of no force and effect if an order approving all aspects of this Commitment Letter and the Fee Letter and the transactions contemplated thereby is not entered by the Bankruptcy Court on or before December 13, 2012, in form and substance satisfactory to the Commitment Parties or is stayed or modified at any time thereafter or such order shall not have become final and non-appealable on or before December 28, 2012.

**D.**     **Fees; Indemnification; Expenses**

1.     _Fees_.  In addition to the fees described in the Term Sheet, the Company will pay (or cause to be paid) the fees set forth in that certain letter agreement dated as of the date hereof, executed by the Agent and acknowledged and agreed to by the Company relating to this Commitment Letter (the "**_Fee Letter_**").  The Company also agrees to pay, or to reimburse each Commitment Party for, all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of (i) the Agent (including fees, costs, disbursements and expenses of its outside counsel, King & Spalding LLP, and local counsel) and (ii) the Initial Exit Lenders (including reasonable and documented out-of-pocket fees, costs, disbursements and expenses of (a) their outside counsel, Stroock & Stroock & Lavan LLP, and local counsel, (b) Miller Buckfire & Co., LLC, as financial advisor to the Initial Exit Lenders (pursuant to the Miller Buckfire Engagement Letter), and (c) any other professional advisors retained by the Initial Exit Lenders or their counsel), on or before the Closing Date, to the extent invoiced to the Company no later than one Business Day prior to the Closing Date.  The Company also agrees to pay all costs and expenses of each Commitment Party (including, without limitation, reasonable fees and disbursements of counsel) incurred in connection with the enforcement of any of their respective rights and remedies hereunder.  "**_Business Day_**" means any day except a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required to close.

2.     _Indemnification_.  The Company agrees to indemnify and hold harmless the Agent, each Exit Lender, their respective affiliates and their officers, directors, employees, agents, advisors, legal counsel, consultants, representatives, controlling persons, members and successors and permitted assigns (each, an "**_Indemnified Person_**") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("**_Losses_**") to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Fee Letter, the Exit Facility, the use of proceeds thereof or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any such Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by the Company or its respective affiliates or equity holders), and (a) to reimburse each such Indemnified Person promptly upon demand for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with investigating or defending any of the foregoing; provided that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of such Indemnified Person, (b) to reimburse the Agent and each Initial Exit Lender from time to time, upon presentation of a summary statement, for all reasonable and documented out-of-pocket expenses (including, but not limited to, expenses of the Commitment Parties' due diligence investigation, consultants' fees, syndication expenses, travel expenses and fees, and disbursements and other charges of one outside counsel), incurred in connection with the Exit Facility and the preparation and negotiation of this Commitment Letter, the Fee Letter, the definitive documentation for the Exit Facility, the use of proceeds thereof and any ancillary documents and security arrangements

3

AMF Bowling Worldwide, Inc.
November 12, 2012
Page 4

in connection therewith and (c) to reimburse the Agent and each Initial Exit Lender from time to time, upon presentation of a summary statement, for all out-of-pocket expenses (including, but not limited to, consultants' fees, travel expenses and fees, and disbursements and other charges of outside counsel), incurred in connection with the enforcement of this Commitment Letter, the Fee Letter, the definitive documentation for the Exit Facility and any ancillary documents and security arrangements in connection therewith.  The Company agrees that, notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its subsidiaries or affiliates or to the Company's or its subsidiaries' or affiliates' respective equity holders or creditors or any other person arising out of, related to or in connection with any aspect of the Exit Facility, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

E.    <u>Miscellaneous</u>

1.    <u>Termination</u>.  This Commitment Letter and all commitments and undertakings of the Commitment Parties under this Commitment Letter shall expire at 5:00 p.m., New York, New York time, on December 13, 2012 (as such time may be extended by mutual agreement of the parties hereto) unless by such time the Company both executes and delivers to each Commitment Party this Commitment Letter and the Fee Letter.  Thereafter, all commitments and obligations of the Commitment Parties under this Commitment Letter will expire on the earliest of (a) May 12, 2013, unless the Exit Facility Closing Date occurs on or prior thereto, (b) the Bankruptcy Court denying approval of this Commitment Letter or the Fee Letter with respect to the Exit Facility or (at the election of the Commitment Parties) the Bankruptcy Court not having entered an order approving such letters, or such order shall not have been stayed or modified at any time thereafter, or such order shall not have become final and non-appealable, by the respective dates provided therefor in paragraph C hereof, (c) if any event occurs or information becomes available that, in the judgment of a majority of the Initial Exit Lenders, results in the failure to satisfy any condition set forth in <u>Section C</u> of this Commitment Letter and (d) the termination of the commitments in respect of the DIP Facility without the occurrence of the closing date of the DIP Facility.  In addition to the foregoing, this Commitment Letter may be terminated at any time by mutual agreement, and all commitments and undertakings of the Commitment Parties hereunder may be terminated by the Agent at the direction of Initial Exit Lenders representing more than 50% of the commitments hereunder if the Company fails to perform its obligations under this Commitment Letter or the Fee Letter on a timely basis.

2.    <u>No Third-Party Beneficiaries</u>.  This Commitment Letter is solely for the benefit of the Company, the Agent, the Initial Exit Lenders and the Indemnified Persons; no provision hereof shall be deemed to confer rights on any other person or entity.

3.    <u>No Assignment; Amendment</u>.  This Commitment Letter and the Fee Letter may not be assigned by the Company to any other person or entity, but all of the obligations of the Company hereunder and under the Fee Letter shall be binding upon the successors and assigns of the Company.  This Commitment Letter and the Fee Letter may not be amended or modified except in writing executed by each of the parties hereto.

4.    <u>Use of Name and Information</u>.  The Company agrees that any references to the Agent, any Initial Exit Lender or any of their respective affiliates made in connection with the Exit Facility (other than any such references made to the Bankruptcy Court in connection with the Chapter 11 Cases) are subject to the prior approval of the Agent or such Exit Lender, as applicable, which approval shall not be unreasonably withheld.  Each Commitment Party shall be permitted to use information related to the

4

AMF Bowling Worldwide, Inc.
November 12, 2012
Page 5

syndication and arrangement of the Exit Facility in connection with marketing, press releases or other transactional announcements or updates provided to investor or trade publications, including, but not limited to, the placement of "tombstone" advertisements, or otherwise describing the names of the Company and its affiliates, and the amount, type and closing date of the Exit Facility, in publications of its choice at its own expense.

     5.    <u>Governing Law</u>.  This Commitment Letter, the Fee Letter and any claim, controversy or dispute arising under or related to the Commitment Letter or the Fee Letter shall be governed by, and construed in accordance with, the laws of the State of New York.  Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any jurisdiction thereof, in any suit, action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby or thereby, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined only in such New York State court or, to the extent permitted by law, in such Federal court, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby or thereby in any New York State court or in any such Federal court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Service of any process, summons, notice or document by registered mail addressed to the Company at the address above shall be effective service of process for any suit, action or proceeding brought in any such court.

     6.    <u>Survival</u>.  The obligations of the parties hereto under the fee, expense reimbursement, indemnification, confidentiality, and governing law provisions of this Commitment Letter shall survive the expiration and termination of this Commitment Letter; provided, however, that upon closing of the Exit Facility, the relevant provisions in the definitive documentation shall control.

     7.    <u>Confidentiality</u>.   This Commitment Letter is delivered to the Company on the understanding that neither this Commitment Letter nor the Fee Letter nor any of their terms or substance, nor the activities of any Commitment Party pursuant hereto, shall be disclosed, directly or indirectly, to any other person except (a) to the Company's equity sponsors, officers, directors, employees, attorneys, agents, accountants and advisors on a confidential and need-to-know basis, (b) as required by applicable law or compulsory legal process (in which case the Company agrees to inform the Agent and the Initial Exit Lenders promptly thereof prior to such disclosure (to the extent permitted by applicable law)), (c) to the extent required by the Bankruptcy Court and (d) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Commitment Letter or the enforcement of rights hereunder.

     Each Commitment Party agrees that neither this Commitment Letter nor the Fee Letter nor any of their terms or substance shall be disclosed, directly or indirectly, to any other person except (a) to each Commitment Party's respective officers, directors, employees, agents, attorneys, accountants and advisors on a confidential and need-to-know basis, (b) as required by applicable law or compulsory legal process (in which case the Company shall be promptly informed thereof prior to such disclosure (to the extent permitted by applicable law)), (c) with prospective lenders and their affiliates (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such items and instructed to keep such items confidential), (d) in connection with the exercise of any remedies

NY 74232504v2

AMF Bowling Worldwide, Inc.
November 12, 2012
Page 6

hereunder or any suit, action or proceeding relating to this Commitment Letter or the Fee Letter or the enforcement of rights hereunder or thereunder and (e) otherwise with the consent of the Company.

Notwithstanding anything herein to the contrary, any party to this Commitment Letter (and any employee, representative or other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Commitment Letter and the Fee Letter and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure, except that (i) tax treatment and tax structure shall not include the identity of any existing or future party (or any affiliate of such party) to this Commitment Letter or the Fee Letter and (ii) no party shall disclose any information relating to such tax treatment and tax structure to the extent nondisclosure is reasonably necessary in order to comply with applicable securities laws.  For this purpose, the tax treatment of the transactions contemplated by this Commitment Letter and the Fee Letter is the purported or claimed U.S. Federal income tax treatment of such transactions and the tax structure of such transactions is any fact that may be relevant to understanding the purported or claimed U.S. Federal income tax treatment of such transactions.

The Company hereby agrees that if the Fee Letter is required to be filed with the Bankruptcy Court or disclosed to the U.S. Trustee for purposes of obtaining approval to pay any fees provided for therein or otherwise, then it shall promptly notify the Commitment Parties and take all reasonable actions necessary to prevent the Fee Letter from becoming publicly available, including, without limitation, filing a motion or an ex parte request pursuant to sections 105(a) and 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure seeking a Bankruptcy Court order authorizing the Company to file the Fee Letter under seal to the maximum extent permitted by the Bankruptcy Court; provided, however, that if the Bankruptcy Court does not permit such filing under seal, then any such filing shall be redacted to the maximum extent permitted by the Bankruptcy Court and approved by the Commitment Parties in writing.   The provisions of this section shall survive any termination or completion of the arrangement provided by this Commitment Letter.

8.      Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities.

The Company acknowledges that each Commitment Party may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which the Company and its subsidiaries may have conflicting interests regarding the transactions described herein or otherwise.  None of the Commitment Parties will furnish confidential information obtained from the Company by virtue of the transactions contemplated by this Commitment Letter or the other relationships of such Commitment Party with the Company to other companies.  The Company also acknowledges that none of the Commitment Parties have any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to the Company, confidential information obtained by such Commitment Party from other companies.

The Company acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Company and any Commitment Party is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether any Commitment Party has advised or is advising the Company on other matters, (b) each Commitment Party, on the one hand, and the Company, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor does the Company rely on, any fiduciary duty on the part of each Commitment Party, (c) the Company is capable of evaluating and understanding, and the Company understands and accepts, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) the Company has been advised that each Commitment Party is engaged in a

6

AMF Bowling Worldwide, Inc.
November 12, 2012
Page 7

broad range of transactions that may involve interests that differ from the Company's interests and that no Commitment Party has any obligation to disclose such interests and transactions to the Company by virtue of any fiduciary, advisory or agency relationship and (e) the Company waives, to the fullest extent permitted by law, any claims it may have against each Commitment Party for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that no Commitment Party shall have any liability (whether direct or indirect) to the Company in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Company, including the Company's equity holders, employees or creditors.  Additionally, the Company acknowledges and agrees that no Commitment Party is advising the Company as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction (including, without limitation, with respect to any consents needed in connection with the transactions contemplated hereby).  The Company shall consult with the Company's own advisors concerning such matters and shall be responsible for making the Company's own independent investigation and appraisal of the transactions contemplated hereby (including, without limitation, with respect to any consents needed in connection therewith), and no Commitment Party shall have any responsibility or liability to the Company with respect thereto.  Any review by any Commitment Party of the Borrower, the Company and the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of such Commitment Party and shall not be on behalf of the Company or any of the Company's affiliates.

9.    Counterparts; Section Headings.  This Commitment Letter and the Fee Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter or the Fee Letter by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.  Section headings used herein are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

10.    Entire Agreement.  This Commitment Letter and the Fee Letter embody the entire agreement and understanding among the Commitment Parties, the Company and their affiliates with respect to the Exit Facility, and supersede all prior understandings and agreements among the parties relating to the subject matter hereof.  However, the terms and conditions of the commitments of the Initial Exit Lenders and the undertakings of the Agent hereunder are not limited to those set forth herein, in the Term Sheet or in the Fee Letter; those matters not covered or made clear herein or in the Term Sheet are subject to mutual agreement of the parties.

11.    Patriot Act.  The Commitment Parties hereby notify the Company that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "*PATRIOT Act*"), each Commitment Party and each of their respective affiliates are required to obtain, verify and record information that identifies the Company and each Guarantor, which information includes the name, address, tax identification number and other information regarding the Company and each Guarantor that will allow each Commitment Party to identify the Company and each Guarantor in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to the Commitment Parties.  The Company hereby acknowledges and agrees that the Agent shall be permitted to share any or all such information with the Initial Exit Lenders.

12.    Waiver of Jury Trial.

**EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS**

NY 74232504v2

AMF Bowling Worldwide, Inc.
November 12, 2012
Page 8

**COMMITMENT LETTER, THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.**

[Signature pages follow]

8

The Commitment Parties are pleased to have been given the opportunity to assist the Company in connection with the on this important transaction.

Very truly yours,

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

CREDIT SUISSE LOAN FUNDING LLC

By:_____
    Name:
    Title:

GOLDMAN SACHS PALMETTO STATE CREDIT FUND, L.P.
By:  Goldman Sachs Palmetto State Credit Fund Advisors, LLC, its general partner

By:_____
    Name:
    Title:

LIBERTY HARBOR MASTER FUND I, L.P.
By:  Liberty Harbor I GP, LLC, its general partner

By:_____
    Name:
    Title:

[Signature Page to Exit Commitment Letter (AMF)]

MIDTOWN ACQUISITIONS, L.P.

By:_____
  Name:
  Title:

ACCEPTED AND AGREED
this 12th day of November, 2012:

**AMF BOWLING WORLDWIDE, INC.**


By: _____
     Name:
     Title:

Annex I


Summary of Proposed Terms and Conditions

**<u>Exhibit 3 to the Restructuring Term Sheet</u>**

**Bidding Procedures**

## Bidding Procedures

As set forth in the Term Sheet,[1] the Debtors shall seek Bids (as defined herein) pursuant to these Bidding Procedures. The Debtors shall seek approval of the Bidding Procedures by way of a motion filed within five (5) calendar days of the Filing Date, and such Bidding Procedures may be incorporated into the Joint Plan and related documents, including the disclosure statement related to the Joint Plan. The proposed treatment under the Joint Plan in the instance where a Sale Transaction does not occur shall constitute the Plan Transaction.

A. **Assets to Be Sold**: The Debtors are providing these Bidding Procedures, whereby prospective bidders may qualify for and participate in the Auction (as defined herein), if one occurs, thereby competing to make the highest or otherwise best offer for the purchase of (i) all or substantially all of the assets of the Debtors (the "Assets") or (ii) new stock of the Reorganized Debtors (the "New Stock").

B. **Potential Bidders**:

i. The Debtors shall afford each potential bidder (each, a "Bidder") reasonable due diligence information. The due diligence information to be provided to each Bidder will be information that the Debtors reasonably believe is appropriate to enable each Bidder to evaluate the proposed Sale Transaction, but taking into account the Debtors' need to protect their trade secrets and confidential research, development, and commercial information.

ii. For a party to be considered a Bidder, such party must:

a) submit to the Debtors an executed confidentiality agreement in form and substance satisfactory to the Debtors; and

b) demonstrate to the Debtors a reasonable likelihood of the ability to close on a proposed Sale Transaction in a timely manner, including the ability to pay the purchase price for the Assets or New Stock (the "Purchase Price") and to receive any and all necessary governmental, licensing, regulatory or other approvals. The Debtors may, in their discretion and in the exercise of their business judgment, require that such parties demonstrate the legitimacy of their interest by, among other things, requiring them to provide proof of access to funds and/or committed capital sufficient to finance a proposed Sale Transaction.

C. **Purchase Agreement**: The Debtors will prepare a form of purchase agreement (the "Purchase Agreement"), subject to the approval of the Bankruptcy Court, pursuant to which a Winning Bidder (as defined below) would acquire the Assets or New Stock. A copy of the Purchase Agreement, which shall comply with the

---

[1]   Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Term Sheet.

RSA and shall provide for cash consideration sufficient to pay the First Lien Loan Claims in full, will be submitted to the Bankruptcy Court at least ten (10) calendar days prior to the hearing to consider the Bidding Procedures.

D.   **Qualified Bid / Qualified Bidder**:   Any proposal, solicitation, or offer to effectuate a Sale Transaction (each, a "<u>Bid</u>") received on before [_____, **2013] at 5:00 p.m.** (prevailing Eastern Time), or such later date as may be determined by the Debtors (the "<u>Bid Deadline</u>"), that meets the following requirements (collectively, the "<u>Bid Conditions</u>") (as reasonably determined by the Debtors, in consultation with the Requisite Consenting Lenders, the DIP Agent, iStar and their respective advisors) shall constitute a "<u>Qualified Bid</u>," and such Bidder submitting such Bid shall be a "<u>Qualified Bidder</u>":

  i.   states that such Bid includes an offer by the Bidder to purchase the Assets or New Stock;

  ii.   is accompanied by a deposit in the amount equal to 5% of the Bidder's proposed purchase price in cash to an interest bearing escrow account to be identified and established by the Debtors (the "<u>Deposit</u>");[2]

  iii.   provides for an aggregate consideration (which may include non-cash consideration) that equals or exceeds the sum of:

      a)   sufficient cash to indefeasibly pay all allowed First Lien Loan Claims in full in cash on the Effective Date, including any accrued but unpaid interest (plus interest and fees due and owing under the First Lien Facility as of the Effective Date pursuant to the terms of the First Lien Facility or related documents, including payment on account of any accrued but unpaid interest (including post-petition interest at the default contract rate)); plus

      b)   sufficient cash to indefeasibly pay all allowed DIP Facility Claims in full in cash on the Effective Date, including any accrued but unpaid interest (plus interest and fees due and owing under the DIP Facility as of the Effective Date pursuant to the terms of the DIP Facility, any interim or final orders governing the DIP Facility, and/or related documents); plus

      c)   an amount of cash sufficient to fund the Administration Fund; plus

      d)   $500,000 (the "<u>Initial Minimum Overbid Increment</u>").  Bids must specify the manner in which their Initial Minimum Overbid Increments are allocated among the Debtors' classes of creditors.

---

[2]   For the avoidance of doubt, in no event shall a First Lien Lender be required to provide a Deposit by virtue of the Plan Transaction.

iv. includes an executed purchase agreement, together with the exhibits and schedules related thereto and any related transaction documents or other material documents integral to such Bid pursuant to which the Bidder proposes to effectuate the Sale Transaction (the "<u>Sale Process Documents</u>"), including a mark-up of any changes proposed to the Purchase Agreement;

v. includes evidence of committed financing, access to funds or such other financial and other information, documented to the Debtors' satisfaction, that will reasonably allow the Debtors, in consultation with the Requisite Consenting Lenders and their advisors, to make a determination that the Bidder has received sufficient funding commitments in connection with effectuating the Sale Transaction (and such funding commitments or other financing shall not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors);

vi. fully discloses the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity formed for the purpose of consummating the proposed Sale Transaction), and the complete terms of any such participation;

vii. is not conditioned on (1) the obtaining or the sufficiency of financing or any internal approval, (2) the outcome or review of due diligence or (3) any tax contingency (although such Bid may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' reasonable business judgment, in consultation with the Requisite Consenting Lenders and their advisors, than those set forth in the Term Sheet);

viii. demonstrates, in the Debtors' and iStar's reasonable business judgment, that the potential Bidder can provide adequate assurance of future performance under all executory contracts and unexpired leases to be assumed pursuant to a proposed Sale Transaction;

ix. states that the offer by the Bidder set forth in the Sale Process Documents is irrevocable until (i) the closing of the proposed Sale Transaction (pursuant to confirmation of the Joint Plan) if such Bidder is the Winning Bidder, or (ii) the Debtors accept a higher Qualified Bid (as defined herein) and the Bidder is not selected as the Backup Bidder (as defined herein);

x.      does not request or entitle the Bidder to any expense reimbursement, break-up or "topping" fee, termination fee, contribution, or similar type of payment;

xi.     to the extent relevant, contains such information requested by the Debtors, in consultation with the Requisite Consenting Lenders and their advisors, regarding any proposed condition to closing of the Sale Transaction, which information is satisfactory to the Debtors;

xii.    contains evidence that the Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, and the submission, execution and delivery of the Sale Process Documents, which evidence is satisfactory to the Debtors, in consultation with the Requisite Consenting Lenders;

xiii.   includes a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale Transaction, together with evidence satisfactory to the Debtors, in consultation with the Requisite Consenting Lenders and their advisors, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals;

xiv.    provides evidence, as required by and reasonably acceptable to iStar, that the Bidder or the entity designated by the Bidder to be the assignee of the Amended iStar Agreements (if other than the Bidder) satisfies all requirements of a transferee permitted under Section 25(b) of the Amended iStar Agreements.

xv.     sets forth an estimated timeframe for obtaining any required internal, governmental, licensing, regulatory or other approvals or consents for consummating the proposed Sale Transaction;

xvi.    includes a written acknowledgement that the Bidder agrees to all of the terms for sale set forth in these Bidding Procedures;

xvii.   includes such other information as may be reasonably requested in writing by the Debtors at least two (2) calendar days prior to the Auction; and

xviii.  is transmitted via email (in .pdf or similar format) to:  (i) AMF Bowling Worldwide, Inc., 7313 Bell Creek Road, Mechanicsville, Virginia 23111, Attn: Dan McCormack (dmccormack@amf.com);  (ii) Moelis & Company, the Debtors' proposed investment bankers, 1999 Avenue of the Stars, Suite 1900, Los Angeles, California 90067, Attn.: Robert J. Flachs (robert.flachs@moelis.com);  (iii) Kirkland & Ellis LLP, the Debtors'

proposed counsel, 300 N. LaSalle, Chicago, Illinois 60654, attn.: Jeffrey D. Pawlitz (jeffrey.pawlitz@kirkland.com); and (iv) McGuireWoods LLP, the Debtors' proposed co-counsel, One James Center, 901 East Cary Street, Richmond, Virginia 23219, attn.:     Dion W. Hayes (dhayes@mcguirewoods.com), so as to be **actually received** on or before the Bid Deadline.     The Debtors shall promptly provide copies of transmitted bids received to (a) Stroock & Stroock & Lavan LLP, counsel to the Consenting Lenders, 180 Maiden Lane, New York, New York 10038, attn: Kristopher M. Hansen, Sayan Bhattacharyya and Marianne S. Mortimer; (b) Katten Muchin Rosenman, LLP, counsel for iStar, 575 Madison Avenue, New York, New York 10022, attn: Kenneth E. Noble (kenneth.noble@kattenlaw.com); and (c) King & Spalding LLP, counsel for the DIP Agent and the First Lien Agent, 1185 Avenue of the Americas, New   York,   New   York   10036,   attn.:   Michael   C.   Rupe (mrupe@kslaw.com).

E.    **First Lien Lenders/Plan Transaction**:   For the avoidance of doubt, the First Lien Lenders, collectively in relation to the Plan Transaction, shall constitute a Qualified Bidder, and the Plan Transaction shall be deemed a Qualified Bid.

F.    **Baseline Bid**:   After the Bid Deadline, the Debtors shall, in consultation with the Requisite Consenting Lenders, the DIP Agent and their respective advisors, determine which Qualified Bid represents the then highest or otherwise best bid (the "Baseline Bid").   The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Winning Bid (as defined herein) shall take into account any factors the Debtors, in consultation with the Requisite Consenting Lenders, the DIP Agent and their respective advisors, reasonably deem relevant to the value of the Qualified Bid to their estates, including, *inter alia*:  (a) the amount and nature of the consideration; (b) certainty of closing; (c) the net economic effect of any changes to the value to be received by each of the Debtors' classes of claims or interests from the transaction currently set forth in the Joint Plan, if any, contemplated by the Sale Process Documents, and (d) tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").   A Qualified Bid selected as the Baseline Bid shall be provided to all other Qualified Bidders at least twenty-four (24) hours prior to the start of an Auction.

G.    **Stalking Horse Bid**:   At any time before the Bid Deadline, the Debtors, in consultation with the Requisite Consenting Lenders, the DIP Agent and their respective advisors, may seek Bankruptcy Court approval to enter into a purchase agreement (the "Stalking Horse Agreement"), subject to higher or otherwise better offers at the Auction, with any bidder that submits a bid (the "Stalking Horse Bidder") to establish a minimum Qualified Bid at the Auction.   The Stalking Horse Agreement may contain certain customary terms and conditions, including expense reimbursement and a break-up fee in an amount to be

determined by the Debtors, in consultation with the Requisite Consenting Lenders, the DIP Agent and their respective advisors.  To the extent the Debtors seek Bankruptcy Court approval to enter into any such Stalking Horse Agreement, the Debtors may seek expedited approval thereof, but in no event shall the Debtors seek such expedited approval on less than five (5) business days notice. The Debtors shall serve notice of the Stalking Horse Agreement and any hearing to consider approval thereof on all parties entitled to notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.  To the extent that the Bankruptcy Court approves the Debtors' entry into a Stalking Horse Agreement, and the order approving the Stalking Horse Agreement is entered less than three (3) business days before the date of the Auction, the Auction date (and any corresponding dates thereafter) shall be adjusted to allow for three (3) business days notice between entry of any such approval order and the date of the Auction and shall account for the exact number of days so adjusted.

H.    **No Qualified Bids**:  If no Qualified Bids are submitted by the Bid Deadline, the Debtors shall not hold an Auction, and no Sale Transaction shall occur. Notwithstanding anything herein to the contrary, the Debtors shall not be required to determine that any Bid is the Baseline Bid and may determine not to hold an Auction if the Debtors, in consultation with the Requisite Consenting Lenders, the DIP Agent and their respective advisors, determine the Bids to be inadequate.

I.    **Return of Deposit**:  In the event that any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors shall cause such Bidder to be refunded its Deposit and all accumulated interest thereon within three (3) business days after the Bid Deadline.

## Auction

If one or more Qualified Bids (in addition to the Plan Transaction) are received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the Winning Bidder.  The Auction shall take place on [_____], 2013, at [•] (prevailing Eastern Time) at the offices of Debtors' proposed counsel, Kirkland & Ellis LLP, at 601 Lexington Avenue, New York, New York 10022, or such later date and time as selected by the Debtors, in consultation with the Requisite Consenting Lenders and the DIP Agent.  The Debtors shall send written notice of the date, time and place of the Auction to the Qualified Bidders no later than two (2) business days before such Auction, and will post notice of the date, time and place of the Auction no later than two (2) business days before such Auction on the website of the Debtors' notice and claims agent at http://kccllc.net/amf.  The Auction shall be conducted by the Debtors in a timely fashion according to the following procedures:

A.    **The Debtors Shall Conduct the Auction**.  The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid or the Stalking Horse Agreement.  All incremental bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid

23

shall be fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a transcript of all bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Winning Bid.

B.    **Participation at the Auction**.    Any official committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code (the "Committee"), its advisors, and all Qualified Bidders will be permitted to attend the Auction, though only the Qualified Bidders shall be entitled to: (i) make any subsequent bids at the Auction; (ii) make statements on the record at the Auction; or (iii) otherwise participate at the Auction in any manner whatsoever.  The Qualified Bidders shall appear in person at the Auction, through a duly authorized representative, or as otherwise agreed by the Debtors.

C.    **Terms of Overbids**.    All Qualified Bidders shall have the right to submit an Overbid.    An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid.  To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

    i.    *Minimum Overbid Increment.*  Any Overbid after the Baseline Bid shall be made in increments of at least $250,000 (the "Overbid Increments"). Overbids must specify the manner in which their Overbid Increments are allocated among the Debtors' classes of creditors.

    ii.    An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid, but shall otherwise comply with the terms of these Bidding Procedures.  Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above; *provided*, the Bid Deadline and the Initial Minimum Overbid Increment shall not apply. Any Overbid shall remain open and binding on the Bidder until and unless (a) the Debtors accept a higher Qualified Bid as an Overbid and (b) such Overbid is not selected as the Backup Bid.  Any modifications to the Sale Process Documents on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors than such Qualified Bidder's previous bid.

      In the event that a Qualified Bid is comprised of more than one entity (each a "member," and collectively, the "members"), if less than all of the members of any Qualified Bidder elect to participate in any round of the Auction, such remaining participating member or members shall be required to demonstrate such remaining member's or members' financial capacity to consummate the transactions required by such member's or members' Bid.

      To the extent not previously provided, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence reasonably acceptable to the Debtors demonstrating such Qualified Bidder's ability to close the Sale Transaction proposed by such Overbid.

24

iii.    *Announcing Overbids.*    The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtors' estates based on, *inter alia*, the Bid Assessment Criteria.

During the course of the Auction, the Debtors shall, after the submission of each Overbid, promptly inform each participant which Overbid reflects, in the Debtors' view, the highest or otherwise best offer.  The Auction may include individual negotiations between the Debtors with Qualified Bidders and/or open bidding in the presence of all other Qualified Bidders.

iv.    *Consideration of Overbids.*    The Debtors reserve the right, in their reasonable business judgment, to adjourn the Auction one or more times to, among other things: facilitate discussions between the Debtors and Qualified Bidders, allow Qualified Bidders to consider how they wish to proceed, and provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

D.    **Right to Credit Bid**.  The rights of the First Lien Agent and the Second Lien Agent on behalf of the First Lien Lenders and the Second Lien Lenders, respectively, to "credit bid" pursuant to section 363(k) of the Bankruptcy Code are preserved and may be exercised in accordance with applicable law.

E.    **Removal of a Qualified Bidder**.  The Debtors reserve the right to remove any Qualified Bidder (other than the Requisite Consenting Lenders) from the Auction if, at any point, the Debtors determine in their business judgment that the Qualified Bidder is no longer engaged in active bidding at the Auction (including, without limitation, if such Qualified Bidder has failed to bid in previous rounds of bidding).

F.    **Additional Procedures**.  The Debtors may announce at the Auction additional procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction provided such additional rules are not inconsistent with these Bidding Procedures.

G.    **Consent to Jurisdiction as Condition to Bidding**.  All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of these Bidding Procedures.

H.    **Closing the Auction**.  The Auction shall continue until there is only one Qualified Bid that the Debtors, in consultation with the Requisite Consenting

Lenders, (provided that none of the Requisite Consenting Lenders is an active participant in the Auction, other than by virtue of being a deemed Qualified Bidder with a deemed Qualified Bid pursuant to these Bidding Procedures), the DIP Agent and their respective advisors, determine in their reasonable business judgment is the highest and best Qualified Bid (such Qualified Bid, the "Winning Bid," and such Qualified Bidder the "Winning Bidder"), and that further bidding is unlikely to result in a Winning Bid that would be acceptable to the Debtors, at which point, the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid.

Such acceptance by the Debtors of the Winning Bid is conditioned upon approval by the Bankruptcy Court of the Winning Bid and the entry of the order confirming the Joint Plan.

The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction and any and all such Bids and Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

In selecting the Winning Bid, the Debtors, in consultation with the Requisite Consenting Lenders (provided that none of the Requisite Consenting Lenders is an active participant in the Auction, other than by virtue of being a deemed Qualified Bidder with a deemed Qualified Bid pursuant to these Bidding Procedures), the DIP Agent and their respective advisors, may consider all factors, including, without limitation, the Bid Assessment Criteria.

The Debtors, in consultation with the Requisite Consenting Lenders, the DIP Agent and their respective advisors, may require that within two (2) calendar days after adjournment of the Auction, the Winning Bidder complete and execute all Sale Process Documents, instruments, or other documents evidencing and containing the terms and conditions upon which the Winning Bid was made.

I.   **No Collusion; Good Faith Bona Fide Offer**.   Each Qualified Bidder participating at the Auction will be required to confirm that (i) it has not engaged in any collusion with respect to the bidding (though Qualified Bidders are permitted to make joint bids) and (ii) its Qualified Bid is a good faith, bona fide offer and it intends to consummate the proposed transaction if selected as the Winning Bidder.

J.   **Backup Bidder**.  Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the party with the next-highest or otherwise second best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, in consultation with the Requisite Consenting Lenders (provided that none of the Requisite Consenting Lenders is an active participant in the Auction, other than by virtue of being a deemed Qualified Bidder with a deemed Qualified Bid pursuant to these Bidding

Procedures), the DIP Agent and their respective advisors, shall be required to serve as a backup bidder (the "Backup Bidder").  The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder (the "Backup Bid") shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Winning Bid and the Winning Bidder.  The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the first business day that is sixty (60) days after the date on which the Auction is concluded or (ii) the closing of the transaction with the Winning Bidder (the "Outside Backup Date").

Following the hearing to confirm the Joint Plan (the "Confirmation Hearing"), if the Winning Bidder fails to consummate an approved Sale Transaction, the Debtors may select the Backup Bidder as the Winning Bidder.  The Debtors will be authorized, but not required, to consummate the Sale Transaction of such Backup Bidder without further order of the Bankruptcy Court or notice to any party.  In such case, the defaulting Winning Bidder's deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Winning Bidder.  The deposit of the Backup Bidder shall be held by the Debtors until the earlier of 24 hours after (a) the closing of the transaction with the Winning Bidder and (b) the Outside Backup Date.

Notwithstanding the foregoing, in no event shall the Plan Transaction constitute a Backup Bid.  If no other Bids remain that would otherwise qualify as a Backup Bid, and the Winning Bid Sale Transaction is not consummated, the Plan Transaction shall be implemented in the Joint Plan.

K.   **Return of Deposit**.  The Deposits of each Qualified Bidder shall be held in one or more interest-bearing escrow accounts by the Debtors and shall be returned (other than with respect to the Winning Bidder and the Backup Bidder) upon or within three (3) business days after the Auction.  Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon.  If the Winning Bidder (or the Backup Bidder, if applicable) timely closes the Sale Transaction, its Deposit shall be credited towards its purchase price.

L.   **Information Rights**.  At all times from the submission of a Qualified Bid through the end of the Auction, the Debtors shall share information on an equal and no greater basis with each Qualified Bidder (including the Purchaser), provided that the Debtors shall no longer be required to share any information with a Qualified Bidder (including the Purchaser) once it has ceased bidding in the Auction.

## Sale Hearing

Upon selection of a Winning Bid (which will be subject to approval by the Bankruptcy Court), if any, the Debtors will file the Winning Bid with the Bankruptcy Court and shall

proceed to a hearing to confirm the Joint Plan (the "***Confirmation Hearing***"),which Confirmation Hearing shall also constitute a hearing on the Sale Transaction.  Any such Confirmation Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Confirmation Hearing

### Failure to Consummate Purchase by the Winning Bidder

The Deposit of the Winning Bidder shall be applied to the Purchase Price at the closing of the Sale Transaction.  If the Winning Bidder fails to reasonably promptly consummate a Sale Transaction consistent with the Winning Bid because of a breach or failure to perform on the part of such Winning Bidder, the Backup Bidder will be deemed to be the new "Winning Bidder" and the Debtors will be authorized, but not required, to consummate a Sale Transaction with the Backup Bidder as contemplated by the Backup Bid without further order of the Bankruptcy Court upon at least two (2) business days notice to the Requisite Consenting Lenders and the DIP Agent; *provided*, that if such bid is a different structure than the Winning Bid then the Debtors will be required to consult with the Requisite Consenting Lenders and the DIP Agent and obtain appropriate approval orders from the Bankruptcy Court.  In such case, (a) the defaulting Winning Bidder's Deposit shall be forfeited to the Debtors and (b) all parties in interest, and the Debtors specifically, reserve the right to seek all available damages from the defaulting Winning Bidder.

Except as otherwise provided herein, all Deposits shall be returned to each Qualified Bidder not selected by the Debtors as the Winning Bidder or the Backup Bidder by no later than the third (3rd) business day following the date on which the Auction is concluded.  The Deposit of the Backup Bidder shall be held by the Debtors and shall be (a) applied to the Purchase Price at the closing of the Sale Transaction if the Debtors consummate the Sale Transaction with the Backup Bidder, (b) forfeited to the Debtors if the Backup Bidder becomes the Winning Bidder and the Backup Bidder fails to reasonably promptly consummate a Sale Transaction consistent with the Backup Bid because of a breach or failure to perform on the part of the Backup Bidder as set forth in the Sale Transaction Documents, or (c) returned to the Backup Bidder within three (3) business days after the Backup Bid Termination Date if the Backup Bidder does not become the Winning Bidder.

### No Modification of Procedures

These Bidding Procedures may not be modified in any material manner except upon (i) an order of the Bankruptcy Court or (ii) the express written consent of the Debtors (with the reasonable consent of the Requisite Consenting Lenders).

### Reservation of Rights; Modifications; Deadline Extension

Solely in connection with the exercise of the Debtors' fiduciary obligations, the Debtors reserve their rights to modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets or New Stock, including, without limitation, extending the deadlines set forth in the Bidding Procedures, modifying bidding increments, adjourning or canceling the Auction at the Auction and/or adjourning the

28

Sale Hearing in open court without further notice, withdrawing from the Auction any or all of the Assets or New Stock at any time prior to or during the Auction, or canceling the Sale Transaction process or Auction, and rejecting all Qualified Bids if, in the Debtors' business judgment no such bid is for a fair and adequate price.

## No Impairment Under the RSA

Nothing in these Bidding Procedures shall (or otherwise be deemed to) amend, modify, supplement, supersede, impair, replace or otherwise alter any of the rights and obligations of the Debtors or any of the Consenting Lenders under the RSA.

29

## Exhibit A to the Bidding Procedures

**Form Purchase Agreement**

**[To Be Filed No Later Than 10 Calendar Days Prior to the
Hearing to Consider the Bidding Procedures]**

EXHIBIT B
JOINDER AGREEMENT

[_____], 2012

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of November 12, 2012 (as amended, supplemented or otherwise modified from time to time, the "Restructuring Support Agreement"),[2] by and among the Company and the Consenting Lenders.

1.      Agreement to be Bound.  The Transferee hereby agrees to be bound by all of the terms of the Restructuring Support Agreement, a copy of which is attached to this hereto as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Transferee shall hereafter be deemed to be a "Consenting Lender" and a "Party" for all purposes under the Restructuring Support Agreement.

2.      Representations and Warranties.  With respect to the aggregate principal amount of First Lien Loans set forth below its name on the signature page hereof, the Transferee hereby makes the representations and warranties of the Consenting Lenders set forth in Section 8 of the Agreement to each other Party to the Restructuring Support Agreement.

3.      Governing Law.  This joinder agreement (the "Joinder Agreement") to the Restructuring Support Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

* * * * *

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

---

[2]   Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Restructuring Support Agreement.

IN WITNESS WHEREOF, the Transferee has caused this Joinder Agreement to be executed as of the date first written above.


Name of Transferor:  _____

Name of Transferee:  _____


By:        _____

Name:      _____

Title:     _____

Principal Amount of First Lien Loans Transferred:  $_____


Notice Address:

_____
_____
_____
Fax: _____
Attention:_____

With a copy to:

_____
_____
_____
Fax: _____
Attention:_____