Patrick J. Nash, Jr. (*pro hac vice* pending)
Jeffrey D. Pawlitz (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Joshua A. Sussberg (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Attorneys for the Debtors and
Debtors in Possession*

Dion W. Hayes (VSB No. 34304)
John H. Maddock III (VSB No. 41011)
Sarah B. Boehm (VSB No. 45201)
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
Telephone:    (804) 775-1000
Facsimile:    (804) 775-1061

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMF BOWLING WORLDWIDE, INC., *et al.*,[1] | ) | Case No. 12-36495 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (A) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION, (E) MODIFYING AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  AMF Bowling Worldwide, Inc. (3272); 300, Inc. (3632); American Recreation Centers, Inc. (1151); AMF BCH LLC (9642); AMF Beverage Company of Oregon, Inc. (4960); AMF Bowling Centers Holdings, Inc. (1697); AMF Bowling Centers, Inc. (1662); AMF Bowling Mexico Holding, Inc. (7931); AMF Holdings, Inc. (5037); AMF WBCH LLC (9643); AMF Worldwide Bowling Centers Holdings, Inc. (1641); Boliches AMF, Inc. (9631); Bush River Corporation (7033); King Louie Lenexa, Inc. (0814); Kingpin Holdings, LLC (5411); and Kingpin Intermediate Corp. (5447).  The location of the Debtors' service address is:  7313 Bell Creek Road, Mechanicsville, Virginia 23111.

This matter having come before the Court upon the motion, dated November 12, 2012 (the "Motion"),[2] filed by AMF Bowling Worldwide, Inc. (the "Borrower"), Kingpin Holdings, LLC ("Holdings"), Kingpin Intermediate Corp., American Recreation Centers Inc., AMF BCH LLC, AMF Bowling Centers Holdings Inc., AMF Bowling Mexico Holding, Inc., AMF Holdings, Inc., AMF WBCH LLC, AMF Worldwide Bowling Centers Holdings Inc., King Louie Lenexa, Inc., AMF Beverage Company of Oregon, Inc., Bush River Corporation, 300, Inc., AMF Bowling Centers, Inc. and Boliches AMF, Inc. (each of the foregoing, including Holdings, a "Guarantor," and collectively, the "Guarantors" and together with the Borrower, the "Debtors"), each as a debtor and debtor in possession in the above-captioned Chapter 11 cases (collectively with any Successor Cases (as defined herein), the "Cases"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001(a)-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules"), seeking entry of an interim order (this "Interim Order"), *inter alia*:

(i)　　　authorizing the Debtors to obtain senior secured post-petition financing on a superpriority basis pursuant to the terms and conditions of that certain Senior Secured Debtor-In-Possession Credit Agreement attached hereto as Exhibit A (the "DIP Loan Agreement"; together with the agreements, documents, instruments and certificates executed by the Debtors or otherwise delivered in connection therewith, the "DIP Loan Documents"), by and among the Debtors, Credit Suisse AG, Cayman Islands Branch ("Credit Suisse"), as post-petition administrative agent (in such capacity, the "DIP Agent"), Credit Suisse Securities (USA) LLC, as sole lead arranger and sole bookrunner, and the lenders party thereto from time to time (collectively, the "DIP Lenders"), providing for, *inter alia*:

(a)　　　a first lien, superpriority, new money, non-amortizing multiple draw term loan facility providing for the borrowing of term loans from time to time in accordance

---

[2]　Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

DMSLIBRARY01-19506382.21

with the Budget (as defined below) in an aggregate maximum principal amount not to exceed $50 million (the "DIP Facility"), $35 million of which shall be available to and shall be drawn in a single draw by the Debtors on the Closing Date (as defined below), and up to $20 million of which amount shall be used to provide cash collateral for the issuance of letters of credit under the DIP Loan Agreement (the "Letters of Credit");

(b)     on the Closing Date, the replacement of all outstanding letters of credit issued under the First Lien Loan Agreement (as defined below) (collectively, the "Pre-Petition Letters of Credit") by Letters of Credit issued under the DIP Loan Agreement by the LC Issuer (as defined below);

(c)     the cash collateralization, at 102% of face amount, of all Letters of Credit to be issued as soon as practicable but in no event more than one (1) business day following the Closing Date in replacement of the Pre-Petition Letters of Credit; and

(d)     following entry of the Final Order (as defined below), up to three (3) additional drawings of the DIP Facility upon no less than five (5) business days' prior written notice to the DIP Agent and the DIP Lenders, each in a principal amount of not less than $5 million and, in the aggregate for such three (3) additional drawings, in a principal amount not to exceed $15 million; and

(ii)     authorizing the Debtors to execute and deliver the DIP Loan Agreement and the other DIP Loan Documents and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(iii)     pursuant to section 364(c)(2) of the Bankruptcy Code, granting the DIP Agent, for the benefit of itself and the DIP Lenders, valid, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral (as defined below) that is not otherwise subject to a valid, perfected and unavoidable security interest or lien as of the Petition Date (as defined below) to secure any and all obligations owing under and with respect to the DIP Facility and the DIP Loan Documents (collectively, and including, without limitation, all "Obligations" as defined in the DIP Loan Agreement, the "DIP Obligations"), subject only to the Carve-Out (as defined below);

(iv)     pursuant to section 364(c)(3) of the Bankruptcy Code, granting the DIP Agent, for the benefit of itself and the DIP Lenders, for the purpose of securing the DIP Obligations, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral that is subject to Permitted Prior Liens (as defined below), subject only to the Carve-Out;

(v)     pursuant to section 364(d)(1) of the Bankruptcy Code, granting the DIP Agent, for the benefit of itself and the DIP Lenders, for the purpose of securing the DIP Obligations, valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens on and security interests in all Pre-Petition Collateral (as defined below) securing the Pre-Petition Obligations (as defined below), wherever located, subject only to (x) Permitted Prior Liens, and (y) the Carve-Out;

(vi) pursuant to section 364(c)(1) of the Bankruptcy Code, granting all of the claims of the DIP Agent and the DIP Lenders on account of the DIP Obligations allowed superpriority administrative expense claim status in each of the Cases with priority over any and all administrative expenses of the kind specified in or arising under any section of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 or 1114 of the Bankruptcy Code), subject only to the Carve-Out;

(vii) authorizing the Debtors' use of cash collateral, as defined in section 363(a) of the Bankruptcy Code (collectively, "Cash Collateral"), pursuant to the terms and conditions set forth in this Interim Order and the DIP Loan Agreement;

(viii) providing adequate protection to the Pre-Petition Agents (as defined below) and the Pre-Petition Lenders (as defined below) for the Diminution in Value (as defined below), if any, of their interests in the Pre-Petition Collateral, including Cash Collateral;

(ix) authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents as such amounts become due and payable, including, without limitation, continuing commitment fees, closing fees, servicing fees, audit fees, structuring fees, backstopping fees, arrangement fees, syndication fees, administrative agent's fees, and the reasonable and documented fees and disbursements of attorneys and advisors engaged by the DIP Agent and/or Midtown Acquisitions, L.P., Credit Suisse Loan Funding LLC, Liberty Harbor Master Fund I, L.P. and Goldman Sachs Palmetto State Credit Fund, L.P. (collectively, the "Backstop Parties"), all to the extent provided in, and in accordance with the terms of, the DIP Loan Agreement, the other DIP Loan Documents, the AMF Bowling Worldwide, Inc. $50,000,000 Senior Secured Debtor-In-Possession Credit Facility Commitment Letter, dated as of November 12, 2012, between the Borrower, Credit Suisse, Credit Suisse Securities (USA) LLC and the Backstop Parties (the "Commitment Letter") and the AMF Bowling Worldwide, Inc. Superpriority Secured Debtor-In-Possession Credit Facility Fee Letter, dated as of November 12, 2012, between the Borrower, Credit Suisse and Credit Suisse Securities (USA) LLC (the "Fee Letter");

(x) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order; and

(xi) scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing;

and the Court having considered the Motion, the Flachs Declaration, the exhibits attached thereto, the DIP Loan Documents, and the evidence submitted at the interim hearing held on November 12, 2012 to consider the interim relief requested in the Motion (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy

Rules 4001(b), (c) and (d), and 9014; and the Interim Hearing having been held and concluded;

and all objections, if any, to the interim relief requested in the Motion having been withdrawn,

resolved or overruled by the Court; and it appearing to the Court that granting the interim relief

requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and

their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best

interests of the Debtors, their estates, and their creditors, and is essential for the continued

operation of the Debtors' businesses; and it further appearing that the Debtors are unable to

obtain unsecured credit for money borrowed allowable as an administrative expense under

section 503(b)(1) of the Bankruptcy Code; and adequate protection being provided on account of

the interests of certain holders of liens on the property of the Debtors' estates on which liens are

to be granted; and after due deliberation and consideration, and for good and sufficient cause

appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT

HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF

LAW:[3]

    A.    *Petition Date*.   On the date of the Motion (the "Petition Date"), each of the

Debtors filed a separate voluntary petition under Chapter 11 of the Bankruptcy Code in the

United States Bankruptcy Court for the Eastern District of Virginia (this "Court") commencing

these Cases.

    B.    *Debtors-in-Possession*.   The Debtors continue to manage and operate their

businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.  No trustee or examiner has been appointed in any of the Cases.

---

[3]    Where appropriate in this Interim Order, findings of fact shall be construed as conclusions of law and
conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

DMSLIBRARY01-19506382.21

C.      *Jurisdiction and Venue*.   The Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).   The statutory predicates for the relief set forth herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.   Venue for these Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      *Committee Formation*.   As of the date hereof, the United States Trustee (the "U.S. Trustee") has not yet appointed the official committee of unsecured creditors in these Cases (the "Committee").

E.      *Debtors' Stipulations*.   Subject in all respects to paragraph 42 hereof, after consultation with their attorneys, financial advisors, and other consultants, the Debtors admit, stipulate, acknowledge, and agree that:

(i)      Prior to the Petition Date: (a) each of the Debtors other than Holdings (collectively, the "First Lien Obligors"), Credit Suisse, as Agent (in such capacity, the "First Lien Agent"), Credit Suisse Securities (USA) LLC, as sole lead arranger and sole bookrunner, and the lenders party thereto (collectively, the "First Lien Lenders") entered into that certain *First Lien Credit Agreement*, dated as of June 12, 2007 (as amended by that certain *Amendment No. 1*, dated as of May 8, 2009, and as further amended by that certain *Amendment No. 2* (the "Second Amendment"), dated as of May 3, 2012, the "First Lien Loan Agreement"); and (b) each of the Debtors other than Holdings (collectively, the "Second Lien Obligors," and together with the First Lien Obligors, the "Pre-Petition Debt Obligors"), Gleacher Products Corp., as Agent (as successor to Credit Suisse in such capacity, the "Second Lien Agent"; together with the First Lien Agent, collectively, the "Pre-Petition Agents"), Credit Suisse Securities (USA) LLC, as sole lead arranger and sole bookrunner, and the lenders party thereto (collectively, the "Second Lien Lenders"; together with the First Lien Lenders, collectively, the "Pre-Petition Lenders") entered into that certain *Second Lien Credit Agreement*, dated as of June 12, 2007 (as amended by that certain *Amendment No. 1*, dated as of May 8, 2009, the "Second Lien Loan Agreement"; together with the First Lien Loan Agreement, the "Pre-Petition Agreements").

(ii)      Each of the Pre-Petition Debt Obligors (other than the Borrower) is: (a) a guarantor of the Borrower's obligations under the First Lien Loan Agreement pursuant to the terms of that certain *First Lien Guaranty*, dated as of June 12, 2007 (the "First Lien Guaranty");

DMSLIBRARY01-19506382.21

and (b) a guarantor of the Borrower's obligations under the Second Lien Loan Agreement pursuant to the terms of that certain *Second Lien Guaranty*, dated as of June 12, 2007 (the "Second Lien Guaranty").

(iii)    The First Lien Loan Agreement, the First Lien Guaranty, the Intercreditor Agreement (as defined below) and the other agreements, documents, instruments and certificates executed by the First Lien Obligors or otherwise delivered in connection with the First Lien Loan Agreement (collectively, the "First Lien Loan Documents"), are valid and enforceable in accordance with their terms against each of the Pre-Petition Debt Obligors, are not subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever, and are not subject to avoidance, subordination, recovery, disallowance, recharacterization or other challenge pursuant to applicable state or federal law (including, without limitation, the Bankruptcy Code).

(iv)    Pursuant to the First Lien Loan Documents (after giving effect to the Second Amendment), the First Lien Lenders agreed to provide the Borrower with revolving loans in an aggregate amount up to $40,000,000, and a term loan in the amount of $245,000,000. As of the Petition Date: (x) the outstanding principal amount owed by the First Lien Obligors with respect to the revolving loans made under the First Lien Loan Agreement was not less than $19,492.776.20, including Pre-Petition Letters of Credit with the outstanding face amount of not less than $19,492.776.20; and (y) the outstanding principal amount owed by the First Lien Obligors with respect to the term loans made under the First Lien Loan Agreement was not less than $216,000,000 (collectively, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the First Lien Loan Documents, including, without limitation, principal, accrued and unpaid interest (including at the default rate), premiums, any reimbursement obligations (contingent or otherwise) in respect of letters of credit, any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), treasury, cash management and derivative obligations, indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Borrower's or any other Loan Parties' (as defined in the First Lien Loan Agreement) obligations pursuant to the First Lien Loan Documents, the "First Lien Obligations").

(v)    Pursuant to the Second Lien Loan Agreement, the Second Lien Guaranty, the Intercreditor Agreement (as defined below) and the other agreements, documents, instruments and certificates executed by the Second Lien Obligors or otherwise delivered in connection with the Second Lien  Loan Agreement (collectively, the "Second Lien Loan Documents"; together with the First Lien Loan Documents, the "Pre-Petition Loan Documents"), the Second Lien Lenders agreed to provide the Borrower with a term loan in the amount of $80,000,000. As of the Petition Date, the outstanding principal amount owed by the Second Lien Obligors with respect to the Second Lien Loan Agreement was not less than $80,000,000 (collectively, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Second Lien Loan Documents, including, without limitation, accrued and unpaid interest, any reimbursement obligations (contingent or otherwise) in respect of letters of credit, any fees, expenses and disbursements (including, without limitation, attorneys' fees,

7

financial advisors' fees, related expenses and disbursements), treasury, cash management and derivative obligations, indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Borrower's or any other Loan Parties' (as defined in the Second Lien Loan Agreement) obligations pursuant to the Second Lien Loan Documents, the "<u>Second Lien Obligations</u>"; together with the First Lien Obligations, the "<u>Pre-Petition Obligations</u>").

(vi)    The First Lien Obligations are legal, binding and enforceable obligations of the Pre-Petition Debt Obligors and are not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature whatsoever.  No portion of the First Lien Obligations, or any funds previously paid to the First Lien Agent or the First Lien Lenders, is subject to any offset, defense, claim, or counter-claim of any type, kind or nature whatsoever, or subject to avoidance, subordination, recovery, disallowance, recharacterization or other challenge pursuant to applicable state or federal law (including, without limitation, the Bankruptcy Code).

(vii)    To secure the Pre-Petition Obligations, the Pre-Petition Debt Obligors granted to the Pre-Petition Agents and the Pre-Petitions Lenders security interests in and liens on (collectively, the "<u>Pre-Petition Liens</u>"), among other things, substantially all of each of the Pre-Petition Debt Obligors' assets, whether tangible or intangible, including, without limitation, accounts, equipment, goods, inventory, personal property, general intangibles, chattel paper, contracts, deposit accounts, equity interests, real estate (including leasehold interests), fixtures, instruments, intercompany obligations, investment property, patent, trademark and copyright collateral, documents and records, all proceeds, products, rents and profits of the foregoing, all accessions to, substitutions and replacements for, each of the foregoing, and any insurance, indemnity, warranty or guaranty payable to the Borrower from time to time with respect to any of the foregoing, in each case, subject to the terms of the Intercreditor Agreement (collectively, the "<u>Pre-Petition Collateral</u>").

(viii)    The First Lien Agent filed (a) UCC-1 Financing Statements regarding the Pre-Petition Collateral against the First Lien Obligors in the applicable state and/or county filing offices, the effectiveness of each of which, as applicable, was continued by the filing of a UCC-3 Financing Statement Amendment, (b) mortgages regarding the Pre-Petition Collateral consisting of certain real estate of the First Lien Obligors in the applicable filing offices, and (c) notices of security interest regarding the Pre-Petition Collateral consisting of intellectual property in the applicable filing offices.   In addition, the Second Lien Agent filed (a) UCC-1 Financing Statements regarding the Pre-Petition Collateral against the Second Lien Obligors in the applicable state and/or county filing office, the effectiveness of each of which, as applicable, was continued by the filing of a UCC-3 Financing Statement Amendment, (b) mortgages regarding the Pre-Petition Collateral consisting of certain real estate of the Second Lien Obligors in the applicable filing offices, and (c) notices of security interest regarding the Pre-Petition Collateral consisting of intellectual property in the applicable filing offices.[4]

---

[4]    Copies of each of these UCC-1 Financing Statements, UCC-3 Financing Statement Amendments, mortgages and notices of security interest will be provided to the Court, if necessary, upon request.

DMSLIBRARY01-19506382.21

(ix)    The relative priority of the liens and security interests of the First Lien Agent and First Lien Lenders, on the one hand, and the Second Lien Agent and Second Lien Lenders, on the other hand, are governed by the terms of that certain *Intercreditor Agreement*, dated as of June 12, 2007 (the "Intercreditor Agreement"), by and among the First Lien Agent, the Second Lien Agent, Credit Suisse, as control agent, and the Pre-Petition Debt Obligors and all the provisions of such agreement are valid and enforceable as set forth in Section 510 of the Bankruptcy Code.

(x)    Subject to the provisions of paragraph 40 hereof: (a) the liens and security interests of the First Lien Agent and the First Lien Lenders in the Pre-Petition Collateral (collectively, the "First Lien Pre-Petition Liens") are senior in priority to all other liens on or security interests in the Pre-Petition Collateral, subject only to the DIP Liens and any other liens of the DIP Lenders under the DIP Facility, and certain liens otherwise permitted by the First Lien Loan Agreement (to the extent any such permitted liens were (i) existing, valid, enforceable, properly perfected and  non-avoidable, and (ii) senior in priority to the First Lien Pre-Petition Liens as of the Petition Date, the "Permitted Prior Liens"); (b) the liens and security interests of the Second Lien Agent and the Second Lien Lenders in the Pre-Petition Collateral (collectively, the "Second Lien Pre-Petition Liens"; together with the First Lien Pre-Petition Liens, the "Pre-Petition Liens") are senior in priority to all other liens on or security interests in the Pre-Petition Collateral except for the DIP Liens, the First Lien Pre-Petition Liens and the Permitted Prior Liens; (c) the First Lien Pre-Petition Liens are valid, binding, enforceable, non-avoidable and perfected; (d) the First Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the Pre-Petition Debt Obligors, enforceable in accordance with the terms of the First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); (e) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the First Lien Pre-Petition Liens or the First Lien Obligations exist, and no portion of the First Lien Pre-Petition Liens or the First Lien Obligations is subject to any challenge or defense, including, without limitation, avoidance, disgorgement, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of actions and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against the First Lien Agent, the First Lien Lenders and/or any of their respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the First Lien Loan Documents, as applicable; and (g) subject to paragraph 42 hereof, the Debtors have waived, discharged and released any right they may have to challenge any of the First Lien Obligations, the priority of the First Lien Obligations and the security, validity and priority of the First Lien Pre-Petition Liens, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action related to the First Lien Obligations against the First Lien Agent, the First Lien Lenders and/or any of their respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors or employees.

(xi)    Except with respect to league bowling fees collected, properly escrowed and used to fund prize winnings, as set forth in more detail in the *Debtors' Motion for Entry of*

*an Order Authorizing, But Not Directing, the Debtors to Continue (I) Using Their Existing Cash Management System, Bank Accounts, and Business Forms, and (II) Performing Ordinary Course Intercompany Transactions* (the "Cash Management Motion"), filed contemporaneously with the Motion, the Debtors represent that all of the Debtors' cash (other than cash advanced by the DIP Lenders under the DIP Facility and cash proceeds of DIP Collateral that does not otherwise constitute Pre-Petition Collateral), including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Cash Collateral, constitute the Cash Collateral of the Pre-Petition Agents and the Pre-Petition Lenders.

(xii)   The Pre-Petition Debt Obligors acknowledge and stipulate that the Pre-Petition Debt Obligors are in default of their debts and obligations under the Pre-Petition Loan Documents.

F.   *Findings Regarding the Post-Petition Financing*.

(i)   *Request for Post-Petition Financing*.   The Debtors seek authority to: (a) enter into the DIP Facility on the terms described herein and in the DIP Loan Documents; and (b) use Cash Collateral on the terms described herein to administer the Cases and fund the operation of their businesses.   At the Final Hearing, the Debtors will seek final approval of the DIP Loan Documents and the proposed post-petition financing arrangements and use of Cash Collateral arrangements pursuant to a proposed final order (the "Final Order"), which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders in all respects, and notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order. Good cause has been shown for the entry of this Interim Order.

(ii)   *Priming of Pre-Petition Liens*.   The priming of the liens of the Pre-Petition Lenders, as contemplated by this Interim Order and the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors.   However, the Pre-Petition Agents and the Pre-Petition Lenders are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363 and 364 of the Bankruptcy Code, for and only to the extent of (subject to the terms of the Intercreditor Agreement) the diminution, if any, in the value of

each of their respective interests in the Pre-Petition Collateral (including, without limitation, Cash Collateral) (the "Diminution in Value").

(iii)     *Need for Post-Petition Financing and Use of Cash Collateral*.   The Debtors need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the DIP Facility as provided for herein as is necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors and other parties-in-interest, and to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers and customers, to pay their employees and otherwise to finance their operations through the Chapter 11 process requires the availability of working capital from the DIP Facility and the use of Cash Collateral.    Without the ability to access the Interim Financing (as defined below) and the DIP Facility and use Cash Collateral, the Debtors, their estates and their creditors would suffer immediate and irreparable harm, and the Debtors' chances for a successful exit and reorganization from the Cases would be jeopardized.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iv)     *No Credit Available on More Favorable Terms*.   Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than provided for in the DIP Facility.   The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.   The Debtors also have been unable to obtain sufficient credit (a) having priority over that of administrative

DMSLIBRARY01-19506382.21

expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a post-petition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders, (1) perfected priming security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims and liens, and (3) the other protections set forth in this Interim Order.

(v)    *Use of Proceeds of the DIP Facility*.  As a condition to entry into the DIP Loan Agreement, the extension of credit under the DIP Facility and the authorization to use Cash Collateral (including, without limitation, the proceeds of the DIP Facility), the DIP Agent and the DIP Lenders require, and the Debtors have agreed, that the proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Loan Documents and, except with respect to expenditures related to Professionals (as defined herein), in accordance with the Budget, solely for (a) working capital and other general corporate purposes of the Borrower and the Guarantors in the ordinary course of business, (b)  payment of costs of administration of the Cases, (c) payment of such prepetition expenses as consented to by the DIP Lenders or as approved by the Court pursuant to orders approving the first day motions filed by the Debtors, (d) in connection with the initial advance under the DIP Facility, the replacement of all Pre-Petition Letters of Credit with replacement Letters of Credit issued under the DIP Facility and the cash collateralization of such replacement Letters of Credit in an amount equal to 102% of the face amount thereof, (e) to pay fees and expenses related to the DIP

DMSLIBRARY01-19506382.21

Facility, including, without limitation, as set forth in the Commitment Letter and the Fee Letter, and (f) to make the adequate protection payments provided for in this Interim Order.

G.     *Adequate Protection*.

(i)     The First Lien Agent and the First Lien Lenders are entitled to receive adequate protection to the extent of the Diminution in Value of their interests in the Pre-Petition Collateral (including Cash Collateral).  Pursuant to section 361, 363 and 507(b) and subject to the terms of this Interim Order, as adequate protection, the First Lien Agent, for the benefit of itself and the First Lien Lenders, will receive the interest payments, the adequate protection liens and claims, and the professional reimbursements, as more fully set forth in paragraph 15 herein.

(ii)     The Second Lien Agent and the Second Lien Lenders are entitled to receive adequate protection (subject to the terms of the Intercreditor Agreement) to the extent of the Diminution in Value of their interests in the Pre-Petition Collateral (including Cash Collateral).  Pursuant to section 361, 363 and 507(b) and subject to the terms of this Interim Order, as adequate protection, the Second Lien Agent, for the benefit of itself and the Second Lien Lenders, will receive the adequate protection liens and claims, and the professional reimbursements, as more fully set forth in paragraph 15 herein.

H.     *New Loan*.  The DIP Facility (including the Interim Financing) constitutes new loans and financial accommodations from the DIP Lenders to the Debtors, separate and distinct from the loans and financial accommodations provided prior to the Petition Date under the Pre-Petition Loan Documents, and the proceeds of the DIP Facility may only be borrowed and such proceeds and the use of Cash Collateral may only be used in compliance with the Budget and the DIP Loan Documents.

DMSLIBRARY01-19506382.21

I.      *Sections 506(c) and 552(b)*.   Upon entry and subject to the terms of the Final

Order, in exchange for (i) the Pre-Petition Agents', the Pre-Petition Lenders', the DIP Agent's

and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-

Out, and (ii) the Pre-Petition Agents' and the Pre-Petition Lenders' agreement to subordinate

their Pre-Petition Liens to the DIP Liens and the Carve-Out, each of the Pre-Petition Agents, the

Pre-Petition Lenders, the DIP Agent and the DIP Lenders shall each receive (a) a waiver of any

"equities of the case" claims under section 552(b) of the Bankruptcy Code and (b) a waiver of

the provisions of section 506(c) of the Bankruptcy Code.

J.      *Good Faith of the DIP Agent and the DIP Lenders; Debtors' Business Judgment*.

(i)      *Willingness to Provide Financing*.   The DIP Lenders have indicated a

willingness to provide financing to the Debtors subject to: (a) the entry by the Court of this

Interim Order and the Final Order; (b) approval by the Court of the terms and conditions of the

DIP Facility and the DIP Loan Documents; and (c) entry of findings by the Court that such

financing is essential to the Debtors' estates, that the DIP Agent and the DIP Lenders are

extending post-petition credit to the Debtors pursuant to the DIP Loan Documents and this

Interim Order in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority

claims, security interests and liens and other protections granted pursuant to this Interim Order

and the DIP Loan Documents will have the protections provided in section 364(e) of the

Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur,

amendment, reargument or reconsideration of this Interim Order or any other order.

(ii)      *Business Judgment and Good Faith Pursuant to Section 364(e)*.   The

extension of credit under the DIP Facility, governed by the terms and conditions of the DIP Loan

Documents, the fees paid and to be paid thereunder, and this Interim Order as it relates to the

14

Interim Financing: (a) are fair and reasonable; (b) are the best available to the Debtors under the circumstances; (c) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; and (d) are supported by reasonably equivalent value and fair consideration. The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Agent and the DIP Lenders. The use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used and/or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

K.    *Notice*. Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (iv) King & Spalding LLP ("K&S"), as counsel to the DIP Agent for itself and for the DIP Lenders; (v) K&S, as counsel to the First Lien Agent for itself and for the First Lien Lenders; (vi) Stroock & Stroock & Lavan LLP ("Stroock"), as counsel to the First Lien Ad Hoc Group (as defined below); (vii) O'Melveny & Myers LLP, as counsel to the Second Lien Ad Hoc Group (as defined below) and as counsel to the Second Lien Agent; (viii) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (ix) all financial institutions at which the Debtors maintain deposit accounts; (x) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; and (xi) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting

DMSLIBRARY01-19506382.21

to receive notice prior to the date hereof. The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order.

L.    *Immediate Entry*.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed. The Court concludes that entry of this Interim Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

Based upon the foregoing findings and conclusions, the Motion and the record made before the Court with respect to the Motion at the Interim Hearing, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    Interim Financing Approved.    The Motion is granted to the extent provided herein, the Interim Financing is authorized and approved, and the use of Cash Collateral, in each case, on an interim basis, is authorized, subject to the terms and conditions set forth in this Interim Order.

2.    Objections Overruled.    All objections to the interim relief sought in the Motion to the extent not withdrawn or resolved are hereby overruled.

### DIP Facility Authorization

3.    Authorization of the DIP Facility.    The DIP Facility and the Interim Financing are hereby approved by this Interim Order. The Debtors are expressly and immediately authorized, empowered and directed to execute and deliver the DIP Loan Documents, and to incur and to

DMSLIBRARY01-19506382.21

perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to deliver any and all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens. The Debtors are hereby authorized, empowered and directed to pay, in accordance with this Interim Order, the principal, interest, fees, expenses, legal fees and other amounts described in the DIP Loan Documents, and the Commitment Letter and the Fee Letter, as such become due and without the need to obtain further approval of the Court, including, without limitation, closing fees, letter of credit fees (including issuance, fronting and other related charges), unused facility fees, commitment fees, servicing fees, administrative agent fees, backstopping fees, issuance fees, audit fees, arrangement fees, syndication fees, facility fees and the reasonable fees and disbursements of the respective attorneys, advisors, accountants and other consultants engaged by the DIP Agent and/or the Backstop Parties. Pursuant to sections 105(a) and 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure, the Debtors are authorized to file the Fee Letter under seal. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by, and will be subject to, this Interim Order and the DIP Loan Documents. Upon execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

4.      Syndication Procedures. The syndication procedures attached to the Commitment Letter (the "Syndication Procedures") are hereby approved and shall be binding upon all parties in interest, including, without limitation, the Debtors, the DIP Agent, each Backstop Party, each

DIP Lender and each Eligible Lender (as defined in the Syndication Procedures).  The filing of

the Motion, the execution of the DIP Loan Documents, the Commitment Letter (including,

without limitation, the Syndication Procedures) and the Fee Letter, and the funding of the Interim

Financing (as defined below) pursuant to the DIP Loan Agreement and this Interim Order

complies with applicable state and federal securities laws.  The DIP Agent and the Backstop

Parties, as applicable, shall have no liability whatsoever in respect of the Syndication Procedures.

5.      <u>Authorization to Borrow</u>.  Prior to the entry of the Final Order, and to prevent

immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to

borrow and incur liabilities related thereto in an aggregate principal amount of $35,000,000

(the "<u>Interim Financing</u>"), subject to the terms and conditions set forth in the DIP Loan

Documents and the DIP Facility, as applicable, and this Interim Order with up to $20,000,000 of

such Interim Financing to be used to cash collateralize the Letters of Credit.

6.      <u>DIP Obligations</u>.  Upon its entry, this Interim Order shall constitute and evidence

the validity and binding effect of the DIP Obligations, which DIP Obligations shall be

enforceable against the Debtors, their estates and any successors thereto, including, without

limitation, any trustee appointed in any of the Cases, or any case under Chapter 7 of the

Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings

superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  Upon entry

of this Interim Order, the DIP Obligations will include all post-petition loans and any other post-

petition indebtedness or obligations, contingent or absolute, which may now or from time-to-

time be owing by any of the Debtors to the DIP Lenders under this Interim Order and the DIP

Loan Documents, including, without limitation, all principal, accrued interest, costs, fees,

expenses and other amounts due under the DIP Facility as set forth herein.  The DIP Obligations

shall be due and payable as provided for herein and in the DIP Loan Documents.

7.        DIP Liens.  To secure the DIP Obligations, effective immediately upon entry of

this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the

Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted

continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected

post-petition priming, first-priority security interests in and liens (collectively, the "DIP Liens")

on all real and personal property and other assets of the Debtors (except for the proceeds of

avoidance actions under Chapter 5 of the Bankruptcy Code), whether now owned by or owing to,

or hereafter acquired by or arising in favor of the Debtors (including under any trade names,

styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the

Debtors, and regardless of where located, including, without limitation:   (a) all Pre-Petition

Collateral; (b) all cash and cash equivalents; (c) all funds in the DIP Priority Account (as defined

below) or any other deposit account, securities account or other account of the Debtors and all

cash and other property deposited therein or credited thereto from time to time; (d) all accounts

and other receivables; (e) all contract rights; (f) all instruments, documents and chattel paper; (g)

all securities (whether or not marketable); (h) all goods, as-extracted collateral, equipment,

inventory and fixtures; (i) all real property interests; (j) all interests in leaseholds, (k) all

franchise rights; (l) all patents, tradenames, trademarks (other than intent-to-use trademarks),

copyrights and all other intellectual property; (m) all general intangibles; (n) all capital stock,

limited liability company interests, partnership interests and financial assets; (o) all investment

property; (p) all supporting obligations; (q) all letters of credit and letter of credit rights; (r) all

commercial tort claims, (s) all tort claims and all other claims and causes of action (other than

avoidance actions under Chapter 5 of the Bankruptcy Code); (t) [reserved]; (u) upon entry of the

Final Order, all avoidance actions and the proceeds of avoidance actions under Chapter 5 of the

Bankruptcy Code; (v) all books and records (including, without limitation, customers lists, credit

files, computer programs, printouts and other computer materials and records); and (w) to the

extent not covered by the foregoing, all other assets or property of the Debtors, whether tangible,

intangible, real, personal or mixed, and all proceeds and products of each of the foregoing and all

accessions to, substitutions and replacements for, and rents, profits and products of, each of the

foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to

such Debtor from time to time with respect to any of the foregoing (all of which being

hereinafter collectively referred to as the "DIP Collateral"), as collateral security for the prompt

and complete payment and performance when due (whether at the stated maturity, by

acceleration or otherwise) of the DIP Obligations; provided, however, that the DIP Collateral

shall not include Excluded Collateral (as defined in the DIP Loan Agreement).  Notwithstanding

anything contained herein to the contrary, subject to entry of the Final Order, the Debtors are

authorized to grant the DIP Lenders the DIP Liens upon any leasehold interest held by the

Debtors, notwithstanding any provision of any lease or other license, contract or other agreement

that would prohibit or restrict the granting of leasehold mortgages; provided, however, the DIP

Lenders may subsequently foreclose and/or assign such leasehold interests only in full

compliance with the applicable lease or contract and provided, further, that the provisions of this

paragraph 7 shall not (a) render any contract or Lease unable to be assumed and/or assigned by

any Debtor or (b) impair or limit the ability or right of (i) any Debtor to assume and/or assign

any contract or Lease or (ii) any lessor to object to such relief on any grounds, including, but not

limited to, violations of the applicable lease and sections 365(b) or 1123 of the Bankruptcy Code.

Upon entry of the Final Order, all landlord agreements to which any of the Pre-Petition Agents are a party shall be deemed amended to include the DIP Agent as a beneficiary thereunder, and such agreements shall thereafter be additionally enforceable by the DIP Agent against, and binding upon, each landlord party thereto in accordance with, and subject to, its respective terms and conditions until the DIP Obligations have been paid in full in cash and the DIP Loan Agreement shall have been terminated.

8.      <u>DIP Lien Priority</u>.

(a)      The DIP Agent, for the benefit of itself and the DIP Lenders, and for the purpose of securing the DIP Obligations, shall have the following DIP Liens:

(i)      Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to a valid, perfected and unavoidable security interest or lien as of the Petition Date, including all funds in the DIP Priority Account (as defined below) or any other account of the Debtors, subject only to the Carve-Out;

(ii)      Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral that is subject only to (x) Permitted Prior Liens, and (y) the Carve-Out; and

(iii)      Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens on and security interests in all Pre-Petition Collateral securing the Pre-Petition

21

Obligations, wherever located, subject only to (x) Permitted Prior Liens, and (y) the Carve-Out.

(b)     Except as expressly set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases, and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code, and/or upon the dismissal of any of the Cases.  The DIP Liens shall not be subject to sections 506(c) (upon entry of the Final Order), 510, 549, 550 or 551 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

9.     <u>Protection of DIP Lenders' Rights</u>.  So long as there are any DIP Obligations outstanding under the DIP Loan Agreement, the Pre-Petition Agents and the Pre-Petition Lenders shall (a) have no right to, and take no action to, foreclose upon or recover in connection with the liens granted thereto pursuant to the Pre-Petition Agreements, this Interim Order or otherwise seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the debt and obligations underlying the Pre-Petition Loan Documents or the Adequate Protection Liens, including, without limitation, in respect of the occurrence or continuance of any Event of Default (as defined in the Pre-Petition Agreements), (b) be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents, (c) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, memoranda of lease, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (c), the DIP Lenders file financing statements or other documents to perfect the liens granted

pursuant to the DIP Loan Documents and/or this Interim Order, or as may be required by
applicable state law to continue the perfection of valid and unavoidable liens or security interests
as of the date of filing and (d) deliver or cause to be delivered, at the Debtors' costs and expense
(for which the Pre-Petition Lenders shall be reimbursed upon submission to the Debtors of
invoices or billing statements), any termination statements, releases and/or assignments (to the
extent provided for herein) in favor of the DIP Agent and the DIP Lenders or other documents
necessary to effectuate and/or evidence the release, termination and/or assignment of the
Adequate Protection Liens on any portion of the DIP Collateral subject to any sale or disposition
approved or arranged for by the DIP Agent.

10.     Superpriority DIP Claim.  Upon entry of this Interim Order, the DIP Agent and
the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an
allowed superpriority administrative expense claim (the "Superpriority DIP Claim"), in each of
the Cases of the Debtors, for all of the DIP Obligations: (a) with priority over any and all
administrative expense claims and unsecured claims against the Debtors or their estates in any of
the Cases, at any time existing or arising, of any kind or nature whatsoever, including, without
limitation, (i) administrative expenses of the kinds specified in or ordered pursuant to sections
105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113
and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided
under section 364(c)(1) of the Bankruptcy Code, (ii) any claims allowed pursuant to the
obligations under the Pre-Petition Loan Documents and (iii) the Pre-Petition Lenders'
Superpriority Claims; and (b) which shall at all times be senior to the rights of the Debtors and
their estates, and any successor trustee or other estate representative, but subject in each of the
foregoing cases to the Carve-Out.

DMSLIBRARY01-19506382.21

11.        <u>Extension of Credit</u>.    The DIP Agent and the DIP Lenders shall have no

obligation to make any loan or advance, or to issue any Letters of Credit, under the DIP Loan

Documents, unless all of the conditions precedent to the making of such extension of credit or

issuance of such Letter of Credit under this Interim Order and the DIP Loan Documents have

been satisfied in full or waived in accordance with the DIP Loan Documents.

12.        <u>Establishment of DIP Priority Account; Use of DIP Facility Proceeds; LC
Account</u>.

(a)        The proceeds of any borrowing under the DIP Facility shall be deposited

into a segregated account of the Borrower (the "<u>DIP Priority Account</u>"), the contents of which

shall be invested at all times in cash and Cash Equivalents (as such term is defined in the DIP

Loan Documents).    The DIP Agent and the DIP Lenders are hereby authorized, but not required,

to take possession of or control over (as defined in the Uniform Commercial Code as in effect

from time to time in the State of New York), or take any other action in order to validate and

perfect the security interests granted to them in the DIP Priority Account hereunder.    Whether or

not the DIP Agent on behalf of the DIP Lenders shall, in its sole discretion, choose to take

possession of or control over, or otherwise confirm perfection of the security interests granted to

it hereunder, such security interests shall be deemed valid, perfected, allowed, enforceable, non-

avoidable and not subject to challenge dispute or subordination, at the time and on the date of

entry of this Interim Order in favor of the DIP Agent for the benefit of the DIP Lenders.    The

DIP Agent, without any further consent of any party, is authorized to take, execute, deliver and

file such instruments (in each case without representation or warranty of any kind) to enable the

DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.    From and after the

Closing Date, the Debtors shall be permitted to make withdrawals from the DIP Priority Account

only to pay Professionals (as defined below) and pursuant to the terms herein, including, without

limitation, for the purposes and in the amounts set forth in the Budget and in the DIP Loan Documents, including, without limitation, for the purposes set forth in clause (b) below.  The Debtors are authorized to use the proceeds of the DIP Facility to make the adequate protection payments provided for in paragraph 15 of this Interim Order and to make payments on the DIP Facility.  Under no circumstances may any cash, funds, securities, financial assets or other property held in or credited to the DIP Priority Account be used to pay any pre-petition obligations or for any purpose except as permitted under this Interim Order or as authorized by the Court pursuant to any order of the Court, including orders approving the first day motions.

(b)      The proceeds of the DIP Facility will be used to pay Professionals and only for the following purposes, in each case in accordance with and subject to the Budget: (i) for the payment of prepetition amounts acceptable to the DIP Lenders as authorized by the Court pursuant to orders approving the first day motions filed by the Debtors; (ii) in accordance with the terms of the DIP Facility and the Interim and/or Final Orders, (A) for the payment of working capital and other general corporate needs of the Debtors in the ordinary course of business, and (B) for the payment of expenses incurred in connection with the Cases; provided, however, that the payment of expenses incurred on behalf of Professionals will not be subject to the Budget; (iii) to cash collateralize, at 102%, the aggregate outstanding Letters of Credit (in an amount up to $20 million) to be issued by the issuing DIP Lender designated as such in the DIP Loan Documents (the "LC Issuer") as soon as practicable but in no event more than one (1) business day following the date on which all conditions precedent to the effectiveness of the DIP Facility have been satisfied or waived as provided therein (such date, the "Closing Date") in replacement of all Pre-Petition Letters of Credit (including, with respect to AMF Bowling Centers, Inc.'s leases with iStar Bowling Centers I LP and iStar Bowling Centers II LP, replacement with

Letters of Credit on identical terms as the Pre-Petition Letters of Credit except that the expiration date of the Letters of Credit shall be one year from the date of their issuance by the DIP Lenders) that may exist as of the Petition Date as issued under the First Lien Loan Agreement; (iv) to make the adequate protection payments required by paragraph 15 of this Interim Order; and (v) to pay fees and expenses related to the DIP Facility.

(c)      All cash collateral in connection with Letters of Credit issued under the DIP Facility shall be deposited into an account of the DIP Agent (the "LC Account"), to be held by the DIP Agent as security for the obligations owing to the LC Issuer in respect of such Letters of Credit, in accordance with the terms of the DIP Loan Agreement.   On the DIP Termination Date, all commitments to extend credit or issue Letters of Credit under the DIP Facility will terminate and all obligations owing to the LC Issuer on account of such Letters of Credit shall be paid in full, and, on the DIP Termination Date, the LC Issuer shall disburse any and all remaining funds held in the LC Account to the Borrower.   The Borrower shall grant to the LC Issuer a security interest in all of its right, title and interest in and to the Letter of Credit funds to be held in the LC Account, and the LC Account itself, as security for the obligations owing to the LC Issuer in respect of such Letters of Credit.

(d)      Without in any way limiting the foregoing, no DIP Collateral, proceeds of the DIP Loans, any portion of the Carve-Out or any other amounts may be used directly or indirectly by any of the Debtors, the Committee, if any, or any trustee or other estate representative appointed in the Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (i) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the Superpriority DIP Claim (except in connection with any refinancing of the DIP Obligations or to

26

the extent otherwise expressly set forth herein); or (ii) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the DIP Agent, the DIP Lenders, the First Lien Agent or the First Lien Lenders, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (collectively, the "Released Parties"), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under Chapter 5 of the Bankruptcy Code; (B) any so-called "lender liability" claims and causes of action; (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the Superpriority DIP Claim, the DIP Liens, the DIP Loan Documents, the First Lien  Loan Documents or the First Lien Obligations; (D) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations or the First Lien Obligations; (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (1) the DIP Agent or the DIP Lenders hereunder or under any of the DIP Loan Documents, or (2) the First Lien Agent or the First Lien Lenders under any of the First Lien Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents and the Interim and/or Final Orders); or (F) objecting to, contesting, or interfering

DMSLIBRARY01-19506382.21

with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Loan Agreement) has occurred; provided, however, that no more than $50,000 in the aggregate of the DIP Collateral, the Carve-Out, proceeds from the borrowings under the DIP Facility or any other amounts, may be used by any Committee to investigate claims and/or liens of the First Lien Agent and First Lien Lenders under the First Lien Loan Documents.

13.     Chapter 11 Milestones.  The Debtors failure to comply in any respect with the milestone covenants and deadlines set forth in section 8.01(o) of the DIP Loan Agreement shall constitute an event of default under the DIP Loan Agreement; provided, however, for the purposes of this Interim Order, section 8.01(o)(iii) and (iv) of the DIP Loan Agreement are hereby amended to add the following language to the end of such sections:  "or on such later date as is ordered by the Bankruptcy Court;".

**Authorization to Use Cash Collateral and Adequate Protection**

14.     Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, the Debtors are authorized to use the Cash Collateral to pay Professionals and otherwise in accordance with the Budget and in accordance with this Interim Order.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order and the DIP Loan Documents, and in accordance with the Budget.  Subject to paragraph 32 hereof, upon the occurrence of an Event of Default (as defined in the DIP Loan Agreement), the Debtors shall not seek to use Cash Collateral (a) without the prior written consent of the DIP Agent (at the direction of DIP Lenders holding in excess of 50% of the DIP Lenders' commitments under the DIP Facility, except as to matters under the DIP Loan

28

Agreement requiring unanimity (the "Requisite DIP Lenders")) or (b) over the objection of the

DIP Agent (at the direction of the Requisite DIP Lenders) or the Requisite DIP Lenders.

15.    Adequate Protection.

(a)    First Lien Lender Adequate Protection Liens.  Pursuant to sections 361,

363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the First

Lien Agent and the First Lien Lenders for the use of the Pre-Petition Collateral encumbered by

the First Lien Pre-Petition Liens against the Diminution in Value of such interests in the

Pre-Petition Collateral, the First Lien Obligors hereby grant to the First Lien Agent, on behalf of

itself and the First Lien Lenders, and the First Lien Lenders the following:

(i)    continuing, valid, binding, enforceable and perfected postpetition

"replacement" liens on the DIP Collateral to the extent of any post-petition

Diminution in Value of the First Lien Lenders' interest in the First Lien Pre-

Petition Collateral, including replacement liens on all unencumbered assets of the

First Lien Obligors (the "First Lien Adequate Protection Liens"), which liens will

be junior to the DIP Liens and any other liens of the DIP Lenders under the DIP

Facility, the Permitted Prior Liens and the Carve-Out; and

(ii)    to the extent provided by section 507(b) of the Bankruptcy Code,

an allowed superpriority administrative expense claim in each of the Cases to the

extent of any post-petition Diminution in Value of the First Lien Lenders' interest

in the First Lien Pre-Petition Collateral (the "First Lien Superpriority Claims"),

which claims will be junior to the DIP Obligations, the Superpriority DIP Claim

and the Carve-Out and be payable from and have recourse to all assets and

property of the Debtors.

(b)      Second Lien Lender Adequate Protection Liens.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Second Lien Agent and the Second Lien Lenders for the use of the Pre-Petition Collateral encumbered by the Second Lien Pre-Petition Liens against any Diminution in Value of such interests in the Pre-Petition Collateral, the Second Lien Obligors hereby grant to the Second Lien Agent, on behalf of itself and the Second Lien Lenders, and the Second Lien Lenders the following:

(i)      continuing, valid, binding, enforceable and perfected postpetition "replacement" liens on the DIP Collateral to the extent of any post-petition Diminution in Value of the Second Lien Lenders' interest in the Second Lien Pre-Petition Collateral, including replacement liens on all unencumbered assets of the Second Lien Obligors, (the "Second Lien Adequate Protection Liens"; together with the First Lien Adequate Protection Liens, collectively, the "Adequate Protection Liens") which liens will be junior to the DIP Liens and any other liens of the DIP Lenders under the DIP Facility, the First Lien Pre-Petition Liens, the Permitted Prior Liens, the Carve-Out and the First Lien Adequate Protection Liens; and

(ii)      to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases to the extent of any post-petition Diminution in Value of the Second Lien Lenders' interest in the Second Lien Pre-Petition Collateral (the "Second Lien Superpriority Claims"; together with the First Lien Superpriority Claims, the "Pre-Petition Lenders' Superpriority Claims"), which claims will be junior to the DIP Obligations, the Superpriority DIP Claim, the Carve-Out and the First Lien

30

Superpriority Claims and be payable from and have recourse to all assets and property of the Debtors.

(c)      Adequate Protection Payments and Additional Protections.    As further adequate protection for the First Lien Agent and the First Lien Lenders, and subject, in each case to the Carve-Out, the First Lien Obligors are authorized and directed to provide adequate protection (collectively, the "First Lien Adequate Protection Payments") in the form of (i) upon entry of the Interim Order, payment of all accrued and unpaid amortization payments, interest (at the default rate, to the extent allowable) and fees due to the First Lien Agent and/or First Lien Lenders, as applicable, owed prior to the Petition Date as set forth in the First Lien Loan Documents, (ii) upon entry of the Interim Order,  payment of all unpaid out-of-pocket fees, costs and expenses, owed prior to and as of the Petition Date, of (x) the First Lien Agent (including all reasonable fees, costs, disbursements and expenses of its outside counsel, K&S, its local counsel and one financial advisor, if any, retained by K&S pursuant to the terms hereof and the DIP Loan Documents) and (y) certain of the First Lien Lenders (the "First Lien Ad Hoc Group") (including all reasonable fees, expenses and disbursements of (A) their outside counsel, Stroock and their local counsel, (B) Miller Buckfire & Co., LLC ("Miller Buckfire"), as financial advisor to the First Lien Ad Hoc Group (pursuant to that certain letter of engagement dated as of July 3, 2012 by and among Stroock, Miller Buckfire, and certain of the Debtors), and (C) any other professional advisors engaged by Stroock); (iii) current amortization payments, interest (at the non-default rate) and fees due to the First Lien Agent and/or First Lien Lenders, as applicable, as they become due and owing (without regard to the commencement of the Cases) as set forth in the First Lien Loan Documents; and (iv) the current payment of all reasonable and documented (in summary form), out-of-pocket fees, costs and expenses of (x) the First Lien Agent (including

all reasonable fees, costs, disbursements and expenses of its outside counsel, K&S, its local counsel and one financial advisor, if any, retained by K&S pursuant to the terms hereof and the DIP Loan Documents) and (y) the First Lien Ad Hoc Group (including all reasonable fees, expenses and disbursements of (A) their outside counsel, Stroock and their local counsel, (B) Miller Buckfire, as financial advisor to the First Lien Ad Hoc Group (pursuant to that certain letter of engagement dated as of July 3, 2012 by and among Stroock, Miller Buckfire, and certain of the Debtors), and (C) any other professional advisors engaged by Stroock).  The payments set forth in this paragraph are not and shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

(d)     As further adequate protection for the Second Lien Agent and the Second Lien Lenders, and subject, in each case to the Carve-Out and the First Lien Adequate Protection Payments, the Second Lien Obligors are authorized and directed to provide adequate protection (collectively, the "Second Lien Adequate Protection Payments") in the form of (i) upon entry of the Interim Order, payment (the "True-Up Second Lien Professional Payment") of all unpaid out-of-pocket fees, costs and expenses owed prior to and as of the Petition Date, of (x) the Second Lien Agent (including all reasonable fees, costs, disbursements and expenses of one outside counsel and one local counsel) and (y) certain of the Second Lien Lenders (the "Second Lien Ad Hoc Group") (including all reasonable fees, expenses and disbursements of (A) their outside counsel, O'Melveny & Meyers LLP ("O'Melveny") and their local counsel, and (B) FTI Consulting, Inc. ("FTI"), as financial advisor to the Second Lien Ad Hoc Group (pursuant to that certain letter of engagement dated as of July 12, 2012 by and among O'Melveny, FTI, and certain of the Debtors); and (ii) the current payment of all reasonable and documented (in summary form), out-of-pocket fees, costs and expenses of (x) the Second Lien Agent (including

32

all reasonable fees, costs, disbursements and expenses of one outside counsel and one local counsel) and (y) certain of the Second Lien Lenders (the "Second Lien Ad Hoc Group") (including all reasonable fees, expenses and disbursements of (A) O'Melveny and their local counsel, and (B) FTI.   Other than the True-Up Second Lien Professional Payment, the Second Lien Obligors shall not make Second Lien Adequate Protection Payments in excess of $200,000 in any calendar month in which they remain obligated to pay the Second Lien Adequate Protection Payments (the "Second Lien AP Cap Amount") and no unused amount of the Second Lien AP Cap Amount shall be credited or rolled over to any month subsequent to the month in which the Second Lien Adequate Protection Payments are made.   The provisions of this paragraph are without prejudice to the rights of the Second Lien Agent and the Second Lien Ad Hoc Group to seek payment of adequate protection in excess of what is provided for herein.

(e)    Access to Books and Records.   As further adequate protection for each of the Pre-Petition Agents and the Pre-Petition Lenders, the Debtors shall provide such Pre-Petition Agents and Pre-Petition Lenders with reasonable access to the Debtors' books and records and such financial reports as are provided to the DIP Agent pursuant to sections 6.01 and 6.15 of the DIP Loan Agreement.

16.    Adequate Protection Reservation.   The receipt by the Pre-Petition Agents and Pre-Petition Lenders of the adequate protection provided pursuant to paragraph 15 of this Interim Order shall not be deemed an admission that the interests of the Pre-Petition Agents and Pre-Petition Lenders are indeed adequately protected.   Further, this Interim Order shall not prejudice or limit the rights of the Pre-Petition Agents or the Pre-Petition Lenders to seek additional relief with respect to the use of Cash Collateral or for adequate protection, subject to the terms of the Intercreditor Agreement.

17.    <u>Reporting</u>.  The Debtors shall provide to the DIP Agent for the benefit of the DIP

Lenders, and to the Pre-Petition Agents for the benefit of the Pre-Petition Lenders: (i) monthly

consolidated financial statements of the Debtors and their subsidiaries (consistent in form and

substance with prior monthly reporting required to be provided to the First Lien Agent for

delivery to the First Lien Lenders pursuant to the First Lien Loan Agreement) within thirty (30)

days of month-end, certified by the Borrowers' chief financial officer; (ii) quarterly consolidated

financial statements of the Debtors and their subsidiaries within forty-five (45) days of fiscal

quarter-end, certified by the Borrower's chief financial officer; (iii) annual audited consolidated

financial statements of the Debtors and their subsidiaries within one hundred and ten (110) days

of fiscal year-end, certified with respect to such consolidated statements by independent certified

public accountants reasonably acceptable to the DIP Lenders, which shall not be qualified in any

material respect as to scope but may contain a qualification with respect to the Cases; (iv)

following delivery of the Budget, on every Friday during the Cases, an updated 13-week cash

flow forecast, in each case, in form and substance satisfactory to the DIP Agent at the direction

of the Requisite DIP Lenders (the "<u>Weekly Cash Flow Forecast</u>") for the subsequent 13 week

period consistent with the form of the Budget; (v) beginning on the third Friday following the

Closing Date, and on each Friday following, a variance report (the "<u>Variance Report</u>") setting

forth actual cash receipts and disbursements of the Debtors for the prior week and setting forth

all the variances, on a line-item and aggregate basis, from the amount set forth for such week as

compared to (1) the Budget on a weekly and cumulative basis (which shall be subject to the

variances set forth in the DIP Loan Documents), and (2) the most recent Weekly Cash Flow

Forecast (as applicable) delivered by the Debtors, in each case, on a weekly and cumulative basis

(and each such Variance Report shall include explanations for all material variances and shall be

certified by the Chief Financial Officer or Chief Restructuring Officer of the Debtors); and (vi)

annual business and financial plans provided at least thirty (30) days prior to the fiscal year-end.

The Borrower will promptly provide notice to the DIP Agent, for prompt distribution to the DIP

Lenders, of any Material Adverse Change (as defined in the DIP Loan Agreement).

18. <u>Additional Reports and Information</u>.  Further, the Debtors will provide to the DIP

Agent, for the benefit of the DIP Lenders, such other reports and information as may be

reasonably requested by the DIP Agent or the DIP Lenders.  In addition, the Debtors authorize

their accountants, financial advisors and consultants to cooperate, consult with, and provide to

the DIP Agent, for the benefit of the DIP Lenders, all such information as may be reasonably

requested with respect to the businesses, results of operations, and financial condition of the

Debtors.

19. <u>Section 507(b) Reservation</u>.   Nothing herein shall impair or modify the

application of section 507(b) of the Bankruptcy Code in the event that the adequate protection

provided hereunder is insufficient to compensate for any Diminution in Value during any of the

Cases subject to the Carve-Out.

**<u>Provisions Common to DIP Facility and Use of Cash Collateral Authorizations</u>**

20. <u>Amendment of the DIP Loan Documents or this Interim Order</u>.  Except for

actions expressly permitted to be taken by the DIP Agent or the Requisite DIP Lenders, no

amendment, modification, termination or waiver of any provision of the DIP Loan Documents or

this Interim Order or any other related documents, or any consent to any departure by any of the

Debtors therefrom, shall in any event be effective unless the same shall be in writing (it being

understood that any necessary signatures may be on a document consenting to such amendment,

modification, termination, or waiver) and (a) in the case of an amendment to cure any ambiguity,

non-material omission, defect or inconsistency, signed by the DIP Agent and the Debtors and

DMSLIBRARY01-19506382.21

(b) in the case of any other amendment, modification, termination or waiver, signed by the Debtors, the DIP Agent and the DIP Lenders.

21.        Budget.  The Debtors have prepared and delivered to the DIP Agent and the DIP Lenders a budget, more particularly described in the DIP Loan Agreement (the "Budget"), which reflects the Debtors' anticipated cumulative cash receipts and expenditures on a weekly basis and all necessary and required cumulative expenses which the Debtors expect to incur during each week from the Petition Date through the Scheduled Maturity Date (as defined in the DIP Loan Agreement) (the "Budget Period").  During the Budget Period, the Debtors are authorized to use the proceeds of the DIP Facility and Cash Collateral for expenditures that consist solely of cash disbursements consistent with and pursuant to the Budget; provided, however, that the Debtors may not exceed expenditures that, on a weekly basis, relate to the Debtors' use of the DIP Facility and/or Cash Collateral with respect to any expenditures in excess of Permitted Variances.  The term "Permitted Variances" shall mean (i) all favorable variances, and (ii) an unfavorable variance, on an aggregate basis, of (A) no more than 20% with respect to the first two weeks after the Closing Date (the "First Testing Period"), (B) no more than 15% with respect to the first three weeks after the Closing Date (the "Second Testing Period"), and (C) no more than 12.5% with respect to the first four weeks after the Closing Date and on a weekly rolling basis with respect to each subsequent four week period (each such period, with the First Testing Period and the Second Testing Period, the "Testing Periods"); provided, however, that those expenditures related to Professionals shall not be subject to the Budget and shall be excluded from the calculation of Permitted Variance.  The Permitted Variance with respect to each Testing Period shall be determined and reported to the DIP Agent and the DIP Lenders not later than the Friday immediately following each such Testing Period.  Additional variances, if

DMSLIBRARY01-19506382.21

any, from the Budget, and any proposed changes to the Budget, shall be subject to agreement by

the Debtors and the approval of the DIP Agent at the direction of the Requisite DIP Lenders, in

each case without further notice, motion or application to, order of, or hearing before, the Court.

22.      <u>Budget Compliance</u>.   Subject to paragraph 40 hereof and except as otherwise

provided herein or approved by the DIP Agent (at the direction of the Requisite DIP Lenders),

the Debtors will not, and will not permit any subsidiary directly or indirectly to, use any Cash

Collateral or the proceeds of the DIP Facility in a manner or for a purpose other than those

consistent with the Budget and this Interim Order or the Final Order (as applicable) and to pay

Professionals.

23.      <u>Modification of Automatic Stay</u>.   The automatic stay imposed by section 362(a)

of the Bankruptcy Code is hereby modified as necessary to permit: (a) the Debtors to grant the

DIP Liens and the Superpriority DIP Claim, and to perform such acts as the DIP Agent may

request, either in its sole discretion or at the direction of the Requisite DIP Lenders, to assure the

perfection and priority of the DIP Liens; (b) the Debtors to take all appropriate action to grant the

Adequate Protection Liens and the Pre-Petition Lenders' Superpriority Claims set forth in

paragraph 15 hereof, and to take all appropriate action to ensure that the Adequate Protection

Liens granted thereunder are perfected and maintain the priority set forth herein; (c) the Debtors

to incur all liabilities and obligations to the Pre-Petition Agents, the Pre-Petition Lenders, the

DIP Agent and the DIP Lenders as contemplated under this Interim Order; (d) the Debtors to pay

all amounts referred to, required under, in accordance with, and subject to the DIP Loan

Documents, the Commitment Letter, the Fee Letter and the Interim Order; (e) the DIP Agent and

the DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of

Default under the DIP Loan Documents and subject to the five (5) day notice requirement set

forth in clause (b) of paragraph 32, all rights and remedies provided for in the DIP Loan

Documents and take any or all actions provided therein; and (f) the implementation of the terms of this Interim Order.

24.     <u>Perfection of DIP Liens and Post-Petition Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of all liens granted herein, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of execution, filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the Pre-Petition Agents, the Pre-Petition Lenders, the DIP Agent or the DIP Lenders to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent and the Pre-Petition Agents is authorized to execute, file or record and the DIP Agent may require the execution, filing or recording, as each, in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable law or to otherwise evidence the DIP Liens and/or Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; <u>provided, however</u>, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent all such financing statements, mortgages, notices, and other documents as the DIP Agent may reasonably request.  The DIP Agent, in its discretion, may file a photocopy of this Interim Order as a financing

statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

25.　　　__After-Acquired Property__.  Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including, without limitation, all DIP Collateral pledged or otherwise granted to the DIP Agent and/or the DIP Lenders pursuant to this Interim Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Permitted Prior Lien in existence as of the Petition Date which is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law, recharacterization or other challenge.

26.　　　__Proceeds of Subsequent Financing__.  If the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents at any time prior to the indefeasible payment in full in cash of all of the Pre-Petition Obligations and the indefeasible payment in full in cash of all of the DIP Obligations, the cancellation, backing or cash collateralization of Letters of Credit issued pursuant to the DIP Facility, the satisfaction of the Superpriority DIP  Claims, and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility and this Interim Order, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, then all of the cash proceeds

DMSLIBRARY01-19506382.21

derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied to the DIP Obligations.

27.      <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full in cash of all DIP Obligations, the cancellation, backing or cash collateralization of Letters of Credit issued pursuant to the DIP Loan Documents, and the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral as required under this Interim Order and the DIP Loan Documents, as applicable, and (b) maintain the cash management system in effect as of the Petition Date, as modified by this Interim Order and any order that may be entered by the Court in accordance with this Interim Order.

28.      <u>Restrictions on Lease Rejections</u>.      Except as otherwise provided in that certain *Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Assume, or Assume and Assign, Certain Amended Master Agreements with iStar Financial Effective Only upon Consummation of the Debtors' Restructuring, and (II) Cure Outstanding Defaults Immediately upon Entry of Such Order* and that certain *Debtors' Motion for Entry of an Order Authorizing and Approving (I) Rejection of Certain Unexpired Leases and (II) Abandonment of Certain Personal Property, Each Effective Nunc Pro Tunc to the Petition Date*, unless and until all DIP Obligations have been indefeasibly paid in full in cash, and all First Lien Obligations have been indefeasibly paid in full, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Loan Documents if any of the Debtors shall seek or if there is entered, an order under section 365 of the Bankruptcy Code rejecting a lease (i) to which any of the Debtors is a party, and (ii) that is  part of (or whose premises contain any) DIP Collateral.

DMSLIBRARY01-19506382.21

29.     <u>Insurance Policies</u>.   The Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Loan Documents.  The Debtors shall provide the DIP Agent and its counsel (for distribution to the DIP Lenders) with evidence of such insurance within five (5) calendar days after entry of this Interim Order.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, each of the DIP Agent and the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

30.     <u>Disposition of or New Liens on DIP Collateral</u>.   The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent (at the direction of the Requisite DIP Lenders) (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, except as otherwise provided for herein).  Absent further order of the Court, the Debtors shall not create or permit to exist any post-petition liens or encumbrances on any of their assets or property except any post-petition liens agreed to by the DIP Agent (at the direction of the Requisite DIP Lenders) in writing.

31.     <u>DIP Termination Date</u>.   On the DIP Termination Date, (a) all DIP Obligations shall be immediately due and payable, and all commitments to extend credit or issue Letters of Credit under the DIP Facility will terminate, and (b) all authority to use Cash Collateral shall cease.  For purposes of this Interim Order, the term "<u>DIP Termination Date</u>" shall have the meaning set forth in the DIP Loan Agreement.

32.     <u>Rights and Remedies Upon Event of Default</u>.   Notwithstanding the provisions of section 362 of the Bankruptcy Code, and without order of or application or motion to the Court,

41

immediately upon the occurrence and during the continuance of an Event of Default under the

DIP Loan Documents: (a) the Requisite DIP Lenders may direct the DIP Agent, by written notice

to the Borrower, its counsel and any counsel for the Committee, to terminate the DIP Facility,

declare the DIP Obligations to be immediately due and payable and, subject to the immediately

following clause (b), exercise all rights and remedies under the DIP Loan Documents and this

Interim Order; and (b) the automatic stay provisions of section 362 of the Bankruptcy Code shall

be vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to

exercise all rights and remedies provided for in the DIP Loan Documents, and to take any or all

of the following actions without further order of or application to the Court (as applicable):

(i) immediately terminate the Debtors' use of any Cash Collateral; (ii) cease making any

extensions of credit under the DIP Facility to the Debtors; (iii) declare all DIP Obligations to be

immediately due and payable; (iv) freeze monies or balances in the Debtors' accounts (and, with

respect to the DIP Facility, sweep all funds contained in the DIP Priority Account);

(v) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP

Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights

against the DIP Collateral in the possession of any of the applicable DIP Lenders, including,

without limitation, disposition of the DIP Collateral solely for application towards the DIP

Obligations; and (vi) take any other actions or exercise any other rights or remedies permitted

under this Interim Order, the DIP Loan Documents or applicable law to effect the repayment of

the DIP Obligations; provided, however, that prior to the exercise of any right in clauses (i), (iv),

(v) or (vi) of this paragraph, the DIP Agent shall be required to provide, in each case, five (5) business

days prior written notice to the Debtors, lead counsel for the Debtors, lead counsel for the Committee,

lead counsel for the First Lien Ad Hoc Group, lead counsel for each of the Pre-Petition Agents,

lead counsel for the Second Lien Ad Hoc Group, of the DIP Agent's intent to exercise its rights and remedies.  The Debtors shall cooperate with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise; and the Debtors shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agent and the DIP Lenders set forth in the Interim and/or Final Orders and in the DIP Loan Documents.

33.      Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.  The DIP Agent and the DIP Lenders have acted in good faith in connection with the DIP Facility, the Interim Financing, and with this Interim Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, reversed, amended or vacated by a subsequent order of the Court or any other court, the DIP Agent and the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, reversal, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.  Any liens or claims granted to the DIP Agent and the DIP Lenders arising prior to the effective date of any such modification, reversal, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

DMSLIBRARY01-19506382.21

34.         <u>DIP and Other Expenses</u>.  The Debtors are authorized and directed to pay, in cash

on a current basis, all reasonable and documented out-of-pocket fees, costs, disbursements and

expenses of the First Lien Agent, the First Lien Lenders, the DIP Agent and the Backstop Parties

incurred at any time, as provided by the DIP Loan Documents, the Interim Order, and the

Budget, including, without limitation, legal, accounting, collateral examination and monitoring

fees, fees and expenses of Miller Buckfire as financial advisor for the First Lien Ad Hoc Group,

fees and expenses of other consultants, and indemnification and reimbursement of fees and

expenses as set forth in the DIP Loan Documents, the Commitment Letter or the Fee Letter.

Payment of all such fees and expenses shall not be subject to allowance by the Court, and such

parties' right to receive such payment of fees and expenses shall not be required to comply with

the U.S. Trustee's fee guidelines.  Such fees and expenses shall not be subject to any offset,

defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

35.         <u>Indemnification</u>.  The Debtors shall jointly and severally indemnify and hold

harmless the DIP Agent (solely in its capacity as a DIP Agent), each DIP Lender (solely in its

capacity as a DIP Lender) and each of their affiliates and each of their respective officers,

directors, employees, controlling persons, agents, advisors, attorneys and representatives of each,

in their respective capacities as such (each, an "<u>Indemnified Party</u>"), from and against any and all

any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees

and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded

against any Indemnified Party, in each case arising out of or in connection with or relating to any

investigation, litigation or proceeding or the preparation of any defense with respect thereto,

arising out of or in connection with or relating to the DIP Facility, the DIP Loan Documents or

the transactions contemplated thereby, or any use made or proposed to be made with the

DMSLIBRARY01-19506382.21

proceeds of the DIP Facility, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Loan Documents are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct.   No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct.   In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.   The foregoing indemnity includes indemnification for the DIP Agent's and the DIP Lenders' exercise of discretionary rights granted under, and in accordance with, this Interim Order.   In all such litigation, or the preparation therefor, the DIP Agent and the DIP Lenders shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel.

36.     <u>Proofs of Claim</u>.   The DIP Agent, the DIP Lenders, the Pre-Petition  Agents and the Pre-Petition Lenders shall not be required to file proofs of claim in any of the Cases for any claim allowed herein.   Any proof of claim filed by the DIP Agent, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Lenders shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons.   Any order entered by the

Court in relation to the establishment of a bar date in any of the Cases shall not apply to the DIP

Agent, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Lenders.

37.    <u>Rights of Access and Information</u>.    Without limiting the rights of access and

information afforded the Pre-Petition Agents, the Pre-Petition Lenders, the DIP Agent and the

DIP Lenders under this Interim Order and/or the DIP Loan Documents, the Debtors shall be, and

hereby are, required to afford representatives, agents and/or employees of the DIP Agent

reasonable access to the Debtors' premises and their books and records in accordance with this

Interim Order and/or the DIP Loan Documents and shall reasonably cooperate, consult with, and

provide to such persons all such information as may be reasonably requested.    In addition, the

Debtors authorize their independent certified public accountants, financial advisors, investment

bankers, and consultants to cooperate, consult with, and provide to the DIP Agent (and so long as

an Event of Default under the DIP Loan Documents has occurred and is continuing, each of the

DIP Lenders) all such information as may be reasonably requested with respect to the business,

results of operations, and financial condition of any of the Debtors.

38.    <u>Access to DIP Collateral/No Landlord's Liens</u>.    Upon entry of a Final Order

providing for such relief and subject to applicable state law, notwithstanding anything contained

herein to the contrary and without limiting any other rights or remedies of the DIP Agent, for the

benefit of the DIP Lenders, contained in this Interim Order, or otherwise available at law or in

equity, and subject to the terms of this Interim Order, upon written notice to the landlord of any

leased premises that an Event of Default has occurred and is continuing under the DIP Facility,

the DIP Agent may, subject to any separate agreement by and between such landlord and the DIP

Agent (a "<u>Separate Agreement</u>"), enter upon any leased premises of the Debtors for the purpose

of exercising any remedy with respect to DIP Collateral located thereon and, subject to any

Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; provided, however, that, subject to any such Separate Agreement, the DIP Agent shall only pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the DIP Agent, calculated on a per diem basis.  Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded to the DIP Agent in this paragraph.

39.    Continuing Effect of Intercreditor Agreement.    The Pre-Petition Debt Obligors, the Pre-Petition Agents and the Pre-Petition Lenders each shall continue to be bound by, and be subject to all the terms, provisions and restrictions of, the Intercreditor Agreement.

40.    Carve-Out.

(i)    For the purposes of this Interim Order, the term "Carve-Out" shall mean the following: (a) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (b) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000; (c) to the extent allowed by the Court at any time, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors (collectively, the "Professionals") and (subject to the Budget and any Permitted Variances allowed thereunder) any official committee of creditors at any time before or on the date and time of the delivery by the DIP Agent, at the direction of the Requisite DIP Lenders, of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (d) after the date that is one (1) business day after the date of the delivery by the DIP Agent, at the direction of

the Requisite DIP Lenders, of the Carve-Out Trigger Notice, to the extent allowed by the Court at any time, all unpaid fees, disbursements, costs and expenses incurred by Professionals and the professionals or professional firms retained by any Committee in an aggregate amount not to exceed $450,000 (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"); provided, however, that nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any such professionals.  For the avoidance of doubt, the payment of all accrued and unpaid fees, disbursements, costs and expenses incurred by Professionals pursuant to subsection (c) above shall not be subject to any budget, including the Budget.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent at the direction of the Requisite DIP Lenders to the Debtors and their counsel, the U.S. Trustee, and lead counsel to any official committee appointed in these Cases, which notice may be delivered following the occurrence of an Event of Default under the DIP Loan Documents and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(ii)     For the avoidance of doubt, the Carve-Out shall be senior to all liens and claims (including, without limitation, administrative and superpriority claims) securing the DIP Obligations and the Pre-Petition Obligations, including the Adequate Protection Liens and any and all other forms of adequate protection, liens, security interests and other claims granted herein to the Pre-Petition Agents, the Pre-Petition Lenders, the DIP Agent, or the DIP Lenders.

41.     Payment of Compensation.  Prior to the occurrence of an Event of Default, the Debtors are authorized to pay compensation and reimbursement of fees and expenses that are

DMSLIBRARY01-19506382.21

authorized to be paid under sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Court, as the same may be due and payable, and such payments shall not reduce the Carve-Out.   Upon the receipt of the Carve-Out Trigger Notice, the right of the Debtors to pay professional fees outside of paragraph 40 hereof shall terminate, and, after receipt of the Carve Out Trigger Notice, the Debtors shall provide immediate notice to all professionals informing them that such notice was delivered and further advising them that the Debtors' ability to pay such professionals is subject to and limited by the Carve-Out.

42.    Reservation of Certain Third Party Rights and Bar of Challenges and Claims.  The Committee shall have a maximum of thirty (30) calendar days from the date of the Committee's appointment, but in no event later than forty-five (45) calendar days from entry of the Interim Order (the "Investigation Period") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and challenge (each, a "Challenge") the findings, the Debtors' stipulations, or any other stipulations contained in this Interim Order, including, without limitation, any challenge to the validity, priority or enforceability of the liens securing the obligations under the First Lien Loan Documents, or to assert any claim or cause of action related to the First Lien Obligations against the First Lien Agent or the First Lien Lenders arising under or in connection with the First Lien Loan Documents or the First Lien Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of First Lien Obligations, or otherwise.   The Investigation Period may only be extended: (a) with the prior written consent of counsel to the DIP Agent, at the direction of the Requisite DIP Lenders, as memorialized in an order of the Court, or (b) pursuant to an order of the Court upon a showing of good cause for such extension. Except to the extent asserted in an adversary proceeding or contested matter filed during the

Investigation Period, upon the expiration of such applicable Investigation Period (to the extent not otherwise waived or barred): (i) any and all Challenges or potential Challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in the Interim and/or Final Orders shall be irrevocably and forever binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including, without limitation, any Chapter 7 trustee, without further action by any party or the Court; (iii) the First Lien Obligations shall be deemed to be finally allowed and the First Lien Pre-Petition Liens shall be deemed to constitute valid, binding and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the First Lien Obligors shall be deemed to have released, waived and discharged the Released Parties from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the First Lien Obligations.  Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations contained in the Final Order shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge.

43.      No Third Party Rights.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

44.      Section 506(c) Claims.    Upon entry of the Final Order, no costs or expenses of administration that have been or may be incurred in any of the Cases at any time shall be charged against the DIP Agent, any of the DIP Lenders, the Pre-Petition Agents or the Pre-

50

Petition Lenders or any of their respective claims or liens (including any claims or liens granted pursuant to this Interim Order) or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

45.     <u>Section 552(b)</u>.  Upon entry of the Final Order, the Pre-Petition Agents and the Pre-Petition Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to either of the Pre-Petition Agents (on its own behalf and on behalf of the Pre-Petition Lenders) with respect to proceeds, products, offspring, or profits of any of the Pre-Petition Collateral.

46.     <u>No Marshaling/Application of Proceeds</u>.  In no event shall the DIP Agent, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Pre-Petition Collateral, as applicable, and all proceeds shall be received and applied in accordance with this Interim Order.

47.     <u>Right to Credit Bid</u>.  Each of the DIP Agent (at the direction of the Requisite DIP Lenders), the First Lien Agent (at the direction of the Required Lenders (as defined in the First Lien Loan Agreement)) and, to the extent permitted by Section 363(k) of the Bankruptcy Code, the Second Lien Agent (at the direction of the Required Lenders (as defined in the Second Lien Loan Agreement)) shall have the right to "credit bid" the full amount of their respective claims in connection with any sale of all or any portion of the Pre-Petition Debt Obligors' assets, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

DMSLIBRARY01-19506382.21

48.    <u>Discharge Waiver/Release</u>.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization.  As set forth herein, none of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP Obligations in full in cash on or prior to the earlier to occur of the effective date of such plan of reorganization or sale.  Subject to the Committee's rights set forth in paragraph 42, upon entry of the Final Order, the Debtors agree to forever waive and release any and all claims and causes of action against the Pre-Petition Agents, the Pre-Petition Lenders, the DIP Agent and the DIP Lenders whether at law or in equity, arising under or relating to section 105 and Chapter 5 of the Bankruptcy Code and under any other similar provisions of applicable state or federal law.

49.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the First Lien Agent's, the First Lien Lenders', the DIP Agent's or the DIP Lenders' rights to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the First Lien Agent, the First Lien Lenders, the DIP Agent and the DIP Lenders under the DIP Loan Documents, the Bankruptcy Code or under applicable law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases, conversion of any or all of the Cases to a case under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a

DMSLIBRARY01-19506382.21

Chapter 11 plan or plans of reorganization, or (iv) object to the application or motion by any

professionals retained by the Debtors, the Second Lien Agent, any of the Second Lien Lenders or

any Committee for the payment of fees and expenses, including, without limitation, in

connection with the Carve-Out; or (c) any other rights, claims, or privileges (whether legal,

equitable or otherwise) of the Pre-Petition Agents, the Pre-Petition Lenders, the DIP Agent or the

DIP Lenders.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is

without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors' or

any party-in-interest's right to oppose any of the relief requested in accordance with the

immediately preceding sentence or the payment of Professionals subject to the Carve-Out in

connection with any such opposition.

51. 50. <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be

construed to constitute a substantive consolidation of any of the Debtors' estates, it being

understood, however, that the Debtors shall be jointly and severally liable for the obligations

hereunder and in accordance with the terms of this Interim Order.

51. <u>No Waiver by Failure to Seek Relief</u>.  The DIP Agent's or any DIP

Lender's delay or failure to exercise rights and remedies under the DIP Loan Documents,

applicable law, or this Interim Order shall not constitute a waiver of the DIP Agent's or such DIP

Lenders' respective rights hereunder, thereunder or otherwise, unless any such waiver is pursuant

to a written instrument executed by the DIP Agent or such DIP Lenders, as applicable.

52. <u>Binding Effect of this Interim Order</u>.  Immediately upon entry by the Court,

this Interim Order shall inure to the benefit of the Debtors, the Pre-Petition Agents, the Pre-

Petition Lenders, the DIP Agent and the DIP Lenders, and it shall become valid and binding

upon the Debtors, the Pre-Petition Agents, the Pre-Petition Lenders, the DIP Agent and the DIP

Case 12-36495-KRH   Doc 72   Filed 11/14/12   Entered 11/14/12 16:18:52   Desc Main
Document      Page 54 of 304

Lenders, their respective successors and assigns, any and all other creditors of the Debtors, any

committee appointed in any of the Cases, including, without limitation, the Committee, and all

other parties-in-interest and their respective successors and assigns, including any trustee or

other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the

Cases, or upon dismissal of any of the Cases. Further, upon entry of this Interim Order: (a) the

Debtors' admissions contained herein shall be binding on the Debtors; and (b) the DIP

Obligations of the Debtors under the DIP Loan Documents shall constitute allowed claims for all

purposes in any of the Cases.

      53.      <u>Interim Order Controls</u>.  In the event of any inconsistency between the

terms and conditions of the DIP Loan Documents, any other document or any other order of the

Court and of this Interim Order, the provisions of this Interim Order shall govern and control.

      54.      <u>Survival</u>.  The provisions of this Interim Order and any actions taken

pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any

order that may be entered (a) confirming any plan of reorganization in any of the Cases, (b)

converting any or all of the Cases to a case under Chapter 7 of the Bankruptcy Code, (c)

dismissing any or all of the Cases, or (d) pursuant to which the Court abstains from hearing any

of the Cases. The terms and provisions of this Interim Order, including the claims, liens, security

interests, and other protections (as applicable) granted to the Pre-Petition Agents, the Pre-Petition

Lenders, the DIP Agent or the DIP Lenders pursuant to this Interim Order, notwithstanding the

entry of any such order, shall continue in any of the Cases, or following dismissal of any of the

Cases, and shall maintain their priority as provided by this Interim Order. The terms and

provisions concerning the indemnification of the First Lien Agent, the First Lien Lenders, the

DIP Agent and the DIP Lenders shall continue in any of the Cases following dismissal of any of

DMSLIBRARY01-19506382.21

the Cases, termination of the provisions of this Interim Order, and/or the indefeasible repayment of the First Lien Obligations and the DIP Obligations.

55.     <u>Entry of this Interim Order/Waiver of Applicable Stay</u>.  The Clerk of the Court is hereby directed to forthwith enter this Interim Order on the docket of the Court maintained in regard to the Cases.  This Interim Order shall be effective upon its entry and not subject to any stay (all of which are hereby waived), notwithstanding anything to the contrary contained in Bankruptcy Rule 4001(a)(3).

56.     <u>Notice of Entry of this Interim Order</u>.  The Debtors' counsel shall serve a copy of this Interim Order or a suitable notice respecting same on all of the following parties:  (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (d) counsel to the DIP Agent for itself and for the DIP Lenders; (e) counsel to the First Lien Agent for itself and for the First Lien Lenders; (f) Stroock, as counsel to the First Lien Ad Hoc Group; (g) counsel to the Second Lien Agent for itself and for the Second Lien Lenders; (h) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (i) all financial institutions at which the Debtors maintain deposit accounts; (j) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; and (k) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof.

57.     <u>Final Hearing</u>.  The Final Hearing shall take place on **December 6, 2012 at 10:00 a.m.**, and parties shall have until **December 3, 2012** to file an objection if necessary and serve such objection on proposed counsel for the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn:  Patrick J. Nash, Jr. and Jeffrey D. Pawlitz, and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg,

DMSLIBRARY01-19506382.21

and McGuireWoods LLP, One James Center, 901 East Cary Street, Richmond, Virginia 23219, Attn: Dion W. Hayes; counsel for the DIP Agent, King & Spalding LLP, 1185 Avenue of the Americas, New York, New York 10036, Attn:  Michael C. Rupe and Christopher G. Boies; counsel for the First Lien Ad Hoc Group, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038, Attn: Kristopher M. Hansen, Sayan Bhattacharyya and Marianne S. Mortimer; and counsel for the Second Lien Ad Hoc Group, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071, Attn:  Ben H. Logan and Jennifer Taylor.  Any objections by creditors or any other party-in-interest to the Motion or any of the provisions of this Interim Order shall be deemed waived unless filed and received in accordance with the foregoing on or before the close of business on such date.  In the event the Court modifies any of the provisions of this Interim Order or other documents following the Final Hearing, such modifications shall not affect the rights and priorities of the DIP Agent and the DIP Lenders pursuant to this Interim Order with respect to the DIP Collateral and any portion of the DIP Facility that arises, or is incurred or is advanced prior to such modifications (or otherwise arising prior to such modifications), and this Interim Order shall remain in full force and effect except as specifically modified pursuant to the Final Hearing.

58.     Effect of this Interim Order.  This Interim Order shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

59.      <u>Retention of Jurisdiction</u>.    The Court shall retain jurisdiction to hear,

determine and, if applicable, enforce the terms of, any and all matters arising from or related to

the DIP Facility and/or this Interim Order.

SO ORDERED by the Court this _____day of November, 2012.


_____
UNITED    STATES    BANKRUPTCY    JUDGE

DMSLIBRARY01-19506382.21

WE ASK FOR THIS:

*/s/ Dion W. Hayes*
Dion W. Hayes (VSB No. 34304)
John H. Maddock III (VSB No. 41011)
Sarah B. Boehm (VSB No. 45201)
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
Telephone:    (804) 775-1000
Facsimile:    (804) 775-1061

        - and -

Patrick J. Nash, Jr. (*pro hac vice* pending)
Jeffrey D. Pawlitz (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

        - and -

Joshua A. Sussberg (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Attorneys for the Debtors and*
*Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing
proposed order has been endorsed by or served upon all necessary parties.

        */s/  Dion W. Hayes*

**Execution Version**

**SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of November 13, 2012**

**among**

**KINGPIN HOLDINGS, LLC,**

**KINGPIN INTERMEDIATE CORP.,**

**AMF BOWLING WORLDWIDE, INC.,**

**THE LOAN PARTIES FROM TIME TO TIME PARTY HERETO,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO**

**and**

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH,**
**as an Issuing Lender and DIP Agent**

_____

**CREDIT SUISSE SECURITIES (USA) LLC,**
**as Sole Lead Arranger and Sole Bookrunner**

## Table of Contents[*]

**Page**

**ARTICLE I**        **DEFINITIONS**        **1**

**Section 1.01**     Defined Terms ......................................................................................... 1
**Section 1.02**     Computation of Time Periods and Other Definitional Provisions ......... 37
**Section 1.03**     Accounting Terms and Determinations ................................................. 37
**Section 1.04**     UCC Definitions .................................................................................... 38

**ARTICLE II**       **THE CREDIT FACILITIES**        **38**

**Section 2.01**     Commitments to Lend ............................................................................ 38
**Section 2.02**     Notice of Borrowings ............................................................................ 38
**Section 2.03**     Notice to Lenders; Funding of Loans .................................................... 39
**Section 2.04**     Evidence of Loans ................................................................................. 40
**Section 2.05**     Letters of Credit .................................................................................... 41
**Section 2.06**     Interest. .................................................................................................. 46
**Section 2.07**     Extension and Conversion ..................................................................... 46
**Section 2.08**     Maturity of Loans ................................................................................. 47
**Section 2.09**     Prepayments .......................................................................................... 47
**Section 2.10**     Adjustment of Commitments ................................................................ 48
**Section 2.11**     Fees ........................................................................................................ 49
**Section 2.12**     Pro-Rata Treatment ............................................................................... 49
**Section 2.13**     Sharing of Payments ............................................................................. 50
**Section 2.14**     Payments; Computation ........................................................................ 50

**ARTICLE III**      **TAXES, YIELD PROTECTION AND ILLEGALITY**        **51**

**Section 3.01**     Taxes ..................................................................................................... 51
**Section 3.02**     Change in Law, Etc ............................................................................... 53
**Section 3.03**     Basis for Determining Interest Rate Inadequate or Unfair .................... 54
**Section 3.04**     Increased Costs and Reduced Return .................................................... 55
**Section 3.05**     Funding Losses ...................................................................................... 56
**Section 3.06**     Base Rate Loans Substituted for Affected Eurodollar Loans ................ 57

**ARTICLE IV**       **CONDITIONS**        **57**

**Section 4.01**     Conditions to Closing ............................................................................ 57
**Section 4.02**     Conditions to All Credit Extensions ..................................................... 60

**ARTICLE V**        **REPRESENTATIONS AND WARRANTIES**        **61**

**Section 5.01**     Organization and Good Standing .......................................................... 61
**Section 5.02**     Power; Authorization; Enforceable Obligations ................................... 61
**Section 5.03**     No Conflicts .......................................................................................... 61
**Section 5.04**     No Default .............................................................................................. 61

---

[*]    The Table of Contents is not part of the SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT.

**Table of Contents (cont.)**

| | | |
|---|---|---|
| **Section 5.05** | Financial Condition | 62 |
| **Section 5.06** | No Material Effect | 63 |
| **Section 5.07** | Title to Properties; Possession Under Leases | 63 |
| **Section 5.08** | Litigation | 63 |
| **Section 5.09** | Taxes | 63 |
| **Section 5.10** | Compliance with Law. | 63 |
| **Section 5.11** | ERISA; Employee Benefit Arrangements | 64 |
| **Section 5.12** | Subsidiaries | 65 |
| **Section 5.13** | Governmental Regulations, Etc | 66 |
| **Section 5.14** | Purpose of Loans and Letters of Credit | 66 |
| **Section 5.15** | Labor Matters | 66 |
| **Section 5.16** | Environmental Matters. | 67 |
| **Section 5.17** | Intellectual Property | 67 |
| **Section 5.18** | [Reserved] | 68 |
| **Section 5.19** | Disclosure | 68 |
| **Section 5.20** | Security Interests | 68 |
| **Section 5.21** | Ownership | 69 |
| **Section 5.22** | No Broker's Fees. | 69 |
| **Section 5.23** | Orders. | 69 |
| **Section 5.24** | Budget | 69 |
| | | |
| **ARTICLE VI** | **AFFIRMATIVE COVENANTS** | **69** |
| | | |
| **Section 6.01** | Information | 70 |
| **Section 6.02** | Preservation of Existence and Franchises | 73 |
| **Section 6.03** | Books and Records; Lender Meeting | 73 |
| **Section 6.04** | Compliance with Law; Employee Benefit Arrangements | 73 |
| **Section 6.05** | Payment of Taxes | 74 |
| **Section 6.06** | Insurance; Certain Proceeds | 74 |
| **Section 6.07** | Maintenance of Property | 75 |
| **Section 6.08** | DIP Priority Account; Account Control Agreements | 75 |
| **Section 6.09** | Audits/Inspections | 75 |
| **Section 6.10** | Additional Loan Parties; Additional Security. | 76 |
| **Section 6.11** | [Reserved] | 78 |
| **Section 6.12** | Contributions | 78 |
| **Section 6.13** | [Reserved] | 79 |
| **Section 6.14** | Certain Post-Closing Matters. | 79 |
| **Section 6.15** | Additional Information Obligations | 79 |
| | | |
| **ARTICLE VII** | **NEGATIVE COVENANTS** | **80** |
| | | |
| **Section 7.01** | Limitation on Debt | 80 |
| **Section 7.02** | Restriction on Liens | 81 |
| **Section 7.03** | Nature of Business | 82 |
| **Section 7.04** | Consolidation, Merger and Dissolution | 82 |
| **Section 7.05** | Asset Dispositions | 83 |
| **Section 7.06** | Investments | 84 |
| **Section 7.07** | Restricted Payments, etc. | 86 |
| **Section 7.08** | Amendments of Certain Agreements | 86 |
| **Section 7.09** | Transactions with Affiliates | 87 |
| **Section 7.10** | Fiscal Year; Organizational and Other Documents | 88 |

**Table of Contents (cont.)**

| | | |
|---|---|---|
| **Section 7.11** | Restrictions with Respect to Intercorporate Transfers | 88 |
| **Section 7.12** | Ownership of Subsidiaries; Limitations on Holdings | 89 |
| **Section 7.13** | Sale and Leaseback Transactions | 90 |
| **Section 7.14** | Additional Negative Pledges | 90 |
| **Section 7.15** | Impairment of Security Interests | 90 |
| **Section 7.16** | Financial Covenants | 90 |
| **Section 7.17** | Chapter 11 Claims | 91 |
| **Section 7.18** | Revision of Orders; Applications to Bankruptcy Court | 92 |
| **Section 7.19** | Critical Vendors | 92 |
| **Section 7.20** | Foreign Pension Plans | 92 |
| **Section 7.21** | Compliance with Budget | 92 |
| **Section 7.22** | Use of Collateral | 92 |
| **Section 7.23** | iStar Action. | 93 |
| **Section 7.24** | Independence of Covenants | 93 |

**ARTICLE VIII    DEFAULTS    93**

| | | |
|---|---|---|
| **Section 8.01** | Events of Default | 93 |
| **Section 8.02** | Acceleration; Remedies | 97 |
| **Section 8.03** | Allocation of Payments After Event of Default | 99 |
| **Section 8.04** | Certain Bankruptcy Matters | 100 |

**ARTICLE IX    AGENCY PROVISIONS    102**

| | | |
|---|---|---|
| **Section 9.01** | Appointment; Authorization | 102 |
| **Section 9.02** | Delegation of Duties | 103 |
| **Section 9.03** | Exculpatory Provisions | 103 |
| **Section 9.04** | Reliance on Communications | 103 |
| **Section 9.05** | Notice of Default | 103 |
| **Section 9.06** | Credit Decision; Disclosure of Information by DIP Agent | 104 |
| **Section 9.07** | No Reliance on Arranger's or Agent's Customer Identification Program | 104 |
| **Section 9.08** | Indemnification | 104 |
| **Section 9.09** | Agents in Their Individual Capacity | 105 |
| **Section 9.10** | Successor Agents | 105 |
| **Section 9.11** | Certain Other Agents | 106 |
| **Section 9.12** | Agents' Fees; Arranger Fee | 106 |

**ARTICLE X MISCELLANEOUS 106**

| | | |
|---|---|---|
| **Section 10.01** | Notices and Other Communications | 106 |
| **Section 10.02** | No Waiver; Cumulative Remedies | 107 |
| **Section 10.03** | Amendments, Waivers and Consents | 107 |
| **Section 10.04** | Expenses | 109 |
| **Section 10.05** | Indemnification | 109 |
| **Section 10.06** | Successors and Assigns | 110 |
| **Section 10.07** | Confidentiality and Disclosure | 114 |
| **Section 10.08** | Set-off | 115 |
| **Section 10.09** | Interest Rate Limitation | 115 |
| **Section 10.10** | Counterparts | 115 |
| **Section 10.11** | Integration | 115 |
| **Section 10.12** | Survival of Representations and Warranties | 116 |

**Table of Contents (cont.)**

| | | |
|---|---|---|
| **Section 10.13** | Severability | 116 |
| **Section 10.14** | Headings | 116 |
| **Section 10.15** | Defaulting Lenders | 116 |
| **Section 10.16** | Governing Law; Submission to Jurisdiction | 116 |
| **Section 10.17** | Waiver of Jury Trial | 117 |
| **Section 10.18** | Binding Effect | 117 |
| **Section 10.19** | Lenders' U.S. Patriot Act Compliance Certification | 117 |
| **Section 10.20** | U.S. Patriot Act Notice | 118 |

**ARTICLE XI     SECURITY                                     118**

| | | |
|---|---|---|
| **Section 11.01** | Security | 118 |
| **Section 11.02** | Perfection of Security Interests | 119 |
| **Section 11.03** | Pledged Collateral | 120 |
| **Section 11.04** | Collateral Agent's and Secured Parties' Rights; Limitations on Agent's and Secured Parties' Obligations. | 121 |
| **Section 11.05** | Covenants of the Loan Parties with Respect to Collateral | 122 |
| **Section 11.06** | Accounts; Collection of Accounts and Payments | 125 |
| **Section 11.07** | Agent's Appointment as Attorney-In-Fact | 125 |
| **Section 11.08** | Remedies; Rights Upon Default | 127 |
| **Section 11.09** | Grant of License to Use Property; Intellectual Property | 129 |
| **Section 11.10** | Limitation on the Collateral Agent's and Secured Parties' Duty in Respect of Collateral | 130 |
| **Section 11.11** | Authorized Terminations | 131 |
| **Section 11.12** | Modifications | 131 |

**ARTICLE XII    GUARANTY                                     132**

| | | |
|---|---|---|
| **Section 12.01** | Guaranty of Guaranteed DIP Obligations of the Borrower | 132 |
| **Section 12.02** | Demand by the DIP Agent or the DIP Lenders | 134 |
| **Section 12.03** | Enforcement of Guaranty. | 134 |
| **Section 12.04** | Waiver | 134 |
| **Section 12.05** | Modification of Guaranteed DIP Obligations, Etc | 134 |
| **Section 12.06** | Reinstatement. | 135 |
| **Section 12.07** | Waiver of Subrogation, Etc. | 135 |
| **Section 12.08** | Election of Remedies | 136 |
| **Section 12.09** | Continuation of Guaranty | 136 |

**Schedules:**

| | | |
|---|---|---|
| Schedule 1.01A | – | DIP Lenders and Commitments |
| Schedule 1.01D | – | Lender Addresses |
| Schedule 1.01E | – | Insignificant Subsidiaries |
| Schedule 1.01F | – | Liquor License Subsidiaries |
| Schedule 2.05 | | Existing Letters of Credit |
| Schedule 5.04 | – | Defaults, Etc. |
| Schedule 5.05 | – | Financial Condition |
| Schedule 5.08 | – | Litigation |
| Schedule 5.09 | – | Taxes |
| Schedule 5.10 | – | Compliance with Law |
| Schedule 5.11 | – | Pension and Benefit Plans |

**Table of Contents (cont.)**

Schedule 5.12        –   Subsidiaries
Schedule 5.16        –   Environmental Matters
Schedule 5.17        –   Intellectual Property
Schedule 5.18        –   Insurance
Schedule 5.21        –   Ownership
Schedule 5.22        –   Broker's Fees
Schedule 6.10(b)     –   Exceptions to Additional Security
Schedule 7.06        –   Existing Investments
Schedule 7.09        –   Transactions with Affiliates
Schedule 11.01(a)    –   Claims

**Table of Contents (cont.)**

**Exhibits:**

Exhibit A-1      –   Form of Notice of Borrowing

Exhibit A-2      –   Form of Notice of Extension/Conversion

Exhibit B        –   Form of Note

Exhibit C        –   Form of Assignment and Acceptance

Exhibit D        –   [*Reserved*]

Exhibit E        –   Budget

Exhibit F        –   [*Reserved*]

Exhibit G        –   Form of Intercompany Note

Exhibit H        –   Form of Intercompany Note Subordination Provisions

Exhibit I        –   Form of Accession Agreement

Exhibit J        –   [*Reserved*]

Exhibit K        –   [*Reserved*]

Exhibit L        –   Form of Secretary's Certificate

## SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT is dated as of November 13, 2012 and is among KINGPIN HOLDINGS, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (as defined below) ("Holdings"), KINGPIN INTERMEDIATE CORP., a Delaware corporation and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code ("Kingpin"), AMF BOWLING WORLDWIDE, INC., a Delaware corporation and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "Borrower"), each of the other Loan Parties party hereto, as debtors and debtors-in-possession under chapter 11 of the Bankruptcy Code, the banks, other financial institutions and other Persons (as defined below) from time to time party hereto (the "DIP Lenders") and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as  Issuing Lender and DIP Agent.

Holdings, Kingpin, the Borrower and each other Loan Party (as defined herein) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") on November 12, 2012 (the "Petition Date");

Each of the Loan Parties is continuing in the possession of its assets and in the management of its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

The Loan Parties have requested the DIP Lenders to provide credit facilities (the "DIP Facility") to the Borrower in an aggregate principal amount of $50,000,000 for the purposes described herein.

To provide security for the repayment of the loans made available pursuant hereto and payment of the other obligations of the Borrower hereunder, the Loan Parties have agreed to provide the DIP Agent and the DIP Lenders, in each case, subject to the Carve-Out (as defined below), with Liens on the Collateral (as defined below).

The DIP Lenders are willing to make the requested credit facilities available on the terms and conditions set forth herein.  Accordingly, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01**    **Defined Terms.**  The following terms, as used herein, have the following meanings:

"Accession Agreement" means an agreement, substantially in the form of Exhibit I hereto, executed and delivered by an Additional Subsidiary Guarantor (including a Foreign Subsidiary) after the Closing Date in accordance with Section 6.10(a) or (d).

"Account Control Agreement" means (i) with respect to a Deposit Account, a deposit account control agreement, reasonably acceptable in form and substance to the Collateral Agent, among one or more Loan Parties, the Collateral Agent and the bank which maintains such Deposit Account (execution of such agreement shall be conclusive evidence of such approval of the Collateral Agent) and (ii) with respect to a Securities Account, a securities account control agreement, reasonably acceptable in form and substance to the Collateral Agent, among one or more Loan Parties, the Collateral Agent and the Securities Intermediary which maintains such Securities Account (execution of such agreement shall be conclusive evidence of such approval of the Collateral Agent), in each case as the same may be amended, modified or supplemented from time to time.

"Account Debtor" means an "account debtor" (as defined in the UCC), and also means and includes Persons obligated to pay negotiable instruments and other Receivables.

"Accounts" means (i) all "accounts" (as defined in the UCC), (ii) all of the rights of any Loan Party in, to and under all purchase orders for goods, services or other property, (iii) all of the rights of any Loan Party to any goods, services or other property represented by any of the foregoing (including returned or repossessed goods and unpaid seller's rights of rescission, replevin, reclamation and rights to stoppage in transit) and (iv) all monies due to or to become due to any Loan Party under any and all contracts for any of the foregoing (in each case, whether or not yet earned by performance on the part of such Loan Party), including, without limitation, the right to receive the Proceeds of said purchase orders and contracts and all Supporting Obligations of any kind given by any Person with respect to all or any of the foregoing.

"Additional Collateral Documents" has the meaning set forth in Section 6.10(b).

"Additional Subsidiary Guarantor" means each Person that becomes a Subsidiary Guarantor after the Closing Date by execution of an Accession Agreement as provided in Section 6.10.

"Adequate Protection Provisions" means provisions in an Order that provide:

(a)    the First Lien Agent, on behalf of and for the benefit of the First Lien Lenders, and the First Lien Lenders, as adequate protection for the use of the First Lien Prepetition Collateral (and subject to the Carve-Out): (i) upon entry of the Interim Order, payment of all accrued and unpaid amortization payments, interest (including interest on the overdue amortization payments and unpaid and accrued interest at the default rate, to the extent allowable) and reasonable and documented (in summary form), out-of-pocket fees due to the First Lien Agent and/or First Lien Lenders, as applicable, owed prior to the Petition Date as set forth in the First Lien Loan Documents; (ii) upon entry of the Interim Order, payment of all unpaid out-of-pocket fees, costs and expenses, owed prior to and as of the Petition Date, of (x) the First Lien Agent (including all reasonable fees, costs, disbursements and expenses of its outside counsel, K&S, its local counsel and one financial advisor, if any, retained by K&S pursuant to the terms hereof and the DIP Loan Documents) and (y) certain of the First Lien Lenders (the "First Lien Ad Hoc Group") (including all reasonable fees, expenses and disbursements of (A) their outside counsel, Stroock and their local counsel, (B) Miller Buckfire, as financial advisor to the First Lien Ad Hoc Group (pursuant to that certain letter of engagement dated as of July 3, 2012 by and among Stroock, Miller Buckfire, and certain of the Debtors), and (C) any other professional advisors engaged by Stroock); (iii) current amortization payments, interest (at the non-default rate) and reasonable and documented (in summary form), out-of-pocket fees due to the First Lien Agent and/or First Lien Lenders, as applicable, as they become due and owing (without regard to the commencement of the Chapter 11 Cases) as set forth in the First Lien Loan Documents; (iv) the current payment of all reasonable and documented (in summary form), out-of-pocket fees, costs and expenses of (x) the First Lien Agent (including all reasonable fees, costs, disbursements and expenses of its outside counsel, K&S, its local counsel and one financial advisor, if any, retained by K&S as provided in Section 10.04) and the First Lien Ad-Hoc Group (including all reasonable, fees, expenses and disbursements of (A) their outside counsel, Stroock, (B) Miller Buckfire and (C) any other professional advisors engaged by Stroock; (the items set forth in clauses (i) through (iv), the "First Lien Adequate Protection Payments"), (v) the First Lien Adequate Protection Liens; (vi) the First Lien Superpriority Claims, which claims will be junior to any claims that may arise in relation to the DIP Obligations and be payable from and have recourse to all assets and property of the Loan Party, and (vii) access to the Loan Parties' books and records and such financial reports as are provided to the DIP Agent, in each case to the extent set forth in this Agreement; and

(b)      the Second Lien Agent, on behalf of and for the benefit of the Second Lien Lenders, and the Second Lien Lenders, as adequate protection for the use of the Second Lien Prepetition Collateral (and subject to the Carve-Out and the First Lien Adequate Protection Payments): upon entry of and to the extent permitted under the Interim Order, (i) upon entry of the Interim Order, payment of all unpaid out-of-pocket fees, costs and expenses owed prior to and as of the Petition Date, of (x) the Second Lien Agent (including all reasonable fees, costs, disbursements and expenses of one outside counsel and one local counsel) and (y) certain of the Second Lien Lenders (the "Second Lien Ad Hoc Group") (including all reasonable fees, expenses and disbursements of (A) their outside counsel, O'Melveny and their local counsel, and (B) FTI, as financial advisor to the Second Lien Ad Hoc Group (pursuant to that certain letter of engagement dated as of July 12, 2012 by and among O'Melveny, FTI, and certain of the Debtors); (ii) payment of all reasonable and documented, out-of-pocket fees, costs and expenses of (x) the Second Lien Agent (including all reasonable fees, costs, disbursements and expenses of one outside counsel and one local counsel) and (y) the Second Lien Ad-Hoc Group (including all reasonable fees, expenses and disbursements of (A) their outside counsel, O'Melveny and their local counsel, and (B) FTI, as financial advisor to the Second Lien Ad-Hoc Group; provided, that the payments in clauses (i) and (ii) shall be limited as and to the extent set forth in any Order; (iii) the Second Lien Adequate Protection Liens, which Liens will be junior to the Liens of the DIP Lenders under the DIP Facility and the First Lien Adequate Protection Liens; (iv) the Second Lien Superpriority Claims, which claims will be junior to any claims that may arise in relation to the DIP Obligations and the First Lien Superpriority Claims and be payable from and have recourse to all assets and property of the Loan Parties; and (v) access to the Loan Parties' books and records and such financial reports as are provided to the DIP Agent, in each case to the extent set forth in this Agreement.

"Adjusted Eurodollar Rate" means, for any Interest Period, the quotient obtained (expressed as a decimal, carried out to five decimal places) by dividing (i) the applicable Eurodollar Rate for such Interest Period by (ii) 1.00 minus the Eurodollar Reserve Percentage; provided, that in no event shall the Adjusted Eurodollar Rate at any time be less than 1.75% per annum.  The Adjusted Eurodollar Rate for each outstanding Loan shall be adjusted automatically on and as of the effective date of any change in the Eurodollar Reserve Percentage.

"Administrative Office" means the DIP Agent's office located at Eleven Madison Avenue, New York, New York 10010, or such other office in New York City as may be designated by the DIP Agent by written notice to the Borrower and the DIP Lenders.

"Affected Lender" has the meaning set forth in Section 3.06.

"Affiliate" means, with respect to any Person, (i) any Person that directly, or indirectly through one or more intermediaries, controls such Person (a "Controlling Person") or (ii) any other Person which is controlled by or is under common control with a Controlling Person.  As used herein, the term "control" means (i) with respect to any Person having voting shares or their equivalent and elected directors, managers or Persons performing similar functions, the possession, directly or indirectly, of the power to vote 10% or more of the Equity Interests having ordinary voting power of such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting shares or their equivalent, by contract or otherwise

"Agent" means the DIP Agent or the Collateral Agent and any successors and assigns in such capacity, and "Agents" means any two or more of them.

"Agreement" means this Senior Secured Loan Party-In-Possession Credit Agreement, as amended, restated, modified or supplemented from time to time.

"Anti-Terrorism Laws" means any Laws relating to terrorism or money-laundering, including, without limitation, (i) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 and relating to Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, (ii) the U.S. Patriot Act, (iii) the International Emergency Economic Power Act, 50 U.S.C. §1701 et seq., (iv) the Bank Secrecy Act, (v) the Trading with the Enemy Act, 50 U.S.C. App. 1 et seq. and (vi) any related rules and regulations of the U.S. Treasury Department's Office of Foreign Assets Control or any other Governmental Authority, in each case as the same may be amended, supplemented, modified, replaced or otherwise in effect from time to time.

"Applicable Lending Office" means (i) with respect to any DIP Lender (other than the Issuing Lender), the "Lending Office" of such DIP Lender (or of an Affiliate of such DIP Lender) designated on Schedule 1.01D hereto or in any applicable Assignment and Acceptance pursuant to which such DIP Lender became a DIP Lender hereunder or such other office of such DIP Lender (or of an Affiliate of such DIP Lender) as such DIP Lender may from time to time (so long as no additional cost to the Borrower results) specify to the DIP Agent and the Borrower as the office by which its Loans are to be made and maintained, and (ii) with respect to the Issuing Lender and for each Letter of Credit, the "Lending Office" of the Issuing Lender (or of an Affiliate of the Issuing Lender) designated on the signature pages hereto or such other office of the Issuing Lender (or of an Affiliate of the Issuing Lender) as the Issuing Lender may from time to time specify (so long as no additional cost to the Borrower results) to the DIP Agent and the Borrower as the office by which its Letters of Credit are to be issued and maintained.

"Applicable Margin" means a rate per annum equal to (x) 7.75% in the case of Base Rate Loans and (y) 8.75% in the case of Eurodollar Rate Loans.

"Approved Fund" means (i) with respect to any DIP Lender, an entity (whether a corporation, partnership, limited liability company, trust or otherwise) that is engaged in making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and is managed by such DIP Lender, its parent holding company or any of their respective Subsidiaries, (ii) with respect to any DIP Lender that is a fund that invests in bank loans and similar extensions of credit, any other fund that invests in bank loans and similar extensions of credit and is managed by the same investment advisor as such DIP Lender or by any parent company of such DIP Lender or any of their respective Subsidiaries and (iii) any special purpose funding vehicle described in Section 10.06(h).

"Asset Disposition" means any sale (including any Sale/Leaseback Transaction, whether or not involving a Capital Lease), lease (as lessor), transfer or other disposition (including any such transaction effected by way of merger or consolidation and including any sale or other disposition of Equity Interests of a Subsidiary, but excluding any sale or other disposition by way of Casualty or Condemnation) by any Group Company of any asset. For the avoidance of doubt, an Equity Issuance by any Person of its own Equity Interests shall not constitute an Asset Disposition by that Person.

"Assignment and Acceptance" means an Assignment and Acceptance, substantially in the form of Exhibit C hereto, under which an interest of a DIP Lender hereunder is transferred to an Eligible Assignee pursuant to Section 10.06(b).

"Attributable Debt" means, at any date (i) in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (ii) in respect of any Synthetic Lease Obligation of any Person, the capitalized or principal amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease

or other agreement were accounted for as a Capital Lease and (iii) in respect of any Sale/Leaseback Transaction, the lesser of (A) the present value, discounted in accordance with GAAP at the interest rate implicit in the related lease, of the obligations of the lessee for net rental payments over the remaining term of such lease (including any period for which such lease has been extended or may, at the option of the lessor be extended) and (B) the fair market value of the assets subject to such transaction.

"Availability Period" means the period commencing on the Closing Date up to but excluding the DIP Termination Date.

"Bank Secrecy Act" means the Financial Recordkeeping and Reporting of Currency and Foreign Transactions Act of 1970, 31 U.S.C. 1051, et seq., as the same may be amended, supplemented, modified, replaced or otherwise in effect from time to time.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Base Rate" means, for any day, a rate per annum equal to the higher of (i) the Prime Rate for such day and (ii) the sum of 1/2 of 1% plus the Federal Funds Rate for such day.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Rate shall be effective on the effective date of such change in the Prime Rate or the Federal Funds Rate; provided, that in no event shall the Base Rate at any time be less than 2.75% per annum.

"Base Rate Loan" means any Loan during any period in which it bears interest based on the Base Rate.

"Basel III" means the reforms and measures developed by the Basel Committee on Banking Supervision and known as Basel III.

"Borrower" means AMF Bowling Worldwide, Inc., and its successors.

"Borrowing" means the making of a Term Loan by the DIP Lenders to the Borrower.

"Bowling Equipment" means any of the following, whether now existing or hereafter arising:  all pin setting machines (pinsetters/pinspotters), ball returns, settees, scoring systems (including front desk systems), lanes, lane cleaning machines, bumpers, approaches, foul lights, gutters and masking units.

"Budget" means a cash flow forecast setting forth all cumulative cash receipts and expenditures on a weekly basis and required cumulative expenses for the period beginning as of the week of the Petition Date through the Scheduled Maturity Date, broken down by week, including the anticipated weekly uses of the proceeds of the DIP Facility for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Cases, and working capital and other general corporate needs, which forecast shall be in form and substance satisfactory to the DIP Agent at the direction of the Required DIP Lenders.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required to close, except that:

(i)     when used in Section 2.05 with respect to any action taken by or with respect to the Issuing Lender in respect of a Letter of Credit, the term "Business Day" shall not include any day on which commercial banks are authorized by law to close in the jurisdiction where the Issuing Lender's Applicable Lending Office is located; and

(ii)     if such day relates to a borrowing of, a payment or prepayment of principal of or interest on, or the Interest Period for, a Eurodollar Loan, or a notice by the Borrower with respect to any such borrowing, payment, prepayment or Interest Period, such day shall also be a day on which commercial banks are open for international business (including dealings in Dollar deposits) in London.

"Capital Expenditures" means for any period the aggregate amount of all expenditures (whether paid in cash or other consideration or accrued as a liability) that would, in accordance with GAAP, be included as additions to property, plant and equipment and other capital expenditures of Holdings and its Consolidated Subsidiaries for such period, as the same are or would be set forth in a consolidated statement of cash flows of Holdings and its Consolidated Subsidiaries for such period (including the amount of assets leased under any Capital Lease).

"Capital Lease" of any Person means any lease of (or other arrangement conveying the right to use) property (whether real, personal or mixed) by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

"Capital Lease Obligations" means, with respect to any Person, all obligations of such Person as lessee under Capital Leases, in each case taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"Carve-Out" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000; (iii) to the extent allowed by the Bankruptcy Court at any time, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Loan Parties (collectively, the "Professionals")  and any official committee of creditors at any time before or on the date and time of the delivery by the DIP Agent at the direction of the Required DIP Lenders of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) after the date that is one (1) Business Day after the date of the delivery by the DIP Agent at the direction of the Required DIP Lenders of the Carve-Out Trigger Notice, to the extent allowed by the Bankruptcy Court at any time, all unpaid fees, disbursements, costs and expenses incurred by the Professionals and the Committee in an aggregate amount not to exceed $450,000 (such amount set forth in clause (iv), the "Post-Carve-Out Trigger Notice Cap"); provided, however, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professional or any other person or entity.  For the avoidance of doubt and notwithstanding anything to the contrary herein or elsewhere, (1) the payment of all accrued and unpaid fees, disbursements, costs, and expenses incurred by the Loan Parties pursuant to clause (iii) above shall not be subject to any budget, including the Budget, and (2) the Carve-Out shall be senior to all liens securing the DIP Obligations, the adequate protection liens, all claims and any and all other forms of adequate protection, liens or claims securing the DIP Obligations.

"Carve-Out Trigger Notice" means a written notice delivered by the DIP Agent at the direction of the Required DIP Lenders to the Loan Parties and their counsel, the United States Trustee,

and lead counsel to any Committee, which notice may be delivered following the occurrence of an Event of Default, and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

"Cash Collateralize" means to deliver to the Issuing Lender as collateral for one or more LC Obligations, cash or deposit balances pursuant to Section 2.05(t).

"Cash Equivalents" means, at any date of determination:

(i)      securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) or, with respect to any Foreign Subsidiary, an equivalent obligation of the government of the country in which such Foreign Subsidiary transacts business, in each case maturing within one year after such date;

(ii)      time deposits and certificates of deposit, including eurodollar time deposits, and, with respect to any Foreign Subsidiary, time deposits in the currency of any country in which such Foreign Subsidiary transacts business, of any commercial bank organized in the United States having capital and surplus in excess of $100,000,000 or, with respect to any Foreign Subsidiary, a commercial bank organized under the laws of any other country in which such Foreign Subsidiary transacts business having total assets in excess of $100,000,000 (or its foreign currency equivalent) with a maturity date not more than one year from the date of acquisition;

(iii)      repurchase obligations with a term of not more than seven calendar days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (ii) above and organized in the United States;

(iv)      direct obligations issued by any state of the United States or any political subdivision of any state or any public instrumentality thereof maturing within ninety (90) calendar days after the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from such other nationally recognized rating service reasonably acceptable to the DIP Agent);

(v)      commercial paper issued by the parent corporation of any commercial bank organized in the United States having capital and surplus in excess of $100,000,000 or, with respect to any Foreign Subsidiary, a commercial bank organized under the laws of any other country in which such Foreign Subsidiary transacts business having total assets in excess of $100,000,000 (or its foreign currency equivalent), and commercial paper issued by others having one of the two highest ratings obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from such other nationally recognized rating services reasonably acceptable to the DIP Agent) and in each case maturing within one year after the date of acquisition;

(vi)      overnight bank deposits and bankers' acceptances at any commercial bank organized in the United States having capital and surplus in excess of $100,000,000, or with respect to any Foreign Subsidiary, a commercial bank organized under the laws of any other country in which such Foreign Subsidiary transacts business having total assets in excess of $100,000,000 (or its foreign currency equivalent);

(vii)    deposits available for withdrawal on demand with commercial banks organized in the United States having capital and surplus in excess of $50,000,000 or, with respect to any Foreign Subsidiary, a commercial bank organized under the laws of any other country in which such Foreign Subsidiary transacts business having total assets in excess of $50,000,000 (or its foreign currency equivalent); and

(viii)    investments in money market funds substantially all of whose assets comprise securities of the types described in <u>clauses (i)</u> through <u>(vii)</u>.

"<u>Cash Management Agreement</u>" means any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements.

"<u>Cash Management Bank</u>" means any Person that, at the time it enters into a Cash Management Agreement, is a DIP Lender or an Affiliate of a DIP Lender, in its capacity as a party to such Cash Management Agreement.

"<u>Cash Management Obligation</u>" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of such Person under or in respect of a Cash Management Agreement.

"<u>Cash-On-Hand</u>" means cash and Cash Equivalents of Holdings, Kingpin, the Borrower and their Consolidated Subsidiaries (excluding any cash proceeds received directly or indirectly by the Borrower from Equity Issuances by Holdings and any capital contributions received directly or indirectly by the Borrower or Kingpin from the holders of the Equity Interests of Holdings).

"<u>Casualty</u>" means any casualty, loss, damage, destruction or other similar loss with respect to real or personal property or improvements.

"<u>Challenge</u>" means an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, to the findings, the Loan Parties' stipulations, or any other stipulations contained in the Orders, including, without limitation, any challenge to the validity, priority or enforceability of the liens securing the obligations under the First Lien Loan Documents, or assertion of any claim or cause of action against the First Lien Agent or the First Lien Lenders arising under or in connection with the First Lien Loan Documents or the First Lien Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of First Lien Obligations, or otherwise.

"<u>Change in Law</u>" means the occurrence, after the date of this Agreement, of any of the following: (i) the adoption or taking effect of any applicable law, rule, regulation or treaty, (ii) any change in any applicable law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (iii) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"<u>Change of Control</u>" means the occurrence of any of the following events:

(i)    (A) Holdings shall cease to own directly 100% of the Equity Interests of Kingpin, on a fully-diluted basis assuming the conversion and exercise of all outstanding Equity Equivalents (whether or not such securities are then currently convertible or exercisable), (B) Kingpin shall cease to own directly 100% of the Equity Interests of the Borrower, on a fully-diluted basis assuming the conversion and exercise of all outstanding Equity Equivalents (whether or not such securities are then currently convertible or exercisable), (C) the Sponsor Group shall cease to own beneficially (as defined in the Exchange Act), directly or indirectly, at

least 35% of the Equity Interests of Holdings (such percentage to be computed without regard to any Qualifying Equity Issuances by Holdings of its Equity Interests), (D) any "person" or "group" (as each such term is defined in the Exchange Act), other than the Sponsor Group, is or becomes the "beneficial owner" (as defined in the Exchange Act except that a Person will be deemed to have beneficial ownership of all shares that such Person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of a greater percentage of the voting Equity Interests of Holdings than the percentage of the voting Equity Interests of Holdings then owned beneficially, directly or indirectly, by the Sponsor Group or (E) the failure at any time of the Investor Group to control, whether through the ownership of voting securities or by contract, a majority of the seats on the board of directors (or persons performing similar functions) of Holdings; or

(ii)     during any period of two consecutive calendar years, individuals who at the beginning of such period constituted the board of directors (or persons performing similar functions) of Holdings together with any new members of such board of directors (A) whose elections by such board of directors or whose nominations for election by the equityholders of Holdings was approved by a vote of a majority of the members of such board of directors then still in office who either were directors at the beginning of such period or whose election or nomination for election was previously so approved or by any new directors who were nominated to serve on behalf of the Investor Group or (B) elected or appointed by the Investor Group, cease for any reason to constitute a majority of the directors of Holdings still in office; or

(iii)    a "change of control", as defined in the First Lien Credit Agreement or Second Lien Credit Agreement, occurs.

"Chapter 11 Cases" means the case to be filed under Chapter 11 of the Bankruptcy Code by Borrower in its capacity as a debtor and debtor-in-possession in the Bankruptcy Court, together with the cases of its affiliated debtors and debtors-in-possession.

"Claims" means all Commercial Tort Claims, each of the claims described on Schedule 11.01(a) hereto, as such Schedule may be amended, modified or supplemented from time to time, and all claims, causes of action and similar rights and interests (however characterized) of a Loan Party, whether arising in contract, tort or otherwise, and whether or not subject to any action, suit, investigation or legal, equitable, arbitration or administrative proceedings.

"Closing Date" means November 13, 2012, or such later date as may be mutually agreed by the Loan Parties and the Required DIP Lenders.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto, as interpreted by the rules and regulations issued thereunder, in each case as in effect from time to time.

"Collateral" has the meaning set forth in Section 11.01(a).

"Collateral Agent" means Credit Suisse AG, Cayman Islands Branch, in its capacity as collateral agent for the Secured Parties under the DIP Loan Documents, and its successor or successors in such capacity.

"Collateral Documents" means, collectively, any pledges, security agreements, patent, trademark or copyright filings or mortgages delivered and any instruments of assignment, Account

Control Agreements, lockbox letters or other instruments or agreements executed pursuant to the foregoing, and any Additional Collateral Documents.

"Commitment" means (i) with respect to each DIP Lender (other than the Issuing Lender), its Term Loan Commitment, as and to the extent applicable and (ii) with respect to the Issuing Lender, its LC Commitment, in each case as set forth on Schedule 1.01A or Assignment and Acceptance, as any such amount may be increased or decreased from time to time pursuant to this Agreement.

"Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Compliance Certificate" means, for any period, the certificate required for such period under Section 6.01(c).

"Computer Hardware" means all computer and other electronic data processing hardware of a Loan Party, whether now or hereafter owned, licensed or leased by such Loan Party, including, without limitation, all integrated computer systems, central processing units, memory units, display terminals, printers, features, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware, all documentation, flowcharts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes associated with any of the foregoing and all options, warranties, services contracts, program services, test rights, maintenance rights, support rights, renewal rights and indemnifications relating to any of the foregoing.

"Condemnation" means any taking by a Governmental Authority of property or assets, or any part thereof or interest therein, for public or quasi-public use under the power of eminent domain, by reason of any public improvement or condemnation.

"Condemnation Award" means all proceeds of any Condemnation or transfer in lieu thereof.

"Consolidated EBITDA" means for any period the sum of (i) Consolidated Net Income for such period (excluding therefrom (x) any extraordinary, unusual or non-recurring items of gain or loss, (y) any gain or loss from discontinued operations and (z) any gain or loss attributable to Asset Dispositions made other than in the ordinary course of business), plus (ii) to the extent not otherwise included in the determination of Consolidated Net Income for such period, all proceeds of business interruption insurance policies, if any, received during such period plus (iii) (without duplication) an amount which, in the determination of Consolidated Net Income for such period, has been deducted for (A) Consolidated Interest Expense, (B) provisions for Federal, state, local and foreign income, franchise, state single business unitary and similar taxes, (C) depreciation, amortization (including, without limitation, amortization of goodwill and other intangible assets), impairment of goodwill and other non-cash charges or expenses (excluding any such non-cash charge to the extent that it represents amortization of a prepaid cash expense that was paid in a prior period), (D) non-cash compensation expense, or other non-cash expenses or charges, arising from the sale of stock, the granting of stock options, the granting of stock appreciation rights and similar arrangements (including any repricing, amendment, modification, substitution or change of any such stock, stock option, stock appreciation rights or similar arrangements), (E) non-cash rent expense, (F) expenses incurred by Holdings or any Consolidated Subsidiary to the extent reimbursed in cash by a third party other than Holdings or one or more of its Consolidated Subsidiaries, (G) losses from foreign currency adjustments, (H) losses in respect of pension or other post-retirement benefits or pension assets, (I) write-offs of deferred financing costs, (J) expenses in respect of earn-out obligations, (K) any financial advisory fees, accounting fees, legal fees and similar advisory and

10

consulting fees and related out-of-pocket expenses of the Borrower and its Consolidated Subsidiaries incurred as a result of Foreign Asset Dispositions, (L) cash charges and expenses in connections with employee or management relocation or severance costs, including, without limitation, related to Dispositions, all determined in accordance with GAAP and in each case eliminating any increase or decrease in income resulting from non-cash accounting adjustments made in connection with Foreign Asset Dispositions, and (M) any fees, costs and expenses of Holdings, Kingpin, the Borrower and their direct or indirect Subsidiaries incurred in connection with the DIP Facility; minus (iv) any amount which, in the determination of Consolidated Net Income for such period, has been added for any non-cash income or non-cash gains, all as determined in accordance with GAAP, minus (v) the aggregate amount of cash payments made during such period in respect of any non-cash accrual, reserve or other non-cash charge or expense accounted for in a prior period and not otherwise reducing Consolidated Net Income for such period minus (vi) any amount which, in the determination of Consolidated Net Income for such period, has been added for interest income, gains from foreign currency adjustments and gains in respect of pension or other post-retirement benefits or pension assets.

"Consolidated Interest Expense" means, for any period, the total interest expense, whether paid or accrued and whether or not capitalized, (including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments under Capital Leases and the implied interest component of Synthetic Leases (regardless of whether accounted for as interest expense under GAAP), all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances, in each case determined on a consolidated basis for such period.

"Consolidated Net Income" means, for any period, the net income (or net loss) after taxes of Holdings and its Consolidated Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded from the calculation of Consolidated Net Income for any period (i) the income (or loss) of any Person in which any other Person (other than Holdings or any of its Wholly-Owned Consolidated Subsidiaries) has an ownership interest, except to the extent that any such income is actually received in cash by Holdings or such Wholly-Owned Consolidated Subsidiary in the form of Restricted Payments during such period, (ii) the income (or loss) of any Person accrued prior to the date it becomes a Consolidated Subsidiary of Holdings or is merged with or into or consolidated with Holdings or any of its Consolidated Subsidiaries or that Person's assets are acquired by Holdings or any of its Consolidated Subsidiaries and (iii) the income of any Subsidiary of Holdings to the extent that the declaration or payment of Restricted Payments or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary.

"Consolidated Subsidiary" means with respect to any Person at any date any Subsidiary of such Person or other entity the accounts of which would be consolidated with those of such Person in its consolidated financial statements if such statements were prepared as of such date in accordance with GAAP.

"Contractual Obligation" has the meaning set forth in Section 11.04(a).

"Copyright" means any of the following, whether now existing or hereafter arising, created or acquired: (i) all common law and/or statutory rights in all copyrightable subject matter under the laws of the United States or any other country (whether or not the underlying works of authorship have been published); (ii) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental, derivative or collective work registrations and pending applications for registrations in the United States Copyright Office or any other country; (iii) all computer programs, web pages, computer data bases and computer

program flow diagrams, including all source codes and object codes related to any or all of the foregoing; (iv) all tangible property embodying or incorporating any or all of the foregoing, whether in completed form or in some lesser state of completion, and all masters, duplicates, drafts, versions, variations and copies thereof, in all formats; (v) all claims for, and rights to sue for, past, present and future infringement of any of the foregoing; (vi) all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing, including, without limitation, damages and payments for past, present or future infringements thereof and payments and damages under all Copyright Licenses in connection therewith; and (vii) all rights in any of the foregoing, whether arising under the laws of the United States or any foreign country or otherwise, to copy, record, synchronize, broadcast, transmit, perform and/or display any of the foregoing or any matter which is the subject of any of the foregoing in any manner and by any process now known or hereafter devised.

"Copyright License" means any agreement now or hereafter in existence granting to any Loan Party any rights, whether exclusive or non-exclusive, to use another Person's copyrights or copyright applications, or pursuant to which any Loan Party has granted to any other Person, any right, whether exclusive or non-exclusive, with respect to any Copyright, whether or not registered.

"Credit Exposure" has the meaning set forth in the definition of "Required DIP Lenders".

"Credit Extension" means a Borrowing or the issuance, renewal or extension of a Letter of Credit.

"Debt" of any Person means at any date, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person to the extent of the value of such property (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business), (iv) all obligations, other than intercompany items, of such Person to pay the deferred purchase price of property or services (other than trade accounts and accrued expenses arising in the ordinary course of business), (v) the Attributable Debt of such Person in respect of Capital Lease Obligations, (vi) all obligations of such Person to purchase securities or other property which arise out of or in connection with the sale of the same or substantially similar securities or property and which mature or otherwise become non-contingent on or prior to the Petition Date, (vii) all non-contingent obligations (and, solely for purposes of Section 7.01 and Section 8.01(e), all contingent obligations) of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, bankers' acceptance or similar instrument, (viii) all obligations of others secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) a Lien on, or payable out of the proceeds of production from, any property or asset of such Person, whether or not such obligation is assumed by such Person; provided that the amount of any Debt of others that constitutes Debt of such Person solely by reason of this clause (viii) shall not for purposes of this Agreement exceed the greater of the book value or the fair market value of the properties or assets subject to such Lien, (ix) all Guaranty Obligations of such Person in respect of Debt of another Person, (x) all Debt Equivalents of such Person and (xi) the Debt of any other Person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venturer) to the extent such Person would be liable therefor under applicable law or any agreement or instrument by virtue of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Debt provide that such person shall not be liable therefor; provided that (x) Debt shall not include earn-out obligations until matured or earned or employee consulting agreements and (y) the amount of any Limited Recourse Debt of any Person shall be equal to the lesser of (A) the aggregate principal amount of such Limited Recourse Debt for which such Person provides credit support of any kind (including any undertaking agreement or instrument that would constitute Debt), is directly or indirectly

12

liable as a guarantor or otherwise or is the lender and (B) the fair market value of any assets securing such Debt or to which such Debt is otherwise recourse.

"Debt Equivalents" of any Person means any Equity Interest of such Person which by its terms (or by the terms of any security for which it is convertible or for which it is exchangeable or exercisable), or upon the happening of any event or otherwise (including an event which would constitute a Change of Control but only to the extent such an event occurs), (A) matures or is mandatorily redeemable or subject to any mandatory repurchase requirement, pursuant to a sinking fund or otherwise, (B) is convertible into or exchangeable for Debt or Debt Equivalents or (C) is redeemable or subject to any repurchase requirement arising at the option of the holder thereof, in each case, in whole or in part, on or prior to the first anniversary of the Scheduled Maturity Date.

"Debt Issuance" means the issuance by any Group Company of any Debt.

"Default" means any condition or event which constitutes an Event of Default or which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means at any time any DIP Lender that, within one Business Day of when due, (i) has failed to make a Loan required pursuant to the terms of this Agreement, (ii) other than as set forth in clause (i) above, has failed to pay to any Agent or any DIP Lender an amount owed by such DIP Lender pursuant to the terms of the Agreement or any other DIP Loan Document unless such amount is subject to a good faith dispute or (iii) has been deemed insolvent or has become subject to a receivership or insolvency event.

"Deposit Accounts" means all "deposit accounts" (as defined in the UCC) and also means and includes all demand, time, savings, passbook or similar accounts maintained by a Loan Party with a bank or other financial institution, whether or not evidenced by an Instrument, all cash and other funds held therein and all passbooks related thereto and all certificates and Instruments, if any, from time to time representing, evidencing or deposited into such deposit accounts.

"DIP Agent" means Credit Suisse AG, Cayman Islands Branch, in its capacity as DIP Agent for the DIP Lenders hereunder and under the other DIP Loan Documents, and its successor or successors in such capacity.

"DIP Commitment" means the aggregate Term Loan Commitment of the DIP Lenders under the DIP Facility.

"DIP Facility" has the meaning set forth in the recitals.

"DIP Lender" means each Person listed on Schedule 1.01A and each Eligible Assignee that becomes a DIP Lender pursuant to Section 10.06(b) and their respective successors and shall include the Issuing Lender in such capacity.

"DIP Liens" means the following Liens and security interests:

(a)      subject to the Carve-Out and subject only to Permitted Existing Liens, pursuant to Section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming Lien on, and security interest in the First Lien Prepetition Collateral  securing the First Lien Obligations, wherever located, that may be subject to a validly perfected security interest in existence on the Petition Date securing the First Lien Obligations under the First Lien Loan Documents (the "First Lien Credit

Agreement Liens"), which First Lien Credit Agreement Liens shall be primed by and made subject and subordinate to the perfected first priority senior priming Liens and security interests to be granted to the DIP Agent for the benefit of the DIP Lenders, which senior priming Liens and security interests in favor of the DIP Agent for the benefit of the DIP Lenders shall also be senior to the First Lien Adequate Protection Liens, the Second Lien Adequate Protection Liens and the Liens securing the Second Lien Obligations under the Second Lien Loan Documents (the "Second Lien Credit Agreement Liens");

(b)     subject to the Carve-Out, pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority perfected Lien on, and security interest in, all Collateral not subject to a Lien or security interest on the Petition Date (including, without limitation, all funds in the DIP Priority Account);

(c)     subject to the Carve-Out, pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior perfected Lien on, and security interest in, all Collateral that is subject to a perfected Lien or security interest on the Petition Date or subject to a Lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by Section 546(b) of the Bankruptcy Code; and

(d)     all funds in the DIP Priority Account or any other Deposit Account of the Loan Parties (except for payroll, employee benefits and trust accounts and League Funds).

"DIP Loan Documents" means this Agreement, the Notes, the Fee Letter, the Collateral Documents, the Intercompany Notes, each Accession Agreement, each LC Document, each Secured Cash Management Agreement, each Account Control Agreement and all other related agreements and documents issued or delivered hereunder or thereunder or pursuant hereto or thereto, in each case as the same may be amended, modified or supplemented from time to time.

"DIP Loans" means the Term Loans.

"DIP Obligations" means all obligations of the Borrower and the other Loan Parties to the DIP Agent and the DIP Lenders under the DIP Facility, including, without limitation, (i) all principal and accrued interest, premiums (if any), costs, fees and expenses and (ii) all Cash Management Obligations owing under any Secured Cash Management Agreement to a Cash Management Bank.

"DIP Priority Account" means a segregated account of the Borrower subject to a control agreement with a securities intermediary acceptable to the DIP Agent, in form and substance satisfactory to the DIP Agent, which establishes "control" (as defined in the UCC) in favor of the DIP Agent for the benefit of the DIP Lenders.

"DIP Termination Date" means the earliest of: (i) the Scheduled Maturity Date, (ii) the consummation of any sale of all or substantially all of the assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code, (iii) if the Final Order has not been entered, the date that is forty-five (45) calendar days after the Petition Date, and (iv) the date of the acceleration of the DIP Loans and/or the termination of the DIP Commitment pursuant to Section 8.02, and (v) the Effective Date.

"Disclosure Statement" means a disclosure statement relating to the Plan, and all related schedules, supplements, exhibits and orders.

"Disclosure Statement Order" means an order of the Bankruptcy Court approving the Disclosure Statement.

"Dollars" and the sign "$" means lawful money of the United States.

"Domestic Subsidiary" means with respect to any Person each Subsidiary of such Person which is incorporated under the laws of the United States or any state thereof or the District of Columbia, and "Domestic Subsidiaries" means any two or more of them.

"Effective Date" means the effective date of the Plan.

"Eligible Assignee" means (i) any DIP Lender, (ii) any Affiliate of a DIP Lender, (iii) any Approved Fund and (iv) any other commercial bank, finance company, insurance company or other financial institution or fund (other than a natural Person) approved by (A) the DIP Agent at the direction of the Required DIP Lenders, and (B) unless a Default or an Event of Default has occurred and is continuing at the time any assignment is effected pursuant to Section 10.06(b), the Borrower (except the consent of the Borrower shall be required in the case of an assignment to an Ineligible Assignee pursuant to clause (iii) below), each such approval not to be unreasonably withheld, conditioned or delayed and any such approval required of the Borrower to be deemed given by the Borrower if no objection from the Borrower is received by the assigning DIP Lender and the DIP Agent within five Business Days after notice of such proposed assignment has been provided by the assigning DIP Lender to the Borrower; provided, however, that (i) Holdings and its Affiliates shall not qualify as Eligible Assignees, (ii) no Person shall be an Eligible Assignee if such Person appears on the list of Specially Designated Nationals and Blocked Persons prepared by the U.S. Treasury Department's Office of Foreign Assets Control or the purchase by such Person of an assignment or the performance by any Agent of its duties under the DIP Loan Documents with respect to such Person violates or would violate any Anti-Terrorism Law, and (iii) no Person shall be an Eligible Assignee if such Person (an "Ineligible Assignee") is disclosed on a list of competitors identified and accepted by the DIP Agent prior to the Effective Date, as updated from time to time by the Borrower and approved by the DIP Agent and Required DIP Lenders (which approval shall not be unreasonably withheld, conditioned or delayed).

"Employee Benefit Arrangements" means in any jurisdiction the benefit schemes or arrangements in respect of any employees or past employees operated by any Group Company or in which any Group Company participates and which provide benefits on retirement, ill-health, injury, death or voluntary withdrawal from or termination of employment, including termination indemnity payments and life assurance and post-retirement medical benefits, other than ERISA Plans and Foreign Pension Plans.

"Environmental Laws" means all Laws relating in any way to the environment, the preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of remediation, fines, penalties or indemnities), of any Group Company directly or indirectly resulting from or based on (i) violation of any Environmental Law, (ii) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Material, (iii) exposure to any Hazardous Material, (iv) the release or threatened release of any Hazardous Material into the environment or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" means all "equipment" (as defined in the UCC), including all items of machinery, equipment, Computer Hardware, Bowling Equipment, furnishings and fixtures of every kind, whether or not affixed to real property, as well as all motor vehicles, automobiles, trucks, trailers, railcars, barges and vehicles of every description, handling and delivery equipment, all additions to, substitutions for, replacements of or accessions to any of the foregoing, all attachments, components, parts (including spare parts) and accessories whether installed thereon or affixed thereto and all fuel for any thereof and all

options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights and indemnifications relating to any of the foregoing.

"Equity Equivalents" means with respect to any Person any rights, warrants, options, convertible securities, exchangeable securities, indebtedness or other rights, in each case exercisable for or convertible or exchangeable into, directly or indirectly, Equity Interests of such Person or securities exercisable for or convertible or exchangeable into Equity Interests of such Person, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

"Equity Interests" means all shares of capital stock, partnership interests (whether general or limited), limited liability company membership interests, beneficial interests in a trust and any other interest or participation that confers on a Person the right to receive a share of profits or losses, or distributions of assets, of an issuing Person, but excluding any debt securities convertible into such Equity Interests.

"Equity Issuance" means (i) any sale or issuance by any Group Company to any Person other than Holdings or a Subsidiary of Holdings of any Equity Interests or any Equity Equivalents (other than any such Equity Equivalents that constitute Debt) and (ii) the receipt by any Group Company of any cash capital contributions, whether or not paid in connection with any issuance of Equity Interests of any Group Company, from any Person other than Holdings or a Subsidiary of Holdings.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any rule or regulation issued thereunder.

"ERISA Affiliate" means each business or entity which is a member of a "controlled group of corporations", under "common control" or an "affiliated service group" with a Group Company within the meaning of Section 414(b), (c) or (m) of the Code, or required to be aggregated with a Group Company under Section 414(o) of the Code or is under "common control" with a Group Company, within the meaning of Section 4001(a)(14) of ERISA.

"ERISA Event" means:

(i)     a reportable event as defined in Section 4043 of ERISA and the regulations issued under such section, with respect to an ERISA Plan, excluding, however, (A) such events as to which the PBGC by regulation has waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) calendar days of the occurrence of such event and (B) the filing of the Chapter 11 Cases;

(ii)     the requirements of Section 4043(b) of ERISA apply with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of any ERISA Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA (other than the filing of the Chapter 11 Cases) is reasonably expected to occur with respect to such ERISA Plan within the following thirty (30) calendar days;

(iii)     (x) the failure to meet the minimum funding standard of Section 412 of the Code or Section 302 of ERISA with respect to any ERISA Plan (whether or not waived), the application for a minimum funding waiver under Section 412(c) of the Code or Sections 302(c) of ERISA with respect to any ERISA Plan, or the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any ERISA Plan; or (y) the failure to make any required contribution to any Multiemployer Plan;

16

(iv)     (A) the incurrence of any liability by a Group Company or any ERISA Affiliate pursuant to Title I or IV of ERISA (other than premiums payable to the PBGC) or the penalty or excise tax provisions of the Code relating to employee benefit plans (as defined in Section 3 of ERISA), or (B) the occurrence or existence of any event, transaction or condition that could reasonably be expected to result (x) in the incurrence of any such liability by a Group Company or any ERISA Affiliate, or (y) in the imposition of any Lien on any of the rights, properties or assets of a Group Company or any ERISA Affiliate, in either case pursuant to Title I or IV of ERISA or to such penalty or excise tax provisions of the Code or to Section 401(a)(29) or 412 of the Code;

(v)     the provision by the administrator of any ERISA Plan pursuant to Section 4041(a)(2) of ERISA of a notice (or the reasonable expectation of such provision of notice) of intent to terminate such ERISA Plan in a distress termination described in Section 4041(c) of ERISA, the institution by the PBGC of proceedings to terminate any ERISA Plan or appoint a trustee to administer any ERISA Plan or the occurrence of any event or condition which would reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee by the PBGC to administer, any ERISA Plan;

(vi)     the withdrawal of, or the incurrence of any potential liability by, a Group Company or ERISA Affiliate in connection with a complete or partial withdrawal (within the meaning of Section 4203 and 4205 of ERISA) from any Multiemployer Plan, the receipt by a Group Company or ERISA Affiliate of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA;

(vii)     the imposition of liability (or the reasonable expectation thereof) on a Group Company or ERISA Affiliate pursuant to Section 4062, 4063, 4064 or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA;

(viii)     the assertion of a claim (other than routine claims for benefits) against any ERISA Plan other than a Multiemployer Plan or the assets thereof, or against a Group Company in connection with any ERISA Plan;

(ix)     the receipt from the United States Internal Revenue Service of notice of the failure of any ERISA Plan (or any Employee Benefit Arrangement intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any ERISA Plan (or under any Employee Benefit Arrangement intended to qualify under Section 501(a) of the Code) to qualify for exemption from taxation under Section 501(a) of the Code, and, with respect to Multiemployer Plans, notice thereof to any Group Company;

(x)     a determination that any ERISA Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); and

(xi)     the establishment or amendment by a Group Company of any Welfare Plan that provides post-employment welfare benefits in a manner that would increase the liability of a Group Company.

"ERISA Plan" means an employee pension benefit plan which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code (currently or hereafter), that is sponsored, maintained by, contributed to or for which there is an obligation to

contribute by any Group Company or with respect to which any Group Company has liability (including on account of any ERISA Affiliate), but not including a Multiemployer Plan.

"Eurodollar Rate" means, for any Loan for the Interest Period applicable thereto:

(i)      the rate per annum determined by the DIP Agent to be the average British Bankers Association Interest Settlement Rate for deposits in Dollars (for delivery on the first day of such Interest Period) for a period of time comparable to such Interest Period, determined as of approximately 11:00 A.M. (London time) three Business Days prior to the first day of such Interest Period; or

(ii)      if the rate referenced in the preceding clause (i) is not available, the rate per annum determined by the DIP Agent as the rate of interest at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Loan being made or continued by the DIP Agent and with a term equivalent to such Interest Period as would be offered by the DIP Agent's London branch to major banks in the London interbank market at their request at approximately 11:00 A.M. (London time) three Business Days prior to the first day of such Interest Period.

"Eurodollar Rate Loan" means any Loan during any period in which it bears interest based on the Eurodollar Rate.

"Eurodollar Reserve Percentage" means for any day during any Interest Period, the reserve percentage (expressed as a decimal, carried out to five decimal places) in effect on such day, whether or not applicable to any DIP Lender, under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any other entity succeeding to the functions currently performed thereby) for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to "Eurocurrency liabilities").

"Event of Default" has the meaning set forth in Section 8.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Asset Disposition" means an Asset Disposition permitted pursuant to Section 7.05 other than (x) Asset Dispositions pursuant to Section 7.05(v), (x), and (xiii), or (y) pursuant to Section 7.05(ix) to the extent such licenses exceed $100,000 in any Fiscal Year.

"Excluded Collateral" has the meaning set forth in Section 11.01(a).

"Excluded Contract" means at any date any rights or interest of a Loan Party in, to or under any agreement, contract, license, instrument, document or other general intangible (referred to solely for purposes of this definition as a "Contract") only to the extent, if any, that notwithstanding the Chapter 11 Cases and the Orders, such Contract, under applicable law or by the express terms of a valid and enforceable restriction in favor of a Person who is not a Group Company, (i) prohibits, or requires any consent or establishes any other condition for, an assignment thereof or a grant of a security interest therein by a Loan Party or (ii) would give any party to such Contract other than a Group Company an enforceable right to terminate its obligations thereunder; provided that (x) rights to payment under any such Contract otherwise constituting an Excluded Contract by virtue of this definition shall be included in the Collateral to the extent permitted thereby or by Section 9-406 or Section 9-408 of the UCC, (y) all

Proceeds paid or payable to any Loan Party from any sale, transfer or assignment of such Contract and all rights to receive such Proceeds shall be included in the Collateral.

"Excluded Equipment" means at any date any equipment of a Loan Party which is subject to, or secured by, a Capital Lease Obligation or Purchase Money Debt which is permitted under this Agreement if and to the extent that (i) notwithstanding the Chapter 11 Cases and the Orders, the express terms of a valid and enforceable restriction in favor of a Person who is not a Group Company which is contained in the agreements or documents granting or governing such Capital Lease Obligation or Purchase Money Debt secured thereby prohibits, or requires any consent or establishes any other conditions for, an assignment thereof, or a grant of a security interest therein, by a Loan Party and (iii) such restriction relates only to the asset or assets acquired by a Loan Party with the Proceeds of such Capital Lease Obligation or Purchase Money Debt; provided that all Proceeds paid or payable to any Loan Party from any sale, transfer or assignment or other voluntary or involuntary disposition of such Equipment and all rights to receive such Proceeds shall be included in the Collateral to the extent not otherwise required to be paid to the holder of the Capital Lease Obligation or Purchase Money Debt secured by such Equipment.

"Excluded Taxes" means with respect to any Recipient on account of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (i) income or franchise taxes imposed on (or measured by) net income by the United States or by the jurisdiction under the laws of which such Recipient is organized or in which its principal office is located or, in the case of any DIP Lender, in which its Applicable Lending Office is located, (ii) any branch profits taxes imposed by the United States or imposed as a result of such Recipient being organized under the laws of, or having its principal office in, or, in the case of any DIP lender, having its Applicable Lending Office located in, the jurisdiction imposing such tax, (iii) in the case of any DIP Lender (other than an Eligible Assignee pursuant to a request by the Borrower under Section 2.10(b)), any United Stated federal withholding tax imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in the DIP Loans or Commitment pursuant to a law in effect on the date on which (A) such DIP Lender acquires such interest in the DIP Loan or Commitment or (B) such DIP Lender changes its Applicable Lending Office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its Applicable Lending Office, (iv) taxes attributable to such Recipient's failure to comply (other than as a result of a Change in Law) with Section 3.01(d) and (v) any taxes imposed under FATCA.

"Existing Letters of Credit" means, collectively, the letters of credit issued before the Closing Date and described by date of issuance, letter of credit number, undrawn amount, name of beneficiary and date of expiry on Schedule 2.05 hereto, and "Existing Letter of Credit" means any one of them.

"Failed Loan" has the meaning set forth in Section 2.03(e).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Rate" means for any day the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (i) if such day is not a Business Day, the

19

Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Credit Suisse AG, Cayman Islands Branch on such day on such transactions as determined by the DIP Agent.

"Fee Letter" means that certain letter agreement, dated as of the date hereof, between Borrower and the DIP Agent.

"Final Order" means a final order of the Bankruptcy Court approving the DIP Facility, in form and substance satisfactory to the DIP Agent and the Required DIP Lenders.

"First Lien Adequate Protection Liens" means replacement Liens to the extent of any post-petition diminution in value of the First Lien Lenders' interest in the First Lien Prepetition Collateral, including replacement Liens on all unencumbered assets of the Loan Parties, which Liens will be junior to the Liens of the DIP Lenders under the DIP Facility, Permitted Existing Liens and the Carve-Out.

"First Lien Adequate Protection Payments" has the meaning set forth in the definition of "Adequate Protection Provisions".

"First Lien Ad-Hoc Group" has the meaning set forth in clause (a) of the definition of "Adequate Protection Provisions."

"First Lien Agent" means Credit Suisse AG, Cayman Islands Branch, in its capacity as Administrative Agent for the First Lien Lenders under the First Lien Credit Agreement and other First Lien Loan Documents, and its successor or successors in such capacity.

"First Lien Credit Agreement" means the First Lien Credit Agreement, dated as of June 12, 2007 (as amended by Amendment No. 1 to First Lien Credit Agreement, dated as of May 8, 2009, and Amendment No. 2 to First Lien Credit Agreement, dated as of May 3, 2012), among Borrower, Kingpin, the First Lien Lenders and the First Lien Agent.

"First Lien Credit Agreement Liens" has the meaning set forth in the definition of "DIP Liens".

"First Lien Lenders" means each "Lender" as defined in the First Lien Credit Agreement.

"First Lien Loan Documents" means the First Lien Credit Agreement and the other Finance Documents (as defined in the First Lien Credit Agreement), and any other document related to or evidencing the loans and obligations thereunder.

"First Lien Obligations" means the "Obligations" as defined in the First Lien Credit Agreement.

"First Lien Prepetition Collateral" means the "Collateral" as defined in the First Lien Credit Agreement securing the First Lien Obligations.

"First Lien Superpriority Claims" means superpriority administrative expense claims with respect to the First Lien Prepetition Collateral and to the extent of any post-petition diminution in

value of the First Lien Lenders' interest in the First Lien Prepetition Collateral, which claims will be junior to the DIP Obligations, the Superpriority DIP Claims and the Carve-Out.

"First Testing Period" has the meaning set forth in the definition of "Permitted Variances".

"Foreign Asset Disposition" means an Asset Disposition where the relevant asset is (i) the stock or assets of a Foreign Subsidiary or the Qubica JV Entity or (ii) one or more assets of the Borrower or a Domestic Subsidiary which are located outside the United States or any territory thereof.

"Foreign Pension Plan" means any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States by any Group Company (other than a mandatory Governmental Authority plan) primarily for the benefit of employees of any Group Company residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"Foreign Subsidiary" means with respect to any Person any Subsidiary of such Person that is not a Domestic Subsidiary of such Person.

"FTI" means FTI Consulting, Inc.

"GAAP" means at any time generally accepted accounting principles as then in effect in the United States, applied on a basis consistent (except for changes with which the Borrower's independent public accountants have concurred) with the most recent audited consolidated financial statements of Holdings and its Consolidated Subsidiaries (or Kingpin and its Consolidated Subsidiaries, as applicable) previously delivered to the DIP Lenders.

"General Intangibles" means all "general intangibles" (as defined in the UCC) and also means and includes (i) all Payment Intangibles and other obligations and indebtedness owing to any Loan Party (other than Accounts), from whatever source arising, (ii) all Claims, Judgments and/or Settlements, (iii) all rights or claims in respect of refunds for taxes paid, (iv) all rights in respect of any pension plans or similar arrangements maintained for employees of any Loan Party or any ERISA Affiliate, (v) all interests in limited liability companies and/or partnerships which interests do not constitute Securities and (vi) all Supporting Obligations of any kind given by any Person with respect to all or any of the foregoing.

"Government Acts" has the meaning set forth in Section 2.05(s)(i).

"Governmental Authority" means any federal, state, local, provincial or foreign government, authority, agency, central bank, quasi-governmental or regulatory authority, court or other body or entity, and any arbitrator with authority to bind a party at law.

"Granting Lender" has the meaning set forth in Section 10.06(h).

"Group Company" means any of Holdings, Kingpin, the Borrower or their respective Subsidiaries (regardless of whether or not consolidated with Holdings, Kingpin or the Borrower for purposes of GAAP), and "Group Companies" means all of them, collectively.

"Guaranteed DIP Obligations" has the meaning set forth in Section 12.01.

"Guarantor" means each of Holdings, Kingpin and the Subsidiary Guarantors, and "Guarantors" means all of them, collectively.

"Guaranty" has the meaning set forth in Section 12.01.

"Guaranty Obligation" means, with respect to any Person, without duplication, any obligation (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guarantying, intended to guaranty, or having the economic effect of guarantying, any Debt or other obligation of any other Person in any manner, whether direct or indirect, and including, without limitation, any obligation, whether or not contingent, (i) to purchase any such Debt or other obligation or any property constituting security therefor, (ii) to advance or provide funds or other support for the payment or purchase of such indebtedness or obligation or to maintain working capital, solvency or other balance sheet condition of such other Person (including, without limitation, maintenance agreements, comfort letters, take or pay arrangements, put agreements or similar agreements or arrangements) for the benefit of the holder of Debt or other obligation of such other Person, (iii) to lease or purchase property, securities or services primarily for the purpose of assuring the owner of such Debt or other obligation or (iv) to otherwise assure or hold harmless the owner of such Debt or obligation against loss in respect thereof, it being understood and agreed that indemnification and similar reimbursement obligations entered into in the ordinary course of business in favor of the obligor on any such Debt or other obligation which are not enforceable by any holder of such Debt or other obligation and which do not otherwise constitute Debt hereunder shall not be deemed to constitute Guaranty Obligations for purposes of this Agreement and the other DIP Loan Documents.  The amount of any Guaranty Obligation hereunder shall (subject to any limitations set forth therein) be deemed to be an amount equal to the lesser of the outstanding principal amount or maximum principal amount of the Debt or other obligation in respect of which such Guaranty Obligation is made.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants or environmental contaminants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environment Law.

"Hilco" has the meaning set forth in Section 4.01(g).

"Hilco Engagement Letter" has the meaning set forth in Section 4.01(g).

"Holdings" means Kingpin Holdings, LLC, a Delaware limited liability company and its successors.

"Indemnified Liabilities" has the meaning set forth in Section 10.05.

"Indemnified Taxes" means taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under this Agreement or any other Loan Document (but excluding Other Taxes).

"Indemnitee" has the meaning set forth in Section 10.05.

"Ineligible Assignee" has the meaning set forth in the definition of "Eligible Assignee."

"Initial Lenders" means Midtown Acquisitions, L.P., Credit Suisse Loan Funding LLC, Goldman Sachs Palmetto State Credit Fund, L.P. and Liberty Harbor Master Fund I, L.P.

"Insignificant Subsidiaries" means the Subsidiaries of the Borrower listed on Schedule 1.01E hereto.

"Insurance Proceeds" means all insurance proceeds (other than business interruption insurance proceeds), damages, awards, claims and rights of action with respect to any Casualty.

"Interim Order" means the interim order entered by the Bankruptcy Court in the Chapter 11 Cases.

"Intellectual Property" means all Patents, Trademarks, Copyrights, Software, Licenses, rights in intellectual property, goodwill, trade names, service marks, trade secrets, confidential or proprietary technical and business information, know-how, show-how, process, domain names, mask works, customer lists, vendor lists, subscription lists, data bases and related documentation, registrations, franchises and all other intellectual or other similar property rights.

"Intercompany Note" means a promissory note contemplated by Section 7.06(a)(viii), substantially in the form of Exhibit G hereto, and "Intercompany Notes" means any two or more of them.

"Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of June 12, 2007, by and among the First Lien Agent, the Second Lien Agent, Credit Suisse, Cayman Island Branch, as control agent, the First Lien Lenders and the Second Lien Lenders.

"Interest Payment Date" means the last day of each applicable Interest Period and the DIP Termination Date.

"Interest Period" means a period commencing on the date of borrowing specified in the applicable Notice of Borrowing or on the date specified in the applicable Notice of Extension/Conversion and ending one, two or three months thereafter; provided that:

> (i)     any Interest Period which would otherwise end on a day which is not a Business Day shall, subject to clause (v) below, be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

> (ii)     any Interest Period which begins on the last Business Day in a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

> (iii)     no Interest Period shall be elected which would end after the DIP Termination Date for the applicable Loans.

"Investigation Period" means a maximum of thirty (30) calendar days from the date of the Committee's appointment, but in no event later than forty-five (45) calendar days from entry of the Interim Order, provided, that the "Investigation Period" may be extended (a) with the prior written consent of counsel to the DIP Agent, at the direction of the Required DIP Lenders, as memorialized in an order of the Bankruptcy Court, or (b) pursuant to an order of the Bankruptcy Court upon a showing of good cause for such extension.

"Investment" in any Person means (i) the acquisition (whether for cash, property, services, assumption of Debt, securities or otherwise) of assets, Equity Interests, bonds, notes, debentures, time deposits or other securities of such Person, (ii) any deposit with, or advance, loan or other extension

of credit to or for the benefit of such Person (other than deposits made in connection with the purchase of equipment or inventory in the ordinary course of business) or (iii) any other capital contribution to or investment in such Person, including by way of Guaranty Obligations of any Debt or other obligation of such Person, any support for a letter of credit issued on behalf of such Person incurred for the benefit of such Person or any release, cancellation, compromise or forgiveness in whole or in part of any Debt owing by such Person.  The outstanding amount of any Investment shall be deemed to equal the difference of (i) the aggregate initial amount of such Investment less (ii) all returns of principal thereof or capital with respect thereto and all dividends and other distributions of income received in respect thereof and all liabilities expressly assumed by another Person (and with respect to which Holdings and its Subsidiaries, as applicable, shall have received a novation) in connection with the sale of such Investment.

"Investor Group" means the Sponsor Group immediately prior to the Closing Date.

"Issuing Lender" means Credit Suisse AG, Cayman Islands Branch, in its capacity as issuer of Letters of Credit under Section 2.05(a), and its successor or successors in such capacity.

"ISP" has the meaning set forth in Section 2.05(p).

"iStar Action" means a motion or adversary proceeding seeking relief from the Bankruptcy Court with respect to the Loan Parties' obligations under the iStar Sale/Leaseback Documents.

"iStar Master Agreements" means the (i) Lease I Agreement between iStar Bowling Centers I LP, as Landlord, and AMF Bowling Centers, Inc., as Tenant, dated as of February 27, 2004, as amended; and (ii) Lease II Agreement between iStar Bowling Centers II LP, as Landlord, and AMF Bowling Centers, Inc., as Tenant, dated as of February 27, 2004, as amended.

"iStar Sale/Leaseback" means the Sale/Leaseback Transaction effected pursuant to the iStar Sale/Leaseback Documents.

"iStar Sale/Leaseback Documents" means (i) the iStar Master Agreements, (ii) the Guaranty dated as of February 27, 2004 by Kingpin in favor of iStar Bowling Centers I LLC and (iii) the Seller's Certificates dated as of February 27, 2004 by each of AMF Bowling Centers, Inc. and AMF Recreation Centers, Inc., in each case as seller, in each case as the same may be amended, modified or supplemented from time to time in accordance with the provisions thereof and of this Agreement, and including all basic lease information and all other agreements, documents and instruments relating to the iStar Sale/Leaseback and all exhibits and schedules to any of the foregoing.

"Judgments" means all judgments, decrees, verdicts, decisions or orders issued in resolution of or otherwise in connection with a Claim, whether or not final or subject to appeal, and including all rights of enforcement relating thereto and any and all Proceeds thereof.

"Kingpin" means Kingpin Intermediate Corp., a Delaware corporation and its successors.

"K&S" means King & Spalding LLP.

"Law" means any international, foreign, Federal, state or local statute, treaty, rule, guideline, regulation, ordinance, code, or administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests,

licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"LC Account" has the meaning set forth in Section 2.05(t).

"LC Commitment" means the commitment of the Issuing Lender to issue Letters of Credit on the Closing Date to replace the Existing Letters of Credit.

"LC Disbursement" means a payment or disbursement made by the Issuing Lender pursuant to a Letter of Credit.

"LC Documents" means, with respect to any Letter of Credit, such Letter of Credit, any amendments thereto, any documents delivered in connection therewith, any application therefor and any agreements, instruments, guaranties or other documents (whether general in application or applicable only to such Letter of Credit) governing or providing for (i) the rights and obligations of the parties concerned or at risk or (ii) any collateral security for such obligations.

"LC Obligations" means at any time, the sum of (i) the maximum amount which is, or at any time thereafter may become, available to be drawn under Letters of Credit then outstanding, assuming compliance with all requirements for drawings referred to in such Letters of Credit plus, without duplication, (ii) the aggregate amount of all LC Disbursements not yet reimbursed by the Borrower as provided in Section 2.05(i) to the Issuing Lender in respect of drawings under Letters of Credit.

"Lead Arranger" means Credit Suisse Securities (USA) LLC, in its capacity as sole lead arranger and sole bookrunner.

"League Funds" means cash collected by any Loan Party as league bowling fees, properly escrowed and used to fund prize winnings.

"Leaseholds" means with respect to any Person all of the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Letter of Credit" means a letter of credit issued or deemed issued pursuant to Section 2.05(a).

"Letter-of-Credit Right" means all "letter-of-credit rights" (as defined in the UCC) and also means and includes all rights of a Loan Party to demand payment or performance under a letter of credit (as defined in Article V of the UCC).

"Licenses" mean all Patent Licenses, Trademark Licenses, Copyright Licenses, Software Licenses and any agreement now or hereinafter in existence granting any Loan Party any right, whether exclusive or non-exclusive, with respect to any Person's Intellectual Property, now or hereafter in existence, whether or not registerable, or pursuant to which any Loan Party has granted to any other Person, any right, whether exclusive or non-exclusive, with respect to any Intellectual Property now or hereafter in existence, whether or not registerable.

"Lien" means, with respect to any asset, any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory or other) or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable Laws of any jurisdiction). Solely for

the avoidance of doubt, neither the filing of a UCC financing statement that is a protective lease filing in respect of an operating lease that does not constitute a security interest in the leased property or otherwise give rise to a Lien nor the filing of a UCC financing statement in respect of consigned goods that does not constitute a security interest in the consigned goods or otherwise give rise to a Lien shall constitute a Lien solely on account of being filed in a public office.

"Limited Recourse Debt" means with respect to any Persons, Debt to the extent:  (i) such Person (A) provides no credit support of any kind (including any undertaking, agreement or instrument that would constitute Debt), (B) is not directly or indirectly liable as a guarantor or otherwise or (C) does not constitute the lender; and (ii) no default with respect thereto would permit upon notice, lapse of time or both any holder of any other Debt (other than the Loans or the Notes) of such Person to declare a default on such other Debt or cause the payment thereof to be accelerated or payable prior to its stated maturity.

"Liquor License Subsidiaries" means (i) as of the Closing Date, each of the Subsidiaries listed on Schedule 1.01F hereto and, thereafter, (ii) any other Subsidiary of the Borrower established solely for the purpose of satisfying applicable requirements of local Law with respect to the ownership and use of liquor licenses and which has entered into (A) a lease pursuant to which such Subsidiary leases, as lessee, from the Borrower or one or more of its Consolidated Subsidiaries (other than another Liquor License Subsidiary) snack bar and related space at one or more bowling centers and (B) a management services agreement with AMF Bowling Centers, Inc. pursuant to which AMF Bowling Centers, Inc. provides employees, management and related services to such Subsidiary.

"Loan" means a Term Loan (or a portion of Term Loans), individually or collectively as appropriate; provided that, if any such loan or loans (or portions thereof) are combined or subdivided pursuant to a Notice of Extension/Conversion, the term "Loan" shall refer to the combined principal amount resulting from such combination or to each of the separate principal amounts resulting from such subdivision, as the case may be.

"Loan Party" means each of Holdings, Kingpin, the Borrower and each Subsidiary Guarantor, and "Loan Parties" means any combination of the foregoing.

"Management Agreement" means the Management Agreement dated as of February 27, 2004 between the Borrower and CHS Management IV LP, a Delaware limited partnership, as the same may be amended, supplemented or modified from time to time in accordance with the terms thereof and of this Agreement.

"Margin Stock" means "margin stock" as such term is defined in Regulation U.

"Material Adverse Effect" means the occurrence of an event, circumstance or other matter which has resulted in or could reasonably be expected to result in a material adverse change in (i) the business, assets, operations, performance, properties, condition (financial or otherwise), contingent liabilities, prospects or material agreements of the Loan Parties and their Subsidiaries, individually, and the Loan Parties and their Subsidiaries, taken as a whole, since June 30, 2011 (other than the commencement of the Chapter 11 Cases and the continuation of the Chapter 11 Cases), (ii) the legality, validity or enforceability of any DIP Loan Document or the Orders, (iii) the ability of the Borrower or the Loan Parties to perform their respective obligations under the DIP Loan Documents, (iv) the value of the DIP Collateral, (v) the perfection or priority of the DIP Liens granted pursuant to the DIP Loan Documents or the Orders, or (vi) the ability of the DIP Agent and the DIP Lenders to enforce the DIP Loan Documents.  Notwithstanding the foregoing, the events set forth on Schedule 1.01 (the "Specified Events") shall not be deemed to constitute a "Material Adverse Effect" for the purposes of this definition.

"Miller Buckfire" means Miller Buckfire & Co., LLC, as financial advisor to the Initial Lenders.

"Miller Buckfire Engagement Letter" means that certain letter of engagement dated as of July 3, 2012 between Stroock, as outside counsel to the First Lien Ad-Hoc Group, Miller Buckfire, Kingpin and the Borrower.

"Moody's" means Moody's Investors Service, Inc., a Delaware corporation, and its successors or, absent any such successor, such nationally recognized statistical rating organization as the Borrower and the DIP Agent may select.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

"Net Cash Proceeds" means:

(i)     with respect to any Asset Disposition (other than an Asset Disposition consisting of a lease where one or more Group Companies is acting as lessor entered into in the ordinary course of business), Casualty or Condemnation, (A) the gross amount of all cash proceeds (including Insurance Proceeds and Condemnation Awards in the case of any Casualty or Condemnation, except to the extent and for so long as such Insurance Proceeds or Condemnation Awards are to be used for repair, restoration or replacement pursuant to plans approved by the Required DIP Lenders) actually paid to or actually received by any Group Company in respect of such Asset Disposition, Casualty or Condemnation (including any cash proceeds received as income or other proceeds of any noncash proceeds of any Asset Disposition, Casualty or Condemnation as and when received), less (B) the sum of (w) the amount, if any, of all taxes (other than income taxes) and all income taxes (as estimated in good faith by the applicable financial or accounting officer of the Borrower giving effect to the overall tax position of the Borrower and its Subsidiaries), and customary fees, brokerage fees, commissions, costs and other expenses (other than those payable to any Group Company or to Affiliates of any Group Company) that are incurred in connection with such Asset Disposition, Casualty or Condemnation and are payable by any Group Company, but only to the extent not already deducted in arriving at the amount referred to in clause (i)(A) above, (x) all appropriate amounts that must be set aside as a reserve in accordance with GAAP against any liabilities associated with such Asset Disposition, Casualty or Condemnation, (y) if applicable, the amount of any Debt secured by a Permitted Lien that has been repaid or refinanced in accordance with its terms with the proceeds of such Asset Disposition, Casualty or Condemnation; and (z) any payments to be made by any Group Company as agreed between such Group Company and the purchaser of any assets subject to an Asset Disposition, Casualty or Condemnation in connection therewith; and

(ii)     with respect to any Equity Issuance or Debt Issuance, the gross amount of cash proceeds paid to or received by any Group Company in respect of such Equity Issuance or Debt Issuance as the case may be (including cash proceeds subsequently as and when received at any time in respect of such Equity Issuance or Debt Issuance from non-cash consideration initially received or otherwise), net of underwriting discounts and commissions or placement fees, investment banking fees, legal fees, consulting fees, accounting fees and other customary fees and expenses incurred by any Group Company in connection therewith (other than those payable to any Group Company or to any Affiliate of any Group Company).

"Non-Consenting Lender" has the meaning set forth in Section 2.10(b).

"Non-U.S. Lender" has the meaning set forth in Section 3.01(d).

"Note" means a promissory note, substantially in the form of Exhibit B hereto, evidencing the obligation of the Borrower to repay outstanding Term Loans, as such note may be amended, modified or supplemented from time to time.

"Notice of Borrowing" means a request by the Borrower for a Borrowing, substantially in the form of Exhibit A-1 hereto.

"Notice of Extension/Conversion" has the meaning set forth in Section 2.07(b).

"O'Melveny" means O'Melveny & Meyers LLP.

"Operating Lease" means, as applied to any Person, a lease (including leases which may be terminated by the lessee at any time) of any property (whether real, personal or mixed) by such Person as lessee which is not a Capital Lease.

"Orders" means, collectively, the Interim Order and the Final Order.

"Other Loan Parties" means, with respect to any Guarantor, any and all of the Loan Parties other than such Guarantor.

"Other Taxes" has the meaning set forth in Section 3.01(b).

"Participant Register" has the meaning set forth in Section 10.06(e).

"Patent" means any of the following:  (i) all letters patent and design letters patent of the United States or any other country; (ii) all applications filed or in preparation for filing for letters patent and design letters patent of the United States or any other country including, without limitation, applications in the United States Patent and Trademark Office, with the World Intellectual Property Organization or in any similar office or agency of the United States or any other country or political subdivision thereof; (iii) all reissues, divisions, continuations, continuations-in-part, revisions, renewals or extensions thereof; (iv) all claims for, and rights to sue for, past, present or future infringement of any of the foregoing; (v) all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing, including, without limitation, damages and payments for past, present or future infringements thereof and payments and damages under all Patent Licenses in connection therewith; and (vi) all rights corresponding to any of the foregoing whether arising under the laws of the United States or any foreign country or otherwise.

"Patent License" means any agreement now or hereafter in existence granting to any Loan Party any right, whether exclusive or non-exclusive, with respect to any Person's patent or any invention now or hereafter in existence, whether or not patentable, or pursuant to which any Loan Party has granted to any other Person, any right, whether exclusive or non-exclusive, with respect to any Patent or any invention now or hereafter in existence, whether or not patentable and whether or not a Patent or application for Patent is in or hereafter comes into existence on such invention.

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any entity succeeding to any or all of its functions under ERISA.

"Permit" means any license, permit, franchise, right or privilege, certificate of authority or order, or any waiver of the foregoing, issued or issuable by any Governmental Authority.

"Permitted Existing Liens" means existing liens incurred pursuant to clauses (i)-(iii), (v)-(x), (xv)-(xxi), (xxiii), (xxiv) and (xxvi) of Section 7.02 of the First Lien Credit Agreement, solely to the extent that such existing liens have been incurred and are valid, perfected, enforceable and unavoidable liens as of the Petition Date.

"Permitted Joint Venture" means the Qubica JV Entity and any other joint venture, in the form of a corporation, limited liability company, business trust, joint venture, association, company or partnership, entered into by the Borrower or any of its Subsidiaries which (i) is engaged in a line of business related, ancillary or complementary to those engaged in by the Borrower and its Subsidiaries and (ii) is formed or organized in a manner that limits the exposure of the Borrower and its Subsidiaries for the liabilities thereof to the Investments of the Borrower and its Subsidiaries therein permitted under Section 7.06(a)(i).

"Permitted Liens" has the meaning set forth in Section 7.02.

"Permitted Variances" means (i) all favorable variances, (ii) an unfavorable variance of (a) no more than 20% with respect to the first two weeks after the Closing Date (the "First Testing Period"), (b) no more than 15% with respect to first three weeks after the Closing Date (the "Second Testing Period"), and (c) no more than 12.5% with respect to the first four weeks after the Closing Date and on a rolling basis with respect to each subsequent four-week period (each such period, with the First Testing Period and the Second Testing Period, the "Testing Periods"); provided, however, that expenditures related to accrued and unpaid fees, disbursements, costs and expenses incurred by the Professionals shall not be subject to the Budget and shall be excluded from the calculation of Permitted Variance.

"Person" means an individual, a corporation, a partnership, an association, a limited liability company, a trust or an unincorporated association or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Petition Date" has the meaning set forth in the recitals.

"Plan" means of a plan of reorganization under Chapter 11 of the Bankruptcy Code of the Loan Parties (including all related schedules, supplements, exhibits and orders, as applicable), which shall otherwise be in form and substance satisfactory to the Required DIP Lenders.

"Plan Confirmation Order" means an order of the Bankruptcy Court confirming the Plan.

"Post-Carve-Out Trigger Notice Cap" has the meaning set forth in clause (iv) of the definition of "Carve-Out".

"Pre-Commitment Information" means, taken as an entirety, any written information in respect of the Borrower, the Qubica JV Entity, any Subsidiary of the Borrower, Kingpin or Holdings provided to any Agent or any DIP Lender by or on behalf of the Sponsor or the Borrower prior to the Closing Date.

"Preferred Stock" means, as applied to the Equity Interests of a Person, Equity Interests of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over the Equity Interests of any other class of such Person.

"Prime Rate" means for any day the rate of interest announced by Credit Suisse AG, Cayman Islands Branch, in New York City (or such other principal office of the DIP Agent as communicated in writing to the Borrower and the DIP Lenders) from time to time as its Prime Rate for Dollars loaned in the United States.  It is a rate set by Credit Suisse AG, Cayman Islands Branch, based upon a variety of factors, including Credit Suisse AG, Cayman Islands Branch's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such announced rate.  Any change in the interest rate resulting from a change in the Prime Rate shall take effect at the opening of business on the day specified in the announcement of such change.

"Professionals" has the meaning set forth in clause (iii) of the definition of "Carve-Out".

"Pro-Forma Basis" means, for purposes of calculating compliance of any transaction with any provision hereof, that the transaction in question shall be deemed to have occurred as of the first day of the most recent period of four consecutive fiscal quarters of the Borrower which precedes or ends on the date of such transaction and with respect to which the DIP Agent has received the financial information for Kingpin and its Consolidated Subsidiaries required under Section 6.01(a) and (b), as applicable, and the Compliance Certificate required by Section 6.01(c) for such period.  As used in this definition, "transaction" means any incurrence or assumption by a Group Company of Attributable Debt in respect of a Sale/Leaseback Transaction (other than the iStar Sale/Leaseback) under Section 7.13.  In connection with any calculation of an applicable financial covenant upon giving effect to a transaction on a "Pro-Forma Basis", (i) any Debt incurred by the Borrower or any of its Subsidiaries in connection with such transaction (or any other transaction which occurred during the relevant four fiscal quarter period) shall be deemed to have been incurred as of the first day of the relevant four fiscal-quarter period, (ii) if such Debt has a floating or formula rate, then the rate of interest for such Debt for the applicable period for purposes of the calculations contemplated by this definition shall be determined by utilizing the rate which is or would be in effect with respect to such Debt as at the relevant date of such calculations, (iii) income statement items (whether positive or negative) and Capital Expenditures attributable to all property acquired or disposed of in such transaction or to the Investment comprising such transaction, as applicable, shall be included or excluded as if such transaction has occurred as of the first day of the relevant four-fiscal-quarter period, (iv) such other pro-forma adjustments which would be permitted or required by Regulation S-X or S-K under the Securities Act shall be taken into account and (v) such other adjustments as may be reasonably agreed between the Borrower and the DIP Agent shall be taken into account.

"Purchase Money Debt" means Debt of the Borrower or any of its Subsidiaries incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property used in the business of the Borrower or such Subsidiary; provided that such Debt is incurred within one-hundred twenty (120) calendar days after such property is acquired or, in the case of improvements, constructed.

"Qualifying Equity Issuance" means the issuance by Holdings for cash of its common Equity Interests to the Sponsor Group or any other Person  if: (A) 100% of the proceeds of such issuance shall be immediately contributed by Holdings to Kingpin (for further contribution to the Borrower); (B) after giving effect thereto, no Change of Control shall have occurred; (C) such stock shall be issued in a private placement exempt from registration under the Securities Act; (D) the proceeds thereof shall be used only to repay the DIP Obligations under the DIP Facility immediately, and in any event the proceeds thereof shall not be used to repay any Subordinated Debt or make any Restricted Payment; (E) within five Business Days after such issuance, the Borrower shall have delivered to the DIP Agent a certificate of the chief financial officer or chief accounting officer of the Borrower attesting to the satisfaction of the foregoing conditions, describing the uses of the proceeds of such issuance and attesting that such use shall

not constitute a Default or an Event of Default; and (F) such proceeds shall be used within thirty (30) calendar days after such issuance as described in such certificate.

"Qubica JV Entity" means QubicaAMF Worldwide, S.à.r.l., a *société à responsabilité limitée* organized under the laws of Luxembourg and which is not a Subsidiary of the Borrower, and its successors.

"Real Property" means, with respect to any Person, all of the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"Receivables" means all Accounts, all Payment Intangibles, all Instruments, all Chattel Paper, all Electronic Chattel Paper, all Letter-of-Credit Rights and all Supporting Obligations supporting or otherwise relating to any of the foregoing.

"Recipient" means (a) any Agent, (b) any DIP Lender and (c) the Issuing Lender, including in each case their successors and permitted assigns as provided for in this Agreement, as applicable.

"Register" has the meaning set forth in Section 10.06(d).

"Regulation D, T, U or X" means Regulation D, T, U or X, respectively, of the Board of Governors of the Federal Reserve System as amended, or any successor regulation.

"Regulation S-X" means Regulation S-X under the Securities Act, as amended, or any successor regulation.

"Reinvestment Funds" means, with respect to any Insurance Proceeds or any Condemnation Award, that portion of such funds as shall, according to a certificate of a Responsible Officer of the Borrower delivered to the DIP Agent within 30 calendar days after an executive officer of the Borrower becoming aware of the occurrence of the Casualty or Condemnation giving rise thereto, be reinvested or contractually committed to be reinvested within 180 calendar days after the date of receipt of such Insurance Proceeds or Condemnation Award in the repair, restoration or replacement of the properties that were the subject of such Casualty or Condemnation or in other tangible assets of a like nature used or useful in the ordinary course of business of the Borrower an its Subsidiaries; provided that (i) the aggregate amount of such proceeds with respect to any such event or series of related events shall not exceed $5,000,000 without the prior written consent of the Required DIP Lenders, (ii) such certificate shall be accompanied by evidence reasonably satisfactory to the DIP Agent that any property subject to such Casualty or Condemnation has been or will be repaired, restored or replaced to, or better than, its condition immediately prior to such Casualty or Condemnation or that such Insurance Proceeds or Condemnation Awards have otherwise been or will be reinvested in tangible assets of a like nature used or useful in the ordinary course of business of the Borrower and its Subsidiaries, (iii) at the request of the DIP Agent, pending such reinvestment in the case of Insurance Proceeds or Condemnation Awards in excess of $1,000,000, the entire amount of such proceeds shall be deposited in an account with respect to which an Account Control Agreement (as defined in the Security Agreement) is in full force and effect and (iv) from and after the date of delivery of such certificate, the Borrower or one or more of its Subsidiaries shall diligently proceed, in a commercially reasonable manner, to complete the repair, restoration or replacement of the properties that were the subject of such Casualty or Condemnation or otherwise reinvest such Insurance Proceeds or Condemnation Awards as described in such certificate; and provided, further, if any of the foregoing conditions shall cease to be satisfied at any time, such funds shall no longer be deemed Reinvestment Funds and such funds shall immediately be applied to prepayment of the Loans in accordance with Section 2.09(b); and provided, further, that any funds not so

reinvested within such 180 day calendar period shall immediately be applied to the payment of the Loans in accordance with Section 2.09(b).

"Released Parties" means the Indemnitees, the First Lien Agent, the First Lien Lenders, the affiliates, assigns, or successors of each of the foregoing, and each of their respective officers, directors, controlling persons, employees, agents and attorneys.

"Replacement Date" has the meaning set forth in Section 2.10(b).

"Replacement Lender" has the meaning set forth in Section 2.10(b).

"Required DIP Lenders" means DIP Lenders whose aggregate Credit Exposure (as hereinafter defined) constitutes more than 50% of the Credit Exposure of all DIP Lenders at such time; provided, however, that if any DIP Lender shall be a Defaulting Lender at such time then there shall be excluded from the determination of Required DIP Lenders such DIP Lender and the aggregate principal amount of Credit Exposure of such DIP Lender at such time. For purposes of the preceding sentence, the term "Credit Exposure" as applied to each DIP Lender shall mean, (i) at any time prior to the termination of the Term Loan Commitment, (x) the aggregate amount of the outstanding Term Loans of such DIP Lender plus (y) the undrawn portion of the Term Loan Committed Amount allocable to such DIP Lender in accordance with its Term Loan Commitment Percentage, and (ii) at any time after the termination of the Term Loan Commitment, the aggregate amount of the outstanding Term Loans of such DIP Lender.

"Responsible Officer" means the chief executive officer, president, senior vice president, vice president, chief financial officer, treasurer or assistant treasurer, secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means (i) any dividend or other distribution, direct or indirect, on account of any class of Equity Interests or Equity Equivalents of any Group Company or the Qubica JV Entity, now or hereafter outstanding, (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any class of Equity Interests or Equity Equivalents of any Group Company, now or hereafter outstanding and (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire any class of Equity Interests or Equity Equivalents of any Group Company, now or hereafter outstanding.

"S&P" means Standard & Poor's Ratings Group, a division of McGraw Hill, Inc., a New York corporation, and its successors or, absent any such successor, such nationally recognized statistical rating organization as the Borrower and the DIP Agent may select.

"Sale/Leaseback Transaction" means any direct or indirect arrangement with any Person or to which any such Person is a party providing for the leasing to Holdings or any of its Subsidiaries of any property, whether owned by Holdings or any of its Subsidiaries as of the Closing Date or later acquired, which has been or is to be sold or transferred by Holdings or any of its Subsidiaries to such Person or to any other Person from whom funds have been, or are to be, advanced by such Person on the security of such property.

"Scheduled Maturity Date" means June 30, 2013, which date may be extended upon the Borrower's request with consent of the Required DIP Lenders.

"Second Lien Adequate Protection Liens" means replacement Liens to the extent of (subject to the terms of the Intercreditor Agreement) any post-petition diminution in value of the Second Lien Lenders' interest in the Second Lien Prepetition Collateral, including replacement Liens on all unencumbered assets of the Loan Parties, which Liens shall be junior to the Liens of the DIP Lenders, the Permitted Existing Liens, the Carve-Out and the First Lien Adequate Protection Liens.

"Second Lien Ad-Hoc Group" has the meaning set forth in clause (b) of the definition of "Adequate Protection Provisions."

"Second Lien Agent" means Gleacher Products Corp. (as successor to Credit Suisse, Cayman Islands Branch), in its capacity as Administrative Agent for the secured creditors under the Second Lien Loan Documents.

"Second Lien Collateral Documents" means the pledge agreements, security agreements, mortgages and other agreements and instruments securing the obligations of the Loan Parties under and pursuant to the Second Lien Credit Agreement and any related guaranties.

"Second Lien Credit Agreement" means the Second Lien Credit Agreement dated as of dated as of June 12, 2007 (as amended by Amendment No. 1 to Second Lien Credit Agreement, dated as of May 8, 2009) among Kingpin, the Borrower, the Second Lien Agent and various lenders from time to time party thereto.

"Second Lien Credit Agreement Liens" has the meaning set forth in the definition of "DIP Liens".

"Second Lien Lenders" means the lenders party to the Second Lien Credit Agreement.

"Second Lien Loan Documents" mean the Second Lien Credit Agreement, the related notes and guarantees, the Second Lien Collateral Documents and the other agreements and instruments entered into in connection with the Second Lien Credit Agreement.

"Second Lien Obligations" means the "Obligations" as defined in the Second Lien Credit Agreement.

"Second Lien Prepetition Collateral" means the "Collateral" as defined in the Second Lien Credit Agreement securing the Second Lien Obligations.

"Second Lien Superpriority Claims" means superpriority administrative expense claims with respect to the Second Lien Prepetition Collateral and to the extent of any post-petition diminution in value of the Second Lien Lenders' interest in the Second Lien Prepetition Collateral, which claims will be junior to the DIP Obligations, the Superpriority DIP Claims, the Carve-Out and the First Lien Superpriority Claims.

"Second Testing Period" has the meaning set forth in the definition of "Permitted Variances".

"Secured Cash Management Agreement" means any Cash Management Agreement that is entered into by and between the Borrower and any Cash Management Bank.

"Secured Parties" means, collectively, the DIP Lenders, the Cash Management Banks and the other Persons the DIP Obligations owing to which are or are purported to be secured by the Collateral under this Agreement and the Collateral Documents.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlements" means all right, title and interest of a Loan Party in, to and under any settlement agreement or other agreement executed in settlement or compromise of any Claim, including all rights to enforce such agreements and all payments thereunder or arising in connection therewith.

"Software" means all "software" (as defined in the UCC), and also means and includes all software programs, whether now or hereafter owned, licensed or leased by a Loan Party, designed for use on Computer Hardware, including, without limitation, all operating system software, utilities and application programs in whatever form and whether or not embedded in goods, all source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever, all firmware associated with any of the foregoing, all documentation, flowcharts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes associated with any of the foregoing, and all options, warranties, services contracts, program services, test rights, maintenance rights, support rights, renewal rights and indemnifications relating to any of the foregoing.

"Software License" means any agreement (including any agreement constituting a Copyright License, Patent License and/or Trademark License) now or hereafter in existence granting to any Loan Party any right, whether exclusive or non-exclusive, to use another Person's Software, or pursuant to which any Loan Party has granted any other Person, any right, whether exclusive or non-exclusive, to use any Software, whether or not subject to any registration.

"SPC" has the meaning set forth in Section 10.06(h).

"Specified Events" has the meaning set forth in the definition of "Material Adverse Effect".

"Sponsor" means Code Hennessy & Simmons LLC and Code Hennessy & Simmons IV, LP, collectively, and their respective successors.

"Sponsor Group" means the Sponsor and any of its Subsidiaries or Affiliates.

"Stroock" means Stroock & Stroock & Lavan LLP.

"Subordinated Debt" means the First Lien Obligations and Debt permitted pursuant to Section 7.01(ii).

"Subsidiary" means with respect to any Person any corporation, partnership, limited liability company, association or other business entity of which (i) if a corporation, more than 50% of the total voting power of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability company, association or business entity other than a corporation, more than 50% of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have more than 50% ownership interest in a

partnership, limited liability company, association or other business entity if such Person or Persons shall be allocated more than 50% of partnership, association or other business entity gains or losses or shall be or control the managing director, manager or a general partner of such partnership, association or other business entity.

"Subsidiary Guarantor" means each Subsidiary of Holdings existing on the Closing Date (other than the Borrower, any Foreign Subsidiary, a non-Wholly-Owned Liquor License Subsidiary and any Insignificant Subsidiary) and each Subsidiary of Holdings (other than the Borrower, a Foreign Subsidiary, and except to the extent otherwise provided in Section 6.10(d), any Insignificant Subsidiary or a non-Wholly-Owned Liquor License Subsidiary) that becomes a party to this Agreement after the Closing Date (by execution of an Accession Agreement or otherwise), and "Subsidiary Guarantors" means any two or more of them.

"Superpriority DIP Claims" means all of the claims of the DIP Agent and the DIP Lenders on account of the DIP Obligations, which claims shall be entitled to the benefits of Section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind that are specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out.

"Supporting Obligation" means a Letter-of-Credit Right, Guaranty Obligation or other secondary obligation supporting or any Lien securing the payment or performance of one or more Receivables, General Intangibles, Documents or Investment Property.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (i) a so-called synthetic, off-balance sheet or tax retention lease or (ii) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such person (without regard to accounting treatment).

"Term Loan Commitment" means, with respect to any DIP Lender, the commitment of such DIP Lender to make Term Loans in a principal amount equal to such DIP Lender's Term Loan Commitment Percentage of the Term Loan Committed Amount.

"Term Loan Commitment Percentage" means, for each DIP Lender, the percentage identified as its Term Loan Commitment Percentage on Schedule 1.01A, as such percentage may be (i) adjusted pursuant to Section 2.10(b) and (ii) modified in connection with any assignment made in accordance with the provisions of Section 10.06(b).

"Term Loan Committed Amount" means $50,000,000.

"Term Loan" has the meaning set forth under Section 2.01.

"Testing Periods" has the meaning set forth in the definition of "Permitted Variances".

"Trademark" means any of the following: (i) all trademarks, trade names, corporate names, company names, business names, domain names, fictitious business names, trade styles, service marks, slogans, logos, certification marks, collective marks, brand names, trade dress and any other advertising device or source identifier which are or have been used in the United States or in any state, territory or possession thereof, or in any other place, nation or jurisdiction, along with all prints and labels on which any of the foregoing have appeared or appear, package and other designs, and any other source or business identifiers, and general intangibles of like nature, and the rights in any of the foregoing which

arise under applicable law; (ii) the goodwill of the business symbolized thereby or associated with each of the foregoing; (iii) all registrations and applications in connection therewith, including, without limitation, registrations and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof, (iv) all reissues, extensions and renewals thereof; (v) all claims for, and rights to sue for, past, present or future infringements of any of the foregoing; (vi) all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing, including, without limitation, damages and payments for past, present or future infringements thereof and payments and damages under all Trademark Licenses in connection therewith; and (vii) all rights corresponding to any of the foregoing whether arising under the laws of the United States or any foreign country or otherwise; provided, that "Trademark" does not include any "intent to use" Trademark applications for which a statement of use has not been filed and accepted with the U.S. Patent and Trademark Office.

"Trademark License" means any agreement now or hereafter in existence granting to any Loan Party any right, whether exclusive or non-exclusive, to use another Person's trademarks or trademark applications, or pursuant to which any Loan Party has granted to any other Person, any right, whether exclusive or non-exclusive, to use any Trademark, whether or not registered, and the rights to prepare for sale, sell and advertise for sale, all of the inventory now or hereafter owned by any Loan Party and now or hereafter covered by such license agreements.

"Transaction" means (a) the execution, delivery and performance by the Loan Parties of this Agreement and each other DIP Loan Document to which they are a party, the Borrowing of the Term Loans on the Closing Date, the use of the proceeds thereof and the issuance of Letters of Credit hereunder, and the grant of Liens by the Loan Parties on the Collateral pursuant to this Agreement, the Orders and the Collateral Documents, (b) the execution, delivery and performance by Holdings of this Agreement and each of the other DIP Loan Documents to which it is a party, the guaranteeing of the DIP Obligations by Holdings and the grant of Liens by Holdings on the Collateral pursuant to this Agreement, the Orders and the Collateral Documents, (c) the commencement and filing of the Chapter 11 Cases and (d) the payment of all fees, costs and expenses associated with all of the foregoing.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of the security interests of the Collateral Agent in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"UK Pension Plan" means the Foreign Pension Plan referenced on Schedule 5.11.

"Unfunded Liabilities" means (i) with respect to each ERISA Plan other than a Multiemployer Plan, the amount (if any) by which the present value of all nonforfeitable benefits under each ERISA Plan exceeds the current value of such ERISA Plan's assets allocable to such benefits, all determined in accordance with the respective most recent valuations for such ERISA Plan using applicable PBGC plan termination actuarial assumptions (the terms "present value" and "current value" shall have the same meanings specified in Section 3 of ERISA) and (ii) with respect to each Foreign Pension Plan required to be funded under local law, the amount (if any) by which the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan exceeds the current value of the assets of such Foreign Pension Plan's assets allocable to such benefits, all determined as of the end of the Borrower's most recently ended fiscal year on the basis of actuarial assumptions utilized by the Foreign Pension Plan, each of which is reasonable.

"United States" means the United States of America, including each of the States and the District of Columbia, but excluding its territories and possessions.

"Unused Line Fee" has the meaning set forth in Section 2.11(b).

"U.S. Lender" has the meaning set forth in Section 3.01(d)(ii).

"U.S. Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same may be amended, supplemented, modified, replaced or otherwise in effect from time to time.

"Variance Report" has the meaning set forth in Section 6.01(m).

"Weekly Cash Flow Forecast" means an updated 13 week cash flow forecast, in each case in form and substance satisfactory to the DIP Agent at the direction of the Required DIP Lenders.

"Welfare Plan" means a "welfare plan" as such term is defined in Section 3(1) of ERISA.

"Wholly-Owned Consolidated Subsidiary" means, with respect to any Person at any date, a Wholly-Owned Subsidiary of such Person which is a Consolidated Subsidiary of such Person at such date.

"Wholly-Owned Subsidiary" means, with respect to any Person at any date, any Subsidiary of such Person all of the shares of capital stock or other ownership interests of which (except directors' qualifying shares and/or other nominal shares required by applicable Law to be owned by another Person) are at the time directly or indirectly owned by such Person.

**Section 1.02    Computation of Time Periods and Other Definitional Provisions.** For purposes of computation of periods of time hereunder, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". All references to time herein shall be references to Eastern Standard time or Eastern Daylight time, as the case may be, unless specified otherwise. References in this Agreement to Articles, Sections, Schedules, Appendices or Exhibits shall be to Articles, Sections, Schedules, Appendices or Exhibits of or to this Agreement unless otherwise specifically provided. The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.

**Section 1.03    Accounting Terms and Determinations.** Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the DIP Lenders hereunder shall be prepared, in accordance with GAAP applied on a consistent basis (but excluding the effect of ASC 840 and any recharacterization of the iStar Master Agreements as capital leases). All financial statements delivered to the DIP Lenders hereunder shall be accompanied by a statement from the Borrower that GAAP has not changed since the most recent financial statements delivered by the Borrower to the DIP Lenders or if GAAP has changed describing such changes in detail and explaining how such changes affect the financial statements. All calculations made for the purposes of determining compliance with this Agreement shall (except as otherwise expressly provided herein) be made by application of GAAP applied on a basis consistent with the most recent annual or quarterly financial statements delivered pursuant to Section 6.01 (or, prior to the delivery of the first financial statements pursuant to Section 6.01, consistent with the financial statements described in Section 5.05(a) (but without giving effect to any deviations from GAAP disclosed therein)); provided, however, if (i) the Borrower shall object to

37

determining such compliance on such basis at the time of delivery of such financial statements due to any change in GAAP or the rules promulgated with respect thereto or (ii) either the DIP Agent or the Required DIP Lenders shall so object in writing within sixty (60) calendar days after delivery of such financial statements (or after the DIP Lenders have been informed of the change in GAAP affecting such financial statements, if later), then such calculations shall be made on a basis consistent with the most recent financial statements delivered by the Borrower to the DIP Lenders as to which no such objection shall have been made.  Any financial ratios required to be maintained by any Group Company pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).  For purposes of making all financial calculations to determine compliance for any period with Section 7.16, all components of such calculations shall be adjusted to include or exclude, as the case may be, without duplication, such components of such calculations attributable to any business or assets that have been acquired by Holdings or any of its Subsidiaries or that have been sold pursuant to any Asset Disposition (including any Foreign Asset Disposition) after the first day of the applicable period of determination and prior to the end of such period, in each case as determined in good faith by the Borrower on a Pro-Forma Basis.

Section 1.04    **UCC Definitions**.    Unless otherwise defined herein or the context otherwise requires, the following terms, together with any uncapitalized terms used herein which are defined in the UCC, have the respective meanings provided in the UCC: (i) As-Extracted Collateral; (ii) Certificated Security; (iii) Chattel Paper; (iv) Documents; (v) Electronic Chattel Paper; (vi) Financial Assets; (vii) Goods, (viii) Instruments; (ix) Inventory; (x) Investment Property; (xi) Payment Intangibles; (xii) Proceeds; (xiii) Securities Account; (xiv) Securities Intermediary; (xv) Security; (xvi) Security Certificate; (xvii) Security Entitlements; and (xviii) Uncertificated Security.

## ARTICLE II
## THE CREDIT FACILITIES

Section 2.01    **Commitments to Lend.**    Each DIP Lender severally agrees, on the terms and conditions set forth in this Agreement, to make (i) an initial term loan on the Closing Date and (ii) following entry of the Final Order, up to three additional term loans on any Business Day during the Availability Period, in each case to the Borrower in Dollars in an aggregate principal amount not to exceed its Term Loan Commitment (each a "Term Loan" and collectively the "Term Loans").  Each Borrowing shall be made from the several DIP Lenders ratably in proportion to their respective Term Loan Commitments.  The initial Term Loan made on the Closing Date shall be in an aggregate principal amount of $35,000,000, and each additional Term Loan shall be in an aggregate principal amount of not less than $5,000,000.  The Term Loan Commitments are not revolving in nature, and amounts repaid or prepaid may not be reborrowed.

Section 2.02    **Notice of Borrowings.**    The Borrower shall give the DIP Agent a Notice of Borrowing (or telephone notice promptly confirmed by a Notice of Borrowing) not later than 12:00 Noon on the fifth Business Day before each Borrowing (other than with respect to the Borrowing on the Closing Date).  Each such Notice of Borrowing shall be irrevocable and shall specify:

(i)       the date of such Borrowing, which shall be a Business Day;

(ii)      the aggregate principal amount of such Borrowing; and

(iii)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.03.

### Section 2.03    Notice to Lenders; Funding of Loans.

(a)    *Notice to Lenders*.  Upon receipt of a Notice of Borrowing, the DIP Agent shall promptly notify each DIP Lender of such DIP Lender's ratable share of the Borrowing referred to therein, and such Notice of Borrowing shall not thereafter be revocable by the Borrower (except to the extent the DIP Agent shall notify the Borrower that Loans at the Eurodollar Rate are unavailable in accordance with Section 3.02).

(b)    *Funding of Loans*.  On the date of each Borrowing, each DIP Lender shall make available its share of such Borrowing no later than 3:00 P.M., in immediately available funds in Dollars, to the DIP Agent at the Administrative Office.  Unless the DIP Agent determines that any applicable condition specified in Article IV has not been satisfied, the DIP Agent shall promptly credit the amounts so received to the general deposit account of the Borrower designated by the Borrower in the applicable Notice of Borrowing, which account must be in the United States or, if a Borrowing shall not occur on such date because any condition precedent herein shall not have been met, promptly return the amounts received from the DIP Lenders in like funds.

(c)    *Funding by DIP Agent in Anticipation of Amounts Due from the Lenders*.  Unless the DIP Agent shall have received notice from a DIP Lender prior to the date of any Borrowing that such DIP Lender will not make available to the DIP Agent such DIP Lender's share of such Borrowing, the DIP Agent may assume that such DIP Lender has made such share available to the DIP Agent on the date of such Borrowing in accordance with subsection (b) of this Section, and the DIP Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If and to the extent that such DIP Lender shall not have so made such share available to the DIP Agent, such DIP Lender and the Borrower severally agree to repay to the DIP Agent forthwith on demand (in the case of such DIP Lender) or within two Business Days of notice from the DIP Agent, (in the case of the Borrower) such corresponding amount, together with interest thereon for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the DIP Agent at (i) a rate per annum equal to the higher of the Federal Funds Rate and the interest rate applicable thereto pursuant to Section 2.06, in the case of the Borrower, and (ii) the Federal Funds Rate, in the case of such DIP Lender.  If such DIP Lender shall repay to the DIP Agent such corresponding amount, such amount so repaid shall constitute such DIP Lender's Loan included in such Borrowing for purposes of this Agreement.

(d)    *Obligations of Lenders Several*.  The failure of any DIP Lender to make a Loan required to be made by it as part of any Borrowing hereunder shall not relieve any other DIP Lender of its obligation, if any, hereunder to make any Loan on the date of such Borrowing, but no DIP Lender shall be responsible for the failure of any other DIP Lender to make the Loan to be made by such other DIP Lender on such date of Borrowing.

(e)    *Failed Loans*.  If any DIP Lender shall fail to make any Loan (a "Failed Loan") which such DIP Lender is otherwise obligated hereunder to make to the Borrower on the date of Borrowing thereof, and the DIP Agent shall not have received notice from the Borrower or such DIP Lender that any condition precedent to the making of the Failed Loan has not been satisfied, then, until such DIP Lender shall have made or be deemed to have made (pursuant to the last sentence of this Section 2.03(e)) the Failed Loan in full or the DIP Agent shall have received notice from the Borrower or such DIP Lender that any condition precedent to the making of the Failed Loan was not satisfied at the time the Failed Loan was to have been made, whenever the DIP Agent shall receive any amount from the Borrower for the account of such DIP Lender, (i) the amount so received (up to the amount of such Failed Loan) will, upon receipt by the DIP Agent be deemed to have been paid to the DIP Lender in satisfaction of the obligation for which paid, without actual disbursement of such amount to the DIP Lender, (ii) the

DIP Lender will be deemed to have made the same amount available to the DIP Agent for disbursement as a Loan to the Borrower (up to the amount of such Failed Loan) and (iii) the DIP Agent will disburse such amount (up to the amount of the Failed Loan) to the Borrower or, if the DIP Agent has previously made such amount available to the Borrower on behalf of such DIP Lender pursuant to the provisions hereof, reimburse itself (up to the amount of the amount made available to the Borrower); provided, however, that the DIP Agent shall have no obligation to disburse any such amount to the Borrower or otherwise apply it or deem it applied as provided herein unless the DIP Agent shall have determined in its sole discretion that to so disburse such amount will not violate any law, rule, regulation or requirement applicable to it.  Upon any such disbursement by the DIP Agent such DIP Lender shall be deemed to have made a Term Loan to the Borrower in satisfaction, to the extent thereof, of such DIP Lender's obligation to make the Failed Loan.

## Section 2.04      Evidence of Loans.

(a)      *Lender Accounts*.  Each DIP Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness to such DIP Lender resulting from each Loan made by such DIP Lender from time to time, including the amounts of principal and interest payable and paid to such DIP Lender from time to time under this Agreement.

(b)      *DIP Agent Records*.  The DIP Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each DIP Lender hereunder and (iii) the amount of any sum received by the DIP Agent hereunder from the Borrower and each DIP Lender's share thereof.

(c)      *Evidence of Debt*.   The entries made in the accounts maintained pursuant to subsections (a) and (b) of this Section 2.04 shall be prima facie evidence of the existence and amounts of the obligations therein recorded; provided, however, that the failure of any DIP Lender or the DIP Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans made to it in accordance with their terms.

(d)      *Notes*.   Notwithstanding any other provision of this Agreement, if any DIP Lender shall request and receive a Note or Notes as provided in Section 10.06 or otherwise, then the Loans of such DIP Lender shall be evidenced by one or more Notes, in each case, substantially in the form of Exhibit B, payable to the order of such DIP Lender for the account of its Applicable Lending Office in an amount equal to the aggregate unpaid principal amount of such DIP Lender's Term Loans, as applicable.

(e)      *Note Endorsements*.  Each DIP Lender having one or more Notes issued by the Borrower shall record the date and amount of each Term Loan made by it to the Borrower evidenced by such Note and the date and amount of each payment of principal made by the Borrower with respect thereto, and may, if such DIP Lender so elects in connection with any transfer or enforcement of any Note, endorse on the reverse side or on the schedule, if any, forming a part thereof appropriate notations to evidence the foregoing information with respect to each outstanding Loan evidenced thereby; provided that the failure of any DIP Lender to make any such recordation or endorsement shall not affect the obligations of the Borrower hereunder or under any such Note.  Each DIP Lender is hereby irrevocably authorized by the Borrower so to endorse each of its Notes and to attach to and make a part of each of its Notes a continuation of any such schedule as and when required.

### Section 2.05    Letters of Credit.

(a)    *Issuance of Letters of Credit*.  On the Closing Date, each Existing Letter of Credit shall be automatically and without further action by the parties thereto be deemed to be a Letter of Credit issued pursuant to this Section 2.05(a) for the account of Borrower and subject to the provisions hereof, and the fees specified in Section 2.11(c) shall be payable (in substitution for any fees set forth in the applicable letter of credit reimbursement agreements or applications relating to such Existing Letters of Credit) as if such Existing Letters of Credit had been issued pursuant to this Agreement on the Closing Date.  All cash held by the First Lien Agent as cash collateral for Existing Letters of Credit as of the Closing Date shall be transferred to the Issuing Lender to be held by the Issuing Lender in accordance with Section 2.05(t) to Cash Collateralize the LC Obligations.

(b)    *Additional Letters of Credit*.  No Letters of Credit shall be issued other than those described in clause (a) above.

(c)    [*Reserved*].

(d)    [*Reserved*].

(e)    [*Reserved*].

(f)    [*Reserved*].

(g)    *Drawings Under Letters of Credit*.  Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the Issuing Lender shall determine in accordance with the terms of such Letter of Credit whether such drawing should be honored.  If the Issuing Lender determines that any such drawing shall be honored, such Issuing Lender shall make available to such beneficiary in accordance with the terms of such Letter of Credit the amount of the drawing and shall notify the Borrower and the DIP Agent as to the amount to be paid as a result of such drawing and the payment date.

(h)    *Duties of Issuing Lender to DIP Lenders*; *Reliance*.  Any action taken or omitted to be taken by the Issuing Lender under or in connection with any Letter of Credit shall not create for the Issuing Lender any resulting liability if taken or omitted in the absence of bad faith, gross negligence or willful misconduct.  The Issuing Lender shall be entitled (but not obligated) to rely, and shall be fully protected in relying, on the representation and warranty by the Borrower set forth in the last sentence of Section 4.02 to establish whether the conditions specified in paragraphs (b) and (c) of Section 4.02 are met in connection with any issuance of a Letter of Credit.  The Issuing Lender shall be entitled to rely, and shall be fully protected in relying, upon advice and statements of legal counsel, independent accountants and other experts selected by the Issuing Lender and upon any Letter of Credit, draft, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopier, telex or teletype message, statement, order or other document believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary unless the beneficiary and the Borrower shall have notified such Issuing Lender that such documents do not comply with the terms and conditions of the Letters of Credit.

(i)    *Reimbursement Obligations*.  To the extent the amounts delivered to the Issuing Lender to Cash Collateralize the LC Obligations pursuant to Sections 2.05(a) and 2.05(t), together with any investment earnings thereon, are insufficient to repay any drawing under any Letter of Credit, together with any and all reasonable charges and expenses which the Issuing Lender may pay or incur

relative to such drawing which are due and payable hereunder, the Borrower shall be irrevocably and unconditionally obligated forthwith to reimburse the Issuing Lender in Dollars for the amount of such deficiency.  Such reimbursement payment shall be due and payable (i) at or before 2:00 P.M. (New York time or the relevant local time, as applicable) on the third Business Day after the date the Issuing Lender notifies the Borrower of such drawing; provided that no payment otherwise required by this sentence to be made by the Borrower at or before 2:00 P.M. (New York time or the relevant local time, as applicable) on any day shall be overdue hereunder if arrangements for such payment satisfactory to the applicable Issuing Lender, in its reasonable discretion, shall have been made by the Borrower at or before 2:00 P.M. (New York time or the relevant local time, as applicable) on such day and such payment is actually made at or before 3:00 P.M. (New York time or the relevant local time, as applicable) on such day.  If the Borrower fails to make any reimbursement when due hereunder, then the DIP Agent shall promptly notify the Issuing Lender and each other DIP Lender of the LC Disbursement, the amount thereof and the payment then due from the Borrower in respect thereof.  In addition to the foregoing, the Borrower agrees to pay to the Issuing Lender interest, payable on demand, on any and all amounts not paid by the Borrower to the Issuing Lender when due under this Section 2.05(i), for each day from and including the date when such amount becomes due to but excluding the date such amount is paid in full, whether before or after judgment, at a rate per annum equal to 2.00% plus the rate applicable to Term Loans for such day.  Each reimbursement payment to be made by the Borrower pursuant to this Section 2.05(i) shall be made to the Issuing Lender in Federal or other funds immediately available to it at its address referred to in Section 10.01.

(j)        [*Reserved*].

(k)        [*Reserved*].

(l)        [*Reserved*].

(m)        *Obligations in Respect of Letters of Credit Unconditional*.  The obligations of the Borrower under Section 2.05(i) above shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under all circumstances whatsoever, including, without limitation, the following circumstances:

(i)        any lack of validity or enforceability of this Agreement or any Letter of Credit or any document related hereto or thereto;

(ii)        any amendment or waiver of or any consent to departure from all or any of the provisions of this Agreement or any Letter of Credit or any document related hereto or thereto, in each case consented to by the Borrower;

(iii)        the use which may be made of the Letters of Credit by, or any acts or omission of, a beneficiary of a Letter of Credit (or any Person for whom the beneficiary may be acting);

(iv)        the existence of any claim, set-off, defense or other rights that the Borrower may have at any time against a beneficiary of a Letter of Credit (or any Person for whom the beneficiary may be acting), the Issuing Lender or any other Person, whether in connection with this Agreement or any Letter of Credit or any document related hereto or thereto or any unrelated transaction;

(v)    any statement or any other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect whatsoever;

(vi)    payment under a Letter of Credit against presentation to the Issuing Lender of a draft or certificate that does not comply with the terms of such Letter of Credit; provided that the Issuing Lender's determination that documents presented under such Letter of Credit comply with the terms thereof shall not have constituted gross negligence or willful misconduct of the Issuing Lender; or

(vii)    any other act or omission to act or delay of any kind by the Issuing Lender or any other Person or any other event or circumstance whatsoever that might, but for the provisions of this subsection (vii), constitute a legal or equitable discharge of the Borrower's obligations hereunder.

(n)    *Designation of Subsidiaries as Account Parties*.  Notwithstanding anything to the contrary set forth in this Agreement, a Letter of Credit issued hereunder may contain a statement to the effect that such Letter of Credit is issued for the account of a Subsidiary of the Borrower; provided that notwithstanding such statement, the Borrower shall be the actual account party for all purposes of this Agreement for such Letter of Credit and such statement shall not affect the Borrower's reimbursement obligations hereunder with respect to such Letter of Credit.

(o)    *Modification and Extension*.  The issuance of any supplement, restatement, modification, amendment, renewal, or extensions to any Letter of Credit shall, for purposes hereof, be treated in all respects the same as a Credit Extension hereunder.

(p)    *International Standby Practices*.  Unless otherwise expressly agreed by the Issuing Lender and the Borrower when a Letter of Credit is issued, the rules of the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance) (the "ISP") shall apply to each Letter of Credit.

(q)    [Reserved]

(r)    *Conflict with LC Documents*.  In the event of any conflict between this Agreement and any LC Document, this Agreement shall govern.

(s)    *Indemnification of Issuing Lender*.

(i)    In addition to its other obligations under this Agreement, the Borrower hereby agrees to protect, indemnify, pay and save the Issuing Lender harmless from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable attorneys' fees) that the Issuing Lender may incur or be subject to as a consequence, direct or indirect, of (A) the issuance of any Letter of Credit or (B) the failure of the Issuing Lender to honor a drawing under a Letter of Credit as a result of any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority (all such acts or omissions, herein called "Government Acts").

(ii)    As between the Borrower and the Issuing Lender, the Borrower shall assume all risks of the acts or omissions of or the misuse of any Letter of Credit by the beneficiary thereof.  The Issuing Lender shall not be responsible for:  (A) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in

connection with the application for and issuance of any Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (B) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, that may prove to be invalid or ineffective for any reason; (C) failure of the beneficiary of a Letter of Credit to comply fully with conditions required in order to draw upon a Letter of Credit; (D) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (E) errors in interpretation of technical terms; (F) any loss or delay in the transmission or otherwise of any documents required in order to make a drawing under a Letter of Credit or of the proceeds thereof; and (G) any consequences arising from causes beyond the control of the Issuing Lender, including, without limitation, any Government Acts.  None of the above shall affect, impair, or prevent the vesting of the Issuing Lender's rights or powers hereunder.

(iii)    In furtherance and extension and not in limitation of the specific provisions hereinabove set forth, any action taken or omitted by the Issuing Lender, under or in connection with any Letter of Credit or the related certificates, if taken or omitted in good faith, shall not put the Issuing Lender under any resulting liability to the Borrower or any other Loan Party other than for gross negligence, bad faith or willful misconduct.  It is the intention of the parties that this Agreement shall be construed and applied to protect and indemnify the Issuing Lender against any and all risks involved in the issuance of any Letter of Credit, all of which risks are hereby assumed by the Loan Parties, including, without limitation, any and all risks, whether rightful or wrongful, of any present or future Government Acts.  The Issuing Lender shall not, in any way, be liable for any failure by the Issuing Lender or anyone else to pay any drawing under any Letter of Credit as a result of any Government Acts or any other cause beyond the control of the Issuing Lender.

(iv)    Nothing in this <u>subsection (s)</u> is intended to limit the reimbursement obligations of the Borrower contained in this <u>Section 2.05</u>.  The obligations of the Borrower under this <u>Section 2.05(s)</u> shall survive the termination of this Agreement.  No act or omission of any current or prior beneficiary of a Letter of Credit shall in any way affect or impair the rights of the Issuing Lender to enforce any right, power or benefit under this Agreement.

(v)    Notwithstanding anything to the contrary contained in this <u>Section 2.05(s)</u>, the Borrower shall not have any obligation to indemnify any Issuing Lender in respect of any liability to the extent incurred by the Issuing Lender arising out of the gross negligence, bad faith or willful misconduct of the Issuing Lender, as determined by a court of competent jurisdiction.  Nothing in this Agreement shall relieve the Issuing Lender of any liability to the Borrower in respect of any action taken by the Issuing Lender which action constitutes gross negligence, bad faith or willful misconduct of the Issuing Lender or a violation of the ISP or UCC, as applicable, as determined by a court of competent jurisdiction.

(t)    *Cash Collateral*.

(i)    On the Closing Date, the Borrower shall Cash Collateralize all LC Obligations by delivering a portion of the proceeds from the Term Loans drawn on the Closing Date to the Issuing Lender in an amount in Dollars in cash equal to the sum of 102% of all LC Obligations incurred with respect to the Letters of Credit.  Such amounts shall be held by the Issuing Lender as collateral for the payment and performance of the LC Obligations in a segregated account of the DIP Agent (the "<u>LC Account</u>").  The Issuing Lender will, at the request of the Borrower, invest amounts deposited in such accounts in Cash Equivalents; provided,

however, that (i) the Issuing Lender shall not be required to make any investment that, in its sole judgment, would require or cause the Issuing Lender to be in, or would result in any, violation of any Law, (ii) such Cash Equivalents shall be subjected to a first priority perfected security interest in favor of the Collateral Agent and (iii) the selection of such Cash Equivalents shall be in the sole discretion of the Issuing Lender with the consent of the Borrower (such consent not to be unreasonably withheld). The Borrower shall indemnify the Issuing Lender for any losses relating to such investments in Cash Equivalents. Other than any interest or profits earned on such investments, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such accounts. Amounts held by the Issuing Lender under this clause (t) shall be applied by the Issuing Lender immediately for drawings under the applicable Letters of Credit and, if the maturity of the Loans has been accelerated, to satisfy the LC Obligations of the Borrower.

(ii)    On the DIP Termination Date, all commitments to extend Letters of Credit shall terminate and all LC Obligations and all other obligations owing to the Issuing Lender on account of such Letters of Credit shall be paid in full, and the Issuing Lender shall promptly deposit any remaining funds held in the LC Account directly into a Deposit Account of the Borrower. Upon the expiration of any Letter of Credit or portion thereof, the Issuing Lender shall promptly deposit the amounts used to Cash Collateralize such Letter of Credit or portion thereof directly into a Deposit Account of the Borrower.

(u)    *Resignation or Removal of the Issuing Lender*. The Issuing Lender may resign at any time by giving sixty (60) calendar days' notice to the DIP Agent and the Borrower; provided, however, that such resignation shall not affect the status of any outstanding Letters of Credit issued by the resigning Issuing Lender as set forth in Section 2.05(v) below. Upon any such resignation, the Borrower shall (within sixty (60) calendar days after such notice of resignation) appoint a successor as the Issuing Lender. Subject to Section 2.05(v) below, upon the acceptance of any appointment as the Issuing Lender hereunder by a successor Issuing Lender, such successor shall succeed to and become vested with all the interests, rights and obligations of the retiring Issuing Lender and the retiring Issuing Lender shall be discharged from its obligations to issue Letters of Credit hereunder. The acceptance of any appointment as Issuing Lender hereunder by a successor Issuing Lender shall be evidenced by an agreement entered into by such successor, in a form reasonably satisfactory to the Borrower and the DIP Agent, and, from and after the effective date of such agreement, (i) such successor shall be a party hereto and have all the rights and obligations of the Issuing Lender under this Agreement and the other DIP Loan Documents and (ii) references herein and in the other DIP Loan Documents to the "Issuing Lender" shall be deemed to refer to such successor or to any previous Issuing Lender, as the context shall require.

(v)    *Rights with Respect to Outstanding Letters of Credit*. After the resignation of the Issuing Lender hereunder the retiring Issuing Lender shall remain a party hereto and shall continue to have all the rights and obligations of the Issuing Lender under this Agreement and the other DIP Loan Documents with respect to Letters of Credit issued by it prior to such resignation, but shall not be required to issue additional Letters of Credit.

(w)    *Reporting*. The Issuing Lender will report in writing to the DIP Agent (i) on or prior to each Business Day on which the Issuing Lender expects to amend, renew or extend any Letter of Credit, the date of such amendment, and the aggregate face amount of Letters of Credit to be amended, renewed or extended by it and outstanding after giving effect to such issuance, amendment, renewal or extension (and the Issuing Lender shall advise the DIP Agent on such Business Day whether such amendment, renewal or extension occurred and whether the amount thereof changed), (ii) on each Business Day on which such Issuing Lender makes a LC Disbursement, the date and amount of such LC Disbursement and (iii) on any Business Day on which the Borrower fails to reimburse a LC Disbursement

45

required to be reimbursed to the Issuing Lender on such day, the date of such failure and the amount of such LC Disbursement.

### Section 2.06      Interest.

(a)      *Rate Options Applicable to Loans*.    Each Loan shall bear interest on the outstanding principal amount thereof, for each day during the Interest Period applicable thereto, at the Borrower's election, at a rate per annum equal to the sum of the applicable Adjusted Eurodollar Rate or Base Rate (to the extent permitted by Section 3.02 or Section 3.03), for such Interest Period plus the Applicable Margin.  Such interest shall be payable for each Interest Period on each Interest Payment Date.  The Borrower may not request any Borrowing that, if made, would result in an aggregate of more than three separate Interest Periods being outstanding hereunder at any one time.

(b)      *Determination and Notice of Interest Rates*.    The DIP Agent shall determine each interest rate applicable to the Loans hereunder.  The DIP Agent shall give prompt notice to the Borrower and the DIP Lenders of each rate of interest so determined, and its determination thereof shall be conclusive in the absence of manifest error.

(c)      *Default Interest*.    Upon the occurrence and during the continuance of a Default, the Loans and any other overdue amounts owing herein or under the other DIP Loan Documents shall bear interest, payable on demand, at a per annum rate equal to (i) in the case of principal or interest of any Loan, the rate otherwise applicable to such Loan during such period pursuant to this Section 2.06 plus 2.00% and (ii) in the case of any other amount, at the Eurodollar Rate or the Base Rate, as applicable, plus the Applicable Margin plus 2.00%.

### Section 2.07      Extension and Conversion.

(a)      *Continuation and Conversion Options*.    The Loans included in each Borrowing shall bear interest initially over the Interest Periods allowed by Section 2.06 and as specified by the Borrower in the applicable Notice of Borrowing.    Thereafter, the Borrower may elect to change or continue such Loans for an additional Interest Period, subject to Section 3.05 in the case of any such change or continuation effective on any day other than the last day of the then current Interest Period applicable to such Loans (subject in each case to the provisions of Article III and Section 2.07(d)).

(b)      Each such election shall be made by delivering a notice, substantially in the form of Exhibit A-2 hereto (a "Notice of Extension/Conversion") (or telephone notice promptly confirmed by a Notice of Extension/Conversion), which notice shall not thereafter be revocable by the Borrower, to the DIP Agent not later than 12:00 Noon on the third Business Day before the continuation selected in such notice is to be effective.  A Notice of Extension/Conversion shall apply to the entire aggregate principal amount of the relevant Loans.

(c)      *Contents of Notice of Extension/Conversion*.    Each Notice of Extension/Conversion shall specify (i) the Term Loans to which such notice applies; and (ii) the date on which the conversion or continuation selected in such notice is to be effective, which shall comply with the applicable clause of Section 2.07(a) above.  Each Interest Period specified in a Notice of Interest Rate Election shall comply with the provisions of the definitions of the terms "Interest Period".  If no Notice of Extension/Conversion is timely received prior to the end of an Interest Period for any Loans, the Borrower shall be deemed to have elected that such Loans be converted to Base Rate Loans or extended for an Interest Period equal to the previous Interest Period applicable to such Loans effective as of the last day of such expiring Interest Period.

(d)    _Notification to Lenders_.   Upon receipt of a Notice of Extension/Conversion (written or telephonic as set forth above) from the Borrower pursuant to Section 2.07(a) above, the DIP Agent shall promptly notify each DIP Lender of the contents thereof.

(e)    [_Reserved_].

(f)    _Accrued Interest_.   Accrued interest on a Loan (or portion thereof) being extended or converted shall be paid by the Borrower on the date of extension or conversion.

Section 2.08    **Maturity of Loans.**   The Borrower shall repay to the DIP Agent for the ratable account of the DIP Lenders the aggregate principal amount of all Term Loans outstanding on the DIP Termination Date.

Section 2.09    **Prepayments.**

(a)    _Voluntary Prepayments_. The Borrower shall have the right voluntarily to prepay Loans in whole or in part from time to time, subject to Section 3.05, but otherwise without premium or penalty; provided, however, that (i) each partial prepayment of Loans shall be in a minimum principal amount of $1,000,000 and integral multiples of $100,000 in excess thereof, and (ii) the Borrower shall have given prior written or telecopy notice (or telephone notice promptly confirmed by written or telecopy notice) to the DIP Agent by 12:00 Noon at least three Business Days prior to the date of prepayment.   Each notice of prepayment shall specify the prepayment date, the principal amount remaining and amount to be prepaid and the Interest Period of such Loan.   Each notice of prepayment shall be irrevocable and shall commit the Borrower to prepay such Loan by the amount, and on the date, stated therein.  Subject to the foregoing, amounts prepaid under this Section 2.09(a) shall be applied as the Borrower may elect; provided that if the Borrower fails to specify the application of a voluntary prepayment, then such prepayment shall be applied to Term Loans in direct order of Interest Period maturity.   All prepayments under this Section 2.09(a) shall be accompanied by accrued interest on the principal amount being prepaid to the date of payment.

(b)    _Mandatory Prepayments_.

(i)    _Asset Dispositions, Casualties and Condemnations, etc_.   Within five Business Days after receipt by any Group Company of proceeds from any Asset Disposition (other than any Excluded Asset Disposition) or any Foreign Asset Disposition, Casualty or Condemnation, the Borrower shall prepay the Loans in an aggregate amount equal to 100% of the Net Cash Proceeds of any such Foreign Asset Disposition, other Asset Disposition or any Casualty or Condemnation (except to the extent constituting Reinvestment Funds).

(ii)    _Debt and Equity Issuances_.   Within five Business Days after receipt by any Group Company of proceeds from any Debt Issuance (other than such Debt Issuance permitted pursuant to Section 7.01 of this Agreement) or any Qualifying Equity Issuance, the Borrower shall prepay the Loans in an aggregate amount equal to 100% of the Net Cash Proceeds of such Debt Issuance or Qualifying Equity Issuance.

(iii)    _Payments in Respect of Subordinated Debt_.   Immediately upon receipt by the DIP Agent or any DIP Lender of any amount pursuant to the subordination provision of any Debt of Holdings or any of its Subsidiaries that is subordinate to the DIP Obligations, all proceeds thereof shall be applied pro-rata to the outstanding Term Loans.

(iv)     *Breakage*; *Accrued Interest*.  All prepayments under this Section 2.09(b) shall be subject to Section 3.05.  All prepayments under this Section 2.09(b) shall be accompanied by accrued interest on the principal amount being prepaid to the date of payment.

(v)     *Payments Cumulative*.  Except as otherwise expressly provided in this Section 2.09, payments required under any subsection or clause of this Section 2.09 are in addition to payments made or required under any other subsection or clause of this Section 2.09.

(vi)     *Notice*.  The Borrower shall give to the DIP Agent and the DIP Lenders at least five Business Days' prior written or telecopy notice of each and every event or occurrence requiring a prepayment under Section 2.09(b), including the amount of Net Cash Proceeds expected to be received therefrom and the expected schedule for receiving such proceeds; provided, however, that in the case of any prepayment event consisting of a Casualty or Condemnation, the Borrower shall give such notice within five Business Days after the occurrence of such event.

### Section 2.10     Adjustment of Commitments.

(a)     *Termination*.  The Term Loan Commitments of the DIP Lenders and the LC Commitment of the Issuing Lender shall terminate automatically at the end of the Availability Period. The Term Loan Committed Amount shall be permanently reduced by the aggregate principal amount of each Borrowing.

(b)     *Optional Termination of Commitments (Non-Pro-Rata)*.  If (i) any DIP Lender has demanded compensation or indemnification pursuant to Section 3.01 or Section 3.04, (ii) the obligation of any DIP Lender to make Loans has been suspended pursuant to Section 3.02, (iii) any DIP Lender is a Defaulting Lender or (iv) any DIP Lender (each a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 10.03 or any other provision of any DIP Loan Document requires the consent of more than the Required DIP Lenders and with respect to which the Required DIP Lenders shall have granted their consent, the Required DIP Lenders shall have the right (and, if no Default or Event of Default then exists, the Borrower shall also have the right) to replace, upon notice to such DIP Lender and the DIP Agent, such DIP Lender by causing such DIP Lender to assign and delegate, without recourse, its Commitment to one or more existing DIP Lenders or Eligible Assignees (each, a "Replacement Lender") in accordance with and subject to the restrictions set forth in Section 10.06, , provided, however, that if either the Borrower or the Required DIP Lenders elect to exercise such right with respect to DIP Lender pursuant to clause (i) or (ii) above, they shall be obligated to remove or replace, as the case may be, all DIP Lenders that have similar requests then outstanding for compensation pursuant to Section 3.01 or 3.04 or whose obligation to make Eurodollar Loans has been similarly suspended.

The replacement of a DIP Lender pursuant to this Section 2.10(b) shall be effective on the date of notice of such replacement to the Borrower, the DIP Lenders through the DIP Agent (the "Replacement Date"), subject to the satisfaction of the following conditions:

(i)     each replacement DIP Lender and/or Eligible Assignee, and the DIP Agent acting on behalf of each DIP Lender subject to replacement, shall have satisfied the conditions to an Assignment and Acceptance set forth in Section 10.06(b) and

(ii)     each DIP Lender subject to removal shall have received payment of an amount equal to the aggregate principal amount of all Loans held by such DIP Lender, all accrued interest thereon, all accrued but unpaid fees owing to it pursuant to Section 2.11 and other

amounts payable to it hereunder (including, without limitation, under <u>Article III</u> or <u>Sections 10.04</u> and <u>10.05</u>) from the replacement DIP Lender and/or Eligible Assignee (in the case of such outstanding principal and accrued interest) and from the Borrower (in the case of all other amounts).

Upon the satisfaction of the above conditions,  such DIP Lender shall, without any further consent or other action by it, cease to constitute a DIP Lender hereunder; <u>provided</u> that the provisions of this Agreement (including, without limitation, the provisions of <u>Article III</u> and <u>Sections 10.04</u> and <u>10.05</u>) shall continue to govern the rights and obligations of a removed DIP Lender with respect to any Loans made or any other actions taken by such removed DIP Lender while it was a DIP Lender; <u>provided</u> that, in the case of a Non-Consenting  Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such terminated DIP Lender was a Non-Consenting Lender.

**Section 2.11**      **<u>Fees.</u>**

(a)      *<u>Fee Letter</u>*.  Kingpin and Borrower shall pay to the DIP Agent and the Initial Lenders the fees specified in the Fee Letter.

(b)      *<u>Unused Line Fee</u>*.   The Borrower shall pay to the DIP Agent for the ratable benefit of each DIP Lender an unused line fee, payable monthly in arrears on the last Business Day of each month and on the DIP Termination Date and calculated on the basis of the actual number of days elapsed in a year of 360 days, accruing at a rate per annum equal to 0.75% on the average daily amount of unused Term Loan Commitment under the DIP Facility during such month (the "<u>Unused Line Fee</u>").

(c)      *<u>Fees In Respect of Letters of Credit</u>*.

(i)      *<u>Issuance Fee</u>*.  The Borrower shall pay directly to the Issuing Lender for its own account an issuance fee upon the issuance of each Letter of Credit in an amount equal to 0.25% times the amount available to be drawn under such Letter of Credit.

(ii)      *<u>Issuing Lender Fees</u>*.  In addition to the issuance fee payable pursuant to <u>clause (ii)</u> above, the Borrower promises to pay to the Issuing Lender for its own account without sharing by the DIP Lenders the customary and reasonable fees and charges from time to time of the Issuing Lender with respect to the issuance, amendment, transfer, administration, cancellation and conversion of, and drawings under, each Letter of Credit (collectively, the "<u>Issuing Lender Fees</u>").

**Section 2.12      <u>Pro-Rata Treatment.</u>**  Except to the extent otherwise provided herein, each Borrowing, each payment or prepayment of principal of or interest on any Loan, each payment of fees (other than the Issuing Lender Fees retained by the Issuing Lender for its own account and the administrative fees retained by the Agents for their own account) and each continuation of any Loan, shall be allocated pro-rata among the relevant DIP Lenders in accordance with the respective Term Loan Commitment Percentages of such DIP Lenders (or, if the Commitments of such DIP Lenders have expired or been terminated, in accordance with the respective principal amounts of the outstanding Term Loans of such DIP Lenders); <u>provided</u> that, in the event any amount paid to any DIP Lender pursuant to this <u>Section 2.12</u> is rescinded or must otherwise be returned by the DIP Agent, each DIP Lender shall, upon the request of the DIP Agent, repay to the DIP Agent the amount so paid to such DIP Lender, with interest for the period commencing on the date such payment is returned by the DIP Agent until the date the DIP Agent receives such repayment at a rate per annum equal to, during the period to but excluding the date two Business Days after such request, the Federal Funds Rate, plus 2.00% per annum, and

thereafter, at the Eurodollar Rate plus 2.00% per annum.

Section 2.13    **Sharing of Payments.**    The DIP Lenders agree among themselves that, except to the extent otherwise provided herein, if any DIP Lender shall obtain payment in respect of any Loan, unreimbursed LC Disbursements or any other obligation owing to such DIP Lender under this Agreement through the exercise of a right of setoff, banker's lien or counterclaim, or pursuant to a secured claim under Section 506 of the Bankruptcy Code or other security or interest arising from, or in lieu of, such secured claim, received by such DIP Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, in excess of its pro-rata share of such payment as provided for in this Agreement, such DIP Lender shall promptly pay in cash or purchase from the other DIP Lenders a participation in such Loans, unreimbursed LC Disbursements and other obligations in such amounts, and make such other adjustments from time to time, as shall be equitable to the end that all DIP Lenders share such payment in accordance with their respective ratable shares as provided for in this Agreement; provided that nothing in this Section 2.13 shall impair the right of any DIP Lender to exercise any right of set-off or counterclaim it may have for payment of indebtedness of the Borrower other than its indebtedness hereunder.    The DIP Lenders further agree among themselves that if payment to a DIP Lender obtained by such DIP Lender through the exercise of a right of setoff, banker's lien, counterclaim or other event as aforesaid shall be rescinded or must otherwise be restored, each DIP Lender which shall have shared the benefit of such payment shall, by payment in cash or a repurchase of a participation theretofore sold, return its share of that benefit (together with its share of any accrued interest payable with respect thereto) to each DIP Lender whose payment shall have been rescinded or otherwise restored. Each Loan Party agrees that any DIP Lender so purchasing such a participation may, to the fullest extent permitted by law, exercise all rights of payment, including setoff, banker's lien or counterclaim, with respect to such participation as fully as if such DIP Lender were a holder of such Loan, LC Obligation or other obligation in the amount of such participation.    If under any applicable bankruptcy, insolvency or other similar law, any DIP Lender receives a secured claim in lieu of a setoff to which this Section 2.13 applies, such DIP Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the DIP Lenders under this Section 2.13 to share in the benefits of any recovery on such secured claim.

Section 2.14    **Payments; Computation.**

(a)    *Payments by the Borrower.*    Each payment of principal of and interest on Loans, LC Obligations and fees hereunder (other than fees payable directly to the Issuing Lender) shall be paid not later than 2:00 P.M. on the date when due, in Dollars and in funds immediately available to the DIP Agent at the account designated by it by notice to the Borrower.    Each such payment shall be made irrespective of any set-off, counterclaim or defense to payment which might in the absence of this provision be asserted by the Borrower or any Affiliate against any Agent or any DIP Lender.    Payments received after 2:00 P.M. shall be deemed to have been received on the next Business Day.    The Borrower shall, at the time it makes any payments under this Agreement, specify to the DIP Agent the Loan, Letters of Credit, fees or other amounts payable by the Borrower hereunder to which such payment is to be applied (and if any such specified application would be inconsistent with the terms hereof, the DIP Agent shall, subject to Section 2.12, distribute such payment to the DIP Lenders in such manner as the DIP Agent may deem reasonably appropriate).    The DIP Agent will distribute such payments to the applicable DIP Lenders on the date of receipt thereof, if such payment is received prior to 2:00 P.M.; otherwise, the DIP Agent may, in its sole discretion, distribute such payment to the applicable DIP Lenders on the date of receipt thereof or on the immediately succeeding Business Day.    Whenever any payment hereunder shall be due on a day which is not a Business Day, the date for payment thereof shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case the date for payment thereof shall be the next preceding Business Day.    If the date for any payment of principal is extended by operation of law or otherwise, interest thereon shall be payable for such extended

time.  The Borrower hereby authorizes and directs each Agent to debit any account maintained by the Borrower for such purpose with such Agent to pay when due any amounts required to be paid from time to time under this Agreement as directed at such time(s) by the Borrower.

(b)        *Distributions by the DIP Agent*.  Unless the DIP Agent shall have received notice (written or telephonic) from the Borrower prior to the date on which any payment is due to the DIP Lenders hereunder that the Borrower will not make such payment in full, the DIP Agent may assume that the Borrower has made such payment in full to the DIP Agent on such date, and the DIP Agent may, in reliance upon such assumption, cause to be distributed to each DIP Lender on such due date an amount equal to the amount then due such DIP Lender.  If and to the extent that the Borrower shall not have so made such payment, each DIP Lender shall repay to the DIP Agent forthwith on demand such amount distributed to such DIP Lender together with interest thereon for each day from the date such amount is distributed to such DIP Lender until the date such DIP Lender repays such amount to the DIP Agent, at the Federal Funds Rate.

(c)        *Computations*.  All computations of interest and fees hereunder shall be made on the basis of the actual number of days elapsed over a year of 360 days.  Interest shall accrue from and including the date of borrowing (or continuation) but excluding the date of payment.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

### Section 3.01     Taxes.

(a)        *Payments Net of Certain Taxes*.  Any and all payments by any Loan Party to or for the account of any Recipient or under any other DIP Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding any and all Excluded Taxes.  If any Loan Party shall be required by law to deduct or withhold any Indemnified Taxes or Other Taxes from or in respect of any sum payable under this Agreement or any other DIP Loan Document to any Recipient the sum payable shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 3.01) such Recipient receives an amount equal to the sum it would have received had no such deductions or withholdings been made.  In addition, if any Loan Party shall be required by law to deduct or withhold any taxes from or in respect of any sum payable under this Agreement or any other DIP Loan Document to any Recipient (a) such Loan Party shall make such deductions and withholdings, (b) such Loan Party shall pay the full amount deducted or withheld to the relevant taxation authority or other authority in accordance with applicable law and (c) within thirty (30) calendar days, such Loan Party shall furnish to the Agent, at the Administrative Office, and to the applicable DIP Lender or Issuing Lender the original or a certified copy of a receipt evidencing payment thereof, a copy of the return reporting such payment or other documentation evidencing such payment reasonably satisfactory to the Agent and the applicable DIP Lender or Issuing Lender.

(b)        *Other Taxes*.  In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary, intangible, recording, filing, excise or property taxes or similar charges or levies (including mortgage recording taxes) which arise from any payment made by it under this Agreement or any other DIP Loan Document or from the execution, delivery, performance, registration or enforcement of, or otherwise with respect to, this Agreement or any other DIP Loan Document (such taxes or similar charges or levies, "Other Taxes").

(c)    *Additional Taxes*. The Borrower agrees to indemnify each Recipient, within 10 Business Days after demand therefor, for the full amount of Indemnified Taxes and Other Taxes (including, without limitation, any Indemnified Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 3.01), as applicable, whether or not correctly or legally asserted, paid or payable by such Recipient (as the case may be) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto; provided, however, that if the Borrower reasonably believes that such Indemnified Taxes or Other Taxes were not correctly or legally asserted, then subject to any limitations set forth in Section 3.01(f) (including clauses (ii) and (iii) of the proviso contained therein), the Recipient will use reasonable efforts to cooperate with the Borrower to obtain a refund of such Indemnified Taxes  or Other Taxes so long as such efforts would not, in the sole discretion of the Recipient, result in any additional costs, expenses or risks or be otherwise disadvantageous to it. For purposes of this Section 3.01(c), a certificate delivered by a Recipient to the Borrower (with a copy to the DIP Agent), or by the DIP Agent on its own behalf or on behalf of another Recipient, setting forth in reasonable detail the nature and amount of Indemnified Taxes or Other Taxes (and any liability arising therefrom) for which it is claiming indemnification hereunder, shall be conclusive absent manifest error.

(d)    *U.S. Tax Forms and Certificates*.

(i)    Each Recipient organized under the laws of a jurisdiction outside the United States (a "Non-U.S. Lender"), on or prior to the date of its execution and delivery of this Agreement in the case of each Non-U.S. Lender listed on the signature pages hereof and on or prior to the date on which it becomes a Non-U.S. Lender in the case of each other Non-U.S. Lender, and from time to time thereafter as required by law, shall provide the Borrower and the DIP Agent with (i) two properly completed and duly signed original copies of Internal Revenue Service Form W-8 BEN, W-8 IMY or W-8 ECI, as appropriate, or any successor form prescribed by the Internal Revenue Service, certifying that such Non-U.S. Lender is entitled to benefits under an income tax treaty to which the United States is a party which reduces the rate of withholding tax on payments of interest or certifying that the income receivable pursuant to this Agreement is effectively connected with the conduct of a trade or business in the United States, and/or (ii) any other form or certificate required by any taxing authority (including any certificate required by Sections 871(h) and 881(c) of the Code), certifying that such Non-U.S. Lender is entitled to an exemption from or a reduced rate of tax on payments pursuant to this Agreement or any of the other DIP Loan Documents.  Should a Non-U.S. Lender, which is otherwise exempt from or subject to a reduced rate of withholding tax, become subject to any taxes because of its failure to deliver a form required to be delivered hereunder, the Borrower shall take such steps as such Non-U.S. Lender shall reasonably request to assist such Non-U.S. Lender to recover such taxes.

(ii)    Each Recipient that is a U.S. person as defined in Section 7701(a)(30) of the Code (a "U.S. Lender") shall deliver to the Borrower and the DIP Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of Internal Revenue Service Form W-9 or any successor form prescribed by the Internal Revenue Service, certifying that such U.S. Lender is exempt from federal backup withholding.

(iii)    If a payment made to a Recipient under any DIP Loan Document would be subject to United States federal withholding tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional

documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (ii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(e)      _Mitigation_. If any Loan Party is required to pay additional amounts to or for the account of any Recipient pursuant to this Section 3.01, then such Recipient will agree to use reasonable efforts to change the jurisdiction of its Applicable Lending Office or to file or deliver to the Borrower any certificate or document so as to eliminate or reduce any such additional payment which may thereafter accrue if such change, filing or delivery, in the judgment of such Recipient, would not subject such recipient to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Recipient.

(f)      _Refunds_. If any DIP Lender or Agent receives a refund from a taxation authority in respect of any tax for which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 3.01, which refund in the sole judgment of such DIP Lender or Agent is directly attributable to any such indemnified tax or additional amounts paid pursuant to this Section 3.01, such DIP Lender or Agent shall (within thirty (30) calendar days from the date of such receipt) pay to the indemnifying party the amount of such refund (but only to the extent of indemnity payments made with respect to the tax giving rise to such refund or credit), net of all out-of-pocket expenses (including any taxes on a refund or on interest received or credited) which such DIP Lender or Agent certifies that it has reasonably determined to have been incurred in connection with obtaining such refund; provided, however, that (i) each Loan Party shall repay, upon the request of such DIP Lender or Agent, the amount paid to such Loan Party pursuant to the previous clause (plus penalties, interest or other charges) to such DIP Lender or Agent in the event such DIP Lender or Agent is required to repay such refund or credit to such tax authority, (ii) such DIP Lender or Agent, as the case may be, shall have no obligation to cooperate with respect to any contest (or continue to cooperate with respect to any contest), or to seek or claim any refund if such DIP Lender or Agent determines, in its sole discretion, that its interest would be adversely affected by so cooperating (or continuing to cooperate) or by seeking or claiming any such refund and (iii) no Loan Party shall have any right to examine the tax returns or other records of any DIP Lender or Agent or to obtain any information with respect thereto by reason of the provisions of this Section 3.01 or any judgment or determination made by any DIP Lender or Agent pursuant to this Section 3.01. Notwithstanding anything to the contrary in this paragraph (f), in no event will an indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (e) the payment of which would place the indemnified party in a less favorable net after-tax position than the indemnified party would have been in if the tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such tax had never been paid.

(g)      Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a DIP Lender, the termination of the DIP Loans or Commitments and the repayment, satisfaction or discharge of all obligations under any DIP Loan Document.

**Section 3.02      Change in Law, Etc.**   If, on or after the date of this Agreement, (i) the adoption of any applicable Law, or any change in any applicable Law, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any DIP Lender (or its Applicable Lending Office) with any request or directive (whether or not having the force of Law) of any such authority, central bank or comparable agency shall make it unlawful or impossible for any DIP Lender (or

its Applicable Lending Office) to make, maintain or fund any of its Loans at the Eurodollar Rate; provided that notwithstanding anything herein to the contrary, each of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder issued in connection therewith or in implementation thereof shall be deemed to be a Change in Law for the purposes hereof, regardless of the date enacted, adopted, issued or implemented; or (ii) there shall have occurred any change in national or international financial, political or economic conditions (including the imposition of or any change in exchange controls) or currency exchange rates that would make it impracticable for any DIP Lender (or its Applicable Lending Office) to make, maintain or fund any of its Loans at the Eurodollar Rate, and, in each such case, the affected DIP Lender shall so notify the DIP Agent, the DIP Agent shall forthwith give notice thereof to the other DIP Lenders and the Borrower, whereupon, until each affected DIP Lender notifies the Borrower and the DIP Agent that the circumstances giving rise to such suspension no longer exist, the obligation of each affected DIP Lender to make Loans at the Eurodollar Rate shall be suspended.  Before giving any notice to the DIP Agent pursuant to this Section 3.02, such DIP Lender shall designate a different Applicable Lending Office if such designation will avoid the need for giving such notice and will not, in the judgment of such DIP Lender, be otherwise disadvantageous to such DIP Lender.  If such notice is given, each Loan of such DIP Lender then outstanding shall be converted to a Loan bearing interest at a rate determined by reference to the Base Rate either (i) on the last day of the then current Interest Period applicable to such Loan, if such DIP Lender may lawfully continue to maintain and fund such Loan to such day or (ii) immediately, if such DIP Lender shall determine that it may not lawfully continue to maintain and fund such Loan to such day.

Section 3.03   **Basis for Determining Interest Rate Inadequate or Unfair.**  If on or prior to the first day of any Interest Period for any Eurodollar Borrowing:

(i)   the DIP Agent determines (which determination shall be conclusive) that by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the applicable Eurodollar Rate for such Interest Period; or

(ii)   the Required DIP Lenders advise the DIP Agent that the Eurodollar Rate as determined by the DIP Agent will not adequately and fairly reflect the cost to such DIP Lenders of funding their Loans at the Eurodollar Rate included in such Borrowing for such Interest Period; or

(iii)   the DIP Agent reasonably determines (which determination shall be conclusive) that Dollar deposits in the principal amounts of the Loans comprising such Borrowing are not generally available in the London interbank market;

the DIP Agent shall forthwith give notice thereof to the Borrower and the relevant DIP Lenders, whereupon, until the DIP Agent notifies the Borrower that the circumstances giving rise to such suspension no longer exist, (i) the obligations of the DIP Lenders to make or continue or convert Loans at the Eurodollar Rate shall be suspended and (ii) each outstanding Loan shall instead reference the Base Rate on the last day of the then current Interest Period applicable thereto.  Unless the Borrower notifies the DIP Agent at least two Business Days before the date of any Borrowing for which a Notice of Borrowing has previously been given that it elects not to borrow on such date, such Borrowing shall instead bear interest for each day from and including the first day to but excluding the last day of the Interest Period applicable thereto with reference to the Base Rate on such day.

**Section 3.04**    **Increased Costs and Reduced Return.**

(a)    If on or after the date hereof, the adoption of or any change in any applicable Law or in the interpretation or application thereof applicable to any DIP Lender (or its Applicable Lending Office), or compliance by any DIP Lender (or its Applicable Lending Office) with any request or directive (whether or not having the force of Law) from any central bank or other Governmental Authority, in each case made subsequent to the Closing Date (or, if later, the date on which such DIP Lender becomes a DIP Lender) (provided that notwithstanding anything herein to the contrary, each of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder issued in connection therewith or in implementation thereof shall be deemed to be a Change in Law for the purposes hereof, regardless of the date enacted, adopted, issued or implemented):

(i)    shall subject such DIP Lender (or its Applicable Lending Office) to any tax of any kind whatsoever with respect to any Letter of Credit, any Loans made by it or any of its Notes or its obligation to make Loans or to participate in Letters of Credit, or change the basis of taxation of payments to such DIP Lender (or its Applicable Lending Office) in respect thereof (except for (A) Indemnified Taxes and Other Taxes covered by Section 3.01 and (B) Excluded Taxes);

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such DIP Lender (or its Applicable Lending Office) which is not otherwise included in the determination of the Eurodollar Rate hereunder; or

(iii)    shall impose on such DIP Lender (or its Applicable Lending Office) any other condition (excluding any tax of any kind whatsoever);

and the result of any of the foregoing is to increase the cost to such DIP Lender (or its Applicable Lending Office) of making, continuing or maintaining any Loans or issuing or participating in Letters of Credit or to reduce any amount receivable hereunder in respect thereof, then, in any such case, upon notice to the Borrower from such DIP Lender, through the DIP Agent, in accordance herewith, the Borrower shall be obligated to pay such DIP Lender, within 10 Business Days of its demand, any additional amounts necessary to compensate such DIP Lender on an after-tax basis (after taking into account applicable deductions and credits in respect of the amount indemnified) for such increased cost or reduced amount receivable.

(b)    If any DIP Lender shall have determined that the adoption or the becoming effective of, or any change in, or any change by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof in the interpretation or administration of, any applicable Law regarding capital adequacy, or compliance by such DIP Lender, or its parent corporation, with any request or directive regarding capital adequacy (whether or not having the force of Law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on such DIP Lender's (or parent corporation's) capital or assets as a consequence of its commitments or obligations hereunder to a level below that which such DIP Lender, or its parent corporation, could have achieved but for such adoption, effectiveness, change or compliance (taking into consideration such DIP Lender's (or parent corporation's) policies with respect to capital adequacy), then, upon notice from such DIP Lender to the Borrower, the Borrower shall be obligated to pay to such DIP Lender such additional amount or amounts as will compensate such DIP Lender on an after-tax basis (after taking into account applicable deductions and credits in respect of the amount

indemnified) for such reduction; provided that the Borrower shall not be required to compensate any DIP Lender pursuant to Section 3.04(a) above or this Section 3.04(b) for any additional costs or reductions suffered more than one-hundred eighty (180) calendar days prior to the date such DIP Lender notifies the Borrower of the circumstances giving rise to such additional costs or reductions and of such DIP Lender's intentions to claim compensation therefor, and provided further that, if the Change in Law or in the interpretation or administration thereof giving rise to such additional costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof. Each determination by any such DIP Lender of amounts owing under this Section 3.04 shall, absent manifest error, be conclusive and binding on the parties hereto.

(c)    A certificate in reasonable detail of each DIP Lender setting forth such amount or amounts as shall be necessary to compensate such DIP Lender or its holding company as specified in Section 3.04(a) or (b) above, as the case may be, shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay each DIP Lender the amount shown as due on any such certificate delivered by it within 10 Business Days after receipt of the same.

(d)    Promptly after any DIP Lender becomes aware of any circumstance that will, in its reasonable judgment, result in a request for increased compensation pursuant to this Section 3.04, such DIP Lender shall notify the Borrower thereof. Failure on the part of any DIP Lender so to notify the Borrower or to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital with respect to any period shall not constitute a waiver of such DIP Lender's right to demand compensation with respect to such period or any other period, except as expressly otherwise provided above. The protection of this Section 3.04 shall be available to each DIP Lender regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, guideline or other change or condition which shall have occurred or been imposed.

Section 3.05    Funding Losses.    The Borrower shall indemnify each DIP Lender against any loss or expense (but excluding in any event loss of anticipated profit) which such DIP Lender may sustain or incur as a consequence of (i) any failure by the Borrower to fulfill on the date of any Borrowing hereunder the applicable conditions set forth in Article IV, (ii) any failure by the Borrower to borrow, convert or continue any Loan hereunder after irrevocable notice of such Borrowing, conversion or continuation has been given pursuant to Section 2.02 or 2.07, (iii) any payment, prepayment or conversion of a Loan, whether voluntary or involuntary, pursuant to any other provision of this Agreement or otherwise made on a date other than the last day of the Interest Period applicable thereto, or (iv) the assignment of any Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.10(b), including, in each such case, any loss or reasonable expense sustained or incurred or to be sustained or incurred in liquidating or employing deposits from third parties acquired to effect or maintain such Loan or any part thereof. Such loss or reasonable expense (other than loss of anticipated profits) shall include an amount equal to the excess, if any, as reasonably determined by such DIP Lender, of (i) its cost of obtaining the funds for the Loan being paid, prepaid, converted, not borrowed, redenominated or assigned (based on the applicable Eurodollar Rate), for the period from the date of such payment, prepayment, conversion, failure to borrow, convert or continue to the last day of the Interest Period for such Loan (or, in the case of a failure to borrow, the Interest Period for such Loan which would have commenced on the date of such failure to borrow, convert or continue), redenomination or assignment over (ii) the amount of interest at the then current Eurodollar Rate (as reasonably determined by such DIP Lender) that would be realized by such DIP Lender in reemploying the funds so paid, prepaid, converted, not borrowed or continued for such period or Interest Period, redenomination or assignment, as the case may be. A certificate of any DIP Lender setting forth any amount or amounts which such DIP Lender is entitled to receive pursuant to this Section 3.05 shall be delivered to the Borrower and shall be conclusive absent manifest error

**Section 3.06**      **Base Rate Loans Substituted for Affected Eurodollar Loans**. If (i) the obligation of any DIP Lender to make, or to continue or convert outstanding Loans as or to, Eurodollar Loans has been suspended pursuant to Section 3.02 or (ii) any DIP Lender has demanded compensation under Section 3.01 and 3.04 with respect to its Eurodollar Loans (such lender, an "Affected Lender"), and in any such case the Borrower shall, by at least five (5) Business Days' prior notice to the DIP Agent, have elected that the provisions of this Section 3.06 shall apply, then, unless and until such Affected Lender notifies the Borrower that the circumstances giving rise to such suspension or demand for compensation no longer exist, all Loans which would otherwise be made by any DIP Lender as (or continued as or converted to) Eurodollar Loans with the same Interest Period as the Eurodollar Loans of the Affected Lender shall instead bear interest at the Base Rate (on which interest and principal shall be payable, contemporaneously with the related Eurodollar Loans of the other DIP Lenders).  If the Affected Lender notifies the Borrower that the circumstances giving rise to such suspension or demand for compensation no longer exist, the principal amount of each such Loan shall be converted into a Eurodollar Loan on the first day of the next succeeding Interest Period applicable to the related Eurodollar Loans.  The Borrower shall compensate each DIP Lender (other than the Affected Lender) whose Eurodollar Loans are converted by any such election of Borrower pursuant to this Section 3.06 as set forth in Section 3.05.

## ARTICLE IV
## CONDITIONS

**Section 4.01**      **Conditions to Closing.**  The obligation of each DIP Lender to make a Loan or issue a Letter of Credit on the Closing Date is subject to the satisfaction (or waiver) of the following conditions:

(a)      *Executed DIP Loan Documents*.  Receipt by the DIP Agent of duly executed copies of: (i) this Agreement; (ii) the Notes (if any); (iii) the Collateral Documents and (iv) all other DIP Loan Documents, each in form and substance satisfactory to the DIP Agent, the DIP Lenders and their counsel.

(b)      *Legal Matters*.  All legal matters incident to this Agreement and the borrowings hereunder shall be reasonably satisfactory to the Required DIP Lenders.

(c)      *Organizational Documents*.  The DIP Agent shall have received:  (i) a copy of the certificate or articles of incorporation or other organizational documents, as applicable, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State or other applicable authority of its respective jurisdiction of organization; (ii) a certificate as to the good standing of each Loan Party, as of a recent date, from the Secretary of State or other applicable authority of its respective jurisdiction of organization together, to the extent generally available, with a certificate or other evidence of good standing as to payment of any applicable franchise or similar taxes from the appropriate taxing authority of each such jurisdiction; (iii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date substantially in the form of Exhibit L hereto; (iv) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (iii) above; and (v) such other corporate or other constitutive or organizational documents as the DIP Agent or the Required DIP Lenders may reasonably request.

(d)      *Officer's Certificates*.  The DIP Agent shall have received (i) a certificate, dated the Closing Date and signed by a Responsible Officer of each Loan Party, confirming compliance with the conditions precedent set forth in Section 4.02(b) and (c).

(e)     *Opinions of Counsel*.  The DIP Agent and the DIP Lenders shall have received satisfactory and customary opinions of independent counsel to the Loan Parties, addressing such matters as the DIP Agent or the DIP Lenders shall reasonably request.

(f)     *Hilco Engagement Letter*.  The Borrower shall have retained Hilco Real Estate Appraisal, LLC ("Hilco"), to conduct appraisals of those properties that are owned by the Loan Parties and/or are the subject of the iStar Sales/Leaseback Documents or any other leases to which the Loan Parties are a party (except as may otherwise be agreed in writing by the Required DIP Lenders) in accordance with an engagement letter reasonably satisfactory in form and substance to the DIP Agent and the Required DIP Lenders (the "Hilco Engagement Letter").

(g)     *Delivery of Projections*.  The Borrower shall have delivered or caused to be delivered to the DIP Agent, on behalf of the DIP Lenders, financial projections satisfactory to the Required DIP Lenders in their sole discretion, including income statement, balance sheet and cash flow statement, each in form and substance consistent with the Loan Parties' internal financial statements, for fiscal years ending 2013 and 2014 presented on a monthly basis.

(h)     *Evidence of Insurance*.  The DIP Agent and the Required DIP Lenders shall be satisfied with the amount, types and terms and conditions of all insurance and bonding maintained by the Loan Parties and their Subsidiaries.  Upon the request of the DIP Agent, the Borrower shall, within thirty (30) calendar days following such request, obtain endorsements naming the DIP Agent, on behalf of the DIP Lenders, as an additional insured or loss payee, as applicable, under all insurance policies to be maintained with respect to the properties of the Loan Parties and their Subsidiaries forming part of the Collateral, which endorsement shall provide for 30 days' prior notice of cancellation of such policies to be delivered to the DIP Agent.

(i)     *Litigation*; *Judgments*.  Other than the Chapter 11 Cases, or as stayed upon the commencement of the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Effect or, except as disclosed, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the DIP Facility, the Collateral or the transactions contemplated hereby.

(j)     *Consents*; *Absence of Conflicts.*  (i) All governmental and third party consents and approvals necessary in connection with the DIP Facility and the Transaction shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the DIP Agent and the Required DIP Lenders) and shall remain in effect, and (ii) there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the judgment of the DIP Agent at the direction of the Required DIP Lenders, restrains, prevents, prohibits, restricts or imposes materially adverse conditions upon Borrower, the Subsidiary Guarantors, the DIP Facility or the transactions contemplated hereby.

(k)     *Financial Information*.  The DIP Agent and the Required DIP Lenders shall each be reasonably satisfied that the projections and the financial statements referred to in Section 5.05 are not materially inconsistent with the information, projections, sources and uses of funds or financial model delivered to the DIP Agent prior to the Closing Date.

(l)     *Material Adverse Effect*.  There shall have occurred no event which has resulted in or could reasonably be expected to result in a Material Adverse Effect since July 3, 2012.

(m)      *Payment of Fees*.  All costs, fees, disbursements and expenses of (i) the Agents (including fees, costs, disbursements and expenses of their outside counsel, K&S, and their local counsel) and (ii) the Initial Lenders (including fees, costs, disbursements and expenses of (A) their outside counsel, Stroock and their local counsel, (B) Miller Buckfire as financial advisor to the Initial Lenders and (C) any other professional advisors retained by the Initial Lenders or their counsel, on or before the Closing Date, shall have been paid in full in cash, to the extent invoiced to the Borrower no later than one Business Day prior to the Closing Date; provided that any such expenses invoiced thereafter shall be payable pursuant to Section 10.04.

(n)      *First Day Motions*.  All first day motions filed by the Loan Parties and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance satisfactory to the DIP Agent at the direction of the Required DIP Lenders.

(o)      *Motions and Documents*.  All motions and other documents to be filed with and submitted to the Bankruptcy Court related to the DIP Facility and the approval thereof shall be in form and substance reasonably satisfactory to the Required DIP Lenders

(p)      *Interim Order*.  The Bankruptcy Court shall have entered the Interim Order within three (3) calendar days following the Petition Date, in form and substance satisfactory to the DIP Agent and the Required DIP Lenders.

(q)      *Validity and Priority of DIP Liens*.  The DIP Agent, for the benefit of the DIP Lenders, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein, and such Lien of the DIP Agent for the benefit of the DIP Lenders shall be senior to the First Lien Credit Agreement Liens, the First Lien Adequate Protection Liens, the Second Lien Credit Agreement Liens and the Second Lien Adequate Protection Liens, subject only to the Carve-Out.

(r)      *Budget*.  The DIP Agent and the DIP Lenders shall have received the Budget (attached as Exhibit E), which shall be in form and satisfactory to the DIP Agent at the direction of the Required DIP Lenders.

(s)      *Cash Dominion*.  The Loan Parties shall have entered into Account Control Agreements reasonably acceptable to the DIP Agent and the Required DIP Lenders as required pursuant to Section 6.08.

All corporate and legal proceedings and instruments and agreements relating to the Transaction or in any other document delivered in connection herewith or therewith shall be reasonably satisfactory in form and substance to the DIP Agent and the Required DIP Lenders, and the DIP Agent shall have received all information and copies of all documents and papers, including records of corporate proceedings, governmental approvals, good standing certificates and bring-down facsimiles, if any, which the DIP Agent reasonably may have requested in connection therewith, such documents and papers where appropriate to be certified by proper corporate or Governmental Authorities.  The documents referred to in this Section 4.01 shall be delivered to the DIP Agent no later than the Closing Date.  The certificates and opinions referred to in this Section 4.01 shall be dated the Closing Date.

The requirement that any document, agreement, certificate or other writing be reasonably satisfactory to the Required DIP Lenders shall be deemed to be satisfied if (i) such document, agreement, certificate or other writing was delivered to the DIP Lenders not less than two Business Days prior to the Closing Date, (ii) such document, agreement, certificate or other writing is satisfactory to the DIP Agent

and (iii) DIP Lenders holding at least 50% of the Term Loan Commitments have not objected in writing to such document, agreement, certificate or other writing to the DIP Agent prior to the Closing Date.

Promptly after the Closing Date occurs, the DIP Agent shall notify the Borrower and the DIP Lenders of the Closing Date, and such notice shall be conclusive and binding on all parties hereto.

**Section 4.02   Conditions to All Credit Extensions.**   The obligation of any DIP Lender to make a Loan on the occasion of any Borrowing and the obligation of the Issuing Lender to issue (or renew or extend the term of) any Letter of Credit is subject to the satisfaction of each of the conditions set forth in <u>Section 4.01</u> on the date of such Loan (other than those conditions expressly required to be satisfied on the Closing Date) and the following additional conditions:

(a)   *Notice*.   The Borrower shall have delivered to the DIP Agent an appropriate Notice of Borrowing, duly executed and completed, by the time specified in, and otherwise as permitted by, <u>Section 2.02</u>.

(b)   *Representations and Warranties*.   The representations and warranties made by the Loan Parties in any DIP Loan Document are true and correct in all material respects at and as if made as of such date (in each case immediately prior to, and after giving effect to, the funding of any DIP Loans) except to the extent they expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

(c)   *No Default*.   No Default or Event of Default shall exist or be continuing either prior to or after giving effect thereto.

(d)   *No Restrictions*.   The making of such Loan shall not violate any Law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)   *Material Adverse Effect*.   No Material Adverse Effect shall have occurred.

(f)   [*Reserved*]

(g)   *Compliance with Budget*.   The making of such DIP Loan complies with the Budget, subject to Permitted Variances, or has otherwise been approved in writing by the DIP Agent at the direction of the Required DIP Lenders.

(h)   *Final Order.*   With respect to any Loans made after the Closing Date, the Final Order shall have been entered approving the DIP Facility, in form and substance satisfactory to the DIP Agent and the Required DIP Lenders, which Final Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Agent at the discretion of the Required DIP Lenders

(i)   *Restraint on Collateral*.   There shall not exist any Law, ruling, judgment, order, injunction or other restraint that, in the judgment of the DIP Agent at the direction of the Required DIP Lenders, prohibits, restricts or imposes a materially adverse condition on the Borrower or the other Loan Parties, the DIP Facility or the exercise by the DIP Agent or the DIP Lenders of their rights as secured parties with respect to the Collateral.

The delivery of each Notice of Borrowing and each request for a Letter of Credit shall constitute a representation and warranty by the Loan Parties of the correctness of the matters specified in <u>subsections (b)</u> through <u>(i)</u> above.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the DIP Lenders and the Agents to enter into this Agreement, each Loan Party represents and warrants to the DIP Lenders and the Agents that, on and as of the date hereof, on and as of the Closing Date, after giving effect to the making of the Loans and other Credit Extensions on the Closing Date and on and as of each date as required by Section 4.02:

**Section 5.01        Organization and Good Standing.**  Each of the Group Companies is a corporation, partnership or limited liability company duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its formation, has all corporate, partnership or limited liability company powers and all material governmental licenses, franchises, permits, certificates, authorizations, qualifications, accreditations, easements, rights of way and other rights, consents and approvals required to own its property and carry on its business as now conducted and is duly qualified as a foreign corporation, licensed and in good standing in each jurisdiction where qualification or licensing is required by the nature of its business or the character and location of its property, business or customers, except to the extent the failure to so qualify or be licensed, as the case may be, in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 5.02        Power; Authorization; Enforceable Obligations.**  Each of the Loan Parties has the corporate, partnership, limited liability company or other necessary power and authority, and the legal right, to execute, deliver and perform the DIP Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit hereunder, and has taken all necessary corporate, partnership or limited liability action to authorize the borrowings and other extensions of credit on the terms and conditions of this Agreement and to authorize the execution, delivery and performance of the DIP Loan Documents to which it is a party.  No consent or authorization of, filing with, notice to or other similar act by or in respect of, any Governmental Authority or any other Person is required to be obtained or made by or on behalf of any Loan Party in connection with the borrowings or other extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of the DIP Loan Documents, except for the Interim Order and the Final Order, as applicable.  Subject to the Orders, this Agreement has been, and each other DIP Loan Document to which Holdings or any of its Subsidiaries is a party will be, duly executed and delivered on behalf of such Person.  This Agreement constitutes, and each other DIP Loan Document to which any Loan Party is a party when executed and delivered will constitute, a legal, valid and binding obligation of each Loan Party thereto, enforceable against each such Person in accordance with its terms.

**Section 5.03        No Conflicts.**  Neither the execution and delivery by any Loan Party of the DIP Loan Documents to which it is a party, nor the consummation of the transactions contemplated therein, nor performance of and compliance with the terms and provisions thereof by such Person, nor the exercise of remedies by the Agents and the DIP Lenders under the DIP Loan Documents, will (i) violate or conflict with any provision of the articles or certificate of incorporation, bylaws, partnership agreement, operating agreement or other organizational or governing documents of such Person, (ii) subject to the entry of the Interim Order or Final Order, as applicable, violate, contravene or conflict with any Law applicable to it or its properties or (iii) subject to the entry of the Interim Order or Final Order, as applicable, violate, contravene or conflict with contractual provisions of, cause an event of default under, or give rise to material increased, additional, accelerated or guaranteed, rights of any Person under, any indenture, loan agreement, mortgage, deed of trust or other instrument, material contract or material lease to which it is a party or by which it may be bound.

**Section 5.04        No Default.**  Except as disclosed on Schedules 5.04 and 5.11, none of the Group Companies is in default in any respect under any loan agreement, indenture, mortgage, security

agreement or other agreement relating to Debt or any other contract, lease, agreement or obligation to which it is a party or by which any of its properties is bound which default could reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred or exists.

### Section 5.05      Financial Condition.

(a)      _Audited Financial Statements_.  The consolidated balance sheets of the Borrower and its Consolidated Subsidiaries as of July 3, 2011 and the related consolidated and consolidating statements of income and cash flows for the fiscal year then ended, reported on by KPMG LLP, copies of each of which have been delivered to each of the DIP Lenders, fairly present in all material respects, in accordance with GAAP (except as disclosed therein), the consolidated financial position of the Borrower and its Consolidated Subsidiaries as of each such date and their consolidated results of operations and cash flows for the fiscal year ended July 3, 2011.

(b)      _Unaudited Financial Statements_.  The unaudited consolidated balance sheet of the Borrower and its Consolidated Subsidiaries as of July 3, 2012 and the related unaudited consolidated and consolidating statements of income and cash flows for the fiscal year then ended, copies of which have been delivered to each of the DIP Lenders, fairly present in all material respects, in accordance with GAAP (except as disclosed therein) applied on a basis consistent with the financial statements referred to in Section 5.05(a) of this Section (except for the absence of footnotes and normal year-end audit adjustments), the consolidated financial position of the Borrower and its Consolidated Subsidiaries as of each such date and their consolidated results of operations and cash flows for such fiscal year.

(c)      [_Reserved_]

(d)      _Projections; Budget_.  The projections prepared pursuant to Section 4.01(g), the Budget prepared pursuant to Section 4.01(s) and each Weekly Cash Flow Forecast are based on good faith estimates and assumptions believed by management of the Borrower to be reasonable and fair in light of current conditions and facts known to the Borrower at the time delivered.  The management of the Borrower believes that such projections, Budget and each such Weekly Cash Flow Forecast are reasonable and attainable, it being recognized by the Lenders, however, that projections as to future events are not to be viewed as facts or guaranties of future performance, that actual results during the period or periods covered by such projections may differ from the projected results and that such differences may be material and that the Loan Parties make no representations that such projections will be in fact realized. There is no fact known to Holdings, Kingpin or the Borrower or any of its Subsidiaries which could reasonably be expected to have a Material Adverse Effect which has not been disclosed herein or in the Pre-Commitment Information.

(e)      _Post-Closing Financial Statements_.  The financial statements delivered to the DIP Lenders pursuant to Section 6.01(a), (b) and (l): (i) have been prepared in accordance with GAAP (except as may otherwise be permitted under Section 6.01(a), (b) and (l); and (ii) present fairly in all material respects (on the basis disclosed in the footnotes to such financial statements, if any) the consolidated and consolidating financial condition, results of operations and cash flows of Kingpin and its Consolidated Subsidiaries as of the respective dates thereof and for the respective periods covered thereby.

(f)      _No Undisclosed Liabilities_.  Except as disclosed on Schedules 5.05 and 5.11 hereto or as fully reflected in the financial statements described in Section 5.05(a) and (b) above and the Debt incurred under this Agreement, the First Lien Loan Documents and the Second Lien Loan Documents, (i) there were as of the Closing Date (and after giving effect to any Loans made and Letters of Credit issued on such date and to the Second Lien Loans), no liabilities or obligations (excluding

current obligations incurred in the ordinary course of business) with respect to any Group Company of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether or not due and including obligations or liabilities for taxes, long-term leases and unusual forward or other long-term commitments), and (ii) no Loan Party knows of any basis for the assertion against any Group Company of any such liability or obligation, in each case which, either individually or in the aggregate, are or could reasonably be expected to have, a Material Adverse Effect.

Section 5.06    **No Material Effect.**   Since July 3, 2012, as of the Closing Date (both before and after giving effect to the Transaction), and on the date of each subsequent Borrowing, except as set forth on Schedules 5.04, 5.05 and 5.11, there has been no Material Adverse Effect, and no event or development has occurred which could reasonably be expected to result in a Material Adverse Effect.

Section 5.07    **Title to Properties; Possession Under Leases.**   Each Group Company has good insurable and legal fee title to (in the case of owned Real Property), or valid leasehold interests in (in the case of Leaseholds), all its material properties and assets, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted.   All such material properties and assets are free and clear of Liens other than Permitted Liens. Except as set forth on Schedule 5.07, each Group Company has complied with all obligations under all leases to which it is a party, other than leases that, individually or in the aggregate, are not material to the Group Companies, taken as a whole, and the violation of which will not result in a Material Adverse Effect, and other than noncompliance with the iStar Sale/Leaseback Documents to the extent previously disclosed to the DIP Agent, and all such leases are in full force and effect, other than leases that, individually or in the aggregate, are not material to the Group Companies, taken as a whole, and in respect of which the failure to be in full force and effect will not result in a Material Adverse Effect. Each Group Company enjoys peaceful and undisturbed possession under all such leases with respect to which it is the lessee, other than leases that, individually or in the aggregate, are not material to the Group Companies, taken as a whole, and in respect of which the failure to enjoy peaceful and undisturbed possession will not result in a Material Adverse Effect.

Section 5.08    **Litigation.**   Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases (other than with respect to the liquidation of AMF Bowling Products UK Ltd) and disclosed in Schedules 5.08 and 5.11, there are no actions, suits, investigations or legal, equitable, arbitration or administrative proceedings pending or, to the knowledge of any Loan Party, threatened against or affecting any Group Company in which there is a reasonable possibility of an adverse decision that (i) involves any DIP Loan Document, any aspect of the Transaction or Borrowing after the Closing Date, or (ii) if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.09    **Taxes.**   Except as disclosed in Schedule 5.09 or otherwise permitted by Section 6.05, each Group Company has filed, or caused to be filed, all federal and all material state, local and foreign tax returns required to be filed and paid (i) all amounts of taxes shown thereon to be due (including interest and penalties) and (ii) all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangible taxes) owing by it. No Loan Party knows of any pending investigation of such party by any taxing authority or proposed tax assessments against any Group Company.

Section 5.10    **Compliance with Law.**   Each Group Company is in compliance with all requirements of Law (including Environmental Laws) applicable to it or to its properties, except (i) for any such failure to comply which could not reasonably be expected to cause a Material Adverse Effect or (ii) as set forth on Schedules 5.10 or 5.11.   To the knowledge of the Loan Parties, none of the Group Companies or any of their respective material properties or assets is subject to or in default with respect to

any judgment, writ, injunction, decree or order of any court or other Governmental Authority which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. Except as disclosed in <u>Schedule 5.10</u>, none of the Group Companies has received any written communication from any Governmental Authority that alleges that any of the Group Companies is not in compliance in any material respect with any Law, except for allegations that have been satisfactorily resolved and are no longer outstanding or which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.11**    **ERISA; Employee Benefit Arrangements.**

(a)      *ERISA*.  Except as disclosed in <u>Schedule 5.11</u>:

(i)      There are no Unfunded Liabilities (A) with respect to any member of the Group Companies and (B) with respect to any ERISA Affiliate; <u>provided</u> that for purposes of this <u>Section 5.11(a)(i)(B)</u> only, Unfunded Liabilities shall mean the amount (if any) by which the projected benefit obligation exceeds the value of the plan's assets as of its last valuation date.

(ii)      Each ERISA Plan, other than a Multiemployer Plan, has been maintained in compliance with its terms and complies in all respects with the applicable requirements of ERISA and the Code, and each Group Company and ERISA Affiliate complies in all respects with the applicable requirements of ERISA and the Code with respect to all Multiemployer Plans to which it contributes, except to the extent that the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

(iii)      No ERISA Event has occurred or, subject to the passage of time, is reasonably expected to occur with respect to any ERISA Plan maintained by any member of the Group Companies and, except to the extent that such ERISA Event would not reasonably be expected to have a Material Adverse Effect, no ERISA Event has occurred or, subject to the passage of time, is reasonably expected to occur with respect to any ERISA Plan maintained by an ERISA Affiliate.

(iv)      No Group Company or ERISA Affiliate:  (A) is or has been within the last six years a party to any Multiemployer Plan; or (B) has completely or partially withdrawn from any Multiemployer Plan.

(v)      If any Group Company or any ERISA Affiliate were to incur a complete withdrawal (as described in Section 4203 of ERISA) from all Multiemployer Plans as of the Closing Date, the aggregate withdrawal liability, as determined under Section 4201 of ERISA, with respect to all such Multiemployer Plans would not exceed $10,000,000.

(vi)      The execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder will not involve any transaction that is subject to the prohibitions of Section 406 of ERISA or in connection with which taxes could be imposed pursuant to Section 4975(c)(1)(A)-(D) of the Code, for which an exemption under ERISA does not apply.

(vii)      No Group Company or, to the knowledge of any Group Company, any ERISA Affiliate has any contingent liability with respect to any post-retirement benefit under a Welfare Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA.

(b)     *Foreign Pension Plans*.  Each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities except to the extent that the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 5.11, no Group Company or any of their subsidiaries has incurred any material obligation in connection with the termination of, withdrawal from or winding up of any Foreign Pension Plan.  Except as set forth on Schedule 5.11, there are no material Unfunded Liabilities with respect to any Foreign Pension Plan.

(c)     *Employee Benefit Arrangements*.

(i)     All liabilities under the Employee Benefit Arrangements are (A) funded to at least the minimum level required by law or, if higher, to the level required by the terms governing the Employee Benefit Arrangements, (B) insured with a reputable insurance company, (C) provided for or recognized in the financial statements most recently delivered to the DIP Agent pursuant to Section 6.01(a) or (b) hereof or (D) estimated in the formal notes to the financial statements most recently delivered to the DIP Agent pursuant to Section 6.01(a) hereof, where such failure to fund, insure, provide for, recognize or estimate the liabilities arising under such arrangements could reasonably be expected to have a Material Adverse Effect.

(ii)     There are no circumstances which may give rise to a liability in relation to the Employee Benefit Arrangements which are not funded, insured, provided for, recognized or estimated in the manner described in clause (i) above and which could reasonably be expected to have a Material Adverse Effect.

(iii)     Each Group Company is in compliance with all applicable Laws, trust documentation and contracts relating to the Employee Benefit Arrangements and each Employee Benefit Arrangement complies in all respects with applicable Law except to the extent that the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect. Each Employee Benefit Arrangement and each ERISA Plan intended to be qualified under Section 401(a) of the Code has received a favorable determination from the Internal Revenue Service or is in the form of a prototype document that is the subject of a favorable opinion letter from the Internal Revenue Service, and to the knowledge of any Group Company, nothing has occurred or, subject to the passage of time is reasonably expected to occur, that would result in the loss of the qualified status of such Employee Benefit Arrangement or ERISA Plan.

**Section 5.12     Subsidiaries.**  Schedule 5.12 sets forth a complete and accurate list as of the Closing Date of all Subsidiaries of Holdings.  Schedule 5.12 sets forth as of the Closing Date the jurisdiction of formation of each such Subsidiary; whether each such Subsidiary is a Subsidiary Guarantor, the number of authorized shares of each class of Equity Interests of each such Subsidiary, the number of outstanding shares of each class of Equity Interests, the number and percentage of outstanding shares of each class of Equity Interests of each such Subsidiary owned (directly or indirectly) by any Person and the number and effect, if exercised, of all Equity Equivalents with respect to Equity Interests of each such Subsidiary.  All the outstanding Equity Interests of each Subsidiary of Holdings are validly issued, fully paid and non-assessable and were not issued in violation of the preemptive rights of any shareholder and, as of the Closing Date, are owned by Holdings, directly or indirectly, free and clear of all Liens (other than those arising under the DIP Loan Documents, the First Lien Collateral Documents and the Second Lien Collateral Documents).  Other than as set forth on Schedule 5.12, as of the Closing Date, no such Subsidiary has outstanding any Equity Equivalents nor does any such Person have outstanding any rights to subscribe for or to purchase or any options for the purchase of, or any agreements providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character

relating to, its Equity Interests.   Holdings has no Subsidiaries, other than the Borrower and its Subsidiaries.

### Section 5.13     Governmental Regulations, Etc.

(a)      None of Holdings and its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation U.  No part of the Letters of Credit or proceeds of the Loans will be used, directly or indirectly, for the purpose of purchasing or carrying any "margin stock" within the meaning of Regulation U.  If requested by any DIP Lender or the DIP Agent, the Borrower will furnish to the DIP Agent and each DIP Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 referred to in Regulation U.  No indebtedness being reduced or retired out of the proceeds of the Loans was or will be incurred for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U or any "margin security" within the meaning of Regulation T.  "Margin stock" within the meaning of Regulation U does not constitute more than 25% of the value of the consolidated assets of Holdings and its Consolidated Subsidiaries.  None of the transactions contemplated by this Agreement (including the direct or indirect use of the proceeds of the Loans) will violate or result in a violation of the Securities Act, the Exchange Act, or Regulation T, U or X.

(b)      None of the Group Companies is subject to regulation under the Investment Company Act of 1940, as amended.  In addition, none of the Group Companies is (i) an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended or (ii) controlled by such a company.

### Section 5.14     Purpose of Loans and Letters of Credit.   Subject to Section 7.22, the proceeds of the Term Loans will be used only for the following purposes, in each case in accordance with and subject to the Budget:

(a)      for the payment of prepetition amounts acceptable to the DIP Lenders as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Loan Parties;

(b)      in accordance with the terms of the Orders, (i) for the payment of working capital and other general corporate needs of the Loan Parties in the ordinary course of business; (ii) for the payment of Chapter 11 expenses, including allowed professional fees, costs and expenses for advisors, consultants, counsel and other professionals retained by the Borrower, (iii) to make adequate protection payments, and (iv) to Cash Collateralize, at 102%, the Existing Letters of Credit; and

(c)      to pay fees and expenses related to the DIP Facility.

### Section 5.15     Labor Matters.   There are no strikes against Holdings or any of its Subsidiaries, other than any strikes that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The hours worked and payments made to employees of Holdings and its Subsidiaries have not been in violation in any material respect of the Fair Labor Standards Act or any other applicable Law dealing with such matters, except to the extent any such violation or violations, could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  All payments due from Holdings or any of its Subsidiaries, or for which any claim may be made against Holdings or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower and its Subsidiaries, as applicable.  The consummation of the Transaction will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining

agreement to which Holdings or any of its Subsidiaries is a party or by which Holdings or any of its Subsidiaries (or any predecessor) is bound, other than collective bargaining agreements which, individually or in the aggregate, are not material to Holdings and its Subsidiaries taken as a whole.

Section 5.16   **Environmental Matters.**   Except as disclosed on Schedule 5.16, no Group Company has failed to comply with any Environmental Law or to obtain, maintain, or comply with any permit, license or other approval required under any Environmental Law or is subject to any Environmental Liability which, in any of the foregoing cases, individually or collectively, could reasonably be expected to result in a Material Adverse Effect, or has received notice of any claim with respect to any Environmental Liability, or knows of any basis for any Environmental Liability against any Group Company, in either case which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.17   **Intellectual Property.**   (a)   Schedule 5.17 (as such schedule may be amended or supplemented from time to time) sets forth a true and complete list of (i) all United States and foreign registrations of and applications for Patents, Trademarks, and Copyrights owned by the Borrower and its Domestic Subsidiaries, (ii) all Licenses material to the business of the Borrower and its Subsidiaries and (iii) any "intent to use" trademarks of the Borrower and its Domestic Subsidiaries as of the Closing Date.  Other than Permitted Existing Liens, neither Borrower nor its Domestic Subsidiaries has granted any Lien in any Intellectual Property or License set forth on Schedule 5.17.

(b)   The Borrower and its Subsidiaries own, or possess the right to use, all of the Trademarks, Copyrights, Patents, and other Intellectual Property, franchises, Licenses and other rights that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person, except to the extent the failure to own or possess the right to use any such right could not reasonably be expected to have a Material Adverse Effect.

(c)   To the knowledge of the Borrower and its Subsidiaries, no Copyright, Patent, Trademark, and the businesses of Borrower and its Subsidiaries, including any product, process, method, substance, part or other material now offered or employed, or now contemplated to be offered or employed, by the Borrower or any Subsidiary, infringes upon or misappropriates any Intellectual Property or other rights held by any other Person, except to the extent any such infringement and misappropriation, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(d)   The Borrower and its Subsidiaries have taken all action to maintain and preserve their rights in the Intellectual Property owned by the Borrower and its Domestic Subsidiaries, including without limitation paying all renewal, maintenance, and other fees and taxes, and making all filings required to maintain each and every registration and application of Intellectual Property in full force and effect, except to the extent the failure to take any such action or proceeding would have, in the aggregate, a Material Adverse Effect.  No Intellectual Property owned by the Borrower or any of its Subsidiaries that was subject to the First Lien Credit Agreement has been allowed to lapse or expire except for Intellectual Property that the Borrower and its Subsidiaries have, in the exercise of their reasonable business judgment, permitted to expire or have cancelled or abandoned, or to the extent such action or proceeding would not have a Material Adverse Effect.

(e)   The Intellectual Property material to each of the businesses of the Borrower and its Subsidiaries is valid and subsisting in all material respects, and no holding, decision, or judgment has been rendered in any action or proceeding before any court or administrative authority challenging the validity of or the Borrower's or its Subsidiaries' right to register, or the Borrower's or its Subsidiaries' rights to own or use any Intellectual Property, and no such action or proceeding is pending or, to the

Borrower's and its Subsidiaries' knowledge, threatened, except as disclosed in Schedule 5.17 or except to the extent the failure to do so would not have a Material Adverse Effect.

(f)      All registrations and applications for Copyrights, Patents and Trademarks are standing in the name of the Borrower or one of its Subsidiaries, and no material Intellectual Property has been licensed by the Borrower or its Subsidiaries to any third party, other than in the ordinary course of business on a non-exclusive basis (except as disclosed in Schedule 5.17).

Section 5.18    [Reserved].

Section 5.19    Disclosure.    No information or data (excluding financial and business projections, budgets, estimates, other forward-looking information and general market data and information of a general economic or general industry nature) made by any Loan Party in any DIP Loan Document or furnished to the DIP Agent or any DIP Lender by or on behalf of any Loan Party in connection with any DIP Loan Document, when taken as a whole as of the date furnished contains any untrue statement of a material fact or omits any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not materially misleading in light of the circumstances under which such statements were made; provided that (i) to the extent any such statement, information or report therein was based upon or constitutes a forecast or projection, the Borrower represents only that it acted in good faith and utilized assumptions believed by it to be reasonable at the time made (it being understood and agreed that projections as to future events are not to be viewed as facts or guaranties of future performance, that actual results during the period or periods covered by such projections may differ from the projects results and that such differences may be material and that the Loan Parties make no representations that such representations will in fact be realized) and (ii) as to statements, information and reports specified as having been supplied by third parties, other than Affiliates of the Borrower or any of its Subsidiaries, the Borrower represents only that it is not aware of any material misstatement or omission therein.

Section 5.20    Security Interests.    This Agreement, taken together with the Interim Order and/or the Final Order is effective to create in favor of the DIP Agent for the benefit of the DIP Lenders, legal, valid, enforceable and continuing first priority Liens on, and security interests in, the Collateral pledged hereunder or thereunder, in each case subject to no Liens other than with respect to Permitted Liens.  Pursuant to the terms of the Interim Order and/or Final Order, no filing or other action will be necessary to perfect or protect such Liens and security interests. Pursuant to and to the extent provided in the Interim Order and the Final Order, the Debt of the Loan Parties under this Agreement will constitute allowed administrative expense claims in the Chapter 11 Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including avoidance actions and the proceeds thereof), subject only to the Carve-Out. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all Liens and claims (including administrative and DIP Superpriority Claims) securing the Obligations, the Loan Parties' pre-petition obligations, adequate protection Liens, and all other Liens or claims (including administrative and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative and DIP Superpriority Claims) securing the Obligations and pre-petition obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative and DIP Superpriority Claims) granted to the DIP Lenders.

Section 5.21    **Ownership.**

(a)    *Securities of the Borrower*.  Kingpin owns good, valid and insurable legal title to all the outstanding common stock of the Borrower, free and clear of all Liens of every kind, whether absolute, matured, contingent or otherwise, other than those arising under the DIP Loan Documents, the First Lien Collateral Documents and the Second Lien Collateral Documents.  Except as set forth on Schedule 5.21, there are no shareholder agreements or other agreements pertaining to Kingpin's beneficial ownership of the common stock of the Borrower, including any agreement that would restrict Kingpin's right to dispose of such common stock and/or its right to vote such common stock.

(b)    *Kingpin Equity Interests*.  As of the Closing Date, Holdings owns good, valid and insurable legal title to all the outstanding common stock of Kingpin.  Except as set forth on Schedule 5.21, as of the Closing Date, there are no shareholder agreements or other agreements pertaining to Holdings' beneficial ownership of the common stock of Kingpin, including any agreement that would restrict Holdings' right to dispose of such common stock and/or its right to vote such common stock.

(c)    *Holdings Equity Interests*.  Schedule 5.21 sets forth a true and accurate list as of the Closing Date of each holder of any Equity Interest or Equity Equivalent of Holdings indicating the name of each such holder and the Equity Interest or Equity Equivalent held by each such Person.  Except as set forth on Schedule 5.21, as of the Closing Date, there are no shareholders agreements or other agreements pertaining to the Investor Group's beneficial ownership of the common Equity Interests of Holdings including any agreement that would restrict the Investor Group's right to dispose of such common Equity Interests and/or its right to vote such common Equity Interests.

Section 5.22    **No Broker's Fees**.  Except as disclosed on Schedule 5.22, no broker's or finder's fee or commission will be payable with respect to this Agreement or any of the transactions contemplated hereby as a result of any action by or on behalf of the Borrower or their Affiliates, and each Loan Party hereby indemnifies each Agent and each DIP Lender against, and agrees that it will hold each Agent and each DIP Lender harmless from, any claim, demand or liability for any such broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any expenses (including reasonable fees, expenses and disbursements of counsel) arising in connection with any such claim, demand or liability.

Section 5.23    **Orders**.  The Loan Parties are in compliance with the terms and conditions of the Orders.  Each of the Interim Order (to the extent necessary, with respect to the period prior to the entry of the Final Order) or the Final Order (from after the date the Final Order is entered) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the DIP Agent and Required DIP Lenders, in their sole discretion, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

Section 5.24    **Budget**.  A true and complete copy of the Budget, as agreed to with the DIP Agent as of the Closing Date, is attached as Exhibit E hereto.

# ARTICLE VI
# AFFIRMATIVE COVENANTS

Each Loan Party agrees that so long as any DIP Lender has any Commitment hereunder, any DIP Obligation or other amount payable hereunder or under any Note or other DIP Loan Document or any LC Obligation (in each case other than contingent indemnification obligations) remains unpaid or any Letter of Credit remains outstanding:

**Section 6.01    Information.**  The Borrower will furnish, or cause to be furnished, to the DIP Agent for prompt delivery to each of the DIP Lenders:

(a)    *Annual Financial Statements*.  As soon as available, and in any event within one-hundred ten (110) calendar days after the end of each fiscal year of the Borrower, a consolidated balance sheet and income statement of Kingpin and its Consolidated Subsidiaries, as of the end of such fiscal year, and the related consolidated statement of operations and retained earnings and consolidated statement of cash flows for such fiscal year, setting forth in comparative form consolidated figures for the preceding fiscal year, all such financial statements to be in reasonable form and detail and (in the case of such consolidated financial statements) audited by independent certified public accountants of recognized national standing reasonably acceptable to the Required DIP Lenders and accompanied by an opinion of such accountants (which shall not be qualified in any material respect as to scope but may contain a qualification with respect to the Chapter 11 Cases) to the effect that such consolidated financial statements have been prepared in accordance with GAAP and present fairly in all material respects the consolidated financial position and consolidated results of operations and cash flows of Kingpin and its Consolidated Subsidiaries in accordance with GAAP consistently applied (except for changes with which such accountants concur), certified by the Loan Parties' chief financial officer and accompanied by a written statement by the accountants reporting on compliance with this Agreement to the effect that in the course of the audit upon which their opinion on such financial statements was based (but without any special or additional audit procedures for the purpose), they obtained knowledge of no condition or event relating to financial matters which constitutes a Default or an Event of Default or, if such accountants shall have obtained in the course of such audit knowledge of any such Default or Event of Default, disclosing in such written statement the nature and period of existence thereof, it being understood that such accountants shall be under no liability, directly or indirectly, to the DIP Lenders for failure to obtain knowledge of any such condition or event.

(b)    *Quarterly Financial Statements*.  As soon as available, and in any event within forty-five (45) calendar days after the end of each of the first three fiscal quarters in each fiscal year of the Borrower, a consolidated balance sheet of Kingpin and its Consolidated Subsidiaries as of the end of such fiscal quarter, together with related consolidated statement of operations and retained earnings and consolidated statement of cash flows for such fiscal quarter and the then elapsed portion of such fiscal year, setting forth in comparative form consolidated figures for the corresponding periods of the preceding fiscal year, all such financial statements to be in form and detail and reasonably acceptable to the DIP Agent, and accompanied by a certificate of the chief financial officer of the Borrower to the effect that such quarterly financial statements have been prepared in accordance with GAAP and present fairly in all material respects the consolidated financial position and consolidated results of operations and cash flows of Kingpin and its Consolidated Subsidiaries in accordance with GAAP consistently applied, subject to changes resulting from normal year-end audit adjustments and the absence of footnotes required by GAAP.

(c)    *Officer's Certificate*.  At the time of delivery of the financial statements provided for in Sections 6.01(a), 6.01(b) and 6.01(l) above, a certificate of the chief financial officer, chief restructuring officer or other appropriate Responsible Officer of the Borrower (i) demonstrating compliance with the financial covenant contained in Section 7.16, if applicable, by calculation thereof as of the end of the fiscal period covered by such financial statements, (ii) stating that no Default or Event of Default exists, or if any Default or Event of Default does exist, specifying the nature and extent thereof and what action the Borrower and the other Loan Parties propose to take with respect thereto and (iii) stating whether, since the date of the most recent financial statements delivered hereunder, there has been any material change in the GAAP applied in the preparation of the financial statements of Kingpin and its Consolidated Subsidiaries, and, if so, describing such change.

(d)      [*Reserved*].

(e)      [*Reserved*].

(f)      *Auditor's Reports*.  Within five Business Days of receipt thereof, a copy of any other final report or "management letter" submitted by independent accountants to Kingpin, the Borrower or any of their respective Subsidiaries in connection with any annual, interim or special audit of the books of Kingpin, the Borrower or any of their respective Subsidiaries.

(g)      *Reports*.  Promptly upon transmission or receipt thereof, copies of all filings and registrations with, and reports to or from, the Securities and Exchange Commission, or any successor agency, and copies of all financial statements, proxy statements, notices and reports any Group Company shall send to its shareholders or to a holder of any Debt owed by any Group Company in its capacity as such a holder.

(h)      *Notices*.  Prompt notice of:  (i) the occurrence of any Default or Event of Default; (ii) any matter that has resulted or may result in a Material Adverse Effect, including (A) breach or non-performance of, or any default under, any material agreement of Holdings or any of its Subsidiaries; (B) any dispute, litigation, investigation, proceeding or suspension between Holdings or any of its Subsidiaries and any Governmental Authority; (C) the commencement of, or any material adverse development in, any litigation or proceeding affecting Holdings or any of its Subsidiaries, including pursuant to any applicable Environmental Law; (D) any litigation, investigation or proceeding affecting any Loan Party in which the amount involved exceeds $4,000,000, or in which injunctive relief or similar relief is sought, which relief, if granted, could be reasonably expected to have a Material Adverse Effect; and (E) any material change in accounting policies or financial reporting practice by Holdings or any of its Subsidiaries.  Each notice pursuant to this Section 6.01(h) shall (i) be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower or any other Loan Party has taken and proposes to take with respect thereto and (ii) describe with particularity any and all provisions of this Agreement or the other DIP Loan Documents that have been breached.

(i)      *Employee Benefits Arrangements*.  (i) The Borrower will give written notice to the DIP Agent promptly (and in any event within five Business Days after any officer of any Group Company obtains knowledge thereof) of: (A) any event or condition that constitutes, or is reasonably likely to lead to, an ERISA Event. which, in the case of an event described in clause (iv)(A) of the definition of "ERISA Event", results in the occurrence of a material liability and in the case of an event described in clauses (iv)(B)(x) or (viii) of the definition of "ERISA Event", is reasonably expected to result in the incurrence of a material liability; (B) any change in the funding status of any ERISA Plan or Foreign Pension Plan that could have a Material Adverse Effect, together with a description of any such event or condition or a copy of any such notice and a statement by the chief financial officer of the Borrower briefly setting forth the details regarding such event, condition or notice and the action, if any, which has been or is being taken or is proposed to be taken by the Borrower and the other Loan Parties with respect thereto; (C) any event or condition that constitutes, or is reasonably likely to lead to, an event described in Section 8.01(h)(iii)-(ix), (D) any event or condition that, to the knowledge of any Group Company, could reasonably be expected to result in a nonexempt prohibited transaction in connection with the consummation of the transactions contemplated hereunder, (E) any change in the disclosures in Schedule 5.11 regarding the UK Pension Plan that could result in liability to any Group Company in excess of £8,600,000 or (F) the receipt of a notice from a UK regulator, a trustee of the UK Pension Plan, the UK Pension Plan or similar person or entity imposing or trying to impose liability on or requesting payment from any Loan Party or Domestic Subsidiary with respect to the UK Pension Plan.  Promptly upon request, the Borrower shall furnish the DIP Agent and the DIP Lenders with such additional

information concerning any ERISA Plan or Foreign Pension Plan or Employee Benefit Arrangement as may be reasonably requested, including, but not limited to, with respect to any ERISA Plans, copies of each annual report/return (Form 5500 series), as well as all schedules and attachments thereto required to be filed with the Department of Labor and/or the Internal Revenue Service pursuant to ERISA and the Code, respectively, for each "plan year" (within the meaning of Section 3(39) of ERISA) of each ERISA Plan; and (ii) the Borrower will promptly deliver to the DIP Agent the most recently prepared actuarial reports in relation to the Employee Benefit Arrangements for the time being operated by Group Companies which are prepared in order to comply with the then current statutory or auditing requirements within the relevant jurisdiction.

(j)      *Domestication in Other Jurisdiction*.   Not less than twenty (20) calendar days prior to any change in the jurisdiction of organization of any Loan Party, a copy of all documents and certificates intended to be filed or otherwise executed to effect such change.

(k)      *Other Information*.   With reasonable promptness upon request therefor, such other information regarding the business, properties or financial condition of any Group Company as the DIP Agent or any DIP Lender may reasonably request, which may include such information necessary or advisable to enable the DIP Agent or such DIP Lender either (i) to comply with the policies and procedures adopted by it and its Affiliates to comply with the Bank Secrecy Act, the U.S. Patriot Act and all applicable regulations thereunder or (ii) to respond to requests for information concerning Holdings and its Subsidiaries from any government, self-regulatory organization or financial institution in connection with its anti-money laundering and anti-terrorism regulatory requirements or its compliance procedures under the U.S. Patriot Act, including in each case information concerning the Borrower's direct and indirect shareholders and its use of the proceeds of any Credit Extension hereunder.

(l)      *Monthly Financial Statements*.   As soon as available, and in any event within thirty (30) calendar days after the end of each fiscal month of the Borrower (other than each fiscal month which is the last fiscal month of a fiscal quarter of the Borrower), a copy of the consolidated financial statements for Kingpin and its Consolidated Subsidiaries for such fiscal month (in form and substance consistent with prior monthly reporting required to be provided to the First Lien Agent for delivery to the First Lien Lenders pursuant to the First Lien Credit Agreement), certified by the Loan Parties' chief financial officer and attaching evidence of compliance with the financial covenants set forth in Section 7.16.

(m)      *Weekly Cash Flow Forecasts; Variance Reports*.   Every Friday during the Chapter 11 Cases, (i) commencing after the delivery of the Budget, a Weekly Cash Flow Forecast for the subsequent 13 week period, and (ii) beginning on the third Friday following the Closing Date, a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of the Loan Parties for the prior week and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such week as compared to (1) the Budget on a weekly and cumulative basis (which shall be subject to the variances set forth in the DIP Loan Documents), and (2) the most recent Weekly Cash Flow Forecast delivered by the Loan Parties, in each case, on a weekly and cumulative basis (and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer or Chief Restructuring Officer of the Loan Parties).

(n)      *Business and Financial Plans*.   At least thirty (30) calendar days prior to the fiscal year-end, an annual business and financial plan for the following fiscal year.

The Borrower will furnish, or cause to be furnished to the First Lien Agent, on behalf of and for the benefit of the First Lien Lenders, and the First Lien Lenders, and to the Second Lien Agent, on behalf of and for the benefit of the Second Lien Lenders, and the Second Lien Lenders, access to the Loan Parties'

books and records and such financial reports as are provided to the DIP Agent pursuant to subclauses (a), (b) and (l) of this Section 6.01.

Section 6.02    **Preservation of Existence and Franchises.**    Except as a result of or in connection with a dissolution, merger or disposition of a Subsidiary of the Borrower permitted under Section 7.04 or Section 7.05, each Group Company will do all things necessary to preserve and keep in full force and effect its legal existence and do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, Patents, Copyrights, Trademarks and other Intellectual Property material to the conduct of its business and to maintain and operate such business in substantially the manner in which it is presently conducted and operated; provided, however, that neither Holdings nor any of its Subsidiaries shall be required to preserve any such rights, licenses, permits, franchises, authorizations or Intellectual Property if the preservation thereof is no longer desirable in the conduct of the business of the Borrower and its Subsidiaries or the loss thereof could not reasonably be expected to result in a Material Adverse Effect.

Section 6.03    **Books and Records; Lender Meeting.**    Each of the Group Companies will keep complete and accurate books and records of its transactions in accordance with good accounting practices on the basis of GAAP (including the establishment and maintenance of appropriate reserves). At the request of the DIP Agent or the Required DIP Lenders, within one-hundred ten (110) calendar days after the end of each fiscal year of the Borrower, the Borrower will conduct a meeting (which may be by telephone) of the DIP Lenders to discuss such fiscal year's results and the financial condition of Kingpin and its Consolidated Subsidiaries.  Such meetings shall be held at times and places convenient to the DIP Lenders and to the Borrower.

Section 6.04    **Compliance with Law; Employee Benefit Arrangements.**

(a)    Subject to Section 6.04(b), each of the Group Companies will comply with all requirements of Law applicable to it and its properties (or, with respect to the matters set forth on Schedule 5.10, the applicable settlement negotiations), including the Bankruptcy Court or other court with jurisdiction over the Chapter 11 Cases.

(b)    Except as otherwise provided in this Agreement, each of the Group Companies will do each of the following as it relates to any ERISA Plan sponsored or maintained by, or Multiemployer Plan contributed to by, each of the Group Companies, Foreign Pension Plan or Employee Benefit Arrangement:  (i) maintain each ERISA Plan (other than a Multiemployer Plan), Foreign Pension Plan and Employee Benefit Arrangement in compliance in all material respects with the applicable provisions of ERISA, the Code or other Federal, state or foreign law; (ii) cause each ERISA Plan (other than a Multiemployer Plan) or Employee Benefit Arrangement which is qualified under Section 401(a) of the Code to maintain such qualifications; (iii) make all required contributions to any ERISA Plan subject to Section 412 of the Code or 303 of ERISA and make all required contributions to Multiemployer Plans; (iv) ensure that there are no Unfunded Liabilities in excess of $10,000,000; (v) except for the obligations set forth on Schedule 5.11, not become a party to any Multiemployer Plan; (vi) make all contributions (including any special payments to amortize any Unfunded Liabilities) required to be made in accordance with all applicable laws and the terms of each Foreign Pension Plan in a timely manner; (vii) ensure that all liabilities under the Employee Benefit Arrangements are either (A) funded to at least the minimum level required by Law or, if higher, to the level required by the terms governing the Employee Benefit Arrangements; (B) insured with a reputable insurance company; (C) provided for or recognized in the accounts most recently delivered to the DIP Agent under Section 6.01(c); or (D) estimated in the formal notes to the accounts most recently delivered to the DIP Agent under Section 6.01(a); (viii) ensure that the contributions or premium payments to or in respect of all Employee Benefit Arrangements are and continue to be promptly paid at no less than the rates required under the rules of such arrangements and in

accordance with the most recent actuarial advice received in relation to the Employee Benefit Arrangement and in accordance with applicable law; and (ix) shall use its reasonable efforts to cause each of its ERISA Affiliates to do each of the items listed in clauses (i) through (viii) above as it relates to ERISA Plans and Multiemployer Plans maintained or sponsored by or contributed to by its ERISA Affiliates such that there shall be no liability to a Group Company by virtue of such ERISA Affiliate's acts or failure to act.

Section 6.05   **Payment of Taxes.**   Each of the Group Companies will pay and discharge (i) all taxes, assessments and other governmental charges or levies imposed upon it, or upon its income or profits, or upon any of its properties, before they shall become delinquent and (ii) all lawful claims (including claims for labor, materials and supplies) which, if unpaid, might give rise to a Lien (other than a Permitted Lien) upon any of its properties; provided, however, that no Group Company shall be required to pay any such tax, assessment, charge, levy or claim (i) which is being contested in good faith by appropriate proceedings diligently pursued and as to which adequate reserves have been established in accordance with GAAP, (ii) which represent taxes not discharged in the Borrower's prior Chapter 11 bankruptcy proceeding and which are being paid in accordance with a payment plan applicable thereto established pursuant to such bankruptcy proceeding, or (iii) unless the failure to make any such payment (A) could give rise to an immediate right to foreclose on a Lien securing such amounts (unless proceedings thereto conclusively operate to stay such foreclosure) or (B) could reasonably be expected to have a Material Adverse Effect.

Section 6.06   **Insurance; Certain Proceeds.**

(a)   *Insurance Policies.*   Each of the Group Companies will at all times maintain in full force and effect insurance (including worker's compensation insurance, liability insurance or casualty insurance) in such amounts, covering such risk and liabilities and with such deductibles or self-insurance retentions as are in accordance with normal industry practice or otherwise consistent with past practice of the Group Companies or prudent in the reasonable business judgment of the senior management of the Borrower. The Collateral Agent shall be named as loss payee or mortgagee, as its interest may appear, with respect to all such property and casualty policies and additional insured with respect to all such other policies (other than workers' compensation, employee health and directors and officers policies), and each provider of any such insurance shall agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to the Collateral Agent, that if the insurance carrier shall have received written notice from the Collateral Agent of the occurrence and continuance of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to Holdings or one or more of its Subsidiaries under such policies directly to the Collateral Agent (which agreement shall be evidenced by a "standard" or "New York" lender's loss payable endorsement in the name of the Collateral Agent on Accord Form 27) and that it will give the Collateral Agent thirty (30) calendar days' prior written notice before any such policy or policies shall be altered or canceled, and that no act or default of any Group Company or any other Person shall affect the rights of the Collateral Agent or the DIP Lenders under such policy or policies.

(b)   *Loss Events.*   In case of any Casualty or Condemnation with respect to any property of any Group Company or any part thereof in excess of $500,000, the Borrower shall promptly give written notice thereof to the DIP Agent generally describing the nature and extent of such damage, destruction or taking. The Borrower shall, or shall cause such Group Company to, repair, restore or replace the property of such Person (or part thereof) which was subject to such Casualty or Condemnation, at such Person's cost and expense, whether or not the Insurance Proceeds or Condemnation Award, if any, received on account of such event shall be sufficient for that purpose; provided, however, that such property need not be repaired, restored or replaced to the extent the failure to make such repair, restoration or replacement (i) is desirable to the proper conduct of the business of

such Person in the ordinary course and otherwise in the best interest of such Person or (ii) the failure to repair, restore or replace the property is attributable to the application of the Insurance Proceeds from such Casualty or the Condemnation Award from such Condemnation to the acquisition of other tangible assets used or useful in the business of the Borrower and its Subsidiaries as contemplated in the definition of "Reinvestment Funds" or are applied to the payment of the DIP Obligations in accordance with the provisions of Section 2.09(b)(i).

(c)      *Certain Rights of the Lenders*.  In connection with the covenants set forth in this Section 6.06, it is understood and agreed that none of the Agents, the DIP Lenders or their respective agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.06, it being understood that the Group Companies shall look solely to their insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage.

**Section 6.07      Maintenance of Property.**  Each of the Group Companies will maintain and preserve its properties and equipment material to the conduct of its business, in good working order and condition, except to the extent (x) caused by normal wear and tear or Casualty and Condemnation, or (y) related to the accrued deferred maintenance expenses previously disclosed to the DIP Agent on or prior to the Closing Date, provided that each of the Group Companies, will make, or cause to be made, as to such properties and equipment from time to time all repairs, renewals, replacements, extensions, additions, betterments and improvements thereto as may be needed or proper in the reasonable good faith business judgment of the Responsible Officers of such Group Companies, except as limited by compliance with the Budget .

**Section 6.08      DIP Priority Account; Account Control Agreements.**

(a)      All proceeds of the Term Loans shall be deposited into the DIP Priority Account, and all amounts therein shall be invested at all times in cash and Cash Equivalents.  Withdrawals from the DIP Priority Account shall only be used for the permitted purposes described under Section 5.14 or to make payments on the DIP Obligations.  Under no circumstances may any cash, funds, securities, financial assets or other property held in or credited to the DIP Priority Account or the proceeds thereof held therein or credited thereto be used to pay any pre-petition obligations or for any purpose not permitted under the Orders.

(b)      During the term of the DIP Facility, all cash of the Loan Parties shall be deposited directly into accounts covered by Account Control Agreements (except for payroll, employee benefits and trust accounts (including League Funds)), and other deposit accounts with an aggregate balance not exceeding $150,000 at any time).

**Section 6.09      Audits/Inspections.**  Upon reasonable notice and during normal business hours, each of the Group Companies will permit representatives appointed by the Agents or the Required DIP Lenders to visit and inspect its executive offices and/or manufacturing facilities and, following the occurrence and during the continuance of any Event of Default, any of its properties, and to review and inspect its books and records, accounts receivable and inventory, and to make photocopies or photographs thereof and to write down and record any information such representatives obtain and shall permit the Agents or such representatives to investigate and verify the accuracy of information provided to the DIP Lenders and to discuss all such matters with the officers, employees, independent accountants and representatives of the Group Companies, in each case so long as a Responsible Officer has been given the opportunity to be present; provided, however, that prior to the occurrence and continuance of an Event of Default, such visits shall be limited to one per year per location, and the Group Companies shall not be obligated to reimburse the expenses of more than two representatives of the DIP Agent and the DIP

Lenders in the aggregate.

## Section 6.10    Additional Loan Parties; Additional Security.

(a)    *Additional Subsidiary Guarantors*.  Each Loan Party will take, and will cause each of its Subsidiaries (other than Foreign Subsidiaries, except to the extent provided in subsection (d) below, and other than the Qubica JV Entity and non-Wholly-Owned Liquor License Subsidiaries) to take, such actions from time to time as shall be necessary to ensure that all Subsidiaries of Holdings (other than Foreign Subsidiaries, except to the extent provided in Section 6.10(d) below, and other than the Qubica JV Entity and non-Wholly-Owned Liquor License Subsidiaries) are Subsidiary Guarantors.  Without limiting the generality of the foregoing, if any Group Company shall form or acquire any new Subsidiary, the Borrower, as soon as practicable and in any event within thirty (30) calendar days after such formation or acquisition, will provide the Collateral Agent with notice of such formation or acquisition setting forth in reasonable detail a description of all of the assets of such new Subsidiary and will cause such new Subsidiary (other than a Foreign Subsidiary, except to the extent provided in Section 6.10(d) below, and other than the Qubica JV Entity and non-Wholly-Owned Liquor License Subsidiaries) to:

(i)    within thirty (30) calendar days after such formation or acquisition, execute an Accession Agreement pursuant to which such new Subsidiary shall agree to become a Subsidiary Guarantor and a Loan Party under this Agreement; and

(ii)    deliver such proof of organizational authority, incumbency of officers, opinions of counsel and other documents as is consistent with those delivered by each Loan Party pursuant to Section 4.01 on the Closing Date or as the DIP Agent, the Collateral Agent or the Required DIP Lenders reasonably shall have requested.

(b)    *Additional Security*.  Each Loan Party will cause, and will cause each of its Subsidiaries (other than a Foreign Subsidiary, except to the extent provided in subsection (d) below, and other than the Qubica JV Entity and non-Wholly-Owned Liquor License Subsidiaries) to cause, (i) all of its owned Real Properties and personal property located in the United States, other than those owned Real Properties set forth on Schedule 6.10(b) and other than owned Real Properties which are subject to a Permitted Lien the terms of which prohibit the granting of a Lien thereon in favor of the Secured Parties and (ii) to the extent deemed to be material by the DIP Agent or the Required DIP Lenders in its or their sole reasonable discretion, (A) all of its personal property located in the United States (except to the extent expressly excluded from in any DIP Loan Document), (B) all of its leased Real Properties located in the United States (other than leased Real Properties subject to a Sale/Leaseback Transaction permitted hereunder or other leaseholds the terms of which prohibit the granting of a Lien thereon in favor of the Secured Parties) and (C) all other assets and properties of Holdings and its Domestic Subsidiaries located in the United States as are not covered by any DIP Loan Document (or specifically excluded therefrom) and as may be requested by the Collateral Agent or the Required DIP Lenders in their sole reasonable discretion to be subject at all times to first priority (subject only to Permitted Liens), perfected and, in the case of Real Property (whether leased or owned), title insured Liens in favor of the Collateral Agent pursuant to the DIP Loan Documents or such other security agreements, pledge agreements, mortgages or similar collateral documents as the Collateral Agent shall request in its sole and reasonable discretion (collectively, the "Additional Collateral Documents").  With respect to any Real Property (whether leased or owned) located in the United States acquired or leased by any Loan Party subsequent to the Closing Date for which the Collateral Agent is entitled to a Lien pursuant to the preceding sentence, such Person will cause to be delivered to the Collateral Agent with respect to such Real Property (other than immaterial leased properties or except for properties with respect to which landlord consent for such mortgage cannot be obtained after commercially reasonable efforts by the Borrower to do so or as otherwise approved by the DIP Agent) documents, instruments and other items of the types and in form,

content and scope reasonably satisfactory to the Collateral Agent.  In furtherance of the foregoing terms of this Section 6.10, the Borrower agrees to promptly provide the DIP Agent with written notice of the acquisition by Holdings or any of its Subsidiaries of any Real Property located in the United States having a market value greater than $500,000 or the entering into a lease by Holdings or any of its Subsidiaries of any Real Property located in the United States for annual rent of $50,000 or more, setting forth in each case in reasonable detail the location and a description of the asset(s) so acquired or leased.  Without limiting the generality of the foregoing, each Loan Party will cause, and will cause each of their respective Subsidiaries to cause, 100% of the Equity Interests of each of their respective direct Subsidiaries (such Equity Interests, subject, in the case of Equity Interests in any such Subsidiary that is a Foreign Subsidiary, to the limits imposed on Collateral as provided in clause (i) of the definition of "Excluded Collateral"), other than the Qubica JV Entity and non-Wholly-Owned Liquor License Subsidiaries to be subject at all times to a first priority, perfected Lien in favor of the Collateral Agent pursuant to the terms and conditions of the DIP Loan Documents, subject only to Permitted Liens.

If, subsequent to the Closing Date, a Loan Party shall acquire any registered Intellectual Property, securities, instruments, chattel paper or other personal property required to be delivered to the Collateral Agent as Collateral under any of the DIP Loan Documents, the Borrower shall promptly (and in any event within 10 Business Days after any Responsible Officer of any Loan Party acquires knowledge of the same) notify the Collateral Agent of the same.  Each of the Loan Parties shall adhere to the covenants regarding the location of personal property as set forth in the DIP Loan Documents.

All such security interests and mortgages shall be granted pursuant to documentation consistent with the DIP Loan Documents executed at Closing and otherwise reasonably satisfactory in form and substance to the Collateral Agent and shall constitute valid and enforceable perfected security interests and mortgages prior to the rights of all third Persons and subject to no other Liens except for Permitted Liens.  The Additional Collateral Documents or instruments related thereto shall have been duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Collateral Documents, and all taxes, fees and other charges payable in connection therewith shall have been paid in full.  The Borrower shall cause to be delivered to the Collateral Agent such opinions of counsel, title insurance and other related documents as may be reasonably requested by the Collateral Agent to assure itself that this Section 6.10(b) has been complied with.

(c)    *Real Property Appraisals*.  If the Collateral Agent or the Required DIP Lenders determine that they are required by law or regulation to have appraisals prepared in respect of the Real Property of any Group Company constituting Collateral, the Borrower shall provide to the Collateral Agent appraisals which satisfy the applicable requirements set forth in 12 C.F.R., Part 34 - Subpart C or any successor or similar statute, rule, regulation, guideline or order, and which shall be in scope, form and substance, and from appraisers, reasonably satisfactory to the Required DIP Lenders (it being acknowledged by the Required DIP Lenders that Hilco is satisfactory to the Required DIP Lenders) and shall be accompanied by a certification of the appraisal firm providing such appraisals that the appraisals comply with such requirements.

(d)    *Foreign Subsidiaries Security*.  If, following a change that is reasonably determined to be relevant by the DIP Agent in the relevant sections of the Code or the regulations, rules, rulings, notices or other official pronouncements issued or promulgated thereunder, counsel for the Borrower reasonably acceptable to the Collateral Agent and the Required DIP Lenders fails within ninety (90) calendar days after a reasonable request from the Collateral Agent and the Required DIP Lenders to deliver evidence, in form and substance mutually satisfactory to the Collateral Agent and the Borrower, with respect to any Foreign Subsidiary of Holdings which has not already had all of the Equity Interests issued by it pledged pursuant to the Orders that (i) a pledge (A) of two-thirds or more of the total

combined voting power of all classes of capital stock of such Foreign Subsidiary entitled to vote, and (B) of any promissory note issued by such Foreign Subsidiary to the Borrower or any of its Domestic Subsidiaries, (ii) the entering into by such Foreign Subsidiary of a guaranty in form and substance acceptable to the DIP Agent, (iii) the entering into by such Foreign Subsidiary of a security agreement in form and substance acceptable to the DIP Agent, and (iv) the entering into by such Foreign Subsidiary of a pledge agreement in form and substance acceptable to the DIP Agent, in any such case would reasonably be expected to be restricted by applicable Law of the jurisdiction of organization of such Foreign Subsidiary or would reasonably be expected to cause the undistributed earnings or future earnings, if any, of such Foreign Subsidiary as determined for United States federal income tax purposes to be included as gross income of such Foreign Subsidiary's United States parent (or other domestic Affiliate) for United States federal income tax purposes, then, (A) in the case of a failure to deliver the evidence described in clause (i) above, that portion of such Foreign Subsidiary's outstanding capital stock or any promissory notes so issued by such Foreign Subsidiary, in each case not theretofore pledged, shall be pledged to the Collateral Agent for the benefit of the Secured Parties and securing the DIP Obligations, in each case only to the extent that such pledge would not reasonably be expected to cause the undistributed earnings or future earnings, if any, of such Foreign Subsidiary as determined for United States federal income tax purposes to be included in gross income of such Foreign Subsidiary's United States parent (or other domestic Affiliate) for United States federal income tax purposes or would not reasonably be expected to be restricted by Applicable Law of the jurisdiction of organization of such Foreign Subsidiary; (B) in the case of a failure to deliver the evidence described in clause (ii) above, such Foreign Subsidiary shall execute and deliver a guaranty in form and substance acceptable to the DIP Agent, guaranteeing the DIP Obligations; (C) in the case of a failure to deliver the evidence described in clause (iii) above, such Foreign Subsidiary shall execute and deliver a security agreement in form and substance acceptable to the DIP Agent, granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in all of such Foreign Subsidiary's assets and securing the DIP Obligations; and (D) in the case of a failure to deliver the evidence described in clause (iv) above, such Foreign Subsidiary shall execute and deliver the a pledge agreement in form and substance acceptable to the DIP Agent, pledging to the Collateral Agent, for the benefit of the Secured Parties, all of the capital stock and promissory notes owned by such Foreign Subsidiary, in each case to the extent that entering into such guaranty, security agreement or pledge agreement is permitted by the Laws of the respective foreign jurisdiction.  In addition to the foregoing, if the conditions in the preceding sentence are met, each such Foreign Subsidiary shall execute an Accession Agreement pursuant to which such Foreign Subsidiary shall agree to become a Subsidiary Guarantor and Loan Party and deliver such proof of organizational authority, incumbency of officers, opinions of counsel and other documents as is consistent with those delivered by each Loan Party pursuant to Section 4.01 on the Closing Date or as the DIP Agent, the Collateral Agent or the Required DIP Lenders reasonably shall have requested and with all documents delivered pursuant to this Section 6.10(d) to be in form, scope and substance reasonably satisfactory to the Collateral Agent.

(e)      *Required Actions*.  Each Loan Party agrees that, except as otherwise provided in this Section 6.10, each action required by this Section 6.10 shall be completed as soon as possible, but in no event later than ninety (90) calendar days after such action is either requested to be taken by the Collateral Agent or the Required DIP Lenders or required to be taken by Holdings or any of its Subsidiaries pursuant to the terms of this Section 6.10.

**Section 6.11    [Reserved]**

**Section 6.12    Contributions.**  Within three Business Days following its receipt thereof, (a) Holdings will contribute as a common equity contribution to the capital of Kingpin (for further contribution to the Borrower) any cash proceeds received by Holdings after the Closing Date from any Asset Disposition, Casualty, Condemnation, Debt Issuance or Equity Issuance or any cash capital

contributions received by Holdings after the Closing Date. Within three Business Days following its receipt thereof, (a) Kingpin will contribute as a common equity contribution to the capital of the Borrower any cash proceeds received by Kingpin after the Closing Date from any Asset Disposition, Casualty, Condemnation, Debt Issuance or Equity Issuance or any cash capital contributions received by Kingpin after the Closing Date.

**Section 6.13    [Reserved]**.

**Section 6.14    Certain Post-Closing Matters**.

(a)        Each Loan Party authorizes the Collateral Agent, in its discretion, to effect the execution, filing or recording of any of mortgages, security agreements, pledge agreements, control agreements, financing statements or other agreements to perfect the DIP Liens (notwithstanding that the DIP Liens shall be effective and perfected as of the entry of the Interim Order and without necessity of the execution, filing or recording).

(b)        The Loan Parties shall timely pay all fees and expenses due under the Hilco Engagement Letter.

(c)        The Loan Parties shall use their respective reasonable best efforts to cooperate with and support the DIP Agent and the DIP Lenders in connection with the consummation of the Transaction, including, without limitation, the financing contemplated by the DIP Facility.

(d)        The Credit Parties shall make commercially reasonable efforts to deliver to the DIP Agent, certificates or other evidence of good standing as to payment of any applicable franchise or similar taxes from the appropriate taxing authority of California, Florida, New York, Texas and Virginia for each Loan Party that is qualified to do business in such state, no later than thirty (30) calendar days after the Closing Date (or such longer time period as agreed to by the DIP Agent in writing).

**Section 6.15    Additional Information Obligations**.

(a)        *Chapter 11 Case Documents*.  Each Loan Party shall deliver or cause to be delivered for  review and comment, as soon as commercially reasonable and in any event not less than two (2) Business Days  prior to filing, all material documents (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Loan Parties with the Bankruptcy Court to the DIP Agent and the DIP Lenders and their counsel.

(b)        *Progress Calls*.  Borrower shall hold monthly progress conference calls for the DIP Lenders, starting on the third (3rd) Business Day after the first day of the second week following the Closing Date, until the DIP Termination Date. Such conference calls shall be held every month as soon as a responsible officer of the Borrower is reasonably available to have such conference call and in any event no later than the third (3rd) Business Day after the first day of each second week. During such conference calls a responsible officer of the Borrower shall provide the participating DIP Lenders with a reasonably comprehensive update on the Chapter 11 Cases, variances with respect to the Budget and any other material information relating to the business, condition (financial or otherwise), operation, performance, properties or prospects of any of the Loan Parties and any other information that may be reasonably requested by the DIP Agent or any DIP Lender.

(c)        *Restructuring Proposals*.  Each Loan Party shall promptly deliver or cause to be delivered to the DIP Agent and the DIP Lenders copies of any term sheets, proposals, presentations or

other documents, from any party, related to (i) the restructuring of the Loan Parties, (ii) the sale of assets of one or all of the Loan Parties, or (iii) the restructuring of any iStar Sale/Leaseback Documents.

(d)    *Hilco Documents*.   Each Loan Party shall promptly deliver or cause to be delivered, upon receipt of same, to the DIP Agent and the DIP Lenders copies of any and all appraisal analysis(es), reports, presentations, proposals or other documents prepared by Hilco in relation to the properties that are owned by the Loan Parties and/or are the subject of the iStar Sale/Leasebacks or any other leases to which the Loan Parties are a party.

(e)    *Access to Advisors*.   The Loan Parties shall allow the DIP Agent and the DIP Lenders access to, upon reasonable notice during normal business hours in a time and manner to minimize disruption to the Loan Parties, the financial consultant engaged by the Loan Parties (which engagement shall be on terms and conditions reasonably satisfactory to the DIP Agent at the direction of the Required DIP Lenders).

All deliveries by the Loan Parties to the DIP Agent and/or the DIP Lenders required pursuant to this Article VI shall be subject to the confidentiality provisions of Section 10.07 hereof.

## ARTICLE VII
## NEGATIVE COVENANTS

Each Loan Party agrees that so long as any DIP Lender has any Commitment hereunder, any DIP Obligations or other amount payable hereunder or under any Note or other DIP Loan Document or any LC Obligation (in each case other than contingent indemnification obligations) remains unpaid or any Letter of Credit remains outstanding:

**Section 7.01    Limitation on Debt.**   None of the Group Companies will incur, create, assume or permit to exist any Debt or Synthetic Lease Obligations except:

(i)    Debt of the Loan Parties incurred under this Agreement and the other DIP Loan Documents;

(ii)    Debt existing prior to the date hereof and permitted by the First Lien Credit Agreement;

(iii)    Debt owed to any Person providing property, casualty, liability or other insurance to the Borrower or any Subsidiary of the Borrower, so long as such Debt shall not be in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Debt is incurred and such Debt shall be outstanding only during such year;

(iv)    Debt owing to the Borrower or a Subsidiary of the Borrower to the extent permitted by Section 7.06(a)(viii) or (xi);

(v)    Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided that (A) such Debt (other than credit or purchase cards) is extinguished within three Business Days of its incurrence and (B) such Debt in respect of credit or purchase cards in extinguished within sixty (60) calendar days from its incurrence; and

(vi)    accrual of interest on Debt otherwise permitted under this Section 7.01.

**Section 7.02    Restriction on Liens.**  None of the Group Companies will create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any Person, including any Subsidiary of Holdings) now owned or hereafter acquired by it or on any income or rights in respect of any thereof, except for Liens described in the following clauses (collectively, "Permitted Liens"):

(i)    Liens created by the Orders, this Agreement and the DIP Loan Documents;

(ii)    Liens (other than any Liens imposed by ERISA or pursuant to any Environmental Law) for taxes (including outstanding Chapter 11 taxes), assessments or governmental charges or levies not more than thirty (30) calendar days overdue or not required to be paid pursuant to Section 6.05;

(iii)    Liens securing the charges, claims, demands or levies of landlords (but in all cases excluding any Lien on any Collateral arising under the iStar Sale/Leaseback Documents), carriers, warehousemen, mechanics, sellers of goods, carriers and other like persons which were incurred in the ordinary course of business and which (A) secure charges, claims, demands or levies which are not more than thirty (30) calendar days overdue or not required to be paid pursuant to Section 6.05 or (B) do not, individually or in the aggregate, materially detract from the value of the property or assets which are the subject of such Lien or materially impair the use thereof in the operation of the business of the Borrower or any of its Subsidiaries;

(iv)    (x) Liens (other than any Liens imposed by ERISA or pursuant to any Environmental Law) not securing Debt incurred or (y) deposits made in the ordinary course of business, in each case in connection with workers' compensation, unemployment insurance and other types of social security and other similar obligations incurred in the ordinary course of business;

(v)    Liens (including pledges or deposits) securing obligations in respect of surety bonds (other than appeal bonds), bids, trade contracts, public or statutory obligations, leases, government contracts, performance and return of money bonds and other similar obligations incurred in the ordinary course of business;

(vi)    pledges or deposits of cash and Cash Equivalents securing deductibles, self-insurance, co-payment, co-insurance, retentions and similar obligations to providers of insurance on the ordinary cause of business;

(vii)    zoning restrictions, building codes, easements, rights of way, licenses, reservations, covenants, conditions, waivers, restrictions on the use of property or other minor encumbrances or irregularities of title not securing Debt which do not, individually or in the aggregate, materially impair the use of any property in the operation or business of Holdings or any of its Subsidiaries or the value of such property for the purpose of such business;

(viii)    Liens securing Capital Lease Obligations and Purchase Money Debt incurred prior to the Closing Date and permitted under Section 7.01(ii);

(ix)    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights, in each case incurred in the ordinary course of business;

(x)    Liens on (A) incurred premiums, dividends and rebates which may become payable under insurance policies and loss payments which reduce the incurred premiums on such insurance policies and (B) rights which may arise under State insurance guarantee funds relating to any such insurance policy, in each case securing Debt permitted to be incurred pursuant to Section 7.01(iii);

(xi)    any (A) Lien not securing any Debt or Synthetic Lease Obligations constituting an interest or title of a licensor, lessor or sublicensor or sublessor under any Operating Lease or License entered into by the Borrower or any of its Subsidiaries in compliance with this Agreement or (B) Lien resulting from the subordination by any such lessor or sublessor of its interest or title under such Operating Lease to any Lien described in subparagraph (viii) above; provided that the holder of such Lien or restriction agrees in writing to recognize the rights of such lessee or sublessee under such Operating Lease;

(xii)    Liens in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods;

(xiii)    Permitted Existing Liens;

(xiv)    Liens arising under the iStar Sale/Leaseback Documents consisting of options, whether or not then exercisable, to purchase Bowling Equipment of the Borrower and/or one or more of its Subsidiaries;

(xv)    any other Lien created, incurred, assumed or suffered by a Loan Party on or after the Petition Date, if such Lien is (A) junior to the Liens of the DIP Agent and the DIP Lenders hereunder and junior to any adequate protection Liens granted to the First Lien Agent, the First Lien Lenders, the Second Lien Agent and the Second Lien Lenders, each in accordance with the Orders and (B) approved by the Bankruptcy Court with the prior written consent of the DIP Agent at the direction of the Required DIP Lenders;

(xvi)    additional Liens granted by the Bankruptcy Court to the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders and/or any junior creditors pursuant to the Orders; and

(xvii)    Liens securing the Carve-Out.

**Section 7.03    Nature of Business.**   None of the Group Companies will alter in any material respect the character of the business conducted by such Person as of the Closing Date, except that the Borrower and its Subsidiaries may engage in reasonable extensions thereof and in business reasonably related, ancillary or complementary thereto.

**Section 7.04    Consolidation, Merger and Dissolution.**   Except in connection with an Asset Disposition permitted by the terms of Section 7.05, none of the Group Companies will enter into any transaction of merger or consolidation or liquidate, wind up or dissolve itself or its affairs (or suffer any liquidations or dissolutions); provided that (a) any Foreign Subsidiary of the Borrower may be merged with and into, or be voluntarily dissolved or liquidated into, the Borrower or any Subsidiary of the Borrower, so long as (A) in the case of any such merger, dissolution or liquidation involving one or more Subsidiary Guarantors, (y) the Borrower or such Subsidiary Guarantor, as the case may be, is the surviving corporation of any such merger, dissolution or liquidation and (z) no Person other than the Borrower or a Subsidiary Guarantor receives any consideration in respect of or as a result of such transaction, (B) the security interests granted to the Collateral Agent for the benefit of the Secured Parties

pursuant to the DIP Loan Documents in the assets of such Foreign Subsidiary, if any, and the Borrower or such other Wholly-Owned Subsidiary, as the case may be, and in the Equity Interests of the surviving entity of such merger, dissolution or liquidation shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, dissolution or liquidation) and (C) no Default or Event of Default shall have occurred and be continuing immediately before or immediately after giving effect to such transaction; and (b) AMF Bowling Products UK Ltd may be liquidated upon the sale of its assets pursuant to a transaction permitted by the terms of Section 7.05(xiii).

In the case of any merger or consolidation permitted by this Section 7.04 of any Subsidiary of Holdings which is not a Loan Party into a Loan Party, the Loan Parties shall cause to be executed and delivered such documents, instruments and certificates as the DIP Agent may reasonably request so as to cause the Loan Parties to be in compliance with the terms of Section 6.10 after giving effect to such transaction. Notwithstanding anything to the contrary contained above in this Section 7.04, no action shall be permitted which results in a Change of Control.

    **Section 7.05**  **Asset Dispositions.** None of the Group Companies will make any Asset Disposition; provided that:

    (i)  any Group Company may sell inventory in the ordinary course of business on an arms'-length basis;

    (ii)  the Borrower may make any Asset Disposition to any of the Loan Parties if (A) the Loan Parties shall cause to be executed and delivered such documents, instruments and certificates as the DIP Agent or the Collateral Agent may request so as to cause the Loan Parties to be in compliance with the terms of Section 6.10 after giving effect to such Asset Disposition and (B) after giving effect to such Asset Disposition, no Default or Event of Default exists;

    (iii)  the Borrower and its Subsidiaries may liquidate or sell Cash Equivalents; provided, that the proceeds of such sale are deposited in a Deposit Account subject to an Account Control Agreement;

    (iv)  the Borrower or any of its Subsidiaries may dispose of real estate, machinery or equipment which will be replaced or upgraded with real estate, machinery or equipment put to a similar use and owned, or otherwise used or useful in the ordinary course of business of and owned, by such Person, provided that (A) such replacement or upgraded machinery and equipment is acquired within 60 days after such disposition, (B) upon their acquisition, such replacement assets become subject to the Lien of the DIP Agent under the Collateral Documents (to the extent in effect immediately prior to such disposition), and (C) the proceeds from all such disposals do not exceed $1,000,000 in the aggregate at any time prior to the DIP Termination Date;

    (v)  the Borrower or any of its Subsidiaries may, in the ordinary course of business and in a commercially reasonable manner, dispose of obsolete, worn-out or surplus tangible assets and other excess property no longer used or useful in the ordinary course of business and may, in the ordinary course of business and in a commercially reasonable manner, cancel, abandon, or permit to expire issuances, registrations and applications for immaterial Intellectual Property no longer used or useful in the ordinary course of business;

    (vi)  any Group Company may enter into any Sale/Leaseback Transaction (other than the iStar Sale/Leaseback Transaction) permitted by Section 7.13;

(vii)    any Subsidiary of the Borrower may sell, lease or otherwise transfer any or all or substantially all of its assets (including any such transaction effected by way of merger or consolidation) to the Borrower or any other Loan Party, so long as (A) the security interests granted to the Collateral Agent for the benefit of the Secured Parties pursuant to the DIP Loan Documents in such assets shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such sale, lease or other transfer) and (B) after giving effect to such Asset Disposition, no Default or Event of Default exists;

(viii)    any Group Company may sell or dispose of Equity Interests in its Subsidiaries to qualify directors where required by applicable Law or to satisfy other requirements of applicable Law with respect to the ownership of Equity Interests of Foreign Subsidiaries or Liquor License Subsidiaries;

(ix)    any Group Company may (A) lease, as lessor or sublessor, or license, as licensor or sublicensor, real or personal property (including a license of the Intellectual Property of any Group Company on a non-exclusive basis) in the ordinary course of business and consistent with past practices and (B) grant options to purchase, lease or acquire real or personal property in the ordinary course of business, so long as the Asset Disposition resulting from the exercise of such option would otherwise be permitted under this Section 7.05;

(x)    any Group Company may dispose of defaulted receivables and similar obligations in the ordinary course of business and not as part of an accounts receivable financing transaction; and

(xi)    any Group Company may make one or more Foreign Asset Dispositions;

(xii)    the Borrower or any of its Domestic Subsidiaries may make one or more Asset Dispositions described in Section 7.09(vii);

(xiii)    any Group Company may close and sell any bowling centers, to the extent such sales are authorized by the Bankruptcy Court, provided, that at the time of any such closure or disposition (i) no Default or Event of Default has occurred and is continuing and (ii) the Loan Parties are in compliance on a pro forma basis with the financial covenants set forth in Section 7.16, recomputed for the most recent monthly for which financial statements have been delivered; and

(xiv)    an administrator appointed by the applicable Governmental Authority may sell all or substantially all assets of AMF Bowling Products UK Ltd in connection with liquidation proceedings for AMF Bowling Products UK Ltd instituted by such Governmental Authority.

Upon consummation of an Asset Disposition permitted under this Section 7.05, the Lien therein created (but not the Lien on any proceeds thereof) under the DIP Loan Documents shall be automatically released and the DIP Agent shall (or shall cause the Collateral Agent to) (to the extent applicable) deliver to the Borrower, upon the Borrower's request and at the Borrower's expense, such documentation as is reasonably necessary to evidence the release of the Collateral Agent's security interests, if any, in the assets being disposed of, including amendments or terminations of UCC Financing Statements, if any, the return of stock certificates, if any, and the release of any Subsidiary being disposed of in its entirety from all of its obligations, if any, under the DIP Loan Documents.

**Section 7.06    Investments.**

(a)     _Investments_.   None of the Group Companies will hold, make or acquire, any Investment in any Person, except the following:

(i)     Investments existing on the date hereof in Persons which are Subsidiaries or Permitted Joint Ventures on the date hereof;

(ii)     Holdings, Kingpin, the Borrower or any Subsidiary of the Borrower may invest in cash and Cash Equivalents;

(iii)     Kingpin may hold obligations of one or more officers or other employees of Kingpin or any of its Subsidiaries in connection with such officers' or employees' acquisition of Equity Interests of Holdings prior to the Petition Date, so long as no cash was paid by Kingpin or any of its Subsidiaries to such officers or employees in connection with the acquisition of any such obligations;

(iv)     the Borrower and any Subsidiary of the Borrower may acquire and hold receivables not constituting Debt owing to them, if created or acquired in the ordinary course of business;

(v)     the Borrower and each Subsidiary of the Borrower may acquire and own Investments (including Debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(vi)     deposits by the Borrower or any Subsidiary of the Borrower made in the ordinary course of business consistent with past practices to secure the performance of leases shall be permitted;

(vii)     Holdings and Kingpin may (directly or indirectly, as applicable) make equity contributions to the capital of the Borrower;

(viii)     the Borrower may make Investments in any of its Wholly-Owned Domestic Subsidiaries and any Subsidiary of the Borrower may make Investments in the Borrower or any Wholly-Owned Domestic Subsidiary of the Borrower; provided that (A) each item of intercompany Debt evidencing intercompany loans and advances made by a Foreign Subsidiary or a non-Wholly-Owned Domestic Subsidiary to the Borrower or a Wholly-Owned Domestic Subsidiary of the Borrower shall be evidenced by a promissory note in the form of Exhibit G hereto containing the subordination provisions set forth in Exhibit H hereto and (B) each promissory note evidencing intercompany loans and advances payable to a Loan Party shall be pledged to the Collateral Agent;

(ix)     the Borrower and its Subsidiaries may make transfers of assets to the Borrower and its Subsidiaries in accordance with Section 7.05(vi) and in connection with mergers and consolidations permitted under Section 7.04;

(x)     the Borrower and its Subsidiaries may purchase inventory, machinery, equipment and other assets in the ordinary course of business; and

(xi)     the Borrower or any of its Subsidiaries may make loans and advances to Kingpin (and Kingpin may make loans and advances to Holdings) for the purposes and in the amounts necessary to pay the fees, expenses and taxes described in Section 7.07(iii);

(xii)     Investments existing on the date hereof and identified on <u>Schedule 7.06</u>;

(xiii)    Investments arising out of the receipt by the Borrower or any of its Subsidiaries of non-cash consideration for the sale of assets permitted under <u>Section 7.05</u>; and

(xiv)    Investments resulting from pledges and deposits specifically referred to in <u>Section 7.02</u>.

<u>provided</u> that no Group Company may make or own any Investment in Margin Stock.

(b)     <u>*Limitation on the Creation of Subsidiaries*</u>.  No Group Company will establish, create or acquire after the Closing Date any Subsidiary.

**Section 7.07     Restricted Payments, etc.**  None of the Group Companies will declare or pay any Restricted Payments (other than Restricted Payments payable solely in Equity Interests (exclusive of Debt Equivalents) of such Person), except that:

(i)     any Wholly-Owned Subsidiary of the Borrower may make Restricted Payments to the Borrower or to any Wholly-Owned Subsidiary of the Borrower;

(ii)    any non-Wholly-Owned Subsidiary of the Borrower may make Restricted Payments to the Borrower or to any Wholly-Owned Subsidiary of the Borrower or ratably to all holders of its outstanding Equity Interests;

(iii)   the Borrower may make cash Restricted Payments to Kingpin (and Kingpin may make cash Restricted Payments to Holdings) for the purpose of paying, and in amounts not to exceed the amount necessary to pay, (A) the then currently due fees and expenses of Holdings' counsel, accountants and other advisors and consultants, and other operating and administrative expenses of Holdings (including employee and compensation expenditures and other similar costs and expenses) permitted under the Budget, (B) the then currently due fees and expenses of Holdings' independent directors permitted under the Budget and (C) the then currently due taxes payable by Holdings solely on account of the income of Holdings related to its Investment in the Borrower and its Subsidiaries and the reasonable expenses of preparing returns reflecting such taxes; <u>provided</u> that Holdings agrees to contribute to the Borrower any refund Holdings receives relating to any such taxes; and

(iv)   non-cash repurchases of Equity Interests by Holdings deemed to occur upon exercise of stock options if such Equity Interests represent a portion of the exercise price of such options.

**Section 7.08     Amendments of Certain Agreements**.

(a)     None of the Group Companies will, or will permit any of their respective Subsidiaries to, after the issuance thereof, amend, waive or modify (or permit the amendment, waiver or modification of) any of the terms, agreements, covenants or conditions of or applicable to the First Lien Loan Documents, Second Lien Loan Documents or any Subordinated Indebtedness issued by such Group Company.

(b)     <u>*Restriction on Payments of Principal of First Lien Loans and Second Lien Loans*</u>. None of the Group Companies will (i) directly or indirectly redeem, purchase, prepay, retire, defease or otherwise acquire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund

payment, any Debt incurred pursuant to the First Lien Loan Documents or the Second Lien Loan Documents, or set aside any funds for such purpose, whether such redemption, purchase, prepayment, retirement or acquisition is made at the option of the maker or at the option of the holder thereof, and whether or not any such redemption, purchase, prepayment, retirement or acquisition is required under the terms and conditions applicable to the First Lien Loan Documents or the Second Lien Loan Documents, except as expressly provided for in the Orders in the form and substance acceptable to the DIP Agent at the direction of the Required DIP Lenders.

(c)     _Restriction on Payments in Respect of Subordinated Debt_. None of the Group Companies will (i) directly or indirectly, redeem, purchase, prepay, retire, defease or otherwise acquire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any Subordinated Debt, or set aside any funds for such purpose, whether such redemption, purchase, prepayment, retirement or acquisition is made at the option of the maker or at the option of the holder thereof, and whether or not any such redemption, purchase, prepayment, retirement or acquisition is required under the terms and conditions applicable to such Debt or (ii) make any interest payment in respect of any Subordinated Debt, except as expressly provided for in the Orders in the form and substance acceptable to the DIP Agent at the direction of the Required DIP Lenders.

**Section 7.09    Transactions with Affiliates.**    None of the Group Companies will engage in any transaction or series of transactions with any Affiliate of Holdings other than:

(i)     transfers of assets to any Loan Party other than Holdings permitted by Section 7.05;

(ii)     transactions expressly permitted by Section 7.01, Section 7.04, Section 7.05, Section 7.06 or Section 7.07;

(iii)     compensation, indemnities and reimbursement of reasonable expenses of officers and directors as permitted by the Budget; provided that none of the Group Companies will make, commit to make, or permit to be made any bonus payments to executive officers of any Group Company and its respective subsidiaries in excess of the amounts set forth in the Budget;

(iv)     other transactions with the Sponsor and its Affiliates in existence on the Closing Date to the extent disclosed in Schedule 7.09;

(v)     any transaction entered into among the Borrower and the other Loan Parties (other than Holdings) or among such Loan Parties;

(vi)     [_Reserved_];

(vii)     (A) sales by the Borrower or any of its Domestic Subsidiaries of Bowling Equipment, bowling products and other equipment used in the operation or maintenance of bowling centers and related accessories to Foreign Subsidiaries of the Borrower for use in bowling centers operated by such Foreign Subsidiaries and (B) sales by the Borrower or any of its Domestic Subsidiaries of bowling products to Foreign Subsidiaries of the Borrower for resale by such Foreign Subsidiaries, in each case (x) for a price at least equal to the cost to the Borrower and its Domestic Subsidiaries of such Bowling Equipment, bowling products, equipment used in the operation or maintenance of bowling centers or related accessories and (y) in the aggregate at any time prior to the DIP Termination Date not to exceed $500,000;

(viii)    so long as no Default or Event of Default has occurred and is continuing, other transactions which are engaged in by the Borrower or any of its Subsidiaries in the ordinary course of its business on terms and conditions as favorable to such Person as would be obtainable by it in a comparable arms'-length transaction with an independent, unrelated third party; and

(ix)    Holdings may make one or more Qualifying Equity Issuances.

Notwithstanding the foregoing, none of Holdings and its Subsidiaries will enter into any management, consulting or similar agreement or arrangement (other than the Management Agreement) with, or pay any professional, consulting, management or similar fees to or for the benefit of, the Sponsor Group or its successors or transferees.

**Section 7.10    Fiscal Year; Organizational and Other Documents.**  None of the Group Companies will (i) change its fiscal year or (ii) consent to any amendment, modification or supplement (A) that is adverse in any respect to the DIP Lenders to its articles or certificate of incorporation, bylaws (or analogous organizational documents), the Management Agreement or any agreement entered into by it with respect to its Equity Interests or (B) relating the purchase of, or any option to purchase, Bowling Equipment under the iStar Sale/Leaseback Documents or that is otherwise materially adverse to the DIP Lenders with respect to the iStar Sale/Leaseback Documents, in each case as in effect on the Closing Date.  The Borrower will cause the Group Companies to promptly provide the DIP Lenders with copies of all amendments to the foregoing documents and instruments as in effect as of the Closing Date.

**Section 7.11    Restrictions with Respect to Intercorporate Transfers.**  Subject to the Orders, none of the Group Companies will create or otherwise cause or permit to exist any consensual encumbrance or restriction which prohibits or otherwise restricts (i) the ability of any such Subsidiary to (A) make Restricted Payments or pay any Debt owed to the Borrower or any Subsidiary of the Borrower, (B) pay Debt or other obligations owed to any Loan Party, (C) make loans or advances to the Borrower or any Subsidiary of the Borrower, (D) transfer any of its properties or assets to the Borrower or any Subsidiary of the Borrower or (E) act as a Subsidiary Guarantor and pledge its assets pursuant to the DIP Loan Documents or any renewals, refinancings, exchanges, refundings or extensions thereof or (ii) the ability of Holdings or any Subsidiary of Holdings to create, incur, assume or permit to exist any Lien upon its property or assets whether now owned or hereafter acquired to secure the DIP Obligations, except in each case for prohibitions or restrictions existing under or by reason of:

(i)    this Agreement and the other DIP Loan Documents;

(ii)    restrictions contained in the First Lien Loan Documents and Second Lien Loan Documents, all as in effect on the date of this Agreement;

(iii)    customary non-assignment provisions with respect to contracts, leases or licensing agreements entered into by the Borrower or any of its Subsidiaries, in each case entered into in the ordinary course of business and consistent with past practices;

(iv)    any restriction or encumbrance with respect to any asset of the Borrower or any of its Subsidiaries or a Subsidiary of the Borrower imposed pursuant to an agreement which has been entered into for the sale or disposition of such assets or all or substantially all of the capital stock or assets of such Subsidiary, so long as such sale or disposition is permitted under this Agreement;

(v)      restrictions in effect on the date of this Agreement contained in the iStar Sale/Leaseback Documents as in effect on the date of this Agreement;

(vi)      customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business prior to the Closing Date in connection with Permitted Joint Ventures;

(vii)      restrictions on cash and other deposits or net worth imposed by customers or suppliers in the ordinary course of business and consistent with past practice; and

(viii)      Liens permitted under Section 7.02 and any documents or instruments governing the terms of any Debt or other obligations secured by any such Liens; provided that such prohibitions or restrictions apply only to the assets subject to such Liens.

**Section 7.12      Ownership of Subsidiaries; Limitations on Holdings.**

(a)      No Loan Party will (i) permit any Subsidiary of the Borrower to issue Equity Interests to any Person, except (A) to the Borrower or any Wholly-Owned Subsidiary of the Borrower or (B) to qualify directors where required by applicable Law or to satisfy other requirements of applicable Law with respect to the ownership of Equity Interests of Foreign Subsidiaries or Liquor License Subsidiaries or (ii) permit any non-Wholly-Owned Subsidiary of the Borrower to issue any shares of Preferred Stock (other than to Persons in connection with obtaining liquor licenses or otherwise to the extent required by Law).

(b)      Holdings will not (i) hold any material assets other than the Equity Interests of Kingpin and cash or Cash Equivalents expressly permitted to be received and held by it from time to time in accordance with this Agreement, (ii) have any material liabilities other than (A) liabilities under the DIP Loan Documents and other obligations expressly permitted to be incurred by it pursuant to Section 7.01 and (B) tax and accrued liabilities and expenses in the ordinary course of business or (iii) engage in any business activity other than (A) owning the common stock of Kingpin (including purchasing additional shares of common stock after the Closing Date) and activities incidental or related thereto or to the maintenance of the corporate existence of Holdings or compliance with applicable law, (B) acting as a guarantor hereunder and pledging its assets to the Collateral Agent, for the benefit of the DIP Lenders, pursuant to the Orders and the DIP Loan Documents to which it is a party and (C) issuing its own Equity Interests (other than Debt Equivalents).

(c)      Kingpin will not (i) hold any material assets other than the Equity Interests of the Borrower and cash or Cash Equivalents expressly permitted to be received and held by it from time to time in accordance with this Agreement, (ii) have any material liabilities other than (A) liabilities under the DIP Loan Documents, the First Lien Loan Documents, the Second Lien Loan Documents, its Guaranty Obligations in respect of the iStar Sale/Leaseback Transactions and other obligations expressly permitted to be incurred by it pursuant to Section 7.01 and (B) tax and accrued liabilities and expenses in the ordinary course of business or (iii) engage in any business activity other than (A) owning the common stock of the Borrower (including purchasing additional shares of common stock after the Closing Date) and activities incidental or related thereto or to the maintenance of the corporate existence of Kingpin or compliance with applicable law, (B) acting as a guarantor hereunder , the First Lien Loan Documents and the Second Lien Loan Documents and pledging its assets to the Collateral Agent, for the benefit of the DIP Lenders, pursuant to the Orders and the DIP Loan Documents, the First Lien Loan Documents and the Second Lien Loan Documents to which it is a party, the iStar Sale/Leaseback Documents and other Guaranty Obligations expressly permitted to be incurred by it pursuant to Section 7.01 and (C) issuing its own Equity Interests (other than Debt Equivalents).

(d)      No Loan Party will permit any Person other than (A) Holdings to hold any Equity Interests or Equity Equivalents of Kingpin or (B) Kingpin to hold any Equity Interests or Equity Equivalents of the Borrower

Section 7.13      **Sale and Leaseback Transactions.**  None of the Group Companies will directly or indirectly become or remain liable as lessee or as guarantor or other surety with respect to any lease (whether an Operating Lease or a Capital Lease) of any property (whether real, personal or mixed), whether now owned or hereafter acquired, (i) which such Group Company has sold or transferred or is to sell or transfer to any other Person which is not a Group Company or (ii) which such Group Company intends to use for substantially the same purpose as any other property which has been sold or is to be sold or transferred by such Group Company to another Person which is not a Group Company in connection with such lease; provided, however, that the Group Companies may (x) remain liable under the iStar Sale/Leaseback and (y) enter into any other Sale/Leaseback Transaction permitted by the Bankruptcy Court pursuant to the Final Order, provided that (A) the Borrower shall be in compliance with all other provisions of this Agreement, including Section 7.01 and Section 7.02, (B) the gross cash proceeds of any such Sale/Leaseback Transaction are at least equal to the fair market value of such property (as determined by the Board of Directors of the Borrower in good faith) and (C) the Net Cash Proceeds are applied as set forth in Section 2.09(b)(i) to the extent required therein.

Section 7.14      **Additional Negative Pledges.**  None of the Group Companies will enter into, assume or become subject to any agreement prohibiting or otherwise restricting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired, or requiring the grant of any security for an obligation if security is given for some other obligation, except (in each case subject to the Orders) (i) pursuant to this Agreement and the other DIP Loan Documents, the First Lien Loan Documents and Second Lien Loan Documents, (ii) pursuant to any document or instrument governing Capital Lease Obligations or Purchase Money Debt incurred pursuant to Section 7.01 if any such restriction contained therein relates only to the asset or assets acquired in connection therewith, (iii) pursuant to the iStar Sale/Leaseback Documents, (iv) pursuant to any documents or agreements creating any Lien referred to in Section 7.02(x) if such restriction contained therein relates only to the incurred premiums, dividends, rebates and other rights permitted to be subject to such Lien in accordance with Section 7.02(x), and (v) pursuant to a Permitted Joint Venture so long as any such restriction contained therein relates only to the assets of, or the interest of the Borrower and its Subsidiaries in, such Permitted Joint Venture as of the Closing Date.

Section 7.15      **Impairment of Security Interests.**  None of the Group Companies will (i) take or omit to take any action which action or omission could reasonably be expected to materially impair the Liens and security interests in favor of the Collateral Agent with respect to the Collateral or (ii) grant to any Person (other than the Collateral Agent pursuant to the DIP Loan Documents) any interest whatsoever in the Collateral, except for Permitted Liens.

Section 7.16      **Financial Covenants**.

(a)      *Maximum Budget Variance*.  On and after the first Friday following the Closing Date, the Loan Parties shall at all times adhere to the Budget (subject to Permitted Variances), except to the extent approved in writing by the DIP Agent at the direction of the Required DIP Lenders.

(b)      *Capital Expenditures.*

(i)      Except as provided in clauses (ii) and (iii) below, the Loan Parties shall not, in the aggregate, make or commit to make Capital Expenditures in any month in excess of the amounts set forth below:

| Period | Maximum Capital Expenditures |
| --- | --- |
| November 2012 | $2,581,000 |
| December 2012 | $1,728,000 |
| January 2013 | $2,666,000 |
| February 2013 | $2,495,000 |
| March 2013 | $2,907,000 |
| April 2013 | $2,821,000 |
| May 2013 | $1,883,000 |
| June 2013 | $2,541,000 |
| July 2013 | $3,168,000 |
| August 2013 | $3,168,000 |
| September 2013 | $3,168,000 |
| October 2013 | $3,168,000 |

(ii)     To the extent that Capital Expenditures permitted in clause (i) (before giving effect to any carry forward) for any month set forth above are less than the applicable amount specified for such month, an amount equal to 50% of the difference may be carried forward and utilized to make Capital Expenditures during the next subsequent month.

(iii)     The Loan Parties may make Capital Expenditures not subject to the limitations of clauses (i) and (ii) of no more than $1,000,000 in aggregate at any time prior to the DIP Termination Date for purposes of mitigating property damage sustained in connection with Hurricane Sandy.

(c)     *Minimum EBITDA*.  The Consolidated EBITDA of the Loan Parties shall not, as of the last Business Day of any month, be less than the following:

| Period | Consolidated EBITDA |
| --- | --- |
| November 2012 | $3,528,000 |
| December 2012 | $5,007,000 |
| January 2013 | $9,720,000 |
| February 2013 | $9,013,000 |
| March 2013 | $6,508,000 |
| April 2013 | $4,148,000 |
| May 2013 | -$2,919,000 |
| June 2013 | -$689,000 |
| July 2013 | $3,890,000 |
| August 2013 | $917,000 |
| September 2013 | $1,008,000 |
| October 2013 | $4,060,000 |

**Section 7.17    Chapter 11 Claims.** Until payment in full of the DIP Obligations under this Agreement (other than contingent indemnification obligations not yet due and payable), except for and to the extent permitted under the Carve-Out, the Loan Parties will not, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim (including, without limitation, First Lien Superpriority Claims or Second Lien Superpriority Claims) or Lien which is pari passu with or senior to the claims or Liens, as the case may be, of the Collateral Agent and the DIP Lenders against the Loan Parties hereunder or under the Orders, or apply to the Bankruptcy Court for authority to do so.

**Section 7.18     Revision of Orders; Applications to Bankruptcy Court.** The Loan Parties will not, directly or indirectly (a) seek, support, consent to or suffer to exist any modification, stay, vacation or amendment of the Interim Order or the Final Order except for any modifications and amendments agreed to in writing by the DIP Agent and the Required DIP Lenders, (b) apply to the Bankruptcy Court for authority to take any action prohibited by this Article VII (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the DIP Agent at the direction of the Required DIP Lenders) or (c) seek authorization for or permit the existence of, any claims other than that of the DIP Lenders entitled to a superpriority under Section 364(c)(1) of the Bankruptcy Code that is senior to or pari passu with the DIP Lenders' Section 364(c)(1) claim.

**Section 7.19     Critical Vendors.** No Loan Party shall make or commit to make payments to critical vendors (other than those critical vendors that are approved in writing by the Required DIP Lenders) in respect of prepetition amounts in excess of the amount included in the Budget.

**Section 7.20     Foreign Pension Plans.**  None of the Loan Parties shall, and no Loan Party shall permit any of their subsidiaries (other than AMF Bowling Products UK Ltd.) or the Qubica JV Entity to, take any actions which could result in the termination, withdrawal or winding up of any Foreign Pension Plan (other than the UK Pension Plan) or result in liabilities on the Loan Parties, any of their subsidiaries (other than AMF Bowling Products UK Ltd.) or the Qubica JV Entity with respect to such Foreign Pension Plans.

**Section 7.21     Compliance with Budget.**

(a)     Except as otherwise provided herein or approved by the DIP Agent and the Required DIP Lenders, the Loan Parties will not, and will not permit any Subsidiary to directly or indirectly (a) use any cash or the proceeds of any DIP Loans in a manner or for a purpose other than those materially consistent with this Agreement, the Orders and the most recent Budget (and Permitted Variances related thereto), (b) permit a disbursement causing any variance other than Permitted Variances without the prior written consent of the DIP Agent and the Required DIP Lenders or (c) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Debt arising prior to the Petition Date other than payments authorized by the Bankruptcy Court.

(b)     Prior to the occurrence of an Event of Default, the Loan Parties shall be permitted to pay compensation and reimbursement of fees and expenses solely to the extent that such fees and expenses are in accordance with the Budget and authorized to be paid under Sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court, as the same may be due and payable, and such payments shall not reduce the Carve-Out. Upon receipt of the Carve-Out Trigger Notice, the right of the Loan Parties to pay professional fees outside the Carve-Out shall terminate, and the Loan Parties shall provide immediate notice to all professionals informing them that such notice was delivered and further advising them that the Loan Parties' ability to pay such professionals is subject to and limited by the Carve-Out.

**Section 7.22     Use of Collateral.**  Without limiting Section 6.08, no Collateral, proceeds of Loans, portion of the Carve-Out or any other amounts may be used directly or indirectly by any of the Loan Parties, the Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(a)     to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the DIP Liens or the Superpriority DIP Claims (except to the extent expressly set forth in this Agreement); or

(b)      to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the DIP Agent, the DIP Lenders, the First Lien Agent or the First Lien Lenders, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under Chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the Superpriority DIP Claims, the DIP Liens, the DIP Loan Documents, the First Lien Loan Documents or the First Lien Obligations; (iv) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations or the First Lien Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the DIP Agent or the DIP Lenders hereunder or under any of the DIP Loan Documents, or (B) the First Lien Agent or the First Lien Lenders under any of the First Lien Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable DIP Loan Documents and the Orders); or (vi) objecting to, contesting, or interfering with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; provided, however, that no more than $50,000 in the aggregate of the Collateral, the Carve-Out, proceeds of Loans or any other amounts, may be used by any Committee to investigate claims and/or Liens of the First Lien Agent and First Lien Lenders under the First Lien Credit Agreement.

Section 7.23    **iStar Action**.  The Loan Parties shall not agree to, execute or otherwise consummate any resolution of any iStar Action or settlement with respect to the iStar Sale/Leaseback Documents without the prior written consent of the Required DIP Lenders, which consent shall not be unreasonably withheld.

Section 7.24    **Independence of Covenants.**  All covenants contained herein shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that such action or condition would be permitted by an exception to, or otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default if such action is taken or condition exists.

## ARTICLE VIII
## DEFAULTS

Section 8.01    **Events of Default.**  An event of default shall exist upon the occurrence of any of the following specified events or conditions (each an "Event of Default"):

(a)      _Payment_.  Any Loan Party shall:

(i)      default in the payment when due (whether by scheduled maturity, acceleration or otherwise) of any principal of any of the Loans or any LC Disbursement; or

(ii)      default, and such default shall continue for three or more Business Days, in the payment when due of any interest on the Loans, or of any fees or other amounts owing hereunder, under any of the other DIP Loan Documents or in connection herewith.

(b)     _Representations_.  Any representation, warranty or statement made or deemed to be made by any Loan Party herein, in any of the other DIP Loan Documents, or in any statement or certificate delivered or required to be delivered pursuant hereto or thereto shall prove untrue in any material respect on the date as of which it was made or deemed to have been made.

(c)     _Covenants_.  Any Loan Party shall:

(i)     default in the due performance or observance of any term, covenant or agreement contained in Sections 6.01(a), (j) or (m), 6.08, 6.11, or Article VII; or

(ii)     default in the due performance or observance of any term, covenant or agreement contained in Sections 6.01(b), (c), (d), (f), (g), (h), (i), (l) or 6.04(a) and such default shall continue unremedied for a period of five Business Days; or

(iii)     default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in subsections (a), (b), (c)(i), and (c)(ii)) contained in this Agreement and such default shall continue unremedied for a period of thirty (30) calendar days after the earlier of an executive officer of a Loan Party becomes aware (or should have become aware) of such default or notice thereof given by the DIP Agent ( (without duplication of any other time period contained therein).

(d)     _Other DIP Loan Documents_.  (i) Any Loan Party shall default in the due performance or observance of any term, covenant or agreement in any of the other DIP Loan Documents and such default shall continue unremedied for a period of thirty (30) calendar days after the earlier of an executive officer of a Loan Party becoming aware of such default or notice thereof given by the DIP Agent or (ii) except pursuant to the terms thereof, any DIP Loan Document shall fail to be in full force and effect or any Loan Party shall so assert.

(e)     _Cross-Default_.  Any Group Company (i) fails to make payment when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise but after giving effect to all applicable grace periods), regardless of amount, of any Debt, Guaranty Obligation or Synthetic Lease Obligations incurred after the Petition Date (other than in respect of Debt outstanding under the DIP Loan Documents), (ii) fails to perform or observe any other condition or covenant, or any other event shall occur or condition shall exist, under any agreement or instrument relating to any such Debt, Guaranty Obligation or Synthetic Lease Obligations incurred after the Petition Date, if the effect of such failure, event or condition is to cause, or to permit the holder or holders or beneficiary or beneficiaries of such Debt, Guaranty Obligation or Synthetic Lease Obligations (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, such Debt or Synthetic Lease Obligations to be declared to be due and payable prior to its stated maturity or such Guaranty Obligation to become payable, or cash collateral in respect thereof to be demanded or (iii) shall be required by the terms of such Debt, Guaranty Obligation or Synthetic Lease Obligation to offer to prepay or repurchase such Debt or Synthetic Lease Obligation or the primary Debt underlying such Guaranty Obligation (or any portion thereof) prior to the stated maturity thereof.

(f)     [_Reserved_]

(g)     _Judgments_.  One or more judgments, orders, decrees or arbitration awards are entered with respect to any post-petition liabilities against any Group Company or any of their respective properties involving in the aggregate a liability (to the extent not covered by independent third party insurance or on indemnity from a creditworthy third party as to which the insurer of indemnitor, as applicable, does not dispute coverage), as to any single or related series of transactions, incidents or

conditions, of $200,000 or more, and the same shall not have been discharged, vacated or stayed pending appeal within thirty (30) calendar days after the entry thereof.

(h)     *Employee Benefit Plans*.  An ERISA Event occurs which has resulted or could reasonably be expected to result in liability of any Group Company (x) in aggregate amount in excess of $10,000,000 or (y) in an aggregate amount in excess of $5,000,000 by virtue of an ERISA Affiliate having a liability, and, in each case, such liability shall not have been discharged in the Chapter 11 Cases within thirty (30) calendar days after the incurrence thereof, (ii) any ERISA Plan or Foreign Pension Plan (other than the UK Pension Plan) has any amount of Unfunded Liabilities which has resulted, could result or could reasonably be expected to result in liability of any Group Company (x) in an aggregate amount in excess of excess of $10,000,000  or (y) in an aggregate amount in excess of $10,000,000 by virtue of an ERISA Affiliate having a liability, (iii) the UK Pension Plan has any amount of Unfunded Liabilities which results or could reasonably be expected to result in liability of any Group Company, (iv) any Foreign Pension Plan is not in compliance with all applicable pension benefits and tax laws, (v) any contribution required to be made in accordance with any applicable law or the terms of any Foreign Pension Plan has not been made; (vi) except as disclosed on <u>Schedule 5.11</u>, any event has occurred or condition exists with respect to any Foreign Pension Plan that has resulted or is reasonably likely to result in any Foreign Pension Plan being ordered or required to be wound up in whole or in part pursuant to any applicable laws or having any applicable registration revoked or refused for the purposes of any applicable pension benefits or tax laws or being placed under the administration of the relevant pension benefits regulatory authority or being required to pay any taxes or penalties under applicable pension benefits and tax laws; (vii) an order has been made or notice has been given pursuant to any applicable pension benefits and tax laws in respect of any Foreign Pension Plan requiring any person to take or refrain from taking any action in respect thereof or that there has been a contravention of any such applicable laws; (viii) an event has occurred or a condition exists that has resulted or could result in Holdings or any Subsidiary of Holdings being required to pay, repay or refund any amount (other than contributions required to be made or expenses required to be paid in the ordinary course) to or on account of any Foreign Pension Plan or a current or former member thereof; (viii) an event has occurred or a condition exists that has resulted or is reasonably likely to result in a payment being made out of a guarantee fund established under the applicable pension benefits laws in respect of a Foreign Pension Plan or (x) an event has occurred or a condition exists that has resulted or is reasonably likely to result in a payment under any guarantee by any Group Company to a Foreign Pension Plan; and which, with respect to all the events and obligations described in the preceding <u>clauses (iii)</u> through <u>(x)</u> of this <u>Section 8.01(h)</u>, in the opinion of the Required DIP Lenders could reasonably be expected to have a Material Adverse Effect.

(i)     *Guaranties*.  Any guaranty of the DIP Obligations given by any Loan Party or any provision thereof shall, except pursuant to the terms thereof, cease to be in full force and effect, or any guarantor thereunder or any Person acting by or on behalf of such guarantor shall deny or disaffirm such guarantor's obligations thereunder.

(j)     *Impairment of Collateral*.  Any Lien or security interest purported to be created by any DIP Loan Document shall cease to be, or shall be asserted by any Group Company not to be, a valid, perfected, first-priority (except as otherwise expressly provided in such DIP Loan Document or any Order) security interest in the securities, assets or properties covered thereby, other than in respect of assets and properties which, individually or in the aggregate are not material to the Group Companies taken as a whole;

(k)     *Ownership*.  A Change of Control shall occur.

(l)    *Material Adverse Effect*.   A Material Adverse Effect shall occur (other than pursuant to clause (iv) of the definition of "Material Adverse Effect").

(m)    *Chapter 11 Cases Motions*.   Any of the following shall occur in any Chapter 11 Case:

(i)    filing of a Plan by the Loan Parties that does not propose to indefeasibly repay the DIP Obligations in full in cash, unless otherwise consented to by the DIP Agent and the Required DIP Lenders;

(ii)    any of the Loan Parties shall file a pleading seeking to vacate or modify any of the Orders over the objection of the Required DIP Lenders;

(iii)    entry of an order without the prior consent of the Required DIP Lenders amending, supplementing or otherwise modifying any Order;

(iv)    reversal, vacation or stay of the effectiveness of any Order;

(v)    any violation of the terms of any Order;

(vi)    dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(vii)    appointment of a Chapter 11 trustee;

(viii)    any sale of all or substantially all assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code, unless (i) the proceeds of such sale indefeasibly satisfy the DIP Obligations in full in cash or (ii) such sale is supported by the DIP Agent at the direction of the Required DIP Lenders;

(ix)    appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrower or any Guarantor;

(x)    granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of the Borrower or any other Loan Party;

(xi)    the Loan Parties' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) which is senior to or pari passu with the DIP Lenders' claims under the DIP Facility;

(xii)    payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein;

(xiii)    loss or modification of exclusivity by the Loan Parties or the filing of a plan of reorganization other than the Plan;

(xiv)    unless otherwise provided in the Interim Order or the Final Order, any of the Loan Parties seek or if there is entered, an order under Section 365 of the Bankruptcy  Code

rejecting a material lease (i) to which any Loan Party is a party, and (ii) that is part of (or whose premises contain any of ) the Collateral; and

(xv)    cessation of the DIP Liens or the Superpriority DIP Claims to be valid, perfected and enforceable in all respects.

(n)    _Financial Matters_.  Any of the Loan Parties shall (i) use cash collateral or DIP Loans for any item other than those set forth in, and in accordance with, the Budget and as approved by the Bankruptcy Court or prepays any pre-petition debt, (ii) assert any right of subrogation or contribution against any other Loan Party prior to the payment in full of the DIP Obligations and the termination of the Commitments, or (iii) exceed the Permitted Variances under the Budget (other than as approved in writing by the DIP Agent at the direction of the Required DIP Lenders).

(o)    _Chapter 11 Cases Milestones_.   The failure to meet any of the following milestones, except to the extent (x) waived the DIP Agent at the direction of the Required DIP Lenders:

(i)    the Loan Parties' filing with the Bankruptcy Court, on or before ninety (90) calendar days following the Petition Date, of the Plan, in form and substance satisfactory to the DIP Agent at the direction of the Required DIP Lenders;

(ii)    the Loan Parties' filing with the Bankruptcy Court, on or before ninety (90) calendar days following the Petition Date, of the Disclosure Statement, in form and substance satisfactory to the DIP Agent at the direction of the Required DIP Lenders;

(iii)    the Bankruptcy Court's entry of the Disclosure Statement Order, in form and substance satisfactory to the DIP Agent at the direction of the Required DIP Lenders, on or before one-hundred twenty (120) calendar days following the Petition Date;

(iv)    the Bankruptcy Court's entry of the Plan Confirmation Order, in form and substance satisfactory to the DIP Agent at the direction of the Required DIP Lenders, and such order shall have become a final non-appealable order, on or before one-hundred sixty (160) calendar days following the Petition Date; and

(v)    the Effective Date having occurred not later than one-hundred eighty (180) calendar days following the Petition Date.

**Section 8.02    Acceleration; Remedies.**  Upon the occurrence of an Event of Default, and at any time thereafter unless and until such Event of Default has been waived in writing by the Required DIP Lenders (or the DIP Lenders as may be required pursuant to Section 10.03), the DIP Agent (or the Collateral Agent, as applicable) may, and upon the request and direction of the Required DIP Lenders shall, deliver written notice to the Bankruptcy Court that the automatic stay provisions of Section 362 of the Bankruptcy Code have been vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):

(a)    _Termination of Commitments_.  Declare the Commitments terminated whereupon the Commitments shall be immediately terminated.

(b)    _Acceleration of Loans_.  Declare the unpaid principal of and any accrued interest in respect of all Loans, any reimbursement obligations arising from drawings under Letters of Credit and

any and all other indebtedness or obligations of any and every kind owing by a Loan Party to any of the DIP Lenders hereunder to be due whereupon the same shall be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties.

(c)     *Cash Collateral*.  Immediately terminate the use by any Loan Party of any cash or Cash Equivalents comprising part of the Collateral (including, without limitation, all cash and Cash Equivalents deposited in the DIP Priority Account or other bank account subject to an Account Control Agreement), and sweep any cash or Cash Equivalents subject to a Account Control Agreement to an account of the DIP Agent for the benefit of the DIP Lenders.

(d)     Accounts.  Freeze monies or balances in the Loan Parties' Accounts and sweep all funds in the DIP Priority Account.

(e)     Set-Off.  Immediately set-off any and all amounts in accounts maintained by the Loan Parties with the DIP Agent or the DIP Lenders (other than payroll, employee benefit and trust accounts and League Funds) against the DIP Obligations, or otherwise enforce any and all rights against the Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the Collateral solely for application towards the DIP Obligations; provided, however, that prior to the exercise of any right set forth in this clause (e), the DIP Agent shall be required to provide five (5) Business Days written notice to the Loan Parties and the Committee of the DIP Agent's intent to exercise its rights and remedies.

(f)     Enforcement of Rights.  Take any other actions or exercise any other rights or remedies permitted under the Orders, the DIP Loan Documents or applicable law to effectuate the repayment of the DIP Obligations; provided, however, that prior to the exercise of any right set forth in this clause (f), the DIP Agent shall be required to provide five (5) Business Days written notice to the Loan Parties, Stroock, as outside counsel to the First Lien Ad-Hoc Group, O'Melveny, as outside counsel to the Second Lien Ad-Hoc Group and the Committee of the DIP Agent's intent to exercise its rights and remedies.

Neither the Loan Parties, the Committee, the First Lien Agent, the First Lien Ad-Hoc Group, the Second Lien Agent, the Second Lien Ad-Hoc Group nor any other party-in-interest shall have the right to contest the enforcement of remedies set forth in the Orders and the DIP Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable DIP Loan Documents. The Loan Parties shall cooperate fully with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the Collateral or otherwise.  The Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agent and the DIP Lenders set forth in the Orders and in the DIP Loan Documents.

In case any one or more of the covenants and/or agreements set forth in this Agreement or any other DIP Loan Document shall have been breached by any Loan Party, then the DIP Agent may proceed to protect and enforce the DIP Lenders' rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other DIP Loan Document. Without limitation of the foregoing, the Borrower agrees that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof.   The DIP Agent acting pursuant to this paragraph shall be indemnified by the Borrower against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with Section 10.05.

## Section 8.03     Allocation of Payments After Event of Default.

(a)     *Priority of Distributions*.  The Borrower hereby irrevocably waives the right to direct the application of any and all payments in respect of the DIP Obligations and any proceeds of Collateral after the occurrence and during the continuance of an Event of Default and agrees that, notwithstanding the provisions of Sections 2.09(b) and 2.14, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the DIP Agent, the Collateral Agent or any Secured Party on account of amounts then due and outstanding under any of the DIP Loan Documents or in respect of the Collateral shall be paid over or delivered in respect of its DIP Obligations as follows (but subject to the Carve-Out):

FIRST, to payment of that portion of the DIP Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the DIP Agent and amounts payable under Article III) payable to the DIP Agent in its capacity as such;

SECOND, to payment of that portion of the DIP Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the DIP Lenders including fees, charges and disbursements of counsel to the respective DIP Lenders, including fees and time charges for attorneys who may be employees of any such DIP Lender and amounts payable under Article III, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

THIRD, to payment of that portion of the DIP Obligations constituting unpaid principal of and (if not paid pursuant to clauses First and Second above) interest of the Term Loans and amounts owing under Secured Cash Management Agreements, ratably among the DIP Lenders and the Cash Management Banks in proportion to the respective amounts described in this clause Third held by them;

FOURTH, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower (on behalf of itself and the other Loan Parties) or as otherwise required by Law.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; and (ii) each of the Secured Parties shall receive an amount equal to its Pro-Rata Share of amounts available to be applied pursuant to clauses "SECOND" and "THIRD" above.

(b)     *Pro-Rata Treatment*.  For purposes of this Section, "Pro-Rata Share" means, when calculating a Secured Party's portion of any distribution or amount, that amount (expressed as a percentage) equal to a fraction the numerator of which is the then unpaid amount of such Secured Party's DIP Obligations and the denominator of which is the then outstanding amount of all DIP Obligations. When payments to the Secured Parties are based upon their respective Pro-Rata Shares, the amounts received by such Secured Parties hereunder shall be applied (for purposes of making determinations under this Section 8.03 only) (i) first, to their DIP Obligations (other than Cash Management Obligations) and (ii) second, to their Cash Management Obligations.  If any payment to any Secured Party of its Pro-Rata Share of any distribution would result in overpayment to such Secured Party, such excess amount shall instead be distributed in respect of the unpaid DIP Obligations (other than Cash Management Obligations) or Cash Management Obligations, as the case may be, of the other Secured Parties, with each Secured Party whose DIP Obligations (other than Cash Management Obligations) or Cash Management Obligations, as the case may be, have not been paid in full in full to receive an amount equal

99

to such excess amount multiplied by a fraction the numerator of which is the unpaid DIP Obligations (other than Cash Management Obligations) or Cash Management Obligations, as the case may be, of such Secured Party and the denominator of which is the unpaid DIP Obligations (other than Cash Management Obligations) or Cash Management Obligations, as the case may be, of all Secured Parties entitled to such distribution.

(c)    *Distributions with Respect to Letters of Credit*.   Each of the Secured Parties agrees and acknowledges that if (after all outstanding Loans and LC Reimbursements with respect to Letters of Credit have been paid in full) the DIP Lenders are to receive a distribution on account of undrawn amounts with respect to Letters of Credit issued (or deemed issued) under this Agreement, such amounts shall be deposited in an account designated by the Collateral Agent and held as cash security for the repayment of DIP Obligations owing to the DIP Lenders as such.   Upon termination of all outstanding Letters of Credit, all of such cash security shall be applied to the remaining DIP Obligations of the DIP Lenders.   If there remains any excess cash security, such excess cash shall be distributed in accordance with Section 8.03(a) hereof.

(d)    *Reliance by Collateral Agent*.   For purposes of applying payments received in accordance with this Section 8.03, the Collateral Agent shall be entitled to rely upon the DIP Agent under the Credit Agreement for a determination (which the DIP Agent agrees (or shall agree) to provide upon request of the Collateral Agent) of the outstanding DIP Obligations owed to the Agents or the DIP Lenders.   Unless it has actual knowledge (including by way of written notice from a Cash Management Bank) to the contrary, the Collateral Agent, in acting hereunder, shall be entitled to assume that no Secured Cash Management Agreements are in existence.

**Section 8.04    Certain Bankruptcy Matters**.

(a)    Except to the extent provided otherwise in an Order, the Loan Parties hereby agree that, subject only to the Carve-Out, the DIP Obligations shall (i) constitute Superpriority DIP Claims over all administrative expense claims and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and, to the extent provided in any of the Orders, shall not be subject to any claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code.

(b)    In the event of a conflict between, or inconsistency among, the Interim Order or the Final Order, on the one hand, and any other DIP Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)    Notwithstanding anything to the contrary contained herein or elsewhere:

(i)    The DIP Agent and the DIP Lenders shall not be required to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the Orders or any other DIP Loan Document. If the DIP Agent or the Required DIP Lenders shall, in its or their sole discretion, from time to time elect to prepare, file, register or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar

instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Collateral Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 8.04(c) or of the perfection of any other Liens in favor of the DIP Agent, for the benefit of the DIP Lenders, on the Collateral.

(ii)     Except as otherwise agreed to by the DIP Lenders, the Liens, lien priorities, Superpriority DIP Claims and other rights and remedies granted to the DIP Agent and the DIP Lenders pursuant to this Agreement, the Orders or the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Superpriority DIP Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.

(d)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     except for the Carve-Out and to the extent provided in any of the Orders and subject to the Orders, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Secured Party or the DIP Agent against the Loan Parties in respect of any DIP Obligations;

(ii)     other than as provided in the Orders or the DIP Loan Documents, the Collateral Agent's Liens on the Collateral shall constitute valid, enforceable and perfected first priority Liens, and shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)     the Collateral Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Collateral Agent or any Secured Party to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Collateral Agent's Liens under applicable non-bankruptcy law.

(e)     In connection with any sale of all or any portion of the Collateral or the First Lien Prepetition Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Collateral Agent, in accordance with applicable law, each Loan Party hereby gives the Collateral Agent (at the direction of the Required DIP Lenders), the First Lien Agent (at the direction of the Required Lenders (as defined in the First Lien Credit Agreement)), and, to the extent permitted by Section 363(k) of the Bankruptcy Code, the Second Lien Agent (at the direction of the Required Lenders (as defined in the Second Lien Loan Agreement), the power and right, without assent by such Loan Party, to "credit bid" the full amount of all DIP Obligations and First Lien Obligations, as applicable, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral or First Lien Prepetition Collateral.

## ARTICLE IX
## AGENCY PROVISIONS

### Section 9.01     Appointment; Authorization.

(a)     *Appointment*.  Each DIP Lender hereby designates and appoints Credit Suisse AG, Cayman Islands Branch as DIP Agent and Collateral Agent for such DIP Lender to act as specified herein and in the other DIP Loan Documents, and each such DIP Lender hereby authorizes the Agents, as the agents for such DIP Lender, to take such action on its behalf under the provisions of this Agreement and the other DIP Loan Documents and to exercise such powers and perform such duties as are expressly delegated by the terms hereof and of the other DIP Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere herein and in the other DIP Loan Documents, the Agents shall not have any duties or responsibilities, except those expressly set forth herein and therein, or any fiduciary relationship with any DIP Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any of the other DIP Loan Documents, or shall otherwise exist against the Agents.  In performing its functions and duties under this Agreement and the other DIP Loan Documents, each Agent shall act solely as an agent of the DIP Lenders and does not assume and shall not be deemed to have assumed any obligation or relationship of agency or trust with or for any Loan Party.  Without limiting the generality of the foregoing two sentences, the use of the term "agent" herein and in the other DIP Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.  The provisions of this Article IX (other than Section 9.10) are solely for the benefit of the Agents and the DIP Lenders, and none of the Loan Parties shall have any rights as a third party beneficiary of the provisions hereof (other than Section 9.10).

(b)     *Release of Collateral*.  The DIP Lenders irrevocably authorize the Collateral Agent, at the Collateral Agent's option and in its discretion, to release any security interest in or Lien on any Collateral granted to or held by the Collateral Agent (i) upon termination of this Agreement and the other DIP Loan Documents, termination of the Commitments and all Letters of Credit and payment in full of all DIP Obligations, including all fees and indemnified costs and expenses that are payable pursuant to the terms of the DIP Loan Documents, (ii) if such Collateral constitutes property sold or to be sold or disposed of as part of or in connection with any disposition permitted pursuant to the terms of this Agreement or (iii) if approved by the Required DIP Lenders, pursuant to the terms of Section 10.03.

(c)     *Release of Guarantors*.  The DIP Lenders irrevocably authorize the DIP Agent, at the DIP Agent's option and in its discretion, to release any Guarantor from its obligations hereunder if (i) such Guarantor is no longer required to be a Guarantor pursuant to the terms of this Agreement or (ii) if approved by the Required DIP Lenders pursuant to the terms of Section 10.03.  Upon the request of the DIP Agent, the DIP Lenders will confirm in writing the DIP Agent's authority to release a particular Guarantor pursuant to this Section 9.01(c).

(d)     *HLT Classification*.  Each DIP Lender recognizes that applicable Laws may require the DIP Agent to determine whether the transactions contemplated hereby should be classified as "highly leveraged" or assigned any similar or successor classification, and that such determination may be binding upon the other DIP Lenders.  Each DIP Lender understands that any such determination shall be made solely by the DIP Agent based upon such factors (which may include the DIP Agent's internal policies and prevailing market practices) as the DIP Agent shall deem relevant and agrees that the DIP Agent shall have no liability for the consequences of any such determination.

**Section 9.02**    **Delegation of Duties.**  The DIP Agent may execute any of its duties hereunder or under the other DIP Loan Documents by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The DIP Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it in the absence of bad faith, gross negligence or willful misconduct.

**Section 9.03**    **Exculpatory Provisions.**  No Agent or any of its or their directors, officers, employees or agents shall be (i) liable for any action lawfully taken or omitted to be taken by any of them under or in connection herewith or in connection with any of the other DIP Loan Documents or the transactions contemplated hereby or thereby (except for its own bad faith, gross negligence or willful misconduct in connection with its duties expressly set forth herein) or (ii) responsible in any manner to any of the DIP Lenders or participants for any recitals, statements, representations or warranties made by any of the Loan Parties contained herein or in any of the other DIP Loan Documents or in any certificate, report, document, financial statement or other written or oral statement referred to or provided for in, or received by the DIP Agent under or in connection herewith or in connection with the other DIP Loan Documents, or enforceability or sufficiency therefor of any of the other DIP Loan Documents, or for any failure of any Loan Party to perform its obligations hereunder or thereunder or be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained herein or therein or as to the use of the proceeds of the Loans or the use of the Letters of Credit or of the existence or possible existence of any Default or Event of Default or to inspect the properties, books or records of the Loan Parties.

**Section 9.04**    **Reliance on Communications.**  The Agents shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex, teletype or e-mail message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to any of the Loan Parties, independent accountants and other experts selected by the Agents).  The Agents may deem and treat each DIP Lender as the owner of its interests hereunder for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the DIP Agent in accordance with Section 10.06(b).  The Agents shall be fully justified in failing or refusing to take any action under this Agreement or under any of the other DIP Loan Documents unless it shall first receive such advice or concurrence of the Required DIP Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the DIP Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Agents shall in all cases be fully protected in acting, or in refraining from acting, hereunder or under any of the other DIP Loan Documents in accordance with a request of the Required DIP Lenders (or to the extent specifically provided in Section 10.03, all the DIP Lenders) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the DIP Lenders (including their successors and assigns).  Where this Agreement expressly permits or prohibits an action unless the Required DIP Lenders otherwise determine, any Agent shall, and in all other instances the DIP Agent may, but shall not be required to, initiate any solicitation for the consent or vote of the DIP Lenders.

**Section 9.05**    **Notice of Default.**  An Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder, except with respect to defaults in the payment of principal, interest and fees required to be paid to such Agent for the accounts of the DIP Lenders, unless such Agent has received notice from a DIP Lender or a Loan Party referring to the Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  If an Agent receives such a notice, such Agent shall give prompt notice thereof  to each other Agent and the DIP Lenders.  The DIP Agent and the Collateral Agent shall take such actions with respect

to such Default or Event of Default as shall be reasonably directed by the Required DIP Lenders; provided, however, that unless and until the DIP Agent has received any such direction, the DIP Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default or it shall deem advisable or in the best interest of the DIP Lenders.

**Section 9.06    Credit Decision; Disclosure of Information by DIP Agent.**  Each DIP Lender expressly acknowledges that no Agent has made any representations or warranties to it and that no act by any Agent hereinafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent to any DIP Lender as to any matter, including whether any Agent has disclosed material information in its possession.  Each DIP Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other DIP Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, assets, operations, property, financial and other condition, prospects and creditworthiness of the Loan Parties, and all requirements of Law pertaining to the Transaction, and made its own decision to make its Loans hereunder and enter into this Agreement.  Each DIP Lender also represents that it will, independently and without reliance upon any Agent or any other DIP Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other DIP Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, assets, operations, property, financial and other conditions, prospects and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the DIP Lenders by the DIP Agent hereunder, the Agents shall not have any duty or responsibility to provide any DIP Lender with any credit or other information concerning the business, operations, assets, property, financial or other conditions, prospects or creditworthiness of any Loan Party or their respective Affiliates which may come into the possession of any Agent.

**Section 9.07    No Reliance on Arranger's or Agent's Customer Identification Program.**  Each DIP Lender acknowledges and agrees that neither such DIP Lender nor any of its Affiliates, participants or assignees may rely on the Lead Arranger or any Agent to carry out such DIP Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the U.S. Patriot Act or the regulations thereunder, including the regulations contained in 31 C.F.R. 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or agents, the DIP Loan Documents or the transactions hereunder or contemplated hereby:  (i) any identification procedures; (ii) and recordkeeping; (iii) comparisons with government lists, (iv) customer notices; or (v) other procedures required under the CIP regulations or such other Laws.

**Section 9.08    Indemnification.**  Whether or not the transactions contemplated hereby are consummated, the DIP Lenders agree to indemnify each Agent (to the extent not reimbursed by the Borrower or any other Loan Party and without limiting the obligation of the Borrower or any other Loan Party to do so), ratably according to their respective Commitments (or if the Commitments have expired or been terminated, in accordance with the respective principal amounts of outstanding Loans of the DIP Lenders), from and against any and all Indemnified Liabilities which may at any time (including, without limitation, at any time following payment in full of the DIP Obligations) be imposed on, incurred by or asserted against an Agent in its capacity as such in any way relating to or arising out of this Agreement or the other DIP Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by an Agent under or in connection with any of the foregoing; provided that no DIP Lender shall be liable for the payment to any Agent of any portion of such Indemnified Liabilities resulting from such Person's gross negligence or

willful misconduct; provided, however, that no action taken in accordance with the directions of the Required DIP Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.08.  If any indemnity furnished to an Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished.  Without limitation of the foregoing, each DIP Lender shall reimburse the DIP Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including fees and disbursements of counsel) incurred by the DIP Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other DIP Loan Document, or any document contemplated by or referred to herein, to the extent that the DIP Agent is not reimbursed for such expenses by or on behalf of the Borrower or any other Loan Party.  The agreements in this Section 9.08 shall survive the payment of the DIP Obligations and all other obligations and amounts payable hereunder and under the other DIP Loan Documents.

   **Section 9.09 Agents in Their Individual Capacity.** Each Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting and other business with the Borrower or any other Loan Party as though such Agent were not an Agent hereunder or under another DIP Loan Document.  The DIP Lenders acknowledge that, pursuant to any such activities, an Agent or its Affiliates may receive information regarding any Loan Party or its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.  With respect to the Loans made by, Letters of Credit issued by and all obligations owing to it, an Agent shall have the same rights and powers under this Agreement as any DIP Lender and may exercise the same as though it was not an Agent, and the terms "DIP Lender" and "DIP Lenders" shall include each Agent in its individual capacity.

   **Section 9.10 Successor Agents.** Any Agent may, at any time, resign upon thirty (30) calendar days' written notice to the DIP Lenders.  If an Agent resigns under a DIP Loan Document, the Required DIP Lenders shall appoint from among the DIP Lenders a successor Agent, which successor Agent shall be consented to by the Borrower at all times other than during the existence of an Event of Default (which consent of the Borrower shall not be unreasonably withheld or delayed).  If no successor Agent shall have been so appointed by the Required DIP Lenders and shall have accepted such appointment prior to the effective date of the resignation of the resigning Agent, then the resigning Agent shall have the right, after consulting with the DIP Lenders and the Borrower, to appoint a successor Agent; provided such successor is a DIP Lender hereunder or an Eligible Assignee.  If no successor Agent is appointed prior to the effective date of the resignation of the resigning Agent, the DIP Agent may appoint, after consulting with the DIP Lenders and the Borrower, a successor Agent from among the DIP Lenders.  Upon the acceptance of any appointment as an Agent hereunder by a successor, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations as an Agent, as appropriate, under this Agreement and the other DIP Loan Documents and the provisions of this Section 9.10 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement.  If no successor DIP Agent has accepted appointment as DIP Agent within sixty (60) calendar days after the retiring DIP Agent's giving notice of resignation, the retiring DIP Agent's resignation shall nevertheless become effective and the DIP Lenders shall perform all duties of the DIP Agent hereunder until such time, if any, as the Required DIP Lenders appoint a successor DIP Agent as provided for above.  Likewise, if no successor Collateral Agent has accepted appointment as Collateral Agent within sixty (60) calendar days after the retiring Collateral Agent's giving notice of resignation, the retiring Collateral Agent's resignation shall nevertheless become effective and the DIP

Lenders shall perform all duties of the Collateral Agent under the DIP Loan Documents until such time, if any, as the Required DIP Lenders appoint a successor Collateral Agent as provided for above.

      **Section 9.11**    **Certain Other Agents.**  None of the DIP Lenders identified on the facing page or signature pages of this Agreement as a "sole bookrunner", "lead manager" or "sole arranger" shall have any right, power, obligation, liability, responsibility or duty under the Agreement other than those applicable to all DIP Lenders as such.  Without limiting the foregoing, none of the DIP Lenders or any such Person so identified shall have or be deemed to have any fiduciary relationship to any DIP Lender or Loan Party.  Each DIP Lender acknowledges that it has not relied, and will not rely, on any of the DIP Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

      **Section 9.12**    **Agents' Fees; Arranger Fee.**  The Borrower shall pay to the DIP Agent for its own account, to the Collateral Agent for its own account fees in the amounts and at the times previously agreed upon between the Borrower and the DIP Agent and the Lead Arranger, to the extent applicable, in each case with respect to this Agreement, the other DIP Loan Documents and the transactions contemplated hereby and thereby.

**ARTICLE X**
**MISCELLANEOUS**

      **Section 10.01**    **Notices and Other Communications.**

      (a)    *General*.  Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including by facsimile transmission) and mailed, faxed or delivered, to the address, facsimile number or (subject to subsection (c) below) electronic mail address specified for notices:  (i) in the case of Holdings, Kingpin, the Borrower or the DIP Agent, as set forth on the signature pages hereof; (ii) in the case of the Issuing Lender, as set forth on the signature pages hereto; (iii) in the case of any DIP Lender, as set forth in Schedule 1.01D hereto or in any applicable Assignment and Acceptance pursuant to which such DIP Lender became a DIP Lender hereunder; and (iv) in the case of any party, at such other address as shall be designated by such party in a notice to the Borrower and the DIP Agent.  All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the intended recipient and (ii) (A) if delivered by hand or by courier, when signed for by the intended recipient; (B) if delivered by mail, four Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of subsection (c) below), when delivered; provided, however, that notices and other communications to the DIP Agent and any DIP Lender pursuant to Article II shall not be effective until actually received by such Person.  Any notice or other communication permitted to be given, made or confirmed by telephone hereunder shall be given, made or confirmed by means of a telephone call to the intended recipient at the number specified pursuant to this Section 10.01, it being understood and agreed that a voicemail message shall in no event be effective as a notice, communication or confirmation hereunder.

      (b)    *Effectiveness of Facsimile Documents and Signatures*.  DIP Loan Documents may be transmitted and/or signed by facsimile or signed and delivered by electronic mail in an Adobe PDF document.  The effectiveness of any such documents and signatures shall, subject to requirements of Law, have the same force and effect as manually-signed originals and shall be binding on all Loan Parties, the Agents and the DIP Lenders.  The DIP Agent may also require that any such documents and signatures be confirmed by a manually-signed original thereof; provided, however, that the failure to

106

request or deliver the same shall not limit the effectiveness of any facsimile document, Adobe PDF document or signature.

(c)     *Limited Use of Electronic Mail*.  Except as expressly provided herein or as may be agreed by the DIP Agent in its sole discretion, electronic mail and internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information, and to distribute DIP Loan Documents for execution by the parties thereto, to distribute executed DIP Loan Documents in Adobe PDF format and may not be used for any other purpose.

(d)     *Reliance by Agents and Lenders*.  The Agents and the DIP Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower or any other Loan Party even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify each Agent and each DIP Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other communications with the DIP Agent may be recorded by the DIP Agent, and each of the parties hereto hereby consents to such recording.

**Section 10.02   No Waiver; Cumulative Remedies.**  No failure or delay on the part of an Agent or any DIP Lender in exercising any right, power or privilege hereunder or under any other DIP Loan Document and no course of dealing between the Agents or any DIP Lender and any of the Loan Parties shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other DIP Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights and remedies provided herein are cumulative and not exclusive of any rights or remedies which the Agents or any DIP Lender would otherwise have.  No notice to or demand on any Loan Party in any case shall entitle the Loan Parties to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Agents or the DIP Lenders to any other or further action in any circumstances without notice or demand.

**Section 10.03   Amendments, Waivers and Consents.**  Neither this Agreement nor any other DIP Loan Document nor any of the terms hereof or thereof may be amended, changed, waived, discharged or terminated except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Holdings, Kingpin, the Borrower and the Required DIP Lenders or, in the case of any other DIP Loan Document, pursuant to an agreement or agreements in writing entered into by Holdings, Kingpin the Borrower and/or any other Loan Parties party thereto and the DIP Agent (at the direction of the Required DIP Lenders) and/or the Collateral Agent (at the direction of the Required DIP Lenders), as applicable, party thereto; <u>provided</u> that (i) the foregoing shall not restrict the ability of the Required DIP Lenders to waive any Event of Default prior to the time the DIP Agent shall have declared, or the Required DIP Lenders shall have requested the DIP Agent to declare, the Loans immediately due and payable pursuant to <u>Article VIII</u> and (ii) the DIP Agent and the Borrower may, with the consent of the other, amend, modify or supplement this Agreement and any other DIP Loan Document to cure any ambiguity, typographical error, defect or inconsistency if such amendment, modification or supplement does not adversely affect the rights of any Agent or any DIP Lender; <u>provided</u>, <u>however</u>, that:

(i)     no such amendment, change, waiver, discharge or termination shall, without the consent of each DIP Lender directly affected thereby:

(A)     extend the final maturity of any Loan or the time of payment of any reimbursement obligation, or any portion thereof, arising from drawings under

Letters of Credit; provided that this clause (A) shall not restrict the ability of the Required DIP Lenders to waive any Event of Default (other than an Event of Default the waiver of which would effectively result in any such extension), prior to the time the DIP Agent shall have declared, or the Required DIP Lenders shall have requested the DIP Agent to declare, the Loans immediately due and payable pursuant to Article VIII;

(B)      reduce the rate, or extend the time of payment, of interest on any Loan (other than as a result of waiving the applicability of any post-default increase in interest rates) thereon or fees hereunder;

(C)      reduce or waive the principal amount of any Loan or any LC Disbursement;

(D)      increase the Commitment of a DIP Lender over the amount thereof in effect (it being understood and agreed that a waiver of any Default or Event of Default or a mandatory reduction in the Commitments shall not constitute a change in the terms of any Commitment of any DIP Lender);

(E)      release all or substantially all of the Collateral securing the DIP Obligations except as provided in Section 11.08(a) (provided that the Collateral Agent may, without consent from any other DIP Lender, release any Collateral that is released in compliance with Section 9.01(b));

(F)      release the Borrower or any material Guarantor from its obligations under the DIP Loan Documents (provided that the DIP Agent may, without the consent of any other DIP Lender, release any Guarantor that is sold or transferred in compliance with Section 7.05);

(G)      amend, modify or waive any provision of this Section 10.03, reduce any percentage specified in, or otherwise modify, the definition of Required DIP Lenders;

(H)      consent to the assignment or transfer by the Borrower or all or substantially all of the other Loan Parties of any of its or their rights and obligations under (or in respect of) the DIP Loan Documents, except as permitted thereby; or

(I)      amend, modify or waive any provision of Section 7.16 or any definitional provisions thereof; and

(ii)      no provision of Article IX may be amended without the consent of the DIP Agent and the Collateral Agent and no provision of Section 2.05 may be amended without the consent of the Issuing Lender.

Notwithstanding the fact that the consent of all the DIP Lenders is required in certain circumstances as set forth above, (i) subject to Section 2.10(b), each DIP Lender is entitled to vote as such DIP Lender sees fit on any bankruptcy reorganization plan that affects the Loans or the Letters of Credit, and each DIP Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code supersede the unanimous consent provisions set forth herein and (ii) the Required DIP Lenders may consent to allow a Loan Party to use cash collateral in the context of a bankruptcy or insolvency proceeding.

The various requirements of this Section 10.03 are cumulative. Each DIP Lender and each holder of a Note shall be bound by any waiver, amendment or modification authorized by this Section 10.03 regardless of whether its Note shall have been marked to make reference therein, and any consent by any DIP Lender or holder of a Note pursuant to this Section 10.03 shall bind any Person subsequently acquiring a Note from it, whether or not such Note shall have been so marked.

**Section 10.04    Expenses.**  Holdings, Kingpin, the Borrower and each other Loan Party, jointly and severally pay promptly, and in each case no later than five (5) Business Days after receipt of a summary invoice from an Agent or the Initial Lenders (whether or not the transactions contemplated hereby are consummated), all (i) reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the Agents (including fees, costs, disbursements and expenses of the Agents' outside counsel, K&S, and its local counsel) and the Initial Lenders (including fees, costs, disbursements and expenses of (a) their outside counsel, Stroock, and their local counsel, (b) Miller Buckfire, as financial advisor to the Initial Lenders (pursuant to the Miller Buckfire Engagement Letter), and (c) any real estate appraiser or equipment appraiser, and (d) in the event that Miller Buckfire is in material breach of the information sharing provisions set forth in that certain Common Interest Agreement, dated November 9, 2012, by and among the First Lien Agent, the First Lien Ad-Hoc Group and Miller Buckfire, one financial advisor engaged by either the DIP Agent or its counsel), in connection with the negotiations, preparation, execution and delivery of the DIP Loan Documents and the funding of all DIP Loans under the DIP Facility, including, without limitation, all due diligence, syndication (including printing, distribution and bank meeting), transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Agent, the Initial Lenders and their respective counsel and professional advisors in connection with the DIP Facility, the DIP Loan Documents or the transaction contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Loan Documents, and (ii) documented costs and expenses of each of the DIP Agent, the Initial Lenders and their respective counsel and professional advisors, in connection with the enforcement of any rights and remedies under the DIP Loan Documents.  To the extent not timely paid by the Loan Parties, each DIP Lender agrees that such amounts shall be drawn from the DIP Facility by the DIP Agent (without need to meet borrowing conditions) and shall constitute DIP Obligations and will count against the DIP Commitment.  The agreements in this Section 10.04 shall survive the termination of the DIP Commitment and this Agreement.

**Section 10.05    Indemnification.**  Whether or not the transactions contemplated hereby are consummated, the Loan Parties, jointly and severally, agree to indemnify, save and hold harmless each Agent, each DIP Lender and their respective Affiliates, directors, officers, employees, counsel, agents and attorneys-in-fact and their respective successors and assigns (collectively, the "Indemnitees") from and against:  (i) any and all claims, demands, actions or causes of action that are asserted against any Indemnitee by any Person (other than the DIP Agent or any DIP Lender) relating directly or indirectly to a claim, demand, action or cause of action that such Person asserts or may assert against any Loan Party, any Affiliate of any Loan Party or any of their respective officers or directors; (ii) any and all claims, demands, actions or causes of action that may at any time (including at any time following repayment of the DIP Obligations and the resignation or removal of any Agent or the replacement of any DIP Lender) be asserted or imposed against any Indemnitee, arising out of or relating to, the DIP Loan Documents, any predecessor DIP Loan Documents, the Commitments, the use of or contemplated use of the proceeds of any Credit Extension, the relationship of any Loan Party, any Agent and the DIP Lenders under this Agreement or any other DIP Loan Document or any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Group Company, or any Environmental Liability related in any way to any Group Company; (iii) any administrative or investigative proceeding by any Governmental Authority arising out of or related to a claim, demand, action or cause of action described in clause (i) or (ii) above; and (iv) any and all liabilities (including liabilities under

indemnities), losses, costs or expenses (including fees and disbursements of counsel) that any Indemnitee suffers or incurs as a result of the assertion of any foregoing claim, demand, action, cause of action or proceeding, or as a result of the preparation of any defense in connection with any foregoing claim, demand, action, cause of action or proceeding, in all cases, and whether or not an Indemnitee is a party to such claim, demand, action, cause of action, or proceeding (all the foregoing, collectively, the "Indemnified Liabilities"); provided that no Indemnitee shall be entitled to indemnification for any claim to the extent such claim is determined by a court of competent jurisdiction is a final and nonappealable judgment to have been caused by its own gross negligence, bad faith or willful misconduct or to have resulted from material breach by such Indemnitee (or its officers directors, employees, controlling persons and members) or any dispute between Indemnitees (other than the Lead Arranger, the DIP Agent or any other Agent in its capacity as such) that does not involve an act or omission by any Loan Party; and provided further that the Borrower shall not be required to reimburse the legal fees and expenses of more than one outside counsel (in addition to up to one local counsel in each applicable local jurisdiction) for all Indemnities unless, in the written opinion of outside counsel reasonably satisfactory to the Borrower and the DIP Agent, representation of all such Indemnitees would be inappropriate due to the existence of an actual or potential conflict of interest. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, shareholders or creditors or an Indemnitee or any other Person or any Indemnitee is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Each Loan Party agrees not to assert or permit any of their respective Subsidiaries to assert any claim against any Agent, any DIP Lender, any of their Affiliates or any of their respective directors, officers, employees, attorneys, agents and advisers, and each of the Agents, and the DIP Lenders agrees not to assert or permit any of their respective Subsidiaries to assert any claim against Holdings, Kingpin, the Borrower or any of their respective Subsidiaries or any of their respective directors, officers, employees, attorneys, agents or advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the DIP Loan Documents, any of the transactions contemplated herein or therein or the actual or proposed use of the proceeds of the Loans or the Letters of Credit. Without prejudice to the survival of any other agreement of the Loan Parties hereunder and under the other DIP Loan Documents, the agreements and obligations of the Loan Parties contained in this Section 10.05 shall survive the repayment of the Loans, LC Obligations and other obligations under the DIP Loan Documents and the termination of the Commitments hereunder.

### Section 10.06    Successors and Assigns.

(a)    _Generally_.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided that none of the Loan Parties may assign or transfer any of its interests and obligations without the prior written consent of either the Required DIP Lenders or the DIP Lenders, as the terms set forth in Section 10.03 may require;

(b)    _Assignments_.  Any DIP Lender may assign all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Loans, its Notes and its Commitments); provided, however, that

(i)    each such assignment shall be to an Eligible Assignee;

(ii)    except in the case of an assignment to another DIP Lender, an Affiliate of an existing DIP Lender or any Approved Fund (A) the aggregate amount of Term Loan Commitment or Term Loans of an assigning DIP Lender subject to each such assignments (determined as of the date the Assignment and Acceptance with respect to such assignment is recorded by the DIP Agent) shall not, without the consent of the DIP Agent and, if no Default or

Event of Default has occurred and is continuing, the Borrower, be less than $500,000, and an integral multiple of $100,000 (or such lesser amount as shall equal the assigning DIP Lender's entire Term Loan Commitment or Term Loans) and (B) after giving effect to such assignment, the aggregate amount of the Term Loan Commitment of and Term Loans at the time owing to, the assigning DIP Lender shall not be less than $500,000 (unless the assigning DIP Lender shall have assigned its entire Term Loan Commitment and Term Loans at the time owing it pursuant to such assignment or assignments otherwise complying with this Section 10.06 executed substantially simultaneously with such assignment);

(iii)     each such assignment by a DIP Lender shall be of a constant, and not varying, percentage of all rights and obligations in respect of Commitments under this Agreement and the other DIP Loan Documents;

(iv)     the parties to such assignment shall either (A) electronically execute and deliver to the DIP Agent an Assignment and Acceptance via an electronic settlement system acceptable to the DIP Agent (which initially shall be ClearPar, LLC) or (B) execute and deliver to the DIP Agent for its acceptance an Assignment and Acceptance, together with any Note subject to such assignment and a processing fee of $3,500, payable or agreed between the assigning DIP Lender and the assignee (and which shall not be required to be paid by the Borrower).

(c)     *Assignment and Acceptance*.  By executing and delivering an Assignment and Acceptance in accordance with this Section 10.06, the assigning DIP Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows:  (i) such assigning DIP Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and the assignee warrants that it is an Eligible Assignee; (ii) except as set forth in clause (i) above, such assigning DIP Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, any of the other DIP Loan Documents or any other instrument or document furnished pursuant hereto or thereto, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any of the other DIP Loan Documents or any other instrument or document furnished pursuant hereto or thereto or the financial condition of the Loan Parties or the performance or observance by any Loan Party of any of its obligations under this Agreement, any of the other DIP Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (iii) such assignee represents and warrants that it is legally authorized to enter into such assignment agreement; (iv) such assignee confirms that it has received a copy of this Agreement, the other DIP Loan Documents, together with copies of the most recent financial statements delivered pursuant to Section 6.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the DIP Agent, the Issuing Lender, such assigning DIP Lender or any other DIP Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other DIP Loan Documents; (vi) such assignee appoints and authorizes each of the DIP Agent and the Collateral Agent to take such action on its behalf and to exercise such powers under this Agreement or any other DIP Loan Document as are delegated to such Persons by the terms hereof or thereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement and the other DIP Loan Documents are required to be performed by it as a DIP Lender. Upon execution, delivery, and acceptance of such Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of such assignment, have the obligations, rights, and benefits of a DIP Lender hereunder and the assigning DIP Lender shall, to the extent of such assignment, relinquish its rights and be released from its obligations under this Agreement.   Upon the consummation of any

assignment pursuant to this Section 10.06(c), the assignor, the DIP Agent and the Loan Parties shall make appropriate arrangements so that, if required, new Notes are issued to the assignor and the assignee. Before becoming a party to this Agreement, the assignee shall deliver to the Borrower and the DIP Agent all applicable forms, certification or documentation in accordance with Section 3.01(d). In addition, if applicable, the assignee shall deliver to the DIP Agent the information referred to in Section 10.20.

(d)     Register. The Borrower hereby designates the DIP Agent to serve as its agent, solely for purposes of this Section 10.06(d), to (i) maintain a register (the "Register") on which the DIP Agent will record the Commitments from time to time of each DIP Lender, the Loans made by each DIP Lender and each repayment in respect of the principal amount of the Loans of each DIP Lender and to (ii) retain a copy of each Assignment and Acceptance delivered to the DIP Agent pursuant to this Section 10.06. Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligation in respect of such Loans. The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Agents, the Issuing Lender and the DIP Lenders shall treat each Person in whose name a Loan and the Note evidencing the same is registered as the owner thereof for all purposes of this Agreement, notwithstanding notice or any provision herein to the contrary. With respect to any DIP Lender, the assignment or other transfer of the Commitments of such DIP Lender and the rights to the principal of, and interest on, any Loan made and any Note issued pursuant to this Agreement shall not be effective until such assignment or other transfer is recorded on the Register and, except to the extent provided in this Section 10.06(d), otherwise complies with Section 10.06, and prior to such recordation all amounts owing to the transferring DIP Lender with respect to such Commitments, Loans and Notes shall remain owing to the transferring DIP Lender. The registration of assignment or other transfer of all or part of any Commitments, Loans and Notes for a DIP Lender shall be recorded by the DIP Agent on the Register only upon the acceptance by the DIP Agent of a properly executed and delivered Assignment and Acceptance and payment of the administrative fee referred to in Section 10.06(b)(iv). The Register shall be available at the offices where kept by the DIP Agent for inspection by the Borrower and any DIP Lender at any reasonable time upon reasonable prior notice to the DIP Agent. The Borrower may not replace any DIP Lender pursuant to Section 2.10(b), unless, with respect to any Notes held by such DIP Lender, the requirements of subsection 10.06(b) and this Section 10.06(d) have been satisfied.

(e)     Participations. Each DIP Lender may, without the consent of the Borrower, the Issuing Lender or any Agent, sell participations to one or more Persons in all or a portion of its rights, obligations or rights and obligations under this Agreement (including all or a portion of its Loans, its Notes and its Commitments); provided, however, that (i) such DIP Lender's obligations under this Agreement shall remain unchanged, (ii) such DIP Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participant shall be entitled to the benefit of the right of setoff contained in Section 10.08 and the yield protection provisions contained in Sections 3.01, 3.04 and 3.05 to the same extent that the DIP Lender from which such participant acquired its participation would be entitled to the benefits of such yield protection provisions so long as the participant delivers to the applicable DIP Lender the tax forms, certifications and other documentation applicable to it in accordance with Section 3.01(d) and otherwise complies with the requirements of Section 3.01 as if it were a Recipient; provided that Borrower shall not be required to reimburse any participant pursuant to Sections 3.01, 3.04 or 3.05 in an amount which exceeds the amount that would have been payable thereunder to such DIP Lender had such DIP Lender not sold such participation (except, in the case of entitlement to payment pursuant to Section 3.01, to the extent such entitlement to receive a greater payment results from any change in any applicable Law or in the interpretation or application thereof that occurs after the participant acquired the applicable participation) and (iv) the Loan Parties, the Agents, the Issuing Lender and the other DIP Lenders shall continue to deal solely and directly with such DIP Lender in connection with such DIP Lender's rights and obligations under the DIP Loan Documents, and such DIP Lender shall retain the sole right to enforce the obligations of the Loan

Parties relating to the DIP Obligations owing to such DIP Lender and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing the amount of principal of or the rate at which interest is payable on such Loans or Notes, extending any scheduled principal payment date or date fixed for the payment of interest on such Loans or Notes or extending its Commitment).  Each DIP Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans, Notes and Commitments or other obligations under the DIP Loan Documents (each such register, a "<u>Participant Register</u>") , <u>provided</u> that no DIP Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any Loans, Notes, Commitments or other obligations under the DIP Loan Documents) to any Person except to the extent that such disclosure is necessary to establish that such Loan, Note, Commitment or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries on a Participant Register shall be conclusive absent manifest error and such DIP Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding notice to the contrary.

(f)     <u>Other Assignments</u>.  Any DIP Lender may at any time (i) assign all or any portion of its rights under this Agreement and any Notes to a Federal Reserve Bank, (ii) pledge or assign a security interest in all or any portion of its interest and rights under this Agreement (including all or any portion of its Notes, if any) to secure obligations of such DIP Lender and (iii) grant to an SPC referred to in <u>subsection (h)</u> below identified as such in writing from time to time by such DIP Lender to the DIP Agent and the Borrower the option to provide to the Borrower all or any part of any Loans that such DIP Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; <u>provided</u> that no such assignment, option, pledge or security interest shall release a DIP Lender from any of its obligations hereunder or substitute any such Federal Reserve Bank or other Person to which such option, pledge or assignment has been made for such DIP Lender as a party hereto.

(g)     <u>Information</u>.  Any DIP Lender may furnish any information concerning any Loan Party or any of their respective Subsidiaries in the possession of such DIP Lender from time to time to assignees and participants (including prospective assignees and participants), subject, however, to the provisions of <u>Section 10.07</u>.

(h)     <u>Other Funding Vehicles</u>.  Notwithstanding anything to the contrary contained herein, any DIP Lender (a "<u>Granting Lender</u>") may grant to a special purpose funding vehicle (an "<u>SPC</u>") the option to fund all or any part of any Loan that such Granting Lender would otherwise be obligated to fund pursuant to this Agreement; <u>provided</u> that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to fund all or any part of such Loan, the Granting Lender shall be obligated to fund such Loan pursuant to the terms hereof, (iii) no SPC shall have any voting rights pursuant to <u>Section 10.01</u> and (iv) with respect to notices, payments and other matters hereunder, the Borrower, the DIP Agent and the DIP Lenders shall not be obligated to deal with an SPC, but may limit their communications and other dealings relevant to such SPC to the applicable Granting Lender.  The funding of a Loan by an SPC hereunder shall utilize the Term Loan Commitment of the Granting Lender to the same extent that, and as if, such Loan were funded by such Granting Lender.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or payment under this Agreement for which a DIP Lender would otherwise be liable for so long as, and to the extent, the Granting Lender provides such indemnity or makes such payment.  Notwithstanding anything to the contrary contained in this Agreement, any SPC may disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee to such SPC.  This <u>Section 10.06(h)</u> may not be amended without the

prior written consent of each Granting Lender, all or any part of whose Loan is being funded by an SPC at the time of such amendment.

       **Section 10.07   Confidentiality and Disclosure.** (a)  Each of the DIP Agent and the DIP Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (ii) to the extent requested by any regulatory authority (in which case the DIP Agent or such DIP Lender, as applicable, shall use reasonable efforts to notify the Borrower prior to such disclosure); (iii) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; (iv) to any other party to this Agreement; (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder; (vi) subject to an agreement containing provisions substantially the same as those of this Section 10.07, to (A) any Eligible Assignee of or participant in, or any prospective Eligible Assignee of or participant in, any of its rights or obligations under this Agreement or (B) any direct or indirect contractual counterparty or prospective counterparty (or such contractual counterparty's or prospective counterparty's professional advisor) to any credit derivative transaction relating to obligations of the Borrower (it being understood that, in the case of the immediately preceding clauses (A) and (B) above, the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (vii) with the consent of the Borrower; (viii) to the extent such information (A) becomes publicly available other than as a result of a breach of this Section or (B) becomes available to an Agent or any DIP Lender on a nonconfidential basis from a source other than the Borrower; or (ix) to the National Association of Insurance Commissioners or any other similar organization or any nationally recognized rating agency that requires access to information about a DIP Lender's or its Affiliates' investment portfolio in connection with ratings issued with respect to such DIP Lender or its Affiliates.  For the purposes of this Section 10.07, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the DIP Agent or any DIP Lender on a nonconfidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the date hereof, such information is clearly identified in writing at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.07 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information, but in no event shall such Person exercise less than a reasonable degree of care. Notwithstanding the foregoing, any Agent and any DIP Lender may place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the Internet or worldwide web as it may choose, and circulate similar promotional materials, after the closing of the transactions contemplated by this Agreement in the form of a "tombstone" or otherwise describing the names of the Loan Parties, or any of them, and the amount, type and closing date of such transactions, all at their sole expense.

       (b)      Notwithstanding the foregoing or any other contrary provision in this Agreement or any other DIP Loan Documents, the parties hereto hereby agree that, from the commencement of discussions with respect to the Transaction and the DIP Loan Documents, each of the parties hereto and each of their respective employees, representatives and other agents may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure (as such terms are used in Sections 6011, 6111 and 6112 of the Code and the Treasury Regulations promulgated thereunder) of the DIP Loan Documents and the Transaction and all materials of any kind (including opinions or other tax analyses) that are provided to any of the parties hereto relating to such tax treatment and tax structure, other than any information for which nondisclosure is reasonably necessary in order to comply with applicable

securities laws; provided, however, that for this purpose the U.S. federal income tax treatment and U.S. federal income tax structure shall not include (i) the identity of any existing or future party (or affiliate of such party) to this Agreement or (ii) any specific market pricing information, including the amount of any fees, expenses, rates or payments, arising in connection with this Agreement or the transactions contemplated hereby.

Section 10.08    **Set-off.**    In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of a payment Event of Default, each DIP Lender (and each of its Affiliates) is authorized at any time and from time to time, without presentment, demand, protest or other notice of any kind (all of such rights being hereby expressly waived), to set-off and to appropriate and apply any and all deposits (general or specific (other than payroll, employee benefits and trust accounts (including League Funds))) and any other indebtedness at any time held or owing by such DIP Lender (including, without limitation, branches, agencies or Affiliates of such DIP Lender wherever located) to or for the credit or the account of any Loan Party against obligations and liabilities of such Loan Party then due to the DIP Lenders hereunder, under the Notes, under the other DIP Loan Documents or otherwise, and any such set-off shall be deemed to have been made immediately upon the occurrence of an Event of Default even though such charge is made or entered on the books of such DIP Lender subsequent thereto.  The Loan Parties hereby agree that to the extent permitted by law any Person purchasing a participation in the Loans and Commitments hereunder pursuant to Section  2.14 or 10.06(e) may exercise all rights of set-off with respect to its participation interest as fully as if such Person were a DIP Lender hereunder and any such set-off shall reduce the amount owed by such Loan Party to the DIP Lender.

Section 10.09    **Interest Rate Limitation.**    Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be charged or contracted for, charged or otherwise received by the DIP Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10.09, shall be cumulated and the interest and Charges payable to such DIP Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such DIP Lender shall have received such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of payment.

Section 10.10    **Counterparts.**    This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument.  It shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

Section 10.11    **Integration.**    This Agreement, together with the other DIP Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Agreement and those of any other DIP Loan Document, the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the DIP Agent or the DIP Lenders in any other DIP Loan Document shall not be deemed a conflict with this Agreement.  Each DIP Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

**Section 10.12    Survival of Representations and Warranties.**  All representations and warranties made hereunder and in any other DIP Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Agents and each DIP Lender, regardless of any investigation made by any Agent or any DIP Lender or on their behalf and notwithstanding that any Agent or any DIP Lender may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other DIP Obligation shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

**Section 10.13    Severability.**  Any provision of this Agreement and the other DIP Loan Documents to which any Loan Party is a party that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 10.14    Headings.**  The headings of the sections and subsections hereof are provided for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

**Section 10.15    Defaulting Lenders.**  Each DIP Lender understands and agrees that if such DIP Lender is a Defaulting Lender then, notwithstanding the provisions of Section 10.03, it shall not be entitled to vote on any matter requiring the consent of the Required DIP Lenders or to object to any matter requiring the consent of all the DIP Lenders adversely affected thereby; provided, however, that all other benefits and obligations under the DIP Loan Documents shall apply to such Defaulting Lender, except as provided in Section 2.03(e).

**Section 10.16    Governing Law; Submission to Jurisdiction.**

(a)    THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS (OTHER THAN LETTERS OF CREDIT AND OTHER THAN AS EXPRESSLY SET FORTH IN SUCH OTHER DIP LOAN DOCUMENTS) AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING, WITHOUT LIMITATION, SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).  EACH LETTER OF CREDIT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OR RULES DESIGNATED IN SUCH LETTER OF CREDIT, OR IF NO SUCH LAWS OR RULES ARE DESIGNATED, THE ISP AND, AS TO MATTERS NOT GOVERNED BY THE ISP, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING, WITHOUT LIMITATION, SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

(b)    Any legal action or proceeding with respect to this Agreement or any other DIP Loan Document may be brought in the courts of the State of New York in New York County, or of the United States for the Southern District of New York, and, by execution and delivery of this Agreement, each Loan Party hereby irrevocably accepts for itself and in respect of its property, generally and unconditional, the nonexclusive jurisdiction of such courts.  Each Loan Party irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such court and any claim that any such proceeding brought in any such court has been brought in an inconvenient forum.  Notwithstanding any other provision of this

Section 10.16, the Bankruptcy Court shall have exclusive jurisdiction over any action or dispute involving, relating to or arising out of this agreement or the other DIP Loan Documents.

(c)      Each Loan Party hereby irrevocably consents and agrees that any and all process which may be served in any suit, action or proceeding of the nature referred to in this Section 10.16 may be served the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to Holdings', Kingpin's or the Borrower's address referred to in Section 10.03, as the case may be. Each Loan Party agrees that such service (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon and personal delivery to it.  Nothing in this Section 10.16 shall affect the right of any DIP Lender to serve process in any manner permitted by law or limit the right of any DIP Lender to bring proceedings against Holdings, Kingpin or the Borrower in the courts of any jurisdiction or jurisdictions.

Section 10.17  **Waiver of Jury Trial.**   EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 10.17 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.    EACH PARTY HERETO CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.17.

Section 10.18  **Binding Effect.**   This Agreement shall become effective at such time when it shall have been executed by Holdings, Kingpin the Borrower and the DIP Agent shall have received copies hereof (telefaxed or otherwise) which, when taken together, bear the signatures of each DIP Lender, and thereafter this Agreement shall be binding upon and inure to the benefit of Holdings, Kingpin, the Borrower, each Agent and each DIP Lender and their respective successors and assigns.

Section 10.19  **Lenders' U.S. Patriot Act Compliance Certification.**   Each DIP Lender or assignee or participant of a DIP Lender that is not incorporated under the Laws of the United States or a State thereof (and is not excepted from the certification requirement contained in Section 313 of the U.S. Patriot Act and the applicable regulations because it is both (i) an Affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country and (ii) subject to supervision by a banking regulatory authority regulating such affiliated depository institution or foreign bank) shall deliver to the DIP Agent the certification or, if applicable, recertification, certifying that such DIP Lender is not a "shell" and certifying to other matters as required by Section 313 of the U.S. Patriot Act and the applicable regulations thereunder: (i) within ten (10) calendar days after the Closing Date or, if later, the date such DIP Lender, assignee or participant of a DIP Lender becomes a DIP Lender, assignee or participant of a DIP Lender hereunder and (ii) at such other times as are required under the U.S. Patriot Act.

Section 10.20   **U.S. Patriot Act Notice.**   Each Agent and each DIP Lender (for itself and not on behalf of any other person) hereby notifies each Loan Party that, pursuant to the requirements of the U.S. Patriot Act, such Agent and DIP Lender is required to obtain, verify and record information that identifies each of Holdings and each other Loan Party, which information includes the name and address of each such Loan Party and other information that will allow such Agent and DIP Lender to identify each such Loan Party in accordance with the U.S. Patriot Act.

## ARTICLE XI

## SECURITY.

Section 11.01   **Security**.

(a)      To induce the Agents and the DIP Lenders to enter into this Agreement and the other DIP Loan Documents and to secure the due and punctual payment and performance of all DIP Obligations of it and of all other Loan Parties, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing or due or to become due, in accordance with the terms thereof and to secure the performance of all of its obligations and the obligations of all other Loan Parties hereunder and under the other DIP Loan Documents in respect of the DIP Obligations, each Loan Party hereby grants to the Collateral Agent for the benefit of the Secured Parties a security interest in, and each Loan Party hereby pledges and collaterally assigns to the Collateral Agent for the benefit of the Secured Parties, a Lien upon and a continuing priming first-priority security interest (subject only to (i) the Permitted Existing Liens, (ii) the Carve-Out, and (iii) Liens permitted under Section 7.02) in accordance with Sections 364(c)(2) and (3) and 364(d)(1) of the Bankruptcy Code, in all of its right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Loan Party, whether owned or consigned by or to, or leased from or to, such Loan Party, and regardless of where located (all of which being hereinafter collectively referred to as the "Collateral"), including but not limited to:

(i)      all Receivables;

(ii)      all Inventory;

(iii)      all General Intangibles;

(iv)      all Intellectual Property;

(v)      all Documents and Chattel Paper and all Supporting Obligations of any kind given by any Person with respect thereto;

(vi)      all Equipment;

(vii)      all Instruments, Equity Interests, Financial Assets, Investment Property and all Supporting Obligations of any kind given by any Person with respect thereto;

(viii)      all Deposit Accounts, Securities Accounts, cash and other property deposited therein or credited thereto from time to time, all monies and property of any kind of any Loan Party maintained with or in the possession of an Agent from time to time (including, without limitation, the LC Account and the DIP Priority Account);

      (ix)     all Goods and As-Extracted Collateral;

      (x)     all Letters of Credit and Letter of Credit Rights;

      (xi)     all books and records (including, without limitation, customer lists, credit files, computer programs, printouts and other computer materials and records) of each Loan Party pertaining to any of the Collateral;

      (xii)     (A) all Real Property, all Mortgage Policies (each as defined in the First Lien Credit Agreement) and all other related documents; and

      (xiii)     all Proceeds of all or any of the Collateral described in <u>clauses (i) through (xi)</u> hereof  and any claims or causes of action (including any proceeds or property recovered in respect of avoidance actions or causes of action under Chapter 5 of the Bankruptcy Code, and, upon entry of the Final Order, avoidance actions and proceeds of avoidance actions under chapter 5 of the Bankruptcy Code), tort claims, insurance claims and other rights to payment not otherwise included in the foregoing and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing;

<u>provided</u>, <u>however</u>, that the Collateral shall not include the following property (collectively, the "<u>Excluded Collateral</u>"): (i) any Security owned by any Loan Party which constitutes a voting Equity Interest issued by a Foreign Subsidiary of such Loan Party to the extent that the inclusion of such Equity Interest the Collateral would cause the Collateral pledged by such Loan Party hereunder or under any other DIP Loan Document to include in the aggregate more than 65% of the total combined voting power of all classes of voting securities of such Foreign Subsidiary (such percentage subject to adjustment as provided under <u>Section 6.10(d)</u>), (ii) Excluded Contracts, (iii) Excluded Equipment, (iv) Deposit Accounts consisting of payroll, employee benefits and trust accounts and League Funds and (v) Equity Interests owned by any Loan Party issued by Qubica JV Entity or any of its Subsidiaries; <u>provided</u>, <u>further</u>, that if and when any property shall cease to be Excluded Collateral, immediately at and from such time, the Collateral shall include, and the security interest granted by each Loan Party shall attach to, such property.

      (b)     In addition, to secure the prompt and complete payment, performance and observance of the Obligations and in order to induce the Collateral Agent and the DIP Lenders as aforesaid, each Loan Party hereby grants to the Collateral Agent, for itself and the benefit of Secured Parties, a right of setoff against the property of such Loan Party held by the Collateral Agent or any Secured Party, consisting of Collateral now or hereafter in the possession or custody of or in transit to the Collateral Agent or any Secured Party, for any purpose, including safekeeping, collection or pledge, for the account of such Loan Party, or as to which such Loan Party may have any right or power.

      **Section 11.02**   **Perfection of Security Interests**.  To the extent permitted by applicable Law, each Loan Party hereby irrevocably authorizes Collateral Agent and its affiliates, counsel and other representatives, at any time and from time to time, to file in the name of such Loan Party or otherwise and without separate authorization or authentication of such Loan Party appearing thereon, such UCC financing statements or continuation statements as the Collateral Agent may reasonably deem necessary or reasonably appropriate to further perfect or maintain the perfection of the Lien of the DIP Agent under this Agreement, and such financing statements and amendments may describe the Collateral covered thereby "all of the debtor's personal property and assets" or words to similar effect, whether now owned or hereafter acquired, notwithstanding that such description may be broader in scope than the Collateral described in this Agreement.  Each Loan Party hereby also authorizes Collateral Agent and its affiliates, counsel and other representatives, at any time and from time to time, to execute and file any and all

agreements, instruments, documents and papers as the Collateral Agent may reasonably request to evidence the Lien of the DIP Agent in any Patent, Trademark,  Copyright or other Intellectual Property, including without limitation the goodwill or accounts and general intangibles of such Loan Party relating thereto or represented thereby. Such Loan Party agrees that, except to the extent that any filing office requires otherwise, a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.   The Loan Parties shall pay the costs of, or incidental to, any recording or filing of any financing or continuation statements or other assignment documents concerning the Collateral.

### Section 11.03    Pledged Collateral.

(a)    Delivery of Certificated Securities. Each Loan Party will promptly deliver each Instrument and each Certificated Security (other than Cash Equivalents held in a Deposit Account or a Securities Account which in each case is subject to an effective Account Control Agreement to the Collateral Agent (or the DIP Agent on its behalf), accompanied by duly executed stock powers or other instruments of transfer or assignment in blank, all in form and substance satisfactory to the Collateral Agent and all promissory notes (other than promissory notes with an aggregate face value not in excess of $250,000) shall be endorsed by the applicable Loan Party or accompanied by a duly executed instrument of transfer or assignment in blank. Notwithstanding the foregoing, for so long as any Certificated Security existing prior to the date hereof is held by the First Lien Agent there shall be no delivery requirement under this Section 11.03(a) with respect to such Certificated Securities.

(b)    Rights of Loan Parties with Respect to Pledged Collateral. As long as no Default or Event of Default shall have occurred and be continuing and until written notice shall be given by the DIP Agent to the relevant Loan Parties of its intent to exercise its corresponding rights in accordance with Section 11.08 hereof:

(i)    (A) Each Loan Party shall be entitled to vote, give consents and have all other consensual rights with respect to any pledged Equity Interests, or any part thereof for all purposes not inconsistent with the provisions of this Agreement or any other DIP Loan Document and (B) the Collateral Agent shall execute and deliver (or cause to be executed and delivered) to the relevant Loan Party all such proxies and other instruments as such Loan Party may reasonably request for the purpose of enabling such Loan Party to exercise the voting and other rights that it is entitled to exercise pursuant to this Agreement; and

(ii)    (A) As long as no Event of Default shall have occurred and be continuing each Loan Party shall be entitled, from time to time, to collect, receive and retain for its own use, free and clear of the Lien created by this Agreement, any and all cash dividends, distributions, principal and interest paid in respect of the pledged Equity Interests or notes to the extent permitted in this Agreement other than any and all dividends, interest, principal or other distributions paid or payable other than in cash in respect of any pledged Collateral, and Instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any pledged Collateral whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any pledged Equity Interests or received in exchange for pledged Equity Interests or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise; and (B) upon the occurrence and during the continuance of an Event of Default, all dividends and interest and all other distributions in respect of any of the Equity Interests or notes, whenever paid or made, shall be delivered to the Collateral Agent to hold as pledged Collateral and shall, if received by any Loan Party, be received in trust for the benefit of the Collateral Agent, be segregated from the other property or funds of such Loan

Party, and be forthwith delivered to the Collateral Agent as pledged Collateral in the same form as so received (with any necessary endorsement).

> **Section 11.04    Collateral Agent's and Secured Parties' Rights; Limitations on Agent's and Secured Parties' Obligations**.

(a)    Subject to each Loan Party's rights and duties under the Bankruptcy Code (including Section 365 of the Bankruptcy Code), it is expressly agreed by each Loan Party that, anything herein or in any other DIP Loan Document to the contrary notwithstanding, each Loan Party shall remain liable under each of its respective Contractual Obligations (as defined below) incurred after the Petition Date or assumed with the consent of the DIP Agent and Bankruptcy Court approval (which may be pursuant to a Plan confirmed by the Bankruptcy Court) to observe and perform all the conditions and obligations to be observed and performed by it thereunder. Neither the Collateral Agent nor any Secured Party shall have any obligation or liability under any Contractual Obligation by reason of or arising out of this Agreement or any other Loan Document or the granting herein of a Lien thereon or the receipt by any Agent or any Secured Party of any payment relating to any Contractual Obligation pursuant hereto. Neither the Collateral Agent nor any Secured Party shall be required or obligated in any manner to perform or fulfill any of the obligations of any Loan Party with respect to any Contractual Obligation, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any Contractual Obligation, or, other than as may be required in the Chapter 11 Cases, to present or file any claims, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times. "Contractual Obligation" means, as applied to any Person, any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

(b)    At any time after an Event of Default has occurred and is continuing, after giving notice to the relevant Loan Party of its intent to do so, each Agent may notify each of such Loan Party's Account Debtors and all other Persons obligated on any of the Collateral that the DIP Agent has a security interest therein, and that payments shall be made (i) directly to the Collateral Agent (by instructing that such payments be remitted by direct wire transfer to the Collateral Agent or to a post office box which shall be in the name and under the control of the Collateral Agent or (ii) to one or more other banks in the United States (by instructing that such payments be remitted by direct wire transfer to, or to a post office box which shall be in the name and under the control of, such bank) subject to an Account Control Agreement. Once any such notice has been given to any Account Debtor or other Person obligated on the Collateral, none of the Loan Parties shall give any contrary instructions to such Account Debtor or other Person without the Agents' prior written consent.

(c)    At any time after an Event of Default has occurred and is continuing, the Collateral Agent may in the Collateral Agent's own name, in the name of a nominee of the Collateral Agent or in the name of any Loan Party communicate (and such Loan Party hereby authorizes the Collateral Agent to so notify) with each Account Debtor to verify with such Persons, to the Collateral Agent's reasonable satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts, Instruments, Chattel Paper and/or payment intangibles, and that such Collateral has been assigned to the Collateral Agent hereunder for the benefit of the Secured Parties, and that any payments due or to become due in respect of such Collateral are to be made directly to Collateral Agent or any other designee on its behalf.

(d)    It is understood and agreed that the security interests in cash and Investment Property created hereunder shall not prevent the Loan Parties from using such assets in the ordinary

course of their respective businesses, subject to the provisions of the Interim Order, the Final Order (as applicable) the Budget and the Account Control Agreements with respect to such cash and Investment Property.

**Section 11.05   Covenants of the Loan Parties with Respect to Collateral**. Without limiting any Loan Party's covenants and agreements contained in this Agreement and the other DIP Loan Documents, each Loan Party covenants and agrees with the Collateral Agent, for the benefit of the Agents and the Secured Parties, that from and after the date of this Agreement and until the DIP Termination Date:

(a)   Further Assurances; Pledge of Instruments; Chattel Paper.

(i)   At any time and from time to time, upon the reasonable written request of the Collateral Agent and at the sole expense of such Loan Party, such Loan Party shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions (including the filing and recording of financing statements and other documents) as the Agents may reasonably deem necessary to carry out the terms of this Agreement and of the rights and powers herein granted with respect to the Collateral, including (A) using its commercially reasonable efforts to secure all consents and approvals necessary or appropriate for the assignment to or for the benefit of the Collateral Agent of any Contractual Obligation held by such Loan Party (including Excluded Contracts) and to enforce the security interests granted hereunder; and (B) filing any financing or continuation statements under the UCC in effect in any jurisdiction with respect to the Liens granted hereunder or under any other Loan Document.

(ii)   (A) Without the prior written consent of the Collateral Agent, such Loan Party will not (x) sell, assign, transfer, pledge the pledged Collateral (except pursuant to a transaction permitted by this Agreement) or (y) otherwise encumber any of its rights in or to the pledged Collateral (except for Liens permitted under this Agreement), or any unpaid dividends, interest or other distributions or payments with respect to the pledged Collateral or grant a Lien in the pledged Collateral, unless otherwise expressly permitted by this Agreement; (B) upon the written request of the Collateral Agent, each Loan Party will, at its expense, promptly execute and deliver all such further instruments and take all such further actions as the Collateral Agent from time to time may reasonably request in order to ensure to Agent and Secured Parties the security interests to the pledged Collateral granted hereby are perfected to the extent required to be perfected under this Agreement; and (C) in the case of each Loan Party which is an issuer of pledged Collateral, such Loan Party agrees that after an Event of Default has occurred and is continuing it will comply with instructions of the Collateral Agent with respect to the Equity Interests of such issuer without further consent by the applicable Loan Party.

(iii)   Unless such Collateral has been delivered to the Collateral Agent pursuant to Section 11.03 (or to the First Lien Agent on behalf of the Collateral Agent), such Loan Party shall deliver to the Collateral Agent all Collateral consisting of the following negotiable Documents, certificated Equity Interests, Chattel Paper and Instruments (in each case, accompanied by stock powers, allonges or other instruments of transfer executed in blank) promptly (and in any event within ten (10) Business Days) after such Loan Party receives the same: (A) any negotiable Document or Instrument having a value in excess of $250,000, (B) any certificated Equity Interests (other than certificated pledged Equity Interests of Subsidiaries of such Loan Party delivered to Agent pursuant to Section 11.03 above) or (C) any Chattel Paper (other than Chattel Paper (I) the value of which, in the aggregate for all such Chattel Paper, does not exceed $250,000 or (II) which evidences leases of Inventory for a period of time that is less

than one month), and such Loan Party will provide prompt written notice of receipt thereof to the Collateral Agent.

(iv)       Each Loan Party will, upon obtaining ownership of any additional Equity Interests or promissory notes or Instruments of a Pledged Entity or any Equity Interests or promissory notes or Instruments required to be pledged to the Collateral Agent pursuant to clause (iii) above, which Equity Interests are not listed on Schedule 5.12 on the date hereof, (and which notes or Instruments have not been delivered to the First Lien Agent prior to the Closing Date) promptly deliver to the Collateral Agent (x) each Instrument in certificated form (with a stock power executed in blank or allonge) and (y) a certificate executed by a Responsible Officer of such Loan Party describing any such additional Equity Interests, notes or Instruments, attaching supplements to Schedule 5.12 to the extent necessary to cause such schedule to be complete and accurate at such time and certifying that such Equity Interests, promissory notes or Instruments have been duly pledged with the Collateral Agent.  Each Loan Party hereby authorizes the Collateral Agent to attach any such supplement to Schedule 5.12 to this Agreement and agrees that all pledged Equity Interests and Pledged Notes listed on any such certificate delivered to the Collateral Agent shall for all purposes hereunder be considered Collateral.

(v)       Upon the reasonable request of the Collateral Agent, such Loan Party shall, in accordance with the terms of this Agreement, obtain waivers or subordinations of Liens from landlords, bailees and mortgagees, and such Loan Party shall to the extent required by this Agreement, in all instances obtain signed acknowledgements of the Collateral Agent's Liens from bailees having possession of such Loan Party's Goods that they hold for the benefit of the DIP Agent.

(vi)       Such Loan Party shall obtain authenticated Account Control Agreements from (A) each Securities Intermediary issuing or holding any financial assets to or for such Loan Party and (B) each commodities intermediary holding commodities for such Loan Party; and such Loan Party shall within twenty (20) Business Days after acquiring any uncertificated securities that are not credited to a Securities Account obtain from each issuer of such uncertificated securities an acknowledgment of the pledge of such uncertificated securities to the Collateral Agent granting "control" (within the meaning of Section 8-106 of the UCC) over such uncertificated securities to the Collateral Agent and in a form that is reasonably satisfactory to the Collateral Agent. Each Loan Party shall obtain an Account Control Agreement as required pursuant to Section 6.08.

(vii)       If such Loan Party is or becomes the beneficiary of a Letter of Credit with a face value in excess of $250,000, such Loan Party shall promptly, and in any event within ten (10) Business Days after becoming a beneficiary, notify the Collateral Agent thereof and, unless otherwise consented by the Collateral Agent, cause the issuer and/or confirmation bank to consent to the assignment of any Letter-of-Credit Rights to the Collateral Agent and agree to direct all payments thereunder to a Deposit Account subject to a Account Control Agreement, all in form and substance reasonably satisfactory to the Collateral Agent.

(viii)       At any time (A) upon the Collateral Agent's reasonable written request or (B) if an Event of Default has occurred and is continuing, unless the Collateral Agent has otherwise consented in writing (which consent may be revoked), such Loan Party shall take all steps necessary to grant the Collateral Agent control of all Electronic Chattel Paper with a face value in excess of $250,000 in accordance with the UCC and all "transferable records" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

(ix)    Such Loan Party shall promptly, and in any event within twenty (20) Business Days after the same is acquired by it, notify the Collateral Agent of Commercial Tort Claims in excess of $1,000,000, individually or in the aggregate, acquired by it and unless otherwise consented by the Collateral Agent, such Loan Party shall enter into a supplement to this Agreement, granting to the Collateral Agent a Lien in such Commercial Tort Claim.

(b)    <u>Maintenance of Records</u>. Such Loan Party shall mark its books and records pertaining to the Collateral to evidence this Agreement and the Liens granted hereby. Upon (A) the Collateral Agent's reasonable written request or (B) unless the Collateral Agent shall otherwise consent in writing (which consent may be revoked), the occurrence and during the continuance of an Event of Default, such Chattel Paper (other than Chattel Paper the value of which, in the aggregate for all such Chattel Paper, does not exceed $1,000,000) and Instruments (other than Instruments the value of which, in the aggregate for all such Instruments, does not exceed $1,000,000) shall be marked by Loan Party with a legend, in form and substance reasonably satisfactory to the Collateral Agent; provided that each Loan Party shall be required to so mark each such Chattel Paper or Instrument only to the extent that the same is in such Loan Party's possession.

(c)    <u>Covenants Regarding Patent, Trademark and Copyright Collateral</u>.

(i)    In no event shall such Loan Party, either directly or through any agent, employee, licensee or designee, file an application for the registration of any Patent, Trademark or Copyright with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency without giving the Collateral Agent prior written notice thereof, and, upon request of the Collateral Agent, such Loan Party shall execute and deliver any and all Patent Security Agreements, Copyright Security Agreements or Trademark Security Agreements as the Collateral Agent may request to evidence the Collateral Agent's Lien on such Patent, Trademark or Copyright, and the General Intangibles of Loan Party relating thereto or represented thereby; <u>provided</u>, that no Loan Party shall be required to execute a Trademark Security Agreement or otherwise grant a Lien in favor of the Collateral Agent on any "intent to use" trademark.

(ii)    Such Loan Party shall take all actions necessary or reasonably requested by any Agent to maintain and pursue (and not abandon) each application, to obtain the relevant registration and to maintain the registration of each of the Patents, Trademarks and Copyrights (now or hereafter existing that is material to the conduct of any Loan Party's business or operations), including the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings, unless such Loan Party shall determine that such Patent, Trademark or Copyright is not material to the conduct of its business or operations.

(iii)    In the event that any Loan Party becomes aware that any of the Patent, Trademark or Copyright Collateral that is material to the conduct of such Loan Party's business or operations is infringed upon, or misappropriated or diluted by a third party, each Loan Party shall promptly notify Agent and, if applicable, comply with <u>Section 11.05(a)(ix)</u>. Such Loan Party shall, unless it shall reasonably determine that such Patent, Trademark or Copyright Collateral is not material to the conduct of its business or operations, promptly sue for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution, and shall take such other actions as the Collateral Agent shall deem appropriate under the circumstances to protect such Patent, Trademark or Copyright Collateral.

(d)      Notices. Such Loan Party will advise the Agents promptly, in reasonable detail, (i) of any Lien (other than Permitted Encumbrances) on or claim made or asserted against a material portion of the Collateral of which it has knowledge, which could reasonably be expected to have a material adverse effect on the Collateral or the ability of the Collateral Agent to exercise any of its remedies hereunder.

(e)      Organizational/Collateral Location Changes; No Reincorporation. Such Loan Party will give Agent at least fifteen (15) calendar days prior written notice of any change to the information set forth on Schedule 5.12 to the extent needed to make Schedule 5.12 up to date and accurate. Such Loan Party shall not affect any such change unless it has taken all steps necessary or reasonably required by the Collateral Agent to maintain continued perfection of the Collateral Agent's security interest in the Collateral with the same priority as prior to such change. Without limiting the prohibitions on mergers involving any Loan Party as contained in this Agreement, none of the Loan Parties shall reincorporate or reorganize itself under the laws of any jurisdiction other than the jurisdiction in which it is incorporated or organized as of the date hereof without the prior written consent of the Agents.

**Section 11.06   Accounts; Collection of Accounts and Payments**. Each Loan Party, and any of its employees, agents and other Persons acting for or in concert with any Loan Party shall, acting as trustee for the Collateral Agent and the Secured Parties, receive, as the sole and exclusive property of Secured Parties, any moneys, checks, notes, drafts or other payments relating to and/or constituting proceeds of Accounts or other Collateral which come into the possession or under the control of such Loan Party or any employees, agents, or other Persons acting for or in concert with any Loan Party, and promptly upon receipt thereof, such Loan Party or such Persons shall  deposit the same or cause the same to be deposited in kind, in the DIP Priority Account or any other Deposit Account with any financial institution subject to an Account Control Agreement.

**Section 11.07   Agent's Appointment as Attorney-In-Fact**.

(a)      Until the discharge of the DIP Obligations, each Loan Party hereby irrevocably appoints the Collateral Agent (or the DIP Agent acting upon the instructions of the Collateral Agent) and any officer or agent thereof as its true and lawful attorney-in-fact, with full power of substitution, in the name of such Loan Party, the Collateral Agent, the DIP Agent, the Secured Parties or otherwise, for the sole use and benefit of the Collateral Agent and the Secured Parties, but at such Loan Party's expense, to the extent permitted by law, to exercise at any time and from time to time while an Event of Default has occurred and is continuing all or any of the following powers with respect to all or any of the Collateral; such power, being coupled with an interest, is irrevocable until the discharge of DIP Obligations:

(i)      to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or reasonably desirable to carry out the terms of this Agreement;

(ii)      to receive, take, endorse, assign and deliver any and all checks, notes, drafts, acceptances, documents and other negotiable and non-negotiable Instruments taken or received by such Loan Party as, or in connection with, the Collateral;

(iii)      to accelerate any Receivable which may be accelerated in accordance with its terms, and to otherwise demand, sue for, collect, receive and give acquittance for any and all monies due or to become due on or by virtue of any Collateral;

(iv)     to commence, settle, compromise, compound, prosecute, defend or adjust any Claim, suit, action or proceeding with respect to, or in connection with, the Collateral;

(v)     to sell, transfer, assign or otherwise deal in or with the Collateral or the Proceeds or avails thereof, including, without limitation, for the implementation of any assignment, lease, license, sublicense, grant of option, sale or other disposition of any Patent, Trademark, Copyright or Software or any action related thereto, as fully and effectually as if the Collateral Agent were the absolute owner thereof;

(vi)     pay or discharge taxes and Liens levied or placed on or threatened against the Collateral;

(vii)     sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral;

(viii)     obtain and adjust insurance maintained by such Loan Party or paid to the Collateral Agent;

(ix)     to the extent permitted in the Chapter 11 Cases, commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral;

(x)     defend any suit, action or proceeding brought against such Loan Party with respect to any Collateral (with such Loan Party's consent (not to be unreasonably withheld or delayed) to the extent such action or its resolution could materially affect such Loan Party or any of its affiliates in any manner other than with respect to its continuing rights in such Collateral);

(xi)     to extend the time of payment of any or all of the Collateral and to make any allowance and other adjustments with respect thereto;

(xii)     credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law; and

(xiii)     to do, at its option, but at the expense of such Loan Party, at any time or from time to time, all acts and things which the Collateral Agent reasonably deems necessary to protect or preserve the Collateral and to realize upon the Collateral.

Anything in this Section 11.07(a) to the contrary notwithstanding, the Agents agree that neither Agent will exercise any rights under the power of attorney provided for in this Section 11.07(a) unless an Event of Default shall have occurred and be continuing.

(b)     Upon the occurrence and during the continuance of an Event of Default, if any Loan Party fails to perform or comply with any of its agreements contained herein, the Collateral Agent,

at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement. The Collateral Agent shall provide the Loan Parties with notice of any such performance or action in a commercially reasonable matter.  Performance of such Loan Party's obligations as permitted under this <u>Section 11.07</u> shall in no way constitute a violation of the automatic stay provided by Section 362 of the Bankruptcy Code and each Loan Party hereby waives applicability thereof. Moreover, none of the DIP Agent, the Collateral Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Agent or the Second Lien Lenders shall in any way be responsible for the payment of any costs incurred in connection with preserving or disposing of any Collateral pursuant to Sections 105 and 506(c) of the Bankruptcy Code and the Collateral may not be charged for the incurrence of any such cost.

(c)      Each Loan Party hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. Exercise by the Collateral Agent of the powers granted hereunder is not a violation of the automatic stay provided by Section 362 of the Bankruptcy Code and each Loan Party waives applicability thereof. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

### Section 11.08   <u>Remedies; Rights Upon Default</u>.

(a)      If any Event of Default has occurred and is continuing, the Collateral Agent, directly or indirectly through the DIP Agent acting upon the instructions of the Collateral Agent may and upon the direction of the Required DIP Lenders shall, in addition to all other rights and remedies granted to it in this Agreement and in any other agreement securing, evidencing or relating to the DIP Obligations (including without limitation, the right to give or cause the Collateral Agent to give instructions or a notice of sole or exclusive control under an Account Control Agreement): (i) exercise on behalf of the Secured Parties all rights and remedies of a secured party under the UCC (whether or not in effect in the jurisdiction where such rights are exercised) and, in addition, (ii) without demand of performance or other demand or notice of any kind (except as required by the Interim Order or Final Order, such notice as may be specifically required by law and the notice specified below of time and place of public or private sale) to or upon any Loan Party or any other Person (all and each of which demands, advertisements and notices (except any notice required by the Interim Order or Final Order, such notice as may be specifically required by law and the notice specified below of time and place of public or private sale) to or upon any Loan Party or any other Person all of which demands and/or notices are hereby waived by each Loan Party), (A) withdraw all cash and Cash Equivalents in any Deposit Account or Securities Account of a Loan Party and apply such cash and Cash Equivalents and other cash, if any, then held by it as Collateral in satisfaction of the DIP Obligations (B) give notice and take sole possession and control of all amounts on deposit in or credited to any Deposit Account or Securities Account pursuant to the related Account Control Agreement and (C) if there shall be no such cash, Cash Equivalents or other amounts or if such cash, Cash Equivalents and other amounts shall be insufficient to pay all the DIP Obligations (other than contingent indemnification obligations not yet due and payable)in full or cannot be so applied for any reason or if the Collateral Agent determines to do so, collect, receive, appropriate and realize upon the Collateral and/or sell, assign, give an option or options to purchase or otherwise dispose of and deliver the Collateral (or contract to do so) or any part thereof at public or private sale, at any office of the Collateral Agent or elsewhere in such manner as is commercially reasonable and as the Collateral Agent may deem best, for cash, on credit or for future delivery, without assumption of any credit risk and at such price or prices as the Collateral Agent may deem reasonably satisfactory.

(b)      To the extent permitted by applicable law, the Collateral Agent (or the DIP Agent acting upon the instructions of the Collateral Agent) or any Secured Party may be the purchaser of any or all of the Collateral so sold at any public sale (or, if the Collateral is of a type customarily sold in a

recognized market or is of a type which is the subject of widely distributed standard price quotations, at any private sale). Each Loan Party will execute and deliver such documents and take such other action as the Collateral Agent deems necessary or reasonably advisable in order that any such sale may be made in compliance with Law. Upon any such sale, the Collateral Agent (or the DIP Agent acting upon the instructions of the Collateral Agent) shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral so sold. Each purchaser at any such sale shall hold the Collateral so sold to it absolutely and free from any claim or right of whatsoever kind. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix in the notice of such sale. At any such sale, the Collateral may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may determine. Neither the Collateral Agent nor the DIP Agent shall be obligated to make any such sale pursuant to any such notice. The Collateral  Agent (or the DIP Agent acting upon the instructions of the Collateral Agent) may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned without further notice. In the case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent (directly or indirectly through the DIP Agent acting on its behalf) until the selling price is paid by the purchaser thereof, but neither the Collateral Agent nor the DIP Agent shall not incur any liability in the case of the failure of such purchaser to take up and pay for the Collateral so sold and, in the case of any such failure, such Collateral may again be sold upon like notice.

(c)      If an Event of Default has occurred and is continuing, the Collateral Agent shall give each Loan Party not less than ten (10) calendar days' prior notice of the time and place of any sale or other intended disposition of any of the Collateral, except any Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market.

(d)      For the purpose of enforcing any and all rights and remedies under this Agreement, the Collateral Agent may, if any Event of Default has occurred and is continuing, (i) require each Loan Party to, and each Loan Party agrees that it will, at its expense and upon the request of the Collateral Agent, forthwith assemble, store and keep all or any part of the Collateral as directed by the Collateral Agent and make it available at a place designated by the Collateral Agent which is, in the Collateral Agent's opinion, reasonably convenient to the Collateral Agent and such Loan Party, whether at the premises of such Loan Party or otherwise, it being understood that such Loan Party's obligation so to deliver the Collateral is of the essence of this Agreement and that, accordingly, upon application to a court of equity having jurisdiction, the Collateral Agent shall be entitled to a decree requiring specific performance by such Loan Party of such obligation; (ii) to the extent permitted by applicable law, enter, with or without process of law and without breach of the peace, any premise where any of the Collateral is or may be located, and without charge or liability to any Loan Party, seize and remove such Collateral from such premises; (iii) have access to and use such Loan Party's books and records relating to the Collateral; and (iv) prior to the disposition of the Collateral, store or transfer it without charge in or by means of any storage or transportation facility owned or leased by such Loan Party, process, repair or recondition it or otherwise prepare it for disposition in any manner and to the extent the Collateral Agent deems appropriate and, in connection with such preparation and disposition, use, have used and license without charge any Intellectual Property owned or used by such Loan Party. The Collateral Agent may also render any or all of the Collateral unusable at any Loan Party's premises and may dispose of such Collateral on such premises without liability for rent or costs.

(e)      If any Event of Default has occurred and is continuing, the Collateral Agent shall, to the extent permitted by applicable law, without notice to any Loan Party or any party claiming through any Loan Party, without regard to the solvency or insolvency at such time of any Person then liable for the payment of any of the DIP Obligations, without regard to the then-value of the Collateral

and without requiring any bond from any complainant in such proceedings, be entitled as a matter of right to the appointment of a receiver or receivers (who may be the Collateral Agent or the DIP Agent) of the Collateral or any part thereof, and of the profits, revenues and other income thereof, pending such proceedings, with such powers as the court making such appointment shall confer, and to the entry of an order directing that the profits, revenues and other income of the property constituting the whole or any part of the Collateral be segregated, sequestered and impounded for the benefit of the Collateral Agent and the Secured Parties, and each Loan Party irrevocably consents to the appointment of such receiver or receivers and to the entry of such order.

(f)      If any Event of Default has occurred and is continuing, each Loan Party agrees, to the extent it may lawfully do so, that it will not at any time in any manner whatsoever (i) claim or take the benefit or advantage of, any appraisal, valuation, stay, extension, moratorium, turnover or redemption law, or any law permitting it to direct the order in which the Collateral shall be sold, now or at any time hereafter in force which may delay, prevent or otherwise affect the performance or enforcement of this Agreement, and each Loan Party hereby waives all benefit or advantage of all such laws, or (ii) hinder, delay or impede the execution of any power granted to the Collateral Agent, the DIP Agent or any other Secured Party in any DIP Loan Document.

(g)      If any Event of Default has occurred and is continuing, each Loan Party, to the extent it may lawfully do so, on behalf of itself and its successors and assigns and all others whose claims derive through or under it, including, without limitation, any and all subsequent creditors, vendees and lienors, waives and releases all rights to demand or to have any marshalling of the Collateral upon any sale, whether made under any power of sale granted herein or pursuant to judicial proceedings or under any foreclosure or any enforcement of this Agreement, and consents and agrees that all of the Collateral may at any such sale be offered and sold as an entirety.

(h)      Each Loan Party waives, to the extent permitted by law, presentment, demand, protest and any notice of any kind (except as required by the Interim Order or Final Order or as expressly required hereunder or in the other Loan Documents) in  connection with this Agreement and any action taken by the Collateral Agent and/or the DIP Agent with respect to the Collateral.

(i)      Each Agent shall take any action allowed by it to be taken pursuant to this Section 11.08 if the Required DIP Lenders so direct and it receives satisfactory indemnities, if applicable.

**Section 11.09    Grant of License to Use Property; Intellectual Property**.

(a)      For the purpose of enabling the Collateral Agent to exercise rights and remedies under Section 11.08 hereof (including, without limiting the terms of Section 11.08 hereof, in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, lease, license, assign, give an option or options to purchase or otherwise dispose of any Collateral) at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Loan Party hereby grants to the Collateral Agent, for the benefit of the Collateral Agent and the Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to such Loan Party) to use, license or sublicense any Intellectual Property now owned or hereafter acquired by such Loan Party, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all Software and programs used for the compilation or printout thereof and an irrevocable license (exercisable without payment of rent or other compensation to such Loan Party) to use and occupy all real estate owned or leased by such Loan Party.

(b)      The Collateral Agent may:

(i)      subject to the express terms of any valid and enforceable restriction in favor of a Person who is not a Group Company that prohibits, or requires any consent or establishes any other conditions for, an assignment thereof, license, or sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any Patents, Trademarks, Copyrights or other Intellectual Property included in the Collateral throughout the world for such term or terms, on such conditions and in such manner as the Collateral Agent shall in its sole discretion determine; provided, that, the Collateral Agent shall not license any Intellectual Property in a way that would result in the cancellation or voiding of any material Intellectual Property;

(ii)      without assuming any obligations or liability thereunder, at any time and from time to time, enforce (and shall have the exclusive right to enforce) against any Licensee or sublicensee all rights and remedies of any Loan Party in, to and under any License and take or refrain from taking any action under any provision thereof, and each Loan Party hereby releases the Collateral Agent and each of the Secured Parties from, and agrees to hold the Collateral Agent and each of the Secured Parties free and harmless from and against any claims arising out of, any lawful action so taken or omitted to be taken with respect thereto;

(iii)      request that each Loan Party will use its commercially reasonable efforts to obtain all requisite consents or approvals by the licensor or sublicensor of each License to effect the assignment of all of such Loan Party's right, title and interest thereunder to the Collateral Agent or its designee and will execute and deliver to the Collateral Agent a power of attorney, in form and substance reasonably satisfactory to the Collateral Agent, for the implementation of any lease, assignment, License, sublicense, grant of option, sale or other disposition of a Patent, Trademark, Copyright or other Intellectual Property; and

(iv)      direct any Loan Party to refrain, in which event each such Loan Party shall refrain, from using or practicing any Trademark, Patent, Copyright or other Intellectual Property in any manner whatsoever, directly or indirectly, and shall, if requested by the Collateral Agent, change such Loan Party's name to eliminate therefrom any use of any Trademark and will execute such other and further documents as the Collateral Agent may request to further confirm this change and transfer ownership of the Trademarks, Patents, Copyrights, other Intellectual Property and registrations and any pending applications therefor to the Collateral Agent.

(c)      In the event of any disposition following the occurrence and during the continuance of any Event of Default, each Loan Party shall supply its know-how and expertise relating to the manufacture and sale of the products or services bearing or offered under any of the Trademarks or the products, services or works utilizing, made or rendered in connection with or under any of the Patents, Trademarks or Copyrights, and its customer lists and other records relating to such Patents, Trademarks or Copyrights and to the distribution of said products, services or works, to the Collateral Agent.

**Section 11.10    Limitation on the Collateral Agent's and Secured Parties' Duty in Respect of Collateral**. The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for its own account. The Collateral Agent and each Secured Party shall use reasonable care with respect to the Collateral in its possession or under its control. Neither Agent nor any Secured Parties shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Collateral Agent or such Secured Party, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto. Each Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the

Collateral is accorded treatment substantially equal to that which it accords its own property. The Collateral Agent shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehousemen, carrier, forwarding agency, consignee or other agent or bailee selected by the Collateral Agent absent gross negligence or willful misconduct. The powers conferred on the Collateral Agent, the DIP Agent and the Secured Parties hereunder are solely to protect the Agents' and Secured Parties' interests in the Collateral and shall not impose any duty upon any Agent or any Secured Party to exercise any such powers. The Agents and the Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Loan Party for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

**Section 11.11**    Authorized Terminations.

(a)    Upon any sale or other transfer by any Loan Party (other than any sale or transfer to another Loan Party) of any Collateral that is permitted under this Agreement or upon the effectiveness of any written consent to the release of the security interest granted hereby in any Collateral pursuant to Section 11.02, the security interest in such Collateral shall be automatically released and such Collateral shall be sold free and clear of the Lien and security interests created hereby.

(b)    Following the DIP Termination Date or the release pursuant to clause (a) above, the Collateral Agent shall promptly, at the expense of the relevant Loan Party, execute and deliver to such Loan Party all documents that such Loan Party shall reasonably request to evidence such termination or release, including authorization to file termination statements and releases in accordance with Section 9-513(c) of the UCC. Any execution and delivery of documents pursuant to this Section 11.11 shall be without recourse to or warranty by the Collateral Agent.

**Section 11.12    Modifications**.

(a)    The Liens, lien priority, administrative priorities and other rights and remedies granted to the Collateral Agent for the benefit of the Secured Parties pursuant to this Agreement, the Interim Order and/or the Final Order (specifically, including, but not limited to, the existence, perfection and priority of the Liens provided herein and therein and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any of the Loan Parties (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    no costs or expenses of administration which have been or may be incurred in any of the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with the Superpriority DIP Claims (other than the Carve-Out) in respect of any DIP Obligation;

(ii)    the liens and security interests granted herein shall constitute valid and perfected first priority liens and security interests subject only to (i) Permitted Liens and (ii) the Carve-Out, and shall be prior to all other liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(iii)    the liens and security interests granted hereunder shall continue valid and perfected without the necessity that financing statements be filed or that any other action be taken under applicable non-bankruptcy law.

(b)    Notwithstanding any failure on the part of any Loan Party, an Agent or the Secured Parties to perfect, maintain, protect or enforce the liens and security interests in the Collateral granted hereunder, the Interim Order and the Final Order shall automatically, and without further action by any Person, perfect such liens and security interests against the Collateral.

## ARTICLE XII

## GUARANTY

**Section 12.01    Guaranty of Guaranteed DIP Obligations of the Borrower**. In order to induce the DIP Agents and the DIP Lenders to enter into this Agreement and other DIP Loan Documents and to induce the DIP Lenders to make the DIP Loans and the Issuing Lender to incur LC Obligations as provided for in this Agreement, each Guarantor jointly and severally hereby unconditionally guarantees to the DIP Agent and the DIP Lenders, and their respective successors, endorsees, transferees and permitted assigns for the benefit of Secured Parties, the prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of the DIP Obligations (other than such Person's own DIP Obligations under this Agreement) (hereinafter the "Guaranteed DIP Obligations"). Each Guarantor agrees that this guaranty (the terms of Article XII, collectively, this "Guaranty") is a guaranty of payment and performance and not of collection, and that its obligations under this Guaranty shall be primary, absolute and unconditional, irrespective of, and shall not be released, discharged or otherwise affected or impaired by:

(a)    any extension, renewal, settlement, compromise, acceleration, waiver or release in respect of any obligation of the Borrower or any Other Loan Party under this Agreement, any other DIP Loan Document, or any other agreement or instrument evidencing or securing any Guaranteed DIP Obligation, by operation of law or otherwise;

(b)    any change in the manner, place, time or terms of payment of any Guaranteed DIP Obligation or any other amendment, supplement or modification to this Agreement, the DIP Loan Documents or any other agreement or instrument evidencing or securing any Guaranteed DIP Obligation;

(c)    any release, non-perfection or invalidity of any direct or indirect security for any Guaranteed DIP Obligation, any sale, exchange, surrender, realization upon, offset against or other action in respect of any direct or indirect security for any Guaranteed DIP Obligation or any release of any Other Loan Party or any other guarantor or guarantors of any Guaranteed DIP Obligation;

(d)    any change in the existence, structure or ownership of the Borrower or any Other Loan Party or any insolvency, bankruptcy, reorganization, arrangement, readjustment, composition, liquidation or other similar proceeding affecting any Borrower or any Other Loan Party or its assets or any resulting disallowance, release or discharge of all or any portion of any Guaranteed DIP Obligation;

(e)    the existence of any claim, set-off or other right which any Guarantor may have at any time against the Borrower, any Other Loan Party, any Agent, any other Secured Party or any other Person, whether in connection herewith or any unrelated transaction; provided that nothing herein shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(f)     any invalidity or unenforceability relating to or against the Borrower or any Other Loan Party for any reason of this Agreement, any DIP Loan Document or any other agreement or instrument evidencing or securing any Guaranteed DIP Obligation or any provision of applicable law or regulation purporting to prohibit the payment by the Borrower or any Other Loan Party of any Guaranteed DIP Obligation;

(g)     any failure by any Agent or any other Secured Party: (i) to file or enforce a claim against any Other Loan Party or its estate; (ii) to give notice of the existence, creation or incurrence by any Other Loan Party of any new or additional indebtedness or obligation under or with respect to the Guaranteed DIP Obligations; (iii) to commence any action against any Other Loan Party; (iv) to disclose to any Guarantor any facts which such Agent or such other Secured Party may now or hereafter know with regard to any Other Loan Party; or (v) to proceed with due diligence in the collection, protection or realization upon any collateral securing the Guaranteed DIP Obligations;

(h)     any direction as to application of payment by the Borrower, any Other Loan Party or any other Person;

(i)     any subordination by any Secured Party of the payment of any Guaranteed DIP Obligation to the payment of any other liability (whether matured or unmatured) of any Other Loan Party to its creditors;

(j)     any act or failure to act by any Agent or any other Secured Party under this Agreement or otherwise which may deprive any Guarantor of any right to subrogation, contribution or reimbursement against any Other Loan Party or any right to recover full indemnity for any payments made by such Guarantor in respect of the Guaranteed DIP Obligations; or

(k)     any other act or omission to act or delay of any kind by the Borrower, any Other Loan Party, any Agent, any Secured Party or any other Person or any other circumstance whatsoever which might, but for the provisions of this clause, constitute a legal or equitable discharge of any Guarantor's obligations hereunder.

Each Guarantor has irrevocably and unconditionally delivered this Agreement to the DIP Agent, for the benefit of the Secured Parties, and the failure by any Other Loan Party or any other Person to sign this Agreement or a guaranty similar to this Agreement or otherwise shall not discharge the obligations of any Guarantor hereunder. The irrevocable and unconditional liability of each Guarantor hereunder applies whether it is jointly and severally liable for the entire amount of the Guaranteed DIP Obligations, or only for a pro-rata portion, and without regard to any rights (or the impairment thereof) of subrogation, contribution or reimbursement that such Guarantor may now or hereafter have against any Other Loan Party or any other Person. This Agreement is and shall remain fully enforceable against each Guarantor irrespective of any defenses that any Other Loan Party may have or assert in respect of the Guaranteed DIP Obligations, including, without limitation, failure of consideration, breach of warranty, statute of frauds, payment, statute of limitations, accord and satisfaction and usury, except that a Guarantor may assert the defense of final payment in full of the Guaranteed DIP Obligations.

Each Guarantor shall be regarded, and shall be in the same position, as the principal debtor with respect to the Guaranteed DIP Obligations. The Guarantors agree that any notice or directive given at any time to the DIP Agent which is inconsistent with the waiver in the immediately preceding sentence shall be null and void and may be ignored by the DIP Agent and the Secured Parties and, in addition, may not be pleaded or introduced as evidence in any litigation relating to this Guaranty for the reason that such pleading or introduction would be at variance with the written terms of this Guaranty, unless the DIP Agent and the Required DIP Lenders have specifically agreed otherwise in writing. It is agreed among the

Guarantors, the DIP Agent and Secured Parties that the foregoing waivers are of the essence of the transaction contemplated by the DIP Loan Documents and that, but for this Guaranty and such waivers, the DIP Agent and the DIP Lenders would decline to enter into this Agreement and the Secured Parties would decline to enter into the applicable documents governing the DIP Obligations.

Section 12.02    **Demand by the DIP Agent or the DIP Lenders**. In addition to the terms of the Guaranty set forth in Section 12.01 hereof, and in no manner imposing any limitation on such terms, it is expressly understood and agreed that, if, at any time, the outstanding principal amount of the Guaranteed DIP Obligations under this Agreement (including all accrued interest thereon) is declared to be immediately due and payable, then the Guarantors shall, without demand, pay to the holders of the Guaranteed DIP Obligations the entire outstanding Guaranteed DIP Obligations due and owing to such holders. Payment by the Guarantors shall be made to the DIP Agent in Dollars in immediately available funds to an account designated by the DIP Agent hereunder or at any other address that may be specified in writing from time to time by the DIP Agent, and shall be credited and applied to the Guaranteed DIP Obligations.

Section 12.03    **Enforcement of Guaranty**. In no event shall the DIP Agent have any obligation (although it is entitled, at its option in its sole discretion) to proceed against Borrower or any Collateral pledged to secure the Guaranteed DIP Obligations before seeking satisfaction from any Guarantor, and the DIP Agent may proceed, prior or subsequent to the enforcement of the DIP Agent's rights hereunder, to exercise any right or remedy which it may have against any Collateral, as a result of any Lien it may have as security for all or any portion of the Guaranteed DIP Obligations.

Section 12.04    **Waiver**.

(a)      In addition to the waivers contained in Section 12.01 hereof, each Guarantor hereby waives to the fullest extent permitted by Law, and each Guarantor hereby agrees that is shall not at any time insist upon, plead or in any manner whatsoever claim or take the benefit or advantage of, any appraisal, valuation, stay, extension, marshaling of assets or redemption laws, or exemption, whether now or at any time hereafter in force, which may delay, prevent or otherwise affect the joint and several performance by the Guarantors of the Guaranteed DIP Obligations under, or the enforcement by the DIP Agent, the DIP Lenders or other Secured Parties of, this Guaranty.

(b)      Each Guarantor hereby waives to the fullest extent permitted by Law diligence and presentment (whether for non-payment or protest or of acceptance, maturity, extension of time, change in nature or form of the Guaranteed DIP Obligations, acceptance of further security, release of further security, composition or agreement arrived at as to the amount of, or the terms of, the Guaranteed DIP Obligations, notice of adverse change in the financial condition of the Borrower or any other Loan Party or any other fact which might increase the risk to a Guarantor) with respect to any of the Guaranteed DIP Obligations or all other demands whatsoever and waive the benefit of all provisions of law which are or might be in conflict with the terms of this Guaranty.

Section 12.05    **Modification of Guaranteed DIP Obligations, Etc**. Each Guarantor hereby acknowledges and agrees that the DIP Agent and the Secured Parties may at any time or from time to time, to the extent permitted by this Agreement or applicable Law, with or without the consent of, or notice to, the Guarantors:

(a)      change or extend the manner, place or terms of payment of, or renew or alter all or any portion of, the Guaranteed DIP Obligations;

(b)      take any action under or in respect of the DIP Loan Documents in the exercise of any remedy, power or privilege contained therein or available to it at law, equity or otherwise, or waive or refrain from exercising any such remedies, powers or privileges;

(c)      amend or modify, in any manner whatsoever, the DIP Loan Documents (in accordance with the terms thereof);

(d)      extend or waive the time for any Loan Party's performance of, or compliance with, any term, covenant or agreement on its part to be performed or observed under the DIP Loan Documents, or waive such performance or compliance or consent to a failure of, or departure from, such performance or compliance;

(e)      (i) subject to this Agreement, take and hold Collateral for the payment of the Guaranteed DIP Obligations guaranteed hereby or (ii) upon the occurrence and during the continuance of an Event of Default or otherwise in accordance with the DIP Loan Documents, sell, exchange, release, dispose of, or otherwise deal with, any property pledged, mortgaged or conveyed, or in which the DIP Agent or any Secured Party has been granted a Lien, to secure any of the DIP Obligations;

(f)      release any Person who may be liable in any manner for the payment of any amounts owed by the Borrower or any Guarantor to the DIP Agent or any Secured Party;

(g)      modify or terminate the terms of any intercreditor or subordination agreement pursuant to which claims of other creditors of the Borrower and the other Loan Parties are subordinated to the claims of the DIP Agent and the Secured Parties; and/or

(h)      subject to this Agreement, apply any sums by whomever paid or however realized to any amounts owing by Borrower and the other Loan Parties to the DIP Agent or any Secured Party in such manner as the DIP Agent or any DIP Lender shall determine in its discretion;

and none of the DIP Agent or any Secured Party shall incur any liability to any Guarantor as a result thereof, and no such action shall impair or release the Guaranteed DIP Obligations of the Guarantors under this Guaranty (unless, subject to Section 12.06 below, such action results in the payment in full and satisfaction of the DIP Obligations).

Section 12.06   **Reinstatement**.  This Guaranty shall remain in full force and effect and continue to be  effective, or be reinstated, should any petition be filed by or against the Borrower or any Guarantor for liquidation or reorganization, should Borrower or any Guarantor become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Borrower's or such Guarantors' assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Guaranteed DIP Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by the DIP Agent or any Secured Party, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made and such Guaranteed DIP Obligations shall be deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

Section 12.07   **Waiver of Subrogation, Etc**.  Notwithstanding anything to the contrary in this Guaranty, or in any other DIP Loan Document, each Guarantor hereby expressly and irrevocably waives, to the fullest extent permitted by law, on behalf of itself and its successors and assigns (including any surety), any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a

principal, to a guarantor against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which any such Guarantor may have or hereafter acquire against any Loan Party in connection with or as a result of such Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which such Guarantor is a party or otherwise.

Section 12.08   **Election of Remedies**. If the DIP Agent may, under applicable law, proceed to realize benefits under any of the DIP Loan Documents giving the DIP Agent and Secured Parties a Lien upon any Collateral of any Loan Party, either by judicial foreclosure or by non-judicial sale or enforcement, the DIP Agent may, at its sole option, determine which of such remedies or rights it may pursue without affecting any of such rights and remedies under this Guaranty. If, in the exercise of any of its rights and remedies, the DIP Agent shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Loan Party, whether because of any applicable laws pertaining to "election of remedies" or the like, each Guarantor hereby consents to such action by the DIP Agent and waives, to the fullest extent permitted by law, any claim based upon such action, even if such action by the DIP Agent shall result in a full or partial loss of any rights of subrogation which such Guarantor might otherwise have had but for such action by the DIP Agent. Any election of remedies which results in the denial or impairment of the right of the DIP Agent to seek a deficiency judgment against any Loan Party shall not impair any Guarantor's obligation to pay the full amount of the Guaranteed DIP Obligations. In the event the DIP Agent shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the DIP Loan Documents, the DIP Agent may bid all or less than the amount of the Guaranteed DIP Obligations and the amount of such bid need not be paid by the DIP Agent but shall be credited against the Guaranteed DIP Obligations.  Any difference between such bid amount and the remaining balance of the Guaranteed DIP Obligations shall be deemed to be the amount of the Guaranteed DIP Obligations guaranteed under this Guaranty; provided, any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which the DIP Agent and Secured Parties might otherwise be entitled but for such bidding at any such sale.

Section 12.09   **Continuation of Guaranty**. This Guaranty is a continuing guaranty and shall remain in full force and effect until the satisfaction in full of all DIP Obligations. Upon payment and performance in full of the Guaranteed DIP Obligations, the DIP Agent shall deliver to the Guarantors such documents as each such Guarantor may reasonably request to evidence such termination in accordance with this Agreement. This Guaranty shall be binding on each Guarantor regardless of whether the Chapter 11 Case with respect to each such Guarantor is dismissed.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BORROWER:

AMF BOWLING WORLDWIDE, INC.

By: _____
Name:   Rachel S. Labrecque
Title:    Vice President of Finance and
Controller


GUARANTORS:

KINGPIN INTERMEDIATE CORP.
AMF HOLDINGS, INC.
AMF BCH LLC
AMF WORLDWIDE BOWLING CENTERS
   HOLDINGS INC.
AMF BOWLING CENTERS HOLDINGS INC.
AMF WBCH LLC
AMF BOWLING MEXICO HOLDING, INC.
BOLICHES AMF, INC.
AMF BEVERAGE COMPANY OF OREGON,
   INC.
BUSH RIVER CORPORATION
KING LOUIE LENEXA, INC.
AMF BOWLING CENTERS, INC.
AMERICAN RECREATION CENTERS, INC.

By: _____
Name:   Rachel S. Labrecque
Title:    Vice President of Finance and
Controller

[Signature Page to Credit Agreement]

KINGPIN HOLDINGS, LLC

By:  _____

Name: Rachel S. Labrecque

Its:    Vice President of Finance

300, INC.

By: _____
Name:   William C. Dufour
Title:   President and Secretary

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH, as DIP Agent and Issuing Lender

By: _____
    Name: **Didier Siffer**
    Title: **Authorized Signatory**

By: _____
    Name: **Megan Kane**
    Title: **Authorized Signatory**

Eleven Madison Avenue
New York, New York 10010
Facsimile: (212) 322 2238

GOLDMAN SACHS PALMETTO STATE
CREDIT FUND, L.P., as a DIP Lender
By:  Goldman Sachs Palmetto State Credit Fund
    Advisors, LLC, its general partner

By: *Gregg J. Fu*

    Name: *Gregg J. Fellin*
    Title: *Authorized Signatory*


LIBERTY HARBOR MASTER FUND I, L.P., as a
DIP Lender
By:  Liberty Harbor I GP, LLC, its general partner

By: *Gregg J. Fu*

    Name: *Gregg J. Fellin*
    Title: *Authorized Signatory*


CREDIT SUISSE LOAN FUNDING LLC, as a
DIP Lender


By:_____

    Name:
    Title:


MIDTOWN ACQUISITIONS, L.P., as a DIP
Lender


By:_____

    Name:
    Title:

GOLDMAN SACHS PALMETTO STATE
CREDIT FUND, L.P., as a DIP Lender
By:  Goldman Sachs Palmetto State Credit Fund
       Advisors, LLC, its general partner


By:_____
    Name:
    Title:


LIBERTY HARBOR MASTER FUND I, L.P., as a
DIP Lender
By:  Liberty Harbor I GP, LLC, its general partner


By:_____
    Name:
    Title:


GOLDMAN SACHS LIBERTY HARBOR
CAPITAL, LLC, as a DIP Lender


By:_____
    Name:
    Title:


CREDIT SUISSE LOAN FUNDING LLC, as a
DIP Lender


By:_____
    Name:   JULIA P. KINGSBURY
    Title:   VICE PRESIDENT


MIDTOWN ACQUISITIONS, L.P., as a DIP
Lender


By:_____
    Name:
    Title:

[Signature Page to DIP Credit Agreement]

GOLDMAN SACHS PALMETTO STATE
CREDIT FUND, L.P., as a DIP Lender
By: Goldman Sachs Palmetto State Credit Fund
    Advisors, LLC, its general partner


By:_____
    Name:
    Title:


LIBERTY HARBOR MASTER FUND I, L.P., as a
DIP Lender
By: Liberty Harbor I GP, LLC, its general partner


By:_____
    Name:
    Title:


GOLDMAN SACHS LIBERTY HARBOR
CAPITAL, LLC, as a DIP Lender


By:_____
    Name:
    Title:


CREDIT SUISSE LOAN FUNDING LLC, as a
DIP Lender


By:_____
    Name:
    Title:


MIDTOWN ACQUISITIONS, L.P., as a DIP
Lender


By:_____
    Name: Gina Bastable
    Title: Manager

## SCHEDULES TO AGREEMENT

This document contains the schedules (the "Schedules") referred to in, and is of the date of, that certain Senior Secured Debtor-in-Possession Credit Agreement (as amended from time to time, the "Agreement"), dated as of November 13, 2012, among Holdings, the Borrower, each of the other Loan Parties party thereto, the Lenders from time to time party thereto, and Credit Suisse AG, Cayman Islands Branch, as Issuing Lender and DIP Agent. Capitalized terms used herein and not otherwise defined have the meanings ascribed to them in the Agreement.

This Schedule is qualified in its entirety by reference to the specific provisions of the Agreement.  Matters reflected herein may not necessarily be limited to matters strictly required by the Agreement to be reflected in the Schedules.  To the extent that any such additional matters are included, they are included for informational purposes only.

Schedule headings have been placed on the Schedules for the convenience of the parties only; such headings shall be given no substantive or interpretive effect whatsoever.  The matters disclosed in any particular schedule of these Schedules shall be deemed to have been disclosed in all other sections of these Schedules where it is readily apparent that the matters so disclosed are applicable to such other schedules.

## **Schedule 1.01A**

### **DIP Lenders and Commitments**

| Lender | Commitment Amount | Commitment Percentage |
|---|---|---|
| Credit Suisse Loan Funding LLC | $10,000,000.00 | 20.00% |
| Goldman Sachs Palmetto State Credit Fund, L.P. | $3,637,000.00 | 7.27% |
| Liberty Harbor Master Fund I, L.P. | $22,863,000.00 | 45.73% |
| Midtown Acquisitions, L.P. | $13,500,000.00 | 27.00% |
| Totals: | $50,000,000.00 | 100.00% |

## Schedule 1.01D

## Lender Addresses

| Lender | Address for Notices | Applicable Lending Office for Base Rate Loans | Applicable Lending Office for Eurodollar Loans |
|---|---|---|---|
| Credit Suisse Loan Funding LLC | Eleven Madison Avenue New York, NY 10010 Attention: Ashwinee Sawh Facsimile: 866-469-3871 or 212-442-5186 | Eleven Madison Avenue New York, NY 10010 Attention: Ashwinee Sawh Facsimile: 866-469-3871 or 212-442-5186 | Eleven Madison Avenue New York, NY 10010 Attention: Ashwinee Sawh Facsimile: 866-469-3871 or 212-442-5186 |
| Goldman Sachs Palmetto State Credit Fund, L.P. | c/o Goldman Sachs Asset Management, L.P. 1 American Lane Greenwich, CT 06831 Attention: Brendan McGovern Facsimile: (212) 256-5597 | c/o Goldman Sachs Asset Management, L.P. 1 American Lane Greenwich, CT 06831 Attention: Brendan McGovern Facsimile: (212) 256-5597 | c/o Goldman Sachs Asset Management, L.P. 1 American Lane Greenwich, CT 06831 Attention: Brendan McGovern Facsimile: (212) 256-5597 |
| Liberty Harbor Master Fund I, L.P. | c/o Goldman Sachs Asset Management, L.P. 1 American Lane Greenwich, CT 06831 Attention: Brendan McGovern Facsimile: (212) 256-5597 | c/o Goldman Sachs Asset Management, L.P. 1 American Lane Greenwich, CT 06831 Attention: Brendan McGovern Facsimile: (212) 256-5597 | c/o Goldman Sachs Asset Management, L.P. 1 American Lane Greenwich, CT 06831 Attention: Brendan McGovern Facsimile: (212) 256-5597 |
| Midtown Acquisitions, L.P. | 65 East 55th St. 20th Floor New York, NY 10022 Attention: Lorraine Conti / Lourdes Manent Telephone: (212) 446-4053 | 65 East 55th St. 20th Floor New York, NY 10022 Attention: Lorraine Conti / Lourdes Manent Telephone: (212) 446-4053 | 65 East 55th St. 20th Floor New York, NY 10022 Attention: Lorraine Conti / Lourdes Manent Telephone: (212) 446-4053 |

## Schedule 1.01E

**Insignificant Subsidiaries**

| Entity Name | Jurisdiction of Organization or Formation |
|---|---|
| The Bowler's Choice Restaurant, Inc. | Maryland |
| Corner Restaurant East, Inc. | Maryland |
| Southdale Bowler's Restaurant, Inc. | Maryland |
| Prince George's Concession, Inc. | Maryland |

## Schedule 1.01F

**Liquor License Subsidiaries**

| Entity Name | Jurisdiction of Organization or Formation |
|---|---|
| AMF Beverage Company of Oregon, Inc. | Oregon |
| Bush River Corporation | South Carolina |
| King Louie Lenexa, Inc. | Kansas |
| 300, Inc. | Texas |
| The Bowler's Choice Restaurant, Inc. | Maryland |
| Corner Restaurant East, Inc. | Maryland |
| Southdale Bowler's Restaurant, Inc. | Maryland |
| Prince George's Concession, Inc. | Maryland |

## Schedule 2.05

**Existing Letters of Credit**

|  | Beneficiary | LC Number | Issued Date | Expire Date | Balance |
|---|---|---|---|---|---|
| 1. | iStar Financial, Inc. – Lease II | TS-07002209 | 02/27/04 | 11/23/12 | $2,397,352.81 |
| 2. | iStar Financial, Inc. – Lease I | TS-07002208 | 02/27/04 | 11/23/12 | $2,413,248.44 |
| 3. | iStar Financial, Inc. – Lease I | TS-07004702 | 06/24/08 | 11/23/12 | $5,000,000.00 |
| 4. | iStar Financial, Inc. – Lease II | TS-07004703 | 06/24/08 | 11/23/12 | $5,000,000.00 |
| 5. | AIG (American International Group) | TS-07002213 | 03/02/04 | 11/23/12 | $748,615.00 |
| 6. | Hartford Fire Insurance Co. | TS-07002230 | 03/11/04 | 11/23/12 | $356,754.00 |
| 7. | Travelers Indemnity Co. | TS-07006084 | 06/30/11 | 11/23/12 | $3,350,000.00 |
|  |  |  |  | **Total:** | **$19,425,970.25** |

Balances as of September 30, 2012.

**Schedule 5.04**

**Defaults**

1.  The Borrower failed to make interest payments and other deliveries required by the First Lien Credit Agreement and Second Lien Credit Agreement (together, the "Existing Credit Agreements") pursuant to the terms of the Forbearance Agreement dated as of September 10, 2012 (as amended by that certain First Amendment to Forbearance Agreement, dated as of September 28, 2012, by that certain Second Amendment to Forbearance Agreement dated as of October 19, 2012 and by that certain Third Amendment to Forbearance Agreement dated as of November 6, 2012) by and among the Borrower, Holdings, the Subsidiary Guarantors, the DIP Agent, and the Lenders party thereto as amended.

2.  AMF Bowling Centers, Inc. ("AMF") failed to pay rent under the iStar Master Leases pursuant to the terms of the Forbearance Agreement No. 2 dated as of September 28, 2012 by and among AMF, iStar Bowling Centers I, LP ("iStar I") and iStar Bowling Centers II, LP ("iStar II") and the Borrower.

3.  AMF received notices from iStar I and iStar II (together, "iStar") with respect to potential deferred maintenance in the bowling centers that iStar leased to AMF under the iStar Master Leases.

4.  AMF vacated and ceased making rent payments under the following bowling center leases beginning in June 2012 ("Abandoned Center Leases"):

| Landlord | Center Name and Number |
|---|---|
| Gayle S. Lovelace Revocable Trust of 2001<br>300 Camino Del Oeste<br>Bakersfield, CA 93309 | AMF 4848 Madison Avenue Lanes (#1569) |
| Summit City Limits, LLC<br>21645 Boulder Creek Drive<br>Lakeville, MN 55044 | AMF City Limits Lanes (#634) |
| Micheltree Properties, LLC<br>101 Dixie Highway<br>Chicago Heights, IL 60411 | AMF Classic Lanes (#632) |
| G. L. Thomas Properties LLC<br>3515 Gila Ride Road<br>Yuma, AZ 85366 | AMF Inca Lanes (#286) |
| Lang Corporation/PAM Realty/Lang's Bowlarama<br>25 East Main Rd<br>Middletown, RI 02842 | AMF Lang's Bowl (#172) |
| BTR Free State Bowl, Inc.<br>3333 New Hyde Park Rd., #100<br>New Hyde Park, NY 11042 | AMF Rolling Meadows Lanes (#385) |

| Landlord | Center Name and Number |
|---|---|
| Shea Village, LLC<br>4455 E. Camelback Rd., Ste. D-280<br>Phoenix, AZ 85018 | AMF Shea Village Lanes (#352) |
| Bennprop, LLC<br>109 East Eight St.<br>Chattanooga, TN 37402 | AMF Tri State Lanes (#298) |
| Phillip/Ann Jacobson<br>50 North 3rd Street<br>Newark, OH 43055 | AMF Valley Lanes (#188) |
| Lewis Commercial Properties, LLC<br>9505 Abercorn Street<br>Savannah, GA 31416 | AMF Victory Lanes (#112) |
| Wonder Bowl Limited Partnership<br>10 Morning Green<br>San Antonio, TX 78257 | AMF Wonder Lanes (#82) |
| Salvatore Muzzi<br>701 Meadowood Drive<br>Woodland, CA 95695 | AMF Woodhaven Lanes (#235) |
| Springfield Center I Associates LP<br>c/o WP Realty, Inc.<br>940 Haverford Road<br>Bryn Mawr, PA 19010 | AMF Airway Lanes (#75) |

5. AMF Bowling Products UK Ltd ("UK BPO") failed to perform its obligations due for periods after August 2012 under (i) the BPO Services Agreement between the Qubica JV Entity and the Borrower ("BPO Services Agreement"), (ii) the Agreement among UK BPO, the Borrower and QubicaAMF Worldwide, LLC, a subsidiary of the Qubica JV Entity ("QAMF LLC") ("Cost Allocation Agreement"), and (iii) the UK Services Agreement among UK BPO, QubicaAMF BV and QubicaAMF Europe SpA (both subsidiaries of the Qubica JV Entity) ("UK Services Agreement"). The BPO Services Agreement, the Cost Allocation Agreement and the UK Services Agreement are collectively referred to herein as the "UK Documents".

6. The insolvency of UK BPO (see Schedule 5.05) is a default under the Existing Credit Agreements. In addition, the insolvency of UK BPO triggered the commencement of the wind up of the UK Pension Plan (see Schedule 5.05).

**Schedule 5.05**

**Financial Condition**

1. <u>Undisclosed Liabilities</u>.

   a. As disclosed at pages 19 and 20 in the Business Plan Review ("Review") located in the Data Room, which has been made available to Agent and DIP Lender, the Borrower identified deferred maintenance and other necessary or advisable facility investments with respect to the bowling centers, which will remain following the amendment to the iStar Master Leases (the "Remaining Centers") that the Borrower intends to cure through capital expenditures during FY 2013 through FY 2017 as indicated in the Review. There is deferred maintenance in the Borrower's other bowling centers with respect to which the Borrower has not made plans to address.

   b. AMF received notices from iStar with respect to potential defects that may violate the terms of the iStar Master Leases.  AMF believes that the cost to remedy such defects is in excess of $10 million and the cost to remedy is reflected in the facility investments.

   c. The Borrower is aware that a number of its bowling centers, including those subject to the iStar Master Leases, are not in compliance with the technical requirements of Title III of the Americans With Disabilities Act, 42 U.S.C. Section 12181, *et seq.* ("ADA"). The capital expenditures to remedy the defects with respect to the Remaining Centers are reflected in the facility investments.

   d. UK BPO is the sponsor of a UK defined benefit pension plan called The AMF Bowling Pension Plan ("UK Pension Plan"). The UK Pension Plan is underfunded.  UK BPO entered into an insolvency proceeding in the UK and is being liquidated. The liquidation will cause the winding up of the UK Pension Plan and the determination of the Section 75 liability, which is the deficit or difference between the UK Pension Plan's liabilities and its assets ("Deficit").  The UK Pension Plan's actuary has estimated that the Deficit could exceed £8.6 million. The Borrower guaranteed 90% of the Deficit and AMF guaranteed 100% of the Deficit.  In addition, QAMF, LLC, a subsidiary of the Qubica JV Entity, in which the Group Company holds a 50% interest, provided a 10% guarantee of the Deficit.

   e. Prior to UK BPO entering into insolvency, it ceased performing under the UK Documents and this may result in claims by the Qubica JV Entity.

   f. AMF may have potential withdrawal liability under several Multiemployer Plans, the amount of which is not known (see Schedule 5.11).

   g. AMF failed to make rent payments under the Abandoned Center Leases and this may result in claims for damages from the landlords.

   h. The Borrower may have potential liability as guarantor under three UK bowling center leases that were not released when the Borrower sold the UK bowling centers business in 2004.

2. No Material Effect.  See item 1 above.

## Schedule 5.07

### Title to Properties

With respect to the Abandoned Center Leases, certain landlords have taken legal proceedings or exercised self-help to take possession of these bowling centers.

## Schedule 5.08

### Litigation and Claims

I.    Litigation.

- Maurice Lerari v. Societe Anonyme du Bowling de Montparnasse (Labor Court of Paris) – Suit for Overtime filed by Former GM of Montparnasse bowling center in France.

- Jerome Gaillard v. Societe Anonyme du Bowling de Montparnasse (Paris Court of Appeal) – Misclassification of position.

- 4 Bowl v. AMF Bowling Centers, Inc. (U.S. District Court, Central District of California) – 4Bowl alleges that AMF stole its idea for a national tournament.

- U.S. Occupational Safety and Health Review Commission ("OSHA") v. AMF Bowling Centers, Inc. – Death of Mechanic at 300 Dallas.

- John Truel, et al. v. A. Aguirre LLC et al, including AMF Bowling Centers, Inc. (District Court of Canadian County, OK) - Overcharges and False Advertising on Mixed Beverages.

- Glady Erbar and Tom Erbar v. v. A. Aguirre LLC et al, including AMF Bowling Centers, Inc. (District Court of Canadian County, OK) - Overcharges and False Advertising on Mixed Beverages.

- Jackson Archer v. AMF Bowling Centers, Inc. and AMF, Inc. (Madison County, IL) – Plaintiff claims exposure to asbestos during employment.

- James and Doris Burch v. AMF, Inc. (Madison County, IL) – Plaintiff claims exposure to asbestos during employment.

- Harvey Haycook v. AMF, Inc. (St. Louis County Circuit Court, MO) - Plaintiff claims exposure to asbestos during employment.

- Jewish Community Center v. AMF Bowling Centers, Inc. (St. Louis County Circuit Court. MO) – Breach of Lease Agreement/Removal of Equipment from closed center.

- Van Tim, Inc. v. AMF Bowling Centers, Inc. (Clark County Superior Court, WA) – Breach of Lease Agreement – Failure to Maintain Premises.

- Lang's Bowlarama, Inc., Lang Corporation and Pam Realty, Inc. v. AMF Bowling Centers, Inc. (State of Rhode Island Superior Court) – Breach of Lease. Failure to maintain premises.

- W.P. Realty, Inc., as Agent for Springfield Center I Associates Limited Partnership (Demand Letter) – Breach of lease for Airway Lanes.

- Tiessen v. AMF Bowling Centers, Inc. (U.S. District Court for Western District of OK) – ADA.

- G.L. Thomas Family Living Trust dated 8/18/94 v. AMF Bowling Centers, Inc. (Yuma County Superior Court, AZ) – Breach of lease.

- Dominic Grimmett v. AMF Bowling Worldwide, Inc. (District Court of Oklahoma County, OK) – Wrongful Termination and Breach of Contract.

- Wonder Bowl Limited Partnership (73rd Judicial District Court, Bexar County, TX) – Breach of Lease.

- BTR Free State Bowls, Inc. v. AMF Bowling Centers, Inc. (Cook County Circuit Court, IL) – Breach of Lease.

- Disability Rights Section of the Civil Rights Division of the U.S. Department of Justice (Request for Mediation) - Anonymous Complaint re: ADA Access for Service Animals at AMF Pikesville Lanes.

- Summit City Limits, LLC v. AMF Bowling Centers, Inc. (First Judicial District, Dakota County, MN) – Breach of Lease.

- Penny Jahsman d/b/a A.J.'s Pro Shop (Commonwealth of Massachusetts Superior Court) – Unfair Termination of Pro Shop Lease/Ban from Center.

- Ashley Kessler (EEOC and PA Human Rights Commission, Pittsburgh, PA) – Gender, ADA, Retaliation.

- James Hayes (EEOC – Charlotte, NC) – Age Discrimination.

- Melissa Herbert (EEOC – Baltimore, MD) – Retaliation.

- Keiron Baronville (EEOC – Savannah, GA) – Race Discrimination.

- Tonya Allen (EEOC – San Antonio, TX) – Race and Retaliation.

- Damien Heredha (Unite Here! Local 11) – Wrongful Termination.

- Jeanne Isabelle (EEOC – Houston, TX) - Race Discrimination.

- Sara Guglielmoni (CT Human Rights Commission) – Race, Retaliation, Sex Discrimination.

- Teresa Alonzo (CA Department of Fair and Equal Housing) – Disability/Failure to Engage in Good Faith Interactive Process.

- Larry Buchanan (EEOC and Commonwealth of PA Human Relations) – ADA.

- Teresa Columbo – ADA (Demand Letter only).

- Michael Rigueur (NY State Division of Harassment) – Harassment.

- Megan Foley (CA DFEH) – Disability/Unfair Termination/Depression.

- Stephen Pulka (Demand Letter) – Unfair Termination.

- Frank Prescott (EEOC – Mobile, AL) – Age, Retaliation.

- Virginia Bratek (EEOC) – ADA, Retaliation.

- Alfred Olsen (Demand Letter) – Wage/Hour.

- John Balady (EEOC) – Age Discrimination.

- Laquandra Jackson – Sex, Race Discrimination.

- Tom Malz – Appeal of Denial of Unemployment Benefits.

- <u>Jeff Moore</u> – Wage/Hour, Retaliation, Wrongful Termination.

- The City of Waco, Texas and Waco Independent School District –Property Taxes (Pre-Petition Claim from 2001 Chapter 11 Case).

II.   <u>Threatened Claims</u>

- Linda Gabriel (MD) – Discrimination

- Storm Horncastle (MD) - Discrimination.

- Xavier Moss (EEOC, NY) – Wrongful Termination.

- Leigh Ann McNellie (EEOC, NY) – Discrimination.

- Chad Howard (Call to AMF Merit Hotline) – Sexual Harassment, Physical Assault, Denial of Worker's Compensation Benefits, Discrimination.

- Amanda Reyes – ADA.

- Desirae Garza (AMF Open Door Policy) – Criminal History Background Check Error.

- Jennifer Skipper (AMF Open Door Policy) – Sexual Harassment.

- Rene Reese (AMF Open Door Policy) – Hostile Work Environment.

- Drew Groves (AMF Merit Hotline) – Retaliation.

- Lawrence Brasier (AMF Open Door Policy) – Wrongful Termination.

- Jennifer Norris (AMF Open Door Policy) – Sexual Discrimination.

- Malcom Roberson (AMF Merit Hotline) – Discrimination.

- Jeff Moore – Wrongful Termination.

- Todd Larner – Wrongful Termination.

- Cliff Crabb (AMF Open Door Policy) – Hostile Work Environment.

- Sanjoy Sukaphond (CA DFEH) – Racial Discrimination.

- Rovalia Banks (Grievance/HR) – Wrongful Termination.

- Mary Ann Jones (AMF Open Door Policy) – Sexual Harassment.

- Gavin McKinney – Retaliation.

- Blake Johnson (AMF Open Door Policy) – Sexual Harassment.

- Tenna Holloway (AMF Open Door Policy) – Sexual Harassment.

- Esmerelda Ickes (AMF Merit Hotline) – Wrongful Termination.

- Corby Hilburn (AMF Open Door Policy) – Racial Discrimination.

- Joe Rogers (AMF Open Door Policy) – Hostile Work Environment.

- Jennifer Pearson – Hostile Work Environment.

- Islam Skrine – Unsigned Severance and General Release Paperwork.

- Chris Mackin – Wrongful Termination.

- Lisa Jacques – Retaliation.

- Anna Null – Wrongful Termination.

- Charlene Strang – Constructive Discharge.

- Mehja Eskridge – Wrongful Termination.

- Stephen Fryer – AMF did not rehire him after summer layoff.

- Jacob Bryan – Hostile Work Environment.

- Sonjia Walker – Sexual Harassment, Discrimination, Retaliation.

- Stephen Solomon – Unfair dismissal.

- Marcus Duncan - Wage and Hour.

III. (A)        Open General Liability Matters in Litigation

[SEE ATTACHED]

III. (B)        Open General Liability – Claims

[SEE ATTACHED]

IV. Open Worker's Compensation Claims

[SEE ATTACHED]

### III. (A) Open General Liability - Matters in Litigation

| Plaintiff | Loss Date |
|---|---|
| ALEXANDER, BARBARA | 10/2/2010 |
| ALONZO, RUBEN | 9/11/2010 |
| ANDREWS, TRACI | 12/22/2009 |
| BARONE, MARY | 2/3/2009 |
| BENNETT, MYRA | 8/30/2009 |
| CALBERT, DERICK | 5/15/2012 |
| CASTILLO, ANTONIA | 4/15/2011 |
| CHACON, MARTA | 12/21/2009 |
| CLARK, GLENDA | 7/8/2010 |
| CROWELL, TRACY | 12/15/2011 |
| CUCINOTTA, TINA | 9/20/2010 |
| DEELEY, ROBERT | 10/4/2009 |
| DONAGHY, JUSTIN | 2/6/2010 |
| DREW, WANDA | 1/15/2011 |
| GALLAGHER, CONNIE | 2/7/2011 |
| GUERRERO, MARTHA | 3/4/2011 |
| HICKS, ANGELA | 12/12/2009 |
| HILL, FRED | 12/8/2004 |
| HOURIGAN, GERARD | 2/6/2010 |
| HOWARD, ANDREA | 4/23/2011 |
| KELLY, PHILIP | 3/29/2010 |
| LOVATO, PAUL | 10/10/2008 |
| LUCIE, MAUREEN | 9/29/2010 |
| MARSHALL, CAROLYN | 2/5/2009 |
| MOLINA, JASMIN | 1/26/2011 |
| NAGLE, JOHN | 6/13/2009 |
| NGUYEN, CHRISTINE | 8/13/2009 |
| PATRICK, BRITTNY | 1/15/2011 |
| PERNICIARO, THERESA | 2/19/2012 |
| PHILLIPS, STEVEN | 10/4/2009 |
| PRESLEY, MONICA | 12/16/2011 |
| PRINCE, STUART | 12/30/2009 |
| RAFFONE, DIANE | 9/14/2010 |
| RIVERA, JENNIFER | 12/11/2010 |
| RYERSON, MARK | 10/13/2009 |
| SALEM, IRA | 11/4/2010 |
| SANTOS, MICHAEL | 10/15/2010 |
| SCHROEDER, FREDA | 3/24/2011 |
| SIMON, LAURA | 5/16/2010 |
| STEWART, MONICA | 11/13/2009 |
| TRIOLA, DOREEN | 3/28/2010 |
| WELLS, JANICE | 9/15/2008 |
| WILLIAMS, GERALD | 1/11/2012 |
| WILLIAMS, JEANNA | 5/15/2010 |
| YEAGER, KATHY | 10/29/2011 |

**III. (B) Open General Litigation - Claims**

| Claimant | Loss Date |
|---|---|
| AHLERS, DONNA | 7/29/2012 |
| ALDOUSARI, MOHAMMAD | 7/1/2012 |
| ANDERSON, LINDA | 6/11/2011 |
| BABEL, CONRAD | 6/16/2012 |
| BARONE, LOUIS | 7/12/2010 |
| BARTLEY, NOREEN | 6/22/2011 |
| BENSON, JACKSON | 5/22/2012 |
| BLEVINS, JACOB | 6/6/2012 |
| BOSTON, LEZZO | 6/3/2011 |
| BROMBERG, GERALD | 5/16/2011 |
| BROWN, SHANTINA | 10/21/2011 |
| CAMP, LANIYAH | 4/25/2012 |
| CARROLL, KAREN | 4/3/2011 |
| CARTER, CAROLINE | 10/31/2009 |
| CARTER, NANCY | 2/17/2012 |
| CASTELLANOS, NORMA | 7/21/2012 |
| CLENNON, ISAIAH | 3/3/2012 |
| COHEN, ALYSHA | 3/23/2011 |
| CRETA, LUCY | 11/21/2009 |
| CUEVA, CHRISTOPHER | 7/21/2012 |
| DAVIS, HENRY | 1/24/2012 |
| DAVIS, JENNIFER | 2/16/2012 |
| DEATON, KAREN | 6/11/2012 |
| DEBORD, VIOLET | 4/25/2012 |
| DESSART, DANIELLE | 5/18/2012 |
| DICKENS, EUNICE | 6/26/2011 |
| DIETRICH, PHILOMENA | 9/20/2012 |
| DIFRUSCIO, IDA | 2/6/2012 |
| DIONICIO, GILMARY | 3/6/2010 |
| DOBBINS, SHARRON | 2/25/2012 |
| DOWDY, NELDA | 9/11/2010 |
| DUDLEY, TAMMY | 9/16/2012 |
| ELLENBURG, KIMBERLY | 12/17/2011 |
| ENGLE, FRANCESCA | 6/2/2011 |
| ESPOSITO, COURTNEY | 7/25/2010 |
| FARMERTAYLOR, TYNEICE | 6/3/2012 |
| FERGUSON, RHONDA | 3/3/2012 |
| FISCHER, MARIE | 1/27/2012 |
| FOTI, FRANK | 12/30/2011 |
| FREDERICK, CARRIE | 4/30/2011 |
| FRIEDMAN, JACOB | 1/30/2011 |
| GELAKAEK, LOLITA | 7/20/2012 |
| GORDON, ANTONIO | 1/18/2011 |

| | |
|---|---|
| GRABINER, HILDA | 7/28/2012 |
| GRAHAM, TERESA | 1/22/2011 |
| GRINNELL, CLAUDE | 2/4/2011 |
| HALBERT, EDNA | 5/13/2011 |
| HAMMOND, BRIDGETTE | 3/12/2011 |
| HERSEY, LUCI | 6/2/2012 |
| HUDSON, HENRY | 9/4/2011 |
| JACKSON, BETTY | 1/21/2011 |
| JELAKAER, GEOVANI | 7/20/2012 |
| KAMP, NANCY | 1/27/2012 |
| KEEL, TERESA | 6/25/2012 |
| KEELEN, JUDE | 6/11/2012 |
| KENNEDY, SANDRA | 12/4/2011 |
| LAWSON, ERIC | 3/9/2012 |
| LITKOVITZ, MARY | 6/5/2012 |
| LOPEZ, MARTA GALARZA | 2/17/2012 |
| LORIA, ROBERT | 8/14/2012 |
| LUGO, ALIZA | 10/14/2011 |
| LYNCH, EILEEN | 5/23/2011 |
| MACALUSO, FRANK | 2/3/2012 |
| MACKAY, MEGAN | 8/21/2011 |
| MACKAY, RACHAEL | 8/21/2011 |
| MALDONADO, ESTHER | 2/27/2011 |
| MARGINSON, ROBERT | 5/4/2012 |
| MARTINEZ, DANIEL | 3/2/2012 |
| MARTINEZ, GILBERT | 1/31/2011 |
| MELENDEZ, ANA | 2/11/2011 |
| MINTER, MARCUS | 2/7/2010 |
| MIRANDA, THELMA | 2/26/2012 |
| MONACO, MARILYN | 4/21/2007 |
| MONSON, ANTHONY | 1/30/2011 |
| MOORE, DIANE | 1/12/2012 |
| MURRAY, JOHN | 6/17/2011 |
| NORRIS, MILDRED | 2/2/2012 |
| OEHRLEIN, THOR | 1/30/2011 |
| OLEARYBARBER, KAREN | 3/25/2011 |
| ONEAL, ERNEST | 3/17/2012 |
| PACHECO, ANTHONY | 2/4/2011 |
| PETTERS, BEV | 6/11/2012 |
| POGUE, THOMAS | 6/27/2011 |
| PRIEST, NADINE | 5/14/2011 |
| PULLEN, GERI | 10/17/2011 |
| RICHMOND, ROBIN | 12/14/2011 |
| RODRIGUEZ, DIANA | 7/20/2011 |
| ROSEMAN, CYNTHIA | 10/22/2011 |
| RUDDY, BARBARA | 3/7/2012 |
| SACKS, MELANIE | 8/26/2012 |

| | |
|---|---|
| SCHMELKE, ARDEM | 2/27/2011 |
| SCHNITTGER, SAMANTHA | 8/25/2008 |
| SINGLETARY, GRACE | 6/9/2012 |
| SKINNAR, SHAWNTE | 5/13/2012 |
| SMITH, JERMAINE | 9/25/2010 |
| SPILLER, KAREN | 11/19/2011 |
| STULL, ERIC-JAY | 1/3/2012 |
| SULLCAPUMA, CHRISTOPHER | 3/24/2012 |
| TERESHACK, JOAN | 3/19/2011 |
| THOMAS, DARWIN | 5/10/2009 |
| VASQUEZ, JENNIFER | 3/2/2012 |
| VERGATI, CATHERINE | 1/27/2011 |
| WALDROP, LISA | 9/4/2011 |
| WILSON, FLORA | 3/4/2012 |
| WILSON, LOREN | 6/17/2011 |
| ZEIDMAN, SHARON | 9/1/2012 |

**IV.  Open Worker's Compensation Claims**

| Claimant | Loss Date |
|---|---|
| ADWAY, CYNTHIA C. | 9/30/2012 |
| ALDRICH, TIMOTHY D. | 10/3/2012 |
| ALONZO, TERESA | 3/13/2010 |
| ALREWAEI DANIELS, JOSHUA A. | 10/12/2012 |
| ALSTON, HOYT | 3/24/2010 |
| ALWARD, BRENDA | 2/9/2006 |
| Alward, Brenda | 11/7/2009 |
| ANGLIN, JEFFREY R | 9/21/2012 |
| ANTIQUINA, TARA R | 9/16/2012 |
| AYERS, DANNY | 8/5/2008 |
| AZZARA, STEVEN R. | 9/30/2012 |
| BAILEY, ALAN J | 9/2/2012 |
| BEECKMAN, CYNTHIA A | 9/8/2012 |
| BENEDETTO, FRANK W | 6/1/2012 |
| BENEDICT, DAVID J | 9/7/2012 |
| BENNETT, THOMAS S | 4/27/2012 |
| BESSER, WENDELL | 1/19/2003 |
| BEST, MATTHEW D | 8/14/2012 |
| BIRAMONTES, JENNIFER | 3/12/2010 |
| BLAKE, RAVYN S | 5/6/2012 |
| BOE, DOLORES E | 12/11/2011 |
| BOGGIO, STEVEN P | 8/21/2012 |
| BOUCHER, CASEY L | 1/1/2012 |
| BOYER, CHERYL | 9/11/2009 |
| BRASSIL, JENIFER L. | 10/20/2012 |
| BRATTON, LESLIE J | 11/22/2011 |
| BRAZIEL, DANA M | 9/22/2012 |
| BROOM, STEPHEN C | 9/13/2012 |
| BROWN, TERI | 10/29/2009 |
| BRUCE, PATRICIA M. | 10/4/2012 |
| BURDICK, KATHY | 11/30/2004 |
| BURNS, MICHELLE L. | 10/13/2012 |
| BUSSIERE, CLAYTON D | 4/10/2012 |
| CADARI, LORI | 12/9/2010 |
| CADARI, LORI A | 12/9/2010 |
| CALHOUN, TERRENCE G. | 10/1/2012 |
| CASIO, DOTTY L. | 10/21/2012 |
| CASTRO, EMMA | 1/1/2005 |
| CIGARROA, ELADIO Z | 7/23/2011 |
| CLEMENT, DAVID | 3/24/2011 |
| CLEMENT, DAVID | 5/23/2010 |
| CLONICK, PATRICIA | 1/13/2003 |
| CONNER, ALICIA W | 10/10/2011 |
| COOK, GARRETT S | 9/16/2012 |
| CORNWELL, DAVID | 11/17/2010 |
| CRABB, CLIFFORD T | 9/17/2012 |

| Claimant | Loss Date |
|----------|-----------|
| CRAIG, ROBERT M. | 10/4/2012 |
| CURIEL, SAMANTHA R | 8/23/2012 |
| DAVENPORT, JEREMY W | 9/19/2012 |
| DAVIS, MEEGAN | 8/8/2012 |
| DAVIS, SCOTT L | 8/17/2012 |
| DEBONIS, CHRISTINE M. | 10/13/2012 |
| DOCHTERMAN, DAISY | 10/18/2007 |
| DOVE JR., KEITH A. | 10/23/2012 |
| DURANT, LYNDA | 11/14/2001 |
| ELACQUIA, JOHN | 1/23/2009 |
| EVANS, BRENDA | 8/6/2005 |
| EVANS, RYAN C | 8/28/2012 |
| FACTORA, BERNARD | 8/27/2012 |
| FALL, FATOU | 3/4/2012 |
| FANNIN, AMBER | 2/14/2010 |
| FLEMING, ANDREA L | 11/10/2009 |
| FLORES, FRANCISCO | 7/16/2012 |
| FLORES, JOANNE | 11/16/2009 |
| FORD, NATHAN A | 8/2/2012 |
| FORD, TIMOTHY D | 8/31/2012 |
| FRIEDHABER, SCOT H | 10/13/2011 |
| FULLER, DAVID C | 7/15/2011 |
| GAAR, RYAN | 9/23/2012 |
| GABRIEL, KAREEBA I | 8/11/2012 |
| GAYHEART, RANDI | 10/24/2007 |
| GILLOTTI, ANGEL C | 4/12/2012 |
| GOOD, JENNIFER | 10/13/2012 |
| GORDON, MARY | 11/5/2011 |
| GORDON, MARY | 10/12/2012 |
| GORDON, MARY | 9/25/2012 |
| GREEN, ALICE C | 8/11/2012 |
| GUTIERREZ, CARLOS | 3/4/2005 |
| HAAS, MEGAN E. | 10/7/2012 |
| HALL, CHRISTOPHER M | 8/17/2012 |
| HAMPSON, KYLIE M | 8/20/2012 |
| HARMON, DAVID C | 8/19/2012 |
| HARMON, DAVID C. | 10/10/2012 |
| HEFNER, SARAH J | 9/4/2012 |
| HINKLE, PATRICIA | 4/7/2009 |
| HOGGATT, WILLIAM G | 3/20/2012 |
| HORNER, WENDY G. | 10/12/2012 |
| HUBBARD, JOSHUA | 2/13/2008 |
| HUGHES, DONALD J | 10/16/2012 |
| HUGHETT, AMY | 9/19/2012 |
| HULL, BARNEISHA | 7/18/2012 |
| ISLAM, AAMIL F | 8/25/2012 |
| JACKSON, BARBARA D | 8/21/2012 |
| JOHNSON, SUSAN L. | 10/14/2012 |

| Claimant | Loss Date |
|---|---|
| JONES, MARK A | 9/11/2012 |
| JORSTAD, VICTORIA A. | 10/15/2012 |
| KENDER, ERNEST E | 1/7/2012 |
| KENNELL, ROBERT J | 6/19/2011 |
| KERLEY, ROSS E | 9/11/2012 |
| KING, DAROLD S | 4/17/2012 |
| KINNEY-CLEM, JILL A | 8/31/2012 |
| KLOCKO, ELIZABETH A. | 10/22/2012 |
| KREMBLAS, BEVERLY A. | 4/27/2002 |
| KUTTEN, JASMINE D. | 10/22/2012 |
| LAFAVE, MICHAEL A | 10/16/2012 |
| LANGONE, DONALD | 2/16/2005 |
| LEECH, WENDY R | 9/21/2012 |
| LITT, JOHNNA D | 3/29/2012 |
| LODATO, CHRISTINE J | 6/1/2012 |
| LUCKEY, KATI | 10/19/2012 |
| LYONS, SHIRLEY | 9/28/2012 |
| MADDOX, JUSTIN K. | 10/12/2012 |
| MANLEY, YALONDA E | 8/4/2012 |
| MAREZ, VAL P | 8/10/2012 |
| MARKOWITZ, SIDNEY J | 6/28/2012 |
| MARTIN, JAZIREEL S. | 10/6/2012 |
| MASTERSON, SPENCER G | 9/28/2012 |
| MAURIZIO, STEPHANIE M | 9/7/2012 |
| MCCAIN, CAROLYN M | 9/15/2012 |
| MCGINNIS, RONALD J | 9/6/2012 |
| MCKINNON, CARRIE A | 3/3/2012 |
| MCLAUGHLIN, AMANDA R | 8/12/2012 |
| MCNELLIE, LEIGH ANNE | 8/18/2012 |
| MCNELLIE, LEIGH ANNE | 8/18/2012 |
| MEDINA, ANTHONY J | 8/22/2012 |
| METCALF, DOUGLAS B | 8/16/2012 |
| MIDDLETON, SARA | 2/15/2006 |
| MITCHELL, LARRY C | 9/2/2011 |
| MOLNAR, DANE | 3/13/2012 |
| MONDS, ASHLEY L | 8/17/2012 |
| MORGAN, KELLY E | 6/2/2012 |
| MORGAN, KELLY E | 8/8/2012 |
| MURAS, JASON A. | 10/12/2012 |
| MURSCH, MALEAH A | 8/23/2012 |
| MUSTON, SAMANTHA M | 9/2/2012 |
| NELSON, MICHAEL J | 9/27/2012 |
| NEWSOM III, WILLIAM B | 7/26/2012 |
| NOWACKI, DIANE M | 9/22/2012 |
| ORTEGA, RAUL R. | 10/4/2012 |
| OUSLEY, ROBIN J | 1/13/2012 |
| PAGANO, KEVIN | 12/1/2011 |
| PAIGE, ANGELA N. | 10/13/2012 |

| Claimant | Loss Date |
|---|---|
| PASTER, TIFFANY J | 8/25/2012 |
| PERKINS-GENTRY, ANNETTE | 12/1/2006 |
| PORTER JR, EDWARD | 12/27/2010 |
| POWELL, ASHLEE | 9/9/2012 |
| PRINGLE, WENDY | 1/13/2011 |
| PROHASKA, ALAN | 11/15/2008 |
| RAMOS, ROBERT C | 9/14/2012 |
| RAMSAY, JESSICA K | 10/3/2012 |
| RECZEK, CYNTHIA | 1/28/2008 |
| REED, JIMMIE D | 7/30/2012 |
| REYES, GRACIANO E. | 10/7/2012 |
| RICE, RUTH G | 9/15/2012 |
| RICHARDS, ERIC | 3/30/2009 |
| RILEY, ANNALISA | 5/14/2012 |
| RIVERA, ERIC R | 6/25/2012 |
| ROBERTS, LISA | 7/18/2009 |
| ROBINSON PICKARD, JOEL K. | 10/12/2012 |
| RODRIGUEZ, GILBERT III | 8/26/2012 |
| ROGERS, JOE | 6/29/2011 |
| ROGERS, JOE P | 3/20/2012 |
| ROKITA, RICK E. | 10/7/2012 |
| ROME, DAVID J | 9/25/2012 |
| ROPPOLO, JOSEPH | 1/18/2010 |
| ROSE, BRYAN S | 9/20/2012 |
| ROWEL, AMBER A. | 10/14/2012 |
| SABORDO, JEFFREY F | 9/5/2012 |
| SALAIS, JESSICA J. | 10/16/2012 |
| SAXMAN, CHRIS | 10/4/2009 |
| SCOTT, DELTA B | 9/16/2012 |
| SELPH, DONNA E | 9/24/2012 |
| SENAY, STEPHEN P | 10/26/2010 |
| SHAFER, SABRA | 3/7/2010 |
| SHELTON, BRENDAN T. | 10/23/2012 |
| SHOEMAKER, TAMMY | 12/7/2002 |
| SIBERT, RYAN | 1/8/2011 |
| SIMPSON, KATHY L | 1/13/2012 |
| SMITH, ALLEN G | 9/15/2012 |
| SMITH, EDWARD C | 3/13/2012 |
| SMITH, JACQUELINE | 10/31/2007 |
| SNYDER, SHIRLEY J. | 12/6/2001 |
| SOMERVILLE, JEROME | 12/24/2007 |
| SOREN, DAVID | 5/27/2010 |
| SPENCER, KETURAH R | 8/26/2012 |
| STANLEY-BEALS, JULIA K | 2/6/2012 |
| STATEN, DARIUS O. | 10/10/2012 |
| STENSON, BRIAN | 9/26/2010 |
| STINSON, NIKKI M. | 9/19/2012 |
| STROUD, KATRINA T | 4/1/2012 |

| Claimant | Loss Date |
|---|---|
| SUMMERS, JENNIFER A. | 10/17/2012 |
| TALBOT, MARIE V | 8/25/2012 |
| TAYLOR, GLENDA S | 8/14/2012 |
| TAYLOR, ZACHARY C. | 10/12/2012 |
| TAYLOR, ZACHARY C. | 10/12/2012 |
| THOMAS, KENVAL A | 8/26/2012 |
| THORNTON, JEFFREY I. | 10/13/2012 |
| THORPE, ANTHONY D | 9/16/2012 |
| TOMCZAK, MARY | 5/3/2011 |
| TOUHEY, HOWARD | 5/2/2010 |
| TOWNSEND, RODD M | 5/7/2012 |
| TREJO, GABRIEL | 10/12/2012 |
| TREVARROW, MICHAEL J | 8/14/2012 |
| TURCOTT, DEBORAH | 1/27/2008 |
| VERTUCCI, ARTHUR | 3/31/2012 |
| VINSON, PATRICIA | 11/24/2011 |
| VITALI, CHERYL | 7/9/2001 |
| WEGWERTH, LAURA J. | 10/12/2012 |
| WHITE, ROBERT | 9/13/2006 |
| WIESE, SABRINA | 3/15/2009 |
| WILBANKS, NEIL A | 8/26/2012 |
| WILHELM, THEODORE | 12/11/2006 |
| WILHELM, THEODORE | 10/2/2012 |
| WILLIAMS, JERIAH M | 9/21/2012 |
| WOOD, CHRISTOPHER S. | 10/23/2012 |
| WOODIN, RONALD | 3/12/2010 |
| WYSINGER, NICHOLAS W | 8/16/2012 |
| ZAJAC, KEITH | 10/10/2009 |

## Schedule 5.09

### Taxes

1. The Internal Revenue Service ("IRS") is examining whether the Group Company properly withheld and reported payroll taxes on tip income received by certain employees in the bowling centers.  This matter is currently in examination by the IRS.

2. Income Tax Audits & Notices – FYE 7/1/12.

   a. New York State Audit. New York State ("NYS") is currently auditing AMF and its affiliates' return for the period of 6/28/2008 to 6/27/2010.  Due to a 2007 NYS tax law change that requires ownership to be greater than 50% they have determined that AMF Holdings, Inc. ("AMF Holdings") should not have been included in the return.  This is based upon the fact that AMF Holdings does not own a greater than 50% share of the Qubica JV Entity, the company which creates nexus in NYS.  In addition, NYS has taken the position that the wholly owned concession companies, 300, Inc., AMF Beverage Company of Oregon, Inc., Bush River Corporation, and King Louie Lenexa, Inc. should have been included in the combined return.  Since the concession companies do not do business within NYS, this change has lowered AMF's apportionment percentage.  This may result in a potential NYS tax refund of $291,999 and a refund of the NYS MTA Surcharge of $32,284.

      The potential refund from the NYS audit has not been recorded in FYE 7/1/2012 since the amount is not definite.

   b. Michigan Tax Notice. AMF and its affiliates received a tax notice from the State of Michigan for $59,467.41 for the FYE -7/02/2011 which is being protested. AMF and its affiliates filed amended returns for FYE June 28, 2009 and June 27, 2010.   The overpayment from the amended returns should have been applied to FY 2011.  AMF and its affiliates have sent the State of Michigan the supporting documentation in order to have the assessment abated. The matter is currently pending.

## **Schedule 5.10**

### **Compliance with Law**

1.  <u>ADA</u>.  Certain bowling centers, including those subject to the iStar Master Lease, are not in compliance with the technical requirements of the ADA.

2.  <u>OSHA</u>.  Certain bowling centers, including those subject to the iStar Master Lease, are included in a proposed Stipulation and Settlement Agreement with the U.S. Department of Labor through the Occupational Health and Safety Administration ("OSHA") relating to compliance with OSHA regulations as to AMF's bowling equipment and operating procedures. This proposed Stipulation and Settlement Agreement ("OSHA Agreement") is expected to be finalized shortly.  The estimated cost of remediation pursuant to the OSHA Agreement is approximately $2 million, of which approximately $900,000 remains to be spent.

The OSHA Agreement arises out of an accident occurring on February 20, 2011, at AMF's 300 Dallas Center, located at 3805 Beltline Road, Addison, TX 75001. On this date, AMF employee Michael Jeffrey was killed while performing maintenance on bowling equipment, specifically a pinsetter on lane 37 in the course and scope of his employment as a mechanic for AMF.  AMF has settled the private lawsuit with respect to this accident and has no further outstanding liabilities with respect to the private lawsuit.

As a result of the accident, an investigation was performed by OSHA with citations issued on July 25, 2011.  In summary, the citations relate to the following two categories:

(1) <u>Bowling Equipment</u>. Requirements relating to pinsetter machines, including guardrail systems, fixed stairs, and guards, including those related to pulleys, horizontal belts, vertical or inclined belts and flexible cords.

(2) <u>Operating Procedures</u>. Requirements to include for lock out/tag out procedures and annual inspections of energy control procedures.

Following AMF's appeal of the citations, AMF and OSHA entered into settlement negotiations to reach an agreement on the citations and abatement of the citations.  The OSHA Agreement details the abatement measures to be taken by AMF concerning the control of hazardous energy, machine guarding, electrical hazards, fall hazards and implementation of additional operating procedures. AMF has begun the process of implementing these measures.

**<u>Schedule 5.11</u>**

**Pension and Benefit Plans**

1. Multiemployer Plans

   a.    Service Employees International Union National Industry Pension Fund

   b.    South Bay Hotel Employees and Restaurant Employees Pension Plan and Welfare Trust Fund

   c.    Greater St. Louis Service Employees Pension Fund

   d.    Long Beach and Orange County Hotel Employees and Restaurant Employees Health Benefit and Retirement Funds

   e.    Unite Here! Local 11 - Health

   A Group Company may have potential withdrawal liability under the above Multiemployer Plans, the amount of which is not known.

2. Pursuant to an Employment Agreement dated February 1, 2002 with Roland Smith, a former chief executive officer of the Borrower, Mr. Smith is entitled to receive a lifetime nonqualified supplemental retirement benefit at age 65.  The outstanding liability is approximately $125,000.

3. UK BPO is the sponsor of the UK Pension Plan. UK BPO terminated its active employees on September 28, 2012 and ceased trading. UK BPO appointed an administrator and began an insolvency proceeding on October 12, 2012. The insolvency proceeding will result in a windup of the Plan.  The UK Pension Plan's Unfunded Liabilities have been guaranteed by the Borrower (90%) and AMF (100%).  The UK Pension Plan's Unfunded Liabilities could exceed £8.6 million.

**Schedule 5.12**

**Subsidiaries**

| Name of Subsidiary | Jurisdiction of Formation | Subsidiary Guarantor | Authorized Shares | Outstanding Shares | Holder of Outstanding Equity Interests |
|---|---|---|---|---|---|
| Kingpin Intermediate Corp. | Delaware | No | 1,000 | 1,000 shares | Kingpin Holdings, LLC (100%) |
| AMF Bowling Worldwide, Inc. | Delaware | No | 1,000 (post-merger) | 1,000 shares | Kingpin Intermediate Corp. (100%) |
| AMF BCH LLC | Delaware | Yes | 1,000 | 100 | AMF Bowling Worldwide, Inc. (100%) |
| AMF Bowling Centers, Inc. | Virginia | Yes | 15,000 | 9485.1 | AMF Bowling Centers Holdings Inc. (100%) |
| AMF Beverage Company of Oregon, Inc. | Oregon | Yes | 10,000 | 94.851 | AMF Bowling Centers Holdings Inc. (100%) |
| Bush River Corporation | South Carolina | Yes | 100,000 | 18,895.1919193838 | AMF Bowling Centers Holdings Inc. (100%) |
| King Louie Lenexa, Inc. | Kansas | Yes | 30,000 | 94.851 | AMF Bowling Centers Holdings Inc. (100%) |
| 300, Inc. | Texas | Yes | 1,000,000 | 10,000 | AMF Bowling Centers Holdings Inc. (100%) |

| Name of Subsidiary | Jurisdiction of Formation | Subsidiary Guarantor | Authorized Shares | Outstanding Shares | Holder of Outstanding Equity Interests |
|---|---|---|---|---|---|
| American Recreation Centers, Inc. | California | Yes | 26,484,375 | 100 | AMF Bowling Centers, Inc. (100%) |
| Bowler's Choice Restaurant, Inc. | Maryland | No | 1,000 | 100 | AMF Bowling Centers, Inc. (60% or 60 shares), Ethel V. Haley (20% or 20 shares) and Jacob Gilyeat (20% or 20 shares) |
| Corner Restaurant East, Inc. | Maryland | No | 5,000 | 100 | AMF Bowling Centers, Inc. (97% or 97 shares), Douglas C. Meister (1% or 1 share), Walter Reynolds (1% or 1 share) and Joseph Godsey (1% or 1 share) |
| Southdale Bowler's Restaurant, Inc. | Maryland | No | 2,000 | 100 | AMF Bowling Centers, Inc. (98% or 98 shares), Jo Anna Marshall (1% or 1 share) and Doug Meister (1% or 1 share) |
| Prince George's Concession, Inc. | Maryland | No | 1,000 | 100 | AMF Bowling Centers, Inc. (74% or 74 shares), Norman Hawkins (25% or 25 shares) and Tony Green (1% or 1 share) |
| AMF WBCH LLC | Delaware | Yes | 1,000 | 100 | AMF BCH LLC (100%) |

| Name of Subsidiary | Jurisdiction of Formation | Subsidiary Guarantor | Authorized Shares | Outstanding Shares | Holder of Outstanding Equity Interests |
|---|---|---|---|---|---|
| Societe Anonyme du Bowling de Montparnasse | France | No | 3,500 | 3,500 | AMF WBCH LLC (3490 shares), Rachel S. Labrecque (3 shares), Dan McCormack (4 shares) and Marc Leemans (3 shares) |
| AMF Bowling Mexico Holding, Inc. | Delaware | Yes | 1,000 | 75.6972 | AMF Worldwide Bowling Centers Holdings Inc. (100%) |
| Boliches AMF, Inc. | Virginia | Yes | 10,000 | 100.00000000052 | AMF Worldwide Bowling Centers Holdings Inc. (100%) |
| Boliches AMF y Compania | Mexico | No | N/a | N/a | AMF Bowling Mexico Holding, Inc. (79%) and Boliches AMF, Inc. (21%) |
| Servicios AMF, S.A. de C.V. | Mexico | No | N/a | 50,000 | AMF Bowling Mexico Holding, Inc. (79%) and Boliches AMF, Inc. (21%) |
| Operadora Mexicana de Boliches, S.A. | Mexico | No | N/a | 1,500 | Boliches AMF y Compania (85%) and AMF Bowling Mexico Holding, Inc. (15%) |

| Name of Subsidiary | Jurisdiction of Formation | Subsidiary Guarantor | Authorized Shares | Outstanding Shares | Holder of Outstanding Equity Interests |
|---|---|---|---|---|---|
| Promotora de Boliches, S.A. de C.V. | Mexico | No | N/a | 6,955,562 | Boliches AMF y Compania (85%) and AMF Bowling Mexico Holding, Inc. (15%) |
| Inmuebles Obispado, S.A. | Mexico | No | N/a | 4,500 | Boliches AMF y Compania (100%) |
| Inmuebles Minerva, S.A. | Mexico | No | N/a | 4,400 | Boliches AMF y Compania (100%) |
| AMF Bowling Products UK Limited | United Kingdom | No | 1,000 | 1 | AMF Holdings, Inc. (100%) |
| AMF Bowling Centers Holdings Inc. | Delaware | Yes | 1,000 | 100 | AMF Bowling Worldwide, Inc. (100%) |
| AMF Worldwide Bowling Centers Holdings Inc. | Delaware | Yes | 1,000 | 100 | AMF Bowling Worldwide, Inc. (100%) |
| AMF Holdings, Inc. | Delaware | Yes | 1,000 | 1,000 | AMF Bowling Worldwide, Inc. (100%) |

## **Schedule 5.16**

### **Environmental Matters**

None.

## Schedule 5.17

### Intellectual Property

**Trademarks**

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---------|-----------|-----------------|------------------|--------|-------------|-------------------|
| Argentina | AMF and Triangle design | 2472978 | 1972105 | Registered | 10/31/2003 | 11/30/1993 |
| Argentina | AMF and Triangle design | 2838414 | 2302047 | Registered | 12/9/1997 | 12/9/1977 |
| Argentina | AMF and Triangle design | 2119742 | 2838415 | Registered | 12/9/1997 | 8/24/1998 |
| Argentina | AMF and Triangle design | 2338385 | 1892902 | Registered | 5/15/2001 | 10/31/2002 |
| Argentina | AMF and Triangle design | 2338384 | 2259971 | Registered | 5/15/2001 | 11/27/2008 |
| Argentina | AMF and Triangle design | 2338383 | 2223522 | Registered | 5/15/2001 | 4/9/2008 |
| Argentina | AMF and Triangle design | 2338386 | 2223523 | Registered | 5/15/2001 | 4/9/2008 |
| Argentina | AMF and Triangle design | 2338382 | 2223524 | Registered | 5/15/2001 | 4/9/2008 |
| Argentina | AMF and Triangle design | 1008775 | 821553 | Registered (Pend-Cancl) | 11/8/1974 | 4/14/1975 |
| Argentina | AMF and Triangle design | 1160147 | 2284941 | Registered | | 9/14/1981 |
| Argentina | AMF CLASSIC with Pinsplash Design | 2338294 | 1907328 | Registered | 5/14/2001 | 12/11/2002 |
| Argentina | AMF CLASSIC with Pinsplash | 2338293 | 1907327 | Registered | 5/14/2001 | 12/11/2002 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---|---|---|---|---|---|---|
| | Design | | | | | |
| Argentina | AMF CLASSIC with Pinsplash Design | 2338295 | 2259972 | Registered | 5/14/2001 | 11/27/2008 |
| Argentina | AMF THUNDER BOWL | 2435859 | 1997253 | Registered | 6/6/2003 | 11/2/2004 |
| Argentina | BOWLING and design | 2004711 | | Pending | | |
| Australia | AMF ALWAYS MEANS FUN | 762074 | 762074 | Registered | 5/13/1998 | 5/13/1998 |
| Australia | AMF and Circle design | 135883 | 135883 | Registered | 2/27/1958 | 2/27/1958 |
| Australia | AMF and Triangle design | 243430 | 243430 | Registered | 10/26/1970 | 10/26/1970 |
| Australia | AMF and Triangle design | 243431 | 243431 | Registered | 10/26/1970 | 10/26/1970 |
| Australia | AMF and Triangle design | 249685 | 249685 | Registered | 7/5/1971 | 7/5/1971 |
| Australia | AMF and Triangle design | 875604 | 875604 | Registered | 5/14/2001 | 5/14/2001 |
| Australia | AMF CLASSIC with Pinsplash Design | 875344 | 875344 | Registered | 5/10/2001 | 5/3/2002 |
| Australia | AMF GOLD MEDAL LANES | 899533 | 899533 | Registered (Pend-Cancl) | 1/5/2002 | 12/1/2003 |
| Australia | AMF THUNDER BOWL | 9556734 | 956734 | Registered | 6/4/2003 | 6/4/2003 |
| Australia | AMF XTREME | 1020202 | 1020202 | Registered | 9/13/2004 | 9/13/2004 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---------|-----------|-----------------|------------------|--------|-------------|-------------------|
| Australia | XTREME | 882534 | 882534 | Registered | 7/13/2001 | 5/22/2003 |
| Austria | AMF and Triangle design | | 69557 | Registered | | 7/14/1971 |
| Benelux | AMF and design | 504323 | 008638 | Registered | 2/1/1971 | 2/1/1972 |
| Benelux | AMF and Triangle design | 597904 | 0320217 | Registered | 5/22/1973 | 5/22/1973 |
| Brazil | AMF ALWAYS MEANS FUN | 820881503 | 820881503 | Registered | 6/30/1998 | 11/4/2003 |
| Brazil | AMF and Triangle design | 819998559 | 819998559 | Registered | 8/4/1997 | 7/5/2005 |
| Brazil | AMF and Triangle design | 823923800 | 823923800 | Registered | 5/16/2001 | 12/12/2006 |
| Brazil | AMF and Triangle design | 823923819 | 823923819 | Registered | 5/16/2001 | 12/12/2006 |
| Brazil | AMF and Triangle design | 823923797 | 823923797 | Registered | 5/16/2001 | 12/12/2006 |
| Brazil | AMF and Triangle design | 823923789 | 823923789 | Registered | 5/16/2001 | 12/12/2006 |
| Brazil | AMF and Triangle design | 823923770 | 823923770 | Registered | 5/16/2001 | 1/13/2009 |
| Brazil | AMF and Triangle design | 823923827 | 823923827 | Registered | 5/16/2001 | 12/12/2006 |
| Brazil | AMF CLASSIC with Pinsplash Design | 823776646 | 823776646 | Registered | 8/14/2001 | 11/18/2008 |
| Brazil | AMF CLASSIC with Pinsplash Design | 823776654 | 823776654 | Registered | 8/14/2001 | 11/18/2008 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---------|-----------|-----------------|-------------------|--------|-------------|--------------------|
| Brazil | AMF CLASSIC with Pinsplash Design | 823776662 | 823776662 | Registered | 8/14/2001 | 11/18/2008 |
| Canada | AMF | 341711 | TMA193805 | Registered | 4/8/1971 | 9/7/1973 |
| Canada | AMF ALWAYS MEANS FUN | 0889985 | TMA560190 | Registered | 9/11/1998 | 4/15/2002 |
| Canada | AMF and Triangle design | 1106387 | TMA593908 | Registered | 6/13/2001 | 11/5/2003 |
| Canada | AMF CLASSIC with Pinsplash Design | 1104877 | TMA609489 | Registered | 5/30/2001 | 5/5/2004 |
| Canada | AMF PLAYMASTER and design | 763295 | TMA467917 | Registered | 9/6/1994 | 12/19/1996 |
| Canada | AMF THUNDERBOWL | 1178955 | TMA655294 | Registered | 5/26/2003 | 12/16/2005 |
| Chile | AMF | 559845 | 630572 | Registered | 2 /28/2002 | 1 /4 /1982 |
| Chile | AMF and Triangle design | 540392 | 668510 | Registered | 8 /23/2001 | 7 /7 /2003 |
| Chile | AMF CLASSIC with Pinsplash Design | 540393 | 663263 | Registered | 8 /23/2001 | 4 /17/2003 |
| Chile | AMF CLASSIC with Pinsplash Design | 540394 | 667372 | Registered | 8/23/2001 | 6 /17/2003 |
| China | AMF (Chinese Characters) | 1465148 | 1465148 | Registered | 8/5/1999 | 10/28/2000 |
| China | AMF ACCUSYSTEM | 94038418 | 834813 | Registered | 5 /3 /1994 | 4 /28/1996 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---|---|---|---|---|---|---|
| China | AMF and Triangle design | n/a | 812700 | Registered | 2 /25/1994 | 2 /7 /1996 |
| China | AMF and Triangle design | 94033020 | 803425 | Registered | 4 /19/1994 | 12/28/1995 |
| China | AMF and Triangle design | 94033018 | 826640 | Registered | 4 /19/1994 | 3/28/1996 |
| China | AMF and Triangle design | 94033019 | 809639 | Registered | 4 /19/1994 | 1 /21/1996 |
| China | AMF and Triangle design | 94033017 | 812398 | Registered | 4/19/1994 | 2 /7/1996 |
| China | AMF and Triangle design | 2001083342 | 1986035 | Registered | 5/21/2001 | 11/28/2002 |
| China | AMF CLASSIC with Pinsplash Design | 2001083355 | 1941156 | Registered | 5/21/2001 | 2/21/2005 |
| China | AMF CLASSIC with Pinsplash Design | 2001083354 | 1985760 | Registered | 5/21/2001 | 11/28/2002 |
| China | AMF PLAYMASTER | 94033025 | 803421 | Registered | 4 /19/1994 | 12/28/1995 |
| China | AMF THUNDER BOWL | 3572092 | 3572092 | Registered | 5 /28/2003 | 8 /28/2005 |
| Colombia | AMF and Triangle design | | 99.051 | Registered | 11/29/1978 | 5/28/1982 |
| Colombia | AMF and Triangle design | | 99.052 | Registered | 11/29/1978 | 5/28/1982 |
| Czech Republic | AMF and Triangle design | 122271 | 218695 | Registered | 5 /21/1997 | 7 /26/1999 |
| Denmark | AMF and Triangle design | VA 2425 1979 | VR 1980 01892 | Registered | 6/13/1979 | 5/1/1980 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---|---|---|---|---|---|---|
| Dominican Republic | AMF and Triangle design | | 34805 | Registered | | 11/4/1982 |
| Ecuador | AMF and Triangle design | | 26-82 | Registered | | 10/21/1982 |
| Ecuador | AMF and Triangle design | | 27-82 | Registered | | 10/21/1982 |
| European Union (CTM) | AMF THUNDER BOWL | 003209491 | 003209491 | Registered | 6/3/2003 | 6/3/2003 |
| Federation of Russia | AMF | 2001704676 | 240363 | Registered | 2/19/2001 | 3/13/2003 |
| Federation of Russia | AMF and Triangle design | 97706941 | 185452 | Registered | 5/16/1997 | 3/3/2000 |
| Federation of Russia | AMF and Two Triangle design | 2001704677 | 226076 | Registered | 2/19/2001 | 2/19/2001 |
| Federation of Russia | AMF and Two Triangle design (Colored) | 2001707698 | 226078 | Registered | 3 /15/2001 | 3/15/2001 |
| Federation of Russia | AMF PINSPOTTER | 2002703532 | 262465 | Registered | 2/5/2002 | 1/27/2004 |
| Federation of Russia | AMF THUNDER BOWL | 2003722287 | 290472 | Registered | 11/13/2003 | 6/10/2005 |
| Federation of Russia | AMF with Triangle Design (Colored) | 2001707704 | 240306 | Registered | 3/15/2001 | 3/13/2003 |
| France | AMF ALWAYS MEANS FUN | 98732629 | 98732629 | Registered | 5 /15/1998 | 5 /15/1998 |
| France | AMF and Triangle design | 98748100 | 98748100 | Registered | 9/2/1998 | 9/2/1998 |
| France | AMF CLASSIC with Pinsplash | 013105362 | 01/3105362 | Registered | 6/13/2001 | 6/13/2001 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---|---|---|---|---|---|---|
| | Design | | | | | |
| France | AMF PINSPOTTER | 023145415 | 02/3145415 | Registered | 2/4/2002 | 2/4/2002 |
| France | AMF XTREME | 04/3309773 | 04/3309773 | Registered | 8/25/2004 | 8/25/2004 |
| France | XTREME BOWLING | 04/3309776 | 04/3309776 | Registered | 8/25/2004 | 8/25/2004 |
| Germany | AMF ALWAYS MEANS FUN | 39829795 | 39829795 | Registered | 5/27/1998 | 11/6/1998 |
| Germany | AMF and Triangle design | | 924106 | Registered | 6/15/1973 | 6 /15/1973 |
| Germany | AMF and Triangle design | 30130438.6/41 | 30130438 | Registered | 5 /16/2001 | 4 /23/2002 |
| Germany | AMF CLASSIC with Pinsplash Design | 30129894.7/41 | 30129894 | Registered | 5 /12/2001 | 1 /21/2002 |
| Hong Kong | AMF and Triangle design | | 200205081AA | Registered | | 5/14/2001 |
| Hong Kong | AMF and Triangle design | 12751/1995 | 07004/1997 | Registered | 10/9/1995 | 10/9/1995 |
| Hong Kong | AMF and Triangle design (Series) | 2002/14460 | 2003/10654 | Registered | 9 /13/2002 | 8 /27/2003 |
| Hong Kong | AMF CLASSIC with Pinsplash Design | | 2003B07676AA | Registered | 5/14/2001 | 5/8/2001 |
| India | AMF ADVANTAGE | 844706 | 844706 | Registered | 3 /11/1999 | 3 /11/1999 |
| India | AMF ALWAYS MEANS FUN | 802457 | 802457 | Registered | 5 /15/1998 | 5/15/1998 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---|---|---|---|---|---|---|
| India | AMF and Triangle design | | 311751 | Registered | 1/19/1976 | 1/19/1976 |
| India | AMF and Triangle design | | 311749 | Registered | 1/19/1976 | 1/19/1976 |
| India | AMF and Triangle design | | 311748 | Registered | 1/19/1976 | 1/19/1976 |
| India | AMF PINSPOTTER | 1079024 | 1079024 | Registered | 2/7/2002 | 2/7/2002 |
| India | AMF PINSPOTTER | 1079023 | 1079023 | Registered | 2/7/2002 | |
| India | AMF THUNDER BOWL | 1204899 | 442322 | Registered | 6/9/2003 | 6/9/2003 |
| Indonesia | AMF ALWAYS MEANS FUN | D98 09363 | IDM000189480 | Registered | 6/1/1998 | 2/18/2000 |
| Indonesia | AMF ALWAYS MEANS FUN | D98 09364 | 439813 | Registered | 6/1/1998 | 2/18/2000 |
| Ireland | AMF and Triangle design | 5674/90 | B143922 | Registered | 10/2/1990 | 10/2/1990 |
| Ireland | AMF and Triangle design | 90/5673 | B143921 | Registered | 10/2/1990 | 10/2/1990 |
| Ireland | AMF and Triangle design | 90/5675 | 143923 | Registered | 10/2/1990 | 10/2/1990 |
| Israel | AMF and Circle design | | 20495 | Registered | 2/1/1962 | 2 /1 /1962 |
| Israel | AMF and Circle design | | 20494 | Registered | 2/1/1962 | 2 /1 /1962 |
| Israel | AMF and Circle design | | 20496 | Registered | 2/1/1962 | 2 /1 /1962 |
| Israel | AMF THUNDER BOWL | 165199 | 165199 | Registered | 6 /19/2003 | 11/3/2004 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---------|-----------|-----------------|------------------|--------|-------------|-------------------|
| Italy | AMF ALWAYS MEANS FUN | RM98C002455 | 1299803 | Registered | 5/15/1998 | 3/8/2001 |
| Italy | AMF and Triangle design | 93 2251 | 668354 | Registered | 3/26/1993 | 2/1/1996 |
| Japan | AMF | S34-020211 | 00564177 | Registered | 6/24/1959 | 1/10/1961 |
| Japan | AMF | 8301689 | 2516299 | Registered | 7/21/1989 | 3/31/1993 |
| Japan | AMF | S48-073124 | 1320170 | Registered | 5/7/1973 | 1/25/1978 |
| Japan | AMF | 11119390 | 2670427 | Registered | 10/2/1990 | 5/31/1994 |
| Japan | AMF & Triangle Design in Red | 2007-024992 | 05129854 | Registered | 3/23/2007 | 4/18/2008 |
| Japan | AMF ALWAYS MEANS FUN | 42674/1998 | 4454078 | Registered | 5/21/1998 | 2/16/2001 |
| Japan | AMF and Katakana | 2007-024993 | 5129855 | Registered | 3/22/2007 | 4/18/2008 |
| Japan | AMF and Katakana | 2008-003149 | 5230580 | Registered | 1/21/2008 | 5/15/2009 |
| Japan | AMF and Triangle design | 111192/1990 | 2670020 | Registered | 10/2/1990 | 5/31/1994 |
| Japan | AMF and Triangle design (Colored) | S47-132912 | 1296240 | Registered | 9/22/1972 | 9/1/1977 |
| Japan | AMF and Triangle design (Colored) | 2001-047611 | 4579530 | Registered | 5/28/2001 | 6/21/2002 |
| Japan | AMF and Triangle design (Colored) | H04-240873 | 3073564 | Registered | 9/28/1992 | 8/31/1995 |
| Japan | AMF and Triangle design (Colored) | H04-238935 | 3140654 | Registered | 9/28/1992 | 4/30/1996 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---------|-----------|-----------------|------------------|--------|-------------|-------------------|
| Japan | AMF and Triangle design (Colored) | 2008-003147 | 5230579 | Registered | 1/21/2008 | 5/15/2009 |
| Japan | AMF CLASSIC with Pinsplash Design (colored) | 2001-044148 | 04717030 | Registered | 5/16/2001 | 10/10/2003 |
| Japan | AMF PINSPOTTER | 2002-006829 | 04724577 | Registered | 1/31/2002 | 11/7/2003 |
| Japan | AMF Stylized (Katakana Characters) | S48-073123 | 1296241 | Registered | 5/7/1973 | 9/1/1977 |
| Japan | AMF THUNDER BOWL | 2003-045493 | 04733408 | Registered | 6 /3 /2003 | 12/12/2003 |
| Malaysia | AMF and Triangle design | | MB65052 | Registered | 4/15/1974 | 4/15/1974 |
| Mexico | AMF | | 163505 | Registered | | 9/29/1970 |
| Mexico | AMF | | 163506 | Registered | | 9/29/1970 |
| Mexico | AMF and Triangle design | 130756 | 224130 | Registered | 10/27/1978 | 10/27/1978 |
| Mexico | AMF and Triangle design | 493667 | 801930 | Registered | 7 /2 /2001 | 8 /1 /2003 |
| Mexico | AMF and Triangle design | 493668 | 739726 | Registered | 7 /2 /2001 | 3 /26/2002 |
| Mexico | AMF and Triangle design | 493670 | 756880 | Registered | 7 /2 /2001 | 7 /30/2002 |
| Mexico | AMF and Triangle design | 493671 | 752235 | Registered | 7 /1 /2001 | 7 /2 /2001 |
| Mexico | AMF and Triangle design | 533185 | 753716 | Registered | 2 /19/2002 | 2 /19/2002 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---|---|---|---|---|---|---|
| Mexico | AMF and Triangle design | 493669 | 870470 | Registered | 1 /17/2002 | 2 /28/2005 |
| Mexico | AMF CLASSIC with Pinsplash Design | 485822 | 00755581 | Registered | 5 /17/2001 | 5 /17/2001 |
| Mexico | AMF CLASSIC with Pinsplash Design | 485823 | 780084 | Registered | 5 /17/2001 | 2 /25/2003 |
| Mexico | AMF CLASSIC with Pinsplash Design | 485824 | 753302 | Registered | 5 /17/2001 | 6 /28/2002 |
| Mexico | AMF THUNDER BOWL | 606295 | 808035 | Registered | 6 /20/2003 | 9 /29/2003 |
| New Zealand | AMF and Triangle design | | 61519 | Registered | 2/26/1958 | 12/7/1959 |
| New Zealand | AMF and Triangle design | | 234899 | Registered | 3/9/1994 | 11/26/1996 |
| New Zealand | AMF and Triangle design | 784321 | 784321 | Registered | 2/15/2008 | 2/15/2008 |
| New Zealand | AMF XTREME | 784320 | 784320 | Registered | 2/15/2008 | 2/15/2008 |
| Norway | AMF | | 99480 | Registered | | 9 /1 /1977 |
| Norway | AMF and Triangle design | | 94941 | Registered | | 10/2/1975 |
| Pakistan | AMF and Circle design | | 30691 | Registered | | 1/30/1962 |
| Portugal | AMF ALWAYS MEANS FUN | 331146 | 331146 | Registered | 6/26/1998 | 12/10/1998 |
| Portugal | AMF and Triangle design | 271479 | 271479 | Registered | 2/12/1991 | 2/3/1993 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---------|-----------|-----------------|------------------|--------|-------------|-------------------|
| Portugal | AMF THUNDER BOWL | | 372938 | Registered | 6/5/2003 | 7/26/2004 |
| Singapore | AMF | 1106/83 | T91/03309B | Registered | 3/26/1991 | 3 /26/1991 |
| Singapore | AMF (stylized) | s/1107/83 | T83/01107G | Registered | 3 /4 /1983 | 2 /5 /1988 |
| Singapore | AMF ADVANTAGE | T97/033631 | T97/033631 | Registered | 3 /24/1997 | 3 /24/1997 |
| Singapore | AMF ALWAYS MEANS FUN | S/4837/98 | T98/04837J | Registered | 5 /21/1998 | 5 /21/1998 |
| Singapore | AMF ALWAYS MEANS FUN | S/4836/98 | T98/04836B | Registered | 5 /21/1998 | 5 /21/1998 |
| Singapore | AMF and Triangle design | | T91/03144H | Registered | 3/19/1991 | 3 /21/1991 |
| Slovak Republic | AMF and Triangle design | 1376-97 | 196915 | Registered | 5/21/1997 | 5/21/2007 |
| South Africa | AMF and Triangle design | | 74/6231 | Registered | | 11/27/1974 |
| South Africa | AMF and Triangle design | | 74/6234 | Registered | 11/27/1974 | 11/27/1974 |
| South Africa | AMF and Triangle design | | 74/6230 | Registered | 11/27/1974 | 11/27/1974 |
| South Korea | AMF ADVANTAGE | 1997-11670 | 411031 | Registered | 3 /17/1997 | 7/20/1998 |
| South Korea | AMF and Triangle design | 1990-19789 | 224091 | Registered | 7/4/1990 | 10/17/1991 |
| South Korea | AMF and Triangle design | 1996-4835 | 40-0131080 | Registered | 7/18/1996 | 6/16/1997 |
| South Korea | AMF and Triangle design | 82-7238 | 92561 | Registered | 7/14/1982 | 7/5/1983 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---|---|---|---|---|---|---|
| South Korea | AMF and Triangle design | 1993-1434 | 95460 | Registered | 5/13/1993 | 7/25/1994 |
| South Korea | AMF and Triangle design | 1996-4834 | 128138 | Registered | 7/18/1996 | 8 /5/1986 |
| South Korea | AMF and Triangle design | 1996-4833 | 0127682 | Registered | 6/15/1985 | 7/25/1986 |
| South Korea | AMF and Triangle design | 1990-19788 | 221889 | Registered | 7/4/1990 | 9/24/1991 |
| South Korea | AMF and Triangle design | 1996-4832 | 126058 | Registered | 7/18/1996 | 6/16/1997 |
| South Korea | AMF and Triangle design | 94/38125 | 330004 | Registered | 9/22/1994 | 12/22/1995 |
| Spain | AMF ALWAYS MEANS FUN | 2848177 | 2848177 | Pending | 5/14/2008 | 10/20/2008 |
| Spain | AMF and Triangle design | 718242(2) | 718242(2) | Registered | 6 /19/1973 | 6 /21/1977 |
| Spain | AMF and Triangle design | 718246(5) | 718246(5) | Registered | 6 /19/1973 | 2/17/1975 |
| Spain | AMF and Triangle design | 718243(0) | 718243(0) | Registered | 6 /19/1973 | 1/21/1976 |
| Spain | AMF CLASSIC with Pinsplash Design | 2412367 | 2412367 | Registered | 7/3/2001 | 6/8/2002 |
| Spain | AMF CLASSIC with Pinsplash Design | 2412366 | 2412366 | Registered | 7/3/2001 | 6/8/2002 |
| Sweden | AMF | | 141619 | Registered | | 12/29/1972 |
| Sweden | AMF | | 130729 | Registered | | 3/20/1970 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---|---|---|---|---|---|---|
| Sweden | AMF PINSPOTTER | 0200701 | 354551 | Registered | 1/31/2002 | 4/19/2002 |
| Switzerland | AMF | | 373597 | Registered | 5/9/1989 | 12/12/1989 |
| Switzerland | AMF ALWAYS MEANS FUN | 3880 | 455079 | Registered | 5/12/1998 | 5/12/1998 |
| Switzerland | AMF and Triangle design | | 279720 | Registered | 4/22/1975 | 4/22/1975 |
| Taiwan | AMF and Triangle design | | 152240 | Registered | | 5/1/1981 |
| Taiwan | AMF and Triangle design | | 151694 | Registered | | 4/16/1981 |
| United Kingdom | AMF | 987612 | 987612 | Registered | 2 /17/1972 | 2 /17/1972 |
| United Kingdom | AMF ALWAYS MEANS FUN | 2374682 | 2374682 | Registered | 10/4/2004 | 4/15/2005 |
| United Kingdom | AMF and Triangle design | 2048550 | 2048550 | Registered | 12/13/1995 | 8/29/1997 |
| United Kingdom | AMF and Triangle design (Series) | 2270649 | 2270649 | Registered | 5/21/2001 | 4/19/2002 |
| United Kingdom | AMF CLASSIC with Pinsplash Design | 2269724 | 2269724 | Registered | 5/11/2001 | 5/11/2001 |
| United Kingdom | AMF PINSPOTTER | 2292038 | 2292038 | Registered | 2/6/2002 | 2/6/2002 |
| United Kingdom | AMF XTREME | 2371445 | 2371445 | Registered | 8/24/2004 | 2/11/2005 |
| United States | AMF | 72/180,820 | 0,785,142 | Registered | 11/12/1963 | 2/16/1965 |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---|---|---|---|---|---|---|
| United States | AMF | 72/096,824 | 714,104 | Registered | 5/11/1960 | 4/18/1961 |
| United States | AMF | 72/344,657 | 912,787 | Registered | 11/26/1969 | 6/8/1971 |
| United States | AMF | 72/342,005 | 942,646 | Registered | 10/29/1969 | 9/12/1972 |
| United States | AMF | 72/341,772 | 913,754 | Registered | 10/27/1969 | 6/8/1971 |
| United States | AMF ALWAYS MEANS FUN | 75/324,568 | 2,286,177 | Registered | 7 /15/1997 | 10/12/1999 |
| United States | AMF and Triangle design | 78/521,522 | 3,041,394 | Registered | 11/23/2004 | 1/10/2006 |
| United States | AMF and Triangle design | 74/709,676 | 2,013,389 | Registered | 8/1/1995 | 11/5/1996 |
| United States | AMF and Triangle Design | 85/046,971 | 3,907,307 | Registered | 5/25/2010 | 1/18/2011 |
| United States | AMF CLASSIC and Pinsplash Design | 76/253,754 | 2,703,766 | Registered | 5/8/2001 | 4/8 /2003 |
| United States | AMF GENUINE PARTS and Design | 85/354,286 | | Pending | 6/23/2011 | |
| United States | AMF KIDS FEST and Design | 85/667,675 | | Pending | 7/03/2012 | |
| United States | AMF PINSPOTTER | 76/395,174 | 2,879,988 | Registered | 4/12/2002 | 8/31/2004 |
| United States | AMF SUMMER PASS and Design | 85/581,076 | | Pending | 3/27/2012 | |
| United States | AMF SUMMER UNPLUGGED TURN OFF THE TV. TURN ON | 85/582,031 | | Pending | 3/28/2012 | |

| Country | Trademark | Application No. | Registration No. | Status | Filing Date | Registration Date |
|---------|-----------|----------------|------------------|--------|-------------|-------------------|
| | THE FREE FUN. And Design | | | | | |
| United States | AMF THUNDER BOWL | 78/254,116 | 2,924,302 | Registered | 5/24/2003 | 2/1/2005 |
| United States | BOWL OUT | 77/149,702 | 3,502,402 | Registered | 4/5/2007 | 9/16/2008 |
| United States | GIO'S PIZZA and Design | 78/662,377 | 3,235,027 | Registered | 7/1/2005 | 4/24/2007 |
| United States | SLUGGO'S and design | 75/350,348 | 2,195,726 | Registered | 9/2/1997 | 10/13/1998 |
| United States | STAY AND PLAY | 85/560,514 | | Pending | 8/07/2012 | |
| United States | STRIKINGLY DIFFERENT | 77/084,782 | 3,399,150 | Registered | 1/17/2007 | 3/18/2008 |
| United States | XTREME | 75/125,607 | 2,224,594 | Registered | 6/26/1996 | 2/16/1999 |
| Venezuela | AMF and Circle design | | 45872F | Registered | | 9/6/1963 |
| Venezuela | AMF and Triangle design | | 86723F | Registered | | 5 /31/1978 |
| Vietnam | AMF and Triangle design | 36258 | 42252 | Registered | 11/5/1997 | 11/5/1997 |
| Virginia (State Registration) | HANOVER LANES | | 1531 | Registered | | 11/14/1995 |

For informational purposes only, the following "intent to use" Trademarks:

1. AMF GENUINE PARTS Logo.



2. AMF KIDS FEST Logo.



3. STAY AND PLAY wordmark.

**Patents**

None.

**Copyrights**

| Title | Registration No. | Registration Date | Owner |
|---|---|---|---|
| AMF playbook : business strategies that work! | TX0005645797 | 10-17-2002 | AMF Bowling Centers, Inc. |
| AMF Guide to natural bowling. By Victor Kalman & Manny Haller. | RE0000345399 | 07-13-1987 | AMF Pinspotters, Inc. |

**Licenses**

1. Trademark License Agreement (11/20/1986). Licensor: AMF Bowling Companies, Inc. Licensee: AMF Incorporated. **Marks Covered**: AMF and all variations thereof, ACCUDESK, ACCUSCORE, ACCUTRAC, AKU-TRAK, AMFLITE II, ANGLE, ANGLE & Design, Angle Design, CLASSIC, DATAMAGIC, EXACTA, FRAMETER, LEISURELAND, MAGICSCORE, PERMABASE, PINDICATOR, PINVEYOR,

PINWHEEL, RADRAY, STRIKELINE, TEMPO, THE ANGLE, TRI-OPTIC, UNDERLANE, X in a Square Design.

2.  <u>Trademark License Agreement (02/16/1996).</u>  Licensor: AMF Bowling, Inc.  Licensee: AMF Reece, Inc.  **Marks Covered**: AMF, AMF & Design, and other marks that incorporate the initials of "AMF".

3.  <u>Trademark License Agreement (02/16/1996).</u>  Licensor: AMF Bowling, Inc.  Licensee: AMF Machinery Systems, Inc.  **Marks Covered**: AMF, AMF & Design, AMFLOW, and other marks that incorporate the initials of "AMF".

4.  A.  <u>Trademark License Agreement (02/16/1996).</u>  Licensor: AMF Bowling, Inc. Licensee: Ben Hogan   Company. **Marks Covered**: AMF and AMF & Design.
    B.  <u>Amendment to Trademark License Agreement Borrower and Dynamic Brands (9/22/2004).</u>

5.  A.  <u>Trademark License Agreement (01/01/1997).</u>  Licensor: the Borrower, Licensee:  AMF Bowling Centers, Inc. **Marks Covered**: AMF and all variations thereof.
    B.  <u>TLA Extension (1/1/2007).</u>
    C.  <u>Third Amendment to TLA (6/29/2009).</u>

6.  A.  <u>Trademark License Agreement (01/01/1997).</u>  Licensor: the Borrower, Licensee: Boliches AMF y Compania. **Marks Covered**: AMF and all variations thereof.
    B.  <u>TLA Extension (1/1/2007).</u>
    C.  <u>Third Amendment to TLA (1/1/2008).</u>

7.  A.  <u>Trademark License Agreement (01/01/1997).</u>  Licensor: the Borrower, Licensee:  AMF Bowling de Lyon de Part Dieu. **Marks Covered**: AMF and all variations thereof.
    B.  <u>TLA Extension (1/1/2007).</u>
    C.  <u>Third Amendment to TLA (7/1/2009).</u>

8.  A.  <u>Trademark License Agreement (01/01/1997).</u>  Licensor: the Borrower, Licensee: Societe Anonyme du Bowling de Montparnasse. **Marks Covered**: AMF and all variations thereof.
    B.  <u>TLA Extension (1/1/2007).</u>

9.  <u>Trade Mark License Agreement (09/30/2004).</u>  Licensor: the Borrower, Licensee: AMF Bowling UK Limited. **Marks Covered**: AMF & Triangle Design, AMF & Pinsplash Design and AMF XTREME.

10. <u>Trademark Agreement (06/13/2005).</u>  Licensor: the Borrower, Licensee: QubicaAMF Worldwide, S.a.R.L.; QubicaAMF Worldwide, LLC; QubicaAMF Europe S.p.A. **Marks Covered**: AMF and all variations thereof.

11. A.  <u>Exclusive Licensing Agreement (08/2005).</u>  Licensor: the Borrower, Licensee: ZeniMax Media Inc. **Marks Covered**: AMF BILLARDS & GAMES, AMF PLAYMASTER.
    B.  First Amendment (4/26/2007).
    C.  Second Amendment (10/7/2008).

12.     Content License and Services Agreement (05/2007). Parties: Bowling Music Network, Inc., and AMF Bowling Centers, Inc. **Subject Matter**: AMF licenses music and video content from BMN

13. Software License and Support Agreement (06/28/2007). Parties: Centaman Systems Pty Ltd., AMF Bowling Centers, Inc., and the Borrower (Guarantor). **Subject Matter**: Centaman license of software to AMF.

14. Trademark License Agreement (         2008). Licensor: the Borrower, Licensee: Bowling Centres Australia Pty Limited. **Marks**: AMF and Triangle design, AMF XTREME.

15. Trademark License Agreement (02/08/2005).   Licensor: the Borrower, Licensee: Bowling Centres Australia Pty Limited Marks: AMF & Triangle Design and AMF & Pinsplash Design.

## Schedule 5.21

### Ownership

### Kingpin Holdings, LLC

| Unit Holder | Common Units |
|---|---|
| Code Hennessy & Simmons IV LP<br>c/o Code Hennessy & Simmons LLC<br>10 South Wacker Drive, Suite 3175<br>Chicago, IL 60606<br>Facsimile: (312) 876-3854 | 7,455,557.00 |
| CHS Associates IV<br>c/o Code Hennessy & Simmons LLC<br>10 South Wacker Drive, Suite 3175<br>Chicago, IL 60606<br>Facsimile: (312) 876-3854 | 12,243.00 |
| PineBridge Horizon Partners, L.P.<br>599 Lexington Avenue, 25th Floor<br>New York, New York 10022<br>Attn: FT Chong<br>Facsimile: | 400,000.00 |
| PineBridge Horizon Side-by-Side Partners, L.P.<br>599 Lexington Avenue, 25th Floor<br>New York, New York 10022<br>Attn: FT Chong<br>Facsimile: | 600,000.00 |
| PineBridge Horizon Side-by-Side Partners, L.P.<br>599 Lexington Avenue, 25th Floor<br>New York, New York 10022<br>Attn: David Pinkerton<br>Facsimile: | 140,000.00 |
| PineBridge Private Equity Portfolio, L.P.<br>599 Lexington Avenue, 25th Floor<br>New York, New York 10022<br>Attn: David Pinkerton<br>Facsimile: | 130,000.00 |
| APEN Bermuda Ltd.<br>29 Richmond Road<br>Pembroke HM 08, Bermuda<br>Facsimile: | 100,000.00 |
| PineBridge PEP III Direct, L.P.<br>c/o AIG Private Equity Portfolio III, L.P<br>599 Lexington Avenue, 25th Floor<br>New York, New York 10022<br>Attn: David Pinkerton<br>Facsimile: | 130,000.00 |
| Bruckmann, Rosser, Sherrill & Co., II, L.P.<br>c/o Bruckmann, Rosser, Sherrill & Co., Inc.<br>126 East 56th Street, 29th Floor<br>New York, NY 10022<br>Facsimile: | 1,447,239.20 |

| Unit Holder | Common Units |
|---|---|
| Julie Frist<br>c/o Bruckmann, Rosser, Sherrill & Co., Inc.<br>126 East 56th Street, 29th Floor<br>New York, NY 10022<br>Facsimile: | 1,890.80 |
| Bruckmann, Rosser, Sherrill & Co., Inc.<br>126 East 56th Street, 29th Floor<br>New York, NY 10022<br>Facsimile: | 435.00 |
| Marilena Tibrea<br>c/o Bruckmann, Rosser, Sherrill & Co., Inc.<br>126 East 56th Street, 29th Floor<br>New York, NY 10022<br>Facsimile: | 435.00 |
| Edgewater Private Equity Fund III, L.P.<br>900 N. Michigan Avenue, Suite 1800<br>Chicago, IL 60611<br>Facsimile: (312) 664-8571 | 100,000.00 |
| Edgewater Capital Growth Partners I, L.P.<br>900 N. Michigan Avenue, Suite 1800<br>Chicago, IL 60611<br>Facsimile: (312) 664-8571 | 650,000.00 |
| GM Capital Partners I, L.P.<br>767 Fifth Avenue, 16th Floor<br>New York, NY 10153<br>Attention: Charles G. Froland, Managing Director<br>Facsimile: (212) 418-3644 | 1,146,690.58 |
| First Plaza Group Trust<br>767 Fifth Avenue, 16th Floor<br>New York, NY 10153<br>Attention: Charles G. Froland, Managing Director<br>Facsimile: (212) 418-3644 | 853,309.42 |
| Randolph Street Partners VI<br>c/o Kirkland & Ellis LLP<br>200 E. Randolph Drive, Suite 5400<br>Chicago, IL 60601<br>Facsimile: (312) 861-2200 | 31,500.00 |
| Edgewater Funds IV | 2,565.00 |
| John Stokely | 2,565.00 |
| Frederick R. Hipp and Brenda B. Hipp, Trustees U/A The Hipp Family Trust dated 2/6/2001. | 300,000.00 |
| Frederick R. Hipp and Brenda B. Hipp, Trustees U/A The Hipp Family Trust dated 2/6/2001 | 234,859 |
| Walsh, Paige | 700.00 |
| Barkley, Paul | 6,666.00 |
| Buhl, Jay | 4,667.00 |
| Caesar, Chris | 17,333.00 |
| Hatcher, Mark | 4,667.00 |
| Holland, Ian | 1,667.00 |
| Kilpatrick, Mark | 2,067.00 |

| Unit Holder | Common Units |
|---|---|
| McCormack, Dan | 6,500.00 |
| Meade, Rohana | 2,000.00 |
| Pastula, Jody | 6,834.00 |
| Ponsiglione, Tony | 15,833.00 |
| Ross, Larry | 3,333.00 |
| Satterwhite, Steve | 5,834.00 |
| Scarnaty, Joe | 8,166.00 |
| Shearer, Simon | 6,666.00 |
| Walker, John | 27,333.00 |
| White, Wayne | 7,000.00 |
| Wood, Ron | 5,333.00 |
| Wreden, Merrell | 9,166.00 |

## **Schedule 5.22**

Broker's Fees

None.

**Schedule 6.10(b)**

Excluded Real Property

| Center # | City & State | County |
|----------|--------------|--------|
| 28 | Fort Oglethorpe, GA | Catoosa County |
| 76 | New York, NY | New York County |
| 78 | Garden City, NY | Nassau County |
| 82 | San Antonio, TX | Bexar County |
| 155 | San Antonio, TX | Bexar County |
| 172 | Cranston, RI | Providence County |
| 182 | Portland, OR | Multnomah County |
| 209 | Plainview, NY | Nassau County |
| 210 | Woodside, NY | Queens County |
| 214 | Alexandria, VA | Fairfax County |
| 263 | Los Angeles, CA | Westchester County |
| 284 | Garden Grove, CA | Orange County |
| 295 | Thornton, CO | Adams County |
| 358 | Northglenn, CO | Adams County |
| 420 | Mesa, AZ | Maricopa County |
| 423 | Phoenix, AZ | Maricopa County |
| 501 | Portland, OR | Multnomah County |
| 512 | Commack, NY | Suffolk County |
| 536 | Greenbrook, NJ | Somerset County |
| 543 | Bellevue, WA | King County |
| 547 | Richmond Hill, NY | Queens County |
| 567 | Cerritos, CA | Los Angeles County |
| 580 | San Jose, CA | Santa Clara County |
| 581 | Pinole, CA | Pinole County |
| 584 | Clovis, CA | Fresno County |
| 623 | Arcadia, CA | Los Angeles County |

## Schedule 7.06

### Existing Investments

1. Investment by Holdings, Borrower or any Subsidiaries of Borrower in the Qubica JV Entity or any of its respective Subsidiaries.

## Schedule 7.09

**Transaction with Affiliates**

1. Securityholders Agreement, dated as of 2/27/04, by Holdings, Code Hennessy & Simmons IV, LP, and the other co-investors listed therein.

2. Registration Agreement, dated as of 2/27/04, by and among Holdings and Code Hennessy & Simmons IV, LP,

3. Management Agreement, dated as of 2/27/04, by and among the Borrower and CHS Management IV LP.

4. Employment Agreement, dated as of 2/27/04, by and between the Borrower and Frederick R. Hipp, as amended.

## Schedule 11.01(a)

**Claims**

None

**<u>Exhibit A-1</u>**

**Form of Notice of Borrowing**

[Date]

Credit Suisse, Cayman Islands Branch,
as DIP Agent
Eleven Madison Avenue
New York, New York 10010

Ladies and Gentlemen:

Reference is made to the Senior Secured Debtor-In-Possession Credit Agreement dated as of November [__], 2012 (as amended, restated, modified or supplemented, from time to time, the "<u>Credit Agreement</u>"), among Kingpin Intermediate Corp., AMF Bowling Worldwide, Inc., the banks and other financial institutions from time to time party thereto and Credit Suisse, Cayman Islands Branch, as Issuing Lender and DIP Agent. Capitalized terms used herein but not otherwise defined herein have the respective meanings given to such terms in the Credit Agreement. This notice constitutes a Notice of Borrowing pursuant to Section 2.02 of the Credit Agreement.

  1.      The date of the Borrowing will be [____]

  2.      The aggregate principal amount of the Borrowing will be $ [____]

  3.      The Borrowing will be comprised of [Base Rate] [Eurodollar] Loans.

  4.      [The initial Interest Period for the Loans comprising such Borrowing will be _____ .][1]

  5.      The wire-instructions and other account information with respect to the Borrower's account into which proceeds of the Borrowing should be disbursed are as follows:

[BORROWER WIRE / ACCOUNT INSTRUCTIONS]

[Signature page follows]

---

[1] For Eurodollar Borrowings only, otherwise delete.

AMF BOWLING WORLDWIDE, INC.

By. _____

Name:

Its:

**Exhibit A-2**

**Form of Notice of Extension/Conversion**

[Date]

Credit Suisse, Cayman Islands Branch,
as DIP Agent
Eleven Madison Avenue
New York, New York 10010

Ladies and Gentlemen:

This notice shall constitute a "Notice of Extension/Conversion" pursuant to Section 2.07(b) and (c) of the Senior Secured Debtor-In-Possession Credit Agreement dated as of November [__], 2012 (as amended, restated, modified or supplemented, from time to time, the "Credit Agreement") among Kingpin Intermediate Corp., AMF Bowling Worldwide, Inc., the banks and other lending institutions from time to time party thereto and Credit Suisse, Cayman Islands Branch, as Issuing Lender and DIP Agent. Capitalized terms defined in the Credit Agreement and not otherwise defined herein have, as used herein, the respective meanings provided for therein.

1.    The Loans (or portion thereof) to which this notice applies is [all or a portion of all Base Rate Loans currently outstanding] [all or a portion of all Eurodollar Loans currently outstanding having an Interest Period of __ months and ending on the Election Date specified below].

2.    The date on which the conversion or continuation selected hereby is to be effective is [____] (the "Election Date").

3.    The principal amount of the Loans (or portion thereof) to which this notice applies is $ _____.

4.    [The Loans (or portion thereof) which are to be converted will [bear interest based upon the [Base Rate] [Eurodollar Rate]].

5.    [The Interest Period for such Loans will be _____ .]$^{2}$

AMF BOWLING WORLDWIDE, INC.

By. _____
Name:
Its:

---

$^{2}$  For Eurodollar Borrowings only, otherwise delete.

**Exhibit B**

**Form of Note**

Lender:
Principal Sum: $

_____
[Dated on or before
the Closing Date]

      For value received, AMF Bowling Worldwide, Inc., a Delaware corporation (the "Borrower"), hereby promises to pay to the order of the Lender set forth above (the "Lender") for the account of its Applicable Lending Office, at the office of Credit Suisse, Cayman Islands Branch(the "DIP Agent"), as set forth in the Senior Secured Debtor-In-Possession Credit Agreement dated as of November [__], 2012 (as amended, restated, modified or supplemented, from time to time, the "Credit Agreement"), among Kingpin Intermediate Corp., AMF Bowling Worldwide, Inc., the banks and other lending institutions from time to time party thereto and Credit Suisse, Cayman Islands Branch, as Issuing Lender and DIP Agent, the Principal Sum set forth above (or such lesser amount as shall equal the aggregate unpaid principal amount of the Term Loan made by the Lender to the Borrower under the Credit Agreement), in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts provided in the Credit Agreement, and to pay interest on the unpaid principal amount of such Term Loan, at such office, in like money and funds, for the period commencing on the date of such Term Loan until such Term Loan shall be paid in full, at the rates per annum and on the dates provided in the Credit Agreement. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, payable on demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the rates per annum set forth in the Credit Agreement.

      This note is one of the Notes referred to in the Credit Agreement and evidences the Term Loan made by the Lender thereunder. Capitalized terms used in this Note and not otherwise defined shall have the respective meanings assigned to them in the Credit Agreement and the terms and conditions of the Credit Agreement are expressly incorporated herein and made a part hereof.

      The Credit Agreement provides for the acceleration of the maturity of the Term Loan evidenced by this Note upon the occurrence of certain events (and for payment of collection costs in connection therewith) and for prepayments of such Term Loan upon the terms and conditions specified therein. In the event this Note is not paid when due at any stated or accelerated maturity, the Borrower agrees to pay, in addition to the principal and interest, all costs of collection, including reasonable attorney fees in accordance with the terms of the Credit Agreement.

      The date, amount, Type and duration of Interest Period (if applicable) of the Term Loan made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books; provided that the failure of the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrower to make a payment when due of any amount owing under the Credit Agreement or under this Note in respect of the Term Loan to be evidenced by this Note, and each such recordation or endorsement shall be prima facie evidence of such information.

      The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

      This Note and the Term Loan evidenced hereby may be transferred in whole or in part only by registration of such transfer on the Register maintained for such purpose by or on behalf of the Borrower as provided in Section 10.06 of the Credit Agreement.

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

[*Signature page follows*]

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed as of the date first above written.

[BORROWER NAME]

By. _____

Name:

Its:

## Exhibit C

### Form of Assignment and Acceptance

Reference is made to the Senior Secured Debtor-In-Possession Credit Agreement dated as of November [__], 2012 (as amended, restated, modified or supplemented, from time to time, the "Credit Agreement"), among Kingpin Intermediate Corp., AMF Bowling Worldwide, Inc., the banks and other lending institutions from time to time party thereto and Credit Suisse, Cayman Islands Branch, as Issuing Bank and DIP Agent. Capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in the Credit Agreement.

The "Assignor" and the "Assignee" referred to on Schedule 1 hereto agree as follows:

1.      The Assignor hereby sells and assigns, without recourse, to the Assignee, and the Assignee hereby purchases and assumes, without recourse, from the Assignor, effective as of effective date of the assignment as designated in paragraph 4 below (the "Effective Date"), the interests set forth on Schedule 1 hereto (collectively, the "Assigned Interest") in the Assignor's rights and obligations under the Credit Agreement, including, without limitation, (i) the interests set forth on Schedule 1 hereto in the Term Loan Commitment Percentage of the Assignor on the Effective Date and (ii) the Loans owing to the Assignor in connection with the Assigned Interest which are outstanding on the Effective Date. Periodic payments made with respect to the Assigned Interest which (i) accrued prior to the Effective Date shall be remitted to the Assignor and (ii) accrue from and after the Effective Date shall be remitted to the Assignee. From and after the Effective Date, the Assignee, if it is not already a Lender under the Credit Agreement, shall become a "Lender" for all purposes of the Credit Agreement and the other DIP Loan Documents and, to the extent of such assignment, the assigning Lender shall be relieved of its obligations under the Credit Agreement.

2.      The Assignor: (i) represents and warrants that it is the legal and beneficial owner of the Assigned Interest being assigned by it hereunder and that such Assigned Interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the DIP Loan Documents or for the execution, legality, validity, enforceability, genuineness, sufficiency or value of the DIP Loan Documents or any other instrument or document furnished pursuant thereto; (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Credit Party or the performance or observance by any Credit Party of any of its obligations under the DIP Loan Documents or any other instrument or document furnished pursuant thereto; (iv) represents and warrants that under applicable Laws no tax will be required to be withheld by the DIP Agent or any Borrower with respect to any payments to be made to the Assignee hereunder or under any DIP Loan Document, and unless otherwise expressly notified to the DIP Agent, no tax forms described in Section 3.01(d) of the Credit Agreement are required to be delivered by the Assignee and (v) as applicable, delivers in connection therewith the Notes held by the Assignor and requests that the DIP Agent exchange such Notes for new Notes payable to the order of the Assignee in the amounts owed to the Assignee after giving effect to this Assignment and Acceptance, and to the order of the Assignor in the amounts, if any, owed to the Assignor after giving effect to this Assignment and Acceptance.

3.      The Assignee: (i) confirms that it has received a copy of the Credit Agreement, together with copies of the financial statements referred to in Sections 5.05 and 6.01 thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the DIP Agent, the Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or

not taking action under the Credit Agreement; (iii) confirms that it is an Eligible Assignee; (iv) appoints and authorizes the DIP Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers and discretion under the DIP Loan Documents as are delegated to the DIP Agent and the Collateral Agent by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; and (v) agrees that it will perform in accordance with their terms all of the obligations that by the terms of the Credit Agreement are required to be performed by it as a Lender.

4.      Following the execution of this Assignment and Acceptance, it will be delivered to the DIP Agent for acceptance and recording by the DIP Agent. The effective date for this Assignment and Acceptance (the "Effective Date") shall be the date of acceptance hereof by the DIP Agent, unless otherwise specified on Schedule 1.

5.      Upon such acceptance and recording by the DIP Agent, as of the Effective Date (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement.

6.      Upon such acceptance and recording by the DIP Agent, prior to the Effective Date, the Agents shall make all payments under the Credit Agreement and the Notes in respect of the interests assigned hereby (including, without limitation, all payments or principal, interest and fees with respect thereto) to the Assignor, and from and after the Effective Date, the Agents shall make all payments under the Credit Agreement and the Notes in respect of the interests assigned hereby (including, without limitation, all payments of principal, interest and fees with respect thereto) to the Assignee.

7.      This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York. This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Assignment and Acceptance by telecopier shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

8.      This Assignment and Acceptance shall be effective only upon consent of the DIP Agent and, if applicable, the Borrower (and any other Person whose consent is required under Section 10.06 of the Credit Agreement) and delivery to the DIP Agent of this Assignment and Acceptance, together with the transfer fee payable pursuant to Section 10.06(b)(iv) of the Credit Agreement in connection herewith and recordation in the Register pursuant to Section 10.06(d) of the Credit Agreement of the terms hereof.

9.      Attached hereto as Schedule 2 is all contact, address, account and other administrative information relating to the Assignee, including the Assignee's notice address for purposes of Section 10.01 of the Credit Agreement and its Applicable Lending Office for each Loan held or committed to be made by the Assignee.

[Signature Page Follows]

IN WITNESS WHEREOF, the Assignor and the Assignee have caused this Assignment and Acceptance to be executive by their officers thereunto duly authorized as of the date specified thereon.

CONSENTED TO:

Credit Suisse, Cayman Islands Branch, as DIP Agent

By. _____
Name:
Its:

By. _____
Name:
Its:

AMF BOWLING WORLDWIDE, INC.

By. _____
Name:
Its:

[_____ ],
as Assignor

By. _____
Name:
Its:

[_____ ], as Assignee

By. _____
Name:
Its:

**SCHEDULE 1**
to
**ASSIGNMENT AND ACCEPTANCE**

(a)    Date of Assignment:

(b)    Legal Name of Assignor:

(c)    Legal Name of Assignee:

(d)    Effective Date of Assignment:

(e)    Term Loan Commitment Percentage Assigned (expressed as a
       percentage set forth to at least 8 decimals)                        _____%

       Term Loan Commitment Percentage of Assignee after giving effect to
       this Assignment and Acceptance on the Effective Date (set forth to at
       least 8 decimals)                                                    _____%

       Term Loan Commitment Percentage of Assignor after giving effect to
       this Assignment and Acceptance on the Effective Date (set forth to at
       least 8 decimals)                                                    _____%

       Outstanding Principal Balance of Term Loan as of the Effective Date  $_____

       Principal Amount of Assignor's portion of the Term Loan after
       giving effect to this Assignment and Acceptance Agreement on
       the Effective Date                                                   $_____

       Principal Amount of Assignee's portion of the Term Loan after
       giving effect to this Assignment and Acceptance Agreement on
       the Effective Date                                                   $_____

**SCHEDULE 2**
**to**
**ASSIGNMENT AND ACCEPTANCE**

Administrative Details

(Assignee to list names of credit contacts, addresses, phone and facsimile numbers, electronic mail addresses and account and payment information, including the Assignee's notice address for purposes of Section 10.01 of the Credit Agreement and its Applicable Lending Office)

**<u>Exhibit E</u>**

**Budget**

**AMF Bowling Worldwide, Inc**
Cash Forecast
($ in 000s)

| Period Ending | 1<br>11/11/12 | 2<br>11/18/12 | 3<br>11/25/12 | 4<br>12/02/12 | 5<br>12/09/12 | 6<br>12/16/12 | 7<br>12/23/12 | 8<br>12/30/12 | 9<br>01/06/13 | 10<br>01/13/13 | 11<br>01/20/13 | 12<br>01/27/13 | 13<br>02/03/13 | 14<br>02/10/13 | 15<br>02/17/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Receipts | $ 7,954 | $ 8,830 | $ 8,236 | $ 8,158 | $ 9,306 | $ 8,998 | $ 8,546 | $ 9,350 | $ 9,961 | $ 9,625 | $ 10,489 | $ 10,052 | $ 10,678 | $ 10,348 | $ 10,699 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Food & Beverage | 696 | 885 | 801 | 762 | 894 | 869 | 881 | 815 | 902 | 854 | 891 | 978 | 856 | 1,061 | 982 |
| Other AP | 407 | 439 | 284 | 350 | 428 | 778 | 490 | 321 | 261 | 283 | 323 | 419 | 356 | 485 | 330 |
| Facilities | 669 | 905 | 882 | 688 | 584 | 536 | 438 | 445 | 815 | 485 | 505 | 951 | 509 | 455 | 414 |
| iStar rent | - | - | - | - | 2,389 | - | - | - | 2,389 | - | - | - | 2,389 | - | - |
| Other rent | - | - | - | 1,309 | - | - | - | 1,438 | - | - | - | 1,308 | - | - | - |
| Utilities | 322 | 795 | 747 | 477 | 457 | 414 | 685 | 400 | 435 | 425 | 490 | 615 | 382 | 380 | 613 |
| Payroll | 4,251 | 713 | 3,467 | 1,768 | 3,365 | 1,692 | 3,712 | 1,874 | 3,368 | 1,856 | 3,997 | 2,380 | 3,513 | 1,917 | 3,387 |
| Qubica | 110 | 749 | 448 | 389 | 377 | 618 | 397 | 79 | 499 | 141 | 96 | 254 | 148 | 125 | 246 |
| Capex | 557 | 1,103 | 1,057 | 754 | 542 | 542 | 452 | 352 | 563 | 317 | 317 | 317 | 452 | 503 | 503 |
| Insurance | 133 | 10 | 10 | 10 | 10 | 282 | 10 | 33 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Taxes | 198 | 2,040 | 749 | 729 | 248 | 581 | 1,497 | 376 | 564 | 400 | 2,529 | 324 | 579 | 50 | 1,382 |
| League transfers | 565 | 621 | 621 | 620 | 621 | 621 | 623 | 620 | 621 | 725 | 729 | 724 | 626 | 622 | 631 |
| **Total Operating Disbursements** | 7,907 | 8,260 | 9,067 | 7,854 | 9,915 | 6,934 | 9,186 | 6,753 | 10,428 | 5,495 | 9,890 | 8,280 | 9,819 | 5,607 | 8,498 |
| **Net Operating Cash Flows** | 47 | 570 | (831) | 305 | (608) | 2,064 | (640) | 2,597 | (467) | 4,130 | 599 | 1,772 | 859 | 4,740 | 2,202 |
| **Non-Operating Disb/ (Receipts)** | | | | | | | | | | | | | | | |
| Interest / Debt service | - | 2,374 | - | 286 | - | - | - | 296 | - | - | - | - | 296 | - | - |
| Professional fees | 1,732 | 1,500 | - | 763 | - | - | - | - | - | 2,588 | - | - | - | 2,530 | - |
| Restructuring costs | 3 | 10,140 | 1,042 | 1,623 | 1,253 | 4,183 | 44 | 1,210 | 44 | 255 | 44 | 44 | 854 | 44 | 44 |
| **Total Non-Operating Disbursements** | 1,735 | 14,013 | 1,042 | 2,672 | 1,253 | 4,183 | 44 | 1,506 | 44 | 2,843 | 44 | 44 | 1,150 | 2,574 | 44 |
| **Total Net Disbursements** | 9,643 | 22,273 | 10,109 | 10,526 | 11,167 | 11,117 | 9,230 | 8,259 | 10,472 | 8,338 | 9,934 | 8,324 | 10,969 | 8,181 | 8,542 |
| **Net Cash Receipts(Disbursements)** | $ (1,688) | $ (13,443) | $ (1,874) | $ (2,368) | $ (1,861) | $ (2,119) | $ (684) | $ 1,091 | $ (511) | $ 1,287 | $ 555 | $ 1,728 | $ (291) | $ 2,166 | $ 2,158 |
| **Net Cash Balance** | | | | | | | | | | | | | | | |
| Beginning Book Cash Balance | 6,246 | 4,558 | | | | | | | | | | | | | |
| Net Cash Receipts(Disb) | (1,688) | (13,443) | (1,874) | (2,368) | (1,861) | (2,119) | (684) | 1,091 | (511) | 1,287 | 555 | 1,728 | (291) | 2,166 | 2,158 |
| Borrowings (paybacks) | - | 8,885 | 1,874 | 2,368 | 1,861 | 2,119 | 684 | (1,091) | 511 | (1,287) | (555) | (1,728) | 291 | (2,166) | (2,158) |
| **Ending Book Balance** | $ 4,558 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **DIP Financing** | | | | | | | | | | | | | | | |
| Beginning borrowing balance | - | - | 8,885 | 10,758.97 | 13,127 | 14,988 | 17,107 | 17,791 | 16,700 | 17,211 | 15,924 | 15,368 | 13,641 | 13,932 | 11,765 |
| Additional borrowings | - | 8,885 | 1,874 | 2,368 | 1,861 | 2,119 | 684 | - | 511 | - | - | - | 291 | - | - |
| Paybacks / excess cash flow | - | - | - | - | - | - | - | (1,091) | - | (1,287) | (555) | (1,728) | - | (2,166) | (2,158) |
| **Ending outstanding balance (excess cash)** | $ - | $ 8,885 | $ 10,759 | $ 13,127 | $ 14,988 | $ 17,107 | $ 17,791 | $ 16,700 | $ 17,211 | $ 15,924 | $ 15,368 | $ 13,641 | $ 13,932 | $ 11,765 | $ 9,608 |

**AMF Bowling Worldwide, Inc**
Cash Forecast
($ in 000s)

| | Period Ending | 16 02/24/13 | 17 03/03/13 | 18 03/10/13 | 19 03/17/13 | 20 03/24/13 | 21 03/31/13 | 22 04/07/13 | 23 04/14/13 | 24 04/21/13 | 25 04/28/13 | 26 05/05/13 | 27 05/12/13 | 28 05/19/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Cash Receipts** | | $ 12,212 | $ 11,134 | $ 11,284 | $ 10,413 | $ 9,591 | $ 9,892 | $ 9,790 | $ 8,469 | $ 7,965 | $ 7,777 | $ 7,079 | $ 6,306 | $ 6,180 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Food & Beverage | | 1,012 | 1,155 | 1,063 | 1,172 | 946 | 1,021 | 886 | 906 | 729 | 823 | 738 | 787 | 663 |
| Other AP | | 518 | 530 | 495 | 397 | 416 | 427 | 660 | 386 | 366 | 723 | 614 | 471 | 429 |
| Facilities | | 610 | 828 | 368 | 566 | 697 | 525 | 502 | 376 | 458 | 793 | 522 | 407 | 351 |
| iStar rent | | - | 2,389 | - | - | - | - | 2,389 | - | - | - | 2,389 | - | - |
| Other rent | | 1,316 | - | - | - | - | 1,313 | - | - | - | 1,313 | - | - | - |
| Utilities | | 291 | 309 | 587 | 620 | 875 | 296 | 441 | 452 | 476 | 417 | 410 | 795 | 848 |
| Payroll | | 2,020 | 3,507 | 1,951 | 3,501 | 2,030 | 3,484 | 1,834 | 5,091 | 1,971 | 4,025 | 1,877 | 3,362 | 1,783 |
| Qubica | | 102 | 154 | 53 | 37 | 125 | 126 | 121 | 114 | 246 | 95 | 58 | 218 | 98 |
| Capex | | 503 | 637 | 639 | 639 | 639 | 639 | 695 | 560 | 560 | 560 | 695 | 412 | 412 |
| Insurance | | 10 | 10 | 10 | 10 | 10 | 33 | 10 | 26 | 10 | 10 | 2,374 | 10 | 10 |
| Taxes | | 901 | 42 | 20 | 429 | 1,599 | 57 | 563 | 141 | 2,039 | 701 | 103 | 41 | 1,882 |
| League transfers | | 618 | 619 | 618 | 623 | 631 | 637 | 618 | 625 | 631 | 618 | 624 | 652 | 648 |
| **Total Operating Disbursements** | | 7,900 | 10,179 | 5,806 | 7,995 | 7,968 | 8,559 | 8,719 | 8,676 | 7,487 | 10,079 | 10,405 | 7,155 | 7,123 |
| **Net Operating Cash Flows** | | 4,312 | 954 | 5,478 | 2,418 | 1,623 | 1,333 | 1,071 | (206) | 478 | (2,301) | (3,326) | (849) | (944) |
| **Non-Operating Disb/ (Receipts)** | | | | | | | | | | | | | | |
| Interest / Debt service | | - | 267 | - | - | - | 296 | - | - | - | 286 | - | - | - |
| Professional fees | | - | - | 2,845 | - | - | - | 2,250 | - | 1,387 | - | 2,199 | - | - |
| Restructuring costs | | 44 | 585 | 2,044 | 44 | 44 | 1,208 | 44 | 44 | 44 | 44 | 622 | 44 | 44 |
| **Total Non-Operating Disbursements** | | 44 | 852 | 4,889 | 44 | 44 | 1,504 | 2,294 | 44 | 1,431 | 331 | 2,821 | 44 | 44 |
| **Total Net Disbursements** | | 7,944 | 11,032 | 10,695 | 8,039 | 8,012 | 10,063 | 11,013 | 8,720 | 8,917 | 10,409 | 13,225 | 7,199 | 7,167 |
| **Net Cash Receipts(Disbursements)** | | $ 4,268 | $ 102 | $ 589 | $ 2,374 | $ 1,579 | $ (172) | $ (1,223) | $ (251) | $ (953) | $ (2,632) | $ (6,146) | $ (893) | $ (988) |
| **Net Cash Balance** | | | | | | | | | | | | | | |
| Beginning Book Cash Balance | | - | | | | | | | | | | | | |
| Net Cash Receipts(Disb) | | 4,268 | 102 | 589 | 2,374 | 1,579 | (172) | (1,223) | (251) | (953) | (2,632) | (6,146) | (893) | (988) |
| Borrowings (paybacks) | | (4,268) | (102) | (589) | (2,374) | (1,579) | 172 | 1,223 | 251 | 953 | 2,632 | 6,146 | 893 | 988 |
| **Ending Book Balance** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **DIP Financing** | | | | | | | | | | | | | | |
| Beginning borrowing balance | | 9,608 | 5,340 | 5,238 | 4,649 | 2,274 | 695 | 867 | 2,090 | 2,340 | 3,293 | 5,925 | 12,071 | 12,965 |
| Additional borrowings | | - | - | - | - | - | 172 | 1,223 | 251 | 953 | 2,632 | 6,146 | 893 | 988 |
| Paybacks / excess cash flow | | (4,268) | (102) | (589) | (2,374) | (1,579) | - | - | - | - | - | - | - | - |
| **Ending outstanding balance (excess cash)** | | $ 5,340 | $ 5,238 | $ 4,649 | $ 2,274 | $ 695 | $ 867 | $ 2,090 | $ 2,340 | $ 3,293 | $ 5,925 | $ 12,071 | $ 12,965 | $ 13,952 |

**AMF Bowling Worldwide, Inc**
Cash Forecast
($ in 000s)

| | Period Ending | 29 05/26/13 | 30 06/02/13 | 31 06/09/13 | 32 06/16/13 | 33 06/23/13 | 34 06/30/13 |
|---|---|---|---|---|---|---|---|
| **Total Cash Receipts** | | $ 6,236 | $ 6,567 | $ 7,340 | $ 6,759 | $ 7,167 | $ 11,796 |
| | | | | | | | |
| **Operating Disbursements** | | | | | | | |
| Food & Beverage | | 601 | 693 | 536 | 592 | 717 | 597 |
| Other AP | | 329 | 577 | 312 | 557 | 424 | 347 |
| Facilities | | 898 | 498 | 451 | 378 | 401 | 632 |
| iStar rent | | - | - | 2,389 | - | - | - |
| Other rent | | - | 1,321 | - | - | - | 1,321 |
| Utilities | | 509 | 85 | 112 | 27 | 546 | 891 |
| Payroll | | 3,356 | 1,819 | 3,184 | 1,901 | 3,363 | 1,594 |
| Qubica | | 118 | 467 | 43 | 144 | 97 | 21 |
| Capex | | 412 | 547 | 257 | 257 | 257 | 257 |
| Insurance | | 70 | 10 | 10 | 10 | 10 | 1,595 |
| Taxes | | 865 | 258 | 36 | 243 | 1,071 | 33 |
| League transfers | | 629 | 648 | 643 | 624 | 628 | 631 |
| **Total Operating Disbursements** | | **7,785** | **6,923** | **7,973** | **4,733** | **7,514** | **7,919** |
| | | | | | | | |
| **Net Operating Cash Flows** | | **(1,549)** | **(356)** | **(634)** | **2,026** | **(347)** | **3,877** |
| | | | | | | | |
| **Non-Operating Disb/ (Receipts)** | | | | | | | |
| Interest / Debt service | | - | 296 | - | - | - | 286 |
| Professional fees | | - | - | 2,060 | - | - | 9,145 |
| Restructuring costs | | 44 | 641 | 44 | 44 | 44 | 1,376 |
| **Total Non-Operating Disbursements** | | **44** | **937** | **2,104** | **44** | **44** | **10,806** |
| | | | | | | | |
| **Total Net Disbursements** | | 7,829 | 7,860 | 10,077 | 4,777 | 7,558 | 18,725 |
| **Net Cash Receipts(Disbursements)** | | $ (1,593) | $ (1,293) | $ (2,738) | $ 1,982 | $ (392) | $ (6,929) |
| | | | | | | | |
| **Net Cash Balance** | | | | | | | |
| Beginning Book Cash Balance | | - | - | - | - | - | - |
| Net Cash Receipts(Disb) | | (1,593) | (1,293) | (2,738) | 1,982 | (392) | (6,929) |
| Borrowings (paybacks) | | 1,593 | 1,293 | 2,738 | (1,982) | 392 | 6,929 |
| **Ending Book Balance** | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | |
| **DIP Financing** | | | | | | | |
| Beginning borrowing balance | | 13,952 | 15,545 | 16,839 | 19,577 | 17,594 | 17,986 |
| Additional borrowings | | 1,593 | 1,293 | 2,738 | - | 392 | 6,929 |
| Paybacks / excess cash flow | | - | - | - | (1,982) | - | - |
| **Ending outstanding balance (excess cash)** | | $ 15,545 | $ 16,839 | $ 19,577 | $ 17,594 | $ 17,986 | $ 24,915 |

**<u>Exhibit G</u>**

**Form of Intercompany Note**

No. ____

<u>INTERCOMPANY NOTE</u>

[City of Closing]
[Date]

$_____

     For value received, [PAYOR NAME], [PAYOR DESCRIPTION] (together with its successors and permitted assigns, the "Payor"), hereby promise to pay on demand to the order of [PAYEE NAME], [PAYEE DESCRIPTION] (together with its successors and permitted assigns, the "Payee"), the unpaid principal amount of all loans and advances made by the Payee to the Payor. The Payor promises to pay interest on the unpaid principal amount hereof from the date hereof until paid at such rate per annum as shall be agreed upon from time to time by the Payor and the Payee. All such payments of principal and interest shall be made without offset, counterclaim or deduction of any kind in lawful money of the United States of America in immediately available funds at such location in the United States of America as the Payee shall designate from time to time.

     Upon the occurrence and continuation of an Event of Default (as defined in the Credit Agreement) and acceleration of any Obligations (as defined in the Credit Agreement), the unpaid principal amount hereof shall become immediately due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Payor.

     The Payee is hereby authorized (but not required) to record all loans and advances made by it to the Payor (all of which shall be evidenced by this Intercompany Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting prima facie evidence of the accuracy of the information contained therein.

     This Intercompany Note is one of the Intercompany Notes referred to in the Senior Secured Debtor-In-Possession Credit Agreement dated as of [___], 2012 (as amended, restated, modified or supplemented, from time to time, the "<u>Credit Agreement</u>"), among Kingpin Intermediate Corp., AMF Bowling Worldwide, Inc., the banks and other financial institutions from time to time party thereto and Credit Suisse, Cayman Islands Branch, as Issuing Lender and DIP Agent. This Intercompany Note shall be pledged by the Payee pursuant to the Credit Agreement. Each Payor hereby acknowledges and agrees that the Collateral Agent pursuant to and as defined in the Pledge Agreement may exercise all rights provided therein with respect to this Intercompany Note.

THIS INTERCOMPANY NOTE SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

[PAYOR NAME]

By. _____
Name:
Its:

Pay to the order of:

[PAYEE NAME]

By. _____
Name:
Its:

## Exhibit H

**Form of Intercompany Note Subordination Provisions**

EACH PROMISSORY NOTE EVIDENCING AN INTERCOMPANY LOAN OR ADVANCE INCURRED BY THE BORROWER OR A WHOLLY-OWNED DOMESTIC SUBSIDIARY OF THE BORROWER OWING TO ANY FOREIGN SUBSIDIARY OF THE BORROWER OR ANY NON-WHOLLY-OWNED SUBSIDIARY OF THE BORROWER SHALL HAVE INCLUDED ON ITS FACE THE FOLLOWING PROVISION AND SHALL HAVE "ANNEX A TO INTERCOMPANY NOTE" ATTACHED THERETO AND MADE A PART THEREOF.

**"This Intercompany Note, and the obligations of the Payor hereunder, shall be subordinate and junior in right of payment to all Senior Debt (as defined in Section 1 of Annex A hereto) on the terms and conditions set forth in Annex A hereto. Annex A hereto is incorporated herein by reference in its entirety and is a part of this Intercompany Note to the same extent as if it had been set forth in its entirety in this Intercompany Note."**

**ANNEXA**
**TO**
**INTERCOMPANY NOTE**

**Section 1.      Definitions.** Capitalized terms defined in the Credit Agreement (as defined in the promissory note to which this Annex A is attached (the "Intercompany Note") and not otherwise defined herein have, as used in this Annex A, the respective meanings provided for therein. The following additional terms, as used herein, have the following respective meanings:

"Senior Debt" means the DIP Obligations, including any DIP Obligations the proceeds of which are used to refinance other DIP Obligations, in each case whether now owed or hereafter arising, whether fixed or contingent, whether for principal, premium (if any), interest (including, without limitation, any interest which accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of any Loan Party), expenses, indemnifications, reimbursement obligations or otherwise, together with all renewals, extensions, increases or rearrangements thereof.

"Subordinated Debt" means all principal of and interest on all obligations, liabilities and indebtedness of the Payor now or hereafter owing to the Payee or any other holder from time to time of the Intercompany Note under the Intercompany Note, whether fixed or contingent and whether for principal, interest (including, without limitation, any interest which accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of the Payor, whether or not allowed or allowable as a claim in any such proceeding), fees, expenses, indemnifications, reimbursement obligations, subrogation or contribution claims or otherwise, together with all renewals, extensions, increases or rearrangements thereof.

**Section 2.      Subordination by the Payee.** Each of the Payee and each other holder from time to time of the Intercompany Note by its acceptance thereof hereby covenants and agrees that the payment of the Subordinated Debt shall be subordinate and subject in right of payment, to the extent set forth herein, to the prior payment in full of the Senior Debt. The provisions of this Annex A shall constitute a continuing offer to all Persons who, in reliance upon such provisions, become holders of, or continue to hold, Senior Debt, and such provisions are made for the benefit of the holders of the Senior Debt. The holders of the Senior Debt are hereby made obligees hereunder with the same force and effect as if their names were written herein as such, and they and/or each of them may proceed to enforce such provisions.

**Section 3.      Priority and Payment Over in Certain Events.**

(a)      _Priority and Payment Over Upon Acceleration._ In the event of the occurrence and continuation of an Event of Default and acceleration of the Obligations, then and in any such event:

(i)      the holders of the Senior Debt shall be entitled to receive payment in full of all amounts due or to become due on or in respect of all Senior Debt before the Payee shall be entitled to receive and retain any direct or indirect payment on account of the principal, interest or other amounts due or to become due on the Subordinated Debt, including, without limitation, by exercise of any right of set off and any payment which might be payable or deliverable by reason of any other indebtedness being subordinated in right of payment to the Subordinated Debt (other than in the form of securities permitted to be paid in accordance with the first parenthetical in clause (ii) below);

(ii) any payment or distribution of any kind or character, whether in cash, property or securities which may be payable or deliverable in respect of the Subordinated Debt, including any such payment or distribution which may be payable or deliverable by reason of the payment of

any other indebtedness of the Payor which is subordinated to the payment of the Subordinated Debt (except for any such payment or distribution (each an "Excepted Payment")) (A) authorized by an unstayed, final, nonappealable order or decree stating that effect is being given to the subordination of the Subordinated Debt to the Senior Debt and made by a court of competent jurisdiction in a reorganization proceeding under any applicable bankruptcy law and (B) of securities which, if debt securities, are subordinated to at least the same extent as the Subordinated Debt is to (y) the Senior Debt or (z) any securities issued in exchange for the Senior Debt; provided, however, that (i) the final maturity date of such securities shall not be earlier than one year following the maturity date of the last to mature of the Senior Debt (including any securities issued in exchange therefor) at the time outstanding, (ii) such securities shall contain covenants and shall not contain greater defaults than as are contained in such instruments and (iii) such securities shall bear interest at a rate per annum less than or equal to 3% per annum), shall be paid by the Payor or by the trustee in bankruptcy, debtor-in-possession, receiver, liquidating trustee, custodian, assignee, agent or other Person making payment or distribution of assets of the Payor directly to the DIP Agent (or all of the Secured Parties, as applicable) to the extent necessary to pay all Senior Debt in full after giving effect to any concurrent payment or distribution to or for the benefit of the holders of the Senior Debt.

The consolidation of the Payor with, or the merger of the Payor into, another Person or the liquidation or dissolution of the Payor following the conveyance or transfer of its assets substantially as an entirety to another Person upon terms and conditions permitted under the Credit Agreement shall not be deemed a dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors or marshaling of assets and liabilities of the Payor for purposes of this Section 3(a) if the Person formed by such consolidation or into which the Payor is merged or the Person which acquires by conveyance or transfer such property and assets substantially as an entirety, as the case may be, shall comply with the conditions set forth in the Credit Agreement as a prerequisite for such consolidation, merger, conveyance or transfer.

(b)     *Payment on Subordinated Debt Suspended When Senior Debt is in Default.* In the event and during the continuation of any Default or Event of Default under the Credit Agreement or under any other agreement or instrument evidencing or securing any Senior Debt, then unless and until such Default or Event of Default shall have been cured or waived or shall have ceased to exist and any resulting acceleration shall have been rescinded or annulled, or in the event any judicial proceeding shall be pending with respect to any such Default or Event of Default, then no direct or indirect payment, including any payment which may be payable by reason of the payment of any other indebtedness of the Borrower which is subordinated to the payment of the Subordinated Debt) (but excluding any Excepted Payment), shall be made by or on behalf of the Payor on account of the principal of or interest on the Subordinated Debt or on account of the purchase or other acquisition by it of the Subordinated Debt. The provisions of this Section 3(b) shall not apply to any payment with respect to which Section 3(a) would be applicable.

(c)     *Rights and Obligations of the Payees.* If, notwithstanding the foregoing provisions of this Section 3, any Payee or other holder of the Subordinated Debt shall have received any payment or distribution of assets of the Payor of any kind or character, whether in cash, property or securities, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness of the Payor which is subordinated to the payment of the   Subordinated Debt (but excluding any Excepted Payment), before all amounts due or to become due on or in respect of all Senior Debt have been irrevocably paid in full, then and in such event such payment or distribution shall be received in trust for the Secured Parties and other holders of the Senior Debt and shall be forthwith paid over or delivered by the Payee or other holder of the Subordinated Debt receiving the same directly to the DIP Agent (or the Secured Parties) or, to the extent legally required, to the trustee in bankruptcy,

debtor-in-possession, receiver, liquidating trustee, custodian, assignee, agent or other Person making such payment or distribution of assets of the Payor, for application to the payment of all Senior Debt remaining unpaid to the extent necessary to pay all Senior Debt in full after giving effect to any concurrent payment or distribution to or for the benefit of the holders of the Senior Debt.

Section 4.     **Rights of the Secured Parties Not to be Impaired**. No right of the DIP Agent or any other Secured Party or any other present or future holder of the Senior Debt to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act in good faith by the DIP Agent or any other such Secured Party or other holder of the Senior Debt or by any noncompliance by any Payee with the terms and provisions and covenants herein regardless of any knowledge thereof the DIP Agent or any other such Secured Party or other holder may have or otherwise be charged with. The holders of the Senior Debt may, without in any way affecting the obligations of the Payee or any other holder of the Subordinated Debt with respect thereto, at any time or from time to time in their absolute discretion, change the manner, place or terms or payment of, change or extend the time or payment of or renew or alter any Senior Debt, or amend, supplement or modify any agreement or instrument governing or evidencing such Senior Debt or any other document referred to therein, or exercise or refrain from exercising any other of their rights under the Senior Debt including, without limitation, the waiver of any Default or Event of Default thereunder and the release of any collateral securing such Senior Debt, all without notice to or assent from the Payee or any other holder of the Subordinated Debt. The provisions of this Annex A are intended to be for the benefit of the Secured Parties and each other holder of the Senior Debt and shall be enforceable directly by the DIP Agent or other Secured Parties, as applicable, or any other present or future holder or holders of the Senior Debt.

Section 5.     **Restriction on Assignment of Subordinated Debt**. The Payee and each other holder from time to time of the Subordinated Debt by its acceptance thereof agrees not to sell, assign or transfer all or any part of the Subordinated Debt while any Senior Debt remains unpaid unless such sale, assignment or transfer is made expressly subject to the provisions of this Annex A. The Payee represents that no other subordination of the Subordinated Debt is in existence on the date hereof, and the Payee agrees that the Subordinated Debt will not be subordinated to any indebtedness other than the Senior Debt.

Section 6.     **Reliance on Subordination**. The Payee and each other holder from time to time of the Subordinated Debt by its acceptance thereof consents and agrees that all Senior Debt shall be deemed to have been made or incurred at the request of the Payee and all other holders from time to time of the Subordinated Debt and in reliance upon the subordination of the Subordinated Debt pursuant to this Annex A.

Section 7. **Actions Against the Payor; Exercise of Remedies**. Neither the Payee nor any other holder of the Subordinated Debt will (i) commence (unless the DIP Agent or other Secured Parties, as applicable, or other holders of the Senior Debt shall have commenced) any action or proceeding against the Payor to recover all or any part of the Subordinated Debt or (ii) join with any creditor (unless the DIP Agent or other Secured Parties, as applicable, or other holders of the Senior Debt shall also join) in bringing any proceeding against the Payor under the United States Bankruptcy Code or any other state, federal or foreign insolvency statute unless and until, in each case, the Senior Debt shall have been irrevocably paid in full. Neither the Payee nor any other holder of the Subordinated Debt will ask, demand, sue for, take or receive from the Payor, directly or indirectly, in cash, property or securities or by set off or in   any other manner (including, without limitation, from or by way of attachment or seizure of or foreclosure upon any property or assets of the Payor which may now or hereafter constitute collateral for any Subordinated Debt), payment of all or any part of the Subordinated Debt if an Event of Default shall have occurred and be continuing under the Credit Agreement or under any other agreement or instrument evidencing or securing the Senior Debt unless and until all Senior Debt shall have been

irrevocably paid in full or the benefits of this sentence waived by or on behalf of the Secured Parties or the other holder or holders of the Senior Debt.

**Section 8.**      **Subrogation**. The Payee or other holder from time to time of the Subordinated Debt shall be subrogated to the rights of the holders of the Senior Debt to receive payments or distributions of assets of the Payor applicable to the Senior Debt until all amounts owing on the Subordinated Debt has been paid in full; provided that neither the Payee nor any other holder of the Subordinated Debt shall enforce any payment by way of subrogation (whether contractual, under Section 509 of the United States Bankruptcy Code or otherwise) until the Commitments have been terminated and the principal of and interest on the Notes and all other amounts payable under or with respect to the Senior Debt have been irrevocably paid in full. For the purposes of the rights of subrogation set forth in this Section 8, no payments or distributions to any Secured Party or other holder or holders of the Senior Debt of any cash, property or securities to which the Payee or other holder or holders of the Subordinated Debt would be entitled but for the provisions of this Annex A, and no payments over pursuant to the provisions of this Annex A to any Secured Party or other holder or holders of the Senior Debt by the Payee or other holder or holders of the Subordinated Debt, shall, as among the Payor, its creditors (other than the Secured Parties and any other holder or holders of the Senior Debt) and the Payee and other holder or holders of the Subordinated Debt, be deemed to be a payment or distribution by the Payor to or on account of the Senior Debt, it being understood that the provisions of this Annex A are
solely for the purpose of defining the relative rights of the Secured Parties or any other holder or holders of the
Senior Debt and the Payee and any other holder or holders of the Subordinated Debt.

If any payment or distribution to which the Payee or other holder or holders of the Subordinated Debt would otherwise have been entitled but for the provisions of this Annex A shall have been applied, pursuant to the provisions of this Annex A, to the payment of all amounts payable under the Senior Debt, then the Payee or other holder or holders of the Subordinated Debt shall be entitled to receive from the Secured Parties or other holder or holders of the Senior Debt at the time outstanding any payments or distributions received by the Secured Parties or such holder or holders of the Senior Debt in excess of the amount sufficient to irrevocably pay all amounts under or in respect of the Senior Debt in full.

**Section 9.**      **Waiver of UCC Provisions**.   If any applicable provisions of the Uniform Commercial Code as in effect in the State of New York or any other relevant jurisdiction (the "UCC") requires the DIP Agent, the Collateral Agent or any other Secured Party or holder of the Senior Debt or any representative thereof to notify the Payee or other holder of the Subordinated Debt that the DIP Agent, the Collateral Agent or such other Secured Party or holder or representative thereof will foreclose or otherwise realize upon any collateral or other property provided to secure the Senior Debt, whether pursuant to Article 5 of the UCC or otherwise, the Payee and each other holder from time to time of the Subordinated Debt by its acceptance thereof hereby waives, to the extent permitted by applicable law, all such required notice(s) and, to the extent such requirement of notice may not be waived under applicable law, agrees that five Business Days' written notice of any such foreclosure or other realization shall be commercially reasonable. The Payee and each other holder from time to time of the Subordinated Debt by its acceptance thereof further waives, to the extent permitted by applicable law, any and all rights it may have to require the DIP Agent, the Collateral Agent or any other Secured Party or other holder of the Senior Debt or representative thereof to marshal any collateral or other property provided as security for the Senior Debt and any and all other rights and remedies now or hereafter available to the Payee or such other holder of the Subordinated Debt under Section 9-504 of the UCC. The Payee and each other holder from time to time of the Subordinated Debt by its acceptance thereof agrees that the DIP Agent, the Collateral Agent and any other Secured Party or holder of the Senior Debt or representative thereof may sell inventory that constitutes collateral or other security for any Senior Debt pursuant to a repurchase agreement, that such sale shall not be deemed a transfer subject to Section 9-504(5) of the UCC or any

similar provisions of any other applicable law (such provisions, to the extent otherwise applicable to such sale, being hereby waived), and that the repurchase of inventory by a seller under a repurchase agreement shall be a commercially reasonable method of disposition.

**Section 10.    Proofs of Claim.**  The Payee and each other holder from time to time of Subordinated Debt may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Payee or such other holder allowed in any judicial proceedings relative to the Payor, its creditors or its property. If the Payor or any other holder from time to time of Subordinated Debt files any claim, proof of claim or similar instrument in any judicial proceeding referred to above and all Senior Debt has not been irrevocably paid in full, the Payor or such other holder shall (i) file such claim, proof of claim or similar instrument on behalf of the other holder or holders of the Senior Debt as such Secured Parties' or other holder's or holders' interests may appear and (ii) take all such other actions as may be appropriate to ensure that all payments and distributions made in respect of any such proceedings are made to the DIP Agent or other Secured Parties, as applicable, and any other holder or holders of the Senior Debt as its or their interests may appear.

Any term or provision of this Section 10 to the contrary notwithstanding, if any judicial proceeding referred to above is commenced by or against the Payor, and so long as all Senior Debt has not been irrevocably paid in full: (i) the DIP Agent, the Secured Parties, or any other holder or holders of the Senior Debt or representatives thereof are hereby irrevocably authorized and empowered (in each case, in its own name, as administrative agent or representative on behalf of the Secured Parties or in the name of the Payee or any other holder or holders from time to time of the Subordinated Debt or otherwise), but shall have no obligation, to (A) demand, sue for, collect and receive every payment or distribution received in respect of any such proceeding and give acquittance therefor and to file claims and proofs of claims and (B) exercise any voting rights otherwise attributable to the Payee or other holders of the Subordinated Debt in any such proceeding; (ii) the Payee or such other holder or holders of the Subordinated Debt shall duly and promptly take, for the account of the Secured Parties and any other holders or holders of the Senior Debt, such action as the DIP Agent, the Secured Parties or other holder or holders of the Senior Debt or representatives thereof may request to collect all amounts payable by the Payor in respect of the Subordinated Debt and to file the appropriate claims or proofs of claim in respect of the Subordinated Debt; and (iii) the Payee and each other holder of Subordinated Debt shall, at the request of the DIP Agent, the Secured Parties or other holder or holders of the Senior Debt or representatives thereof duly and promptly consent to or join in or stipulate its agreement with any action or position which the Secured Parties and each other holder of the Senior Debt may take in any such judicial proceeding referred to above, including, without limitation, such actions and positions as the Secured Parties may take with respect to requests for relief from the automatic stay, for authority to use cash collateral or to use, sell or lease other property of the estate, for assumption, assignment or rejection of any executory contract and to obtain credit. The Payee and each other holder from time to time of Subordinated Debt by its acceptance thereof hereby appoints the DIP Agent, the Collateral Agent or the other Secured Parties, as applicable, or other holder or holders of the Senior Debt or representatives thereof as its agent(s) and attorney(s) in fact, all acts of such attorney(s) being hereby ratified and confirmed and such appointment(s), being coupled with an interest, being irrevocable until the Senior Debt is irrevocably paid in full, to exercise the rights and file the claims referred to in this Section 10 and to execute and deliver any documentation necessary for the exercise of such rights or to file such claims. Notwithstanding anything to the contrary contained herein, neither the Payee nor any other holder of Subordinated Debt shall file any claim or take any action which competes or interferes with the rights and interests of the Secured Parties or any other holders of the Senior Debt under the Credit Agreement and other DIP Loan Documents or any other agreement or instrument evidencing or securing the Senior Debt. Until the Senior Debt has been irrevocably paid in full, neither the Payee nor any other holder of the Subordinated Debt will (in any proceeding of the type described in Section 2(a)) discharge all or any portion of the obligations of the Payor in respect of the Subordinated Debt, whether by forgiveness,

receipt of capital stock, exercise of conversion privileges or otherwise, without the prior written consent of the DIP Agent or the other Secured Parties, as applicable.

**Section 11.**    **Obligation of the Payor Unconditional.** Nothing contained in this Annex A or in the Intercompany Note is intended to or shall impair, as between the Payor and the holder of the Intercompany Note, the obligation of the Payor, which is absolute and unconditional, to pay to the holder of the Intercompany Note the principal of and interest on the Intercompany Note as and when the same shall become due and payable in accordance with their terms, or is intended to or shall affect the relative rights of the holder of the Intercompany Note and creditors of the Payor other than the holders of the Senior Debt, nor shall anything herein or therein, except as expressly provided, prevent the holder of the Intercompany Note from exercising all remedies otherwise permitted by applicable law, subject to the rights, if any, under this Annex A of the holders of Senior Debt in respect of cash, property, or securities of the Payor received upon the exercise of any such remedy. Upon any distribution of assets of the Payor referred to in this Annex A, the holder of the Intercompany Note shall be entitled to rely upon any order or decree made by any court of competent jurisdiction in which such dissolution, winding up, liquidation or reorganization proceedings are pending, or a certificate of the liquidating trustee or agent or other Person making any distribution to the holder of the Intercompany Note, for the purpose of ascertaining the Persons entitled to participate in such distribution, the holders of the Senior Debt and other indebtedness of the Payor, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Annex A.

**Section 12.**    **Reinstatements in Certain Circumstances.** If, at any time, all or part of any payment with respect to Senior Debt theretofore made by the Payor or any other Person is rescinded or must otherwise be returned by the holders of Senior Debt for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of Payor or such other Persons), the subordination provisions set forth herein shall continue to be effective or be reinstated, as the case may be, all as though such payment had not been made.

**Exhibit I**

**Form of Loan Party Accession Agreement**

**LOAN PARTY ACCESSION AGREEMENT** dated as of [___] among AMF BOWLING WORLDWIDE, INC., the NEW LOAN PARTY referred to herein and CREDIT SUISSE, CAYMAN ISLANDS BRANCH, as DIP Agent and Collateral Agent.

AMF Bowling Worldwide, Inc., a Delaware corporation (together with its successors and permitted assigns, the "Borrower"), entered into a Senior Secured Debtor-In-Possession Credit Agreement dated as of November [__], 2012 (as amended, restated, modified or supplemented, from time to time, the "Credit Agreement") among Kingpin Intermediate Corp. ("Holdings"), Borrower, the banks and other lending institutions from time to time party thereto and Credit Suisse, Cayman Islands Branch, as Issuing Lender and DIP Agent. Capitalized terms defined in the Credit Agreement and not otherwise defined herein have, as used herein, the respective meanings provided for therein.

[New Loan Party Name], [New Loan Party Description] (the "New Loan Party"), was [formed] [acquired] by [the Borrower] [Name of Immediate Parent Company], [Description of Immediate Parent Company] and is a [Wholly-Owned] Subsidiary of the Borrower], [DESCRIBE FORMATION OR ACQUISITION TRANSACTION, AS APPLICABLE].

Section 6.10 of the Credit Agreement requires each Subsidiary (other than certain Foreign Subsidiaries, the Qubica Joint Venture and non-Wholly-Owned Liquor License Subsidiaries) formed or acquired by Holdings or the Borrower or any of their respective Subsidiaries after the Closing Date to become an additional "Guarantor" and a "Loan Party" to the Credit Agreement.  To induce the Lenders to make or maintain extensions of credit to the Borrower under the Credit Agreement and the other DIP Loan Documents referred to therein, and as consideration for extensions of credit previously made to the Borrower, the New Loan Party has agreed to execute and deliver this Loan Party Accession Agreement (as the same may be amended, supplemented or modified from time to time, this "Agreement") in order to evidence its agreement to become a "Guarantor" and a "Loan Party" under the Credit Agreement. Accordingly, the parties hereto agree as follows:

**Section 1.**     **Joinder**.  In accordance with Section 6.10 of the Agreement, the New Loan Party hereby: (i) agrees that, by execution and delivery of a counterpart signature page to the Credit Agreement in the form attached hereto, the New Loan Party shall become a "Guarantor" and a "Loan Party" under the Credit Agreement with the same force and effect as if originally named therein, (ii) acknowledged receipt of a copy of and agrees to be obligated and bound as a "Guarantor" and a "Loan Party" by all of the terms and provisions of the Credit Agreement, (iii) grants to the Collateral Agent for the benefit of the Secured Parties a continuing security interest in the Collateral, in each case to secure the full and punctual payment of the Obligations in accordance with the terms thereof and to secure the performance of all of the obligations of each Loan Party under the Credit Agreement and the other DIP Loan Documents and (iv) acknowledges and agrees that, from and after the date hereof, each reference in the Credit Agreement a "Guarantor" or a "Loan Party" shall be deemed to include the New Loan Party. The New Loan Party hereby waives acceptance by the DIP Agent and the Secured Parties of the guarantee by the New Loan Party under the Credit Agreement upon the execution and delivery by each of the New Loan Party of the counterpart signature referred to herein.

**Section 2.**     **Representations and Warranties.** The New Loan Party hereby represents and warrants that:

(a)      This Agreement has been duly authorized, executed and delivered by the New Loan Party, and each of this Agreement, the Credit Agreement and each of the other DIP Loan Documents to which the New Loan Party is a party, as acceded to hereby by the New Loan Party, constitutes a valid and binding agreement of the New Loan Party, enforceable against the New Loan Party in accordance with its terms, except in each case as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforceability of creditors' rights generally and by equitable principles of general applicability (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(b)      Each of the representations and warranties contained in the Credit Agreement and each of the other DIP Loan Documents to which the New Loan Party is a party is true and correct in all material respects as of the date hereof (unless they specifically relate back to an earlier date, then such representations and warranties are true and correct as of such date), with the same effect as though such representations and warranties had been made on and as of the date hereof after giving effect to the accession of the New Loan Party as an additional "Guarantor" and an additional "Loan Party" under the Credit Agreement.

(c)      Attached hereto as <u>Exhibit A</u> is a correct and complete Perfection Certificate relating to the New Loan Party and its Collateral.

**Section 3.      Effectiveness**.  This Agreement and the accession of the New Loan Party to the Credit Agreement as provided herein shall become effective with respect to the New Loan Party when (i) the DIP Agent shall have received a counterpart of this Agreement duly executed by such New Loan Party and (ii) the DIP Agent and/or the Collateral Agent, as applicable, shall have received a duly executed counterpart signature pages to the Credit Agreement as contemplated hereby.

**Section 4.      Integration; Confirmation**.   On and after the date hereof, the Credit Agreement and the schedules thereto shall be supplemented as expressly set forth herein; all other terms and provisions of each of the Credit Agreement and the other DIP Loan Documents and the respective schedules thereto shall continue in full force and effect and unchanged and are hereby confirmed in all respects.

**Section 5.      Expenses**. The New Loan Party agrees to pay (i) all out-of-pocket expenses of the Agents, including reasonable and documented fees and disbursements of special and local counsel for the Agents, in connection with the preparation, execution and delivery of this Agreement and any document or agreement contemplated hereby and (ii) all taxes which the Collateral Agent or any Secured Party may be required to pay by reason of the security interests granted in the Collateral (including any applicable transfer taxes).

**Section 6.      GOVERNING LAW**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (INCLUDING, WITHOUT LIMITATION, SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES, EXCEPT AS OTHERWISE REQUIRED BY MANDATORY PROVISIONS OF LAW.

**Section 7.      Counterparts**. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement may be transmitted and/or signed by facsimile and if so transmitted or signed, shall, subject to requirements of law, have the same force and effect as a manually signed original and shall be binding on the New Loan Party, the Agents and the Secured Parties. The DIP Agent

may also require that this Agreement be confirmed by a manually signed original hereof; provided, however, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile document or signature.

**[Signature Pages to Follow]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

AMF BOWLING WORLDWIDE, INC.

By. _____
Name:
Its:

[NEW LOAN PARTY NAME]

By. _____
Name:
Its:

Credit Suisse, Cayman Islands Branch, as DIP Agent and Collateral Agent

By. _____
Name:
Its:

By. _____
Name:
Its:

**EXHIBIT A**

**PERFECTION CERTIFICATE**

**<u>Exhibit L</u>**

**Form of Secretary's Certificate**

**[NAME OF COMPANY]**

**<u>SECRETARY'S CERTIFICATE</u>**

**NOVEMBER __, 2012**

I, _____, hereby certify that I am the duly elected, qualified and acting Secretary of _____, a _____ (the "<u>Company</u>") and am authorized to execute this Certificate on behalf of the Company.  This Certificate is delivered pursuant to the Senior Secured Debtor-In-Possession Credit Agreement (the "<u>Agreement</u>") dated as of the date hereof, among Kingpin Holdings, LLC, a Delaware limited liability company, Kingpin Intermediate Corp., a Delaware corporation, AMF Bowling Worldwide, Inc., a Delaware corporation and a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code, each of the other Loan Parties party thereto, as debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code, the banks, other financial institutions and other Persons from time to time party thereto (the "<u>DIP Lenders</u>") and Credit Suisse, Cayman Islands Branch, as Issuing Lender and DIP Agent.  Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Agreement.

Solely in my capacity as _____ of the Company and not in my individual capacity, I certify as of the date hereof that:

(a)    Attached hereto as <u>Exhibit A</u> is a true, accurate and complete copy of the Certificate of Formation of the Company (including any amendments thereto, the "<u>Charter</u>").   Except as attached hereto, no document with respect to an amendment thereto has been filed in the office of _____, and no actions have been taken by the Company in contemplation of the dissolution, liquidation, bankruptcy, receivership, merger or consolidation of the Company.  The Charter of the Company has not been modified or amended, except as shown, rescinded or revoked, and is in full force and effect.

(b)    Attached hereto as <u>Exhibit B</u> is a true, accurate and complete copy of the amended and restated _____ of the Company (including any further amendments thereto, the "<u>Operating Agreement</u>") in effect as of the date hereof.  The Operating Agreement of the Company have not been modified or amended, except as shown, rescinded or revoked, and are in full force and effect.

(c)    Attached hereto as <u>Exhibit C</u> is a true, accurate and complete copy of the resolutions duly adopted by the managers (the "<u>Managers</u>"), of the Company approving and authorizing the execution, delivery and performance of the Agreement and the other DIP Loan Documents to be entered into or delivered by the Company and each of the other agreements, instruments, certificates and documents contemplated thereby, and the consummation of all of the other transactions contemplated thereby.  Such resolutions have not been amended, rescinded, revoked or modified since their adoption and remain in full force and effect as of the date hereof and there are no inconsistent or conflicting resolutions that have been adopted by the Managers of the Company.

(d)    The persons whose names appear on <u>Exhibit D</u> hereto are as of the date hereof duly elected, qualified and acting officers of the Company occupying the offices set forth adjacent to their respective names on <u>Exhibit D</u>, and the signatures set forth adjacent to their respective names are their true signatures, and each such officer is and was at the time of signing duly authorized and empowered to execute and deliver on behalf of the Company the Agreement and the other DIP Loan Documents to which the Company is a party, and each of the other agreements, instruments, certificates and documents contemplated thereby and to act as an authorized officer on behalf of the Company under the Agreement, the other DIP Loan Documents and each of the other agreements, instruments, certificates and documents contemplated thereby.

(e)    Attached hereto as <u>Exhibit E</u> is a copy of a written confirmation from the office of _____ of the Company, dated as of a recent date herewith, confirming that the Company is in good standing in _____.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Company as of the date hereof.

By: _____
Name:
Title:

The undersigned, being the duly elected and qualified _____ of the Company, hereby certifies that _____ is the duly elected and qualified Secretary of the Company and that the foregoing signature appearing above his name is his genuine signature.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Company as of the date hereof.

By: _____
Name:
Title:

## Exhibit A

**Charter**

Attached.

## <u>Exhibit B</u>

**Operating Agreement**

Attached.

## **Exhibit C**

**Resolutions**

Attached.

**Exhibit D**

**Incumbency**

| **Name** | **Office** | **Signature** |
|---|---|---|
|  |  | _____ |
|  |  | _____ |
|  | Secretary | _____ |

*Incumbency Certificate*

# **EXHIBIT E**

## **Certificate of Good Standing**